UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

—————————————————————————

H.E. AMIR M. HAMZA; and FRANCIS
ARTHUR YAKEL,

                 Plaintiffs,

v.

ATHANASIOS DIMADIS KOTSIDIS;
MAROULA KOTSIDOU; VILLAGE OF
PHILMONT; CHIEF VERNON DOYLE;
JASON DETZEL; BOB MACFARLANE;
U-HAUL, INC.; NEW YORK DEP'T OF
ENVTL. CONSERVATION; PHILIP
TKACY; DOUGLAS CROPPER; CARLA
INGERSOLL; MORGAN KLIMA;
HUDSON RENTALS & GARDEN
DESIGN; NEW YORK STATE POLICE;
and TROOPER MIGUEL RODRIGUEZ,

                 Defendants.

1:25-CV-0968
(ECC/ML)

—————————————————————————

H.E. AMIR M. HAMZA,

                 Plaintiff,

v.

CHRIS LIBERATI-CONTANT; ZECHARIAH
DAVIDSON-CUNNINGHAM, in his
individual capacity; ATHANASIOS DIMADIS
KOTSIDIS, in his individual capacity, also
known as Thanos; and MAROULA KOTSIDOU,
in her individual capacity also known as Marou,

                 Defendants.

1:25-CV-1429
(ECC/ML)

—————————————————————————

H.E. AMIR M. HAMZA,

                  Plaintiff,

                                          1:25-CV-1506

v.                                         (ECC/ML)

ATHANASIOS DIMADIS KOTSIDIS also
known as Thanos Dimadis; MAROULA
KOTSIDOU; THE GOVERNMENT OF
THE HELLENIC REPUBLIC, (Greece);
ASSOCIATION OF FOREIGN PRESS
CORRESPONDENTS IN THE USA, INC.,
(AFPC-USA); THE GEORGE WASHINGTON
UNIVERSITY GRADUATE SCHOOL OF
POLITICAL MANAGEMENT, (GSPM); and
THE UNITED STATES DEPARTMENT OF
STATE,

                  Defendants.

_____

APPEARANCES:                               OF COUNSEL:

H.E. AMIR M. HAMZA
  Plaintiff, *Pro Se*
16 Elm Street
Philmont, New York 12075

FRANCIS ARTHUR YAKEL
  Plaintiff, *Pro Se*
Post Office Box 281
Philmont, New York 12565

MIROSLAV LOVRIC, United States Magistrate Judge

## <u>ORDER and REPORT-RECOMMENDATION</u>

The Clerk has sent *pro se* pleadings in the above captioned actions[1] together with applications to proceed *in forma pauperis*, filed by H.E. Amir M. Hamza and Francis Arthur Yakel (collectively "Plaintiffs") to this Court for review.  For the reasons discussed below, I (1) grant Plaintiffs' *in forma pauperis* applications, and (2) recommend that Plaintiffs' pleadings be dismissed in their entirety.

---

[1]    *Hamza, et al. v. Kotsidis, et al.*, 1:25-CV-0968 (ECC/ML) ("*Hamza I*"); *Hamza v. Liberati-Conant, et al.*, 1:25-CV-1429 (ECC/ML) ("*Hamza II*"); and *Hamza v. Kotsidis, et al.*, 1:25-CV-1506 (ECC/ML) ("*Hamza III*").

## TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................... 1

   A.  *Hamza I* Second Amended Complaint ........................................... 1

   B.  *Hamza II* Complaint ...................................................................... 17

   C.  *Hamza III* Complaint ..................................................................... 18

II.   PLAINTIFFS' APPLICATIONS TO PROCEED *IN FORMA PAUPERIS* ............. 20

III.   GOVERNING LEGAL STANDARDS ................................................. 23

   A.  Legal Standard for Initial Review of the Complaint .................... 23

   B.  Legal Standard Governing Consolidation .................................... 25

IV.   ANALYSIS ............................................................................................. 25

   A.  Consolidation ................................................................................. 26

   B.  *Hamza I* .......................................................................................... 26

      1.  Failure to Comply with Fed. R. Civ. P. 8(a) ...................... 26

      2.  Plaintiffs' Claims are Frivolous ......................................... 26

      3.  Claims Pursuant to 42 U.S.C. § 1983 ............................... 27

      4.  Claims Pursuant to 42 U.S.C. § 1985 ............................... 60

      5.  State Law Claims ................................................................ 61

   C.  *Hamza II* ........................................................................................ 62

      1.  Plaintiff Hamza's Claims Are Frivolous ........................... 62

      2.  Claims Pursuant to 42 U.S.C. § 1983 ............................... 63

      3.  Claims Pursuant to 42 U.S.C. § 1985 ............................... 70

   D.  *Hamza III* ...................................................................................... 70

      1.  Plaintiff Hamza's Claims Are Frivolous ........................... 70

      2.  Claims Pursuant to 42 U.S.C. § 1983 ............................... 71

      3.  Claims Pursuant to 42 U.S.C. § 1985 ............................... 72

      4.  State Law Claims ................................................................ 72

V.   OPPORTUNITY TO AMEND ............................................................. 73

VI.   PLAINTIFF HAMZA'S MOTIONS IN *HAMZA III* FOR A PRESERVATION ORDER, EXPEDITED DISCOVERY, AND A COURT CONFERENCE .......................... 76

I.    **BACKGROUND**

A.    *Hamza I* **Second Amended Complaint**[2]

Construed as liberally[3] as possible, the Second Amended Complaint in *Hamza I* alleges

that Plaintiffs' constitutional rights were violated by defendants Athanasios Dimadis Kotsidis,

Maroula Kotsidou,[4] Village of Philmont, Chief Vernon Doyle, Jason Detzel, Bob Macfarlane, U-

Haul, Inc., New York Department of Environmental Conservation, Philip Tkacy, Douglas

Cropper, Carla Ingersoll, Morgan Klima, Hudson Rentals and Garden Design, Trooper Miguel

Rodriguez, and New York State Police (collectively "Defendants").  (*See generally Hamza I*,

Dkt. No. 50.)

The Second Amended Complaint consists of 154-pages of rambling allegations that

appear to all relate in some capacity to a neighborly dispute between Plaintiffs—who own 16

Elm Street, Philmont, New York—and Defendants Kotsidis and Kotsidou—who own 14 Elm

Street, Philmont, New York.[5]  (*See generally Hamza I*, Dkt. No. 50.)

---

[2]    The filing of an amended complaint moots the original pleading.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.")  As a result, the Court has not considered Plaintiffs' original Complaint (*Hamza I*, Dkt. No. 1) or amended complaint (*Hamza I*, Dkt. No. 40).

[3]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[4]    The Clerk of the Court is directed to update the docket to reflect that the correct spelling of Defendant Kotsidou's first name is "Maroula."  (*Hamza I*, Dkt. No. 12; *Hamza I*, Dkt. No. 40 at 1; *Hamza I*, Dkt. No. 50 at 1.)

[5]    Defendant Anthanasios Kotsidis filed an action in New York State Court against Plaintiffs that asserts the following three claims: (1) a claim of trespass, (2) a claim of nuisance, and (3) a claim of negligence.  *Kotsidis v. Hamza*, New York State Supreme Court Columbia County, E012025024455.

The Second Amended Complaint alleges that Plaintiff Hamza sought to become a volunteer firefighter with the Village of Philmont Volunteer Fire Department but his application was rejected by Defendant Village of Philmont's Trustees, and Defendant Detzel informed him that it was rejected because the Trustees perceived Plaintiff Hamza as a "rabble rouser." (*Hamza I*, Dkt. No. 50 at 21.)  The Second Amended Complaint alleges that the rejection of Plaintiff Hamza's volunteer firefighter application was in retaliation for Plaintiff Hamza's engagement in protected speech and was based in whole or in part on his sexual orientation.  (*Id*. at 21-23.)

The Second Amended Complaint alleges that in 2020, Defendant Village of Philmont selectively cited Plaintiffs for having two unregistered vehicles on their private property while the Department of Motor Vehicles was closed and expirations were temporarily extended due to the COVID-19 shutdown.  (*Hamza I*, Dkt. No. 50 at 24-27.)

Plaintiffs allege that in the summer of 2022, Plaintiff Hamza observed Defendant Cropper filming Plaintiff Hamza's minor son and another child riding quad bikes in the Canal Street lot.  (*Id*. at 27.)  Plaintiffs allege that Plaintiff Hamza confronted Defendant Cropper about recording minors without parental consent and since the confrontation, Plaintiffs have documented instances of vehicles associated with Defendants Detzel, Macfarlane, and Cropper lingering on or near Elm Street.  (*Id*. at 27-28.)

Plaintiffs allege that Defendants Kotsidis and Kotsidou used their close relationship with Defendant Cropper to initiate or escalate municipal action against Plaintiffs.  (*Hamza I*, Dkt. No. 50 at 29.)  Plaintiffs allege that, for example, on July 9, 2025, they observed Defendant Cropper's vehicle pass by on Elm Street two times "without any apparent municipal purpose or prior precedent."  (*Id*.)  Plaintiffs allege that this constituted "targeted surveillance and retaliation for [their] protected speech and petitioning activity."  (*Id*. at 30.)

Plaintiffs allege that in summer 2024, Defendants Kotsidis and Kotsidou placed bicycles in the traveled portion of Elm Street directly in front of their property, which obstructed travel. (*Hamza I*, Dkt. No. 50 at 32.) Plaintiffs allege that they summoned Defendant Tkacy and Officer Zobel of the Philmont Police Department regarding the bicycles in the road but that no action was taken to remove the bicycles or enforce the law against Defendants Kotsidis and Kotsidou. (*Id.* at 42.) The Second Amended Complaint alleges that "[e]ventually Trooper TORCHIA" instructed Defendants to remove the bicycles from the roadway. (*Id*. at 43.)

The Second Amended Complaint alleges that Defendant Kotsidis and Kotsidou instigated confrontations with Plaintiffs regarding on-street parking on Elm Street. (*Hamza I*, Dkt. No. 50 at 33-35.) Plaintiffs allege that on July 16, 2024, Defendants Kotsidis and Kotsidou positioned bicycles surrounding Plaintiff Hamza's legally parked truck, which effectively immobilized the truck. (*Id*. at 43.) The Second Amended Complaint alleges that Trooper Torchia removed the bicycles from around Plaintiff Hamza's vehicle and inquired why Plaintiffs had not removed the bicycles themselves. (*Id*.)

Plaintiffs allege that on July 16, 2024, Defendant Kotsidou lodged an environmental complaint with Trooper Torchia regarding oil that leaked from Plaintiff Hamza's truck. (*Hamza I*, Dkt. No. 50 at 44.)

The Second Amended Complaint alleges that during summer 2025, third party Howard Higgley and his family came to Plaintiffs' residence to view a vehicle that Plaintiffs were selling. (*Hamza I*, Dkt. No. 50 at 36.) Plaintiffs allege that Defendants Kotsidis and Kotsidou blew a car horn and accused Plaintiffs and the Higgley family of loitering and trespassing. (*Id*.) Plaintiffs allege that the Higgley family then left without purchasing the vehicle, which terminated the business opportunity for Plaintiffs. (*Id*.)

Plaintiffs allege that Defendants posted derogatory commentary about Plaintiffs to the Philmont Community Board on Facebook. (*Hamza I*, Dkt. No. 50 at 40.)

Plaintiffs allege that Defendants Kotsidis and Kotsidou harassed other neighbors, Shawn and Jaime Lauragne. (*Hamza I*, Dkt. No. 50 at 44-47.)

The Second Amended Complaint alleges that on June 27, 2025, Plaintiffs were approached by Defendant Tkacy, who informed them that two of their three vehicles had suspended registrations based on the review of an automated license plate reader. (*Hamza I*, Dkt. No. 50 at 47.) Plaintiffs allege that they presented updated insurance information to Defendant Tkacy but that he stated he "did not care" and threatened to tow the vehicles. (*Id*.) The Second Amended Complaint alleges that Defendant Tkacy directed Plaintiffs to move the vehicles to the Family Dollar parking lot and instructed Plaintiffs not to tell Defendant Doyle about the conversation because Defendant Doyle "demanded the vehicles be removed that night." (*Hamza I*, Dkt. No. 50 at 48.) Plaintiffs allege that they had consumed alcohol that night and could not legally or safely move the vehicles. (*Id*.) Plaintiffs allege that they felt specifically targeted by Defendants Village of Philmont and that Defendant Tkacy "admitted that the enforcement action was initiated only after complaints were made by Defendants [Kotsidis and Kotsidou], even though the vehicles were legally parked." (*Id*. at 49.) Plaintiffs allege that the actions of employees of Defendant Village of Philmont were motivated by discriminatory animus against Plaintiffs based on their sexual orientation and national origin. (Dkt. No. 50 at 50.) Plaintiffs allege that Defendants Kotsidis and Kotsidou engaged in a municipal conspiracy with Defendant Village of Philmont in retaliation against Plaintiffs. (*Id*. at 52.)

Plaintiffs allege that Plaintiff Hamza and Defendant Detzel "engaged [in a] heated conversation by email regarding Plaintiff H[amza]'s DD 214," which resulted in Defendant

Detzel defaming Plaintiff Hamza in front of Defendants Macfarlane, Tkacy, and Doyle.  (*Hamza I*, Dkt. No. 50 at 52.)

The Second Amended Complaint alleges that on June 2, 2025, Plaintiffs proposed a written cross-easement/shared driveway solution for their property and the property owned by Defendants Kotsidis and Kotsidou.  (*Hamza I*, Dkt. No. 50 at 56.)  Plaintiffs allege that Defendants Kotsidis and Kotsidou rejected the proposal.  (*Id.* at 57.)  Plaintiffs allege that Plaintiff Hamza owns a motorcycle that became landlocked in the back yard.  (*Id*. at 58.)  Plaintiffs allege that they had an easement to their backyard through 11 Elm Street, which is owned by a third-party, but a fence was installed preventing Plaintiffs from accessing their backyard.  (*Id*.)  Plaintiffs allege that they obtained donated fill from the Town of Claverack to create a driveway/ramp on their property to access the landlocked motorcycle and help manage drainage.  (*Id*. at 60.)

The Second Amended Complaint alleges that Defendant Kotsidis falsely alleged that Plaintiff Hamza colluded with the Town of Claverack to intentionally damage his fence and structurally weaken it.  (*Hamza I*, Dkt. No. 50 at 60.)  Plaintiffs allege that Defendant Kotsidis also falsely accused Plaintiff Hamza of throwing rocks at his fence.  (*Id*. at 61.)  Plaintiffs allege that Defendants Kotsidis and Kotsidou blocked access to the ramp area that Plaintiff Hamza was building which impeded additional deliveries of donated fill.  (*Id*. at 61-62.)

Plaintiffs allege that Defendants Kotsidis and Kotsidou accused Plaintiff Hamza of hitting their rented U-Haul with his trailer but that the claim was unfounded.  (*Hamza I*, Dkt. No. 50 at 64.)

The Second Amended Complaint alleges that on August 24, 2025, Plaintiff Hamza was attempting to level the ground on the side of his house.  (*Hamza I*, Dkt. No. 50 at 65-66.)

Plaintiffs allege that at approximately 6:00 p.m., Defendant Kotsidou recorded Plaintiff Hamza "without justification." (*Id*. at 66.) Plaintiffs allege that Plaintiff Hamza asked Defendant Kotsidou to stop recording and used a piece of plywood to shield himself. (*Id*.) The Second Amended Complaint alleges that Defendant Kotsidou called authorities and falsely alleged that Plaintiffs were blocking her access. (*Id*. at 67.)

Plaintiffs allege that at various times Defendant Kotsidou has directed her camera into Plaintiffs' front doorway, which was an intentional privacy invasion. (*Id*. at 68.)

Plaintiffs allege that "[f]or many months" Defendants Kotsidis and Kotsidou have placed food outdoors on and around Elm Street, which has "attract[ed] and sustain[ed] a colony of stray/feral cats." (*Hamza I*, Dkt. No. 50 at 69.) Plaintiffs allege that the "animal congregation" has interfered with their use and enjoyment of their property. (*Id*.) More specifically, Plaintiffs allege that Defendants Kotsidis and Kotsidou have harbored a cat ("Orange Kitty"), and that Orange Kitty caused damage to Plaintiff Hamza's vehicle totaling approximately $6,000 in damage. (*Id*. at 70.)

Plaintiffs allege that Defendants Kotsidis and Kotsidou installed a network of fixed and mobile devices to record Plaintiffs in private spaces including their backyard hot tub. (*Hamza I*, Dkt. No. 50 at 81.) Plaintiffs allege that Defendants posted defamatory statements based on the surveillance footage on the public Philmont Community Facebook page. (*Id*. at 84.) Plaintiffs allege that Defendants Kotsidis and Kotsidou shared manipulated recordings with the District Attorney's Office. (*Id*. at 86.)

The Second Amended Complaint alleges that on August 27, 2025, Defendant Kotsidou complained to Defendant Klima, the Village of Philmont Code Enforcement Officer, regarding fires that Plaintiffs had been having on their property. (*Hamza I*, Dkt. No. 50 at 85.) Plaintiffs

allege that Defendant Klima sent Plaintiff Hamza an email, which stated that "[t]here is no burning allowed in NYS villages.  Please refrain from doing this or you risk being fined."  (*Id*.) Plaintiffs perceived Defendant Klima's email as retaliatory and an attempt by Defendant Kotsidou to seek "alternative enforcement channels when unsatisfied with [the outcome of] previous complaints."  (*Id*. at 87.)  Plaintiffs allege that Defendant Klima's email threatened fines without a legal basis which violated their First Amendment rights.  (*Id*. at 87-88.)  In addition, Plaintiffs allege that Defendant Klima threatened to issue a $250 fine for a "structure" and sun deck that "had existed on the property for years—well before KLIMA's involvement and before Defendant [Kotsidou] resided next door."  (*Id*. at 88.)  Plaintiffs allege that thus, their nonconforming structure is "protected and may not be targeted through retroactive or retaliatory enforcement."  (*Id*.)

The Second Amended Complaint alleges that on September 8, 2025, the Philmont Volunteer Fire Department was dispatched to 16 Elm Street based on photos and a video provided by Defendant Kotsidou to Defendant Klima.  (*Hamza I*, Dkt. No. 50 at 78.)  The Second Amended Complaint alleges that Defendant Klima then relayed the complaint to the fire department.  (*Id*. at 79.)  Plaintiffs allege that the Philmont Fire Chief inspected the fire pit/grill and determined that there was no violation of law or code.  (*Id*. at 78.)

The Second Amended Complaint alleges that Plaintiffs' complaints to Defendant Klima about illegally aimed spotlights and surveillance cameras were ignored but that complaints from Defendant Kotsidou "routinely trigger[ed] immediate enforcement against Plaintiffs," which reflects selective enforcement.  (*Hamza I*, Dkt. No. 50 at 89.)

Plaintiffs allege that on July 17, 2024, an officer employed by Defendant New York State Department of Environmental Conservation ("Defendant DEC") issued Plaintiff Hamza an

appearance ticket charging him with a misdemeanor. (*Hamza I*, Dkt. No. 50 at 91.) Plaintiffs allege that the issuing officer incorrectly characterized the ticket as merely administrative in nature, which "constitutes procedural unfairness." (*Id*.) Plaintiffs allege that Plaintiff Hamza was not granted discovery before entering a plea agreement regarding the misdemeanor charge, which violated his rights. (*Id*. at 92, 94.) Plaintiffs allege that Defendants Kotsidis and Kotsidou inundated Defendant DEC with complaints thus "weaponizing the agency's enforcement machinery to harass Plaintiffs." (*Id*. at 93.) The Second Amended Complaint alleges that the plea agreement was forwarded to the Village of Philmont Court where Defendant Ingersoll presided. (*Id*. at 95.)

The Second Amended Complaint alleges that Plaintiff Hamza's plea agreement required that he pay a $50 fine and $75 surcharge. (*Hamza I*, Dkt. No. 50 at 95.) Plaintiff alleges that Defendant Village of Philmont, through Defendant Ingersoll "and other final decisionmakers— declined to dismiss the charge despite notice that the citation was pretextual and retaliatory." (*Id*. at 97.)

Plaintiffs allege that on July 23, 2025, a complaint was lodged with Defendant DEC that was "more than likely initiated by Defendant" Kotsidou. (*Hamza I*, Dkt. No. 50 at 98.) Plaintiffs allege that Defendant DEC determined that the complaint was unfounded. (*Id*.)

Plaintiffs allege that on August 22, 2025, Defendant DEC officer "Josh" responded to Plaintiff's residence regarding a complaint of an oil leak from one of Plaintiffs' vehicles. (*Hamza I*, Dkt. No. 50 at 100.) Plaintiffs allege that the complaint was likely made by Defendants Kotsidis and Kotsidou in retaliation for the filing of this federal action. (*Id*. at 101.) Plaintiffs allege that complaints lodged with Defendant DEC in July and August 2025 reflect

Defendants Kotsidis and Kotsidou acting in concert with state agencies to deprive Plaintiffs of their constitutional rights.  (*Id*. at 104.)

The Second Amended Complaint alleges that on June 26, 2025, Defendant Detzel emailed Plaintiff Hamza and demanded that Plaintiff Hamza provide his DD-214 (a private military discharge document).  (*Hamza I*, Dkt. No. 50 at 108.)  Plaintiffs allege that when Plaintiff Hamza declined to provide the DD-214, Defendant Detzel accused him of lying about his military service.  (*Id*. at 108-09.)  Plaintiffs allege that on June 27, 2025, Defendant Macfarlane published comments on the Philmont Community Facebook page falsely alleging that Plaintiff owed back property taxes in Philmont.  (*Id*. at 109.)  The Second Amended Complaint alleges that Defendant Macfarlane "escalated the harassment by publicly demanding, on Facebook, that Plaintiff [Hamza] produce his DD-214."  (*Id*.)  Plaintiffs allege that the "timing and substance" of Defendant Macfarlane's statements "strongly suggest that [Defendant Detzel]'s defamatory assertions were shared internally and then repeated publicly to discredit Plaintiff" Hamza.  (*Id*. at 110.)

Plaintiffs allege that on June 27, 2025, Defendant Kotsidis parked a "large U-Haul box truck in front of Plaintiffs' home" which obstructed visibility and access.  (*Hamza I*, Dkt. No. 50 at 110.)  The Second Amended Complaint alleges that Plaintiff Hamza posted a public safety warning on the Philmont Community Facebook page and notified Village Trustee Debra Gitterman regarding the risk that the U-Haul posed to drivers, pedestrians, and children.  (*Id*.)  Plaintiffs allege that an anonymous account posted a "defamatory comment" accusing Plaintiff Hamza of "stolen valor" which implied that he fabricated his military service and Plaintiffs believe the comment "stemmed from [Defendant] DETZEL's defamatory remarks."  (*Id*.)

Plaintiffs allege that Plaintiff Hamza "reluctantly posted a redacted copy of his DD-214" but the "defamatory remarks caused humiliation and emotional pain." (*Id*. at 111.)

The Second Amended Complaint alleges that Defendants Village of Philmont, Tkacy, and Doyle engaged in a pattern of targeting Plaintiffs by threatening to tow Plaintiffs' legally parked vehicles. (*Hamza I*, Dkt. No. 50 at 111-12.) Plaintiffs allege the threats were based on "unverified ALPR [automated license plate recognition] flags" and selective enforcement of parking/code rules. (*Id*. at 113.)

The Second Amended Complaint alleges that Defendant U-Haul entered into a rental agreement with Defendant Kotsidis, providing him with a cargo van. (*Hamza I*, Dkt. No. 50 at 115.) Plaintiffs allege that Defendant Kotsidis intentionally parked the U-Haul van on the public roadway directly in front of Plaintiffs' property, which obstructed Plaintiff Hamza's ability to unload stone and conduct repairs on his property. (*Id*.) Plaintiffs allege that Defendant Kotsidis used the van as a tool of harassment and the placement of it in front of Plaintiffs' property "served no legitimate purpose." (*Id*.) Plaintiffs allege that Plaintiff Hamza contacted Defendant U-Haul regarding the "obstructive placement of the van and its impact on construction access at 16 Elm Street." (*Id*. at 116.) The Second Amended Complaint alleges that Defendant U-Haul assured Plaintiff Hamza that the vehicle would be retrieved but failed to follow through. (*Id*.) Plaintiffs allege that Defendant U-Haul, "as owner and lessor of the cargo van, owed a duty of care to Plaintiffs and the general public to ensure that its vehicle was not used in a manner that would cause foreseeable harm." (*Id*. at 117.) Plaintiffs allege that Defendant Kotsidis backed into Plaintiff Hamza's trailer; Plaintiff Hamza notified Defendant U-Haul and sought trailer repairs and retrieval of the van. (*Hamza I*, Dkt. No. 50 at 124.)

The Second Amended Complaint appears to assert—in a convoluted fashion—that Plaintiffs fear their house may be foreclosed by Defendant Village of Philmont and that such foreclosure might result in Defendant Kotsidis and Kotsidou being unjustly enriched.  (*Hamza I*, Dkt. No. 50 at 127-28.)  The Second Amended Complaint alleges that Defendant Village of Philmont improperly revoked Plaintiffs' tax-exempt status in 2025.  (*Id*. at 129.)

The Second Amended Complaint alleges that on August 1, 2025, Plaintiff Hamza was arrested and transported to the New York State Police Trooper barracks without being provided an arrest warrant or *Miranda* warnings.  (*Hamza I*, Dkt. No. 50 at 136-38.)  Plaintiffs allege that Defendant Kotsidis "furthered his campaign of retaliation by filing a 'Notice of Arrest'" on the docket of this action.  (*Id*. at 139.)

Based on these factual assertions, Plaintiffs appear to assert the following fifty-seven causes of action: (1) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 related to the rejection of Plaintiff Hamza's volunteer firefighter application; (2) a claim that their right to equal protection of the law was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to the rejection of Plaintiff Hamza's volunteer firefighter application; (3) a claim that their rights pursuant to the New York State Human Rights Law ("NYSHRL") N.Y. Exec. Law § 296 were violated related to the rejection of Plaintiff Hamza's volunteer firefighter application; (4) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 related to the citation of unregistered vehicles during the COVID-19 shutdown of the New York DMV in 2020; (5) a claim that their right to equal protection of the law was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to Defendants Cropper, Detzel, and Macfarlane driving down Elm Street "without apparent lawful purpose"; (6) a claim of unlawful search and seizure in violation of the Fourth Amendment and

42 U.S.C. § 1983 related to Defendants' threatened impoundment of Plaintiffs' vehicle; (7) a claim that their procedural due process rights were violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to Defendants Tkacy and Doyle threatening to tow Plaintiffs' vehicle on a Friday night when the DMV offices were closed; (8) a claim that their substantive due process rights were violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to the imposition of penalties during the COVID-19 emergency; (9) a claim of conspiracy between Defendants Doyle, Tkacy, Kotsidis, and Kotsidou in violation of 42 U.S.C. § 1985(3); (10) a claim of private nuisance in violation of New York common law related to Defendant Kotsidou blaring a car horn that unreasonably interfered with Plaintiffs' use and enjoyment of their property; (11) a claim of intentional infliction of emotional distress ("IIED") in violation of New York common law related to Defendants' threats, public shaming with doctored images, and repeated baseless police involvement; (12) a claim of trespass to chattels in violation of New York common law related to the surveillance by Defendants Kotsidis and Kotsidou of Plaintiffs' home and interference with Plaintiffs' ability to enjoy their property; (13) a claim of abuse of process in violation of New York common law related to Defendant Kotsidis's instigation of Plaintiff Hamza's arrest based on an altered video; (14) a claim that their rights pursuant to the NYSHRL were violated related to Defendant Doyle's discriminatory animus targeting Plaintiffs based on their sexual orientation and national origin; (15) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 related to the interaction on June 27, 2025, where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (16) a claim that their equal protection rights were violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to the interaction on June 27, 2025, where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (17) a claim of unlawful

search and seizure pursuant to the Fourth Amendment and 42 U.S.C. § 1983 related to the interaction on June 27, 2025, where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (18) a claim that their procedural due process rights pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 were violated related to the interaction on June 27, 2025, where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (19) a claim of abuse of process pursuant to New York common law related to the interaction on June 27, 2025, where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (20) violations of New York Penal Law Sections 195.00, 195.05, 240.26, and 240.30 related to the interaction on June 27, 2025 where Defendant Tkacy threatened to tow Plaintiffs' vehicle based on the ALPR scan; (21) a claim of private nuisance related to Plaintiffs' inability to access Plaintiff Hamza's motorcycle; (22) a claim of trespass to chattels related to Plaintiffs' inability to access Plaintiff Hamza's motorcycle; (23) a claim of defamation per se related to Defendant Kotsidis's allegation that Plaintiff Hamza "colluded with the Town of Claverack to intentionally damage [his] fence and structurally weaken it"; (24) a claim of IIED pursuant to New York common law related to Defendant Kotsidou's false report to law enforcement that Plaintiff Hamza blocked the sidewalk while attempting to retrieve his motorcycle; (25) a claim seeking declaratory and injunctive relief in the form of an order of protection against Defendants Kotsidis and Kotsidou based on their "long and continuing pattern of" surveilling Plaintiffs; (26) a claim of private nuisance related to Defendants Kotsidis and Kotsidou feeding stray cats in and around Elm Street; (27) a claim of trespass to chattels related to Orange Kitty damaging Plaintiff Hamza's vehicle; (28) a claim of negligence related to Defendants Kotsidis and Kotsidou harboring Orange Kitty and the damage caused by Orange Kitty; (29) a claim of IIED related to Defendant Kotsidou's use of slurs related to Plaintiff Hamza's sexual orientation; (30) a claim of

defamation per se related to Defendant Kotsidou's complaint to Defendant Klima that was ultimately relayed to the Philmont Fire Department that Plaintiffs had a fire; (31) a claim that Defendants Kotsidis and Kotsidou violated the New York State Civil Rights Law § 52-a with their repeated recording of Plaintiffs in their backyard; (32) a claim of IIED against Defendants Kotsidis and Kotsidou related to their "constant surveillance" of Plaintiffs' property; (33) a claim of defamation based on the Facebook posts of Defendants Kotsidis and Kotsidou containing surveillance footage; (34) a claim of abuse of process based on Defendants Kotsidis and Kotsidou submitting selectively edited surveillance footage to the Philmont Police "to weaponize government authority as a tool of harassment and defamation"; (35) a claim of abuse of process related to Defendant Kotsidou's pattern of seeking alternative enforcement channels regarding Plaintiffs' fires in an attempt to retaliate against Plaintiffs; (36) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 related to Defendant Klima's threat to issue a $250 fine to Plaintiffs for a structure and sun deck that existed "well before KLIMA's involvement and before Defendant [Kotsidou] resided next door"; (37) a claim that Plaintiffs' rights to equal protection of the law was violated by Defendant Klima ignoring their concerns regarding spotlights and surveillance cameras while complaints from Defendant Kotsidou "routinely trigger[ed] immediate enforcement against Plaintiffs" in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (38) a claim of abuse of process related to Defendants Kotsidis and Kotsidou "inundat[ing]" Defendant DEC with complaints "thereby weaponizing the agency's enforcement machinery to harass Plaintiffs"; (39) a claim of malicious prosecution against Defendants Kotsidis, Kotsidou, DEC, Village of Philmont, and Ingersoll related to the misdemeanor environmental conservation ticket that Plaintiff Hamza pleaded guilty to; (40) a claim of retaliation against Defendants Kotsidis and Kotsidou in violation of the First

Amendment and 42 U.S.C. § 1983 related to their report to Defendant DEC that Plaintiffs' GMC

Sierra was leaking oil; (41) a claim of private nuisance related to Defendants Kotsidis and

Kotsidou filing a baseless complaint with Defendant DEC alleging that Plaintiffs' GMC Sierra

was leaking oil; (42) a claim of civil conspiracy pursuant to 42 U.S.C. § 1985(3) related to

Defendants Kotsidis and Kotsidou conspiring with "police and municipal officials . . . to deprive

Plaintiffs of equal protection of the laws"; (43) a claim of defamation related to Defendant

Macfarlane's comments on the Philmont Community Facebook page regarding Plaintiff Hamza

owing back taxes and demanding that Plaintiff Hamza produce his DD-214; (44) a claim of IIED

against Defendants Detzel, Macfarlane, and Village of Philmont related to Defendant Detzel's

email request for Plaintiff Hamza's DD-214 form and threat to damage Plaintiff Hamza's

reputation if it was not provided; (45) a claim that Plaintiffs' rights to equal protection of the law

pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 were violated by Defendants

Tkacy and Doyle related to the citations issued and threats to tow Plaintiff Hamza's vehicles;

(46) a claim of private nuisance/obstruction of access against Defendant Kotsidou related to his

parking of a U-Haul van "with the specific intent to interfere with Plaintiffs' property access and

enjoyment" including the interference with Plaintiff Hamza's construction and repair efforts;

(47) a claim that Defendant U-Haul was negligent in its failure to act after being informed that

the van it rented to Defendant Kotsidis was being misused; (48) a claim that Defendants Kotsidis

and Kotsidou falsely reported that Plaintiff Hamza struck their rented U-Haul van; (49) a claim

that Plaintiffs' right to equal protection of the law pursuant to the Fourteenth Amendment and 42

U.S.C. § 1983 was violated by Defendant Village of Philmont's selective revocation of

Plaintiffs' tax-exempt status; (50) a claim that Defendants retaliated against Plaintiffs in violation

of the First Amendment and 42 U.S.C. § 1983 when Defendants revoked Plaintiffs' tax-exempt

status, denied code accommodations, and selectively enforced ordinances; (51) a claim that Defendants Kotsidis and Kotsidou have been (and will continue to be) unjustly enriched at Plaintiffs' expense when they intentionally interfered with Plaintiffs' rehabilitation of 16 Elm Street, which depressed the property's value and forced a potential foreclosure; (52) a claim of prima facie tort pursuant to New York common law related to Defendants' actions filing municipal complaints and code enforcement petitions, social media postings, and legal/administrative filings with the sole purpose to injure Plaintiffs' charitable mission and reputation; (53) a claim of false arrest in violation of the Fourth Amendment and 42 U.S.C. § 1983 based on Defendant Rodriguez's arrest of Plaintiff Hamza on August 1, 2025; (54) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 related to Plaintiff's arrest on August 1, 2025; (55) a claim of IIED based on Plaintiff Hamza's fear that Defendants Kotsidis and Kotsidou will fabricate allegations to instigate further arrests of Plaintiff Hamza; (56) a claim of substantive due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 related to Plaintiff Hamza's arrest on August 1, 2025, which was initiated more than six weeks after the alleged incident and based on questionable video; and (57) a claim of IIED related to Plaintiff Yakel losing his job based on Defendants' "multi-year campaign to terrorize Plaintiffs." (*Hamza I*, Dkt. No. 50 at 21-150.)  As relief, Plaintiffs seek "high-end compensatory damages, together with punitive damages" (*Hamza I*, Dkt. No. 50 at 151), declaratory relief, injunctive relief prohibiting further surveillance, harassment, defamatory publications, retaliatory or selective enforcement, and a direction that municipal actors cease retaliation and provide equal access to public services.  (*Id*. at 152.)

B.    *Hamza II* **Complaint**

Construed as liberally[6] as possible, the Complaint in *Hamza II* alleges that Plaintiff Hamza's constitutional rights were violated by defendants Athanasios Dimadis Kotsidis, Maroula Kotsidou, Chris Liberati-Contant, and Zechariah Davidson-Cunningham.  (*See generally Hamza II*, Dkt. No. 1.)  More specifically, the Complaint alleges that Defendants Kotsidis and Kotsidou aimed cameras at Plaintiff Hamza's doors and bedroom window, recorded his backyard, made complaints to law enforcement agencies, and obstructed access to Plaintiff Hamza's property.  (*Hamza II*, Dkt. No 1 at 4.)  The Complaint alleges that during the months of July and August 2025, Plaintiff Hamza repeatedly contacted the Columbia County District Attorney's Office regarding the surveillance and harassment "emanating from 14 Elm Street." (*Id*.)  Plaintiff Hamza alleges that on August 1, 2025, he was seized by law enforcement at home and arresting officers "did not announce an arrest, present a warrant before force, or provide Miranda warnings prior to questioning."  (*Id*.)  Plaintiff Hamza alleges that the "timing/execution strongly indicate[s] a retaliatory purpose aligned with [Defendants Kotsidis and Kotsidou]'s campaign."  (*Id*.)

Based on these factual allegations, Plaintiff Hamza asserts the following seven claims: (1) a claim of retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Defendants Liberati-Conant, Davidson-Cunningham, Kotsidis, and Kotsidou; (2) a claim that his right to equal protection under the law was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 against Defendants Liberati-Conant, Davidson-Cunningham, Kotsidis, and Kotsidou; (3) a claim that his right to procedural and substantive due process was violated

---

6    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto*, 44 F.3d at 173 (quoting *Burgos*, 14 F.3d at 790).

pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (4) a claim of unreasonable

seizure in violation of the Fourth Amendment and 42 U.S.C § 1983; (5) a claim that Plaintiff

Hamza's *Miranda* rights were violated pursuant to the Fifth and Fourteenth Amendments and 42

U.S.C. § 1983; (6) a claim of conspiracy pursuant to 42 U.S.C. § 1983; and (7) a claim of

conspiracy pursuant to 42 U.S.C. § 1985(3).  (*Hamza II*, Dkt. No. 1 at 6-8.)  As relief, Plaintiff

Hamza seeks compensatory damages, punitive damages, declaratory relief, and injunctive relief.

(*Id*. at 9.)

## C.    *Hamza III* Complaint

Construed as liberally[7] as possible, the Complaint in *Hamza III* alleges that Plaintiff

Hamza's constitutional rights were violated by defendants Athanasios Dimadis Kotsidis,

Maroula Kotsidou, the Government of the Hellenic Republic (Greece), Association of Foreign

Press Correspondents in the USA, Inc., the George Washington University Graduate School of

Political Management, and the United States Department of State.  (*See generally Hamza III*,

Dkt. No. 1.)  More specifically, Plaintiff Hamza alleges that since 2022, Defendants Kotsidis and

Kotsidou have engaged in a pattern of confrontations involving "surveillance, online

disinformation, and complaint-generation to officials (Village of Philmont Police, Columbia

County Sheriff, New York State Police . . .), and regulators (New York State Department of

Environmental Conservation . . .), aimed at Plaintiff [Hamza] and timed to Plaintiff[ Hamza]'s

protected speech and litigation."  (*Hamza III*, Dkt. No. 1 at 5.)  Plaintiff Hamza alleges that when

Defendant Kotsidou is physically present in Philmont (she arrives around May and departs

around December), the incidents increase and that Defendants Kotsidis and Kotsidou have

---

[7]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest.
*Soto*, 44 F.3d at 173 (quoting *Burgos*, 14 F.3d at 790).

publicized narratives about him in English and in Greek.  (*Id*.)  The Complaint alleges that Defendants Kotsidis and Kotsidou "leveraged press credentials and purported governmental ties to lend false official weight to accusations and to influence officials."  (*Id*.)  Plaintiff Hamza alleges that Defendant Kotsidou retaliated against him for or with the Government of Greece. (*Id*.)

Plaintiff Hamza alleges that the "objective" of Defendants Kotsidis and Kotsidou is to "orchestrat[e] an arrest and cloud[]/pressur[e] title to force a distress sale or otherwise gain control over" Plaintiff Hamza's property at 16 Elm Street, which would facilitate the relocation of "associates/family from Greece."  (*Id*.)

Based on these factual allegations, the Complaint asserts the following eight causes of action: (1) a claim of "Retaliation; Abuse of Process; Malicious Prosecution" against Defendants Kotsidis and Kotsidou in violation of the First and Fourth Amendments and 42 U.S.C. § 1983; (2) a claim of conspiracy against Defendants Kotsidis and Kotsidou in violation of 42 U.S.C. § 1985(3); (3) a claim of defamation against Defendants Kotsidis and Kotsidou; (4) a claim of IIED against Defendants Kotsidis and Kotsidou; (5) a claim of private nuisance/trespass/interference with property against Defendants Kotsidis and Kotsidou; (6) a claim of slander of title against Defendants Kotsidis and Kotsidou; (7) a claim of foreign direction/agency against Defendants Kotsidis, Kotsidou, the Government of the Hellenic Republic (Greece), Association of Foreign Press Correspondents in the USA, Inc., the George Washington University Graduate School of Political Management, and the United States Department of State; and (8) a claim of respondent superior/negligent hiring, supervision, and retention against Defendants Association of Foreign Press Correspondents in the USA and the George Washington University Graduate School of Political Management.  (*Hamza III*, Dkt. No.

1 at 7-9.)  As relief, Plaintiff Hamza seeks compensatory and punitive damages against

Defendants Kotsidis and Kotsidou and injunctions "restraining private Defendants from trespass,

direct contact [], knowingly false complaints to officials, and defamatory publications."  (*Id.* at

10.)

## II.     PLAINTIFFS' APPLICATIONS TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee,

currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized,

however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee

for commencing an action.  28 U.S.C. § 1915(a)(1).[8]  After reviewing Plaintiffs' IFP applications

---

[8]     The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

(*Hamza I*, Dkt. Nos. 3, 4; *Hamza II*, Dkt. No. 2; *Hamza III*, Dkt. No. 4), the Court finds that

Plaintiffs meet this standard.[9]  Therefore, Plaintiffs' applications to proceed IFP are granted.[10]

      Plaintiff Hamza is cautioned that the ability to litigate an action without prepayment of

fees is a privilege that can be denied, revoked, or limited based upon a showing of prior abuses.

*See In re Anderson*, 511 U.S. 364, 365-66 (1994) (denying the *pro se* petitioner's request for

leave to proceed IFP where the Court found that, like the previous twenty-two petitions filed

during the three immediately preceding years, the instant petition was "patently frivolous"); *see*

*also Cuoco v. United States Bureau of Prisons*, 328 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) ("The

ability to proceed IFP is a privilege provided for the benefit of indigent persons.").  The authority

of a court to deny or limit a request to proceed IFP is implicit in the permissive, rather than

compulsory, language of the controlling statute, which provides that "any court of the United

States *may* authorize the commencement, prosecution or defense of any suit, action or

proceeding, civil or criminal, or appeal therein, without prepayment of fees or security

therefor[.]"  28 U.S.C. § 1915(a)(1) (emphasis added); *In re McDonald*, 489 U.S. 180, 183

---

[9]    However, the undersigned notes that the applications submitted by Plaintiffs appear incomplete.  For example, in question 2, Plaintiff Hamza indicates that his gross pay or wages are $1,676.  (*Hamza I*, Dkt. No. 3 at ¶ 2.)  Plaintiff Hamza states that he receives Social Security on a monthly basis but does not state the amount of Social Security that he receives or clarify if the amount that he reported in gross pay or wages is the amount of Social Security that he receives.  Moreover, Plaintiff Yakel indicates that in the last twelve months he has not received income from any sources.  (*Hamza I*, Dkt. No. 4 at ¶ 2.)  However, the Complaint appeared to allege that Plaintiff Yakel was employed recently and lost his employment based on the actions of Defendants.  (*Hamza I*, Dkt. No. 1 at ¶¶ 379-380; *see also Hamza I*, Dkt. No. 50 at 147 [alleging that Plaintiff Yakel lost his job, wages, and medical insurance because of the actions of Defendants]; *Hamza II*, Dkt. No. 1, Attach. 2 at 7 [alleging that Defendant Yakel "recently lost his job due to ongoing actions by our neighbors" and that Defendant Yakel "deeply loved his position at the Poured Candel Bar in Hudson, New York . . . . [but t]hat job has now been taken from him"].)

[10]    Plaintiffs are reminded that, although their IFP applications have been granted, they are still required to pay fees that they may incur in this action, including copying and/or witness fees.

(1989).  For this reason, courts are regarded as possessing discretionary authority to deny IFP

status to litigants who have abused the privilege.  *See Hurt v. Soc. Sec. Admin.*, 544 F.3d 308,

309-310 (D.C. Cir. 2008) (quoting *Butler v. Dep't of Justice*, 492 F.3d 440, 444-45 (D.C. Cir.

2007)) ("This Circuit grants IFP status to various plaintiffs, but asserts its discretion to deny or

revoke this privilege for abusive litigants, looking to 'the number, content, frequency, and

disposition of their previous filings[.]' ").

Plaintiff Hamza's litigation history in this district suggests that he is on the brink of being

found to have abused the privilege of proceeding IFP.  In addition to the three cases currently

before the Court (*Hamza I*, *Hamza II*, and *Hamza III*), Plaintiff Hamza has filed four other

lawsuits in this district within the last six years.[11]  In each of those actions, Plaintiff Hamza

requested permission to proceed without prepayment of fees.

A common theme among the dismissed actions filed by Plaintiff Hamza in this district

(including, as will be discussed below, the current pleadings under consideration in this report) is

his failure to include factual allegations in his pleadings that (1) demonstrate that the Court has

jurisdiction to consider his claims, or (2) state a claim upon which relief may be granted.

Accordingly, Plaintiff Hamza is hereby cautioned that (1) proceeding IFP is a privilege that is

extended to litigants at the discretion of the court, and (2) any further filing of patently frivolous

lawsuits may result in the denial of any request to proceed IFP in an action and/or a

---

[11]     (1) *Hamza v. Yandik*, Case No. 1:19-CV-0447 (LEK/DJS) (dismissed for failure to timely
effectuate proper service); (2) *Hamza v. Sollenberger*, Case No. 1:23-CV-0355 (MAD/CFH)
(dismissed without prejudice but without leave to amend based on a lack of subject matter
jurisdiction); (3) *Hamza v. Midas, Inc.*, Case No. 1:23-CV-0543 (MAD/CFH) (dismissed without
prejudice but without leave to amend based on a lack of subject matter jurisdiction); and (4)
*Hamza v. Yandik*, Case No. 1:25-CV-1382 (GTS/PJE) (currently pending).

recommendation to the Chief District Judge that a filing injunction be issued against Plaintiff Hamza, barring him from filing any future lawsuits in this district without prior permission.

## III.    GOVERNING LEGAL STANDARDS

### A.    Legal Standard for Initial Review of the Complaint

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 WL 865296, at *1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis

added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]).  "Determining whether a

complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

shown–that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (internal citation and

punctuation omitted).

Moreover, Rule 10 of the Fed. R. Civ. P. provides that "[a] party must state its claims or

defenses in numbered paragraphs, each limited as far as practicable to a single set of

circumstances[.]"  Fed. R. Civ. P. 10(b).  Rule 10's purpose is to "provide an easy mode of

identification for referring to a particular paragraph in a prior pleading[.]"  *Clervrain v. Robbins*,

22-CV-1248, 2022 WL 17517312, at *2 (N.D.N.Y. Dec. 8, 2022) (Stewart, M.J.) (citation

omitted), *report and recommendation adopted*, 2023 WL 3170384 (N.D.N.Y. May 1, 2023)

(D'Agostino, J.).  A complaint that does not comply with these Rules "presents far too heavy a

burden in terms of defendants' duty to shape a comprehensive defense and provides no

meaningful basis for the Court to assess the sufficiency of [the plaintiff's] claims," and may

properly be dismissed by the court.  *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996)

(McAvoy, C.J.).

"In reviewing a complaint . . . the court must accept the material facts alleged in the

complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v.

Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

### B.    Legal Standard Governing Consolidation

Pursuant to Fed. R. Civ. P. 42(a), a court may consolidate actions where those actions involve common questions of law or fact.  Fed. R. Civ. P. 42(a).  "District courts enjoy substantial discretion in deciding whether and to what extent to consolidate cases."  *Hall v. Hall*, 138 S. Ct. 1118, 1131 (2018).  "The Court may order consolidation upon its own motion, and the consent of the parties is not required."  *Tucker v. Kenney*, 994 F. Supp. 412, 415 (E.D.N.Y. 1998); *accord Nussbaum v. Spider, Inc.*, 09-CV-2023, 09-CV-2026, 2009 WL 2762785, at *1 (E.D.N.Y. Aug. 24, 2009) (citing *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990); *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999)).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiffs' Second Amended Complaint in *Hamza I*, Plaintiff Hamza's Complaint in *Hamza II*, and Plaintiff Hamza's Complaint in *Hamza III*, with this principle in mind, I recommend that all causes of action be dismissed.

A.    **Consolidation**

The factual allegations set forth in *Hamza I*, *Hamza II*, and *Hamza III* chronicle Plaintiffs' ongoing neighborly feud with Defendants Kotsidis and Kotsidou and the resulting consequences stemming therefrom.  After carefully considering the matter, the Court consolidates *Hamza I*, *Hamza II*, and *Hamza III*.  *Hamza I* is designated as the lead case and all future filings are to be made in the lead case only.

B.    ***Hamza I***

1.    **Failure to Comply with Fed. R. Civ. P. 8(a)**

The 154-page Second Amended Complaint is neither short nor plain, but rather is bloated, rambling, and teeming with irrelevant factual digressions and improper legal argument. Dismissal on these grounds is justified.  *See, e.g., Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (affirming dismissal of 88-page *pro se* complaint containing "a labyrinthian prolixity of unrelated and vituperative charges that defied comprehension [and therefore] failed to comply with the [short-and-plain-statement] requirement of Rule 8"); *see also O'Neil v. Ponzi*, 394 F. App'x 795, 796-97 (2d Cir. 2010) ("O'Neil's amended complaint, even when read liberally, fails to contain 'a short and plain statement of the claim' entitling her to relief.  Fed. R. Civ. P. 8(a)(2).").

As a result, I recommend dismissal of Plaintiffs' Second Amended Complaint for failure to comply with Fed. R. Civ. P. 8.

2.    **Plaintiffs' Claims are Frivolous**

In the alternative, I recommend dismissal of Plaintiffs' claims as frivolous.

Plaintiffs' fanciful Second Amended Complaint alleges a far-ranging conspiracy involving private citizen neighbors, members of the Village government, officers of the local

police department, the New York State Department of Environmental Conservation, private company U-Haul, the New York State Police, a New York State Trooper, and the Village of Philmont Judge.  (*See generally* Dkt. No. 50.)

Plaintiffs' claims are precisely the type of fanciful or delusional allegations that warrant dismissal under 28 U.S.C. § 1915(e)(2)(B)(i) as factually frivolous.  *See, e.g.*, *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002) (holding that suit may be dismissed where facts alleged in complaint are "so nutty ('delusional' is the polite word) that they're unbelievable, even though there has been no evidentiary hearing to determine their truth or falsity"); *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (explaining that an action is frivolous when "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy") (internal quotation marks omitted).

As a result, I recommend that, in the alternative, Plaintiffs' Second Amended Complaint be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

### 3.    Claims Pursuant to 42 U.S.C. § 1983

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990).  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States.  *See* 42 U.S.C. § 1983.

a.    **Claims Against Defendants New York State Police, DEC, and Trooper Rodriguez in His Official Capacity**

i.    **Seeking Monetary Damages**

In the alternative, I recommend that Plaintiffs' claims against Defendants New York State Police, DEC, and Trooper Rodriguez in his official capacity[12] be dismissed based on immunity pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

New York State is immune from suits pursuant to 42 U.S.C. § 1983 seeking either legal or equitable relief, under the Eleventh Amendment.  *Papasan v. Allain,* 478 U.S. 265, 276 (1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98-100 (1984); *see Ognibene v. Niagara Cnty. Sheriff's Dep't*, 03-CV-0678, 2003 WL 24243989, at *3 (W.D.N.Y. Dec. 1, 2003) ("To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment.").  The Eleventh Amendment's immunity extends to the New York State Police, New York State Troopers in their official capacities, and New York State Department of Environmental Conservation as agencies of the State of New York.  *Berman Enters., Inc. v. Jorling*, 3 F.3d 602, 606 (2d Cir. 1993) (holding that, due to sovereign immunity, the district court lacked subject matter jurisdiction over section 1983 and state law claims for damages against DEC officers in their official capacities); *Riley v. Cuomo*, 17-CV-1631, 2018 WL 1832929, *4 (E.D.N.Y. Apr. 16, 2018) (holding that the New York State Police, as a division in the executive department of the State, is immune from claims under § 1983); *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 390-91 (E.D.N.Y. 2013) (citing *Dube v. State Univ. of N.Y.*,

---

[12]    "[A] suit against a state official in his or her official capacity is not a suit against an official but rather is a suit against the official's office."  *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989).

900 F.2d 587, 594 (2d Cir. 1990)) (finding that section 1983 and state law damages claims "against the State of New York and the DEC are all barred the Eleventh Amendment"); *New Holland Vill. Condo. Ass'n v. DeStaso Enters. Ltd.*, 139 F. Supp. 2d 499, 501-02 (S.D.N.Y. 2001) (dismissing a section 1983 claim for damages against the DEC based on Eleventh Amendment sovereign immunity); *see also Edelman v. Jordan,* 415 U.S. 651, 663 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 329 (S.D.N.Y.2007) ("[S]overeign immunity also extends to bar claims for monetary damages brought against state officers sued under section 1983 in their official capacities.").

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 for monetary damages against Defendants New York State Police, DEC, and Trooper Rodriguez in his official capacity be dismissed based on immunity pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

### ii.    Seeking Injunctive Relief

"[J]udgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146 (1993) (citing *Green v. Mansour,* 474 U.S. 64, 73 (1985)).  However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law.  *See Edelman,* 415 U.S. at 663; *Ex Parte Young,* 209 U.S. 123 (1908).  In this regard, through the doctrine of *Ex Parte Young,* a party may bring "a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law."  *CSX Transp., Inc. v. New York State Office of Real Prop. Servs.,* 306 F.3d

87, 98 (2d Cir. 2002) (internal quotation marks and alteration omitted); *see also Arthur v. Nyquist,* 573 F.2d 134, 138 (2d Cir.1978).

"In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc.,* 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd,* 630 F. App'x 61 (2d Cir. 2015) (quoting *MacIssac v. Town of Poughkeepsie,* 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011)); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, N.Y.,* 945 F.3d 83, 110 (2d Cir. 2019) ("'[C]onjectural' injuries do not suffice under Article III.") (alteration in original) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)); *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111-12 (1983)) ("[The plaintiffs] lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.").

Plaintiffs seek injunctive relief "prohibiting further surveillance, harassment, defamatory publications, and retaliatory or selective enforcement, and directing municipal actors to cease retaliation and provide equal access to public services." (*Hamza I*, Dkt. No. 50 at 152.) However, Plaintiffs fail to allege facts plausibly suggesting that they are at risk of future harms by Defendants New York State Police, DEC, and Rodriguez in his official capacity. For example, with respect to their request for an injunction prohibiting further defamatory publications, "Plaintiffs have neither alleged how they would suffer continuing defamation absent an injunction barring speech nor that the speech is likely to continue. Absent more, Plaintiffs do not have standing to seek injunctive relief on their . . . claims." *Miller v. James,* 751 F. Supp. 3d 21, 34 (N.D.N.Y. 2024) (Kahn, J.).

30

As a result, in the alternative, I recommend that Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendants New York State Police, DEC, and Trooper Rodriguez in his official capacity be dismissed (1) to the extent that Plaintiffs seek monetary damages as barred by the Eleventh Amendment principles of sovereign immunity, and (2) to the extent that Plaintiffs seek declaratory and injunctive relief for lack of standing.

### b.    Claims Against Defendants Kotsidis and Kotsidou

The requirement that a defendant act "under color of state law," means that the typical § 1983 claim is brought against state and local government officials and entities, not against private individuals or entities. Private actors "may only be held liable under § 1983 where the conduct at issue constitutes 'state action' [–] which only occurs where the challenged action of a private party is 'fairly attributable' to the state." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 504 (N.D.N.Y. 2017) (Hurd, J.) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010)).

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test').

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012).

It is well-settled that "a private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were

improperly influenced or controlled by the private party." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005). Moreover "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights." *Fisk*, 401 F. Supp. 2d at 377 (citing *Kramer v. City of New York*, 04-CV-0106, 2004 WL 2429811, at *7 (S.D.N.Y. Nov. 1, 2004)).

Under any of the applicable tests, Second Amended Complaint fails to allege facts plausibly suggesting that Defendants Kotsidis and Kotsidou acted "under color of state law." Although Defendants Kotsidis and Kotsidou allegedly informed law enforcement about various issues that they had with Plaintiffs, that does not transform them to state actors. The conclusory allegations contained in the Second Amended Complaint fail to plausibly suggest that Defendants Kotsidis and Kotsidou acted in concert with state actors. *See Illescas v. Annucci*, 21-CV-8473, 2024 WL 4882774, at *4 (S.D.N.Y. Nov. 25, 2024) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)) ("Courts in this circuit have held that 'mere conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.'"); *Altieri v. Tsopanides*, 21-CV-1224, 2022 WL 1912851, at *3 (D. Conn. June 3, 2022) (dismissing § 1983 complaint against non-state actor because conclusory allegations that defendants "acted jointly and in concert" with the state were insufficient to plausibly state a claim upon which relief may be granted).

Indeed, the Second Amended Complaint contains several allegations plausibly suggesting that state actors were <u>not</u> acting in concert with Defendants Kotsidis and Kotsidou to violate Plaintiffs' rights. (*Hamza I*, Dkt. No. 50 at 43-44 [alleging that Trooper Torchia of Defendant New York State Police directed Defendants Kotsidis and Kotsidou to remove their bicycles from the roadway and never to place their bicycles in the roadway again]; *Id.* at 45 [alleging that third-

party Shawn Laurange "fearing retaliation or towing by the Philmont Police, began parking

exclusively in the Canal Street Municipal Lot and walking home"]; *Id.* at 64 [alleging that

Trooper Driver deemed the allegation of Defendants Kotsidis and Kotsidou that Plaintiff Hamza

hit their rented U-Haul unfounded]; *Id.* at 67 [alleging that Deputy Pozzi "acknowledged that

[Defendant Kotsidou] filming Plaintiffs in a harassing manner was inappropriate"]; *Id.* at 69

[alleging that Defendants Kotsidis and Kotsidou received "repeated admonitions from Sheriffs

and State Troopers to cease" their pattern of harassment]; *Id.* at 78-79 [alleging that the Philmont

Fire Chief "found no violation of law or code" on September 8, 2025, after being dispatched to

Plaintiffs' property based on a complaint that Plaintiffs believe was "instigated" by Defendant

Kotsidou's complaint]; *Id.* at 83 [alleging that "Officers instructed Defendants [Kotsidis and

Kotsidou] to redirect the cameras away from Plaintiffs' property"]; *Id.* at 86 [alleging that

"Sheriff Pozzi informed Plaintiff HAMZA that . . . given the continuing conflict between the

parties, Defendant [Kotsidou] was advised to exercise discretion and avoid provoking

confrontation"]; *Id.* at 98 [alleging that Defendants Kotsidis and Kotsidou lodged prior

complaints regarding Plaintiffs' fires that were "investigated and deemed baseless"]; *Id.* at 98

[alleging that the DEC determined that the complaint of Defendants Kotsidis and Kotsidou on

July 23, 2025, regarding Plaintiffs' fire was "unfounded"]; *Id.* at 100-02 [alleging that Defendant

DEC Officer "Josh" responded to Plaintiffs' residence regarding a complaint of an oil leak from

a vehicle but merely "advised Plaintiffs to monitor the truck for leaks"]; *Id.* at 105 [alleging that

Defendants Kotsidis and Kotsidou lodged "multiple false" complaints with Defendant DEC

between July and August 2025, but that "[e]ach of these complaints was investigated by DEC

officers, who either found them unfounded or acknowledged that the allegations reflected a

pattern of neighbor driven harassment rather than legitimate environmental concerns"]; *Id.* at 116

33

[alleging that Trooper Driver of Defendant New York State Police inspected the rented U-Haul van and "found no evidence of damage" after Defendant Kotsidis "falsely report[ed] . . . that Plaintiff HAMZA had struck the U-Haul van"]; *Id.* at 122 [alleging that when Trooper Driver responded to Defendant Kotsidis's report that Plaintiff Hamza hit the rented U-Haul, Trooper Drover "consistent with standard procedure, spoke first with Plaintiff HAMZA before interviewing Defendants about the alleged incident.  This demonstrates that police considered Plaintiffs credible reporters rather than aggressors."]; *Id.* at 123 [alleging that "Trooper Driver concurred that the U-Haul Van, in its current location was parked specifically to block access, harass Plaintiffs, and use as a tool to thwart Plaintiffs['] charitable work."]; *Id.* at 124 [alleging that Plaintiff Hamza "and Trooper Driver concluded the proper remedy was to remove the U-Haul van and return it to the rental location"]; *Id.* at 146 [alleging that Defendants Kotsidis and Kotsidou "persisted after law-enforcement admonitions, repositioned cameras after police left"].)

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendants Kotsidis and Kotsidou be dismissed for failure to state a claim upon which relief may be granted.

### c.    Claims Against Defendant Village of Philmont

A municipality—like Defendant Village of Philmont—may be held liable if a plaintiff can assert that a policy or custom of that municipality caused the constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978).  "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates,

such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff."
*Moran v. Cnty. of Suffolk*, 11-CV-3704, 2015 WL 1321685, at *9 (E.D.N.Y. Mar. 24, 2015)
(citing *Parker v. City of Long Beach*, 563 F. App'x 39 (2d Cir. 2014) (failure to train); *Matusick
v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice);
*Hines v. Albany Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers);
*Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (failure to train or supervise);
*Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a
person with policymaking authority for the municipality)).

     "Naked boilerplate allegations against a city are not sufficient to demonstrate a custom,
practice or policy of conducting unlawful arrests." *Brown v. City of New York*, 12-CV-3146,
2014 WL 5089748, at *9, n.12 (S.D.N.Y. Sept. 30, 2014); *see Plair v. City of New York*, 789 F.
Supp. 2d 459, 469 (S.D.N.Y. 2011) (holding that for a *Monell* claim to survive a motion to
dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations"
that the violation of the plaintiff's constitutional rights resulted from the municipality's custom
or official policy).

     Construing Plaintiffs' Second Amended Complaint liberally, they essentially allege that
because Defendants Kotsidis and Kotsidou contacted the Village of Philmont regarding the
conflict between them, that Defendant Village of Philmont is liable as a co-conspirator. (*See
Hamza I*, Dkt. No. 50 at 34 [alleging that Defendants Kotsidis and Kotsidou participated in a
"campaign extended to repeated, knowingly false or baseless calls to law enforcement and
municipal officials."]; *Id.* at 40 [alleging that "[w]henever a parking dispute arose, Defendants
[Kotsidis and Kotsidou] regularly summoned law enforcement on pretextual complaints"]; *Id.* at
46 [alleging that Defendants Kotsidis and Kotsidou "have engaged in a campaign of

intimidation, threatening behavior, false accusations, and exploitation of municipal enforcement mechanisms all in conspiracy with" Defendant Village of Philmont and the Philmont Police Department]; *Id.* at 49 [alleging that "Plaintiffs felt specifically targeted by the Village of Philmont and its Police Department. [Defendant] TKACY admitted that the enforcement action was initiated only after complaints were made by Defendants [Kotsidis and Kotsidou], even though the vehicles were legally parked."]; *Id.* at 52 [alleging that "the Village Trustees, DOYLE and TKACY conspired with Defendants [Kotsidis and Kotsidou] to target [Plaintiffs] and have the vehicles removed solely because they did not want them parked in front of their home or on the public roadway."]; *Id.* at 54 [alleging that "Defendant TKACY explicitly admitted that this enforcement action was initiated only after retaliatory complaints by Defendants [Kotsidis and Kotsidou], demonstrating that the purpose of the action was harassment, retaliation, and discrimination rather than legitimate law enforcement."]; *Id.* at 78 [alleging that "the Philmont Volunteer Fire Department had been dispatched to 16 Elm Street based on photographs and video surveillance supplied by Defendant [Kotsidou] from 14 Elm Street."]; *Id.* at 79 [alleging that Defendant Kotsidou "instigated a complaint to Code Enforcement and that Defendant KLIMA relayed that complaint to the fire department."]; *Id.* at 84 [alleging that "Defendants also submitted selectively edited surveillance footage and complaints to the Village of Philmont and PHILMONT POLICE, not to address legitimate concerns but to weaponize government authority as a tool of harassment and defamation."]; *Id.* at 85 [alleging that "Defendant [Kotsidou] complained to Defendant KLIMA, the Village of Philmont Code Enforcement Officer regarding the legal fires and make further complaints regarding anything [s]he could fabricate."]; *Id.* at 87 [alleging that Defendant Kotsidou "had a pattern of seeking alternate enforcement channels when unsatisfied with previous complaints."]; *Id.* at 104 [alleging that Defendants Kotsidis and

Kotsidou's "history of false reports to police and municipal officials, establishes coordinated joint action with state actors sufficient to trigger § 1983 liability."]; *Id.* at 106 [alleging that Defendants Kotsidis and Kotsidou's "ongoing use of police and municipal channels, supports a claim of conspiracy under 42 U.S.C. § 1985(3), as Defendants acted with discriminatory animus toward Plaintiffs—two openly gay men—in an effort to deprive them of equal protection and due process."]; *Id.* at 107 [alleging that "Defendants' conduct, when attributable to the state through misuse of governmental reporting and enforcement channels, constitutes actionable deprivation of rights under § 1983."]; *Id.* at 111 [alleging that "Village of Philmont officials and police continue to target Plaintiffs . . . by dispatching officers to their property in response to complaints by Defendants [Kotsidis and Kotsidou]"].)  These assertions are insufficient to establish municipal liability.  The response of law enforcement when summoned, is not a violation of constitutional rights without more.

To the extent that Plaintiffs allege that Defendant Village of Philmont revoked their tax-exempt status for some improper purpose, I recommend that such claim be dismissed.  (*Hamza I*, Dkt. No. 50 at 128-33.)  The Second Amended Complaint alleges in conclusory terms that "Village officials improperly revoked [Plaintiffs'] exemption for 2025, acting in coordination with Defendants." (Dkt. No. 50 at 129.)  Plaintiffs allege that the revocation was motivated by discriminatory animus.  (*Id*. at 130.)

"To prevail on a [section] 1983 claim of . . . discrimination in violation of equal protection, the law requires a plaintiff to prove the defendant's underlying . . . discriminatory intent or purpose."  *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (internal quotation marks omitted).  Here, Plaintiffs fail to allege facts plausibly suggesting discriminatory intent or purpose.  Plaintiffs identify as homosexual men (*Hamza I*, Dkt. No. 50 at 74, 81, 103, 104, 106,

146) but fail to allege any facts plausibly suggesting sex discrimination by Defendant Village of

Philmont.  (*See generally Hamza I*, Dkt. No. 50.)

In addition, Plaintiffs allege that the revocation of tax-exempt status was taken in

retaliation for their engagement in protected speech.  (*Hamza I*, Dkt. No. 50 at 132.)  "[A]s a

general matter the First Amendment prohibits government officials from subjecting an individual

to retaliatory actions" for engaging in protected speech.  *Hartman v. Moore*, 547 U.S. 250, 256

(2006).  To state a claim for retaliation pursuant to the First Amendment and 42 U.S.C. § 1983, a

plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant

took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech [or conduct] and the adverse action."  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d

Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  To constitute protected

speech, it must deal with "any matter of political, social or other concern to the community."

*Golub v. City of New York*, 334 F. Supp. 2d 399, 407 (S.D.N.Y. 2004) (citing *Mandell v. Cnty. of

Suffolk*, 316 F.3d 368 (2d Cir. 2003)).

The Second Amended Complaint fails to allege facts plausibly suggesting that (1)

Plaintiffs engaged in protected speech or conduct, and (2) the revocation of their tax-exempt

status was causally connected to their protected speech or conduct.  Plaintiffs' allegation that

they engaged in "public speech, complaints to officials, and charitable operations" without

additional information fails to allege facts plausibly suggesting that Plaintiffs engaged in

protected speech or conduct.  (*Hamza I*, Dkt. No. 50 at 132.)  Moreover, although the Second

Amended Complaint alleges that the revocation of tax-exempt status followed Plaintiffs' "public

speech, complaints to officials, and charitable operations" (*id.*), Plaintiffs fail to set forth any

facts plausibly suggesting a causal connection between the two.  (*See generally Hamza I*, Dkt.

No. 50.)  Indeed, the Second Amended Complaint fails to allege when Plaintiffs allegedly

engaged in "public speech, complaints to officials, and charitable operations" (*Hamza I*, Dkt. No.

50 at 132) and when their tax-exempt status was revoked.  (*Compare Hamza I*, Dkt. No. 50 at

129 [alleging merely that Plaintiffs' tax-exempt status was "revoked . . . for 2025"], *with Hamza

I*, Dkt. No. 50 at 132 [alleging that at some unspecified time "Plaintiffs engaged in protected

activity—including public speech, complaints to officials, and charitable operations—after

which Village actors and their private confederates took adverse actions (revoking tax-exempt

status . . .) in retaliation substantially motivated by that protected conduct, causing constitutional

injury."].)  Hence, the Court cannot infer a causal connection based on temporal and Plaintiffs

fail to set forth any additional facts plausibly suggesting a causal connection between their

protected activity and the adverse action.

To the extent that Plaintiffs' Equal Protection claim is premised on alleged threats to tow

their vehicles and requests to remove their vehicles from the municipal lot, I recommend that it

be dismissed for failure to state a claim upon which relief may be granted.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall

"deny to any persons within its jurisdiction the equal protection of the laws."  U.S. Const.

amend. XIV, § 1.  This constitutional provision is "essentially a direction that all persons

similarly situated be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432,

439 (1985).  Pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), an equal

protection plaintiff may assert a so-called "class of one" claim by alleging that "they were

intentionally treated differently from others similarly situated and that there was no rational basis

for this difference in treatment."  *Doe v. Vill. of Mamaroneck*, 462 F. Supp .2d 520, 558

(S.D.N.Y. 2006).  A plaintiff may also assert a "selective enforcement" claim by showing they

were treated differently "based on impermissible considerations such as race, religion, intent to

inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a

person." *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013).  Whether

plaintiffs attempt to pursue a "selective enforcement" or a "class of one" equal protection claim,

either theory "require[s] a showing of similarly situated individuals or groups who were treated

differently."  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693

(S.D.N.Y. 2011).

    The Second Amended Complaint fails to assert facts plausibly suggesting that other

individuals with suspended registrations were treated differently than Plaintiffs.[13]  (*See generally*

*Hamza I*, Dkt. No. 50.)  Plaintiffs allege in a conclusory fashion that Defendant Village of

Philmont was "motivated by discriminatory animus against Plaintiffs on the basis of their sexual

orientation and national origin, as well as in retaliation for Plaintiffs' prior exercise of legal

rights." (*Hamza I*, Dkt. No. 50 at 50.)  However, Plaintiffs fail to provide any link between their

sexual orientation or national origin and Defendant Village of Philmont's enforcement efforts to

keep vehicles with suspended registrations off the public roadway.[14]  In addition, Plaintiffs fail to

allege facts plausibly suggesting a causal connection between their exercise of legal rights and

the threat to tow their vehicles with suspended registrations.  (*See generally Hamza I*, Dkt. No.

50.)

---

[13]    Indeed, the Second Amended Complaint alleges that third-party Shawn Laurange
"fearing retaliation or towing by the Philmont Police, began parking exclusively in the Canal
Street Municipal Lot and walking home." (*Hamza I*, Dkt. No. 50 at 45.)  Hence, other
individuals were also concerned about enforcement efforts by Defendant Village of Philmont.

[14]    *See People v. Mortel*, 197 A.D.3d 196, 215 (N.Y. App Div. 2d Dep't 2021) (holding that
"where law enforcement officers determine that a vehicle's registration has been suspended, this
suspension furnishes a valid basis to impound the vehicle.").

To the extent that Plaintiffs assert that Plaintiff Hamza was discriminated against based on the denial of his volunteer firefighter application, I recommend that it be dismissed. The Second Amended Complaint fails to allege facts plausibly suggesting that Plaintiff Hamza's sexual orientation was causally connected with the denial of his application. (*See generally Hamza I*, Dkt. No. 50.) In addition, to the extent that Plaintiffs assert a retaliation claim based on the denial of Plaintiff Hamza's volunteer firefighter application, the Second Amended Complaint fails to allege facts plausibly suggesting that (1) Plaintiff Hamza engaged in protected speech or conduct, and (2) his speech or conduct was causally connected to the denial of his application. (*Id*.) Although the Second Amended Complaint alleges that Defendant Detzel informed Plaintiff Hamza that "the rejection stemmed from a Board perception that Plaintiff [Hamza] was a 'rabble rouser,'" (*Hamza I*, Dkt. No. 50 at 21) Plaintiffs fail to allege Plaintiff Hamza's involvement in any matter of political, social or other concern to the community and hence, fail to allege involvement in protected activity.

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Village of Philmont be dismissed for failure to state a claim upon which relief may be granted.

### d.     Claims Against Defendant Doyle

It is well-settled that to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). There is "no special rule for supervisory liability," and "a plaintiff must plead and prove 'that each

Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  The Second Circuit has explained that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly."  *Tangreti*, 983 F.3d at 618 (second alteration in original) (internal quotations and citations omitted).

The Second Amended Complaint alleges that Defendant Doyle—as chief of the Village of Philmont Police Department—directed Defendant Tkacy to tow Plaintiffs' vehicles (if they were not removed from the public roadway) after the Department of Motor Vehicles system indicated that the vehicles' registrations were suspended.  (*Hamza I*, Dkt. No. 50 at 47-52.)  The Second Amended Complaint also alleges that Defendant Doyle was "motivated by discriminatory animus against Plaintiffs on the basis of their sexual orientation and national origin, as well as in retaliation for Plaintiffs' prior exercise of legal rights."  (*Id*. at 50.)

Further, the Second Amended Complaint alleges that Defendant Doyle directed subordinates to get Plaintiffs' vehicles out of the municipal lot "and claimed the municipal lot needed to be closed for construction, even though no closure was imminent."  (*Hamza I*, Dkt. No. 50 at 112.)

Based on these factual allegations, Plaintiffs appear to assert a claim of discrimination, a claim of retaliation, and a claim that their rights to equal protection of the law was violated.[15]

---

[15]      The elements of retaliation, discrimination, and Equal Protection Clause claims are set forth above in Part IV.B.3.c. of this Order and Report-Recommendation.

First, with respect to a claim of discrimination, Plaintiffs fail to allege facts plausibly suggesting that their sexual orientation or national origin were causally connected with Defendant Doyle's direction to Defendant Tkacy to have Plaintiffs either move their vehicles with suspended registration off the public roadway or to tow the vehicles. (*See generally Hamza I*, Dkt. No. 50.) "Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Board of Trustees of Northern Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016); *see also Canady v. Union 1199/SEIU,* 527 F. Supp. 3d 515, 516 (W.D.N.Y. 2021) ("simply falling into a protected category is not enough"); *Perry v. County of Westchester,* 06-CV-3000, 2008 WL 11438085, at *17 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff's membership in a protected class in and of itself does not establish discriminatory animus").

Second, with respect to their retaliation claim, Plaintiffs fail to allege facts plausibly suggesting any causal connection between their "prior exercise of legal rights" with Defendant Doyle's alleged direction to Defendant Tkacy to tow Plaintiffs' unregistered vehicles from the public roadway.[16] (*See generally* Dkt. No. 50.)

---

[16] Temporal proximity may plausibly suggest a causal connection for a retaliation claim pursuant to the First Amendment and 42 U.S.C. § 1983. *See Allah v. Lawson*, 23-CV-0785, 2025 WL 1033836, at *8 (N.D.N.Y. Feb. 18, 2025) (Lovric, M.J.) (citing *Brandon v. Kinter*, 13-CV-0939, 2023 WL 2382637, at *23 (N.D.N.Y. Mar. 6, 2023) (Sannes, C.J.) (finding that three weeks between the grievances and adverse action was sufficiently close temporal proximity to plausibly infer retaliatory intent and causal connection); *Zaire v. Doe*, 03-CV-0629, 2006 WL 1994848, at *5 (N.D.N.Y. July 13, 2006) (Scullin, J.) (finding that two weeks between Plaintiff's protected speech and the adverse action sufficient circumstantial evidence of retaliation for purposes of a causal connection)), *report and recommendation adopted by* 2025 WL 814990 (N.D.N.Y. Mar. 14, 2025) (Kahn, J.). However, the Second Amended Complaint fails to allege when Plaintiffs engaged in "prior exercise [of their] legal rights" that preempted the alleged threat to tow their unregistered vehicles. (*See generally Hamza I*, Dkt. No. 50.) Hence, the Court cannot infer that a causal connection exists based on temporal proximity.

Third, with respect to their Equal Protection Clause claim, Plaintiffs fail to allege facts plausibly suggesting that they were treated differently from others who parked in the municipal lot.

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Doyle be dismissed for failure to state a claim upon which relief may be granted.

### e.    Claims Against Defendants Detzel, Cropper, and Macfarlane

The Second Amended Complaint alleges that Defendants Detzel and Cropper are trustees on the Board of the Village of Philmont (*Hamza I*, Dkt. No. 50 at 4-5, 8-9) and Defendant Macfarlane is chairman of the Village of Philmont Planning Board (*id*. at 4, 9).

With respect to Defendant Detzel, Plaintiffs allege that on June 26, 2025, Defendant Detzel emailed Plaintiff Hamza and inquired about Plaintiff Hamza's DD 214 form.[17] (*Hamza I*, Dkt. No. 50 at 108.) Plaintiffs allege that after Plaintiff Hamza's exchange with Defendant Detzel regarding his Form DD 214, Defendant Macfarlane posted comment on a Village of Philmont Facebook group alleging that Plaintiff Hamza owed back taxes (but Plaintiff Hamza does not own property in Philmont). (*Id*. at 109.) Plaintiffs allege that Defendant Macfarlane then posted on the Facebook page demanding Plaintiff Hamza produce his DD 214. (*Id*.) Plaintiffs allege that shortly after Defendant Macfarlane's post, an anonymous poster commented on one of Plaintiff Hamza's photos referring to stolen valor. (*Id*. at 110.) Based on the timing of Defendant Macfarlane's post and the comment of the anonymous poster, Plaintiffs surmise that Defendant Detzel informed others about their email exchange. (*Id*. at 52, 110-111.)

---

[17]    "Form DD–214 is a Report of Separation issued by the United States Department of Defense pursuant to a formal request." *Nolan v. Holmes*, 334 F.3d 189, 202 (2d Cir. 2003).

Plaintiffs allege that Defendant Detzel informed Plaintiff Hamza that his volunteer firefighter application was denied due to the Board's perception of Plaintiff Hamza as a "rabble rouser." (*Hamza I*, Dkt. No. 50 at 21.)

Plaintiffs allege that Defendants Detzel, Macfarlane, and Cropper have driven their vehicles down Elm Street in the Village of Philmont "without any apparent lawful purpose." (*Hamza I*, Dkt. No. 50 at 28.)  Plaintiffs allege that Defendant Cropper filmed Plaintiff Hamza's minor son and another child in the public Canal Street Municipal Lot.  (*Id*. at 27-28.)

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-57 (1978).  To state a claim under section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor."  *West v. Atkins*, 487 U.S. 42, 48-49 (1988).  Private parties are therefore not generally liable under the statute.  *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties.").

Although Plaintiffs bring claims against Defendants Macfarlane and Cropper as municipal employees, it is clear the alleged actions they undertook were in their private capacities.

"[A] public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to

exercise that authority when he spoke on social media." *Lindke v. Freed*, 601 U.S. 187, 189 (2024).

The Second Amended Complaint is devoid of allegations plausibly suggesting that Defendant Macfarlane's Facebook posts were an exercise of his authority as a Village of Philmont trustee. (*See generally Hamza I*, Dkt. No. 50.) In addition, the Second Amended Complaint fails to allege facts plausibly suggesting that Defendant Macfarlane possessed authority to speak on social media on behalf of the Village of Philmont. (*Id.*)

In addition, Plaintiffs' allegations related to Defendant Cropper involve the driving of his vehicle down a public roadway and filming on public property. It is difficult to fathom how the driving of a vehicle down a public roadway could ostensibly violate Plaintiffs' constitutional rights. Further, the Second Amended Complaint is devoid of factual allegations plausibly suggesting that the actions of Defendant Cropper in driving down Elm Street or filming on public property was taken in the context of his capacity as Village of Philmont trustee. (*See generally Hamza I*, Dkt. No. 50.)

With respect to Defendant Detzel, Plaintiffs allegations that he inquired about Plaintiff Hamza's Form DD 214 and informed Plaintiff that his volunteer firefighter application was denied because of his perceived status as a "rabble rouser" fail to allege constitutional violations. Construing Plaintiffs' allegations liberally, they may have intended to allege a retaliation claim against Defendant Detzel based on the denial of Plaintiff's volunteer application.[18] However,

---

[18] "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a claim for retaliation pursuant to the First Amendment and 42 U.S.C. § 1983, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action."

Plaintiffs fail to allege that (1) they engaged in any protected speech or conduct, or (2) that there was a causal connection between the protected conduct and the denial of Plaintiff Hamza's application.

Moreover, Defendant Detzel's inquiry about Plaintiff Hamza's veteran status did not appear to have been in Defendant Detzel's capacity as a trustee on Defendant Village of Philmont's Board. To the extent that Defendant Detzel's inquiry was in the context of his capacity as a state actor, Plaintiffs' claim still fails because they fail to allege (1) they engaged in any protected speech or conduct, (2) that Defendant Detzel's inquiry was an adverse action, and (3) that there was a causal connection between the protected conduct and the inquiry about Defendant Hamza's veteran status.

In addition, to the extent that the Second Amended Complaint is liberally construed as asserting a discrimination claim based on the denial of Plaintiff Hamza's volunteer firefighter application, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. (*Hamza I*, Dkt. No. 50 at 21-23.) To establish an Equal Protection violation, a plaintiff must prove purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir. 1995). However, in 2019, the Second Circuit stated that "neither this court nor the Supreme Court has recognized § 1983 claims for sexual orientation discrimination in public employment." *Naumovski v. Norris*, 934 F.3d 200, 219 (2d Cir. 2019). Moreover, even assuming that such a claim could be brought, the Second Amended Complaint fails to allege facts plausibly suggesting any connection between the denial of Plaintiff Hamza's volunteer firefighter applicable and his sexual orientation. (*See generally*

---

*Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

*Hamza I*, Dkt. No. 50.)  Even assuming that Plaintiffs alleged prior discriminatory remarks regarding his sexual orientation, the Second Circuit has held that "'stray remarks' . . . do not constitute sufficient indicia of sexual orientation discrimination."  *Cf. Naumovski*, 934 F.3d at 216; *Rodriquez-Coss v. Sessions*, 16-CV-0633, 2018 WL 3213290, at *15 (D. Conn. June 29, 2018).

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendants Detzel, Cropper, and Macfarlane be dismissed for failure to state a claim upon which relief may be granted.

### f.    Claims Against Defendants U-Haul Inc. and Hudson Rentals and Garden Design

Plaintiffs allege that Defendant Kotsidis rented a truck from Defendant U-Haul and used the truck to obstruct Plaintiffs' access to their property.  (*Hamza I*, Dkt. No. 50 at 48, 110, 115-124, 143-144, 149.)  The Second Amended Complaint alleges that Defendant Hudson Rentals and Garden Design owns the U-Haul, Inc. branch in Hudson, New York where Defendants Kotsidis and Kotsidou rented the van at issue.  (*Id*. at 5, 116.)

As set forth above in Part IV.B.3.b., an action under 42 U.S.C. § 1983 cannot be maintained unless the challenged conduct was attributable at least in part to a person acting under color of state law.  *See Chan v. City of New York*, 1 F.3d 96, 106 (2d Cir. 1993) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 835, (1982); Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1993)).

Under any of the applicable tests, the Second Amended Complaint fails to allege facts plausibly suggesting that Defendants U-Haul and Hudson Rentals and Garden Design acted "under color of state law."

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendants U-Haul and Hudson Rentals and Garden Design be dismissed for failure to state a claim upon which relief may be granted.

### g.    Claims Against Defendant Tkacy

The Second Amended Complaint alleges that Defendant Tkacy is a police officer employed by the Philmont Police Department.  (*Hamza I*, Dkt. No. 50 at 5, 9.)  Plaintiffs allege that Defendant Tkacy threatened to tow Plaintiffs' vehicles if they were not moved after identifying the vehicles as having suspended registrations.  (*Id.* at 47-53.)  Plaintiffs allege that Defendants Tkacy "previous[ly exhibited] discriminatory conduct toward Plaintiff HAMZA based on his sexual orientation."  (*Id.* at 48.)

Plaintiffs allege that despite informing Defendant Tkacy that Defendants Kotsidis and Kotsidou placed bicycles in the public roadway, he failed to move the bicycles.  (*Hamza I*, Dkt. No. 50 at 42.)

These allegations fail to allege a constitutional violation by Defendant Tkacy.  As a police officer, Defendant Tkacy was tasked with enforcing the vehicle and traffic laws including issuing citations when vehicles on public roadways are unregistered or uninspected.  *See Dan v. New York*, 24-CV-1233, 2025 WL 1448314, at *10 (N.D.N.Y. May 20, 2025) (Evangelista, M.J.) ("[T]here is well-settled law that a state has a right to enforce its vehicle and traffic laws requiring licensing and registration of motor vehicles. . . . Thus, plaintiff's constitutional rights were not violated by this requirement nor the requirement that he pay the impound fee for the return of his vehicle.").

Moreover, the fact that Defendant Tkacy allegedly previously made discriminatory comments towards Plaintiffs "cannot form the basis of a § 1983 claim."  *Kelly v. Rice*, 375 F.

Supp. 3d 203, 209-10 (S.D.N.Y. 2005) (citing *Haussman v. Fergus*, 894 F. Supp. 142, 149 (S.D.N.Y. 1995) (offensive racial comments cannot form the basis of a § 1983 claim); *Wright v. Santoro*, 714 F. Supp. 665, 666-67 (S.D.N.Y. 1989) ("'discriminatory statements' reflecting racial prejudice not actionable under § 1983 where not shown to be connected with physical injury."), *aff'd*, 891 F.2d 278 (2d Cir. 1989); *Zeno v. Cropper*, 650 F. Supp. 138, 141 (S.D.N.Y. 1986) ("the use of [vile] language, no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim")).

Finally, it is well settled that where the intended beneficiaries of a particular law are entirely generalized, the law does not create a property interest protected by the Due Process Clause. *Harrington v. Cnty. of Suffolk*, 607 F.3d 31, 34-35 (2d Cir. 2010) (citing *West Farms Assocs. v. State Traffic Com'n of State of Conn*, 951 F.2d 469, 472-73 (2d Cir. 1991) ("[U]niversal benefits are not property interests protected by the Due Process Clause.")). "[T]he duty to investigate criminal acts (or possible criminal acts) almost always involves a significant level of law enforcement discretion. That discretion precludes any "legitimate claim of entitlement" to a police investigation." *Harrington*, 607 F.3d at 35 (citations omitted). The general "duty" of police departments to maintain public order and safety is not a duty owed to any particular person or group. *Id*. Hence, there is no constitutional violation for Defendant Tkacy's alleged failure to remove Defendant Kotsidis and Kotsidou's bicycles from the roadway.

As a result, I recommend in the alternative, that Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Tkacy be dismissed for failure to state a claim upon which relief may be granted.

### h.        Claims Against Defendant Ingersoll

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities.  *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009).  "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209.  In contrast, "a judge is not absolutely immune . . . from a suit for prospective injunctive relief." *Mireles v. Waco*, 502 U.S. 9, 10 n.1 (1991) (citing *Pulliam v. Allen*, 466 U.S. 522, 536-43 (1984)); *Shtrauch v. Dowd*, 651 F. App'x 72, 73 (2d Cir. 2016) (summary order) ("[J]udicial immunity does not bar a claim for prospective injunctive and declaratory relief.").

Plaintiffs appear to attempt to sidestep the doctrine of judicial immunity by stating that they "seek only declaratory or prospective relief as permitted by law" against Defendant Ingersoll.  (*Hamza I*, Dkt. No. 50 at 5, 6.)

Nevertheless, a court's ability to award injunctive relief against a judicial officer under Section 1983 is strictly limited.  Under Section 1983, "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.  Moreover, "[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998); *Shtrauch*, 651 F. App'x at 74 (holding that plaintiff was not entitled to declaratory relief against judicial officer where plaintiff "alleges only past conduct and does not seek to prevent an ongoing or future violation of federal law").

Here, Plaintiffs allege that Plaintiff Hamza entered a plea agreement related to an environmental conservation law misdemeanor and the "plea deal was forwarded to the Village of Philmont Court, where Defendant Judge CARLA INGERSOL[L] presided." (*Hamza I*, Dkt. No. 50 at 95.)  In addition, Plaintiffs allege that Plaintiff Hamza requested that Defendant Ingersoll recuse herself from Plaintiff's criminal matter because of "her involvement as a defendant in Plaintiffs' civil rights case." (*Id.*)  However, the Second Amended Complaint fails to set forth the outcome of that motion. (*See generally Hamza I*, Dkt. No. 50.)  Further, Plaintiffs allege that Defendant Ingersoll "declined to dismiss the charge despite notice that the citation was pretextual and retaliatory." (*Hamza I*, Dkt. No. 50 at 97.)

I find that Plaintiffs are not entitled to injunctive relief in this action against Defendant Ingersoll because the Second Amended Complaint "allege[d] neither the violation of a declaratory decree, nor the unavailability of declaratory relief," despite the availability of mechanisms for such relief. *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999). "[D]eclaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order." *Davis v. Campbell*, 13-CV-0693, 2014 WL 234722, at *9 (N.D.N.Y. Jan. 22, 2014) (Baxter, M.J.); *see Brik v. Brodie*, 23-CV-4330, 2023 WL 4373557, at *1 (E.D.N.Y. July 6, 2023) (dismissing the plaintiff's claims for injunctive relief against judge, inter alia, because plaintiff "does not seek to remedy a harm that is truly prospective, [and plaintiff] does [not] show any entitlement to declaratory relief" based on the judge's past conduct).

As a result, I recommend that in the alternative, Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Ingersoll be dismissed for failure to state a claim upon which relief may be granted.

### i.     Claims Against Defendant Klima

Plaintiffs' allegations related to Defendant Klima are that she (1) relayed a complaint made by Defendant Kotsidou to the fire department (*Hamza I*, Dkt. No. 50 at 79), (2) sent an email to Plaintiff Hamza regarding having fires in his backyard (*id.* at 85-87), (3) threatened to issue a fine to Plaintiffs for an alleged structure on their property (*id.* at 88), and (4) failed to take action regarding Plaintiffs' complaints regarding the lights and cameras on Defendants Kotsidis and Kotsidou's house (*id.* at 89).  (*See generally Hamza I*, Dkt. No. 50.)

Plaintiffs do not appear to assert any federal claims related to Defendant Klima's alleged action in relaying a complaint made by Defendant Kotsidou to the fire department.  (*Hamza I*, Dkt. No. 50 at 78-80.)  To the extent that Plaintiffs attempt to enforce criminal violations, "there is no private cause of action to enforce criminal violations."  *Whitbeck v. Otsego Cnty.*, 25-CV-0673, 2025 WL 2717564, at *6 (N.D.N.Y. Sept. 24, 2025) (Lovric, M.J.) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.")), *report and recommendation adopted as modified by*, 2025 WL 2959467 (N.D.N.Y. Oct. 20, 2025) (Nardacci, J.).

To the extent that Plaintiffs assert that their due process rights were violated by Defendant Klima's email that cautioned Plaintiffs to stop having fires in their back yard or risk

being fined (*Hamza I*, Dkt. No. 50 at 85, 87), I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

To state a claim for deprivation of property without due process of law, a plaintiff must: (1) identify a property right; (2) show that the state has deprived him of that right; and (3) show that the deprivation was effected without due process. *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994); *Nat'l Fuel Gas Supply Corp. v. Town of Wales*, 904 F. Supp. 2d 324, 331 (W.D.N.Y. 2012).

Assuming that Plaintiffs' right to have an open fire in their backyard qualifies as a protected property interest under the Due Process Clause, Plaintiffs fail to allege that Defendant Klima deprived them of that right; instead Plaintiffs allege only that Defendant Klima threatened to fine them if they continued to do so. This is insufficient to state a claim under 42 U.S.C. § 1983. *Anderson v. Cameron*, 13-CV-0578, 2016 WL 11259015, at *4 (W.D.N.Y. Sept. 14, 2016) (holding that the defendant's alleged threat to fine the plaintiff if the plaintiff continued to mine his land insufficient to state a claim under 42 U.S.C. § 1983), *report and recommendation adopted by* 2017 WL 2240253 (W.D.N.Y. May 23, 2017). "[T]here can be no recovery under § 1983 for an attempted constitutional violation; only a claim of actual deprivation is cognizable under the statute." *Lyddy v. Bridgeport Bd. of Educ.*, 06-CV-1420, 2007 WL 2697452, at *5 (D. Conn. Sept. 11, 2007); *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990); *Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980); *Ashford v. Skiles*, 837 F. Supp. 108, 115 (E.D. Pa. 1993); *Defeo v. Sill*, 810 F. Supp. 648, 658 (E.D. Pa. 1993). "[T]he mere attempt to deprive a person of

his [constitutional] rights is not, under usual circumstances, actionable under section 1983." *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir. 1987).

Moreover, to the extent that this claim is asserted as a substantive due process claim, it also fails. "Substantive due process is an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action." *Natale*, 170 F.3d at 263. Rather, "substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Nat'l Fuel Gas Supply Corp.*, 904 F. Supp. 2d at 332 (quoting *Natale*, 170 F.3d at 263); *see, e.g., Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (stating that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"); *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (holding that "[o]nly a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983"). It cannot be said that Defendant Klima's conduct in sending an email threatening Plaintiffs with fines for having fires in their backyard, was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale*, 170 F.3d at 263; *see Anderson*, 2016 WL 11259015, at *5 (holding that the defendant's letter threatening the plaintiff with fines for conducting mining operations on his property without a permit was not so outrageously arbitrary as to constitute a gross abuse of governmental authority).

To the extent that Plaintiffs assert a claim of retaliation based on Defendant Klima's threat to fine Plaintiffs for a structure and sun deck on their property, I recommend that it be

dismissed for failure to state a claim upon which relief may be granted. As set forth above in Part IV.B.3.c. of this Order and Report-Recommendation to state a claim for retaliation pursuant to the First Amendment and 42 U.S.C. § 1983, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). The Second Amended Complaint fails to set forth what protected speech or conduct Plaintiffs engaged in. (*Hamza I*, Dkt. No. 50 at 88-89.) Moreover, to the extent that Plaintiffs allege that Defendant Klima was retaliating against them "at [Defendant Kotsidou]'s behest," this Court has generally held that the causal connection is attenuated where the alleged retaliatory conduct was in response to a grievance with another individual. *Jones v. Fischer*, 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (Sharpe, C.J.) ("Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another [defendant]."); *see, e.g., Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a correctional officer where the only alleged basis for retaliation was a complaint about a prior incident by another correctional officer); *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.").

Finally, to the extent that Plaintiffs assert an Equal Protection Clause claim against Defendant Klima for her failure to take enforcement action against Defendants Kotsidis and Kotsidou, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. Plaintiffs fail to allege that anyone similarly situated to them was not threatened with a

fine.  For example, Plaintiffs do not allege that others with a "'structure' and sun deck" were not threatened with a code violation fine under similar circumstances.  The fact that Defendant Klima failed to take enforcement action against Defendants Kotsidis and Kotsidou for entirely different behavior—namely, the use of spotlights and surveillance cameras—does not reflect unequal enforcement of the law.

As a result, I recommend that Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Klima be dismissed for failure to state a claim upon which relief may be granted.

### j.    Claims Against Defendant Rodriguez in his Individual Capacity

Plaintiffs allege that Defendant Rodriguez arrested Plaintiff Hamza on August 1, 2025, and failed to identify his authority and reason for arrest pursuant to N.Y. Crim. Proc. Law § 140.15 or to produce a warrant when requested by Plaintiff Hamza.[19]  (*Hamza I*, Dkt. No. 50 at 136-138.)

"[W]hen analyzing constitutional claims of false arrest, courts generally look to the law of the state where the arrest occurred."  *Whitbeck v. Otsego Cnty.*, 25-CV-0673, 2025 WL 2959467, at *2 (N.D.N.Y. Oct. 20, 2025) (Nardacci, J.) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)).  "To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Whitbeck*, 2025 WL 2959467, at *2 (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)).  Confinement is otherwise privileged

---

[19]    A violation of New York Crim. Proc. Law § 140.15 "does not suffice as a constitutional violation."  *Murphy v. Sr. Investigator Neuberger*, 94-CV-7421, 1996 WL 442797, at *8 n.5 (S.D.N.Y. Aug. 6, 1996); *accord Kondziela v. Cnty. of Erie*, 09-CV-0601, 2011 WL 4055163, at *4 (W.D.N.Y. Sept. 12, 2011).

when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton*, 37 N.Y.2d at 458 (internal citations omitted).

Based on the allegations in the Second Amended Complaint it is entirely unclear whether Plaintiff Hamza's arrest was done without a warrant. (*Hamza I*, Dkt. No. 50 at 136 [alleging that Plaintiff Hamza was arrested by Defendant Rodriguez "without producing or even asserting the existence of an arrest warrant"]; *Id*. at 137 [alleging "Plaintiff HAMZA asked Trooper Rodriguez whether there was a warrant and whether Miranda warnings were required; Rodriguez responded that he did not have to provide either. If the arrest was pursuant to a warrant, Rodriguez was required to inform Plaintiff [Hamza] that a warrant had been issued and, upon request, show it or show it as soon thereafter as practicable."]; *Id*. at 138 [alleging "If the arrest was warrantless, Rodriguez was required to state his authority and reason for arrest unless impracticable."]; *see generally Hamza I*, Dkt. No. 50.)

Plaintiffs' conjecture is insufficient to plausibly suggest that Plaintiff Hamza's arrest was without a warrant or "not otherwise privileged." Indeed, Plaintiffs allege that a New York State Trooper "was physically present" during the incident giving rise to Plaintiff Hamza's arrest (*Hamza I*, Dkt. No. 50 at 140), which directly undermines Plaintiff's assertion that the arrest is based on "video evidence allegedly manufactured or manipulated" by Defendants Kotsidis and Kotsidou (*id.* at 136). Further, pursuant to New York Crim. Proc. Law § 140.10(1)(a), a police officer may arrest a person for any offense when he or she has reasonable cause to believe that

such person has committed such offense in his or her presence.  Hence, a warrant was not

required for Plaintiff Hamza's arrest if the events giving rise to the criminal charges occurred in

the officer's presence.

Moreover, although Plaintiffs highlight the "six week" delay between the incident and

Plaintiff Hamza's arrest, officers are not required to make an arrest as soon as probable cause

exists.  Indeed, the constitution is primarily concerned with delays following an arrest, not prior.

*Aurecchione v. Falco*, 22-CV-4538, 2025 WL 779278, at *5 (S.D.N.Y. Mar. 7, 2025) (citing

*United States v. Pabon*, 817 F.3d 164, 179-81 (2d Cir. 2017)).

Finally, the Second Amended Complaint fails to describe the relevant events leading up

to Plaintiff Hamza's the arrest.  As such, the Second Amended Complaint fails to allege facts

plausibly suggesting that Defendant Rodriguez falsely arrested Plaintiff Hamza.  *See Parrish v.

Orange Cnty. Law Enforcement Agency-M.P.D.*, 25-CV-1674, 2025 WL 2977797, at *5

(S.D.N.Y. Oct. 20, 2025) (finding that the plaintiff failed to plausibly suggest a false arrest claim

where the complaint did not describe "the relevant events leading up to and during the arrest").

As a result, I recommend that to the extent the Second Amended Complaint is construed

as asserting a false arrest/unlawful seizure claim against Defendant Rodriguez in his individual

capacity pursuant to the Fourth Amendment and 42 U.S.C. § 1983, it be dismissed for failure to

state a claim upon which relief may be granted.

To the extent that Plaintiffs assert a retaliation claim against Defendant Trooper in his

individual capacity I recommend that it be dismissed for failure to state a claim upon which relief

may be granted.  As set forth above in Part VI.B.3.i. of this Order and Report-Recommendation,

"it is difficult to establish one defendant's retaliation for complaints against another defendant."

*Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011).  Plaintiffs'

conclusory assertion that "[t]he arrest was clearly retaliatory, carried out in concert with or under pressure from private individuals targeted in Plaintiff's [sic] earlier lawsuit, and designed to intimidate, silence," (*Hamza I*, Dkt. No. 50 at 139) is insufficient to plausibly allege a causal connection between Plaintiffs' lawsuit against other actors and entities and Defendant Rodriguez's arrest of Plaintiff Hamza.

As a result, I recommend that Plaintiffs' claims pursuant to 42 U.S.C. § 1983 against Defendant Rodriguez in his individual capacity be dismissed for failure to state a claim upon which relief may be granted.

### 4.    Claims Pursuant to 42 U.S.C. § 1985

"[T]o make out a violation of § 1985(3) . . . , the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 103 S. Ct. 3352, 3356 (1983). A "conspiracy" requires, for purposes of Section 1985, "a plurality of actors committed to a common goal." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 456 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999). In addition, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). "Mere conclusory or general allegations of a conspiracy are insufficient to state a claim" under Section 1985. *Artemov v. City of New York*, 24-CV-1908, 2024 WL 1436024, at *3 (E.D.N.Y. Apr. 3, 2024) (citing *Doe v. Fenchel*, 837 F. App'x 67, 68-69 (2d Cir. 2021) (summary order) (affirming

dismissal of plaintiff's Section 1985 conspiracy claim where the operative complaint did not include facts to support its conclusory allegations)).

Here, the Second Amended Complaint contains only conclusory allegations of a conspiracy. For example, Plaintiffs assert that their allegations that "the Village Trustees coordinated with DOYLE, TKACY, and Defendants [Kotsidis and Kotsidou] state a claim for municipal conspiracy 42 U.S.C. § 1985(3), which prohibits conspiracies motivated by discriminatory animus." (*Hamza I*, Dkt. No. 50 at 53.) These naked assertions fail to plausibly allege any of the required elements of a conspiracy pursuant to 42 U.S.C. § 1985(3).

Moreover, Plaintiffs fail to allege any discriminatory animus behind the conspirators' action. (*See generally Hamza I*, Dkt. No. 50.) To the extent that the Second Amended Complaint is liberally construed as asserting discriminatory animus behind the conspirators' action based on Plaintiffs' sexual orientation, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. The Second Amended Complaint alleges that at some unspecified time Defendants Tkacy and Doyle previously exhibited "discriminatory conduct toward Plaintiff HAMZA based on his sexual orientation." (*Hamza I*, Dkt. No. 50 at 48.) Plaintiffs fail to specify any link between this prior "discriminatory conduct" and the alleged conspiracy between Defendants. (*See generally Hamza I*, Dkt. No. 50.)

As a result, I recommend that in the alternative, Plaintiffs' claim pursuant to 42 U.S.C. § 1985 against Defendants be dismissed for failure to state a claim upon which relief may be granted.

### 5.    State Law Claims

Having found that all of Plaintiffs' federal claims are subject to dismissal, I recommend that the Court decline to exercise jurisdiction over any state law claims. *See* 28 U.S.C. §

1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

### C.   *Hamza II*

#### 1.   **Plaintiff Hamza's Claims Are Frivolous**

I recommend dismissal of Plaintiff Hamza's claims in *Hamza II* as frivolous.

Plaintiff Hamza's fanciful Complaint alleges a conspiracy involving private citizen neighbors and the District Attorney's Office to harass or otherwise harm him.  (*See generally Hamza II*, Dkt. No. 1.)

Plaintiff Hamza's claims are precisely the type of fanciful or delusional allegations that warrant dismissal under 28 U.S.C. § 1915(e)(2)(B)(i) as factually frivolous.  *See, e.g.*, *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002) (holding that suit may be dismissed where facts alleged in complaint are "so nutty ('delusional' is the polite word) that they're unbelievable, even though there has been no evidentiary hearing to determine their truth or falsity"); *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (explaining that an action is frivolous

when "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy") (internal quotation marks omitted).

As a result, I recommend that Plaintiff Hamza's Complaint in *Hamza II* be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

### 2.    Claims Pursuant to 42 U.S.C. § 1983

#### a.    Claims Against Defendants Liberati-Contant and Davidson-Cunningham

##### i.    Seeking Damages

"Prosecutors sued under § 1983 enjoy absolute immunity 'from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process.'" *Joyner v. Cty. of Cayuga*, 20-CV-0060, 2020 WL 1904088, at *9 (N.D.N.Y. Apr. 17, 2020) (D'Agostino, J.) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)). Prosecutorial immunity from § 1983 liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). This includes "the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Moye v. City of New York*, 11-CV-0316, 2012 WL 2569085, at *5 (S.D.N.Y. July 3, 2012) (quoting *Johnson v. City of New York*, 00-CV-3626, 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000)). Immunity even extends to "the falsification of evidence and the coercion of witnesses[;]" "the knowing use of perjured testimony[;]" "the deliberate withholding of exculpatory information[;]" the "making [of] false

or defamatory statements in judicial proceedings[;]" and the "conspiring to present false evidence at a criminal trial[.]"[20]

Plaintiff Hamza alleges that Defendants Liberati-Contant and Davidson-Cunningham prosecuted the criminal charges brought against him, which involved "credit[ing]" the accounts of Defendants Kotsidis and Kotsidou and "discounting Plaintiff[ Hamza]'s" accounts.  (*Hamza II*, Dkt. No. 1 at 4-5.)  Plaintiff Hamza also appears to allege that Defendants Liberati-Contant and Davidson-Cunningham refused to engage in direct communication with him because he was represented by counsel.  (*Id.* at 5.)

Prosecutors are immune from action "initiating a prosecution, and in presenting the State's case." *Flager v. Trainor*, 663 F.3d 543, 547 (2d Cir. 2011).  Plaintiff Hamza's allegations relate entirely to the conduct of Defendants Liberati-Contant and Davidson-Cunningham[21] in their function as advocates in the judicial phase of the criminal process.  Thus, I recommend in the alternative that Plaintiff Hamza's claims against Defendants Liberati-Contant and Davidson-Cunningham seeking damages be dismissed based on the doctrine of absolute prosecutorial immunity.

---

[20]    *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981) (citing *Lee v. Willins*, 617 F.2d 320, 321-22 (2d Cir. 1980)); *Imbler*, 424 U.S. 409, 431 n.34 (1976); *Burns v. Reed*, 500 U.S. 478, 490 (1991); *Dory*, 25 F.3d at 83.

[21]    The Complaint merely refers to actions of "DAO," which the undersigned interpreted to signify the "District Attorney's Office."  (*See generally Hamza II*, Dkt. No. 1.)  However, the Complaint fails to allege facts plausibly suggesting any action or failure to act on behalf of Defendants Liberati-Contant and Davidson-Cunningham.  Thus, in the alternative, I recommend that Plaintiff Hamza's claims against them be dismissed for failure to allege their personal involvement in any constitutional violation.

### ii.      Seeking Injunctive Relief

Although prosecutorial immunity bars Section 1983 claims for damages, an official-capacity claim for prospective injunctive relief may proceed to remedy an alleged "ongoing violation of federal constitutional law." *Avitabile v. Beach*, 277 F. Supp. 3d 326, 332 (N.D.N.Y. 2017) (citations omitted).

Plaintiff Hamza seeks (1) a declaration that Defendants Liberati-Contant and Davidson-Cunningham violated his rights, and (2) an injunction preventing Defendant Liberati-Contant "from retaliatory/viewpoint-based handling of Plaintiff[ Hamza]'s complaints and from conditioning transparency on pendency of charges; requiring neutral processing and appropriate disclosures." (*Hamza II*, Dkt. No. 1 at 9.)

Plaintiff Hamza's request for declaratory judgment should be dismissed because it relates to Defendants Liberati-Contant and Davidson-Cunningham's previous actions, not their future conduct. *See T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 92 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2700, 221 L. Ed. 2d 966 (2025) (affirming dismissal of claim for declaratory relief against the New York Board of Law Examiners where bar applicant plaintiff "[sought] only a declaration regarding the Board's previous actions, not its future conduct").

As set forth above in Part IV.B.3.a.ii. of this Order and Report-Recommendation, "[i]n seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such a judicial decree." *Leder v. Am. Traffic Sols., Inc*., 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015).  Plaintiff Hamza fails to allege facts plausibly suggesting that he can reasonably expect to encounter future or continuing retaliation or "viewpoint-based handling" of complaints by Defendants Liberati-Contant and Davidson-Cunningham.  (*See generally Hamza*

*II*, Dkt. No. 1.)  As a result, I recommend that his request for injunctive relief be dismissed because Plaintiff Hamza lacks standing.

Moreover, the two claims in the Complaint that appear to be asserted against Defendants Liberati-Contant and Davidson-Cunninham allege (1) retaliation, and (2) a violation of Plaintiff Hamza's right to equal protection of the law.[22]  (*Hamza II*, Dkt. No. 1 at 6.)

As set forth above in Part IV.B.3.c. of this Order and Report-Recommendation, to state a claim for retaliation pursuant to the First Amendment and 42 U.S.C. § 1983, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action."  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  Moreover, as set forth above in Part IV.B.3.i. of this Order and Report-Recommendation, "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."  *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011).  Plaintiff Hamza fails to allege facts plausibly suggesting a causal connection between his protected speech in initiating a lawsuit against Defendants Kotsidis and Kotsidou and the actions of Defendants Liberati-Contant and Davidson-Cunningham in prosecuting criminal charges against him.  (*See generally Hamza II*, Dkt. No. 1.)

---

[22]    To the extent that Plaintiff Hamza attempts to assert claims against Defendants Liberati-Contant and Davidson-Cunningham related to his "irregular home arrest" or the custodial questioning without *Miranda* warnings (*Hamza II*, Dkt. No. 1 at 6-7), the Complaint fails to allege their personal involvement in Plaintiff Hamza's arrest or subsequent questioning.  (*See generally Hamza II*, Dkt. No. 1.)  Thus, Plaintiff Hamza fails to state a claim pursuant to 42 U.S.C. § 1983 upon which relief may be granted against Defendants Liberati-Contant and Davidson-Cunningham related to these allegations.

As set forth above in Part IV.B.3.c. of this Order and Report-Recommendation, the Equal

Protection Clause mandates all state governments to treat similarly situated people alike.  A

plaintiff who does not allege any protected class affiliation can demonstrate an equal protection

violation where the plaintiff shows that he or she was treated differently from similarly situated

individuals in circumstances where there was no rational basis for the difference in treatment

("class of one").  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).  The

Supreme Court has recognized that

> There are some forms of state action, however, which by their nature
> involve discretionary decision[-]making based on a vast array of
> subjective, individualized assessments.  In such cases the rule that people
> should be 'treated alike, under like circumstances and conditions' is not
> violated when one person is treated differently from others, because
> treating like individuals differently is an accepted consequence of the
> discretion granted.  In such situations, allowing a challenge based on the
> arbitrary singling out of a particular person would undermine the very
> discretion that such state officials are entrusted to exercise.

*Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603 (2008).  Notwithstanding, the Second

Circuit has emphasized that *Engquist* does not "bar *all* class-of-one claims involving

discretionary state action."  *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir.

2010).  The Second Circuit instructed that courts consider whether the government action at

issue "involve[s] discretion that is actually exercised on a day-to-day basis" or if the action is

"theoretically discretionary but—as a practical matter—actually depend[s] on de facto

standards."  *Analytical Diagnostic Labs, Inc.*, 626 F.3d at 141 (citing *Alfaro v. Labrador*, 06-CV-

1470, 2009 WL 2525128, at *9 (E.D.N.Y. Aug. 14, 2009)).

Courts in this Circuit have held that "[t]he decisionmaking applied by a prosecutor

deciding which violations to investigate and what cases to bring is the type of 'day-to-day'

government discretion that a 'class of one' claim cannot properly redress."  *Artec Constr. and

Dev. Corp. v. City of New York*, 15-CV-9494, 2017 WL 5891817, at *10 (S.D.N.Y. Nov. 28,

2017) (citing *Vested Bus. Brokers Ltd. v. Cnty. of Suffolk*, 16-CV-4945, 2017 WL 4122616, at *7

(E.D.N.Y. Sept. 15, 2017) ("[T]o the extent that [plaintiff] is challenging [defendant's]

investigation and subsequent decision not to make an arrest, the actions and decisions taken are

discretionary, and not subject to a 'class of one' claim."); *Alfaro*, 2009 WL 2525128, at *9

("[W]here a law is selectively enforced (without clear standards for enforcement) against some

people but not others, a class of one claim inappropriately interferes with the discretionary

decision making process that a law enforcement officer or body must engage in."); *see also*

*United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the

prosecutor has probable cause to believe that the accused committed an offense defined by

statute, the decision whether or not to prosecute, and what charge to file or bring before a grand

jury, generally rests entirely in his discretion."); *United States v. Moore*, 543 F.3d 891, 901 (7th

Cir. 2008) (applying the *Engquist* bar to a case challenging prosecutorial discretion because "the

discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent

with a presumption of uniform treatment")).  Indeed, "[t]he day-to-day work of a prosecutor

necessarily involves the selection of certain individuals to investigate and charge—this is the

very type of government discretion that the Supreme Court removed from equal protection

review in *Engquist*."  *Artec Constr. and Dev. Corp.*, 2017 WL 5891817, at *10.

Thus, I recommend dismissal of Plaintiff Hamza's claim that Defendants Liberati-

Contant and Davidson-Cunningham placed him in a "class of one" through participation in his

criminal prosecution because it is barred under *Engquist*.  *See Owens v. Perez*, 17-CV-0657,

2017 WL 11807650, at *6 (D. Conn. Dec. 6, 2017) (citing *Vested Bus. Brokers, Ltd*., 2017 WL

4122616, at *7 ("Simply, there is no constitutional right to an investigation by government

officials."); *Oliphant v. Villano*, 09-CV-0862, 2011 WL 3902741, at *5 (D. Conn. Sept. 6, 2011)

(plaintiff's allegation that officers failed to investigate his complaints failed to state a constitutional claim)) (the plaintiff's allegations that the defendants failed to investigate his complaint regarding another officer "fail to state a cognizable constitutional claim.").

As a result, in the alternative, I recommend that Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1983 against Defendants Liberati-Contant and Davidson-Cunningham be dismissed (1) to the extent that they seek monetary damages, because Defendants Liberati-Contant and Davidson-Cunningham are immune based on the doctrine of prosecutorial immunity, and (2) to the extent that they seek declaratory and injunctive relief, for failure to state a claim upon which relief may be granted.

### b.    Claims Against Defendants Kotsidis and Kotsidou

As set forth above in Part IV.B.3.b. of this Order and Report-Recommendation, private actors "may only be held liable under § 1983 where the conduct at issue constitutes 'state action' [–] which only occurs where the challenged action of a private party is 'fairly attributable' to the state." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 504 (N.D.N.Y. 2017) (Hurd, J.) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010)).

Under any of the applicable tests, the Complaint fails to allege facts plausibly suggesting that Defendants Kotsidis and Kotsidou acted "under color of state law." Although Defendants Kotsidis and Kotsidou allegedly informed law enforcement about various issues that they had with Plaintiff Hamza, that does not transform them to state actors. *Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005) ("a private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were improperly influenced or controlled by the private party.").

As a result, in the alternative, I recommend that Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1983 against Defendants Kotsidis and Kotsidou be dismissed for failure to state a claim upon which relief may be granted.

### 3.    Claims Pursuant to 42 U.S.C. § 1985

As set forth above in Part IV.B.4. of this Order and Report-Recommendation, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). The Complaint fails to contain any factual allegation suggesting a racial or otherwise class-based animus behind the conspirators' action. (*See generally Hamza II*, Dkt. No. 1.) The Complaint alleges solely that Plaintiff was treated differently "based on viewpoint and sexual orientation bias" but fails to identify any action or inaction by Defendants Liberati-Contant, Davidson-Cunningham, Kotsidis, or Kotsidou that suggests an animus related to Plaintiff Hamza's sexual orientation. (*Hamza II*, Dkt. No. 1 at 6; *see also Hamza II*, Dkt. No. 1 at 7 [alleging "Defendants conspired to deprive Plaintiff of equal protection and equal privileges, motivated in part by invidious class-based animus, including sexual orientation bias and hostility to Plaintiff's viewpoint"].) Plaintiff Hamza's conclusory allegations of animus are insufficient.

As a result, in the alternative, I recommend that Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1985(3) be dismissed for failure to state a claim upon which relief may be granted.

### D.    *Hamza III*

### 1.    Plaintiff Hamza's Claims Are Frivolous

I recommend dismissal of Plaintiff Hamza's claims in *Hamza III* as frivolous.

Plaintiff Hamza's fanciful Complaint impliedly alleges a conspiracy involving private citizen neighbors, foreign governments, an academic institution, a New York State non-profit,

and the United States government to harass or otherwise harm him.  (*See generally Hamza III*, Dkt. No. 1.)

Plaintiff Hamza's claims are precisely the type of fanciful or delusional allegations that warrant dismissal under 28 U.S.C. § 1915(e)(2)(B)(i) as factually frivolous.  *See, e.g.*, *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002) (holding that suit may be dismissed where facts alleged in complaint are "so nutty ('delusional' is the polite word) that they're unbelievable, even though there has been no evidentiary hearing to determine their truth or falsity"); *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (explaining that an action is frivolous when "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy") (internal quotation marks omitted).

As a result, I recommend that Plaintiff Hamza's Complaint in *Hamza III* be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

### 2. Claims Pursuant to 42 U.S.C. § 1983

Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1983 are asserted solely against Defendants Kotsidis and Kotsidou.  (*Hamza III*, Dkt. No. 1 at 7.)  As set forth above in Parts IV.B.3.b. and IV.C.2.b. of this Order and Report-Recommendation, private actors "may only be held liable under § 1983 where the conduct at issue constitutes 'state action' [–] which only occurs where the challenged action of a private party is 'fairly attributable' to the state."  *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 504 (N.D.N.Y. 2017) (Hurd, J.) (citing *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010)).

Under any of the applicable tests, the Complaint fails to allege facts plausibly suggesting that Defendants Kotsidis and Kotsidou acted "under color of state law."  Although Defendants Kotsidis and Kotsidou allegedly informed law enforcement about various issues that they had with Plaintiff Hamza, that does not transform them to state actors.  *Fisk v. Letterman*, 401 F.

Supp. 2d 362, 367 (S.D.N.Y. 2005) ("a private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were improperly influenced or controlled by the private party.").

As a result, in the alternative, I recommend that Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1983 against Defendants Kotsidis and Kotsidou be dismissed for failure to state a claim upon which relief may be granted.

### 3.    Claims Pursuant to 42 U.S.C. § 1985

Plaintiff Hamza's claims pursuant to 42 U.S.C. § 1985(3) are asserted solely against Defendants Kotsidis and Kotsidou.  (*Hamza III*, Dkt. No. 1 at 7.)  As set forth above in Parts IV.B.4. and IV.C.3. of this Order and Report-Recommendation, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action."  *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004).  Plaintiff Hamza fails to allege facts plausibly suggesting some racial or otherwise class-based animus behind the conspirators' actions.

As a result, in the alternative, I recommend that Plaintiff Hamza's claim pursuant to 42 U.S.C. § 1985(3) against Defendants Kotsidis and Kotsidou be dismissed for failure to state a claim upon which relief may be granted.

### 4.    State Law Claims

Having found that all of Plaintiff Hamza's federal claims are subject to dismissal, I recommend that the Court decline to exercise jurisdiction over any state law claims.  *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7

(1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the

balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the

remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)

(citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts,

absent exceptional circumstances, should abstain from exercising pendent jurisdiction when

federal claims in a case can be disposed of by summary judgment").[23]

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se*

litigant without granting leave to amend at least once "when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05

(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when

---

[23]    In addition, the undersigned makes the following three notes regarding Plaintiff Hamza's claims in *Hamza III*: First, Defendant the Government of the Hellenic Republic (Greece) is likely immune from suit pursuant to the Foreign Sovereign Immunities Act ("FSIA"). The FSIA "states that a 'foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in [28 U.S.C. §§] 1605 to 1607.'" *Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 204 (2d Cir. 2018) (internal quotation marks and citation omitted). Sovereign immunity from suit is the default rule, subject only to specific exceptions, which do not appear to be applicable here. Second, "an action against a federal agency . . . is essentially a suit against the United States, [and] such suits are . . . barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994). Hence, Plaintiff Hamza's claims against Defendant United States Department of State may be subject to dismissal based on the doctrine of sovereign immunity. Third, the Complaint lists Defendants the Government of the Hellenic Republic (Greece), Association of Foreign Press Correspondents in the USA, Inc., the George Washington University Graduate School of Political Management, and the United States Department of State as defendants but the body of the Complaint fails to allege facts plausibly suggesting any action or inaction on behalf of those defendants. (*Hamza III*, Dkt. No. 1.) "A complaint cannot be maintained against a defendant who is listed in the caption, but against whom no facts are alleged in the body of the complaint." *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (Kahn, J.).

justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[24]

      I recommend that the Court decline to grant Plaintiffs leave to amend. First, in *Hamza I*, Plaintiffs have already amended their pleading twice. (*Hamza I*, Dkt. Nos. 1, 40, 50.) Any additional amendments are not likely to be productive and will further clog the wheels of justice. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.'"); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

---

[24]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Second, "a court may dismiss a case without allowing leave to amend 'where the substance of the claim pleaded is frivolous on its face.'" *Harris v. U.S. Secret Serv.*, 605 F. Supp. 3d 410, 414 (N.D.N.Y. 2022) (Sannes, J.) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)). The crux of Plaintiffs' grievance in *Hamza I* is that private citizen neighbors, multiple law enforcement agencies, members of the Village government, the Village Court judge, and a private U-Haul business entered a conspiracy to harass and otherwise harm Plaintiffs. (*See generally Hamza I*, Dkt. No. 50.) Plaintiff Hamza then commenced *Hamza II*, where he alleges that the same private citizen neighbors conspired with the Columbia County District Attorney's Office to harass and otherwise harm him. (*See generally Hamza II*, Dkt. No. 1.) Finally, Plaintiff Hamza filed *Hamza III*, where he alleges that the same private citizen neighbors harassed and otherwise harmed him with some ambiguous assistance from the Government of the Hellenic Republic (Greece), the Association of Foreign Press Correspondents in the USA, Inc., the George Washington University Graduate School of Political Management, and the United States Department of State. (*See generally Hamza III*, Dkt. No. 1.)

While the undersigned does not doubt the sincerity of Plaintiffs' beliefs, the allegations in *Hamza I*, *Hamza II*, and *Hamza III* exhibit "a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources." *Kraemer v. City of New York*, 19-CV-6671, 2020 WL 1974204, at *4 (S.D.N.Y. Apr. 24, 2020). As a result, I recommend that the Court deny Plaintiffs leave to amend their pleadings. *See Lang v. Clinton*, 761 F. Supp. 3d 595, 602 (W.D.N.Y. 2024) (dismissing the plaintiff's claims without leave to amend where the allegations "are based on fantastical allegations that scores of national political figures, business leaders, celebrities, and mental health professionals entered into a conspiracy to use 'FISA technology' to remotely electrocute

and otherwise harm him."); *Harris*, 605 F. Supp. 3d at 414 (denying the plaintiff leave to amend where his claim "rests solely on his demonstrably false belief that he is president); *Muzumala v. Unknown Fed. Agents*, 22-CV-7851, 2023 WL 5530308, at *4-5 (S.D.N.Y. Aug. 28, 2023) (dismissing as frivolous the plaintiff's claims that "he is a victim of a broad conspiracy perpetrated by [the d]efendants with the initial goal of his deportation, and later to deprive him of his rights" and declining to grant leave to amend); *Allen v. Tenev*, 21-CV-4119, 2021 WL 3848871, at *2-3 (dismissing the plaintiff's complaint as frivolous where he alleged "that as a young child, Plaintiff developed Robinhood and numerous internet domain names, including Google, Visio, Instagram, Postmates, "Kangeroo," and Amazon, and declining to grant leave to amend); *see also Leib-Podry v. Tobias*, 22-CV-8614, 2024 WL 1421152, at *10 (S.D.N.Y. Feb. 13, 2024) (dismissing the plaintiff's complaint as time-barred and factually frivolous and therefore, declining leave to amend); *Frost v. CVR Assoc., Inc.*, 19-CV-9190, 2019 WL 6340993, at *1-2 (S.D.N.Y. Nov. 26, 2019) (dismissing the plaintiff's complaint as frivolous and declining to grant leave to amend).

## VI.    PLAINTIFF HAMZA'S MOTIONS IN *HAMZA III* FOR A PRESERVATION ORDER, EXPEDITED DISCOVERY, AND A COURT CONFERENCE

Plaintiff Hamza filed motions for a preservation order, expedited discovery, and a court conference.  (*Hamza III*, Dkt. Nos. 2, 3.)  In light of the recommended disposition of this case, Plaintiff Hamza's motions are denied without prejudice. (*Id.*)

**ACCORDINGLY**, it is

**ORDERED** that the Clerk of the Court shall update the docket in *Hamza I* to reflect that the correct spelling of Defendant Kotsidou's first name as "Maroula"; and it is further

**ORDERED** that Plaintiffs' applications to proceed *in forma pauperis* (*Hamza I*, Dkt. Nos. 3, 4; *Hamza II*, Dkt. No. 2; *Hamza III*, Dkt. No. 4) are **GRANTED**; and it is further

**ORDERED** that *Hamza v. Kotsidis*, 1:25-CV-0968 (ECC/ML) is consolidated with *Hamza v. Liberati-Contant*, 1:25-CV-1429 (ECC/ML), and *Hamza v. Kotsidis*, 1:25-CV-1506 (ECC/ML), with *Hamza v. Kotsidis*, 1:25-CV-0968 (ECC/ML) being designated as the lead case, and all future filings to be made in the lead case only; and it is further

**ORDERED** that Plaintiff Hamza's motions for a protective order, to expedite discovery, and for a court conference (*Hamza III*, Dkt. Nos. 2, 3) are **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT PREDJUCIE BUT WITHOUT LEAVE TO REPLEAD** Plaintiffs' Second Amended Complaint (*Hamza I*, Dkt. No. 50), Plaintiff Hamza's Complaint (*Hamza II*, Dkt. No. 1), and Plaintiff Hamza's Complaint (*Hamza III*, Dkt. No. 1) as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i), or in the alternative, because it seeks relief against defendants who are immune from such relief and for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), (iii); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[25]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[26] Such objections shall be filed with the

---

[25]    The Clerk shall also provide Plaintiffs with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[26]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: November  26, 2025
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag

Declined to Follow by    545 Halsey Lane Properties, LLC v. Town of
Southampton,    E.D.N.Y.,    August 19, 2014

2009 WL 2525128
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Richard ALFARO, Plaintiff,

v.

Barbara LABRADOR, Beth Wickey, Ann Nowak,
Hubert Phillips, Keith Tuthill, Paul Houlihan,
William Mees, Steven Frano, Jonathan Irwin,
"John Doe" and "Jane Done" # 1–5, 6–10 and 11–
15, the Town of Southampton Board Members
comprising the Southampton Zoning Board of
Appeals, the Town of Southampton Department
of Land Management and Zoning Division,
and the Town of Southampton, Defendants.

No. 06–CV–1470(JS)(WDW).
|
Aug. 14, 2009.

West KeySummary

1    **Constitutional Law**  Zoning and land use
**Zoning and Planning**  Selective
enforcement and discrimination

A Hispanic business owner failed to state an
equal protection claim against a town based
on alleged racial discrimination. The owner
alleged that the town had not subjected any other
businesses to search warrants or police raids for
zoning violations, but failed to show that he was
treated differently due to impermissible racial
considerations. Although there was evidence that
a neighboring business owner possessed racial
animus towards the business owner, there was
no evidence that any town employees engaged in
racial discrimination against the owner. U.S.C.A.
Const.Amend. 14.

9 Cases that cite this headnote

**Attorneys and Law Firms**

Concetta Maria Rinaldi, Esq., Andrew J. Campanelli, Esq.,
Perry & Campanelli, LLP, Mineola, NY, for Plaintiff.

Geoffrey H. Pforr, Esq., Robert Howard Cabble, Esq.,
Andrew J. Mihalick, Esq., Kral, Clerkin, Redmond, Ryan,
Perry & Girvan, Smithtown, NY, for Defendant William
Mees.

Jeltje DeJong, Esq., David H. Arntsen, Esq., Devitt Spellman
Barrett, Smithtown, NY, for the Southampton Defendants.

*MEMORANDUM AND DECISION*

SEYBERT, District Judge.

**\*1**  Pending before the Court are two motions for summary
judgment, one filed by Defendant William Mees, and
the other by the remaining defendants ("Southampton
Defendants"). For the foregoing reasons, Mr. Mees' motion
is GRANTED. The Southampton Defendants' motion is
GRANTED IN PART AND DENIED IN PART.

*BACKGROUND*

On August 15, 1997, Richard Alfaro ("Mr.Alfaro"), a
Hispanic male, began leasing the premises located at
674 Montauk Highway in East Quogue, New York ("the
Property") through Alfaro Motors 35th Avenue Inc., a
corporation he controlled. Southampton Def. Stmt. ¶ 1.
Mr. Alfaro leased the Property so that he could open and
operate an automobile repair shop. Compl. ¶ 8. The Property
is zoned "Village Business District," a zoning designation
which usually prohibits the operation of an automobile
repair shop. Southampton Def. Ex. C. However, Southampton
permits new owners and lessees to continue pre-existing
non-conforming uses of a property. And here, the Property
came with a Certificate of Occupancy dated November 20,
1984, which listed "one concrete block repair garage" as
a permitted non-conforming use. Southampton Def. Ex. E.
Accordingly, Mr. Alfaro believed that he had a right to operate
an automobile repair shop on the Property.

The Property abuts a business known as Hampton Brake
and Muffler, which Defendant William Mees owns. Across
the street is an automobile shop known as Automagic

East. And diagonal to the Property is a repair shop called Loper's Equipment. Like the Property, both Hampton Brake and Muffler and Automagic East lack proper zoning but have Certificates of Occupancy that permit nonconforming uses. Hampton Brake's Certificate of Occupancy permits "Major Repair of autos and trucks, in wheels, frame, body, brake alignment & mufflers," while Automagic East's permits an "automobile service station." Southampton Def. Exs. Q, R. Mr. Alfaro claims that Hampton Brake and Muffler also operates an on-site junkyard, which Mr. Mees lacks a proper Certificate of Occupancy for. Alfaro Tr. 25:7. Despite this alleged junkyard, Hampton Brake and Muffler, like Automagic East, operates without interference from the town. Loper's Equipment apparently operates without an appropriate Certificate of Occupancy and has correspondingly received numerous zoning-related citations and complaints. Southampton Def. Ex. U.

Mr. Alfaro's problems with Southampton began shortly after his lease commenced. In or about September 1997, Southampton sent Building Inspector Defendant Jonathan Erwin [1] to inspect the Property. Compl. ¶ 50. Mr. Erwin informed Mr. Alfaro that his inspection resulted from a complaint filed with the Southampton Police Department reporting that Mr. Alfaro had illegally changed the Property's use. Compl. ¶ 51. Mr. Erwin's inspection took place before Mr. Alfaro had commenced operation of a repair garage, or any business at all, on the Property. Compl. ¶ 58. Nevertheless, and despite the Property's Certificate of Occupancy permitting the use of "one concrete block repair garage," on October 3, 1997, Southampton issued Mr. Alfaro a Notice of Violation for using "a cement block building ... as a repair garage." Southampton Def. Ex. F. Although Mr. Mees opposed Mr. Alfaro's plans to use the Property as a repair garage, he did not have any conversations or other communications with Mr. Erwin concerning Mr. Alfaro or the Property. Mees Stmt. ¶ 13. However, Mr. Mees and Mr. Erwin did know each other, and Mr. Erwin had patronized Mr. Mees' business three or four times over the past fifteen to twenty years. Mees Stmt. ¶ 6.

**\*2** On October 23, 1997, Mr. Alfaro, through his attorney, wrote to the Southampton Building Department to object to the Notice of Violation and to note that the Property's Certificate of Occupancy covered the Property's allegedly improper use as a repair garage. Southampton Def. Ex. G. On October 27, 1997, the Southampton Building Department responded, stating that: (1) the Certificate of Occupancy "further clarifies the repair garage as an accessory to the

produce operation"; and (2) this non-conforming use "is abandoned ... *if* the use has been discontinued" for a specified time period. Southampton Def. Ex. H (emphasis supplied). But the Southampton Building Department's response did not explain: (1) how the Certificate of Occupancy "clarifies" the Property's use as a repair garage (its plain text contains no such "clarification"); or (2) whether the Property's non-conforming use had, in fact, been abandoned for the necessary time period.

On November 26, 1997, Mr. Alfaro was issued a citation for operating an auto repair business without a proper Certificate of Occupancy. Southampton Def. Ex. J. ¶ 8. This citation resulted in Mr. Alfaro pleading guilty pursuant to a plea bargain. *Id.* ¶ 9. As part of that plea bargain, Mr. Alfaro was required to submit an application to the Zoning Board of Appeals ("ZBA"). *Id.* Thus, in January of 2000, Mr. Alfaro filed such an application with the ZBA seeking: (1) an appeal from the Building Inspector's determination of a violation; and (2) a use variance if the appeal was denied. *Id.* ¶¶ 1, 9.

The ZBA, consisting of Defendants Barbara Labador, Beth Wickey, Ann Nowak, Hubert Phillips and Keith Tuthill, held three hearings on Mr. Alfaro's application. *Id.* ¶ 1. Mr. Mees and two elderly women opposed Mr. Alfaro's application for a special use permit. Southampton Def. Stmt. ¶ 66. Mr. Mees retained attorney Doug Penny to assist him with his opposition. Mees Stmt. ¶ 26. In connection with this representation, Mr. Penny wrote to Defendant Paul Houlihan, Southampton's Chief Building Inspector, and testified at the ZBA hearings. Houlihan Tr. 53:22–55:3. Mr. Mees contends that he opposed Mr. Alfaro's application solely due to his own economic interest, because Mr. Alfaro would have competed with him, and denies ever making any racial slurs towards Mr. Alfaro. Mees Stmt. ¶¶ 25, 27. Mr. Alfaro contends that Mr. Mees was motivated by racial animus, as evidenced by Mr. Mees allegedly referring to Mr. Alfaro as a "F' in spic" and a "spic bastard." Pl. Resp. to Mees Stmt. ¶ 25; Compl. ¶ 45. For purposes of this motion, the Court takes judicial notice of the fact that the term "F' in" is shorthand for a profanity, and that the term "spic" is a derogatory term for Hispanic.

On May 17, 2001, the ZBA made its findings. The ZBA concluded that the Building Inspector correctly interpreted the Certificate of Occupancy, because the Property had only been used to repair the produce business' trucks and the owner's personal vehicles, and had never been used to operate a commercial auto repair business. Southampton Def. Ex. J. ¶ 23. In addition, the ZBA concluded that, even if the Certificate

of Occupancy did permit a commercial auto repair business, the Property's use as a repair garage had been abandoned for seven years, precluding the Property's continued non-conforming use as a repair garage. *Id.* at ¶¶ 24–25. The ZBA then denied Mr. Alfaro's application for a use variance. *Id.* ¶ 26.

**\*3** In June 2001, Mr. Alfaro brought an Article 78 challenge to the ZBA's decision in New York Supreme Court, Suffolk County. Southampton Def. Ex. K. On April 16, 2002, the Hon. John JJ Jones, Jr. denied Mr. Alfaro's Article 78 challenge. Southampton Def. Ex. L. On June 3, 2003, the New York Appellate Division, Second Department, affirmed Justice Jones' decision.

In June 2001, Mr. Alfaro was issued another citation for occupying and using the Property without a proper Certificate of Occupancy, this time by Defendant Steven Frano. Southampton Def. Ex. W. During Mr. Frano's investigation, Mr. Frano obtained permission to park on Mr. Mees' property, and the property of another adjacent owner, for the purposes of observing Mr. Alfaro's activities. Southampton Def. Stmt. ¶¶ 49, 50. Mr. Frano and Mr. Mees were "friendly acquaintence[s]" who sometimes played softball together, and Mr. Frano had patronized Mr. Mees' shop three to five times over the past fifteen to twenty years. Mees Stmt. ¶ 7; Pl. Resp. to Mees Stmt. ¶ 15. Mr. Frano and Mr. Mees apparently discussed the Alfaro case, with Mr. Mees asking him what he was "doing about [it]," but Mr. Frano simply replied that the investigation was on-going. Frano Tr. 84:10–85:15. Mr. Tuthill, a ZBA member and a client of Mr. Mees, also went to observe the Property during this period. Pl. Stmt. ¶ 2. Mr. Mees himself kept a diary detailing Mr. Alfaro's daily activities at the Property, which he later turned over to Southampton. Pl. Stmt. ¶ 3.

On or about April 9, 2003, upon Mr. Frano's application, the Town Justice issued a search warrant for the Property. Southampton Def. Stmt. ¶ 51. On April 10, 2003, Southampton executed the search warrant. Southampton Def. Stmt. ¶ 52. Southampton officials, including Mr. Frano, conducted a four to five hour search, but were only able to seize stamps, papers belonging to Mr. Alfaro's son, tools, and $300 in cash. Pl. Stmt. at ¶ 4. Southampton has never subjected any other property to the execution of a search warrant or a police raid due to alleged building or zoning code violations. *Id.* at ¶¶ 5, 6. [2] Mr. Mees was present during the raid, and smiled as it took place. Pl. Resp. to Mees Stmt. ¶ 61b.

Life continued while these legal proceedings took place. During the lease term, Mr. Alfaro used the premises to perform certain motor vehicle repair work and towing operations. Southampton Def. Stmt. ¶ 3. The Southampton Defendants claim that Mr. Alfaro also used the property to *store* antique cars, but have failed to cite any evidence to that effect. *Id.* In December 1999, Mr. Alfaro exercised his option to purchase the Property. Compl. ¶ 70. Following his purchase of the Property, Mr. Alfaro used it to *repair* his own antique cars. Alfaro Tr. at 62:23. Mr. Alfaro also took phone calls at the Property, through which he helped to operate his businesses at other locations. Alfaro Tr. 64:15–21. Mr. Alfaro also moved his friend's vehicle to the Property, following his friend's automobile accident at a nearby location. Pl. Resp. to Southampton Def. Stmt. ¶ 67. And Mr. Alfaro received some windshield deliveries at the Property, and had those windshields put "in." Southampton Def. Stmt. ¶ 68. But Mr. Alfaro is not aware of any other activity taking place at the Property. Alfaro Tr. 67:8. Mr. Alfaro sold the Property in June 2004. Southampton Def. Stmt. ¶ 54.

**\*4** In March 2006, Mr. Alfaro commenced this case, pleading claims under § 1983 for racial discrimination (Count I), personal animus against him (Count II), lack of due process by delaying his ZBA hearing (Count III), deprivation of property without due process (Count IV), and conspiracy (Count V). On March 28, 2007, the Court dismissed Mr. Alfaro's due process claims, leaving only Counts I, II and V remaining.

## DISCUSSION

### I. *Standard of Review on Summary Judgment*

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.),* 153 F.3d 61, 67 (2d Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In assessing the

record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee,* 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.' " *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). "Mere conclusory allegations or denials will not suffice." *William v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Similarly, "unsupported allegations do not create a material issue of fact." *Weinstock,* 224 F.3d at 41.

## II. *Defendant William Mees is Entitled to Summary Judgment*

As an initial matter, Mr. Alfaro's claims against Mr. Mees fail. It is undisputed that, during the time in question, Mr. Mees was a private individual and not a Southampton employee or official. Under § 1983, private parties such as Mr. Mees can only be held liable upon a showing that the acted "under color of state law." *Nicholas v. Goord,* 430 F.3d 652, 656 n. 7 (2d Cir.2005). A private party acts "under color of state law ... when the private actor is a willful participant in joint activity with the State or its agents." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324 (2d Cir.2002) (internal citations and quotations omitted). In this regard, it is not enough that a private party "merely stand to benefit from an assertion of authority under color of law"; rather, the private party must "act under color of law" such as through a "plan, prearrangement, conspiracy, custom, or policy" with state actors. *Ginsberg v. Healey Car & Truck Leasin Inc.,* 189 F.3d 268, 272–273 (2d Cir.1999). For § 1983 purposes, a nominally private party's actions are attributable to the state when: (1) the party acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the party, the party is a "willful participant in joint activity with the [s]tate," or the party's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test"). *Sybalski v. Indep. Group Home Living Prog., Inc.,* 546 F.3d 255, 257 (2d Cir.2008) (internal citations and quotations omitted).

**\*5** Here, Mr. Alfaro argues that Mr. Mees was a "state actor" because of an alleged "conspiracy" taken between Mr. Mees

and Southampton officials. (Pl. Opp. to Def. Mees. Motion at 6). Specifically, Mr. Alfaro claims that "in furtherance of this conspiracy": Mr. Mees "spewed a multitude of racial slurs at plaintiff in the presence of defendant Town officials," and "hir[ed] a former Town attorney to represent him to vehemently oppose the plaintiff's application before the Town's Zoning Board." *Id.* at 6–7. Even if these allegations were true, they do not show that Mr. Mees was a state actor. Nothing Mr. Mees did employed the "coercive power" of the state, was closely "entwined" with the state, or amounted to the state delegating a "public function" to him. *Sybalski,* 546 F.3d at 257. Rather, at most, Mr. Mees *petitioned* for the state to employ its coercive power against Mr. Alfaro. But Mr. Alfaro does not claim, much less evidence, that Mr. Mees exercised any coercive power himself. Nor does Mr. Alfaro cite anything suggesting that a private citizen's successful request for Government action, through the exercise of his First Amendment petition rights, somehow "entwines" the private party with the Government action that ultimately results, or amounts to a "delegation" of Government power to the petitioner.[3] Thus, Mr. Mees was not a state actor for § 1983 purposes.

Mr. Alfaro's claims predicated on a § 1983 and § 1985 conspiracy theory (rather than Mr. Mees' own alleged "state act[ion]") fair no better. To prove a § 1983 conspiracy, Mr. Alfaro must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). Here, Mr. Alfaro has produced zero evidence that Mr. Mees reached any "agreement" with Southampton or its officials. At most, Mr. Alfaro has set forth unsubstantiated innuendo that such an agreement must have existed because Mr. Mees: (1) knew several of the individual Southampton Defendants personally or professionally; and (2) personally opposed Mr. Alfaro's operation of a repair shop; while (3) supposedly being in violation of Southampton's zoning code himself. Pl. Opp. to Def. Mees Motion at 7. But "conclusory allegations and unsubstantiated statements are insufficient to survive" summary judgment on a § 1983 and § 1985 conspiracy claim, where "the record is devoid of any proof of an agreement among Defendants to act in concert to violate Plaintiffs' constitutional rights." *Rose v. Julliano,* 05–CV–2732, 2008 WL 5233178, \*7 (E.D.N.Y. Dec.8, 2008); *Celestin v. City of New York,* 581 F.Supp.2d 420, 434 (E.D.N.Y.2008) (summary judgment appropriate because "there is no evidence to suggest

that an agreement existed among the officers to violate the plaintiff's constitutional rights").

**\*6** Accordingly, Mr. Mees is entitled to summary judgment. [4]

III. *The Southampton Defendants' Summary Judgment Motion is Granted in Part*

  A. *Most of Mr. Alfaro's Claims are Time Barred*
The parties agree that Mr. Alfaro's claims are subject to a three-year statute of limitations, because § 1983's statute of limitations depends on state law, and New York imposes a three-year limit on civil rights claims. Southampton Def. Motion at 6; Alfaro Opp. to Southampton Def. Motion at 8. Here, Mr. Alfaro filed his Complaint on March 30, 2006. Thus, the Southampton Defendants argue that all of Mr. Alfaro's claims based on events that preceded March 30, 2003 are time-barred. Mr. Alfaro counters that the Southampton Defendants' conduct amounted to a "continuing violation" which tolled the limitations period. But Mr. Alfaro's argument is not persuasive.

Under Second Circuit law, "[t]he crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). In his opposition to the Southampton Defendants' summary judgment motion, Mr. Alfaro's counsel contends that Mr. Alfaro did not know he was being discriminated against until April 10, 2003, when Southampton raided the Property. Alfaro Opp. to Southampton Def. Mot. at 11–12. But Mr. Alfaro cites no evidence to support this contention. And—contrary to counsel's representations—Mr. Alfaro's deposition testimony clearly indicates that he first believed that he was being discriminated against "when I realized that Mees was ... the only opposition that I had [to his Certificate of Occupancy]" which occurred "right after I got the summons." Alfaro Tr. 70:4–9. This took place sometime between 1997 (when Mr. Alfaro first received a notice of violation) and 2000 or 2001, when Mr. Mees opposed Mr. Alfaro's petition before the ZBA. Because it is well-settled that a party's statement "which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment," this Court

must ignore counsel's unsupported claim that Mr. Alfaro did not suspect discrimination until 2003, and instead credit Mr. Alfaro's deposition testimony—which establishes that Mr. Alfaro first thought he was being discriminated against sometime in 2001 or earlier. *Buttry v. Gen. Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995). And, consequently, Mr. Alfaro cannot establish that he suffered any "continuing violation." Thus, the Southampton Defendants' motion for summary judgment is GRANTED with respect to all conduct that took place before March 30, 2003. It follows then that summary judgment is also granted in full to Defendants Labador, Wickey, Phillips, Tuthill, [5] Erwin, Houlihan [6] and the Southampton Zoning Board of Appeals, whose allegedly wrongful conduct all entirely predated March 30, 2003.

**\*7** The Southampton Defendants also argue that Mr. Alfaro's claims relating to the police raid that took place on April 10, 2003 are time-barred. The Southampton Defendants claim that the raid "was merely a procedure that flowed from the 2001 criminal prosecution." Southampton Def. Br. at 9. This argument is not persuasive. As an initial matter, the Southampton Defendants have provided zero factual support for their claim that the raid "merely flowed" from Mr. Alfaro's long concluded criminal prosecution. But even if the raid really did "flow[ ]" from proceedings that took place in 2001, it is indisputable that the raid did not occur until April 10, 2003—several days after the beginning of the timely period. Accordingly, the Southampton Defendants' argument that claims relating to the raid are time-barred is frivolous. Thus, Mr. Alfaro's claims against Mr. Frano, the Town of Southampton, and the Town of Southampton Department of Land Management and Zoning Division may proceed (hereafter, the "Remaining Southampton Defendants"). [7]

  B. *The Remaining Southampton Defendants are Entitled to Summary Judgment on Mr. Alfaro's Racial Discrimination Claim*
Count I of the Complaint alleges that the Defendants denied Mr. Alfaro equal protection of the law by racially discriminating against him. To establish such a claim, Mr. Alfaro must show: (1) that he was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *See Harlen Assoc's v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

For summary judgment purposes, Mr. Alfaro has satisfied the first prong of this test. It is undisputed that several other properties in Southampton contained enforceable zoning violations, including Loper's Equipment, and potentially Hampton Brake & Muffler. But, other than Mr. Alfaro, Southampton has not subjected anyone to search warrants or police raids for zoning violations. Pl. Stmt. ¶¶ 6, 7. Indeed, in deposition, Mr. Houlihan testified that he could not think of a single other incident in which a building or zoning code violation led to a search warrant. Houlihan Tr. at 56–57. And, at least for purposes of this motion, Southampton's targeted enforcement against Mr. Alfaro is more striking because, in contrast to other zoning violators, Mr. Alfaro was allegedly not running an improperly zoned business at the time of the search warrant and raid. Thus, Mr. Alfaro has shown that he was treated differently from similarly situated individuals.

Mr. Alfaro has not, however, shown that he was treated differently due to impermissible racial considerations. Mr. Alfaro has produced no direct or circumstantial evidence suggesting that any Southampton Defendant (rather than the private party, Mr. Mees) had racial animus towards Mr. Alfaro. Indeed, Mr. Alfaro himself tacitly concedes that he has no evidence supporting an inference that Southampton or its employees engaged in racial discrimination against him. In his opposition to the Southampton Defendants' Motion for Summary Judgment at 12–13, Mr. Alfaro argues only that "discriminatory treatment was committed by co-conspirator William Mees," and then makes an unsupported speculative jump that "[s]uch racial discrimination ... was the motivation behind enforcement of the laws of Southampton." But a party cannot defeat summary judgment through "rank speculation" of racial animus. *Finkelshteyn v. Staten Island University Hosp.,* 06–CV–4774, 2009 WL 935744, *12 (E.D.N.Y. March 31, 2009)* (rejecting plaintiff's argument that "Casella's animus must be Pitta's animus"). Therefore, the remaining Southampton Defendants are entitled to summary judgment on Count I of Mr. Alfaro's Complaint.

C. *Mr. Alfaro's "Class of One" Count Survives*

**\*8** Mr. Alfaro argues that "should the Court find that there is not sufficient evidence to sustain a § 1983 claim based upon a violation of equal protection that is racially motivated, at the very least, absent a suspect class, plaintiff is a 'class of one' and, based upon this, was discriminated against." Pl. Opp. to Southampton Def. Motion at 14. In his Complaint, this claim appears as Count II, in which Mr. Alfaro alleges a violation of equal protection based on "personal animus against him."

The Supreme Court has recognized the existence of a "class of one" equal protection cause of action against a municipality for arbitrary or irrational application of property laws. In *Village of Willowbrook v. Olech,* 528 U.S. 562, 564–65, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), the Supreme Court held that a property owner stated a valid "class of one" cause of action by pleading that the defendant Village had demanded a 33 feet easement as a condition for connecting her property to the municipal water supply while similarly situated property owners needed to only grant a 15 foot easement, and that "there was no rational basis for the difference in treatment."

Applying *Village of Willowbrook,* the Second Circuit has held that "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves," and that this burden "is more stringent than that used at the summary judgment stage in the employment discrimination context." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006) (Sotomayor, J.). This is because a class of one plaintiff must show that he "was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose-whether personal or otherwise-is all but certain." *Id.* (internal quotations or citations omitted). Thus, to succeed on a class of one claim, a plaintiff must establish: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. *Id.* That being said, "whether parties are similarly situated is a fact-intensive inquiry." *Id.* Thus, a court may grant summary judgment in the defendant's favor only "where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.*

Roughly a year ago, the Supreme Court decided *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 128 S.Ct. 2146, 2154, 170 L.Ed.2d 975 (2008), in which it held that "class of one" claims cannot be brought in the public employment context, given the highly discretionary and individualized way in which employment decisions are made. More generally, the Court recognized that class of one claims cannot be brought to challenge "some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments ... In such situations, allowing a challenge based on the arbitrary

singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.* The Supreme Court expressly cited certain kinds of law enforcement as an example, noting that a traffic officer might give "only one" speeder a ticket, but that this selective enforcement does not create a "class of one." *Id.* Interpreting *Engquist,* several Second Circuit district courts have identified another element that a prospective "class of one" plaintiff must satisfy: "that the differential treatment resulted from non-discretionary state action." *See, e.g., Seymour's Boatyard, Inc. v. Town of Huntington,* 08–CV–3248, 2009 WL 1514610, *7 (E.D.N.Y. June 1, 2009); see also *Tarantino v. City of Hornell,* 615 F.Supp.2d 102, 112 (W.D.N.Y.2009) (recognizing an identical third element of a class of one claim); *Balakrishnan v. Kusel,* 08–CV–1440, 2009 WL 1291755, *5 (E.D.N.Y. May 8, 2009). And, applying *Engquist,* two circuits have held that class of one claims cannot be raised in the law enforcement context. *Flowers v. City of Minneapolis,* 558 F.3d 794, 799–800 (8th Cir.2009) ("while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim"); *United States v. Moore,* 543 F.3d 891, 901 (7th Cir.2008) (class of one claims cannot challenge the exercise of prosecutorial discretion); see also *Tarantino,* 615 F.Supp.2d at 117 (finding that a class of one claim cannot be used to challenge the enforcement of a rental property ordinance).

**\*9** There is some disagreement, however, on how far *Engquist* restricts "class of one" claims. In *Balakrishnan,* for instance, the Court granted defendants summary judgment on plaintiff's "class of one" equal protection cause of action, but denied summary judgment on plaintiff's selective enforcement cause of action predicated on plaintiff's "class of one" status. In so doing, *Balakrishnan* found that plaintiff survived summary judgment on a quasi-law enforcement claim, concerning the scope of Department of Health investigations into "the alleged regulatory violations committed by plaintiff or the laboratories he directed," and a lengthy "hold" placed on the renewal of plaintiff's certification to perform certain kinds of testing. *Balakrishnan,* 2009 WL 1291755 at *7. The Court noted that plaintiff's certification had been on "hold" for substantially longer than other individuals under investigation, and that the Department of Health's investigation of plaintiff was "longer, more in-depth, or otherwise different from the investigations of the other laboratory directors." *Id.* Thus, the Court concluded that

plaintiff had established triable issues of fact on his selective enforcement claim. *Id.*

Considering the case at hand, and the established case law, the Court respectfully disagrees with the Eighth and Seventh Circuits that class of one claims can *never* be brought in the law enforcement context. These holdings appear to derive from the Supreme Court's hypothetical concerning a traffic officer who must make discretionary determinations regarding whom to ticket for speeding—ticketing one speeder, but not others. The problem with this hypothetical, at least with respect to Mr. Alfaro's claim, is that while an individual officer might only ticket one speeder on one particular occasion, it is indisputable that many speeders get tickets, while many others do not, with no clear standards in place to determine who gets ticketed. In such a circumstance, where a law is selectively enforced (without clear standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage in.

On this point, *Engquist'* s discussion of "discretionary" decisions in the *Village of Willowbrook* context is instructive. *Engquist'* s discussion of *Village of Willowbrook* appears to define "discretionary" decisions, for the purpose of barring "class of one" claims, as those that involve discretion that is actually exercised on a *day-by-day* basis, rather than decisions that are theoretically discretionary but—as a practical matter—actually depend on *de facto* standards. Specifically, *Engquist* distinguished *Village of Willowbrook* based on the Court's understanding that the Village of Willowbrook's zoning board was not "exercising discretionary authority based on subjective, individualized determinations." *Engquist,* 128 S.Ct. at 2153. Rather, the Supreme Court commented, the fact that every other property owner had been required to give an identical easement—15 feet—demonstrated "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Id.* But *Engquist* does not claim, and *Village of Willowbrook,* does not evidence, that the "clear standard" alluded to was an *official* standard which constrained the zoning board's power. Nor does *Engquist* claim, or *Village of Willowbrook* suggest, that the zoning board lacked the statutory authority to treat some property owners different than others (that is, after all, what zoning boards frequently do). Rather, the "clear standard" that *Engquist* references appears to have emerged from the zoning board's consistent pattern and practice—that, at a practical level, it had not

exercised its statutory discretion on a case-by-case basis but instead had required the same standard for everyone.[8] So to here: the issue is not whether Southampton lacked the theoretical discretionary power to enforce its zoning code through search warrants and police raids. It's the fact, accepted as true for purposes of this motion, that it had *never* exercised that power *except* against Mr. Alfaro, placing Mr. Alfaro in a class all by himself amongst zoning code violators. So, viewing the facts in the light most favorable to Mr. Alfaro, Southampton—much like the Village of Willowbrook—had a de facto "clear standard" on how to handle zoning violations—which avoided the use of search warrants and police raids—and violated that standard by peculiarly targeting Mr. Alfaro. And thus, for purposes of this motion, the Court holds that—even if class of one claims cannot challenge discretionary decisions—Southampton's actions here were not "discretionary" enough to bar Mr. Alfaro's claim.

**\*10** That being said, Mr. Alfaro, like all class of one plaintiffs, must still establish the other two prongs of a class of one claim, that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake. *Clubside, Inc.,* 468 F.3d at 159. But for purposes of this motion, Mr. Alfaro satisfies both criteria.

First, the undisputed facts establish that at least one business in close proximity to Mr. Alfaro's engaged in similar, albeit not identical, zoning violations—Loper's Equipment. *See* Southampton Def. Ex. U. And Mr. Alfaro testified that his next door neighbor, Hampton Brake & Muffler, operated an illegal junkyard which its Certificate of Occupancy indisputably did not permit. Mindful of the fact that whether two parties are "similarly situated is a fact-intensive inquiry," and that the Court should only grant summary judgment "where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated," the Court believes that a reasonable jury could consider Loper's Equipment and Hampton Brake & Muffler similarly situated to Mr. Alfaro. *Clubside, Inc.,* 468 F.3d at 159. Both these businesses are on the same block as the Property and, for purposes of this motion, both engaged in zoning violations that did not lead to the execution of search warrants or police raids.

Second, the Southampton Defendants have not even attempted to set forth any rational basis or legitimate government policy to explain why they targeted Mr. Alfaro through the execution of a search warrant or a police raid, but not any other zoning violator (including Loper's Equipment or Hampton Brake & Muffler). In this regard, the Court can take judicial notice of the fact that zoning violations are common, and that there were likely dozens, if not hundreds, of zoning violators within Southampton during the time period in question. *See Kagen v. I.R.S.,* 71 F.3d 1018, 1021 (2d Cir.1995) ("Courts in general have long taken judicial notice of facts of common knowledge").[9] Indeed, at his deposition, Southampton's Chief Building Inspector, Mr. Houlihan acknowledged that he had "no idea" regarding how many zoning code investigations or summonses he was involved in between 1997 and 2001—suggesting a sizeable number. Houlihan Tr. 14–15. For purposes of this motion, Southampton has not contended that Mr. Alfaro's violations were more severe, or articulated any other reason why it treated Mr. Alfaro more severely than all the other zoning violators in the Town. Accordingly, a reasonable jury could find that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Clubside, Inc.,* 468 F.3d at 159. And thus, Mr. Alfaro meets the first prong.

**\*11** Furthermore, the Southampton Defendants do not even claim that they targeted Mr. Alfaro by "mistake." Thus, given the relative similarity in circumstances between Mr. Alfaro and other zoning violators, and the relative dissimilarity in how Southampton treated him, a reasonable jury could also "exclude the possibility that the defendants acted on the basis of a mistake." *Id.*

It follows that Mr. Alfaro's "class of one" equal protection claim survives summary judgment.

### D. The Remaining Southampton Defendants are Entitled to Summary Judgment on Mr. Alfaro's Conspiracy Claim

The Remaining Southampton Defendants are entitled to summary judgment on Mr. Alfaro's conspiracy claim brought under 42 U.S.C. § 1985. Mr. Alfaro has adduced no evidence that the Remaining Southampton Defendants entered into any kind of agreement to deny him equal protection of the law. And, "[i]n order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement,

express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003). Therefore, the Remaining Southampton Defendants are entitled to summary judgment on Mr. Alfaro's conspiracy claim.

In addition, as noted above, the Remaining Southampton Defendants consist of a Southampton employee (Mr. Frano), Southampton itself, and an apparent Southampton government body. And it is well-established that "[u]nder the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo,* 546 F.3d 95, 99 n. 3 (2d Cir.2008). The intracorporate conspiracy doctrine further "bars conspiracy claims alleging concerted action by employees and/or the heads of various departments within a single municipal entity, at least where the complaint fails to allege that the various [municipal] entities were effectively acting as separate entities in carrying out the alleged conspiracy." *Broich v. Incorporated Village of Southampton,* 08–CV–0553, 2009 WL 2225306, *9 (E.D.N.Y.2009) (internal citations and quotations omitted). Here, because the remaining defendants are all part of the same municipal entity—the Town of Southampton—summary judgment is also proper on the basis of the intracorporate conspiracy doctrine.

### E. *Qualified Immunity*
The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1945, 173 L.Ed.2d 868 (2009). To establish qualified immunity, defendants must "show either that their conduct did not violate clearly established rights of which a reasonable person would have known, or that it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Prue v. City of Syracuse,* 26 F.3d 14, 17 (2d Cir.1994).

**\*12** Here, the Southampton Defendants argue that Mr. Frano is entitled to qualified immunity because he was engaged in discretionary functions, and it was objectively reasonable for him to believe that his actions did not violate Mr. Alfaro's rights. Mr. Frano is entitled to qualified immunity on the latter ground.

The timely conduct alleged against Mr. Frano consists of Mr. Frano's role in obtaining a search warrant and facilitating a police raid on Mr. Alfaro's property, thereby selectively enforcing Southampton's zoning code against a "class of one." These actions took place in 2003. But even today, several years after the search warrant and raid, the law concerning "class of one" claims is muddled. As discussed above, two circuits (the Eighth and the Seventh) have effectively held that plaintiffs' cannot assert "class of one claims" in the law enforcement context (*e.g.,* here, a search warrant and raid). And, although this Court disagrees with drawing any bright line rule, the fact that two circuit courts would bar Mr. Alfaro's claim (while the Second Circuit has yet to speak) demonstrates that Mr. Frano's actions did not violate any of Mr. Alfaro's "clearly established rights." *Prue,* 26 F.3d at 17.

In addition, the fact that the Town Justice signed off on the search warrant creates a presumption that Mr. Frano's conduct "was objectively reasonable." *Martinez v. City of Schenectady,* 115 F.3d 111, 115 (2d Cir.1997). And, to rebut that presumption, Mr. Alfaro "must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth" obtained the search warrant through "a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'" *Lynch ex rel. Lynch v. City of Mount Vernon,* 567 F.Supp.2d 459, 466 (S.D.N.Y.2008) (internal citations and quotations omitted). Here, Mr. Alfaro has failed to do so.

Thus, Mr. Frano is entitled to summary judgment on the issue of qualified immunity. Consequently, Mr. Alfaro may proceed to trial only against the Town of Southampton and the Town of Southampton Department of Land Management and Zoning Division. [10]

### CONCLUSION

Mr. Mees' motion for summary judgment is GRANTED in full. The Southampton Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically: (1) Defendants Labrador, Wickey, Nowak, Phillips, Houlihan, Erwin and the Southampton Board Members comprising the Southampton Zoning Board of Appeals are awarded full summary judgment; (2) Defendants the Town of Southampton and the Town of Southampton Department of Land Management and Zoning Division are awarded summary judgment on Counts I and V of the Complaint; and (3) with respect to Count II of the Complaint, Defendants the Town of Southampton and the Town of Southampton Department of Land Management and Zoning

Division are awarded summary judgment with respect to all conduct that took place on or before March 30, 2003.

**\*13** Plaintiff Richard Alfaro may proceed to trial only against the Town of Southampton and the Southampton Department of Land Management and Zoning Division, and only with respect to Count II's "class of one" claim predicated on conduct that postdates March 30, 2003.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2525128

---

## Footnotes

1    Mr. Erwin's last name is incorrectly spelled as "Irwin" in the Complaint and case caption.

2    Mr. Houlihan's testimony, viewed in the light most favorable to Mr. Alfaro, suggests that Southampton never before executed search warrants or ordered police raids in response to zoning violations. Houlihan Tr. at 56–57. However, Mr. Frano testified that Southampton has executed search warrants in response to zoning violations approximately ten to fifteen times, generally in the context of summer rental houses. Frano Tr. at 31–32. But even Mr. Frano—who has been performing similar responsibilities since 1982—could not recall an instance where another commercial business was subjected to a search warrant for a zoning violation, and conceded it was "possible" that Mr. Alfaro's case was unique. Frano Tr. at 32.

3    The First Amendment precludes Congress from making any law that "abridg[es] ... the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. Accordingly, even if Mr. Mees' petitioning for the state to take action could somehow be considered state action itself, Mr. Mees would likely have immunity from Mr. Alfaro's claims under the First Amendment and the *Noerr–Pennington* doctrine. *Barnes Foundation v. Township of Lower Merion,* 242 F.3d 151, 158 (3d Cir.2001) (finding that the "Noerr–Pennington doctrine provides an immunity for First Amendment activity allegedly constituting a civil rights abuse" even when "a racially discriminatory animus allegedly motivated the activity"); *but see LeBlanc–Sternberg v. Fletcher,* 781 F.Supp. 261, 267 (S.D.N.Y.1991) (holding that the First Amendment does not protect petitioning motivated by discriminatory animus). Similarly, the First Amendment protects Mr. Mees' right to use racial slurs during a private dispute, such as a feud with his neighbor Mr. Alfaro. *See Million Youth March, Inc. v. Safir,* 63 F.Supp.2d 381, 391 (S.D.N.Y.1999) ("hateful, racist, and offensive speech ... is entitled to First Amendment protection").

4    Mr. Mees also contends that summary judgment is also appropriate because Mr. Alfaro's claims against him violate New York's Strategic Lawsuits Against Public Participation ("SLAPP") statute. *See* N.Y. Civ. Rights L. § 70–a. But § 70–a does not provide a defendant with grounds for summary judgment. Rather, it permits a defendant to "maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees" against any plaintiff who files a suit seeking to chill public petitioning and participation. *Id.* Here, Mr. Mees has not asserted any SLAPP "action, claim, cross claim or counterclaim" against Mr. Alfaro. Therefore, the Court does not consider his SLAPP-related arguments.

5    Mr. Alfaro claims that Mr. Tuthill went to his property at night to inspect it. Pl. Stmt. ¶ 2; Alfaro Tr. 56. Based on the transcript, it appears that Mr. Tuthill's night-time visits took place in connection with his role on the ZBA, and are thus time-barred. If, however, Mr. Alfaro contends that Mr. Tuthill continued to visit the Property after the ZBA proceedings concluded, in connection with the search warrant and raid, the Court will grant him leave to file a motion to reconsider the Court's award of summary judgment in Mr. Tuthill's favor. The Court cautions Mr. Alfaro, however, that any such motion for reconsideration must be based on a good faith

belief—supported by admissible evidence—that Mr. Tuthill played some direct or indirect role in the raid. If Mr. Alfaro baselessly attempts to bring Mr. Tuthill back into this case, sanctions may be appropriate. *See* FED. R. CIV. P. 11.

6   Mr. Houlihan's term as Southampton's Chief Building Inspector ended in August of 2001, when he became West Hampton Beach's Chief Building Inspector. Houlihan Tr. at 5–6.

7   The Southampton Defendants contend that the Town of Southampton Department of Land Management and Zoning Division is just an administrative agency of the Town of Southampton, and thus not susceptible to suit. *See, generally,* S.W. by J.W. v. Warren, 528 F.Supp.2d 282, 302–03 (S.D.N.Y.2007). But the Southampton Defendants did not include this contention in their Rule 56.1 Statement, and provide no evidentiary support for it in their briefs. Thus, for now, Mr. Alfaro's claim against the Southampton Department of Land Management and Zoning Division survives.

8   By hypothetical: assume that a state statute prohibiting robbery permits a municipality to charge a teenage offender as either a minor or as an adult. Further assume that, over the past 10 years, the municipality had acted under a *de facto* policy to never charge minors as adults for that particular offense, and thus had uniformly prosecuted hundreds of substantially similar offenders as minors, *never* prosecuting even one minor offender as an adult. If that overall policy continued, but a prosecutor singled out a *single* minor offender to charge as an adult simply because the prosecutor irrationally disliked him, would *Engquist* completely foreclose such a "class of one" claim? The Court does not think so.

9   Indeed, a Westlaw search revealed several zoning disputes in recent years which have led to court decisions. *See, e.g.,* Downing v. Charos, Case No.2006–35225, 2007 WL 4439434 (Table) (N .Y. Sup.Ct., Suffolk County 2007); Lafiteau v. Guzewicz, Case No. 06–19664, 831 N.Y.S.2d 354 (Table) (N.Y. Sup.Ct., Suffolk County 2006) (concerning the granting of a special use permit to cure on-going violations); Town Bd. of Town of Southampton v. Credidio, 21 A.D.3d 547, 800 N.Y.S.2d 732 (2d Dep't 2005). Undoubtedly, most zoning code violations never reach this stage.

10   The Southampton Defendants did not move for summary judgment on Mr. Alfaro's *Monell* claim against the municipality. However, to prevail at trial, Mr. Alfaro must prove the Complaint's allegation that Mr. Frano "was clothed with the authority to make official government policy, and laws, on behalf of Southampton." Compl. ¶ 168; *See* Messner v. Calderone, 07–CV–0893, 2008 WL 696909, *4 (N.D.Ill.2008) (permitting a class of one plaintiff to assert a *Monell* claim based upon a mayor's allegedly illegal orders). Municipalities cannot be held liable under § 1983 "by application of the doctrine of *respondeat superior.*" Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir.2008). And, although a municipality can face liability based on its customs or practices, such a theory is fundamentally inconsistent with Mr. Alfaro's "class of one" status, at least when Mr. Alfaro's claims depend on only a few events. *See, generally,* McDorman v. Smith, 05–CV–0448, 2006 WL 2355574, *7–8 (N.D.Ill.2006) (recognizing the inherent tension between a *Monell* claim and a "class of one" claim, but permitting a plaintiff to assert both claims at the pleading stage, noting that plaintiffs are permitted to plead inconsistent claims).

---

      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   11

2025 WL 1033836
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jaiquan ALLAH, Plaintiff,

v.

Ryan LAWSON, Sergeant; Aragona, Sergeant; Stratta,
Sergeant; Grimmick, Sergeant; Anthony Torrisi,
Lieutenant; Thomas Pleat, Correctional Officer; Adam
Molesky, Correctional Officer; Carol Ann Cavanaugh,
Grievance Coordinator/Hearing Officer; Bonnaci,
Correctional Officer; Andrew Lacrosse, Correctional
Officer, Badge #434; Andrew Cohen, formerly
known as John Doe, Badge #257; and Paul Spadinger,
formerly known as John Doe, Badge # 329, Defendants.

9:23-CV-0785 (LEK/ML)
|
Signed February 18, 2025

**Attorneys and Law Firms**

JAIQUAN ALLAH, Pro Se Plaintiff, Upstate Correctional
Facility, Post Office Box 2001, Malone, New York 12953.

KEVIN CANNIZZARO, ESQ., ALBANY COUNTY
ATTORNEY'S OFFICE, Counsel for Defendants, 112 State
Street, Albany, New York 12207.

## REPORT and RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1**  Currently before the Court, in this civil rights action filed
by Jaiquan Allah ("Plaintiff") against Ryan Lawson, Aragona,
Stratta, Grimmick, Anthony Torrisi, Thomas Pleat, Adam
Molesky, Carol Ann Cavanaugh, Bonnaci, Lacoozi, Andrew
Cohen, and Paul Spadinger (collectively "Defendants"), is
Defendants' motion to dismiss for failure to state a claim upon
which relief may be granted and judgment on the pleadings
pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c). (Dkt. No. 49.)
For the reasons set forth below, I recommend that Defendants
motion be granted in part and denied in part.

## I. BACKGROUND

### A. Procedural History

On June 29, 2023, Plaintiff commenced this action by the
filing of a Complaint. (Dkt. No. 1.) On July 31, 2023, Plaintiff
filed a motion for leave to proceed *in forma pauperis* ("IFP").
(Dkt. No. 5.)

On September 19, 2023, Senior United States District Judge
Lawrence E. Kahn granted Plaintiff's IFP application and
ordered that the following claims survive *sua sponte* review:
(1) Plaintiff's First Amendment retaliation claim against
Defendant Torrisi based on the search of Plaintiff's cell
and issuance of a false misbehavior report against him
on February 26, 2023, in response to a lawsuit Plaintiff
filed regarding a "slip and fall accident" that occurred
two days earlier; (2) Plaintiff's First Amendment retaliation
claim against Defendants Molesky, Lawson, and Spadinger
based on these officials searching Plaintiff's cell and issuing
him a false misbehavior report on March 18, 2023, in
response to Plaintiffs submission of a grievance on February
28, 2023; (3) Plaintiff's First Amendment retaliation claim
against Defendant Lawson based on this official placing
Plaintiff on suicide watch on March 23, 2023, in response
to Plaintiff's submission of a grievance regarding the cell
search on March 18, 2023; (4) Plaintiff's First Amendment
retaliation claim against Defendants Aragona and Pleat based
on these officials destroying (or directing others to destroy)
Plaintiff's personal property following his stated intent to file
a grievance against them on May 14, 2023; (5) Plaintiffs
First Amendment retaliation claim against Defendants Stratta
and Pleat based on these officials initiating a use-of-
force incident on May 20, 2023, in response to Plaintiff's
earlier engagement in protected activity; (6) Plaintiff's Fourth
Amendment unlawful strip frisk claim against Defendants
Aragona and Pleat based on the strip search that occurred
on May 14, 2023; (7) Plaintiff's Fourteenth Amendment
conditions-of-confinement claim against Defendant Lawson
based on his exposing Plaintiff to cold temperatures in
the suicide watch cell for hours on March 23, 2023; (8)
Plaintiff's Fourteenth Amendment conditions-of-confinement
claims against Defendants Aragona and Lawson based on
their denial of Plaintiff's access to the bathroom on May 20,
2023; (9) Plaintiff's Fourteenth Amendment excessive force
claims against Defendants Stratta, Pleat, Bonnaci, Lacoozi,
Lawson, Spadinger, and Cohen based on the alleged use of
force incident that occurred on May 20, 2023; (10) Plaintiff's
Fourteenth Amendment failure-to-intervene claims against
Defendants Aragona and Grimmick based on the alleged
use of force incident that occurred on May 20, 2023; (11)
Plaintiff's Fourteenth Amendment disciplinary due process
claim against Defendant Cavanaugh based on Defendant

Cavanaugh's disciplinary sanction imposed against Plaintiff on May 24, 2023; and (12) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson based on his use of racial slurs in connection with placing Plaintiff on suicide watch and subjecting Plaintiff to excessive force. (Dkt. No. 8 at 13-25.) Judge Kahn dismissed without prejudice all remaining claims and terminated Defendants Sheehan and Grimes from this action. (*Id.* at 27-28.)

**\*2** On February 2, 2024, Defendants filed a verified answer. (Dkt. No. 23.) On February 7, 2024, Defendants filed an amended verified answer. (Dkt. No. 25.)

On March 13, 2024, Plaintiff filed an amended complaint naming the Doe defendants. (Dkt. No. 31.)

On March 21, 2024, the undersigned issued a text order that, among other things, directed the Clerk of the Court to update the docket with respect to identifying defendants who were previously listed as "John Doe." (Dkt. No. 33.)

On March 21, 2024, the Clerk of the Court filed Plaintiff's Amended Complaint pursuant to the undersigned's directive. (Dkt. No. 34.) On May 17, 2024, Plaintiff filed a one-page document titled "Amendment of Complaint – Adding Damages," which purports to amend the relief requested in the complaint "by inserting punitive damages in the amount of $500,000" and "compensatory damages in the amount of $2,850,000." [1] (Dkt. No. 48.)

On May 28, 2024, Defendants filed the pending motion to dismiss for failure to state a claim upon which relief may be granted and judgment on the pleadings. (Dkt. No. 49.)

### B. Parties' Briefing on Defendants' Motion to Dismiss

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion to dismiss, Defendants assert that Plaintiff fails to state a claim upon which relief may be granted. (*See generally* Dkt. No. 49, Attach. 2.)

More specifically, with respect to Plaintiff's First Amendment retaliation claim related to the misbehavior report of February 26, 2023, Defendants argue that Plaintiff failed to allege that Defendant Torrisi took any adverse action against Plaintiff because the filing of a "false misbehavior report[ ] is, at best, [a] *de minimis* action." (Dkt. No. 49, Attach. 2 at 15.) In

addition, Defendants argue that the Amended Complaint fails to allege non-conclusory allegations sufficient to connect the slip and fall grievance and the allegedly false misbehavior report of February 26, 2023. (*Id.*) Defendants argue that the Amended Complaint fails to allege facts plausibly suggesting that Defendant Torrisi's shake down of Plaintiff and multiple other inmates was substantially motivated by Plaintiff's prior grievance. (*Id.*) In addition, Defendants assert that the documents attached to the Amended Complaint show that Defendants would have taken the allegedly adverse action of filing the misbehavior report, even in the absence of Plaintiff's grievance because Plaintiff attempted to pass an item to another inmate and refused to surrender the item when directed. (Dkt. No. 49, Attach. 2 at 15-16.)

With respect to Plaintiff's First Amendment retaliation claim related to the misbehavior report of March 18, 2023, Defendants argue that the Amended Complaint fails to allege (1) an adverse action, or (2) a causal connection between an alleged adverse action and the protected conduct. (Dkt. No. 49, Attach. 2 at 16-18.) Defendants argue that an allegedly false misbehavior report is not an adverse action because it would not deter a similarly situated inmate. (*Id.*) Defendants also assert that the Amended Complaint is devoid of allegations connecting a specific grievance with Plaintiff allegedly getting set up to "get his ass beat," the search of his cell, and the misbehavior report that was filed on March 18, 2023. (*Id.*) Further Defendants argue that, as evidenced by the documents attached to the Amended Complaint (1) Plaintiff was found guilty of the contraband (loose screw) found in his cell, (2) Plaintiff pleaded guilty to the charges stemming from the fight with another inmate, and (3) Defendants would have taken the adverse action even in the absence of Plaintiff's grievances based on the odor of smoke, burnt rolled toilet paper located in his cell, and loose screw located in his cell. (*Id.*)

**\*3** With respect to Plaintiff's First Amendment retaliation claim related to searches of his cell, Defendants argue that retaliatory searches of an inmate and their cell are not actionable. (Dkt. No. 49, Attach. 2 at 18-20.) Defendants assert that wholly random searches are essential to effective security and even searches conducted with retaliatory intent or those that are especially thorough in execution are not adverse actions. (*Id.*) Defendants assert that the Amended Complaint fails to assert facts plausibly suggesting a causal connection between Plaintiff's protected speech and the allegedly retaliatory searches. (*Id.*) Finally, Defendants argue that, based on the documents attached to the Amended

Complaint, even in the absence of Plaintiff's protected speech, the searches would have occurred because they were in response to (1) Plaintiff passing a note to a fellow inmate, and (2) the odor of smoke generated by burning toilet paper. (*Id.*)

With respect to Plaintiff's retaliatory administrative segregation in the suicide watch cell claim, Defendants argue that it should be dismissed because it was an administrative action taken because of the fight that Plaintiff was admittedly involved in "in Medical" between Plaintiff and another inmate. (Dkt. No. 49, Attach. 2 at 20-21.) Defendants argue that the record belies Plaintiff's allegation that he was placed on suicide watch, instead, Defendants assert that Plaintiff was placed in administrative segregation based on the fight "in Medical." (*Id.*) Moreover, Defendants argue that Plaintiff fails to allege facts plausibly suggesting a causal connection between his placement in a suicide watch cell (or, administrative segregation) and any protected speech. (*Id.*)

With respect to Plaintiff's retaliatory destruction claim, Defendants argue that the Amended Complaint fails to allege facts plausibly suggesting that Defendants Aragona and Pleat were personally involved in the destruction of his property. (Dkt. No. 49, Attach. 2 at 21-22.)

With respect to Plaintiff's First Amendment Retaliation claim related to the alleged use-of-force incident on May 20, 2023, Defendants argue that the Amended Complaint fails to allege facts plausibly suggesting that the use of force was precipitated by any specific grievance or investigation. (Dkt. No. 49, Attach. 2 at 22-24.) Defendants argue that the documents attached to the Amended Complaint indicate that the use of force was appropriate, not retaliatory, and would have been used in the absence of any grievance. (*Id.*)

With respect to Plaintiff's Fourth Amendment strip frisk claim, Defendants argue that the documents attached to the Amended Complaint and the grievance that Plaintiff filed undermine Plaintiff's allegation that Defendant Pleat was involved in the strip search. (Dkt. No. 49, Attach. 2 at 24-25.) Moreover, Defendants argue that because routine, random strip searches of inmates do not violate the Fourth Amendment, the strip search of Plaintiff and five other inmates on May 14, 2023, is not actionable and should be dismissed. (*Id.*)

With respect to Plaintiff's Fourteenth Amendment conditions of confinement claims, Defendants argue that they must be dismissed. (Dkt. No. 49, Attach. 2 at 26-28.) Defendants

assert that Plaintiff failed to assert facts plausibly suggesting that placement in the suicide watch cell constituted "atypical action" resulting in a "significant deprivation" of any liberty interest he may have possessed. (*Id.*) Moreover, Defendants argue that the Amended Complaint does not allege that Plaintiff's placement in the suicide watch cell posed a substantial risk of serious harm or that Defendant Lawson possessed sufficient culpable intent. (*Id.*) With respect to the May 20, 2023, denial of the bathroom use, Defendants argue that Plaintiff's failure to mention denial of the bathroom in his grievance dated May 21, 2023, related to the incident, "indicates that the allegation is false and must be dismissed as wholly contradicted by a sworn statement he relies on." (*Id.* at 28.) In addition, Defendants argue that Plaintiff failed to allege any "serious physical harm or a serious risk of contamination" arising out of the claimed conduct, nor has he overcome the proposition that urinating on himself, without more, does not rise to a Constitutional violation. (*Id.*)

**\*4** With respect to Plaintiff's Fourteenth Amendment excessive force claims, Defendants argue that the documents attached to the Amended Complaint reflect that the use of force was either (1) objectively reasonable, or (2) *de minimus*. (Dkt. No. 49, Attach. 2 at 28-30.) Defendants argue that Plaintiff was the subject of a weekly security risk group shake down, Plaintiff threw his shirt at staff and punched officers; officers unsuccessfully attempted to gain control through verbal directives and ultimately administered OC spray. (*Id.*)

With respect to Plaintiff's failure to intervene claims, Defendants argue that the Amended Complaint fails to allege facts plausibly suggesting that Defendants Aragona and Grimmick were present during the use of force incident and thus, had a fair opportunity to intervene. (Dkt. No. 49, Attach. 2 at 30-31.)

With respect to Plaintiff's Fourteenth Amendment disciplinary due process claim, Defendants argue that it must be dismissed because a 60-day confinement in the SHU, even coupled with the loss of assorted privileges and the imposition of a surcharge, did not implicate a liberty interest under the Fourteenth Amendment. (Dkt. No. 49, Attach. 2 at 31-32.) Moreover, Defendants argue that in light of the "commonplace imposition of SHU placement as a disciplinary sanction, Plaintiff's confinement cannot plausibly be characterized as 'atypical' or a 'significant deprivation' with respect to similarly situated inmates." (*Id.* at 32.)

With respect to Plaintiff's Fourteenth Amendment equal protection claims, Defendants argue that the Amended Complaint fails to allege facts plausibly suggesting any concomitant physical injury with the alleged racial slurs, sufficient to elevate them to Constitutionally actionable speech. (Dkt. No. 49, Attach. 2 at 32.)

### 2. Plaintiff's Response in Opposition

Generally, in opposition to Defendants' motion to dismiss, Plaintiff argues that (1) with respect to his First Amendment retaliation claim arising out of the misbehavior report of February 26, 2023, Defendant Torrisi authorized officers to shake Plaintiff down and issue him a ticket, which is sufficiently adverse to plausibly suggest a claim for retaliation; (2) with respect to his First Amendment retaliation claim related to the misbehavior report of March 18, 2023, he sufficiently alleged a causal connection between the cell ambush and his grievance of February 28, 2023 because (a) Defendant Molesky warned Plaintiff not to "start a war you can't finish," (b) there was no justification for the search including no physical evidence of the alleged odor of smoke or burnt rolls allegedly located in Plaintiff's cell, (c) there was no body worn camera footage of the search and there should have been, and (d) Plaintiff was found not guilty of the loose screw ticket; (3) with respect to the retaliatory searches of Plaintiff's cell, the incident on (a) February 26, 2023, involved passing a note, which is not dangerous and does not provide a basis for conducting a search and, in any event, no hearing was ever held which "shows the intent, motive, and animosity [Defendant] Torrisi had towards Plaintiff," and (b) March 18, 2023, resulted in a misbehavior report, which indicated that the search was conducted 21 minutes after Plaintiff left for recreation so (Plaintiff argues) it is doubtful that smoke was emanating from his cell; (4) with respect to the retaliatory admission to the suicide cell watch, Defendant Lawson told Plaintiff that if he writes another grievance, Defendant Lawson will make sure Plaintiff stays in the SHU forever, then placed Plaintiff in suicide watch without the required mental health evaluation; (5) with respect to his retaliatory destruction of property claim, the search was extraordinary in that, almost everything in Plaintiff's cell was destroyed, and after conclusion of the strip search, Defendant Aragona stated "... fuck this all was for nothing"; (6) with respect to the First Amendment Retaliation claim related to the use of force incident on May 20, 2023, the close temporal proximity between Plaintiff's receipt that the Notice of Claim for his slip and fall incident was delivered on May 17, 2023, and the

premeditated attack on May 20, 2023, sufficiently alleges a causal connection to survive Defendants' motion to dismiss; (7) with respect to the Fourth Amendment unlawful strip frisks claims, (a) his grievance mentioned "John Doe badge #166," who has since been identified as Defendant Pleat, and (b) Defendants Aragona and Pleat lacked reasonable cause to believe that Plaintiff was engaging in misconduct or criminal activity before the strip search; (8) with respect to his Fourteenth Amendment conditions of confinement claim, Defendant Lawson failed to act with reasonable care when he placed Plaintiff in a suicide watch cell with the window open, causing the temperature in the cell to be "freezing" and telling Plaintiff that if he writes another grievance, Defendant Lawson would be sure that Plaintiff stays in the cold cell forever; (9) with respect to the excessive force claim, (a) he complied with orders and did not resist, and (b) when he was cleared from the scanning machine he was sent to the booking room where the beating began, he was then put in handcuffs and escorted to medical where the beating continued in the medical shower, he was then evaluated by a nurse in medical and assaulted again, he was then strapped to a chair while still handcuffed and punched and kicked again, all of which was unreasonable; (10) with respect to his Fourteenth Amendment disciplinary due process claim he adequately alleged a violation because (a) he was not present during the entirety of his disciplinary hearing, and (b) he was not permitted to present witnesses and evidence; (11) with respect to his Fourteenth Amendment equal protection claims, Defendant Lawson's racial slur and Plaintiff's physical and mental injuries sustained on March 23, 2023, and May 20, 2023, were sufficient; (12) with respect to his Fourteenth Amendment failure to intervene claim, Defendants Aragona and Grimmick knew, based on comments made by other officers, that an assault against Plaintiff was forthcoming, and—instead of "part[ing] ways"—they should have made an effort to stop or limit the amount of force applied. (*See generally* Dkt. No. 57.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED[2]

**\*5** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F.

Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [3]

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*6** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal,* 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)) (other

citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

## III. ANALYSIS [4]

### A. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendant Torrisi

After carefully considering the matter, I answer this question in the affirmative for the reasons set forth below.

A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

**\*7** To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, 99-

CV-2065, 2003 WL 22299359, at \*4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

For purposes of this motion, it is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of a grievance and/or lawsuit. (Dkt. No. 49, Attach. 2 at 14-15 ["Defendants concede that the filing of grievances is protected speech."]); *see Davis v. Goord*, 320 F.3d at 352-53 ("[T]he filing of prison grievances is a constitutionally protected activity."); *Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at \*7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is protected speech).

Although a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout*, 808 F.3d 949, 951 (2d Cir. 1986), there are "two exceptions to this rule: when an inmate is 'able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801 F.3d 51, 64 (2d Cir. 2015) (citing *Freeman*, 808 F.2d at 951-53; *Franco v. Kelly*, 854 F.2d 584, 589-90 (2d Cir. 1988)). Plaintiff's claim relates to the second exception set forth in *Willey*; Plaintiff alleges that he was issued the misbehavior report in retaliation for exercising a constitutionally protected right. Thus, the undersigned rejects Defendants' assertion that Plaintiff's retaliation "claim must be dismissed, because as a matter of law, false accusations in a misbehavior report do not state a cause of action under 42 U.S.C. § 1983." (Dkt. No. 49, Attach. 2 at 14.)

Moreover, I reject Defendants' assertion that the alleged false misbehavior report was *de minimis*." (*Id.* at 15.) Plaintiff alleges that Defendant Torrisi directed a "shake down" of Plaintiff—which the undersigned interprets to mean a strip search—and issued a false ticket (Dkt. No. 34 at 7), which "could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights." *Abreu v. Lipka*, 778 F. App'x 28, 33 (2d Cir. 2019) (holding that "a severe beating, false misbehavior reports, or the withholding of medication" each individually, could constitute an adverse action).

Defendants argue, without any citation to the record, that "Plaintiff concedes that false misbehavior reports did not constitute the type of action that would deter a similarly situated inmate, who may be required to tolerate more

than both public employees and average citizens, from exercising their constitutional rights." (Dkt. No. 49, Attach. 2 at 15.) To the extent that Defendants' assertion is based on the conclusion that *Plaintiff* was not deterred from filing additional grievances, I reject that argument. While "[i]t might seem that, because [an inmate] continued to file grievances even after the alleged retaliation, the defendants' actions were not sufficiently adverse ... such a view misperceives what constitutes adverse action. The test is objective, and the plaintiff is not required to show that he was actually deterred." *Brandon v. Kinter*, 938 F.2d 21, 40 (2d Cir. 2019).

**\*8** In addition, at this stage of the litigation, Plaintiff adequately alleges a causal connection between his protected speech and the adverse actions he experienced on February 26, 2023. First, the incident on February 26, 2023, followed closely in time to Plaintiff's protected speech. (Dkt. No. 34 at 7 [alleging that the incident happened "2 days after Plaintiff['s] slip and fall incident"]); *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action"). Second, the Amended Complaint alleges that immediately preceding the incident with Defendant Torrisi on February 26, 2023, Defendant Torrisi asked Plaintiff about his lawsuit and when Plaintiff declined to discuss, Defendant Torrisi allegedly said "you wanna play games, I can play too." (Dkt. No. 34 at 7.) These alleged statements by Defendant Torrisi provide further context for the incident and causally connect Plaintiff's protected speech with the alleged shakedown and false misbehavior report.

Finally, the undersigned rejects Defendants' circular argument that the false misbehavior report establishes that Defendants would have taken the same action (issuing the misbehavior report) in the absence of Plaintiff's protected conduct. In addition, the Amended Complaint alleges that the basis for the misbehavior report—that Plaintiff was passing something to another inmate—was merely a *post hoc* justification for the search of Plaintiff. (Dkt. No. 34 at 7.)

As a result, I recommend that Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Defendant Torrisi be denied.

**B. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendants Molesky, Lawson, and Spadinger**

After carefully considering the matter, I answer this question in the affirmative.

First, as set forth above in Part III.A. of this Report and Recommendation, the first element of a retaliation claim does not appear to be in dispute. (Dkt. No. 34 at 7 [alleging that Plaintiff turned in a grievance on February 28, 2023]; Dkt. No. 49, Attach. 2 at 16-18 [Defendants arguments related to this claim, which do not raise the issue of whether Plaintiff engaged in protected activity].)

Second, as set forth above in Part III.A. of this Report and Recommendation, I reject Defendants' argument that a false misbehavior report cannot constitute an adverse action. Plaintiff alleges that he was set up to "get his ass beat" and his cell was searched during which a loose screw was planted by officers and a false misbehavior report was written as a result. (Dkt. No. 34 at 7.) "The planting of evidence and issuance of a false misbehavior report based upon that evidence has been found to constitute adverse action for purposes of a retaliation claim." *Shakur v. Thomas*, 14-CV-0427, 2016 WL 11478237, at \*11 (N.D.N.Y. June 2, 2016) (Dancks, M.J.) (collecting cases), *report and recommendation adopted*, 2016 WL 4617242 (N.D.N.Y. Sept. 6, 2016) (D'Agostino, J.); *accord Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at \*10 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.), *report and recommendation adopted*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016) (Suddaby, C.J.).

Third, at this juncture, the temporal proximity between Plaintiff's protected speech on February 28, 2023, and the incident on March 18, 2023, is enough to plausibly suggest a causal connection. *See Brandon v. Kinter*, 13-CV-0939, 2023 WL 2382637, at \*23 (N.D.N.Y. Mar. 6, 2023) (Sannes, C.J.) (finding that three weeks between the grievances and adverse action was sufficiently close temporal proximity to plausibly infer retaliatory intent and causal connection); *Zaire v. Doe*, 03-CV-0629, 2006 WL 1994848, at \*5 (N.D.N.Y. July 13, 2006) (Scullin, J.) (finding that two weeks between Plaintiff's protected speech and the adverse action sufficient circumstantial evidence of retaliation for purposes of a causal connection). In addition, the Amended Complaint alleges that when he filed his grievance, Defendant Molesky—who was involved in the subsequent alleged search and planting of the loose screw in Plaintiff's cell—forewarned Plaintiff to not "start a war you can't finish." (Dkt. No. 34 at 7.) Thus, I find that the Amended Complaint adequately alleged a causal connection between Plaintiff's protected speech and the adverse actions.

**\*9** Finally, I reject, at this juncture, Defendants' argument that Plaintiff's retaliation claim should be dismissed because they would have taken the same action in the absence of Plaintiff's protected speech. Plaintiff alleges that the loose screw was planted by Defendants and thus, even if there was an independent basis for the search, Defendants present no basis for planting contraband in Plaintiff's cell.

As a result, I recommend that Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Defendants Molesky, Lawson, and Spadinger be denied.

### C. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendant Lawson Based on Placement in Suicide Watch

After carefully considering the matter, I answer this question in the affirmative.

The undersigned rejects Defendants' argument that Plaintiff failed to allege facts plausibly suggesting a causal connection between his placement in the suicide watch cell and his protected speech. (Dkt. No. 49, Attach. 2 at 20-21.) The Amended Complaint alleges that Plaintiff was placed in the suicide watch cell by Defendant Lawson two days after filing a grievance with Defendant Lawson. (Dkt. No. 34 at 8.) As set forth above, the temporal proximity between Plaintiff's protected speech and the alleged adverse action are enough at this procedural posture to sufficiently infer a causal connection. *See Hendricks v. Mallozzi*, 20-CV-1035, 2022 WL 1129887, at \*5 (N.D.N.Y. Jan. 14, 2022) (Lovric, M.J.) (citations omitted) ("Although there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment, the same is not true at the motion to dismiss stage."), *report and recommendation adopted,* 2022 WL 856885 (N.D.N.Y. Mar. 23, 2022) (D'Agostino, J.).

In addition, the Amended Complaint alleges that "[a]fter placing Plaintiff in the [suicide watch] cell [Defendant] Lawson said 'your [sic] in my custody now, black monkey. You play by my rules. If you write another grievance, I'll make sure you'll stay here forever.' " (Dkt. No. 34 at 8.) Defendant Lawson's alleged statement also provides support that a causal connection exists between Plaintiff's protected speech and the allegedly adverse action.

Although Defendants argue that Plaintiff was placed in the suicide watch cell as an administrative action, the Amended

Complaint does not appear to contest Plaintiff's placement in the SHU. (*Compare* Dkt. No. 34 at 8, *with* Dkt. No. 49, Attach. 2 at 24-25.) Plaintiff's issue relates to his placement in a specific cell within the SHU—the suicide watch cell—with the window open by Defendant Lawson. (Dkt. No. 34 at 8.)

As a result, I recommend that Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Defendant Lawson based on Plaintiff's placement in the suicide watch cell be denied.

### D. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendants Aragona and Pleat Based on Property Destruction

After carefully considering the matter, I answer this question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 49, Attach. 2 at 21-22.) Plaintiff fails to allege the personal involvement of Defendants Aragona and Pleat in the alleged destruction of his property. (Dkt. No. 34 at 10.) Instead, Plaintiff alleges that Defendants Aragona and Pleat conducted a scan and strip search of his person, made inappropriate comments, and when he returned to "his cell, all his property was destroyed including his commissary and clothes." (*Id.*) The Amended Complaint fails to allege facts plausibly suggesting who was responsible for the destruction of Plaintiff's property in his cell. Plaintiff's argument that "[t]his was no ordinary search on [his] cell," does not change the fact that he fails to allege who was responsible for the alleged adverse action.

**\*10** As a result, I recommend that Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Defendants Aragona and Pleat based on the destruction of property in Plaintiff's cell, be granted.

### E. Whether Plaintiff Sufficiently Alleged a First Amendment Retaliation Claim Against Defendants Stratta and Pleat Based on Use of Force on May 20, 2023

After carefully considering the matter, I answer this question in the affirmative.

Contrary to Defendants' assertions, Plaintiff sufficiently alleges that the use of force incident with Defendants Stratta and Pleat was in retaliation for grievances filed and his notice of claim. (Dkt. No. 34 at 11); *see Barnett v. City of Yonkers*, 15-CV-4013, 2018 WL 4680026, at \*9 (S.D.N.Y. Sept. 28,

2018) (holding that the plaintiff "engaged in protected speech by filing the notice of claim").

Plaintiff alleges that on May 17, 2023, he received a certified mail receipt that the Albany County Clerk and the Municipal Government Agency received the Notice of Claim regarding his slip and fall incident on February 24, 2023. (Dkt. No. 34 at 11.) Plaintiff alleges that during the alleged incident Defendant Stratta stated, "we seen the little grievance you wrote and your notice of claim." (*Id.*) Thus, even assuming *arguendo* that the reference to "little grievance" was not sufficiently clear (because Plaintiff filed multiple grievances), the Amended Complaint contains reference to only one Notice of Claim. (*See generally* Dkt. No. 34.) Therefore, the undersigned rejects Defendants' argument that the allegations are "generally conclusory and unsupported" regarding the protected conduct that triggered the incident with Defendants Stratta and Pleat. (Dkt. No. 49, Attach. 2 at 24.)

To the extent that Defendants present a different factual recitation of the alleged incident, at this juncture, the Court must accept the factual allegations contained in the Amended Complaint.

As a result, I recommend that Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Defendants Stratta and Pleat based on the use of force on May 20, 2023, be denied.

### F. Whether Plaintiff Sufficiently Alleged a Fourth Amendment Unlawful Strip Search Claim

After carefully considering the matter, I answer this question in the affirmative (albeit, barely).

Plaintiff asserts in his opposition memorandum of law, that John Doe badge #166—who was identified in his grievance —is Defendant Pleat. (Dkt. No. 57 at 8 [referring to Dkt. No. 34, Attach. 1 at 9].) Although Plaintiff did not direct the Court to any portion of the Amended Complaint supporting his assertion that Defendant Pleat is John Doe badge #166, given Plaintiff's *pro se* status, the Court may consider it. *See Drake v. Delta Airlines, Inc.*, 147 F.3d 169, 170, n. 1 (2d Cir. 1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) ("In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se*

pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Sharpe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004) (Hurd, J.). Hence, the undersigned rejects Defendants argument that Plaintiff failed to allege the personal involvement of Defendant Pleat because the grievance did not mention Defendant Pleat. [5]

**\*11** To the extent that Defendants argue that the search was *per se* constitutional as a "routine, random strip search," (Dkt. No. 49, Attach. 2 at 24-25) I reject that argument for two reasons.

First, the Amended Complaint alleges that Plaintiff experienced a visual body cavity search, not a strip search. A strip search is "an inspection of a naked individual, without any scrutiny of the subject body's cavities." *Harris*, 818 F.3d at 58. "A strip search is distinguishable from a 'visual body cavity search,' which extends to visual inspection of the anal and genital areas, or a 'manual body cavity search,' which includes some degree of touching or probing of body cavities." *Jenkins v. City of New York*, 18-CV-7024, 2020 WL 6700087, at *2 n.4 (E.D.N.Y. Nov. 12, 2020) (quoting *Harris*, 818 F.3d at 58). The scope of the intrusion varies with the type of search and visual body cavity searches are more intrusive than a mere strip search. [6] *Harris*, 818 F.3d at 58. Plaintiff alleges that Defendant Pleat directed Plaintiff to "spread your ass, so I can see inside your black ass," to bend over, and to squat three times. (Dkt. No. 34 at 10.) Hence, Defendants' blanket argument (that the search was constitutional because it was routine and random), which applies to a mere strip search, is inapplicable. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."). Moreover, the Amended Complaint appears to allege that the visual body cavity search was not routine and random, but that Plaintiff was singled out in retaliation for his protected speech. (Dkt. No. 34 at 10.)

Second, at this juncture, the record is incomplete and lacking relevant information to properly analyze whether Defendants Aragona and Pleat infringed Plaintiff's right to bodily privacy.

"Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy'; and (2) second, the court must determine 'whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights.' " *Harris v. Miller,* 818 F.3d 49, 57 (2d Cir. 2016) (quoting *Covino v. Patrissi,* 967 F.2d 73, 77-78 (2d Cir. 1992)).

With respect to the first inquiry, "there is no dispute that a visual body cavity search is a 'serious invasion of privacy.' " *Velez-Shade v. Population Mgmt.,* 18-CV-1784, 2019 WL 4674767, at *9 (D. Conn. Sept. 25, 2019) (citing *Harris,* 818 F.3d at 58). Thus, at this early stage, the undersigned will assume that Plaintiff had an "actual, subjective expectation of bodily privacy" that society was prepared to accept as reasonable. *See Velez-Shade,* 2019 WL 4674767, at *9 (concluding that the plaintiff had an actual, subjective expectation of bodily privacy where the plaintiff was required to squat and cough during a strip search).

With respect to the second inquiry, Plaintiff's Fourth Amendment claim challenges an isolated search—as opposed to a prison or jail policy or regulation—and thus, the Court must apply the standard set forth in *Bell v. Wolfish,* 441 U.S. 520 (1979):

> **\*12** [i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted.

441 U.S. at 559.

The undersigned is lacking substantial information regarding each of these factors. However, the information that is

available when viewed in the light most favorable to Plaintiff, weighs in favor of allowing the claim to proceed.

### 1. The Scope of the Intrusion

When considering the scope of the intrusion, courts have considered (1) the type of search, and (2) the person who performs the search. *Harris,* 818 F.3d at 58.

With respect to the type of search, "a visual body cavity search, such as the one conducted here is invasive: 'A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body is a serious invasion of privacy.' " *Harris,* 818 F.3d at 58-59 (quoting *Florence v. Bd. of Chosen Freeholders,* 566 U.S. 318, 344-45 (2012)) (Breyer, J., dissenting); *see also Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir. 1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy."; *Cookish v. Powell,* 945 F.2d 441, 446 (1st Cir. 1991) ("[A] 'severe if not gross interference with a person's privacy [ ] occurs when guards conduct a vision inspection of body cavities.")).

With respect to who performed the search, "it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy,* 16 F.3d at 185. Here, Plaintiff (male) alleges that Defendant Pleat (a male officer) conducted the visual inspection.

### 2. The Manner in Which the Search Was Conducted

"A strip search conducted in a professional manner is more reasonable than one that is not." *Harris,* 818 F.3d at 59-60 (citing *Grummett v. Rushen,* 779 F.2d 491, 496 (9th Cir. 1985) (emphasizing that "[t]he record indicates that the searches are performed by the female guards in a professional manner and with respect for the inmates"); *Byrd,* 629 F.3d at 1143 ("[W]e have consistently recognized the 'frightening and humiliating invasion' occasioned by a strip search, 'even when conducted with all due courtesy.' ")).

Here, it is unclear from the record, viewed in the light most favorable to Plaintiff, why the visual body cavity search was conducted or involved the use of verbally aggressive orders. Plaintiff alleges that upon entering the room for the search,

Defendant Pleat was "threatening and harassing" him and threatened to spray Plaintiff. (Dkt. No. 34 at 10.)

### 3. The Justification for Initiating the Search

Defendants provide no justification for the strip search at this juncture other than to suggest that it was a routine, random strip search. (Dkt. No. 49, Attach. 2 at 24-25 [arguing that "because 'routine, random strip searches of inmates' do not violate the Fourth Amendment, the May 14, 2023 strip search to which Plaintiff was subjected is not actionable and should be dismissed as Plaintiff has not alleged a plausible cause of action."].) "[I]t is difficult, if not impossible, for courts to determine the reasonableness of a visual body cavity search without record evidence supporting the officer's justification for initiating the search." *Harris*, 818 F.3d at 61 (citing *Byrd*, 629 F.3d at 1149 (Smith, J., concurring in part, dissenting in part) ("It is appropriate to begin the analysis by looking at the justification for initiating the search, because, in the absence of a proper justification, even the most unintrusive search is unreasonable.")).

**\*13** The Amended Complaint suggests that there was no legitimate justification for the search. (Dkt. No. 34 at 10 [alleging that Plaintiff asked why he was being searched, Defendant Aragona told him, "shut up your [sic] getting stripped and if everything goes well your [sic] head back to your unit," and Plaintiff said "this cant [sic] be a Srg shakedown because I just had one 3 days ago and Srg shakedown is once a week."].)

### 4. The Place in Which the Search Was Conducted

The Second Circuit has held that searches "conducted in the presence of only those individuals needed to conduct the search" are more reasonable than those "conducted in the presence of unnecessary spectators." *Harris*, 818 F.3d 62.

Based on the allegations contained in the Amended Complaint, it appears that Defendants Pleat and Aragona were the only individuals present for the visual body cavity search. (Dkt. No. 34 at 10.)

Given the substantial information lacking regarding a justification for the search—if any—and any additional facts regarding the manner in which the search was conducted,

the undersigned finds that at this juncture, the factors weigh slightly in favor of allowing the claim to proceed.

For each of these reasons, I recommend that Defendants' motion to dismiss Plaintiff's Fourth Amendment unlawful strip search claim against Defendants Aragona and Pleat be denied.

### G. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Conditions-of-Confinement Claim Against Defendant Lawson Related to March 23, 2023

After carefully considering the matter, I answer this question in the negative.

"Numerous courts, including those in the Second Circuit, have found that excessive hot or cold conditions may be unconstitutional." *Harlow v. St. Andrews*, 18-CV-0648, 2020 WL 5834219, at \*7 (N.D.N.Y. Oct. 1, 2020) (Kahn, J.) (citing *Wingate v. Robert N. Davoren Ctr.*, 12-CV-5521, 2013 WL 4856573, at \*3 (S.D.N.Y. Sept. 10, 2013)). However, district courts in this Circuit have also found "allegations of exposure to extreme temperatures for short periods of time are insufficient to state an Eighth or Fourteenth Amendment claim." *Wingate*, 2013 WL 4856573, at \*3.

The Amended Complaint alleges that Plaintiff was placed in a cell with "the window wide open freezing Plaintiff for hours." (Dkt. No. 34 at 8.) These conclusory allegations—which fail to allege the temperature of the room, what (if any) clothing or bedding Plaintiff had access to, or a more specific length of time that Plaintiff was exposed to the cold—are insufficient to plausibly suggest a conditions-of-confinement claim. *See Scott v. Lopez*, 11-CV-0809, 2012 WL 75430, at \*2 (S.D.N.Y. Jan. 5, 2012) (citing *Gardner v. Mental Health Unit of Sullivan Corr. Facility*, 07-CV-5535, 2009 WL 1834382, at \*3 (S.D.N.Y. June 17, 2009) (no constitutional violation where prisoner was "very cold" for no more than seven days); *Felmine v. City of New York*, 09-CV-3768, 2011 WL 4543268, at \*22 (E.D.N.Y. Sept. 29, 2011) (no constitutional violation where pre-trial detainee was kept in cold cell overnight for 6-7 hours) ("several hours of confinement in a chilly room is not a constitutional violation. [The plaintiff]'s temporary deprivation was not sufficiently serious, and therefore does not satisfy the objective component of the inquiry."); *Williams v. Grant*, CV408-203, 2009 WL 3317262, at \*4 (S.D. Ga. Oct. 14, 2009) (allegations that the plaintiff was subjected to three hours of cold temperatures insufficient to state a conditions of confinement claim); *see also Abdullah v. NYPD 30th Precinct*, 2024 WL 325385, at \*6 (S.D.N.Y. Jan.

29, 2024) (collecting cases regarding exposure to cold and concluding that the plaintiff's allegations that he was locked up in a cold prison cell without a sweater or jacket causing flu like symptoms were insufficient to plausibly suggest a constitutional violation because he failed to allege how long he was held in the cold cell or the severity of the temperature of the cell).

**\*14**  As a result, I recommend that Defendants' motion to dismiss Plaintiff's Fourteenth Amendment conditions-of-confinement claim against Defendant Lawson related to the suicide watch cell on March 23, 2023, be granted.

### H. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Conditions-of-Confinement Claim Against Defendants Lawson and Aragona Related to May 20, 2023 [7]

After carefully considering the matter, I answer this question in the affirmative.

"The temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an objective constitutional violation." *DeLaney v. Canfield*, 19-CV-6729, 2020 WL 3893272, at \*5 (S.D.N.Y. July 10, 2020) (collecting cases denying Eighth Amendment claims asserting denial of bathroom access for between seventy minutes and three hours). However, denying someone detained by the State the ability "to eat, drink, or use the bathroom for several hours" may be sufficient to state a claim. *Cano v. City of New York*, 44 F. Supp. 3d 324, 334 (E.D.N.Y. 2014) (pretrial detainees who were denied access to a restroom, among other deprivations, for ten to twenty-four hours stated a Fourteenth Amendment claim).

District courts in the Second Circuit appear to primarily be concerned with (1) the length of the deprivation, and (2) whether the plaintiff was exposed to unsanitary or dangerous conditions as a result of the deprivation. *Compare Urena v. City of New York*, 22-CV-4758, 2024 WL 3607662, at \*6 (S.D.N.Y. July 10, 2024) (concluding that the plaintiff's allegation that he was confined to a bus overnight while handcuffed fails to allege an unreasonable risk of serious damage to his health where there is no allegation that there were dangerous or unsanitary conditions on the bus), *with Colson v. Mingo*, 18-CV-2765, 2024 WL 1018582, at \*13 (S.D.N.Y. Mar. 8, 2024) (finding that the plaintiff adequately alleged a conditions of confinement claim where the plaintiff

alleged that he was handcuffed on a bus for fifteen hours in close proximity to shattered glass, his own human waste, and vomit, feces, and urine of other passengers with no access to a bathroom, water, or hygienic materials).

**\*15**  Construing the Amended Complaint in the light most favorable to Plaintiff, it alleges that he was deprived access to the bathroom on May 20, 2023, from approximately 7 p.m. until 2 a.m. on May 21, 2023. (Dkt. No. 34 at 11-12.) Plaintiff alleges that at approximately 9:50 p.m. on May 20, 2023, he informed Defendants Aragona and Lawson that he needed to use the bathroom, but he continued to be denied access to the bathroom for approximately four additional hours. (Dkt. No. 34 at 12.) The Amended Complaint alleges that "after 6 hours of being in the restraint chair, Plaintiff urinated on himself 3 times and was spitting blood." (*Id.*) I find that these allegations, which include exposure to unsanitary conditions, plausibly suggest a conditions-of-confinement claim pursuant to the Fourteenth Amendment. *See Rashid v. Kurtulus*, 23-CV-0722, 2023 WL 5672589, at \*6 (D. Conn. Sept. 1, 2023) (concluding that the plaintiff's allegations that he was restrained from approximately 7 p.m. until 1 a.m. without access to the bathroom causing him to soil himself, sufficient to alleges a conditions-of-confinement claim).

As a result, I recommend that Defendants' motion to dismiss seeking dismissal of Plaintiff's conditions of confinement claim against Defendants Aragona and Lawson related to the incident on May 20, 2023, be denied. [8]

### I. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Excessive Force Claim Against Defendants Stratta, Pleat, Bonnaci, Lacoozi, Lawson, Spadinger, and Cohen Related to May 20, 2023

After carefully considering the matter, I answer this question in the affirmative.

Although the documents attached to the Amended Complaint illustrate a different scene on May 20, 2023, than the Amended Complaint alleges, Plaintiff's allegations are enough at this juncture for this claim to proceed. *Iqbal*, 129 S. Ct. at 1949 ("a court must accept as true all of the allegations contained in the complaint"). Defendants appear to argue that an issue of fact exists with respect to the use of force incident, and witness credibility is a function reserved for the jury. *In re Fosamax Products Liability Litigation*, 707 F.3d 189, 194 n.4 (2d Cir. 2013).

As a result, I recommend that Defendants' motion to dismiss Plaintiff's use of force claim against Defendants Stratta, Pleat, Bonnaci, Lacoozi, Lawson, Spadinger, and Cohen be denied.

### J. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Failure-to-Intervene Claim Against Defendants Aragona and Grimmick Related to May 20, 2023

After carefully considering the matter, I answer this question in the affirmative with respect to Defendant Grimmick and I answer this question in the negative with respect to Defendant Aragona.

Failure to intervene claims brought by pretrial detainees arise under the Fourteenth Amendment's Due Process Clause and must satisfy the following standards: (1) an objective showing that the challenged conditions were sufficiently serious to constitute a due process violation; and (2) a subjective showing that the official either knowingly or recklessly failed to act regarding an excessive risk to health or safety. *Velez v. City of New York*, 17-CV-9871, 2019 WL 3495642, at *3 (S.D.N.Y. Aug. 1, 2019); *see also McDaniel v. City of New York*, 19-CV-8735, 2022 WL 421122, at *8-10 (S.D.N.Y. Feb. 11, 2022). The subjective prong is met where an officer "has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *McDaniel*, 2022 WL 421122, at *10; *see also Williams v. Salvucci*, 20-CV-5098, 2022 WL 17586326, at *8 (S.D.N.Y. Dec. 12, 2022). Courts may ask whether a defendant "observed or had reason to know the plaintiff was involved in a physical altercation" and "had an extended opportunity to stop the attack but failed to take any action to do so." *Blake v. Sexton*, 12-CV-7245, 2016 WL 1241525, at *4 (S.D.N.Y. Mar. 24, 2016) (alterations and internal quotation marks omitted); *McDaniel*, 2022 WL 421122, at *10.

**\*16** The Amended Complaint alleges that Defendant Grimmick was present in booking for the scan of Plaintiff, during which a conversation ensued between Plaintiff and Defendants Stratta and Grimmick. (Dkt. No. 34 at 11.) The Amended Complaint alleges that Defendant Grimmick said "Allah you draw a lot of heat to yourself, you need to try to fallback because at the end of the day we always win." (*Id.*) Plaintiff alleges that after he was cleared from the scanner machine, he was taken across the hall to the male booking strip room where he was "jumped on ... immediately" by Defendants Stratta, Pleat, and Bonnaci. (*Id.*) The Amended Complaint alleges that after the incident in the male booking

strip room, he was escorted to medical. (*Id.*) Plaintiff alleges that during the escort to medical, he saw Defendant Grimmick and said "word that what we doing Broomstick. Yall gonna jump me, yall gonna pay for this" and Defendant Grimmick smiled and said "don't start a war you can't finish." (*Id.*)

Although these allegations are sparse, as Plaintiff identifies in his opposition memorandum of law, the comments made by Defendant Grimmick immediately preceding and following the incident in the male booking strip room, viewed in the light most favorable to Plaintiff, plausibly suggest Defendant Grimmick was aware that Defendants Stratta, Pleat, and Bonnaci intended to "brutalize" Plaintiff. (Dkt. No. 57 at 10.) Thus, it is reasonable to infer, at this juncture, that Defendant Grimmick had reason to know that a physical altercation involving Plaintiff was about to occur, had an opportunity to stop it, and failed to do so. (Dkt. No. 57 at 14-15.)

However, the undersigned reaches a different conclusion with respect to Defendant Aragona. The Amended Complaint does not allege that Defendant Aragona was present on May 20, 2023, until approximately 8:10 p.m., after the conclusion of the alleged use of force incident. (Dkt. No. 34 at 11-12.) Thus, the Amended Complaint fails to allege facts plausibly suggesting that Defendant Aragona had reason to know Plaintiff was involved in a physical altercation and had a fair opportunity to stop it.

As a result, I recommend that Defendants' motion to dismiss Plaintiff's failure to intervene claim against Defendant Grimmick be denied, but that Defendants' motion to dismiss Plaintiff's failure to intervene claim against Defendant Aragona be granted.

### K. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Disciplinary Due Process Claim Against Defendant Cavanaugh

After carefully considering the matter, I answer this question in the affirmative.

Defendants' sole contention with respect to this claim relates to whether Plaintiff's placement in the SHU constituted an "atypical, significant deprivation" which might "conceivably create a liberty interest." (Dkt. No. 49, Attach. 2 at 31-32.) However, as set forth in Senior District Judge Kahn's Memorandum-Decision and Order dated September 19, 2023, "[p]retrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause." *Washington v. Falco*, 20-CV-3009, 2021

WL 797658, at *7 (S.D.N.Y. Mar. 1, 2021) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In situations in which a restriction is placed on a pretrial detainee for disciplinary reasons, "[p]rocedural due process requires that a pretrial detainee be given written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence ...." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 n.3 (2d Cir. 2017) (internal quotation marks omitted).

The Amended Complaint alleges that on May 24, 2023, Plaintiff was taken to a disciplinary hearing conducted by Defendant Cavanaugh, and he was not provided due process of law. (Dkt. No. 34 at 13.) The Amended Complaint alleges that Plaintiff was later provided a copy of his disposition, which imposed a sanction of Plaintiff fifteen day of SHU confinement and twenty-one days of keeplock confinement. (Dkt. No. 34 at 12; Dkt. No. 34, Attach. 1 at 13.) Senior District Judge Kahn referred to Defendant Cavanaugh's sanction as a "disciplinary determination." (Dkt. No. 8 at 24.) This disciplinary determination that included disciplinary restrictions required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence. Thus, the undersigned rejects Defendants' argument that the sanctions imposed did not implicate a liberty interest and thus no procedures were required.

*17   As a result, I recommend that Defendants' motion to dismiss Plaintiff's Fourteenth Amendment disciplinary due process claim against Defendant Cavanaugh be denied.

### L. Whether Plaintiff Sufficiently Alleged a Fourteenth Amendment Equal Protection Claim Against Defendant Lawson

After carefully considering the matter, I answer this question in the affirmative with respect to the physical altercation on May 20, 2023, and I answer this question in the negative with respect to the placement in suicide watch cell.

As set forth by Senior District Judge Kahn, "Courts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." *Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015); *see also Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse alleged in the amended complaint are considered together, we have little

trouble concluding that plaintiff's allegations were sufficient to state a § 1983 claim for discrimination on the basis of race and religion.").

As set forth by Defendants, Plaintiff failed to allege any physical injury related to his placement in the suicide watch cell. Instead, Plaintiff alleged that he was "freezing" and cold. (Dkt. No. 8.) However, with respect to the incident on May 20, 2023, Plaintiff alleged that he sustained a chipped tooth and bruising on the right side of his eye. (Dkt. No. 34 at 12; Dkt. No. 34, Attach. 1 at 12; Dkt. No. 57 at 13.)

As a result, I recommend that Defendants' motion to dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson be granted with respect to the suicide watch cell placement and denied with respect to the alleged assault on May 20, 2023.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 49) be **GRANTED** in part and Plaintiff's Amended Complaint (Dkt. No. 34) be **DISMISSED**, pursuant to Fed. R. Civ. P. 12 to the extent that it asserts the following claims:

(1) Plaintiff's First Amendment retaliation claim against Defendants Aragona and Pleat based on these officials destroying (or directing others to destroy) Plaintiff's personal property following his stated intent to file a grievance against them on May 14, 2023;

(2) Plaintiff's Fourteenth Amendment conditions-of-confinement claim against Defendant Lawson based on his exposing Plaintiff to cold temperatures in the suicide watch cell for hours on March 23, 2023;

(3) Plaintiff's Fourteenth Amendment failure-to-intervene claims against Defendant Aragona based on the alleged use of force incident that occurred on May 20, 2023; and

(4) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson based on his placement of Plaintiff in the suicide watch cell on March 23, 2023;

and it is further respectfully

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 49) be **DENIED** in part and the following claims from Plaintiff's Amended Complaint (Dkt. No. 34) **SURVIVE**:

(1) Plaintiff's First Amendment retaliation claim against Defendant Torrisi based on the search of Plaintiff's cell and issuance of a false misbehavior report against him on February 26, 2023, in response to a lawsuit Plaintiff filed regarding a "slip and fall accident" that occurred two days earlier;

**\*18** (2) Plaintiff's First Amendment retaliation claim against Defendants Molesky, Lawson, and Spadinger based on these officials searching Plaintiff's cell and issuing him a false misbehavior report on March 18, 2023, in response to Plaintiffs submission of a grievance on February 28, 2023;

(3) Plaintiff's First Amendment retaliation claim against Defendant Lawson based on this official placing Plaintiff on suicide watch on March 23, 2023, in response to Plaintiff's submission of a grievance regarding the cell search on March 18, 2023;

(4) Plaintiffs First Amendment retaliation claim against Defendants Stratta and Pleat based on these officials initiating a use-of-force incident on May 20, 2023, in response to Plaintiff's earlier engagement in protected activity;

(5) Plaintiff's Fourth Amendment unlawful strip frisk claim against Defendants Aragona and Pleat based on the strip search that occurred on May 14, 2023;

(6) Plaintiff's Fourteenth Amendment conditions-of-confinement claims against Defendants Aragona and Lawson based on their denial of Plaintiff's access to the bathroom on May 20, 2023;

(7) Plaintiff's Fourteenth Amendment excessive force claims against Defendants Stratta, Pleat, Bonnaci, Lacoozi, Lawson, Spadinger, and Cohen based on the alleged use of force incident that occurred on May 20, 2023;

(8) Plaintiff's Fourteenth Amendment failure-to-intervene claims against Defendant Grimmick based on the alleged use of force incident that occurred on May 20, 2023;

(9) Plaintiff's Fourteenth Amendment disciplinary due process claim against Defendant Cavanaugh based on Defendant Cavanaugh's disciplinary sanction imposed against Plaintiff on May 24, 2023; and

(10) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson based on his use of racial slurs in connection with subjecting him to excessive force;

and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Slip Copy, 2025 WL 1033836

---

## Footnotes

1    Plaintiff is cautioned that ordinarily, the filing of an amended pleading supersedes any previously filed pleading in its entirety. However, given Plaintiff's *pro se* status, the undersigned construed the operative pleading as Dkt. No. 34 with the addition of damages set forth in Dkt. No. 48.

2    "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

3    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

4    While the Court shares Defendants' desire to dispose early of any causes of action that fail to state a claim upon which relief may be granted, defense counsel is cautioned to only include conceivably meritorious arguments in the future; some of defense counsel's arguments were borderline frivolous.

5    This argument also appears to be a veiled attempt to assert that Plaintiff failed to exhaust his administrative remedies before commencing the action, which is not ripe for a motion to dismiss and instead, must be made on a motion for summary judgment.

6    Moreover, manual body cavity searches tend to be more intrusive than visual body cavity searches.

7    Plaintiff, as a pretrial detainee, asserts a conditions-of-confinement claim pursuant to the Fourteenth Amendment. The analysis contained in Part III.G. of this Report and Recommendation contains citations to cases that consider conditions of confinement under both the Eighth and Fourteenth Amendments. "A detainee's Fourteenth Amendment due process rights concerning the conditions of his confinement are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Bourdon v. Roney*, 99-CV-0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar. 6, 2003) (Sharpe, M.J.) (citing *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244 (1983) (citations omitted)). Hence, a case concluding that a complaint asserted facts plausibly suggesting a conditions-of-confinement claim pursuant to the Eighth Amendment also logically holds that the complaint asserted facts plausibly suggesting a conditions-of-confinement claim pursuant to the Fourteenth Amendment (however, the inverse of this statement is not true).

8    Defendants again appear to include a veiled argument that Plaintiff failed to exhaust his administrative remedies before commencing the action, which is not ripe for a motion to dismiss and instead, must be made on a motion for summary judgment. *See*, *supra*, note 5.

9    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

10   If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 814990
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jaiquan ALLAH, Plaintiff,

v.

Ryan LAWSON, et al., Defendants.

9:23-CV-785 (LEK/ML)
|
Signed March 14, 2025

**Attorneys and Law Firms**

Jaiquan Allah, Malone, NY, Pro Se.

Kevin McDonald Cannizzaro, Albany County Attorney's Office, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1  After bringing this pro se action pursuant to 42 U.S.C. § 1983 against staff members at the Albany County Correctional Facility, Plaintiff Jaiquan Allah filed an amended complaint asserting violations of his constitutional rights. Dkt. No. 34 ("Amended Complaint"). Defendants filed a combined motion to dismiss and motion for judgment on the pleadings, arguing for dismissal of Plaintiff's claims. Dkt. No. 49 ("Motion"). On February 18, 2025, the Honorable Miroslav Lovric, United States Magistrate Judge, issued a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d), recommending that the Motion be granted in part and denied in part. Dkt. No. 66 ("Report and Recommendation").

No party has filed objections to the Report and Recommendation. For the reasons that follow, the Court adopts the Report and Recommendation in its entirety.

**II. BACKGROUND**

The Court assumes familiarity with the background detailed in the Report and Recommendation. *See generally* R. & R.

Judge Lovric assessed Plaintiff's claims in turn. First, he recommended denying the Motion with respect to Plaintiff's First Amendment retaliation claim against Defendant Torrisi. *Id.* at 14. Judge Lovric noted that "it is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of a grievance and/or lawsuit." *Id.* at 15. Further, he found merit to Plaintiff's argument that a false misbehavior report allegedly issued in retaliation for exercising a constitutionally protected right is an adverse action. *Id.* at 16. Judge Lovric also found that Plaintiff adequately alleged a causal connection between his protected speech and the adverse action, because the adverse action "followed closely in time to Plaintiff's protected speech" and Defendant Torrisi allegedly told Plaintiff, "you wanna play games, I can play too." *Id.* at 17.

Second, Judge Lovric recommended denying the Motion with respect to Plaintiff's First Amendment retaliation claim against Defendants Molesky, Lawson, and Spadinger. *Id.* at 18. Judge Lovric explained that Plaintiff engaged in protected speech by filing a grievance, *id.*, that a false misbehavior report allegedly issued in retaliation for exercising a constitutionally protected right is an adverse action, *id.*, and "the temporal proximity between Plaintiff's protected speech ... and the [adverse action] is enough to plausibly suggest a causal connection." *Id.* at 19. Judge Lovric found the causation element further supported by Defendant Molesky allegedly telling Plaintiff not to "start a war you can't finish." *Id.*

Third, Judge Lovric recommended denying the Motion with respect to Plaintiff's First Amendment retaliation claim against Defendant Lawson based on Plaintiff's placement in the suicide watch cell. *Id.* Judge Lovric noted that Plaintiff filed a grievance and was "placed in the suicide watch cell [in the SHU] by Defendant Lawson two days after." *Id.* at 20. "[T]he temporal proximity between Plaintiff's protected speech and the alleged adverse action are enough at this procedural posture to sufficiently infer a causal connection." *Id.* Judge Lovric noted that the causal connection is further supported by Plaintiff's allegation that "after placing Plaintiff in the suicide watch cell, Defendant Lawson said 'you're in my custody now, black monkey. You play by my rules. If you write another grievance, I'll make sure you'll stay here forever.' " *Id.* (cleaned up).

 *2  Fourth, Judge Lovric recommended granting the Motion with respect to Plaintiff's First Amendment retaliation claim against Defendants Aragona and Pleat based on property destruction. *Id.* at 21. Judge Lovric explains that "Plaintiff fails to allege the personal involvement of Defendants

Aragona and Pleat in the alleged destruction of his property." *Id.*

Fifth, Judge Lovric recommended denying the Motion with respect to Plaintiff's First Amendment retaliation claim against Defendants Stratta and Pleat based on their use of force on May 20, 2023. *Id.* Plaintiff engaged in protected speech by filing grievances and a notice of claim, *id.* at 21–22, and he suffered an adverse action in the use of force by Defendants Stratta and Pleat. A causal connection was established because during the alleged incident, Defendant Stratta allegedly stated, "we seen the little grievance you wrote and your notice of claim." *Id.* at 22.

Sixth, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourth Amendment unlawful strip search claim. *Id.* Applying the test laid out in *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016), Judge Lovric first found that Plaintiff had an "actual, subjective expectation of bodily privacy." *Id.* at 25. Then, Judge Lovric explained that the prison officials plausibly did not have sufficient justification to intrude on Plaintiff's Fourth Amendment rights, considering the scope of the intrusion, the manner in which the search was conducted, the justification for initiating the search, and the place in which the search was conducted. *Id.* at 26–28.

Seventh, Judge Lovric recommended granting the Motion with respect to Plaintiff's Fourteenth Amendment conditions-of-confinement claim against Defendant Lawson relating to the events of March 23, 2023. *Id.* at 28. Judge Lovric found Plaintiff's allegation that he was placed in a cell with the window "wide open," "freezing [ ] for hours," was conclusory, as it "fail[ed] to allege the temperature of the room, what (if any) clothing or bedding Plaintiff had access to, or a more specific length of time that Plaintiff was exposed to the cold." *Id.* at 29. Such "conclusory allegations ... are insufficient to plausibly suggest a conditions-of-confinement claim." *Id.*

Eighth, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourteenth Amendment conditions-of-confinement claim against Defendants Lawson and Aragona relating to the events of May 20, 2023. *Id.* at 30. Judge Lovric found that Plaintiff sufficiently stated a claim for relief by asserting he was deprived of access to a bathroom for several hours, which resulted in Plaintiff urinating on himself several times, "spitting blood," and exposure to unsanitary conditions. *Id.* at 31.

Ninth, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourteenth Amendment excessive force claim against Defendants Stratta, Pleat, Bonnaci, Lacoosi, Lawson, Spadinger, and Cohen relating to the events of May 20, 2023. *Id.* at 32. Plaintiff alleges that the Defendants "jumped on" him, and "physically assaulted [him] by kicking and punching him." Am. Compl. at 11. Judge Lovric found that "Plaintiff's allegations are enough at this juncture for this claim to proceed." R. & R. at 32.

Tenth, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourteenth Amendment failure-to-intervene claim against Defendant Grimmick, but granting the Motion with respect to Plaintiff's Fourteenth Amendment failure-to-intervene claim against Defendant Aragona. *Id.* at 32. Judge Lovric noted that before Plaintiff was allegedly attacked in the male booking strip room, Defendant Grimmick allegedly told Plaintiff that he "draw[s] a lot of heat to [him]self," and that he "need[s] to try to fallback because at the end of the day we always win." *Id.* at 33. After he was allegedly attacked, Defendant Grimmick told Plaintiff not to "start a war you can't finish." *Id.* at 34. According to Judge Lovric, "[T]he comments made by Defendant Grimmick immediately preceding and following the incident in the male booking strip room ... plausibly suggest Defendant Grimmick was aware that Defendants Stratta, Pleat, and Bonnaci intended to 'brutalize' Plaintiff," rendering it "reasonable to infer, at this juncture, that Defendant Grimmick had reason to know that a physical altercation involving Plaintiff was about to occur, had an opportunity to stop it, and failed to do so." *Id.*

**\*3** As for Defendant Aragona, Judge Lovric observed that Plaintiff's Amended Complaint "does not allege that Defendant Aragona was present" until "after the conclusion of the alleged force incident." *Id.* Therefore, Judge Lovric concluded that there were no allegations "plausibly suggesting that Defendant Aragona had reason to know Plaintiff was involved in a physical altercation and had a fair opportunity to stop it." *Id.*

Eleventh, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourteenth Amendment disciplinary due process claim against Defendant Cavanaugh. *Id.* Judge Lovric first explained that Plaintiff's placement in the SHU constituted an atypical, significant deprivation which might implicate a liberty interest. *Id.* at 35. He then found that Plaintiff was not provided due process of law during the disciplinary hearing that led to his SHU placement, as

"[t]his disciplinary determination ... required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Id.*

Twelfth, Judge Lovric recommended denying the Motion with respect to Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson relating to the events of May 20, 2023, and granting the Motion with respect to Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson relating to his placement in the suicide watch cell. *Id.* at 36. Judge Lovric concluded that Defendant Lawson's alleged use of racial epithets and verbal harassment, combined with Plaintiff's allegation that he "sustained a chipped tooth and bruising on the right side of his eye," was sufficient to state a claim in regard to the events of May 20, 2023. *Id.* However, Judge Lovric found that "Plaintiff failed to allege any physical injury related to his placement in the suicide watch cell," so any equal protection claim with respect to this event fails. *Id.*

In sum, Judge Lovric recommended that the Motion be granted in part and denied in part. *Id.* at 37–39.

## III. LEGAL STANDARD

"Within fourteen days after being served with a copy [of the Magistrate Judge's report and recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court." 28 U.S.C. § 636(b)(1)(C); *see also* L.R. 72.1. However, if no objections are made, a district court need only review a report and recommendation for clear error. *See DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) ("The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record."). Clear error "is present when upon review of the entire record, the court is left with the definite and firm conviction that a mistake has been committed." *Rivera v. Fed. Bureau of Prisons*, 368 F. Supp. 3d 741, 744 (S.D.N.Y. 2019)

(cleaned up). Upon review, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

No party objected to the Report and Recommendation within fourteen days after being served with a copy of it. Accordingly, the Court reviews the Report and Recommendation for clear error. *See DiPilato*, 662 F. Supp. 2d at 339. Having found none, the Court approves and adopts the Report and Recommendation in its entirety.

## V. CONCLUSION

**\*4** Accordingly, it is hereby:

**ORDERED**, that the Report and Recommendation, Dkt. No. 66, is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that the combined motion to dismiss and motion for judgment on the pleadings, Dkt. No. 49, is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that the following claims are **DISMISSED**: (1) Plaintiff's First Amendment retaliation claim against Defendants Aragona and Pleat based on property destruction; (2) Plaintiff's Fourteenth Amendment conditions-of-confinement claim against Defendant Lawson relating to the events of March 23, 2023; (3) Plaintiff's Fourteenth Amendment failure-to-intervene claim against Defendant Aragona; and (4) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lawson relating to Plaintiff's placement in the suicide watch cell.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2025 WL 814990

2021 WL 3848871
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kent A. ALLEN, Plaintiff,
v.
Valdimer TENEV (Robinhood); Baiju Bhatt
(Robinhood); Radric Davis (Gucci Mane), Defendants.

1:21-CV-4119 (LTS)
|
Signed 08/26/2021

**Attorneys and Law Firms**

Kent A. Allen, Kissimmee, FL, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District
Judge:

 **\*1** Plaintiff, who is appearing *pro se*, asserts claims for
the alleged appropriation of his idea for Robinhood, an
internet website that provides stock-trading services. He also
alleges appropriation of his ideas for the domain names for
other internet websites, including Google, Visio, Instagram,
Postmates, "Kangeroo," and Amazon. He sues: (1) Vladimir
Tenev, a co-founder and co-Chief Executive Officer of
Robinhood; (2) Baiju Bhatt, another co-founder and co-Chief
Executive Officer of Robinhood; and (3) Radric Davis, a
recording artist who is also known as "Gucci Mane." Plaintiff
invokes the diversity of citizenship statute, 28 U.S.C. § 1332,
as the basis for this Court's jurisdiction. By order dated August
19, 2021, the Court granted Plaintiff's request to proceed
without prepayment of fees, that is, *in forma pauperis* ("IFP").
For the reasons set forth below, the Court dismisses this
action.

**BACKGROUND**

Plaintiff alleges the following: When Plaintiff was 10 years
old and living in rural Georgia, he played with his friend,
Defendant Radric Davis, who would become the recording
artist also known as "Gucci Mane." During that time, one
of Plaintiff's favorite "cartoon shows to watch was Robin
Hood." (ECF 2, at 6.) One day, while he was playing with

Davis, Plaintiff "thought about how Robin Hood the cartoon
show should also be used for stock trading. At first, [Davis]
was puzzled at the idea. [Plaintiff] explained to him that the
name ma[de] [Plaintiff] think of stock trading." (*Id.*)

Plaintiff's "myth was that the theme of the [Robin Hood]
show means that a person steal[s] from the rich and give[s]
to the poor. In stock trading, you see this as poor traders
look to become enriched. Additionally, stock trading is a
zero sum game." (*Id.*) Plaintiff assured Davis, who was still
puzzled, that his idea would work and asked Davis to trust
him. Plaintiff told Davis that "once [they] introduce this to the
cartoon creators of Robin Hood they will love it." (*Id.*) Davis
agreed. "Years later, [Davis] became a famed entertainment
artist and put out the idea [to] the public...." (*Id.*) As a child,
Plaintiff also developed the ideas for internet domain names
including Google, Visio, Instagram, Postmates, "Kangeroo,"
and Amazon.

Plaintiff "look[s] to be compensated and ... given credit for
[his] ideas." (*Id.* at 12.) He is "[a]lso just looking to have [his]
personal life back...." (*Id.*) "Due to the welfare of Robinhood
employees," Plaintiff feels that "the remedy of $57 million
would be fair." (*Id.* at 13.)

**DISCUSSION**

The Court must dismiss an IFP complaint, or any portion of
the complaint, that is frivolous or malicious, fails to state a
claim on which relief may be granted, or seeks monetary relief
from a defendant who is immune from such relief. 28 U.S.C.
§ 1915(e)(2)(B)*; see Livingston v. Adirondack Beverage Co.*,
141 F.3d 434, 437 (2d Cir. 1998). A claim is "frivolous when
either: (1) the factual contentions are clearly baseless, such as
when allegations are the product of delusion or fantasy; or (2)
the claim is based on an indisputably meritless legal theory."
*Id.* (internal quotation marks and citation omitted). Moreover,
a court has "no obligation to entertain pure speculation and
conjecture." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir.
2011) (finding as frivolous and baseless allegations that set
forth a fantastical alternative history of the September 11,
2001 terrorist attacks).

 **\*2** Plaintiff should be familiar with these standards, which
the Court has applied in dismissing multiple other actions that
he has filed. Based on Plaintiff's history of filing vexatious
litigation, by order dated June 28, 2021, the Court barred
Plaintiff from filing future civil actions in this court IFP

without first obtaining leave to file. *Allen v. Almanzar*, ECF 1:21-CV-3838, 5 (S.D.N.Y. June 28, 2021).

Because Plaintiff filed this action before the Court issued the filing restriction, this action is not subject to it. But this action is not a departure from Plaintiff's pattern of vexatious litigation.

The Court finds that Plaintiff's factual allegations – that as a young child, Plaintiff developed Robinhood and numerous internet domain names, including Google, Visio, Instagram, Postmates, "Kangeroo," and Amazon, and that Defendant Radric Davis revealed Plaintiff's idea for Robinhood to the public – present no basis for a legally viable claim and are factually baseless. [1]

As the Supreme Court of the United States has held, where, as here, "the facts alleged are 'clearly baseless,' a category encompassing allegations that are 'fanciful,' 'fantastic,' and 'delusional,' " a court may dismiss a claim as "factually frivolous." *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992) (internal citations omitted). "As those words suggest, a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible...." *Id.* at 33. Even if Plaintiff's assertions could be construed as claims of cybersquatting, [2] Plaintiff clearly does not have protectible interests in the ideas for the internet websites and domain names listed in the present complaint. *See Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989) ("Examples of [claims based on an indisputably meritless legal theory include] ... claims of infringement of a legal interest which clearly does not exist.... Examples of [claims whose factual contentions are clearly baseless] are claims describing fantastic or delusional scenarios, claims with which federal district judges are all too familiar."). For these reasons, the Court dismisses this action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

**\*3** In deference to Plaintiff's *pro se* status, the Court would normally permit Plaintiff to amend his complaint. But the Court finds that the complaint cannot be cured with an amendment. Where an amendment would be futile, leave to amend is not required. *Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (court may dismiss a complaint *sua sponte* and without providing leave to amend "where the substance of the claim pleaded is frivolous on its face"). The Court therefore declines to grant Plaintiff leave to amend.

The Court reminds Plaintiff that the filing restriction remains in effect with respect to any future civil actions he files in this court IFP.

## CONCLUSION

The Court dismisses this action as frivolous. 28 U.S.C. § 1915(e)(2)(B)(i).

Plaintiff has consented to receive electronic service of notices and documents in this action. (ECF 3.)

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3848871

---

## Footnotes

[1]    In other actions Plaintiff filed in this court, Plaintiff alleged that he developed well-known internet websites and domain names, including most of those mentioned in the present complaint. *Allen v. Patton*, 1:21-CV-3468, 6 (S.D.N.Y. Aug. 11, 2021) (dismissing for failure to state a claim and as frivolous Plaintiff's claims of appropriation of his ideas for Google and Instagram, and his development of the domain names for Google, Visio, Postmates, Kangaroo, and Amazon); *Allen v. Patton*, ECF 1:21-CV-3457, 7 (S.D.N.Y. June 3, 2021) (same, not including Visio); *Allen v. Patton*, 1:21-CV-3459, 7 (S.D.N.Y. June 3, 2021) (same, not

Allen v. Teñer, Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 115 of 520

including Visio); *Allen v. Patton*, 1:21-CV-4123, 5 (S.D.N.Y. June 1, 2021) (same, not including Visio); *Allen v. Cole*, 1:21-CV-3450, 6 (S.D.N.Y. May 7, 2021) (dismissing for failure to state a claim Plaintiff's claims of appropriation of his ideas for Google and Instagram); *Allen v. Patton*, 1:21-CV-3434, 6 (S.D.N.Y. Apr. 30, 2021) (same).

2    "[C]ybersquatting is the Internet version of a land grab. Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 431 (S.D.N.Y. Apr. 23, 2013) (internal quotation marks and citation omitted). "A claim of cybersquatting is governed by 15 U.S.C. § 1125(d)(1)(A), which imposes liability on any person who registers, traffics in, or uses a domain name that ... is identical or confusingly similar to a trademark." *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12069, 2020 WL 774237, at *3 (S.D.N.Y. Feb. 18, 2020) (internal quotation marks omitted).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 116 of 520

Altieri v. Tsopanides, Not Reported in Fed. Supp. (2022)

2022 WL 1912851

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Robert ALTIERI, Plaintiff,

v.

Timothy TSOPANIDES, Defendant.

No. 3:21-cv-01224 (MPS)
|
Signed 06/03/2022

**Attorneys and Law Firms**

John R. Williams, New Haven, CT, for Plaintiff.

Josephine S. Miller, Danbury, CT, for Defendant.

### RULING ON MOTION TO DISMISS

Michael P. Shea, United States District Judge

**\*1** This case arises from a property dispute between Plaintiff Robert Altieri and Defendant Timothy Tsopanides. Altieri filed suit against Tsopanides and "Officer Valdavinos (#129)," a police officer at the Orange Police Department ("OPD"), claiming that they acted in concert to deprive Altieri of his property without due process of law in violation of 42 U.S.C. § 1983. Altieri voluntarily dismissed his claims against Valdavinos, ECF Nos. 31, 32, and thus, the only remaining claims in this case are against Tsopanides. Tsopanides now moves to dismiss the Section 1983 claim under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, I grant the motion to dismiss the Section 1983 claim and dismiss without prejudice any state law claims.

### I. FACTUAL BACKGROUND

The following facts are taken from Altieri's complaint, ECF No. 1, and are accepted as true for the purposes of this ruling.

Tsopanides is a resident of Orange, Connecticut and owns real estate located at 628 Grassy Hill Road in Orange, Connecticut. ECF No. 1 ¶¶ 4, 7. "Long ago," Tsopanides borrowed $60,000 without interest from Altieri. *Id.* ¶ 7. In exchange for the loan, Tsopanides allowed Altieri "to place a non-motorized residence on Tsopanides's property as a residence for himself until such time as the loan was fully

repaid." *Id.* As of the filing of the complaint, Tsopanides had repaid $38,000 of the loan. *Id.*

On September 8, 2021, Tsopanides visited Altieri at his non-motorized residence and "demanded that [he] immediately vacate the premises." *Id.* ¶ 8. Altieri explained that he had a right to live on Tsopanides's property until Tsopanides repaid the loan. *Id.* Tsopanides then "became enraged," damaged "some of [Altieri's] personal property," and left. *Id.* Altieri filed a complaint with the OPD but the OPD took no action. *Id.*

On September 10, 2021, four OPD officers, including Valdavinos, "pounded" on Altieri's door and "accused [him] of trespassing." *Id.* ¶ 9. Altieri "explained ... that he has a legal right to remain [on] the property in his residence unless and until some court rules otherwise." *Id.* The four officers did not make an arrest, as, Altieri alleges, "they could have done if – but only if – they knew that [he] in fact was trespassing." *Id.* Instead, the officers "proceeded to inflict substantial damage upon [Altieri's] property" by disconnecting his electricity and water. *Id.* The officers inflicted damage that rendered Altieri's home "uninhabitable" and forced him to live at a motel. *Id.*

Altieri alleges that "the police officers acted jointly and in concert with ... Tsopanides and for the specific purpose of violently evicting [Altieri] from his home." *Id.* ¶ 10. Further, Altieri alleges that Tsopanides "was working closely and in conspiracy with the police ... for the specific purpose," *id.* ¶ 5, of depriving Altieri of his property without due process, *id.* ¶ 6.

### II. PROCEDURAL HISTORY

On September 14, 2021, Altieri filed this lawsuit against Valdavinos and Tsopanides. ECF No. 1. On October 9, 2021, Tsopanides filed a motion to dismiss. ECF No. 14. On March 5, 2022, Altieri filed a motion to dismiss his claims against Valdavinos pursuant to Fed. R. Civ. P. 41(a)(2), ECF No. 31, which I granted, ECF No. 32. Tsopanides is the only remaining defendant.

### III. LEGAL STANDARD

**\*2** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 117 of 520

Altieri v. Tsopanides, Not Reported in Fed. Supp. (2022)

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)). The Court must accept the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014). The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

## IV. DISCUSSION

Tsopanides seeks dismissal of Altieri's Section 1983 claim, arguing that Altieri has not alleged that Tsopanides acted jointly or in concert with the police officers. ECF No. 14 at 3. To state a Section 1983 claim against a private party, such as Tsopanides, Altieri must allege facts showing that Tsopanides acted under the color of state law. "Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)); *see Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) ("[A] plaintiff pressing a claim of violation of his constitutional rights under § 1983 is ... required to show state action." (internal quotation marks and citation omitted)). "Private parties act under the color of state law if they jointly participate or conspire with a state actor to violate an individual's federal rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005).

To state a claim for a Section 1983 conspiracy involving a private party, "a plaintiff must allege '(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Knopf v. Esposito*, 803 F. App'x 448, 452–53 (2d Cir. 2020) (quoting *Ciambriello*, 292 F.3d at 324–25). A private actor also acts under the color of state law "when the private actor is a willful participant in joint activity with the State or its agents." *Betts*, 751 F.3d at 84 (internal quotation marks and citation omitted). A complaint that contains "only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights [is] properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello*, 292 F.3d at 325 (internal quotation marks omitted); *see also Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 381–82 (E.D.N.Y. 2021)

("[T]he complaint must allege facts that plausibly suggest a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."). And while "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (internal quotation marks and citation omitted), the plaintiff is still required to allege facts beyond "conclusory, vague, or general allegations" to state a claim "that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights," *Ciambriello*, 292 F.3d at 325.

**\*3** Here, Altieri fails to allege any facts demonstrating that Tsopanides acted in concert or conspired with the police officers. He makes only a conclusory allegation that "the police officers acted jointly and in concert with the defendant Tsopanides and for the specific purpose of violently evicting the plaintiff from his home." ECF No. 1 ¶ 10; *see also id.* ¶ 6 ("At all times mentioned in this Complaint, the defendants acted jointly and in concert with each other for the express purpose of achieving the unlawful objective of the conspiracy, that is, to deprive the plaintiff of his property without due process of law."). Conclusory allegations that a private actor and a state actor acted in concert, however, are insufficient to state a Section 1983 claim against a private actor. *See Ciambriello*, 292 F.3d at 324 ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.").

Altieri argues that a conspiracy may be inferred circumstantially from the factual allegations in the Complaint. Specifically, he argues that "a finder of fact" may infer that "the police acted in conjunction with Tsopanides" to evict him based on the "close proximity in time between" Tsopanides's September 8 visit to his residence, Altieri's complaint to the OPD upon which the police took no action, and the police officers' September 10 visit to Altieri's residence. ECF No. 15 at 3–4. When drawing all reasonable inferences in favor of Altieri, I find that there are no factual allegations from which I may infer that Tsopanides acted jointly or conspired with the police officers. At most, I can infer from the factual allegations that the OPD received Altieri's complaint, that Tsopanides also complained to OPD, and that the police officers credited and acted on Tsopanides's complaint rather than Altieri's complaint. But these inferences, even when taken together, do not establish that Tsopanides was acting under the color of state law. A private party's calling or

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 118 of 520

Altieri v. Tsopanides, Not Reported in Fed. Supp. (2022)

summoning police officers does not constitute joint action with the officers that is actionable under Section 1983. *See Rodriguez v. Winski*, 973 F. Supp. 2d 411, 422 (S.D.N.Y. 2013) (finding that a private party "summoning police or requesting that police take action ... simply does not suffice to constitute joint action or to convert the private party into a state actor"); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (private party's "provision of background information to a police officer does not by itself make [the private party] a joint participant in state action under Section 1983"). Even if I infer that Tsopanides filed a false report with the OPD, causing the police officers to wrongfully evict Altieri, that would not make Tsopanides a state actor. *See Rodriguez*, 973 F. Supp. at 422 ("[E]ven if a private party provides false information to police, ... such provision alone does not constitute joint action actionable under § 1983."); *Vazquez v. Combs*, No. 04-Civ-4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation."). And the reasonable inferences that I can draw from Altieri's factual allegations do not suggest that the police officers—when visiting Altieri on September 10—relied on Tsopanides's judgment rather than their own. *See Ginsberg*, 189 F.3d at 272 ("Where ... a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983."); *Rodriguez*, 973 F. Supp. 2d at 423 (A "substitution of private judgment for police judgment [is] necessary to constitute joint action."). There are no factual allegations suggesting that Tsopanides was present on September 10 or exercised any influence over the police officers and their decision-making—other than by potentially making a complaint to the police which, as noted, is insufficient and is not even expressly alleged. *Cf. Powell v. Alexander*, No. 3:16-CV-01654 (SRU), 2018 WL 4425986, at *4 (D. Conn. Sept. 17, 2018) (concluding that plaintiff sufficiently stated a § 1983 claim against a private party when plaintiff claimed "much more than

simply that" defendants contacted the police, and alleged facts that indicated that defendants "exercised such extreme influence over the [state] defendants, ... [and] that the police officers ceased to exercise[ ] independent judgment" (internal quotation marks and citation omitted)).

**\*4** I conclude that Altieri has failed to state a Section 1983 claim. Nonetheless, because Altieri may be able to plead additional facts that would make out a claim of joint action under Section 1983, I will dismiss the Section 1983 claim without prejudice. Having dismissed Altieri's only federal claim, I note that Altieri has not alleged any other independent basis for federal court jurisdiction. *See* ECF No. 1 (invoking the court's federal question jurisdiction based on the Section 1983 claim and the court's supplemental jurisdiction over any state law claim). It is unclear whether the complaint was intended to plead any state law claims. The complaint does not contain separate counts and, although it mentions 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state law claims, it does not identify any such claims. Altieri's brief, however, asserts that, in addition to being liable under Section 1983, Tsopanides "is liable ... as a civilian damaging personal property in an attempt to carry out an unlawful eviction." ECF No. 15 at 4. In any event, to the extent that the complaint pleads any state law claims, they are dismissed without prejudice to being filed in state court. *See* 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the reasons above, the motion to dismiss (ECF No. 14) is hereby GRANTED, and Altieri's Section 1983 claim is DISMISSED without prejudice. Further, Altieri's state law claims, if any, are DISMISSED without prejudice to being filed in state court. The Clerk is directed this close this case, but within 30 days of this order, Altieri may file a motion to reopen together with an amended complaint that addresses the defects discussed in this ruling.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1912851

---

2016 WL 11259015
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

George L. ANDERSON, Plaintiff,

v.

Jane C. CAMERON, Teresa J. Mucha,
Joe Martens, Landon Marsh, Thomas C.
Jorling and Henry G. Williams, Defendants.

13-CV-578V(Sr)
|
Signed 09/14/2016

**Attorneys and Law Firms**

George L. Anderson, Frewsburg, NY, pro se.

George Michael Zimmermann, Office of the New York State
Attorney General, Buffalo, NY, for Defendants.

### REPORT, RECOMMENDATION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate
Judge

**\*1** This case was referred to the undersigned by the Hon.
Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for
all pretrial matters and to hear and report upon dispositive
motions. Dkt. #15. By Text Order entered on March 8, 2016,
Judge Arcara reassigned this case to the Hon. Lawrence J.
Vilardo. Dkt. #24.

Currently before the Court is defendants Cameron, Marten,
and Mucha's motion to dismiss the complaint for failure to
state a claim pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure. Dkt. #10. For the following reasons, it is
recommended that defendants' motion to dismiss be granted.

### BACKGROUND

Plaintiff commenced this *pro se* action alleging that
defendants have prevented him from "operat[ing] a
grandfathered private property gravel operation" in violation
of his rights under the Mining Law of New York State;
the New York State Constitution; Art. I, § 10, and the
Fifth and Fourteenth Amendments to the United States

Constitution. Dkt. #1, pp. 8-9. Plaintiff seeks injunctive relief
and compensatory and punitive damages. Dkt. #1, p. 10.
For the reasons set forth below, this Court recommends that
defendants' motion to dismiss be granted.

### Plaintiff's Allegations

Plaintiff's complaint centers on a decades-old dispute over
plaintiff's right to conduct mining operations on his private
property in Chautauqua County, New York. Specifically,
plaintiff alleges that: in 1984, Peter Nixon, "a DEC Mined
Land Reclamation Specialist" (Dkt. #1, p. 4) who is not
named as a defendant in the "Caption" or "Parties to
this Action" section of the complaint (Dkt. #1, p. 1),
informed plaintiff to terminate all mining operations on his
property (Dkt. #1, p. 8); in 2005, Lucas Mahoney, another
such "Specialist" who is also not named as a defendant,
"threatened plaintiff['s] customer with criminal charges for
purchasing gravel products from [plaintiff]" (Dkt. #1, p.
8); on November 30, 2011, Teresa J. Mucha, an "Assistant
Region 9 Attorney" with the New York State Department
of Environmental Conservation ("NYSDEC"), threatened
plaintiff with fines and penalties if he did not stop mining
his property (Dkt. #1, p. 9); on May 7, 2013, Administrative
Law Judge ("ALJ") Edward Buhrmaster, also not named as a
defendant, "conspired ... with NYSDEC Region 9 Assistant
Attorney Teresa J. Mucha to commence illegal NYSDEC
Administrative Hearings regarding [the] constitutionality and
jurisdiction of NYS Mining Law" (Dkt. #1, p. 9); and Lucas
Mahoney and other persons also not named as defendants
used "illegally obtained search warrants" to search plaintiff's
property and "issued criminal citations that had no bases
for criminal charges," and prosecuted plaintiff in various
municipal courts (Dkt. #1, p. 10).

Although identified as "Parties to this Action," plaintiff's
complaint contains no factual allegations against Jane C.
Cameron or Joe Martens. Dkt. #1. Likewise, plaintiff makes
no allegations against Langdon Marsh, Thomas C. Jorling,
or Henry G. Williams, who are identified in the "Caption of
Action" but not as "Parties" to the action. Dkt. #1.

**\*2** Plaintiff filed his *pro se* complaint on June 3, 2013, along
with a request for a temporary restraining order ("TRO"). Dkt.
Nos. 1 & 3. By Decision and Order entered on August 21,
2013, the Hon. Frank P. Geraci, Jr. denied plaintiff's request
for a TRO and directed plaintiff to file an amended complaint
in which he: "names each of the defendants he intends to
sue herein, including but not limited to those individuals not
named as defendants in the complaint but referred to in the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 120 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2016)

body of the complaint ... and those individuals already named in the complaint as defendants—Jane C. Cameron, Teresa J. Mucha, Joe Martens, Langdon Marsh, Thomas Jorling, and Henry G. Williams" (Dkt. # 4, p. 3); and "alleges facts against each of [these parties] that would support a claim(s) upon which relief can be granted against them" (Dkt. #4, p. 7). Judge Geraci directed that if plaintiff did not file an amended complaint as directed, "the Court will proceed to review the complaint ... against **only** those defendants named in the Caption and Parties to this Action: Defendant's Information Section of the Complaint," specifically, defendants Cameron, Mucha, and Martens. Dkt. #4, p. 7 (emphasis added).

Judge Geraci noted that according to the complaint, plaintiff had filed a number of lawsuits in both this Court and the New York State Courts "dealing with the same facts involved in this action." Dkt. #4, p. 2. "Moreover," Judge Geraci wrote, "there appear to be significant questions related to the merits and viability of the complaint, including but not limited to whether it states a claim upon which relief may be granted and whether some of the claims alleged are barred, in whole or in part, by, among other things, the doctrine of res judicata, the statute of limitations and absolute and quasi-judicial immunity." Dkt. #4, p. 4.

On September 5, 2013, plaintiff filed a second motion for a TRO (Dkt. #5), which Judge Geraci construed as a motion for reconsideration and denied on January 7, 2014 (Dkt. #8). In the interim, plaintiff filed an interlocutory appeal of Judge Geraci's initial decision denying a TRO (Dkt. #6), which the Second Circuit Court of Appeals affirmed by Summary Order entered on June 27, 2014. Dkt. #11. Plaintiff never filed an amended complaint, thereby forfeiting any potential clams against Langdon Marsh, Thomas Jorling, Henry G. Williams, Peter Nixon, Lucas Mahoney, and ALJ Edward Buhrmaster.

Defendants Cameron, Mucha, and Martens moved to dismiss the complaint for failure to state a claim on March 27, 2014, during the pendency of the interlocutory appeal. (Dkt. #10). After two extensions of time to respond and an order to show cause why the case should not be dismissed for failure to prosecute, plaintiff filed his response and memorandum in opposition (Dkt. Nos. 22, 26) to defendants' motion to dismiss, and defendants replied (Dkt. #23).

## DISCUSSION AND ANALYSIS

### Dismissal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). A complaint that offers "a litany of general conclusions that shock but have no meaning" is not facially plausible. Tufano v. One Toms Point Lane Corp., 64 F. Supp. 2d 119, 123 (S.D.N.Y. 199) (quoting Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987) ). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration "to facts stated on the face of the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).

## 42 U.S.C. § 1983

**\*3**  Plaintiff's complaint is properly asserted under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. Id. Here, plaintiff claims that defendants violated his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States. Dkt. #1.

### Defendants Cameron and Martens: Personal Involvement

Defendants must be personally involved in an alleged constitutional deprivation for a plaintiff to be awarded damages under 42 U.S.C. § 1983. Gaston v. Coughlin,

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 121 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2016)

249 F.3d 156, 164 (2d Cir. 2001); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989). Defendants argue that Cameron, the New York State Attorney General, and Martens, the Commissioner of the New York Department of Environmental Conservation, must be dismissed from the case because plaintiff has failed to allege any action or involvement on either of their parts and their status as supervisors, standing alone, is insufficient to state a claim.

"There is no respondeat superior liability in § 1983 cases." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). That is, supervisory officials may not be held liable merely because they occupy a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). In *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), the Second Circuit Court of Appeals held that a plaintiff may demonstrate a defendant supervisor's liability through evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *Colon*, 58 F.3d at 873.

Following *Colon*, the Supreme Court explicitly rejected the argument in *Iqbal*, 556 U.S. at 677, that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." This created conflict within the Second Circuit about the continuing viability of *Colon*'s supervisory liability test. *Reynolds v. Barrett*, 685 F.3d 193, 206 (2d Cir. 2012); *Aguilar v. Immigration & Customs Enforcement Div.*, 811 F. Supp. 2d 803, 814 (S.D.N.Y. 2011) (acknowledging that the Second Circuit Court of Appeals has not yet decided which of the *Colon* factors remain a basis for establishing supervisory liability following *Iqbal*, and no clear consensus has emerged among the district courts within the Circuit).

However, even if "knowledge and acquiescence," "failure to train" and similar theories of supervisory liability were still available after *Iqbal*, plaintiff has nonetheless failed to allege a facially plausible claim against Cameron or Marten under any theory. Indeed, plaintiff has not made a single factual allegation anywhere in the complaint against either of these defendants. Dkt. #1. As defendants point out, "aside from listing Cameron and Martens as defendants, their names

appear nowhere in the Complaint." Dkt. #10-1, p. 7. Where a plaintiff "fails to specify any culpable action taken" by a defendant, his complaint must be dismissed. *Arar v. Ashcroft*, 585 F.3d 559, 569 (2d Cir. 2009). Dismissal is particularly appropriate where, as here, the plaintiff has rejected the opportunity to re-plead. *Id.* For this reason, it is recommended that the complaint be dismissed in its entirety as against defendants Cameron and Marten.

**Letter Threatening Fines and Penalties**

Due Process

 **\*4**  In his third claim, plaintiff alleges that defendant Mucha violated his due process rights by "stat[ing that] plaintiff violated the NYS Mining Law" and "under threats of fines and penalties[, ordering that] plaintiff ... stop operating [his] gravel operation." Dkt. # 1, p. 9. Under the Due Process Clause of the Fifth Amendment of the Constitution, "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. The Due Process Clause protects individual citizens "against arbitrary action of government," *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), and has both a procedural component protecting against the "denial of fundamental procedural fairness," *Id.* at 845, and a substantive component guarding against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 846; *Lombardi v. Whitman*, 485 F.3d 73, 78-79 (2d Cir. 2007).

Procedural Due Process

To state a claim for deprivation of property without due process of law, a plaintiff must: (1) identify a property right; (2) show that the state has deprived him of that right; and (3) show that the deprivation was effected without due process. *Local 342, Long Island Pub. Serv. Employees v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994); *Nat'l Fuel Gas Supply Corp. v. Town of Wales*, 904 F. Supp. 2d 324, 331 (W.D.N.Y. 2012). Plaintiff's allegations have failed to meet any of these requirements.

As an initial matter, it is unclear from the complaint whether plaintiff's right to conduct a gravel operation on his property qualifies as a protected property interest under the Due Process Clause. Property rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 122 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2016)

claims of entitlement to those benefits." *Donohue v. New York*, No. 1:11-CV-1530 MAD/CRH, 2012 WL 6020058, at *27 (N.D.N.Y. Dec. 3, 2012) (quoting *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972) (holding that the plaintiff must have more than a unilateral expectation; the plaintiff must have a legitimate claim of entitlement to the benefit) ). Other than alleging that his mining operation is "grandfathered" (Dkt. #1, p. 8), plaintiff fails to identify the "independent source" from which his entitlement to operate a mine on his property stems.

Even assuming that plaintiff has a protected property interest, he does not allege that defendant Mucha deprived him of his right to mine his land, only that she threatened to fine him if he continued to do so. This is insufficient to state a claim under 42 U.S.C. § 1983. "[T]here can be no recovery under § 1983 for an attempted constitutional violation; only a claim of actual deprivation is cognizable under the statute." *Lyddy v. Bridgeport Bd. of Educ.*, No. 3:06-CV-1420 AHN, 2007 WL 2697452, at *5 (D. Conn. Sept. 11, 2007); *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir. 1992); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990); *Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980); *Ashford v. Skiles*, 837 F. Supp. 108, 115 (E.D. Pa. 1993); *Defeo v. Sill*, 810 F. Supp. 648, 658 (E.D. Pa. 1993). "[T]he mere attempt to deprive a person of his [constitutional] rights is not, under usual circumstances, actionable under section 1983." *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir. 1987).

Lastly, plaintiff alleges that he has appeared before numerous courts to adjudicate issues related to his mining business, including the United States District Court for the Western District of New York; New York State Supreme Court, Chautauqua County; New York State Supreme Court, Appellate Division (Second Department); and the New York State Court of Claims. Dkt. #1, pp. 4-7. All of these cases were decided against plaintiff, being dismissed upon the opposing party's motion, or *sua sponte* as frivolous, malicious, or failing to state a claim. Dkt. #1, pp. 4-7. Moreover, as further discussed below, plaintiff asserts in his fourth claim that defendant Mucha conspired with an ALJ to hold "illegal NYSDEC Administrative Hearings" regarding plaintiff's continuing mining operations. Dkt. #1, p. 9. These facts as alleged by plaintiff demonstrate that he has been provided with sufficient process of law.

Substantive Due Process

**\*5** Plaintiff's allegations are likewise insufficient to assert a substantive due process claim. "Substantive due process is an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action." *Id.* Rather, "substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Nat'l Fuel Gas Supply Corp.*, 904 F. Supp. 2d at 332 (quoting *Natale*, 170 F.3d at 263)*; see, e.g., Lewis*, 523 U.S. at 845 (stating that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense"); *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (holding that "[o]nly a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983"). It cannot be said that defendant Mucha's conduct in sending a letter threatening plaintiff with fines for conducting mining operations on his property, apparently without a permit, was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale*, 170 F.3d at 263.

The Takings Clause

The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation." U.S. CONST. AMEND. V. The law recognizes two distinct types of takings claims: physical takings and regulatory takings. *See Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995). "A physical taking, the more recognizable of the two, occurs when the government physically takes possession of a property interest." *Nat'l Fuel Gas Supply Corp.*, 904 F. Supp. 2d at 334. By contrast, "[t]he gravamen of a regulatory taking claim is that the state regulation goes too far and in essence effects a taking." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (internal citations omitted). "[T]o withstand a motion to dismiss [on a regulatory takings claim], an aggrieved plaintiff must allege, not only a taking, but that compensation was sought via state procedures and denied." *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 361 (S.D.N.Y. 2005) (internal quotations omitted). This plaintiff has failed to do.

As previously discussed herein, plaintiff does not allege that defendant Mucha actually enjoined him from conducting his mining business on his private property but merely "stated

[that] plaintiff [was] violating NYS Mining Law ... [u]nder threats of fines and penalties." Dkt. #1, p. 9. Further, there is no allegation that plaintiff sought compensation through the state for the "taking" of or interference with his right to mine his property. For this reason, plaintiff's complaint fails to state a takings claim.

### Conspiracy to "Commence Illegal NYSDEC Administrative Hearings"

In his fourth claim, plaintiff alleges that defendant Mucha conspired with ALJ Edward Buhrmaster, a non-party, "to commence illegal NYSDEC Administrative Hearings regarding [the] constitutionality and jurisdiction of [the] NYS Mining Law." Dkt. #1, p. 9. To survive a motion to dismiss a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) an agreement between two or more state actors; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal, causing damages. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); [1] *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 98-99 (W.D.N.Y. 2009) "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Ciambriello*, 292 F.3d at 325; *Walker v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005). Moreover, although "[a] plaintiff is not required to list the place and date of defendants' meetings and the summary of their conversations when he pleads conspiracy, ... the pleadings must present facts tending to show agreement and concerted action." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (report and recommendation) (accepted in part and rejected in part by *Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005) (citations and quotations omitted) ).

 **\*6** In this case, plaintiff has failed to allege any facts showing an agreement between defendant Mucha and the ALJ to injure plaintiff constitutionally or any overt act in furtherance of that agreement. It appears from the wording of the complaint that even if Mucha commenced a proceeding against plaintiff, he never in fact appeared before the ALJ. Dkt. #1, p. 9. As previously stated herein, "there can be no recovery under § 1983 for an attempted constitutional violation; only a claim of actual deprivation is cognizable under the statute." *Lyddy*, 2007 WL 2697452, at \*5 (citing cases). Plaintiff has also not alleged that he was damaged by Mucha and ALJ Buhrmaster's actions.

Even if properly plead, plaintiff's conspiracy claim would nonetheless fail because defendant Mucha, as an agency attorney, is entitled to immunity for commencing a NYSDEC proceeding. "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate of the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) (holding that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983"). Put another way, a prosecutor enjoys absolute immunity for prosecutorial activities unless he or she "proceeds in the clear absence of all jurisdiction." *Barr, 810 F.2d at 361.*

An agency attorney like defendant Mucha may be entitled to absolute immunity provided that her conduct is prosecutorial in nature and within her jurisdiction. *Neroni v. Grannis, No. 3:11-CV-1485 LEK/DEP, 2013 WL 1183075, at \*11 (N.D.N.Y. Mar. 21, 2013); Rodow v. City of New York, 822 F.2d 324, 327 (2d Cir. 1987)* (holding that an attorney for the municipal commission on human rights was entitled to absolute immunity as her conduct was "at least colorably prosecutorial in nature and not clearly beyond her jurisdiction" ). In the view of this Court, defendant Mucha's conduct in commencing an action against plaintiff for violations of the environmental law is clearly "akin to that of a prosecutor." *Bath Petroleum Storage, Inc. v. Sovas, 136 F. Supp. 2d 52, 60 (N.D.N.Y. 2001)* (holding that a NYSDEC attorney was entitled to absolute immunity for any actions he took in initiating an administrative claim). She is therefore entitled to absolute immunity for the conduct alleged in plaintiff's fourth claim.

### Contracts Clause

To the extent that plaintiff invokes the Contracts Clause, his complaint also fails to state a claim. The Contracts Clause provides that "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. CONST. ART. I, § 10. To state a claim for a violation of the Contracts Clause, a plaintiff must allege sufficient facts to demonstrate that state law has "operated as a substantial impairment of a contractual relationship." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). To determine if the Contracts Clause had been violated, a court looks at three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Harmon v. Markus*, 412 Fed.Appx. 420, 423 (2d Cir. 2011) (citing *Romein, 503 U.S. at 186).*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 124 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2016)

Plaintiff alleges that a NYSDEC Mined Land Reclamation Specialist threatened plaintiff's "customer" with criminal charges for purchasing gravel products from him. (Dkt. #1, p. 8). This falls far short of establishing that plaintiff was a party to a "contractual relationship." As defendants have noted, other than to identify the "Contracts Clause" as a potential basis of relief, plaintiff does not use the word "contract" anywhere in the complaint. Dkt. #10-1, p. 12. Even if plaintiff had a longterm contract to sell gravel products, he has not alleged that there was some intervening change in law that somehow impaired that relationship. This is of paramount importance because a "contract ... cannot be impaired by a law in effect at the time the contract was made." *Harmon*, 412 Fed.Appx. at 423 (citing *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) (recognizing that "[l]aws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein") ). As plaintiff has failed to plead any of the essential elements of a Contracts Clause claim, any claims predicated on the U.S. Constitution, Article I, § 10 should be dismissed.

## CONCLUSION

**\*7** For the foregoing reasons, this Court recommends that defendants' motion to dismiss (Dkt. #10) be granted in its entirety. As plaintiff failed to file an amended complaint as directed by Judge Geraci, only those claims as against Cameron, Martens, and Mucha are subject to review. Dkt. #4, p. 7. Should the district judge adopt this Court's recommendation, it would result in this case being dismissed against all remaining parties and the case being closed.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11259015

## Footnotes

1    In *Toussie v. Powell*, 323 F.3d 178, 185 n.3 (2d Cir. 2003), the Second Circuit Court of Appeals declined to decide whether the pleading requirements for a Section 1983 conspiracy claim set forth in *Ciambriello* survived two subsequent Supreme Court decisions, *Swierkiewicz v. Sorema*, N.A., 534 U.S. 506 (2002), and *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993), which generally rejected heightened pleading standards. *See Sibiski v. Cuomo*, No. 08 CV 3376 SJF ARL, 2010 WL 3984706, at \*6 (E.D.N.Y. Sept. 15, 2010). Following *Toussie*, the Second Circuit Court of Appeals, as

**Anderson v. Cameron, Not Reported in Fed. Supp. (2016)**

Case 1:25-cv-00968-ECC-ML     Document 54     Filed 11/26/25     Page 125 of 520

well as other courts within the Circuit, have analyzed Section 1983 conspiracy claims using the *Ciambriello*'s pleading standard. *See Krug v. McNally,* No. 07-1015-cv, 2010 WL 772988, at *1 (2d Cir. Mar. 8, 2010) (quoting *Ciambriello*'s standard for pleading a Section 1983 conspiracy claim); *Orr ex rel. Orr v. Miller Place Union Free School Dist.,* No. 07-CV-787, 2008 WL 2716787, at *4 (E.D.N.Y. July 9, 2008) (citing cases).

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 126 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2017)

2017 WL 2240253
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

George L. ANDERSON, Plaintiff,

v.

Jane C. CAMERON, Teresa J. Mucha,
Joe Martens, Langdon Marsh, Thomas C.
Jorling, and Henry G. Williams, Defendants.

13-CV-578-MAT
|
Signed 05/23/2017

**Attorneys and Law Firms**

George L. Anderson, Frewsburg, NY, pro se.

George Michael Zimmermann, Office of the New York State
Attorney General, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, United States District Judge

**I. Introduction**

**\*1** *Pro se* plaintiff George L. Anderson ("plaintiff")
commenced the instant action on June 3, 2013, alleging
that defendants unlawfully prevented him from operating a
"grandfathered" gravel mining operation on his property in
Chautauqua County, New York. On August 21, 2013, the
Court entered a Decision and Order in which it granted
plaintiff permission to proceed *in forma pauperis* and
instructed him to file an amended complaint no later than
September 23, 2013. Docket No. 4. Plaintiff was informed
that if he failed to file an amended complaint, the Court would
"proceed to further review fully the complaint, pursuant to
28 U.S.C. § 1915(e)(2)(B), against only those defendants
named in the Caption and Parties to Action ... [s]ection[s] of
the complaint." *Id.* at 8. Plaintiff failed to file an amended
complaint, and the Court subsequently ordered that the
complaint be served. Docket No. 8. Defendants Jane C.
Cameron ("Cameron"), Joe Martens ("Martens"), and Teresa
J. Mucha ("Mucha") (collectively the "moving defendants")
filed a motion to dismiss for failure to state a claim on
March 27, 2014. Docket No. 10. The docket indicates that
defendants Thomas C. Jorling, Langdon Marsh, and Henry
G. Williams (collectively the "non-moving defendants") were
never served with the with the summons and complaint.
Docket No. 9.

On January 4, 2017, United States Magistrate Judge H.
Kenneth Schroeder issued a Report and Recommendation
("R&R") (Docket No. 27) recommending that the moving
defendants' motion to dismiss be granted. For the reasons
discussed below, the Court adopts the findings set forth in the
R&R and grants the motion to dismiss. In addition, the Court
finds *sua sponte* pursuant to 28 U.S.C. § 1915 that plaintiff
has failed to state a claim as to Thomas C. Jorling, Langdon
Marsh, and Henry G. Williams. As a result, the complaint is
dismissed in its entirety.

**II. Discussion**

**A. Standard of Review**
When specific objections are made to a magistrate judge's
report and recommendation, the district judge makes a "*de
novo* determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1)(C). When only general
objections are made to a magistrate judge's report and
recommendation, the district judge reviews it for clear error or
manifest injustice. *E.g., Brown v. Peters*, 1997 WL 599355, at
\*2-3 (N.D.N.Y. Sept. 22, 1997), *aff'd*, 175 F.3d 1007 (2d Cir.
1999). After conducting the appropriate review, the district
court may "accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1)(C).

**B. *Sua Sponte* Dismissal of Plaintiff's Claims Against
the Non-Moving Defendants**
As a threshold matter, the Court notes that Judge Schroeder
limited his consideration to whether plaintiff had stated
a claim as to the moving defendants. Judge Schroeder
apparently mistakenly read the Court's August 21, 2013
Decision and Order as dismissing plaintiff's claims against
the non-moving defendants. *See* Docket No. 27 at 4. However,
review of the August 21, 2013 Decision and Order shows that
the Court reserved decision on the adequacy of the claims
against all the defendants listed in the caption, which includes
non-moving defendants Langdon Marsh, Thomas C. Jorling,
and Henry G. Williams. *See* Docket No. 4 at 7. The Court
has reviewed those claims and determines that *sua sponte*
dismissal is appropriate as to the non-moving defendants.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 127 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2017)

**\*2**  Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court shall dismiss a case in which *in forma pauperis* status has been granted if, at any time, the Court determines that the action (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). "*[S]ua sponte* § 1915 ... dismissal may occur and is in some cases preferable after service of process and expansion of the record." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003). Moreover, "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). Nevertheless, even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).

Here, the complaint contains no factual allegations whatsoever against non-moving defendants Langdon Marsh, Thomas C. Jorling, and Henry G. Williams. Indeed, the only times the non-moving defendants' names appear are in the case caption and list of parties. Moreover, plaintiff was given an opportunity to amend his complaint pursuant to the Court's August 21, 2013 Decision and Order and failed to do so. Under these circumstances, the Court finds that *sua sponte* dismissal of the claims against non-moving defendants Langdon Marsh, Thomas C. Jorling, and Henry G. Williams is appropriate.

### C. Plaintiff's Objections to the R&R

Turning to plaintiff's claims against the moving defendants, plaintiff's objections to the R&R are nothing more than a reiteration of the arguments considered by Judge Schroeder. As a result, the Court reviews the R&R for clear error, and finds none.

As discussed in detail in the R&R, the complaint contains no factual allegations whatsoever regarding defendants Cameron and Martens. Because there is no supervisory liability in a case brought under 42 U.S.C. § 1983, and because plaintiff has failed to identify any allegedly unlawful actions taken by Cameron and/or Martens, dismissal of his claims against them is appropriate.

With respect to defendant Mucha, plaintiff alleges that she violated his due process rights by ordering him to stop operating his gravel operation under threat of fines and penalties. As set forth in the R&R, even assuming that plaintiff had a cognizable property interest in continuing his gravel operation, he has failed to allege facts from which a fact-finder could conclude that defendant Mucha actually prevented him from doing so. Moreover, plaintiff's own papers demonstrate that he has been afforded extensive process, including having had his claims adjudicated by no less than four state and federal courts, all of which decided against him.

Plaintiff also has not stated claims for violation of the Constitution's Takings Clause or Contracts Clause. As Judge Schroeder explained, in order to state a claim based on the Takings Clause, a plaintiff must allege that he sought compensation via state procedures and was denied. Plaintiff has made no such claim here. Plaintiff also has not alleged the existence of a contract or a change in law that impaired that contract, as is required to state a claim for violation of the Contracts Clause.

**\*3**  Finally, with respect to Plaintiff's conspiracy claim, the Court agrees with Judge Schroeder that plaintiff has failed to allege any facts showing an agreement between defendant Mucha and the administrative law judge. Additionally, Mucha was acting in a prosecutorial capacity when she allegedly initiated administrative proceedings against plaintiff and is therefore entitled to immunity from civil suit.

Having considered plaintiff's objections, and for the reasons set forth above, this Court finds no clear error or manifest injustice in Judge Schroeder's findings, as a whole, and therefore adopts the R&R with respect to the claims against the moving defendants.

### III. Conclusion

For the reasons set forth in Judge Schroeder's thorough and well-reasoned R&R, the undersigned adopts his conclusions. The R&R (Docket No. 27) is hereby adopted, and the moving defendants' motion to dismiss (Docket No. 10) is granted. In addition, the Court *sua sponte* dismissed the claims against the non-moving defendants, for the reasons set forth above. The Clerk of Court is directed to close this case.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 128 of 520

Anderson v. Cameron, Not Reported in Fed. Supp. (2017)

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2240253

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2959467
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Janel WHITBECK, Plaintiff,

v.

OTSEGO COUNTY; Otsego County Sheriff's
Office; Deputy E. Lincoln, in her individual and
official capacities; and Deputy J. Smith, in his
individual and official capacities, Defendants.

3:25-CV-00673 (AMN/ML)
|
Signed October 20, 2025

**Attorneys and Law Firms**

JANEL WHITBECK, 225 Main Street, Franklin, New York
13775, Plaintiff pro se.

**ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

 **\*1**  On May 27, 2025, Plaintiff *pro se* Janel Whitbeck
commenced this action and asserted claims of false arrest and
deliberate indifference to medical needs pursuant to 42 U.S.C.
§ 1983, as well as claims pursuant to the Americans with
Disabilities Act ("ADA") and the New York State Andrew
Kearse Act, N.Y. Exec. Law § 837-u, against Otsego County,
the Otsego County Sheriff's Office, and Otsego County
Sheriff's Deputies Lincoln and Smith in their individual and
official capacities. Dkt. No. 1. Plaintiff did not pay the
filing fee and sought leave to proceed *in forma pauperis*
("IFP"). Dkt. No. 2. This matter was referred to Magistrate
Judge Miroslav Lovric, who, on September 24, 2025, granted
Plaintiff's motion for leave to proceed IFP. Dkt. No. 5.

Also on September 24, 2025, after conducting an initial
review of the Complaint pursuant to 28 U.S.C. § 1915(e),
Magistrate Judge Lovric issued an Order and Report-
Recommendation recommending that (i) Plaintiff's false
arrest and deliberate indifference claims be permitted to
proceed against Otsego County and Defendants Lincoln
and Smith in their individual and official capacities; (ii)
Plaintiff's ADA claim be permitted to proceed against Otsego
County and Defendants Lincoln and Smith in their official

capacities; and (iii) Plaintiff's claims under the New York
State Andrew Kearse Act and Plaintiff's claims against the
Otsego County Sheriff's Office be dismissed with prejudice.
Dkt. No. 5 ("Report-Recommendation"). Magistrate Judge
Lovric advised that under 28 U.S.C. § 636(b)(1), the parties
had fourteen days in which to file written objections and
that failure to object to the Report-Recommendation within
fourteen days would preclude appellate review. Dkt. No. 5 at
14. [1]

For the reasons set forth below, the Court adopts the Report-
Recommendation in its entirety, except that it dismisses
Plaintiff's false arrest and deliberate indifference claims
against Defendants Lincoln and Smith in their official
capacities with prejudice and without leave to amend and
permits Plaintiff's ADA claim to proceed against Defendants
Lincoln and Smith in their official capacities only to the extent
Plaintiff seeks prospective injunctive relief.

**II. BACKGROUND**

On March 1, 2025, Defendants Lincoln and Smith arrested
Plaintiff for petit larceny. Dkt. No. 5 at 2 (citing Dkt.
No. 1 at 2). Plaintiff alleges that, shortly before her arrest,
she experienced a medical emergency while attempting to
complete a transaction at Walmart. *Id.* (citing Dkt. No. 1 at
2). Specifically, Plaintiff alleges that her trained service dog
alerted her to the onset of a transient ischemic attack (referred
to as "TIA"), and when she attempted to return to her vehicle
to access medication, Walmart staff stopped her, took her
to the security office, and summoned law enforcement. *Id.*
(citing Dkt. No. 1 at 2).

Plaintiff alleges that she was visibly impaired; she was
wearing a medical alert bracelet, her speech was garbled, and
her gait was unsteady. *Id.* (citing Dkt. No. 1 at 2). Plaintiff
alleges that during Defendant Lincoln's search of Plaintiff she
observed her medical alert bracelet. *Id.* (citing Dkt. No. 1 at
2). Plaintiff further alleges that Defendant Smith physically
steadied her, which indicated his awareness of Plaintiff's
impairment. *Id.* (citing Dkt. No. 1 at 2). Defendants Lincoln
and Smith then allegedly proceeded to book, fingerprint, and
photograph Plaintiff while she was exhibiting a facial droop
consistent with a TIA. *Id.* (citing Dkt. No. 1 at 2).

**III. STANDARD OF REVIEW**

 **\*2**  This Court reviews *de novo* those portions of a
magistrate judge's report-recommendation that have been
properly preserved with a specific objection. *Petersen v.*

*Astrue*, 2 F. Supp. 3d 223, 228 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). If no specific objections have been filed, this Court reviews a magistrate judge's report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 228 (citing Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition). Similarly, if an objection simply rehashes arguments originally presented to the magistrate judge, this Court reviews the relevant portions of the report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 228-29 & n.6 (collecting cases). "When performing such a 'clear error' review, 'the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Dezerea W. v. Comm'r of Soc. Sec.*, No. 21-cv-01138, 2023 WL 2552452, at *1 (N.D.N.Y. Mar. 17, 2023) (quoting *Canady v. Comm'r of Soc. Sec.*, No. 17-cv-0367, 2017 WL 5484663, at *1 n.1 (N.D.N.Y. Nov. 14, 2017)).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 22-cv-567, 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

Because neither party has filed any objections to the Report-Recommendation, the Court reviews the Report-Recommendation for clear error.

First, Magistrate Judge Lovric recommended that Plaintiff's claims against the Otsego County Sheriff's Office be dismissed with prejudice. Dkt. No. 5 at 6. Specifically, Magistrate Judge Lovric noted that a municipal department "does not have the capacity to be sued as an entity separate from the municipality in which it is located." *Id.* at 5 (quoting

*White v. Syracuse Police Dep't*, No. 18-cv-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019)). Under New York law, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999); *see also Dudley v. Hochul*, No. 24-cv-0048, 2024 WL 1906594, at *9 (N.D.N.Y. May 1, 2024) (dismissing claims against the Onondaga County Sheriff's Office because it was not amenable to suit), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024).

Second, Magistrate Judge Lovric addressed Plaintiff's claim of false arrest under the Fourth Amendment against Defendants Lincoln and Smith in their individual and official capacities. Dkt. No. 5 at 6-7. Magistrate Judge Lovric noted that, when analyzing constitutional claims of false arrest, courts generally look to the law of the state where the arrest occurred. *Id.* at 6 (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)). "To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* (internal brackets omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)). Confinement is otherwise privileged when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 6-7 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Here, Plaintiff alleges that she experienced a TIA while attempting to complete a transaction at Walmart, and in the course of her attempt to access medication in her car, Walmart staff summoned law enforcement. Dkt. No. 5 at 2 (citing Dkt. No. 1 at 2). Plaintiff further alleges that despite their awareness of her impairment, Defendants Lincoln and Smith proceeded to arrest her. *Id.* Magistrate Judge Lovric recommended that Plaintiff's claim for false arrest against Defendants Lincoln and Smith proceed. *Id.* at 7.

*3 Third, Magistrate Judge Lovric addressed Plaintiff's claim of deliberate indifference to medical needs under the Fourteenth Amendment against Defendants Lincoln and Smith in their individual and official capacities. *Id.* at 7-8. Courts evaluate claims of deliberate indifference that arise during the course of a pretrial arrest and detainment under the Due Process Clause of the Fourteenth Amendment. *Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (citing *Weyant*, 101

F.3d at 856). Magistrate Judge Lovric noted that a plaintiff must demonstrate that (i) an official denied plaintiff the treatment needed to remedy a serious medical condition, and (ii) the official denied such treatment because of his deliberate indifference to that need. Dkt. No. 5 at 7-8 (citing *Mills*, 216 F. App'x at 10). Here, among other things, Plaintiff alleges that in connection with her arrest for petit larceny, Defendants proceeded to book Plaintiff after she explained that she was experiencing a TIA and while she was exhibiting symptoms of a TIA. *See id.* at 2 (citing Dkt. No. 1 at 2). Magistrate Judge Lovric recommended that Plaintiff's medical indifference claim proceed against Defendants Lincoln and Smith. *See id.* at 8. [2]

Fourth, Magistrate Judge Lovric addressed Plaintiff's claims of false arrest and deliberate indifference against Otsego County. Dkt. No. 5 at 8-9. "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, No. 21-cv-650 (AMN/MJK), 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted). Here, Magistrate Judge Lovric recommended that Plaintiff's claims against Otsego County, in which she alleges that Otsego County failed to train or supervise Defendants Lincoln and Smith, be permitted to proceed. Dkt. No. 5 at 9.

Fifth, Magistrate Judge Lovric addressed Plaintiff's claim alleging a violation of Title II of the ADA. *Id.* at 9-11. [3] "To establish a violation of the ADA, the plaintiff must demonstrate (1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of her disability." *Id.* at 10 (quoting *Disabled in Action*

*v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014)). Magistrate Judge Lovric found that Otsego County is a public entity that is subject to the ADA, and Plaintiff appeared to be a qualified individual with a disability who plausibly alleged that Defendants Lincoln and Smith wrongfully arrested her because Plaintiff's actions in response to her disability were misinterpreted as criminal activity. *Id.* Magistrate Judge Lovric noted that Plaintiff alleged that Defendants Lincoln and Smith observed her in a disoriented state, wearing her medical alert bracelet, and she informed Defendants that she suffers from the risk of a TIA. *Id.* at 10-11. Accordingly, Magistrate Judge Lovric recommended that Plaintiff's ADA claim be permitted to proceed against Otsego County and Defendants Lincoln and Smith in their official capacities. *Id.* at 11. [4]

**\*4** Sixth, Magistrate Judge Lovric addressed Plaintiff's claims pursuant to the New York State Andrew Kearse Act. *Id.* at 11-12. Magistrate Judge Lovric noted that the New York State Andrew Kearse Act is an unenacted New York State Assembly Bill that imposes criminal liability for failure to obtain medical care for a person in custody displaying medical distress. *Id.* at 11. [5] Magistrate Judge Lovric further noted that there is no private right of action to enforce federal or state criminal statutes. *See id.* at 12 (citing, *inter alia, Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Thus, Magistrate Judge Lovric recommended that this claim be dismissed for failure to state a claim without leave to amend.

Having reviewed the Report-Recommendation for clear error and considered Magistrate Judge Lovric's findings as to each claim, the Court adopts the Report-Recommendation in its entirety, except that it dismisses Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities with prejudice and without leave to amend and permits Plaintiff's ADA claim to proceed against Defendants Lincoln and Smith in their official capacities only to the extent that Plaintiff seeks prospective injunctive relief.

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation, Dkt. No. 5, is **ADOPTED** in its entirety except as noted above; and the Court further

**ORDERS** that the Otsego County Sheriff's Office is **DISMISSED from this case with prejudice;** and the Court further

**ORDERS** that Plaintiff's claims pursuant to the New York State Andrew Kearse Act be **DISMISSED with prejudice and without leave to amend**; and the Court further

**ORDERS** that Plaintiff's claims of false arrest and deliberate indifference against Otsego County and Defendants Lincoln and Smith in their individual capacities **SURVIVE initial review and require a response**; and the Court further

**ORDERS** that Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities be **DISMISSED with prejudice and without leave to amend**; and the Court further

**ORDERS** that Plaintiff's ADA claim against Otsego County **SURVIVES initial review and requires a response**; and the Court further

**ORDERS** that Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities **SURVIVES initial review and requires a response** to the extent that Plaintiff seeks prospective injunctive relief under the ADA; and the Court further

**ORDERS** that the Clerk shall issue summonses and General Order # 25 and forward them, along with copies of the Complaint, to the United States Marshal for service upon the Defendants; and the Court further

**ORDERS** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Norther District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by the Court. Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any changes in his address; his failure to do so may result in the dismissal of this action.

**\*5  ORDERS** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2959467

---

## Footnotes

1    Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2    To the extent that Plaintiff brings her false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities, "this District has held that [Section 1983] claims against municipal officers in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant." *Sears v. Carmichael*, No. 18-cv-909, 2018 WL 7291417, at *2 (N.D.N.Y. Aug. 6, 2018) (internal citations and quotations omitted), *report and recommendation adopted*, 2019 WL 587587 (N.D.N.Y. Feb. 13, 2019). Since Plaintiff also names Otsego County as a defendant in this action, Plaintiff's Section 1983 claims against Defendants Lincoln and Smith in their official capacities are redundant of her claims against Otsego County. *See, e.g., id.* (recommending dismissal of plaintiff's *Monell* claims against the individual defendants in their official capacities as "redundant," given that plaintiff also named the town of Saranac Lake as a defendant). Accordingly, Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities are dismissed with prejudice and without leave to amend.

3    Magistrate Judge Lovric recommended that Plaintiff's ADA claim proceed against Defendants Lincoln and Smith only in their official capacities because Title II of the ADA does not permit individual capacity suits against state officials. Dkt. No. 5 at 11 n.6 (quoting *Hill v. LaClair*, No. 20-cv-441, 2020 WL 2404771, at \*7 (N.D.N.Y. May 11, 2020)).

4    To the extent that Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities seeks prospective injunctive relief, such claim may proceed. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (holding that Title II ADA suits for prospective injunctive relief may proceed against individual officers in their official capacities). However, Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities seeking monetary relief is redundant of Plaintiff's ADA claim against Otsego County. *See Johnson v. New York State Police*, 659 F. Supp. 3d 237, 254 (N.D.N.Y. 2023). Accordingly, Plaintiff's ADA claim is permitted to proceed against Defendants Lincoln and Smith in their official capacities only to the extent it seeks prospective injunctive relief.

5    As of October 16, 2025, the New York State Andrew Kearse Act is in committee with the New York State Assembly. *See* New York State Senate, Assembly Bill A1745, https://www.nysenate.gov/legislation/bills/2021/A1745.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 134 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

2017 WL 5891817
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ARTEC CONSTRUCTION AND
DEVELOPMENT CORP., Plaintiff,

v.

CITY OF NEW YORK, Defendant.

15 Civ. 9494 (KPF)
|
Signed 11/28/2017

**Attorneys and Law Firms**

Jamie Aron Forman, Bedell & Forman, LLP, New York, NY,
for Plaintiff.

Jenna Lynn Krueger, New York City Law Department, New
York, NY, for Defendant.

OPINION AND ORDER

KATHERINE POLK FAILLA, United States District Judge

**\*1** In June 2015, after a criminal investigation into
its conduct, Plaintiff Artec Construction and Development
Corporation ("Artec") pleaded guilty to a felony charge
of falsifying business records. For several years prior to
that plea, Plaintiff contends, various agencies of Defendant
City of New York—including the Department of Housing
Preservation and Development ("HPD") and the Department
of Investigation ("DOI")—treated Plaintiff differently from
other general contractors in the award of city-sponsored
housing projects. Plaintiff argues that this disparity in
treatment amounted to an equal protection violation, and now
seeks redress pursuant to 42 U.S.C. § 1983.

The Court briefly addressed Plaintiff's allegations when
presented with the first motion to dismiss, filed by then-
Defendants HPD and DOI. In light of Plaintiff's proposed
amendments to its pleading, the Court denied that motion and
left for a later day an evaluation of the merits of Plaintiff's
allegations. *See Artec Constr. & Dev. Corp. v. N.Y.C. Dep't
of Hous. Pres. & Dev.*, No. 15 Civ. 9494 (KPF), 2017 WL
782911 (S.D.N.Y. Feb. 27, 2017) ("*Artec I*"). That day has
come: Plaintiff filed its Second Amended Complaint on
February 28, 2017, and Defendant argues, again, that Plaintiff

has failed to plead a plausible constitutional violation or
municipal liability for any such violation. For the reasons set
forth in this Opinion, Defendant is correct, and its motion
to dismiss under Federal Rule of Civil Procedure 12(b)(6) is
granted.

BACKGROUND [1]

**A. Factual Background**

For purposes of the instant motion, all well-pleaded
allegations in the Second Amended Complaint are taken as
true. Plaintiff is a contractor that builds affordable housing
in New York City, in part through contracts administered by
HPD. (SAC ¶ 1). Plaintiff has served as the general contractor
for at least six HPD-administered projects. (*Id.* at ¶ 7). [2]
Of note, these contracts are subject to the Davis-Bacon Act
of 1931, which is codified at 40 U.S.C. §§ 3141-3148 and
which, along with related statutes, requires contractors and
subcontractors on public works projects to pay laborers the
local prevailing wages (the "Prevailing Wage Laws").

In or about May 2011, the United Brotherhood of
Carpenters and Joiners (the "UBC"), an influential trade
union, "commenced an aggressive public information
campaign against [Plaintiff] alleging that [Plaintiff] and its
subcontractors failed to pay the area standard wages to their
employees and violated the Prevailing Wage Laws." (SAC
¶ 9). The UBC conducted this so-called "smear campaign"
through social media, the local press, and "emails and letters
to government officials, power players and others involved
in the New York City affordable housing industry[.]" (*Id.* at
¶¶ 10-11). A full-page ad ran in the newspaper *City Hall*,
asking, "HPD: Why are you perpetuating these irresponsible
contractors?" (*Id.* at ¶ 12). Similarly, the UBC accused
HPD of enabling Plaintiff's wage violations by "failing to
affirmatively collect certified payrolls and withhold contract
payments as required by the law." (*Id.* at ¶ 11).

**\*2** According to Plaintiff, these allegations gave HPD "an
axe to grind with [Plaintiff]." (SAC ¶ 14). In consequence,
in or about late June 2011, Doug Apple, then-First Deputy
Commissioner of HPD, informed Plaintiff's owner, Chris
Tsetsekas, of HPD's decision to prohibit Plaintiff from acting
as general contractor on a public housing project known as
the West Wind project, located at 45 East 131st Street. (*Id.*
at ¶ 14). While not explicit in his reasoning, Apple intimated
that the prohibition was in response to the UBC's accusations
against Plaintiff and, in turn, that Plaintiff could resume

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 135 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

working on HPD projects "[w]hen the dust settle[d]." (*Id.* at ¶ 15).

In the following months, Plaintiff made amends with the UBC, which then agreed to "fully support [Plaintiff's] efforts to get new HPD-related projects." (SAC ¶ 16). Plaintiff informed HPD about its agreement with the UBC, but by that time DOI was investigating possible violations of the Prevailing Wage Laws by Plaintiff and its subcontractors. (*Id.* at ¶¶ 17, 20). Plaintiff reached out to James Tierney, the DOI Inspector General, to ask for a meeting with DOI "to learn the basis of the investigation and to figure out how it could begin to take on new City-related construction projects again"; eventually, Plaintiff secured a meeting with a DOI investigator. (*Id.* at ¶¶ 21, 23). Plaintiff complains that DOI was "anything but forthcoming" and would not reveal the details of its investigation—even as it sought to question Tsetsekas about Plaintiff's oversight of subcontractors. (*Id.* at ¶ 23). DOI denied, however, that it directed HPD to reject Plaintiff's applications to work on HPD-funded projects. (*Id.*).

On September 14, 2012, HPD placed Plaintiff on "Enhanced Review status" because of Plaintiff's "$1,689,262.79 in prevailing wage violations." (SAC ¶ 24). Kimberly Hardy, HPD's Special Counsel for Regulatory Compliance, insinuated that this decision was prompted by DOI. (*Id.* at ¶ 25). And by March 2013, Plaintiff learned that DOI was working with the United States Attorney's Office for the Eastern District of New York (the "EDNY") on a criminal investigation into Plaintiff's alleged Prevailing Wage Law violations. (*Id.* at ¶ 26).

Plaintiff came to understand that the EDNY "had no interest" in bringing a case against it, and hoped that this disinterest would put an end to the investigation. (SAC ¶ 28). Instead, however, Michael Carroll, the DOI Deputy Commissioner and Chief of Investigations, teamed up with the New York County District Attorney's Office ("DANY"). (*Id.* at ¶¶ 28-29). Thereafter, DOI demanded that Plaintiff pay the allegedly unpaid wages, require Tsetsekas to sit for a proffer session with DOI and DANY, and cooperate with DOI in future investigations of the construction industry. (*Id.*). Plaintiff refused, and now alleges that DOI "made sure [Plaintiff] would be forever barred from performing work on City-related construction projects." (*Id.* at ¶ 30).

In sum, Plaintiff alleges that Apple and Hardy of HPD, and Carroll and Tierney of DOI, were "policymakers" by virtue of their inclusion on the New York City Policymaker List

that the New York City Conflicts of Interest Board issues annually pursuant to the New York City Charter. (SAC ¶¶ 31-35). Plaintiff further alleges that, in their capacity as policymakers, Apple and Hardy precluded Plaintiff from working on HPD projects and placed Plaintiff on Enhanced Review, while Carroll and Tierney singled out Plaintiff for a criminal investigation, and effected a "*de facto* debarment*" from working on HPD projects. (*Id.* at ¶¶ 33-35). Specifically, Plaintiff alleges that HPD barred it from working as the general contractor on seven projects —identified as the West Wind, Cypress Hill, Sugar Hill, East Clarke Place, Alembic/Cypress, Alembic/Broadway, and West 53rd Street projects—that were collectively valued at $171,000,000. (*Id.* at ¶¶ 47-64). Plaintiff further alleges that, during the same time period, HPD permitted seven developers —Mountco Construction & Development Inc. ("Mountco"), Galaxy General Contracting ("Galaxy"), Lettire Construction Corporation ("Lettire"), Procida Construction Corporation ("Procida"), Lemle & Wolff Construction Corporation ("Lemle & Wolff"), Mega Contracting ("Mega"), and MDG Design ("MDG")—to continue working on affordable housing projects, even though they, too, had been placed on Enhanced Review status by HPD because of suspected Prevailing Wage Law violations and had worked with the same problematic subcontractors. (*Id.* at ¶¶ 37-46). To compensate for this unequal treatment, Plaintiff seeks an award of $171,000,000. (*Id.* at ¶ 80).

## B. Procedural Background

**\*3** This case was removed from New York State Supreme Court, New York County, on December 4, 2015. (Dkt. #1). As noted above, HPD and DOI previously moved to dismiss Plaintiff's First Amended Complaint (Dkt. #22); the Court denied that motion and granted Plaintiff leave to replead, *Artec I*, 2017 WL 782911, at *5-6. Plaintiff filed its SAC on February 28, 2017 (Dkt. #33), and the parties appeared for a pre-motion conference on March 22, 2017 (*see* Dkt. #34). Defendant moved to dismiss the SAC on April 28, 2017 (Dkt. #35), Plaintiff filed its opposition on May 26, 2017 (Dkt. #38), and Defendant filed its reply in further support of its motion on June 11, 2017 (Dkt. #39).

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Rule 12(b)(6)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 136 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

When evaluating the sufficiency of a pleading under Rule 12(b)(6), a court must accept all well-pleaded allegations as true and must make all reasonable inferences in favor of the plaintiff. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). This obligation does not apply, however, to legal conclusions couched as factual allegations. *Id.* at 72. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a complaint need not meet a "probability requirement," and a plaintiff's claim can proceed even if it appears that success on the merits is unlikely. *Id.* (quoting *Iqbal*, 556 U.S. at 678).

### 2. Consideration of Documents Outside the Pleadings

Defendant has submitted with its briefing copies of Plaintiff's Plea Agreement with DANY, dated June 16, 2015, in which Plaintiff pleaded guilty to one count of Falsifying Business Records in the First Degree, in violation of New York Penal Law § 175.10 (Krueger Decl., Ex. C); a Superior Court Information in the matter *People v. Artec Construction & Development Corporation*, Case No. SCI-02139-2015, dated February 2, 2016 (*id.*); and a Certificate of Disposition in the same matter, dated January 7, 2016 (*id.* at Ex. D). While the Second Amended Complaint speaks at length about the unconstitutionality of the DOI and DANY criminal investigation, it omits mention of Plaintiff's concomitant plea and conviction.

Typically, when deciding a motion to dismiss, a court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," along with documents so heavily relied upon that they are integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be considered in resolving a motion pursuant to Fed. R. Civ. P. 12(b)(6)). Defendant encourages the Court to take judicial notice of Plaintiff's guilty plea and conviction. (Def. Br. 6). And, indeed, a court may take judicial notice of convictions that are a matter of public record. *Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005). The Court thus considers the fact of Plaintiff's guilty plea and felony conviction, though it does not rely on the Plea Agreement, Superior Court Information, or Certificate of Disposition for the truth of the matters asserted therein. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine

*what* statements they contained—but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

### 3. The Equal Protection Clause

Plaintiff pursues two theories of violation of the Equal Protection Clause, known as "selective enforcement" and "class of one." By way of background, the Equal Protection Clause is a mandate that all state governments—including administrative agencies—treat all similarly situated people alike. *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 597 (2008); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Artec I*, 2017 WL 782911, at *2 (quoting *Harlen Assocs.* v. *Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (alteration in original)).

**\*4** A plaintiff who does not allege any protected class affiliation can, nonetheless, demonstrate an equal protection violation where the plaintiff shows that he or she was treated differently from similarly situated individuals in circumstances where there was no rational basis for the difference in treatment ("class of one"), or where the different treatment was based on a malicious or bad-faith intent to injure ("selective enforcement"). *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (describing "class of one" standard); *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) (describing "selective enforcement" standard); *see generally Bizzarro v. Miranda*, 394 F.3d 82, 86-89 (2d Cir. 2005) (discussing both theories of liability).

With respect to a "class of one" claim, the Supreme Court has recognized "a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operation." *Engquist*, 553 U.S. at 598 (internal quotation marks and citation omitted) (alteration in original). This is because governmental entities must, at times, engage in "discretionary decisionmaking based on a vast array of subjective, individualized assessments" in which "treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. For such cases, generally speaking, equal protection claims are not viable.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 137 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Though *Engquist* was decided in the public employment context, the Second Circuit has recognized that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," while making clear that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010). As this Court noted in *Artec I*, "class of one" claims are more likely to fall within the *Engquist* bar when they challenge actions in the Government's role as a proprietor, managing its internal operations. *Artec I*, 2017 WL 782911, at *3. [3]

### 4. Municipal Liability

Finally, to hold a municipality such as Defendant liable for the alleged constitutional violations, Plaintiff "is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). This is because a municipality is only liable for actions that flow from a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

A "single act of a municipal policymaker, *i.e.*, a person with the authority to set municipal policy, can constitute official policy, and thus, can give rise to municipal liability." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). Authority to set municipal policy resides in "the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (citation omitted). "[W]hether an official had final policymaking authority is a question of state law." *Id.*; *see also Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014).

### B. Analysis

#### 1. Plaintiff's Suit Is Not Barred by *Heck*

**\*5** Defendant first argues that to the extent Plaintiff's equal protection claims are based on the propriety of DOI's investigation, those claims amount to an attack on the validity of Plaintiff's criminal conviction and, as such, are barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). (Def. Br. 7). The Supreme Court in *Heck* held that a plaintiff cannot challenge a criminal conviction

under § 1983 unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. This is often called the "favorable termination" requirement. *Poventud v. City of N.Y.*, 750 F.3d 121, 130 (2d Cir. 2014) (*en banc*).

Neither party argues that Plaintiff's conviction has been vacated or otherwise invalidated. Plaintiff sources its claim, however, in an exception to the *Heck* bar recognized by the Second Circuit, which exception permits § 1983 claims to proceed where the plaintiff is no longer in state custody and does not have any available *habeas* remedy. (Pl. Opp. 2-3 (citing *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999))). *See also Huang v. Johnson*, 251 F.3d 65, 73-75 (2d Cir. 2001) (permitting a § 1983 claim to proceed where Plaintiff was released from custody and could not pursue *habeas* relief).

Defendant is correct that the precise contours of the *Heck* bar are not "definitively settled" in the Second Circuit, *see Teichmann v. New York*, 769 F.3d 821, 827-31 (2d Cir. 2014), but its related argument that *Heck* applies to convictions secured through a guilty plea is inapposite. (Def. Reply 9). It matters not how the conviction was entered; what matters for the *Heck* analysis is whether the plaintiff has any recourse in a writ of *habeas corpus*. *See, e.g.*, *Huang*, 251 F.3d at 73-74 (declining to apply the *Heck* bar to a § 1983 action filed by a plaintiff who pleaded guilty and was no longer in custody). And although the application of *Heck* to a § 1983 claim where a *habeas* remedy is unavailable continues to cause "consternation" in this Circuit, *Teichmann*, 769 F.3d at 828 (Calabresi, J., concurring), Plaintiff's case is a clear one. Even after the *en banc* narrowing of the *Heck* bar in *Poventud*, this Circuit still recognizes an exception to the favorable termination requirement where a plaintiff, like Artec, was never in state custody, "that is, where an action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Id.* (Livingston, J., concurring).

The Plea Agreement between Plaintiff and DANY imposed a fine; because Plaintiff is a corporate entity, Plaintiff was not sentenced to any term of imprisonment. (Krueger Decl., Ex. D). And because Plaintiff was never, and is not now, in state custody, Plaintiff could never challenge the propriety of its conviction through a petition for a writ of *habeas corpus*. Accordingly, Plaintiff may bring a claim under § 1983.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 138 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**2. Plaintiff's Claim That the City Enacted a *De Facto* Debarment Is Timely**

Claims brought under § 1983 must be made within three years of when the plaintiff "knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks omitted). From this, Defendant argues that Plaintiff's claim based on an alleged *de facto* debarment from HPD projects is time-barred, insofar as it accrued before November 9, 2012—three years before the initial complaint in this action was filed in state court. (Def. Br. 9-11). This argument, in turn, is predicated on Plaintiff's allegation in the SAC that responsibility for the alleged debarment shifted "at some unknown point in 2012" from HPD to DOI, because "HPD was no longer running the show." (SAC ¶ 34; *see also* Def. Br. 10).

**\*6** Defendant's argument splits hairs. The initial Complaint in this matter named HPD and DOI as defendants, but, following the Court's February 27, 2017 Order (Dkt. #32), Plaintiff amended its pleading to name the proper entity, *i.e.*, the City of New York (Dkt. #33). Thus, for purposes of the instant motion, the Court evaluates liability as to the City generally, rather than as to HPD or DOI individually. As long as Plaintiff can show that its claim of a *de facto* debarment as to Defendant accrued after November 9, 2012, its § 1983 on those facts is timely.

Plaintiff argues that its claim for a *de facto* debarment did not accrue until after November 2012. (Pl. Opp. 23-24). In so doing, Plaintiff seizes upon Defendant's acknowledgment that "[d]enial of a single contract or project is insufficient to allege a *de facto* debarment." (*Id.* (quoting Def. Br. 11)). Indeed, Plaintiff alleges, by November 9, 2012, it was only aware of one HPD project—the West Wind project—from which it had been barred. (SAC ¶ 48). It was only in December 2012 that Plaintiff was barred from three more HPD projects—Cypress Hill, Sugar Hill, and East Clarke Place—and in early 2013 from two more—Alembic/Cypress and Alembic/Broadway. (*Id.*).

The Court agrees with both parties that a denial of a single contract does not a *de facto* debarment make. *See Quadrozzi Concrete Corp. v. City of N.Y.*, No. 03 Civ. 1905 (LAP), 2004 WL 2222164, at *7 (S.D.N.Y. Sept. 30, 2004); *Housing Works, Inc. v. City of N.Y.*, 680 N.Y.S.2d 487, 492 (1st Dep't 1998). Accordingly, the Court finds that Plaintiff did not know or have reason to know of the alleged *de facto* debarment until after November 9, 2012, which renders its *de facto* debarment claim timely.

**3. The Merits of Plaintiff's Equal Protection Claims**

Plaintiff claims that Defendant treated it differently compared to similarly situated affordable housing developers because Plaintiff was (i) placed on HPD's Enhanced Review list, (ii) subjected to a *de facto* debarment from HPD projects, and (iii) subjected to a criminal investigation. (SAC ¶¶ 33-35). In support of its equal protection claims, Plaintiff proffers evidence of seven comparable contractors—Mountco, Galaxy, Lettire, Procida, Lemle & Wolff, Mega, and MDG (together, the "Comparators")—all of which were on HPD's Enhanced Review list but were permitted to continue working on HPD affordable housing projects and were not subjected to criminal investigation or prosecution. (*Id.* at ¶¶ 38-44).

Before turning to Plaintiff's "class of one" and "selective enforcement" claims, the Court observes at the outset that Plaintiff cannot recover under either theory for its claim that placement on the HPD Enhanced Review list constituted an equal protection violation. (*See* SAC ¶ 33). [4] After all, both "class of one" and "selective enforcement" claims require proof that the plaintiff was treated differently from similarly situated comparators. *Bizzarro*, 394 F.3d at 86. Each of the seven Comparators was also placed on the Enhanced Review list, and thus was treated in the same way as Plaintiff. (SAC at ¶¶ 38-44). Accordingly, the Court limits its analysis to Plaintiff's claims that Defendant impermissibly enacted a *de facto* debarment and participated in a criminal investigation of Plaintiff.

**a. Claims Based on a Class of One Theory**

**\*7** To prevail on a "class of one" claim, Plaintiff must show that it was treated differently than similarly situated comparators and that there was no rational basis for the different treatment. *Vill. of Willowbrook*, 528 U.S. at 564. Specifically, Plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in the circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Kusel*, 626 F.3d at 140 (internal quotation marks and citation omitted).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 139 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Defendant raises what the parties agree is an issue of first impression in this Circuit: whether the Supreme Court's decision in *Engquist*—which eliminated "class of one" claims for government employees—should be extended to bar claims like Plaintiff's that are raised in the government contract approval context. (Def. Br. 18-19; Pl. Opp. 12). Because the degree and type of government discretion used is central to an analysis of whether *Engquist* bars Plaintiff's claims, the Court takes each alleged government action in turn, looking first at Plaintiff's claim that Defendant effectively barred it from working on HPD-funded projects and second at Plaintiff's allegation that Defendant impermissibly singled Plaintiff out for criminal investigation and prosecution.

### i. *De Facto* Debarment

Defendant argues that "when HPD approves contractors for the projects it funds, just like with procuring contactors for City contracts, it is acting only as a proprietor and manager, not as a regulator" and that, importantly, "HPD wields virtually unfettered discretion over the selection process." (Def. Br. 19). Defendant further notes that "HPD must rely upon many subjective decisions by agency experts to optimize the use of taxpayer-funded loans" and "could not function as a lender or mortgagor if every subjective assessment were subject to constitutional review." (*Id.* at 20).

In opposition, Plaintiff makes much of the Second Circuit's holding in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action." (Pl. Opp. 12 (quoting *Kusel*, 626 F.3d at 142)). Plaintiff argues that its claim should not be barred by *Engquist* because "HPD is essentially acting as a regulator/lawmaker by adopting regulations to govern the treatment of private contractors who desire to perform work on privately negotiated contracts." (*Id.* at 13). Moreover, Plaintiff contends, Defendant acted pursuant to a *de facto* standard in its treatment of contractors placed on Enhanced Review for suspected Prevailing Wage Law violations—a standard that permitted those developers to continue working on HPD projects—which HPD violated when it barred Plaintiff from further work. (*Id.* at 14-15). Because Defendant's actions were governed by this standard, they "were not discretionary enough to bar [Plaintiff's] 'class of one' claim." (*Id.* at 15).[5]

**\*8**  The *Engquist* Court was, at base, uneasy about imposing constitutional liability for "forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and found that this concern "applies most clearly in the employment context." *Engquist*, 553 U.S. at 603. Presumably for this reason, the Court was careful to confine its holding to that context, *id.* at 607, and provided little guidance on how it might be extended. It is not surprising, then, that Courts of Appeals have split on this question. *See Kusel*, 626 F.3d at 141-42 (describing circuit split).

While the Second Circuit conceded in *Kusel* that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," it spoke disapprovingly of certain district courts' attempts to extend the *Engquist* bar. *Kusel*, 626 F.3d at 141 ("Several district courts in this Circuit have extended *Engquist*'s holding to require that plaintiffs seeking to establish a class-of-one claim must show the difference in treatment flowed from non-discretionary action, but they have done so without persuasive analysis."). By contrast, the *Kusel* Court found the reasoning in *Alfaro* v. *Labrador* persuasive, which reasoning asked whether the government action at issue "involve[s] discretion that is actually exercised on a day-to-day basis" or if the action is "theoretically discretionary but—as a practical matter—actually depend[s] on de facto standards." *Id.* (citing *Alfaro v. Labrador*, No. 06 Civ. 1470 (JS), 2009 WL 2525128, at *9 (E.D.N.Y. Aug. 14, 2009)). Decisions in the latter category, both courts agreed, were more likely to survive *Engquist*. *Id.*

Defendant argues that its discretion in deciding whether to permit a contractor to work on an HPD-funded project falls into the former "day-to-day" category. HPD issues loans to fund affordable housing construction and, as part of its lending role, "manage[s] the administration of these projects in order to ensure the quality of this public service." (Def. Br. 19). One way in which Defendant "manages" this process is by "approving contractors for private contracts receiving loans." (*Id.*).

Defendant may select a contractor for an HPD-funded project by "any method permitted by Law which [HPD] determines will best meet the Project's objectives and the City Housing and Goals, including, but not limited to, direct negotiation, [Requests for Qualifications], [Requests for Proposals], competitive bidding, public bidding, auction, selection by entities other than [HPD], and application." 28 R.C.N.Y. § 33-03(a). And, as Defendant notes, HPD can "disapprove any contractor or subcontractor because of previous violations of statutes, rules or regulations relating to discrimination, standards of employment or labor standards, or because of

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 140 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

inefficiency, abandonment of duties, or disregard for creditors on prior jobs performed under this Program or other programs of the City." *Id.* § 2-06(a)(3). (*See* Def. Br. 20). The Rules further provide that HPD "may reject any Applicant ... at any time and for any reason" including if HPD determines "at any time that good and sufficient reasons exist why the City should not do business with an Applicant ... or should not allow such Applicant ... to act as Sponsor for a Project," while making clear that the "Rules are not intended to confer rights or benefits upon the general public or upon any individual or entity." *Id.* §§ 33-08(a)(1), 33-08(d). [6] Finally, HPD retains the right to pull funding or change the Sponsor of a project "at any time prior to the execution of a Binding Agreement." *Id.* § 33-08(e).

**\*9** Defendant's discretion to approve applicants for HPD-funded projects is, thus, nearly unfettered. More to the point, HPD's power to choose which contractors will work on its projects is far more discretionary than the process that gave the Second Circuit pause in *Kusel*. There, a clinical testing lab complained that the New York State Department of Health ("DOH") subjected it to "an intense and unwarranted degree of regulatory scrutiny." *Kusel*, 626 F.3d at 137. DOH investigated the lab numerous times over a period of several years and "refused to renew [its] operating permit." *Id.* at 138. Critical to the Court's analysis was the fact that "DOH [did] not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license"; DOH could not revoke a license without a hearing, and the decision could be challenged in an Article 78 proceeding. *Id.* at 142; *see* N.Y. C.P.L.R. § 7801. In sharp contrast, HPD possesses the ability to choose contractors through whatever process it deems best and can elect not to work with a contractor if it determines, in its discretion, that the City should not do business with that entity. The Rules of the City of New York do not require HPD to explain its choices, do not grant contractors the right to a given project, and do not afford due process in the event of a rejection or removal. *See generally* 28 R.C.N.Y. §§ 33-03, 33-08. Plainly, Defendant has broad discretion to approve or disapprove an applicant for an HPD-funded project.

Significantly, however, the analysis does not end there. As Judge Seybert noted in *Alfaro*—and as the Second Circuit found instructive in *Kusel*—government decisionmaking that is "theoretically discretionary" can "as a practical matter [ ] actually depend on *de facto* standards." *Alfaro*, 2009 WL 2525128, at \*9; *see also Kusel*, 626 F.3d at 141. For purposes of this motion, the Court must accept as true Plaintiff's

allegation that Defendant employed what was, effectively, a "consistent pattern and practice" of allowing contractors on the Enhanced Review list to continue to work on HPD-funded projects. *Alfaro*, 2009 WL 2525128, at \*9. (*See* SAC ¶¶ 38-44; Pl. Opp. 15). And where the government acts pursuant to a standard, even where it is not obligated to do so, its decisionmaking implicates the equal protection obligation to treat "all persons similarly situated ... alike." *City of Cleburne*, 473 U.S. at 439.

In light of Plaintiff's policy allegations and the Second Circuit's decision in *Kusel*, the Court must conclude at this stage of the litigation that the decisionmaking process at issue is not so discretionary as to trigger the *Engquist* bar. Accordingly, the Court may consider the merits of Plaintiff's claim that Defendant's *de facto* debarment put Plaintiff in an impermissible "class of one." But while Plaintiff overcomes this first hurdle, it falls at the second.

On the facts alleged in the SAC, the Court cannot find a basis for a "class of one" claim regarding Defendant's *de facto* debarment. To be sure, the SAC pleads sufficient facts to show that Plaintiff was the only one of the Comparators to be denied participation in HPD-funded projects while being on Enhanced Review for suspected Prevailing Wage Law violations. (*See* SAC ¶¶ 37-44). But also according to the SAC, none of the Comparators was being investigated for possible criminal conduct. (*See id.*). Given this rather significant difference, the Court cannot say that Plaintiff alleges the "extremely high degree of similarity" between Plaintiff and the Comparators that is required to prevail on a "class of one" claim. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

Even assuming, for purposes of this motion, that Plaintiff were sufficiently situated to the Comparators, its claim still fails because it cannot prove that there is no rational basis for Defendant's actions. Plaintiff asserts that Defendant's actions were "irrational" (SAC ¶ 77), but the Court does not agree. [7] As Defendant notes, its decision to deny Plaintiff work on HPD-funded contracts was reasonably related to a legitimate government interest in ensuring that "workers on HPD projects receive prevailing wages." (Def. Br. 21). Plaintiff concedes Defendant's interest in enforcing fair wage laws, but claims nonetheless that there was no rational basis to bar Plaintiff from HPD-funded contracts while allowing other contractors that were suspected of similar violations, because "there is nothing here to suggest that [Plaintiff's] alleged prevailing wage violations were more severe than the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 141 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Comparators['][.]" (Pl. Opp. 11). But, of course, there was reason to single out Plaintiff: According to the SAC, none of the Comparators was being investigated by DOI—first with the EDNY and subsequently with DANY—for possible criminal conduct. (SAC ¶¶ 26, 28-29, 38-44).

**\*10** Plaintiff lost its first HPD contract in June 2011, lost three more in December 2012, and lost two more in early 2013. (SAC ¶¶ 51, 53, 55, 57, 59, 61). Plaintiff became aware of DOI's investigation in January 2012 (*id.* at ¶ 20), and learned that the investigation was criminal in nature in March 2013 (*id.* at ¶ 26). On these facts, Defendant's decision to bar Plaintiff from HPD-funded projects during the pendency of an investigation is rationally related to a legitimate government interest. In sum, Plaintiff has failed to plead sufficient facts that, taken as true, show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Kusel*, 626 F.3d at 140 (citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)). On these facts, its "class of one" claim cannot stand.

### ii. The Criminal Investigation

The Court considers next whether Plaintiff's "class of one" claim based on Defendant's participation in criminal investigations into Plaintiff's alleged wage violations is barred by *Engquist* and concludes that it is. The decisionmaking applied by a prosecutor deciding which violations to investigate and what cases to bring is the type of "day-to-day" government discretion that a "class of one" claim cannot properly redress. *See Vested Bus. Brokers Ltd. v. Cty. of Suffolk*, No. 16 Civ. 4945 (JMA) (SIL), 2017 WL 4122616, at \*7 (E.D.N.Y. Sept. 15, 2017) ("[T]o the extent that [plaintiff] is challenging [defendant's] investigation and subsequent decision not to make an arrest, the actions and decisions taken are discretionary, and not subject to a 'class of one' claim."); *Alfaro*, 2009 WL 2525128, at \*9 ("[W]here a law is selectively enforced (without clear standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage in."); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether

or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (applying the *Engquist* bar to a case challenging prosecutorial discretion because "the discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment").

While the Second Circuit clarified in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action," 626 F.3d at 142, it could not have been that Court's intention to hold that door ajar for a claim like Plaintiff's, which would grant a constitutional "class of one" claim to every target of a criminal investigation and every defendant in a criminal prosecution. The day-to-day work of a prosecutor necessarily involves the selection of certain individuals to investigate and charge—this is the very type of government discretion that the Supreme Court removed from equal protection review in *Engquist*. Accordingly, the Court holds that Plaintiff's claim that Defendant placed it in a "class of one" through participation in criminal investigations of it is barred under *Engquist*, and the Court will not consider the merits of this claim.

### b. Claims Based on a Selective Enforcement Theory

Alternatively, Plaintiff complains that Defendant's *de facto* debarment of Plaintiff from HPD-funded projects and criminal investigation of Plaintiff effected equal protection violations on a theory of impermissible "selective enforcement." (SAC ¶¶ 33, 35, 70-74). To plead a viable selective enforcement claim, Plaintiff must establish that "[i] compared with others similarly situated, [Plaintiff] was selectively treated; and [ii] that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." *LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). The Second Circuit has not settled the question of whether the degree of similarity required to prevail in a "selective enforcement claim" is less than that needed for a "class of one" claim, but, in any event, Plaintiff must at least show that Plaintiff and the Comparators are "similarly situated in all material respects." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 695-96 (S.D.N.Y. 2011) (discussing the varying standards applied and collecting cases).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 142 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**\*11** The Court accepts as true that Plaintiff was treated differently than the Comparators, insofar as Plaintiff was the only one of the group to be denied HPD-funded contracts and subjected to a criminal investigation. (SAC ¶¶ 36-64). But the Court need not accept as true Plaintiff's legal conclusions that it was similarly situated to the Comparators or that Defendant acted out of malice. *See Iqbal*, 556 U.S. at 678. Defendant argues that Plaintiff has not pleaded sufficient facts to show that it is similarly situated to the Comparators. (Def. Br. 13 ("[T]he SAC is silent regarding whether the purported [C]omparators were on Enhanced Review status at the time that HPD approved them to work on projects; when, if ever, they were removed from Enhanced Review; and if so, under what conditions.")). Plaintiff weakly responds that it cannot substantiate this claim until it receives discovery from Defendant. (Pl. Opp. 7, 16). Even assuming that, with the benefit of discovery, Plaintiff could show the required degree of similarity, its "selective enforcement" claim would still fail, as the SAC does not contain sufficient allegations that Defendant acted with a malicious intent to injure.

The crux of Plaintiff's claim is that Defendant had an "axe to grind" with Plaintiff following the UBC's "smear campaign" (SAC ¶¶ 13-14), resulting in Defendant vindictively barring Plaintiff from HPD-funded contracts and putting Plaintiff through a criminal investigation (Pl. Opp. 16-19). Plaintiff contends that this vindictive singling-out "evidences irrationality and demonstrates bad faith or malice." (*Id.* at 19). But in so arguing, Plaintiff conflates the two-prong test for "selective enforcement." Plaintiff must show that it was treated differently than those similarly situated *and* that the different treatment was due to a malicious purpose. *LaTrieste Rest. & Cabaret, Inc.*, 40 F.3d at 590. Plaintiff would have this Court find that different treatment is itself proof of a malicious purpose. It is not.

There is nothing in the SAC, save Plaintiff's conclusory assertion that Defendant harbored a grudge because of the UBC's campaign, to support a finding that Defendant barred plaintiff from HPD projects or investigated Plaintiff with a malicious intent. Plaintiff's unsupported allegation does not "nudge[ ] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. What is more, the Court finds compelling Defendant's argument that a plausible, non-discriminatory reason for Defendant's decision to deny Plaintiff work on HPD-funded projects is readily apparent —namely, that Plaintiff, unlike the Comparators, was being investigated for possible criminal violations. And for the reasons stated above with respect to Plaintiff's "class of one" claim, the Court will not second-guess the discretion of the DOI and the prosecutors' offices that investigated Plaintiff under a "selective enforcement" theory without any suggestion in the pleadings of bad faith.

As set forth above, Plaintiff has not adequately pleaded any underlying constitutional violations under § 1983. Accordingly, the Court need not reach the question of whether Plaintiff's allegations establish municipal liability under *Monell*. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2000) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5891817

---

### Footnotes

1    This Opinion draws principally from the Second Amended Complaint ("SAC," Dkt. #33) and, for reasons explained below, from certain facts and documents of which judicial notice can be taken. For convenience, the Court refers to Defendant's moving brief (Dkt. #37) as "Def. Br."; to Plaintiff's brief in opposition (Dkt.

#38) as "Pl. Opp."; and to Defendant's reply brief (Dkt. #39) as "Def. Reply." The Declaration of Jenna Krueger in Support of the Motion to Dismiss (Dkt. #36) is referred to as "Krueger Decl."

2    Plaintiff does not specify when it was awarded these six contracts; Plaintiff simply says it had these contracts "[d]uring the relevant time period." (SAC ¶ 7).

3    *Engquist* did not discuss claims for selective enforcement and the Second Circuit has not yet addressed the question of whether *Engquist*'s holding can be extended to such claims. *See Emmerling v. Town of Richmond*, 434 Fed.Appx. 10, 12 (2d Cir. 2011) (summary order).

4    The Court understands the SAC to raise a claim that Plaintiff was improperly placed on the Enhanced Review list. (SAC ¶ 33). In its briefing, Plaintiff appears to build on a passing reference in the SAC to Defendant's refusal to remove Plaintiff from the Enhanced Review list with the goal of expanding its claim to include an allegation that Defendant improperly kept Plaintiff on the Enhanced Review list. (*Id.* at ¶ 46; Pl. Opp. 9). To the extent that Plaintiff seeks to raise such a claim, the Court finds it has not been adequately pleaded in the SAC and that, even if it had, it would fail on the merits for the same reasons discussed in the text.

5    Plaintiff also analogizes the government action in *Kusel*—which, that Court held, was not so discretionary as to trigger the *Engquist* bar—to the decision to place Plaintiff on the HPD Enhanced Review list, and Plaintiff argues that the Court should permit that claim to proceed. (Pl. Opp. 12-13). Defendant counters that this analogy in fact misreads the opening brief, in which Defendant argues that *Engquist* bars Plaintiff's claim that Defendant impermissibly disallowed Plaintiff from working on various HPD-funded projects. (Def. Reply 5). The Court agrees, but for a different reason. As noted above, Plaintiff cannot recover on a "class of one" theory for its claim that Defendant improperly placed it on the Enhanced Review list because Plaintiff is in a class of, at least, eight. *Shatney v. LaPorte*, 634 Fed.Appx. 53, 54 (2d Cir. 2016) (summary order) ("[A] plaintiff who is in a 'class of one' may bring an equal-protection claim 'where the plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam))). Because the SAC alleges that Plaintiff was treated identically to the Comparators in its placement on HPD's Enhanced Review list, this allegation cannot form the basis for any recovery, and the Court will not probe Defendant's decision to place Plaintiff on Enhanced Review.

6    "Applicant" is defined as "any potential Sponsor of a Project, without regard to the method used by the Agency to select the Sponsor for such Project, including, but not limited to, any person or entity which has submitted or might potentially submit a qualification statement, proposal, bid, application, or other submission." 28 R.C.N.Y. § 33-01(a)(4).

"Sponsor" is defined as "an Applicant or Selected Applicant, or an entity formed by an Applicant or Selected Applicant and approved by the Agency, which has executed one or more Binding Agreement(s) with the Agency." 28 R.C.N.Y. § 33-01(a)(31).

7    Several of the parties' rational basis arguments center on the propriety of Plaintiff's placement on the Enhanced Review list. (Def Br. 20-21; Pl. Opp. 8-9). As noted throughout this Opinion, the Court will not consider these arguments.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 144 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

2017 WL 5891817
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ARTEC CONSTRUCTION AND
DEVELOPMENT CORP., Plaintiff,
v.
CITY OF NEW YORK, Defendant.

15 Civ. 9494 (KPF)
|
Signed 11/28/2017

**Attorneys and Law Firms**

Jamie Aron Forman, Bedell & Forman, LLP, New York, NY, for Plaintiff.

Jenna Lynn Krueger, New York City Law Department, New York, NY, for Defendant.

OPINION AND ORDER

KATHERINE POLK FAILLA, United States District Judge

**\*1** In June 2015, after a criminal investigation into its conduct, Plaintiff Artec Construction and Development Corporation ("Artec") pleaded guilty to a felony charge of falsifying business records. For several years prior to that plea, Plaintiff contends, various agencies of Defendant City of New York—including the Department of Housing Preservation and Development ("HPD") and the Department of Investigation ("DOI")—treated Plaintiff differently from other general contractors in the award of city-sponsored housing projects. Plaintiff argues that this disparity in treatment amounted to an equal protection violation, and now seeks redress pursuant to 42 U.S.C. § 1983.

The Court briefly addressed Plaintiff's allegations when presented with the first motion to dismiss, filed by then-Defendants HPD and DOI. In light of Plaintiff's proposed amendments to its pleading, the Court denied that motion and left for a later day an evaluation of the merits of Plaintiff's allegations. *See Artec Constr. & Dev. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 15 Civ. 9494 (KPF), 2017 WL 782911 (S.D.N.Y. Feb. 27, 2017) ("*Artec I*"). That day has come: Plaintiff filed its Second Amended Complaint on February 28, 2017, and Defendant argues, again, that Plaintiff

has failed to plead a plausible constitutional violation or municipal liability for any such violation. For the reasons set forth in this Opinion, Defendant is correct, and its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is granted.

BACKGROUND [1]

**A. Factual Background**

For purposes of the instant motion, all well-pleaded allegations in the Second Amended Complaint are taken as true. Plaintiff is a contractor that builds affordable housing in New York City, in part through contracts administered by HPD. (SAC ¶ 1). Plaintiff has served as the general contractor for at least six HPD-administered projects. (*Id.* at ¶ 7). [2] Of note, these contracts are subject to the Davis-Bacon Act of 1931, which is codified at 40 U.S.C. §§ 3141-3148 and which, along with related statutes, requires contractors and subcontractors on public works projects to pay laborers the local prevailing wages (the "Prevailing Wage Laws").

In or about May 2011, the United Brotherhood of Carpenters and Joiners (the "UBC"), an influential trade union, "commenced an aggressive public information campaign against [Plaintiff] alleging that [Plaintiff] and its subcontractors failed to pay the area standard wages to their employees and violated the Prevailing Wage Laws." (SAC ¶ 9). The UBC conducted this so-called "smear campaign" through social media, the local press, and "emails and letters to government officials, power players and others involved in the New York City affordable housing industry[.]" (*Id.* at ¶¶ 10-11). A full-page ad ran in the newspaper *City Hall*, asking, "HPD: Why are you perpetuating these irresponsible contractors?" (*Id.* at ¶ 12). Similarly, the UBC accused HPD of enabling Plaintiff's wage violations by "failing to affirmatively collect certified payrolls and withhold contract payments as required by the law." (*Id.* at ¶ 11).

**\*2** According to Plaintiff, these allegations gave HPD "an axe to grind with [Plaintiff]." (SAC ¶ 14). In consequence, in or about late June 2011, Doug Apple, then-First Deputy Commissioner of HPD, informed Plaintiff's owner, Chris Tsetsekas, of HPD's decision to prohibit Plaintiff from acting as general contractor on a public housing project known as the West Wind project, located at 45 East 131st Street. (*Id.* at ¶ 14). While not explicit in his reasoning, Apple intimated that the prohibition was in response to the UBC's accusations against Plaintiff and, in turn, that Plaintiff could resume

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 145 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

working on HPD projects "[w]hen the dust settle[d]." (*Id.* at ¶ 15).

In the following months, Plaintiff made amends with the UBC, which then agreed to "fully support [Plaintiff's] efforts to get new HPD-related projects." (SAC ¶ 16). Plaintiff informed HPD about its agreement with the UBC, but by that time DOI was investigating possible violations of the Prevailing Wage Laws by Plaintiff and its subcontractors. (*Id.* at ¶¶ 17, 20). Plaintiff reached out to James Tierney, the DOI Inspector General, to ask for a meeting with DOI "to learn the basis of the investigation and to figure out how it could begin to take on new City-related construction projects again"; eventually, Plaintiff secured a meeting with a DOI investigator. (*Id.* at ¶¶ 21, 23). Plaintiff complains that DOI was "anything but forthcoming" and would not reveal the details of its investigation—even as it sought to question Tsetsekas about Plaintiff's oversight of subcontractors. (*Id.* at ¶ 23). DOI denied, however, that it directed HPD to reject Plaintiff's applications to work on HPD-funded projects. (*Id.*).

On September 14, 2012, HPD placed Plaintiff on "Enhanced Review status" because of Plaintiff's "$1,689,262.79 in prevailing wage violations." (SAC ¶ 24). Kimberly Hardy, HPD's Special Counsel for Regulatory Compliance, insinuated that this decision was prompted by DOI. (*Id.* at ¶ 25). And by March 2013, Plaintiff learned that DOI was working with the United States Attorney's Office for the Eastern District of New York (the "EDNY") on a criminal investigation into Plaintiff's alleged Prevailing Wage Law violations. (*Id.* at ¶ 26).

Plaintiff came to understand that the EDNY "had no interest" in bringing a case against it, and hoped that this disinterest would put an end to the investigation. (SAC ¶ 28). Instead, however, Michael Carroll, the DOI Deputy Commissioner and Chief of Investigations, teamed up with the New York County District Attorney's Office ("DANY"). (*Id.* at ¶¶ 28-29). Thereafter, DOI demanded that Plaintiff pay the allegedly unpaid wages, require Tsetsekas to sit for a proffer session with DOI and DANY, and cooperate with DOI in future investigations of the construction industry. (*Id.*). Plaintiff refused, and now alleges that DOI "made sure [Plaintiff] would be forever barred from performing work on City-related construction projects." (*Id.* at ¶ 30).

In sum, Plaintiff alleges that Apple and Hardy of HPD, and Carroll and Tierney of DOI, were "policymakers" by virtue of their inclusion on the New York City Policymaker List

that the New York City Conflicts of Interest Board issues annually pursuant to the New York City Charter. (SAC ¶¶ 31-35). Plaintiff further alleges that, in their capacity as policymakers, Apple and Hardy precluded Plaintiff from working on HPD projects and placed Plaintiff on Enhanced Review, while Carroll and Tierney singled out Plaintiff for a criminal investigation, and effected a "*de facto* debarment" from working on HPD projects. (*Id.* at ¶¶ 33-35). Specifically, Plaintiff alleges that HPD barred it from working as the general contractor on seven projects—identified as the West Wind, Cypress Hill, Sugar Hill, East Clarke Place, Alembic/Cypress, Alembic/Broadway, and West 53rd Street projects—that were collectively valued at $171,000,000. (*Id.* at ¶¶ 47-64). Plaintiff further alleges that, during the same time period, HPD permitted seven developers—Mountco Construction & Development Inc. ("Mountco"), Galaxy General Contracting ("Galaxy"), Lettire Construction Corporation ("Lettire"), Procida Construction Corporation ("Procida"), Lemle & Wolff Construction Corporation ("Lemle & Wolff"), Mega Contracting ("Mega"), and MDG Design ("MDG")—to continue working on affordable housing projects, even though they, too, had been placed on Enhanced Review status by HPD because of suspected Prevailing Wage Law violations and had worked with the same problematic subcontractors. (*Id.* at ¶¶ 37-46). To compensate for this unequal treatment, Plaintiff seeks an award of $171,000,000. (*Id.* at ¶ 80).

## B. Procedural Background

**\*3**  This case was removed from New York State Supreme Court, New York County, on December 4, 2015. (Dkt. #1). As noted above, HPD and DOI previously moved to dismiss Plaintiff's First Amended Complaint (Dkt. #22); the Court denied that motion and granted Plaintiff leave to replead, *Artec I*, 2017 WL 782911, at \*5-6. Plaintiff filed its SAC on February 28, 2017 (Dkt. #33), and the parties appeared for a pre-motion conference on March 22, 2017 (*see* Dkt. #34). Defendant moved to dismiss the SAC on April 28, 2017 (Dkt. #35), Plaintiff filed its opposition on May 26, 2017 (Dkt. #38), and Defendant filed its reply in further support of its motion on June 11, 2017 (Dkt. #39).

## DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Rule 12(b)(6)

When evaluating the sufficiency of a pleading under Rule 12(b)(6), a court must accept all well-pleaded allegations as true and must make all reasonable inferences in favor of the plaintiff. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). This obligation does not apply, however, to legal conclusions couched as factual allegations. *Id.* at 72. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a complaint need not meet a "probability requirement," and a plaintiff's claim can proceed even if it appears that success on the merits is unlikely. *Id.* (quoting *Iqbal*, 556 U.S. at 678).

### 2. Consideration of Documents Outside the Pleadings

Defendant has submitted with its briefing copies of Plaintiff's Plea Agreement with DANY, dated June 16, 2015, in which Plaintiff pleaded guilty to one count of Falsifying Business Records in the First Degree, in violation of New York Penal Law § 175.10 (Krueger Decl., Ex. C); a Superior Court Information in the matter *People v. Artec Construction & Development Corporation*, Case No. SCI-02139-2015, dated February 2, 2016 (*id.*); and a Certificate of Disposition in the same matter, dated January 7, 2016 (*id.* at Ex. D). While the Second Amended Complaint speaks at length about the unconstitutionality of the DOI and DANY criminal investigation, it omits mention of Plaintiff's concomitant plea and conviction.

Typically, when deciding a motion to dismiss, a court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," along with documents so heavily relied upon that they are integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be considered in resolving a motion pursuant to Fed. R. Civ. P. 12(b)(6)). Defendant encourages the Court to take judicial notice of Plaintiff's guilty plea and conviction. (Def. Br. 6). And, indeed, a court may take judicial notice of convictions that are a matter of public record. *Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005). The Court thus considers the fact of Plaintiff's guilty plea and felony conviction, though it does not rely on the Plea Agreement, Superior Court Information, or Certificate of Disposition for the truth of the matters asserted therein. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine

*what* statements they contained—but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

### 3. The Equal Protection Clause

Plaintiff pursues two theories of violation of the Equal Protection Clause, known as "selective enforcement" and "class of one." By way of background, the Equal Protection Clause is a mandate that all state governments—including administrative agencies—treat all similarly situated people alike. *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 597 (2008); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Artec I*, 2017 WL 782911, at *2 (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (alteration in original)).

**\*4** A plaintiff who does not allege any protected class affiliation can, nonetheless, demonstrate an equal protection violation where the plaintiff shows that he or she was treated differently from similarly situated individuals in circumstances where there was no rational basis for the difference in treatment ("class of one"), or where the different treatment was based on a malicious or bad-faith intent to injure ("selective enforcement"). *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (describing "class of one" standard); *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) (describing "selective enforcement" standard); *see generally Bizzarro v. Miranda*, 394 F.3d 82, 86-89 (2d Cir. 2005) (discussing both theories of liability).

With respect to a "class of one" claim, the Supreme Court has recognized "a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operation." *Engquist*, 553 U.S. at 598 (internal quotation marks and citation omitted) (alteration in original). This is because governmental entities must, at times, engage in "discretionary decisionmaking based on a vast array of subjective, individualized assessments" in which "treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. For such cases, generally speaking, equal protection claims are not viable.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 147 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Though *Engquist* was decided in the public employment context, the Second Circuit has recognized that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," while making clear that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010). As this Court noted in *Artec I*, "class of one" claims are more likely to fall within the *Engquist* bar when they challenge actions in the Government's role as a proprietor, managing its internal operations. *Artec I*, 2017 WL 782911, at *3. [3]

### 4. Municipal Liability

Finally, to hold a municipality such as Defendant liable for the alleged constitutional violations, Plaintiff "is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). This is because a municipality is only liable for actions that flow from a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

A "single act of a municipal policymaker, *i.e.*, a person with the authority to set municipal policy, can constitute official policy, and thus, can give rise to municipal liability." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). Authority to set municipal policy resides in "the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (citation omitted). "[W]hether an official had final policymaking authority is a question of state law." *Id.*; *see also Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014).

### B. Analysis

#### 1. Plaintiff's Suit Is Not Barred by *Heck*

**\*5** Defendant first argues that to the extent Plaintiff's equal protection claims are based on the propriety of DOI's investigation, those claims amount to an attack on the validity of Plaintiff's criminal conviction and, as such, are barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). (Def. Br. 7). The Supreme Court in *Heck* held that a plaintiff cannot challenge a criminal conviction

under § 1983 unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. This is often called the "favorable termination" requirement. *Poventud v. City of N.Y.*, 750 F.3d 121, 130 (2d Cir. 2014) (*en banc*).

Neither party argues that Plaintiff's conviction has been vacated or otherwise invalidated. Plaintiff sources its claim, however, in an exception to the *Heck* bar recognized by the Second Circuit, which exception permits § 1983 claims to proceed where the plaintiff is no longer in state custody and does not have any available *habeas* remedy. (Pl. Opp. 2-3 (citing *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999))). *See also Huang v. Johnson*, 251 F.3d 65, 73-75 (2d Cir. 2001) (permitting a § 1983 claim to proceed where Plaintiff was released from custody and could not pursue *habeas* relief).

Defendant is correct that the precise contours of the *Heck* bar are not "definitively settled" in the Second Circuit, *see Teichmann v. New York*, 769 F.3d 821, 827-31 (2d Cir. 2014), but its related argument that *Heck* applies to convictions secured through a guilty plea is inapposite. (Def. Reply 9). It matters not how the conviction was entered; what matters for the *Heck* analysis is whether the plaintiff has any recourse in a writ of *habeas corpus*. *See, e.g., Huang*, 251 F.3d at 73-74 (declining to apply the *Heck* bar to a § 1983 action filed by a plaintiff who pleaded guilty and was no longer in custody). And although the application of *Heck* to a § 1983 claim where a *habeas* remedy is unavailable continues to cause "consternation" in this Circuit, *Teichmann*, 769 F.3d at 828 (Calabresi, J., concurring), Plaintiff's case is a clear one. Even after the *en banc* narrowing of the *Heck* bar in *Poventud*, this Circuit still recognizes an exception to the favorable termination requirement where a plaintiff, like Artec, was never in state custody, "that is, where an action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Id.* (Livingston, J., concurring).

The Plea Agreement between Plaintiff and DANY imposed a fine; because Plaintiff is a corporate entity, Plaintiff was not sentenced to any term of imprisonment. (Krueger Decl., Ex. D). And because Plaintiff was never, and is not now, in state custody, Plaintiff could never challenge the propriety of its conviction through a petition for a writ of *habeas corpus*. Accordingly, Plaintiff may bring a claim under § 1983.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 148 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**2. Plaintiff's Claim That the City Enacted a *De Facto* Debarment Is Timely**

Claims brought under § 1983 must be made within three years of when the plaintiff "knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks omitted). From this, Defendant argues that Plaintiff's claim based on an alleged *de facto* debarment from HPD projects is time-barred, insofar as it accrued before November 9, 2012—three years before the initial complaint in this action was filed in state court. (Def. Br. 9-11). This argument, in turn, is predicated on Plaintiff's allegation in the SAC that responsibility for the alleged debarment shifted "at some unknown point in 2012" from HPD to DOI, because "HPD was no longer running the show." (SAC ¶ 34; *see also* Def. Br. 10).

**\*6** Defendant's argument splits hairs. The initial Complaint in this matter named HPD and DOI as defendants, but, following the Court's February 27, 2017 Order (Dkt. #32), Plaintiff amended its pleading to name the proper entity, *i.e.*, the City of New York (Dkt. #33). Thus, for purposes of the instant motion, the Court evaluates liability as to the City generally, rather than as to HPD or DOI individually. As long as Plaintiff can show that its claim of a *de facto* debarment as to Defendant accrued after November 9, 2012, its § 1983 on those facts is timely.

Plaintiff argues that its claim for a *de facto* debarment did not accrue until after November 2012. (Pl. Opp. 23-24). In so doing, Plaintiff seizes upon Defendant's acknowledgement that "[d]enial of a single contract or project is insufficient to allege a *de facto* debarment." (*Id.* (quoting Def. Br. 11)). Indeed, Plaintiff alleges, by November 9, 2012, it was only aware of one HPD project—the West Wind project—from which it had been barred. (SAC ¶ 48). It was only in December 2012 that Plaintiff was barred from three more HPD projects—Cypress Hill, Sugar Hill, and East Clarke Place—and in early 2013 from two more—Alembic/Cypress and Alembic/Broadway. (*Id.*).

The Court agrees with both parties that a denial of a single contract does not a *de facto* debarment make. *See Quadrozzi Concrete Corp. v. City of N.Y.*, No. 03 Civ. 1905 (LAP), 2004 WL 2222164, at \*7 (S.D.N.Y. Sept. 30, 2004); *Housing Works, Inc. v. City of N.Y.*, 680 N.Y.S.2d 487, 492 (1st Dep't 1998). Accordingly, the Court finds that Plaintiff did not know or have reason to know of the alleged *de facto* debarment until after November 9, 2012, which renders its *de facto* debarment claim timely.

**3. The Merits of Plaintiff's Equal Protection Claims**

Plaintiff claims that Defendant treated it differently compared to similarly situated affordable housing developers because Plaintiff was (i) placed on HPD's Enhanced Review list, (ii) subjected to a *de facto* debarment from HPD projects, and (iii) subjected to a criminal investigation. (SAC ¶¶ 33-35). In support of its equal protection claims, Plaintiff proffers evidence of seven comparable contractors—Mountco, Galaxy, Lettire, Procida, Lemle & Wolff, Mega, and MDG (together, the "Comparators")—all of which were on HPD's Enhanced Review list but were permitted to continue working on HPD affordable housing projects and were not subjected to criminal investigation or prosecution. (*Id.* at ¶¶ 38-44).

Before turning to Plaintiff's "class of one" and "selective enforcement" claims, the Court observes at the outset that Plaintiff cannot recover under either theory for its claim that placement on the HPD Enhanced Review list constituted an equal protection violation. (*See* SAC ¶ 33). [4] After all, both "class of one" and "selective enforcement" claims require proof that the plaintiff was treated differently from similarly situated comparators. *Bizzarro*, 394 F.3d at 86. Each of the seven Comparators was also placed on the Enhanced Review list, and thus was treated in the same way as Plaintiff. (SAC at ¶¶ 38-44). Accordingly, the Court limits its analysis to Plaintiff's claims that Defendant impermissibly enacted a *de facto* debarment and participated in a criminal investigation of Plaintiff.

**a. Claims Based on a Class of One Theory**

**\*7** To prevail on a "class of one" claim, Plaintiff must show that it was treated differently than similarly situated comparators and that there was no rational basis for the different treatment. *Vill. of Willowbrook*, 528 U.S. at 564. Specifically, Plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in the circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Kusel*, 626 F.3d at 140 (internal quotation marks and citation omitted).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 149 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Defendant raises what the parties agree is an issue of first impression in this Circuit: whether the Supreme Court's decision in *Engquist*—which eliminated "class of one" claims for government employees—should be extended to bar claims like Plaintiff's that are raised in the government contract approval context. (Def. Br. 18-19; Pl. Opp. 12). Because the degree and type of government discretion used is central to an analysis of whether *Engquist* bars Plaintiff's claims, the Court takes each alleged government action in turn, looking first at Plaintiff's claim that Defendant effectively barred it from working on HPD-funded projects and second at Plaintiff's allegation that Defendant impermissibly singled Plaintiff out for criminal investigation and prosecution.

#### i. *De Facto* Debarment

Defendant argues that "when HPD approves contractors for the projects it funds, just like with procuring contactors for City contracts, it is acting only as a proprietor and manager, not as a regulator" and that, importantly, "HPD wields virtually unfettered discretion over the selection process." (Def. Br. 19). Defendant further notes that "HPD must rely upon many subjective decisions by agency experts to optimize the use of taxpayer-funded loans" and "could not function as a lender or mortgagor if every subjective assessment were subject to constitutional review." (*Id.* at 20).

In opposition, Plaintiff makes much of the Second Circuit's holding in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action." (Pl. Opp. 12 (quoting *Kusel*, 626 F.3d at 142)). Plaintiff argues that its claim should not be barred by *Engquist* because "HPD is essentially acting as a regulator/lawmaker by adopting regulations to govern the treatment of private contractors who desire to perform work on privately negotiated contracts." (*Id.* at 13). Moreover, Plaintiff contends, Defendant acted pursuant to a *de facto* standard in its treatment of contractors placed on Enhanced Review for suspected Prevailing Wage Law violations—a standard that permitted those developers to continue working on HPD projects—which HPD violated when it barred Plaintiff from further work. (*Id.* at 14-15). Because Defendant's actions were governed by this standard, they "were not discretionary enough to bar [Plaintiff's] 'class of one' claim." (*Id.* at 15).[5]

**\*8**  The *Engquist* Court was, at base, uneasy about imposing constitutional liability for "forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and found that this concern "applies most clearly in the employment context." *Engquist*, 553 U.S. at 603. Presumably for this reason, the Court was careful to confine its holding to that context, *id.* at 607, and provided little guidance on how it might be extended. It is not surprising, then, that Courts of Appeals have split on this question. *See Kusel*, 626 F.3d at 141-42 (describing circuit split).

While the Second Circuit conceded in *Kusel* that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," it spoke disapprovingly of certain district courts' attempts to extend the *Engquist* bar. *Kusel*, 626 F.3d at 141 ("Several district courts in this Circuit have extended *Engquist*'s holding to require that plaintiffs seeking to establish a class-of-one claim must show the difference in treatment flowed from non-discretionary action, but they have done so without persuasive analysis."). By contrast, the *Kusel* Court found the reasoning in *Alfaro* v. *Labrador* persuasive, which reasoning asked whether the government action at issue "involve[s] discretion that is actually exercised on a day-to-day basis" or if the action is "theoretically discretionary but—as a practical matter—actually depend[s] on de facto standards." *Id.* (citing *Alfaro v. Labrador*, No. 06 Civ. 1470 (JS), 2009 WL 2525128, at \*9 (E.D.N.Y. Aug. 14, 2009)). Decisions in the latter category, both courts agreed, were more likely to survive *Engquist*. *Id.*

Defendant argues that its discretion in deciding whether to permit a contractor to work on an HPD-funded project falls into the former "day-to-day" category. HPD issues loans to fund affordable housing construction and, as part of its lending role, "manage[s] the administration of these projects in order to ensure the quality of this public service." (Def. Br. 19). One way in which Defendant "manages" this process is by "approving contractors for private contracts receiving loans." (*Id.*).

Defendant may select a contractor for an HPD-funded project by "any method permitted by Law which [HPD] determines will best meet the Project's objectives and the City Housing Goals, including, but not limited to, direct negotiation, [Requests for Qualifications], [Requests for Proposals], competitive bidding, public bidding, auction, selection by entities other than [HPD], and application." 28 R.C.N.Y. § 33-03(a). And, as Defendant notes, HPD can "disapprove any contractor or subcontractor because of previous violations of statutes, rules or regulations relating to discrimination, standards of employment or labor standards, or because of

inefficiency, abandonment of duties, or disregard for creditors on prior jobs performed under this Program or other programs of the City." *Id.* § 2-06(a)(3). (*See* Def. Br. 20). The Rules further provide that HPD "may reject any Applicant ... at any time and for any reason" including if HPD determines "at any time that good and sufficient reasons exist why the City should not do business with an Applicant ... or should not allow such Applicant ... to act as Sponsor for a Project," while making clear that the "Rules are not intended to confer rights or benefits upon the general public or upon any individual or entity." *Id.* §§ 33-08(a)(1), 33-08(d). [6] Finally, HPD retains the right to pull funding or change the Sponsor of a project "at any time prior to the execution of a Binding Agreement." *Id.* § 33-08(e).

**\*9** Defendant's discretion to approve applicants for HPD-funded projects is, thus, nearly unfettered. More to the point, HPD's power to choose which contractors will work on its projects is far more discretionary than the process that gave the Second Circuit pause in *Kusel*. There, a clinical testing lab complained that the New York State Department of Health ("DOH") subjected it to "an intense and unwarranted degree of regulatory scrutiny." *Kusel*, 626 F.3d at 137. DOH investigated the lab numerous times over a period of several years and "refused to renew [its] operating permit." *Id.* at 138. Critical to the Court's analysis was the fact that "DOH [did] not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license"; DOH could not revoke a license without a hearing, and the decision could be challenged in an Article 78 proceeding. *Id.* at 142; *see* N.Y. C.P.L.R. § 7801. In sharp contrast, HPD possesses the ability to choose contractors through whatever process it deems best and can elect not to work with a contractor if it determines, in its discretion, that the City should not do business with that entity. The Rules of the City of New York do not require HPD to explain its choices, do not grant contractors the right to a given project, and do not afford due process in the event of a rejection or removal. *See generally* 28 R.C.N.Y. §§ 33-03, 33-08. Plainly, Defendant has broad discretion to approve or disapprove an applicant for an HPD-funded project.

Significantly, however, the analysis does not end there. As Judge Seybert noted in *Alfaro*—and as the Second Circuit found instructive in *Kusel*—government decisionmaking that is "theoretically discretionary" can "as a practical matter [ ] actually depend on *de facto* standards." *Alfaro*, 2009 WL 2525128, at \*9; *see also Kusel*, 626 F.3d at 141. For purposes of this motion, the Court must accept as true Plaintiff's

allegation that Defendant employed what was, effectively, a "consistent pattern and practice" of allowing contractors on the Enhanced Review list to continue to work on HPD-funded projects. *Alfaro*, 2009 WL 2525128, at \*9. (*See* SAC ¶¶ 38-44; Pl. Opp. 15). And where the government acts pursuant to a standard, even where it is not obligated to do so, its decisionmaking implicates the equal protection obligation to treat "all persons similarly situated ... alike." *City of Cleburne*, 473 U.S. at 439.

In light of Plaintiff's policy allegations and the Second Circuit's decision in *Kusel*, the Court must conclude at this stage of the litigation that the decisionmaking process at issue is not so discretionary as to trigger the *Engquist* bar. Accordingly, the Court may consider the merits of Plaintiff's claim that Defendant's *de facto* debarment put Plaintiff in an impermissible "class of one." But while Plaintiff overcomes this first hurdle, it falls at the second.

On the facts alleged in the SAC, the Court cannot find a basis for a "class of one" claim regarding Defendant's *de facto* debarment. To be sure, the SAC pleads sufficient facts to show that Plaintiff was the only one of the Comparators to be denied participation in HPD-funded projects while being on Enhanced Review for suspected Prevailing Wage Law violations. (*See* SAC ¶¶ 37-44). But also according to the SAC, none of the Comparators was being investigated for possible criminal conduct. (*See id.*). Given this rather significant difference, the Court cannot say that Plaintiff alleges the "extremely high degree of similarity" between Plaintiff and the Comparators that is required to prevail on a "class of one" claim. *Clubside, Inc. v. Valentin*, 468 F.3d 144,159 (2d Cir. 2006).

Even assuming, for purposes of this motion, that Plaintiff were sufficiently situated to the Comparators, its claim still fails because it cannot prove that there is no rational basis for Defendant's actions. Plaintiff asserts that Defendant's actions were "irrational" (SAC ¶ 77), but the Court does not agree. [7] As Defendant notes, its decision to deny Plaintiff work on HPD-funded contracts was reasonably related to a legitimate government interest in ensuring that "workers on HPD projects receive prevailing wages." (Def. Br. 21). Plaintiff concedes Defendant's interest in enforcing fair wage laws, but claims nonetheless that there was no rational basis to bar Plaintiff from HPD-funded contracts while allowing other contractors that were suspected of similar violations, because "there is nothing here to suggest that [Plaintiff's] alleged prevailing wage violations were more severe than the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 151 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Comparators['][.]" (Pl. Opp. 11). But, of course, there was reason to single out Plaintiff: According to the SAC, none of the Comparators was being investigated by DOI—first with the EDNY and subsequently with DANY—for possible criminal conduct. (SAC ¶¶ 26, 28-29, 38-44).

**\*10** Plaintiff lost its first HPD contract in June 2011, lost three more in December 2012, and lost two more in early 2013. (SAC ¶¶ 51, 53, 55, 57, 59, 61). Plaintiff became aware of DOI's investigation in January 2012 (*id.* at ¶ 20), and learned that the investigation was criminal in nature in March 2013 (*id.* at ¶ 26). On these facts, Defendant's decision to bar Plaintiff from HPD-funded projects during the pendency of an investigation is rationally related to a legitimate government interest. In sum, Plaintiff has failed to plead sufficient facts that, taken as true, show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Kusel*, 626 F.3d at 140 (citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)). On these facts, its "class of one" claim cannot stand.

### ii. The Criminal Investigation

The Court considers next whether Plaintiff's "class of one" claim based on Defendant's participation in criminal investigations into Plaintiff's alleged wage violations is barred by *Engquist* and concludes that it is. The decisionmaking applied by a prosecutor deciding which violations to investigate and what cases to bring is the type of "day-to-day" government discretion that a "class of one" claim cannot properly redress. *See Vested Bus. Brokers Ltd. v. Cty. of Suffolk*, No. 16 Civ. 4945 (JMA) (SIL), 2017 WL 4122616, at \*7 (E.D.N.Y. Sept. 15, 2017) ("[T]o the extent that [plaintiff] is challenging [defendant's] investigation and subsequent decision not to make an arrest, the actions and decisions taken are discretionary, and not subject to a 'class of one' claim."); *Alfaro*, 2009 WL 2525128, at \*9 ("[W]here a law is selectively enforced (without clear standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage in."); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether

or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (applying the *Engquist* bar to a case challenging prosecutorial discretion because "the discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment").

While the Second Circuit clarified in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action," 626 F.3d at 142, it could not have been that Court's intention to hold that door ajar for a claim like Plaintiff's, which would grant a constitutional "class of one" claim to every target of a criminal investigation and every defendant in a criminal prosecution. The day-to-day work of a prosecutor necessarily involves the selection of certain individuals to investigate and charge—this is the very type of government discretion that the Supreme Court removed from equal protection review in *Engquist*. Accordingly, the Court holds that Plaintiff's claim that Defendant placed it in a "class of one" through participation in criminal investigations of it is barred under *Engquist*, and the Court will not consider the merits of this claim.

### b. Claims Based on a Selective Enforcement Theory

Alternatively, Plaintiff complains that Defendant's *de facto* debarment of Plaintiff from HPD-funded projects and criminal investigation of Plaintiff effected equal protection violations on a theory of impermissible "selective enforcement." (SAC ¶¶ 33, 35, 70-74). To plead a viable selective enforcement claim, Plaintiff must establish that "[i] compared with others similarly situated, [Plaintiff] was selectively treated; and [ii] that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." *LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). The Second Circuit has not settled the question of whether the degree of similarity required to prevail in a "selective enforcement claim" is less than that needed for a "class of one" claim, but, in any event, Plaintiff must at least show that Plaintiff and the Comparators are "similarly situated in all material respects." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 695-96 (S.D.N.Y. 2011) (discussing the varying standards applied and collecting cases).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 152 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**\*11**  The Court accepts as true that Plaintiff was treated differently than the Comparators, insofar as Plaintiff was the only one of the group to be denied HPD-funded contracts and subjected to a criminal investigation. (SAC ¶¶ 36-64). But the Court need not accept as true Plaintiff's legal conclusions that it was similarly situated to the Comparators or that Defendant acted out of malice. *See Iqbal*, 556 U.S. at 678. Defendant argues that Plaintiff has not pleaded sufficient facts to show that it is similarly situated to the Comparators. (Def. Br. 13 ("[T]he SAC is silent regarding whether the purported [C]omparators were on Enhanced Review status at the time that HPD approved them to work on projects; when, if ever, they were removed from Enhanced Review; and if so, under what conditions.")). Plaintiff weakly responds that it cannot substantiate this claim until it receives discovery from Defendant. (Pl. Opp. 7, 16). Even assuming that, with the benefit of discovery, Plaintiff could show the required degree of similarity, its "selective enforcement" claim would still fail, as the SAC does not contain sufficient allegations that Defendant acted with a malicious intent to injure.

The crux of Plaintiff's claim is that Defendant had an "axe to grind" with Plaintiff following the UBC's "smear campaign" (SAC ¶¶ 13-14), resulting in Defendant vindictively barring Plaintiff from HPD-funded contracts and putting Plaintiff through a criminal investigation (Pl. Opp. 16-19). Plaintiff contends that this vindictive singling-out "evidences irrationality and demonstrates bad faith or malice." (*Id.* at 19). But in so arguing, Plaintiff conflates the two-prong test for "selective enforcement." Plaintiff must show that it was treated differently than those similarly situated *and* that the different treatment was due to a malicious purpose. *LaTrieste Rest. & Cabaret, Inc.*, 40 F.3d at 590. Plaintiff would have this Court find that different treatment is itself proof of a malicious purpose. It is not.

There is nothing in the SAC, save Plaintiff's conclusory assertion that Defendant harbored a grudge because of the UBC's campaign, to support a finding that Defendant barred plaintiff from HPD projects or investigated Plaintiff with a malicious intent. Plaintiff's unsupported allegation does not "nudge[ ] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. What is more, the Court finds compelling Defendant's argument that a plausible, non-discriminatory reason for Defendant's decision to deny Plaintiff work on HPD-funded projects is readily apparent —namely, that Plaintiff, unlike the Comparators, was being investigated for possible criminal violations. And for the reasons stated above with respect to Plaintiff's "class of one" claim, the Court will not second-guess the discretion of the DOI and the prosecutors' offices that investigated Plaintiff under a "selective enforcement" theory without any suggestion in the pleadings of bad faith.

As set forth above, Plaintiff has not adequately pleaded any underlying constitutional violations under § 1983. Accordingly, the Court need not reach the question of whether Plaintiff's allegations establish municipal liability under *Monell*. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2000) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5891817

---

## Footnotes

1    This Opinion draws principally from the Second Amended Complaint ("SAC," Dkt. #33) and, for reasons explained below, from certain facts and documents of which judicial notice can be taken. For convenience, the Court refers to Defendant's moving brief (Dkt. #37) as "Def. Br."; to Plaintiff's brief in opposition (Dkt.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 153 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

#38) as "Pl. Opp."; and to Defendant's reply brief (Dkt. #39) as "Def. Reply." The Declaration of Jenna Krueger in Support of the Motion to Dismiss (Dkt. #36) is referred to as "Krueger Decl."

2    Plaintiff does not specify when it was awarded these six contracts; Plaintiff simply says it had these contracts "[d]uring the relevant time period." (SAC ¶ 7).

3    *Engquist* did not discuss claims for selective enforcement and the Second Circuit has not yet addressed the question of whether *Engquist*'s holding can be extended to such claims. *See Emmerling v. Town of Richmond*, 434 Fed.Appx. 10, 12 (2d Cir. 2011) (summary order).

4    The Court understands the SAC to raise a claim that Plaintiff was improperly placed on the Enhanced Review list. (SAC ¶ 33). In its briefing, Plaintiff appears to build on a passing reference in the SAC to Defendant's refusal to remove Plaintiff from the Enhanced Review list with the goal of expanding its claim to include an allegation that Defendant improperly kept Plaintiff on the Enhanced Review list. (*Id.* at ¶ 46; Pl. Opp. 9). To the extent that Plaintiff seeks to raise such a claim, the Court finds it has not been adequately pleaded in the SAC and that, even if it had, it would fail on the merits for the same reasons discussed in the text.

5    Plaintiff also analogizes the government action in *Kusel*—which, that Court held, was not so discretionary as to trigger the *Engquist* bar—to the decision to place Plaintiff on the HPD Enhanced Review list, and Plaintiff argues that the Court should permit that claim to proceed. (Pl. Opp. 12-13). Defendant counters that this analogy in fact misreads the opening brief, in which Defendant argues that *Engquist* bars Plaintiff's claim that Defendant impermissibly disallowed Plaintiff from working on various HPD-funded projects. (Def. Reply 5). The Court agrees, but for a different reason. As noted above, Plaintiff cannot recover on a "class of one" theory for its claim that Defendant improperly placed it on the Enhanced Review list because Plaintiff is in a class of, at least, eight. *Shatney v. LaPorte*, 634 Fed.Appx. 53, 54 (2d Cir. 2016) (summary order) ("[A] plaintiff who is in a 'class of one' may bring an equal-protection claim 'where the plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam))). Because the SAC alleges that Plaintiff was treated identically to the Comparators in its placement on HPD's Enhanced Review list, this allegation cannot form the basis for any recovery, and the Court will not probe Defendant's decision to place Plaintiff on Enhanced Review.

6    "Applicant" is defined as "any potential Sponsor of a Project, without regard to the method used by the Agency to select the Sponsor for such Project, including, but not limited to, any person or entity which has submitted or might potentially submit a qualification statement, proposal, bid, application, or other submission." 28 R.C.N.Y. § 33-01(a)(4).

"Sponsor" is defined as "an Applicant or Selected Applicant, or an entity formed by an Applicant or Selected Applicant and approved by the Agency, which has executed one or more Binding Agreement(s) with the Agency." 28 R.C.N.Y. § 33-01(a)(31).

7    Several of the parties' rational basis arguments center on the propriety of Plaintiff's placement on the Enhanced Review list. (Def Br. 20-21; Pl. Opp. 8-9). As noted throughout this Opinion, the Court will not consider these arguments.

---

**End of Document**                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 154 of 520

2017 WL 5891817
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ARTEC CONSTRUCTION AND
DEVELOPMENT CORP., Plaintiff,
v.
CITY OF NEW YORK, Defendant.

15 Civ. 9494 (KPF)
|
Signed 11/28/2017

**Attorneys and Law Firms**

Jamie Aron Forman, Bedell & Forman, LLP, New York, NY, for Plaintiff.

Jenna Lynn Krueger, New York City Law Department, New York, NY, for Defendant.

OPINION AND ORDER

KATHERINE POLK FAILLA, United States District Judge

 **\*1**  In June 2015, after a criminal investigation into its conduct, Plaintiff Artec Construction and Development Corporation ("Artec") pleaded guilty to a felony charge of falsifying business records. For several years prior to that plea, Plaintiff contends, various agencies of Defendant City of New York—including the Department of Housing Preservation and Development ("HPD") and the Department of Investigation ("DOI")—treated Plaintiff differently from other general contractors in the award of city-sponsored housing projects. Plaintiff argues that this disparity in treatment amounted to an equal protection violation, and now seeks redress pursuant to 42 U.S.C. § 1983.

The Court briefly addressed Plaintiff's allegations when presented with the first motion to dismiss, filed by then-Defendants HPD and DOI. In light of Plaintiff's proposed amendments to its pleading, the Court denied that motion and left for a later day an evaluation of the merits of Plaintiff's allegations. *See Artec Constr. & Dev. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 15 Civ. 9494 (KPF), 2017 WL 782911 (S.D.N.Y. Feb. 27, 2017) ("*Artec I*"). That day has come: Plaintiff filed its Second Amended Complaint on February 28, 2017, and Defendant argues, again, that Plaintiff

has failed to plead a plausible constitutional violation or municipal liability for any such violation. For the reasons set forth in this Opinion, Defendant is correct, and its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is granted.

BACKGROUND [1]

**A. Factual Background**

For purposes of the instant motion, all well-pleaded allegations in the Second Amended Complaint are taken as true. Plaintiff is a contractor that builds affordable housing in New York City, in part through contracts administered by HPD. (SAC ¶ 1). Plaintiff has served as the general contractor for at least six HPD-administered projects. (*Id.* at ¶ 7). [2] Of note, these contracts are subject to the Davis-Bacon Act of 1931, which is codified at 40 U.S.C. §§ 3141-3148 and which, along with related statutes, requires contractors and subcontractors on public works projects to pay laborers the local prevailing wages (the "Prevailing Wage Laws").

In or about May 2011, the United Brotherhood of Carpenters and Joiners (the "UBC"), an influential trade union, "commenced an aggressive public information campaign against [Plaintiff] alleging that [Plaintiff] and its subcontractors failed to pay the area standard wages to their employees and violated the Prevailing Wage Laws." (SAC ¶ 9). The UBC conducted this so-called "smear campaign" through social media, the local press, and "emails and letters to government officials, power players and others involved in the New York City affordable housing industry[.]" (*Id.* at ¶¶ 10-11). A full-page ad ran in the newspaper *City Hall*, asking, "HPD: Why are you perpetuating these irresponsible contractors?" (*Id.* at ¶ 12). Similarly, the UBC accused HPD of enabling Plaintiff's wage violations by "failing to affirmatively collect certified payrolls and withhold contract payments as required by the law." (*Id.* at ¶ 11).

 **\*2**  According to Plaintiff, these allegations gave HPD "an axe to grind with [Plaintiff]." (SAC ¶ 14). In consequence, in or about late June 2011, Doug Apple, then-First Deputy Commissioner of HPD, informed Plaintiff's owner, Chris Tsetsekas, of HPD's decision to prohibit Plaintiff from acting as general contractor on a public housing project known as the West Wind project, located at 45 East 131st Street. (*Id.* at ¶ 14). While not explicit in his reasoning, Apple intimated that the prohibition was in response to the UBC's accusations against Plaintiff and, in turn, that Plaintiff could resume

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 155 of 520

working on HPD projects "[w]hen the dust settle[d]." (*Id.* at ¶ 15).

In the following months, Plaintiff made amends with the UBC, which then agreed to "fully support [Plaintiff's] efforts to get new HPD-related projects." (SAC ¶ 16). Plaintiff informed HPD about its agreement with the UBC, but by that time DOI was investigating possible violations of the Prevailing Wage Laws by Plaintiff and its subcontractors. (*Id.* at ¶¶ 17, 20). Plaintiff reached out to James Tierney, the DOI Inspector General, to ask for a meeting with DOI "to learn the basis of the investigation and to figure out how it could begin to take on new City-related construction projects again"; eventually, Plaintiff secured a meeting with a DOI investigator. (*Id.* at ¶¶ 21, 23). Plaintiff complains that DOI was "anything but forthcoming" and would not reveal the details of its investigation—even as it sought to question Tsetsekas about Plaintiff's oversight of subcontractors. (*Id.* at ¶ 23). DOI denied, however, that it directed HPD to reject Plaintiff's applications to work on HPD-funded projects. (*Id.*).

On September 14, 2012, HPD placed Plaintiff on "Enhanced Review status" because of Plaintiff's "$1,689,262.79 in prevailing wage violations." (SAC ¶ 24). Kimberly Hardy, HPD's Special Counsel for Regulatory Compliance, insinuated that this decision was prompted by DOI. (*Id.* at ¶ 25). And by March 2013, Plaintiff learned that DOI was working with the United States Attorney's Office for the Eastern District of New York (the "EDNY") on a criminal investigation into Plaintiff's alleged Prevailing Wage Law violations. (*Id.* at ¶ 26).

Plaintiff came to understand that the EDNY "had no interest" in bringing a case against it, and hoped that this disinterest would put an end to the investigation. (SAC ¶ 28). Instead, however, Michael Carroll, the DOI Deputy Commissioner and Chief of Investigations, teamed up with the New York County District Attorney's Office ("DANY"). (*Id.* at ¶¶ 28-29). Thereafter, DOI demanded that Plaintiff pay the allegedly unpaid wages, require Tsetsekas to sit for a proffer session with DOI and DANY, and cooperate with DOI in future investigations of the construction industry. (*Id.*). Plaintiff refused, and now alleges that DOI "made sure [Plaintiff] would be forever barred from performing work on City-related construction projects." (*Id.* at ¶ 30).

In sum, Plaintiff alleges that Apple and Hardy of HPD, and Carroll and Tierney of DOI, were "policymakers" by virtue of their inclusion on the New York City Policymaker List

that the New York City Conflicts of Interest Board issues annually pursuant to the New York City Charter. (SAC ¶¶ 31-35). Plaintiff further alleges that, in their capacity as policymakers, Apple and Hardy precluded Plaintiff from working on HPD projects and placed Plaintiff on Enhanced Review, while Carroll and Tierney singled out Plaintiff for a criminal investigation, and effected a "*de facto* debarment*" from working on HPD projects. (*Id.* at ¶¶ 33-35). Specifically, Plaintiff alleges that HPD barred it from working as the general contractor on seven projects—identified as the West Wind, Cypress Hill, Sugar Hill, East Clarke Place, Alembic/Cypress, Alembic/Broadway, and West 53rd Street projects—that were collectively valued at $171,000,000. (*Id.* at ¶¶ 47-64). Plaintiff further alleges that, during the same time period, HPD permitted seven developers—Mountco Construction & Development Inc. ("Mountco"), Galaxy General Contracting ("Galaxy"), Lettire Construction Corporation ("Lettire"), Procida Construction Corporation ("Procida"), Lemle & Wolff Construction Corporation ("Lemle & Wolff"), Mega Contracting ("Mega"), and MDG Design ("MDG")—to continue working on affordable housing projects, even though they, too, had been placed on Enhanced Review status by HPD because of suspected Prevailing Wage Law violations and had worked with the same problematic subcontractors. (*Id.* at ¶¶ 37-46). To compensate for this unequal treatment, Plaintiff seeks an award of $171,000,000. (*Id.* at ¶ 80).

### B. Procedural Background

**\*3** This case was removed from New York State Supreme Court, New York County, on December 4, 2015. (Dkt. #1). As noted above, HPD and DOI previously moved to dismiss Plaintiff's First Amended Complaint (Dkt. #22); the Court denied that motion and granted Plaintiff leave to replead, *Artec I*, 2017 WL 782911, at *5-6. Plaintiff filed its SAC on February 28, 2017 (Dkt. #33), and the parties appeared for a pre-motion conference on March 22, 2017 (*see* Dkt. #34). Defendant moved to dismiss the SAC on April 28, 2017 (Dkt. #35), Plaintiff filed its opposition on May 26, 2017 (Dkt. #38), and Defendant filed its reply in further support of its motion on June 11, 2017 (Dkt. #39).

### DISCUSSION

### A. Applicable Law

#### 1. Motions to Dismiss Under Rule 12(b)(6)

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 156 of 520

When evaluating the sufficiency of a pleading under Rule 12(b)(6), a court must accept all well-pleaded allegations as true and must make all reasonable inferences in favor of the plaintiff. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). This obligation does not apply, however, to legal conclusions couched as factual allegations. *Id.* at 72. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But a complaint need not meet a "probability requirement," and a plaintiff's claim can proceed even if it appears that success on the merits is unlikely. *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**2. Consideration of Documents Outside the Pleadings**

Defendant has submitted with its briefing copies of Plaintiff's Plea Agreement with DANY, dated June 16, 2015, in which Plaintiff pleaded guilty to one count of Falsifying Business Records in the First Degree, in violation of New York Penal Law § 175.10 (Krueger Decl., Ex. C); a Superior Court Information in the matter *People v. Artec Construction & Development Corporation*, Case No. SCI-02139-2015, dated February 2, 2016 (*id.*); and a Certificate of Disposition in the same matter, dated January 7, 2016 (*id.* at Ex. D). While the Second Amended Complaint speaks at length about the unconstitutionality of the DOI and DANY criminal investigation, it omits mention of Plaintiff's concomitant plea and conviction.

Typically, when deciding a motion to dismiss, a court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," along with documents so heavily relied upon that they are integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be considered in resolving a motion pursuant to Fed. R. Civ. P. 12(b)(6)). Defendant encourages the Court to take judicial notice of Plaintiff's guilty plea and conviction. (Def. Br. 6). And, indeed, a court may take judicial notice of convictions that are a matter of public record. *Shmueli v. City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005). The Court thus considers the fact of Plaintiff's guilty plea and felony conviction, though it does not rely on the Plea Agreement, Superior Court Information, or Certificate of Disposition for the truth of the matters asserted therein. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine *what* statements they contained—but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

**3. The Equal Protection Clause**

Plaintiff pursues two theories of violation of the Equal Protection Clause, known as "selective enforcement" and "class of one." By way of background, the Equal Protection Clause is a mandate that all state governments—including administrative agencies—treat all similarly situated people alike. *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 597 (2008); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Artec I*, 2017 WL 782911, at *2 (quoting *Harlen Assocs.* v. *Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (alteration in original)).

*4 A plaintiff who does not allege any protected class affiliation can, nonetheless, demonstrate an equal protection violation where the plaintiff shows that he or she was treated differently from similarly situated individuals in circumstances where there was no rational basis for the difference in treatment ("class of one"), or where the different treatment was based on a malicious or bad-faith intent to injure ("selective enforcement"). *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (describing "class of one" standard); *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) (describing "selective enforcement" standard); *see generally Bizzarro v. Miranda*, 394 F.3d 82, 86-89 (2d Cir. 2005) (discussing both theories of liability).

With respect to a "class of one" claim, the Supreme Court has recognized "a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operation." *Engquist*, 553 U.S. at 598 (internal quotation marks and citation omitted) (alteration in original). This is because governmental entities must, at times, engage in "discretionary decisionmaking based on a vast array of subjective, individualized assessments" in which "treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. For such cases, generally speaking, equal protection claims are not viable.

Though *Engquist* was decided in the public employment context, the Second Circuit has recognized that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," while making clear that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010). As this Court noted in *Artec I*, "class of one" claims are more likely to fall within the *Engquist* bar when they challenge actions in the Government's role as a proprietor, managing its internal operations. *Artec I*, 2017 WL 782911, at *3. [3]

### 4. Municipal Liability

Finally, to hold a municipality such as Defendant liable for the alleged constitutional violations, Plaintiff "is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). This is because a municipality is only liable for actions that flow from a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

A "single act of a municipal policymaker, *i.e.*, a person with the authority to set municipal policy, can constitute official policy, and thus, can give rise to municipal liability." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). Authority to set municipal policy resides in "the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (citation omitted). "[W]hether an official had final policymaking authority is a question of state law." *Id.*; *see also Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014).

### B. Analysis

#### 1. Plaintiff's Suit Is Not Barred by *Heck*

**\*5** Defendant first argues that to the extent Plaintiff's equal protection claims are based on the propriety of DOI's investigation, those claims amount to an attack on the validity of Plaintiff's criminal conviction and, as such, are barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). (Def. Br. 7). The Supreme Court in *Heck* held that a plaintiff cannot challenge a criminal conviction

under § 1983 unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. This is often called the "favorable termination" requirement. *Poventud v. City of N.Y.*, 750 F.3d 121, 130 (2d Cir. 2014) (*en banc*).

Neither party argues that Plaintiff's conviction has been vacated or otherwise invalidated. Plaintiff sources its claim, however, in an exception to the *Heck* bar recognized by the Second Circuit, which exception permits § 1983 claims to proceed where the plaintiff is no longer in state custody and does not have any available *habeas* remedy. (Pl. Opp. 2-3 (citing *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999))). *See also Huang v. Johnson*, 251 F.3d 65, 73-75 (2d Cir. 2001) (permitting a § 1983 claim to proceed where Plaintiff was released from custody and could not pursue *habeas* relief).

Defendant is correct that the precise contours of the *Heck* bar are not "definitively settled" in the Second Circuit, *see Teichmann v. New York*, 769 F.3d 821, 827-31 (2d Cir. 2014), but its related argument that *Heck* applies to convictions secured through a guilty plea is inapposite. (Def. Reply 9). It matters not how the conviction was entered; what matters for the *Heck* analysis is whether the plaintiff has any recourse in a writ of *habeas corpus*. *See, e.g.*, *Huang*, 251 F.3d at 73-74 (declining to apply the *Heck* bar to a § 1983 action filed by a plaintiff who pleaded guilty and was no longer in custody). And although the application of *Heck* to a § 1983 claim where a *habeas* remedy is unavailable continues to cause "consternation" in this Circuit, *Teichmann*, 769 F.3d at 828 (Calabresi, J., concurring), Plaintiff's case is a clear one. Even after the *en banc* narrowing of the *Heck* bar in *Poventud*, this Circuit still recognizes an exception to the favorable termination requirement where a plaintiff, like Artec, was never in state custody, "that is, where an action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Id.* (Livingston, J., concurring).

The Plea Agreement between Plaintiff and DANY imposed a fine; because Plaintiff is a corporate entity, Plaintiff was not sentenced to any term of imprisonment. (Krueger Decl., Ex. D). And because Plaintiff was never, and is not now, in state custody, Plaintiff could never challenge the propriety of its conviction through a petition for a writ of *habeas corpus*. Accordingly, Plaintiff may bring a claim under § 1983.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 158 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**2. Plaintiff's Claim That the City Enacted a *De Facto* Debarment Is Timely**

Claims brought under § 1983 must be made within three years of when the plaintiff "knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks omitted). From this, Defendant argues that Plaintiff's claim based on an alleged *de facto* debarment from HPD projects is time-barred, insofar as it accrued before November 9, 2012—three years before the initial complaint in this action was filed in state court. (Def. Br. 9-11). This argument, in turn, is predicated on Plaintiff's allegation in the SAC that responsibility for the alleged debarment shifted "at some unknown point in 2012" from HPD to DOI, because "HPD was no longer running the show." (SAC ¶ 34; *see also* Def. Br. 10).

**\*6** Defendant's argument splits hairs. The initial Complaint in this matter named HPD and DOI as defendants, but, following the Court's February 27, 2017 Order (Dkt. #32), Plaintiff amended its pleading to name the proper entity, *i.e.*, the City of New York (Dkt. #33). Thus, for purposes of the instant motion, the Court evaluates liability as to the City generally, rather than as to HPD or DOI individually. As long as Plaintiff can show that its claim of a *de facto* debarment as to Defendant accrued after November 9, 2012, its § 1983 on those facts is timely.

Plaintiff argues that its claim for a *de facto* debarment did not accrue until after November 2012. (Pl. Opp. 23-24). In so doing, Plaintiff seizes upon Defendant's acknowledgment that "[d]enial of a single contract or project is insufficient to allege a *de facto* debarment." (*Id.* quoting Def. Br. 11)). Indeed, Plaintiff alleges, by November 9, 2012, it was only aware of one HPD project—the West Wind project—from which it had been barred. (SAC ¶ 48). It was only in December 2012 that Plaintiff was barred from three more HPD projects—Cypress Hill, Sugar Hill, and East Clarke Place—and in early 2013 from two more—Alembic/Cypress and Alembic/Broadway. (*Id.*).

The Court agrees with both parties that a denial of a single contract does not make a *de facto* debarment make. *See Quadrozzi Concrete Corp. v. City of N.Y.*, No. 03 Civ. 1905 (LAP), 2004 WL 2222164, at \*7 (S.D.N.Y. Sept. 30, 2004); *Housing Works, Inc. v. City of N.Y.*, 680 N.Y.S.2d 487, 492 (1st Dep't 1998). Accordingly, the Court finds that Plaintiff did not know or have reason to know of the alleged *de facto* debarment until after November 9, 2012, which renders its *de facto* debarment claim timely.

**3. The Merits of Plaintiff's Equal Protection Claims**

Plaintiff claims that Defendant treated it differently compared to similarly situated affordable housing developers because Plaintiff was (i) placed on HPD's Enhanced Review list, (ii) subjected to a *de facto* debarment from HPD projects, and (iii) subjected to a criminal investigation. (SAC ¶¶ 33-35). In support of its equal protection claims, Plaintiff proffers evidence of seven comparable contractors—Mountco, Galaxy, Lettire, Procida, Lemle & Wolff, Mega, and MDG (together, the "Comparators")—all of which were on HPD's Enhanced Review list but were permitted to continue working on HPD affordable housing projects and were not subjected to criminal investigation or prosecution. (*Id.* at ¶¶ 38-44).

Before turning to Plaintiff's "class of one" and "selective enforcement" claims, the Court observes at the outset that Plaintiff cannot recover under either theory for its claim that placement on the HPD Enhanced Review list constituted an equal protection violation. (*See* SAC ¶ 33).[4] After all, both "class of one" and "selective enforcement" claims require proof that the plaintiff was treated differently from similarly situated comparators. *Bizzarro*, 394 F.3d at 86. Each of the seven Comparators was also placed on the Enhanced Review list, and thus was treated in the same way as Plaintiff. (SAC at ¶¶ 38-44). Accordingly, the Court limits its analysis to Plaintiff's claims that Defendant impermissibly enacted a *de facto* debarment and participated in a criminal investigation of Plaintiff.

**a. Claims Based on a Class of One Theory**

**\*7** To prevail on a "class of one" claim, Plaintiff must show that it was treated differently than similarly situated comparators and that there was no rational basis for the different treatment. *Vill. of Willowbrook*, 528 U.S. at 564. Specifically, Plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in the circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Kusel*, 626 F.3d at 140 (internal quotation marks and citation omitted).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 159 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

Defendant raises what the parties agree is an issue of first impression in this Circuit: whether the Supreme Court's decision in *Engquist*—which eliminated "class of one" claims for government employees—should be extended to bar claims like Plaintiff's that are raised in the government contract approval context. (Def. Br. 18-19; Pl. Opp. 12). Because the degree and type of government discretion used is central to an analysis of whether *Engquist* bars Plaintiff's claims, the Court takes each alleged government action in turn, looking first at Plaintiff's claim that Defendant effectively barred it from working on HPD-funded projects and second at Plaintiff's allegation that Defendant impermissibly singled Plaintiff out for criminal investigation and prosecution.

### i. *De Facto* Debarment

Defendant argues that "when HPD approves contractors for the projects it funds, just like with procuring contactors for City contracts, it is acting only as a proprietor and manager, not as a regulator" and that, importantly, "HPD wields virtually unfettered discretion over the selection process." (Def. Br. 19). Defendant further notes that "HPD must rely upon many subjective decisions by agency experts to optimize the use of taxpayer-funded loans" and "could not function as a lender or mortgagor if every subjective assessment were subject to constitutional review." (*Id.* at 20).

In opposition, Plaintiff makes much of the Second Circuit's holding in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action." (Pl. Opp. 12 (quoting *Kusel,* 626 F.3d at 142)). Plaintiff argues that its claim should not be barred by *Engquist* because "HPD is essentially acting as a regulator/lawmaker by adopting regulations to govern the treatment of private contractors who desire to perform work on privately negotiated contracts." (*Id.* at 13). Moreover, Plaintiff contends, Defendant acted pursuant to a *de facto* standard in its treatment of contractors placed on Enhanced Review for suspected Prevailing Wage Law violations—a standard that permitted those developers to continue working on HPD projects—which HPD violated when it barred Plaintiff from further work. (*Id.* at 14-15). Because Defendant's actions were governed by this standard, they "were not discretionary enough to bar [Plaintiff's] 'class of one' claim." (*Id.* at 15). [5]

**\*8**  The *Engquist* Court was, at base, uneasy about imposing constitutional liability for "forms of state action ... which by their nature involve discretionary decisionmaking based

on a vast array of subjective, individualized assessments," and found that this concern "applies most clearly in the employment context." *Engquist,* 553 U.S. at 603. Presumably for this reason, the Court was careful to confine its holding to that context, *id.* at 607, and provided little guidance on how it might be extended. It is not surprising, then, that Courts of Appeals have split on this question. *See Kusel,* 626 F.3d at 141-42 (describing circuit split).

While the Second Circuit conceded in *Kusel* that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," it spoke disapprovingly of certain district courts' attempts to extend the *Engquist* bar. *Kusel,* 626 F.3d at 141 ("Several district courts in this Circuit have extended *Engquist*'s holding to require that plaintiffs seeking to establish a class-of-one claim must show the difference in treatment flowed from non-discretionary action, but they have done so without persuasive analysis."). By contrast, the *Kusel* Court found the reasoning in *Alfaro* v. *Labrador* persuasive, which reasoning asked whether the government action at issue "involve[s] discretion that is actually exercised on a day-to-day basis" or if the action is "theoretically discretionary but—as a practical matter— actually depend[s] on de facto standards." *Id.* (citing *Alfaro v. Labrador,* No. 06 Civ. 1470 (JS), 2009 WL 2525128, at \*9 (E.D.N.Y. Aug. 14, 2009)). Decisions in the latter category, both courts agreed, were more likely to survive *Engquist. Id.*

Defendant argues that its discretion in deciding whether to permit a contractor to work on an HPD-funded project falls into the former "day-to-day" category. HPD issues loans to fund affordable housing construction and, as part of its lending role, "manage[s] the administration of these projects in order to ensure the quality of this public service." (Def. Br. 19). One way in which Defendant "manages" this process is by "approving contractors for private contracts receiving loans." (*Id.*).

Defendant may select a contractor for an HPD-funded project by "any method permitted by Law which [HPD] determines will best meet the Project's objectives and the City Housing Goals, including, but not limited to, direct negotiation, [Requests for Qualifications], [Requests for Proposals], competitive bidding, public bidding, auction, selection by entities other than [HPD], and application." 28 R.C.N.Y. § 33-03(a). And, as Defendant notes, HPD can "disapprove any contractor or subcontractor because of previous violations of statutes, rules or regulations relating to discrimination, standards of employment or labor standards, or because of

inefficiency, abandonment of duties, or disregard for creditors on prior jobs performed under this Program or other programs of the City." *Id.* § 2-06(a)(3). (*See* Def. Br. 20). The Rules further provide that HPD "may reject any Applicant ... at any time and for any reason" including if HPD determines "at any time that good and sufficient reasons exist why the City should not do business with an Applicant ... or should not allow such Applicant ... to act as Sponsor for a Project," while making clear that the "Rules are not intended to confer rights or benefits upon the general public or upon any individual or entity." *Id.* §§ 33-08(a)(1), 33-08(d). [6] Finally, HPD retains the right to pull funding or change the Sponsor of a project "at any time prior to the execution of a Binding Agreement." *Id.* § 33-08(e).

**\*9** Defendant's discretion to approve applicants for HPD-funded projects is, thus, nearly unfettered. More to the point, HPD's power to choose which contractors will work on its projects is far more discretionary than the process that gave the Second Circuit pause in *Kusel*. There, a clinical testing lab complained that the New York State Department of Health ("DOH") subjected it to "an intense and unwarranted degree of regulatory scrutiny." *Kusel*, 626 F.3d at 137. DOH investigated the lab numerous times over a period of several years and "refused to renew [its] operating permit." *Id.* at 138. Critical to the Court's analysis was the fact that "DOH [did] not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license"; DOH could not revoke a license without a hearing, and the decision could be challenged in an Article 78 proceeding. *Id.* at 142; *see* N.Y. C.P.L.R. § 7801. In sharp contrast, HPD possesses the ability to choose contractors through whatever process it deems best and can elect not to work with a contractor if it determines, in its discretion, that the City should not do business with that entity. The Rules of the City of New York do not require HPD to explain its choices, do not grant contractors the right to a given project, and do not afford due process in the event of a rejection or removal. *See generally* 28 R.C.N.Y. §§ 33-03, 33-08. Plainly, Defendant has broad discretion to approve or disapprove an applicant for an HPD-funded project.

Significantly, however, the analysis does not end there. As Judge Seybert noted in *Alfaro*—and as the Second Circuit found instructive in *Kusel*—government decisionmaking that is "theoretically discretionary" can "as a practical matter [ ] actually depend on *de facto* standards." *Alfaro*, 2009 WL 2525128, at \*9; *see also Kusel*, 626 F.3d at 141. For purposes of this motion, the Court must accept as true Plaintiff's

allegation that Defendant employed what was, effectively, a "consistent pattern and practice" of allowing contractors on the Enhanced Review list to continue to work on HPD-funded projects. *Alfaro*, 2009 WL 2525128, at \*9. (*See* SAC ¶¶ 38-44; Pl. Opp. 15). And where the government acts pursuant to a standard, even where it is not obligated to do so, its decisionmaking implicates the equal protection obligation to treat "all persons similarly situated ... alike." *City of Cleburne*, 473 U.S. at 439.

In light of Plaintiff's policy allegations and the Second Circuit's decision in *Kusel*, the Court must conclude at this stage of the litigation that the decisionmaking process at issue is not so discretionary as to trigger the *Engquist* bar. Accordingly, the Court may consider the merits of Plaintiff's claim that Defendant's *de facto* debarment put Plaintiff in an impermissible "class of one." But while Plaintiff overcomes this first hurdle, it falls at the second.

On the facts alleged in the SAC, the Court cannot find a basis for a "class of one" claim regarding Defendant's *de facto* debarment. To be sure, the SAC pleads sufficient facts to show that Plaintiff was the only one of the Comparators to be denied participation in HPD-funded projects while being on Enhanced Review for suspected Prevailing Wage Law violations. (*See* SAC ¶¶ 37-44). But also according to the SAC, none of the Comparators was being investigated for possible criminal conduct. (*See id.*). Given this rather significant difference, the Court cannot say that Plaintiff alleges the "extremely high degree of similarity" between Plaintiff and the Comparators that is required to prevail on a "class of one" claim. *Clubside, Inc. v. Valentin*, 468 F.3d 144,159 (2d Cir. 2006).

Even assuming, for purposes of this motion, that Plaintiff were sufficiently situated to the Comparators, its claim still fails because it cannot prove that there is no rational basis for Defendant's actions. Plaintiff asserts that Defendant's actions were "irrational" (SAC ¶ 77), but the Court does not agree. [7] As Defendant notes, its decision to deny Plaintiff work on HPD-funded contracts was reasonably related to a legitimate government interest in ensuring that "workers on HPD projects receive prevailing wages." (Def. Br. 21). Plaintiff concedes Defendant's interest in enforcing fair wage laws, but claims nonetheless that there was no rational basis to bar Plaintiff from HPD-funded contracts while allowing other contractors that were suspected of similar violations, because "there is nothing here to suggest that [Plaintiff's] alleged prevailing wage violations were more severe than the

Comparators[']['][.]" (Pl. Opp. 11). But, of course, there was reason to single out Plaintiff: According to the SAC, none of the Comparators was being investigated by DOI—first with the EDNY and subsequently with DANY—for possible criminal conduct. (SAC ¶¶ 26, 28-29, 38-44).

 **\*10** Plaintiff lost its first HPD contract in June 2011, lost three more in December 2012, and lost two more in early 2013. (SAC ¶¶ 51, 53, 55, 57, 59, 61). Plaintiff became aware of DOI's investigation in January 2012 (*id.* at ¶ 20), and learned that the investigation was criminal in nature in March 2013 (*id.* at ¶ 26). On these facts, Defendant's decision to bar Plaintiff from HPD-funded projects during the pendency of an investigation is rationally related to a legitimate government interest. In sum, Plaintiff has failed to plead sufficient facts that, taken as true, show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Kusel*, 626 F.3d at 140 (citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008)). On these facts, its "class of one" claim cannot stand.

### ii. The Criminal Investigation

The Court considers next whether Plaintiff's "class of one" claim based on Defendant's participation in criminal investigations into Plaintiff's alleged wage violations is barred by *Engquist* and concludes that it is. The decisionmaking applied by a prosecutor deciding which violations to investigate and what cases to bring is the type of "day-to-day" government discretion that a "class of one" claim cannot properly redress. *See Vested Bus. Brokers Ltd. v. Cty. of Suffolk*, No. 16 Civ. 4945 (JMA) (SIL), 2017 WL 4122616, at \*7 (E.D.N.Y. Sept. 15, 2017) ("[T]o the extent that [plaintiff] is challenging [defendant's] investigation and subsequent decision not to make an arrest, the actions and decisions taken are discretionary, and not subject to a 'class of one' claim."); *Alfaro*, 2009 WL 2525128, at \*9 ("[W]here a law is selectively enforced (without clear standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage in."); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether

or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (applying the *Engquist* bar to a case challenging prosecutorial discretion because "the discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment").

While the Second Circuit clarified in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action," 626 F.3d at 142, it could not have been that Court's intention to hold that door ajar for a claim like Plaintiff's, which would grant a constitutional "class of one" claim to every target of a criminal investigation and every defendant in a criminal prosecution. The day-to-day work of a prosecutor necessarily involves the selection of certain individuals to investigate and charge—this is the very type of government discretion that the Supreme Court removed from equal protection review in *Engquist*. Accordingly, the Court holds that Plaintiff's claim that Defendant placed it in a "class of one" through participation in criminal investigations of it is barred under *Engquist*, and the Court will not consider the merits of this claim.

### b. Claims Based on a Selective Enforcement Theory

Alternatively, Plaintiff complains that Defendant's *de facto* debarment of Plaintiff from HPD-funded projects and criminal investigation of Plaintiff effected equal protection violations on a theory of impermissible "selective enforcement." (SAC ¶¶ 33, 35, 70-74). To plead a viable selective enforcement claim, Plaintiff must establish that "[i] compared with others similarly situated, [Plaintiff] was selectively treated; and [ii] that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." *LaTrieste Rest. & Cabaret, Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). The Second Circuit has not settled the question of whether the degree of similarity required to prevail in a "selective enforcement claim" is less than that needed for a "class of one" claim, but, in any event, Plaintiff must at least show that Plaintiff and the Comparators are "similarly situated in all material respects." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 695-96 (S.D.N.Y. 2011) (discussing the varying standards applied and collecting cases).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 162 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

**\*11** The Court accepts as true that Plaintiff was treated differently than the Comparators, insofar as Plaintiff was the only one of the group to be denied HPD-funded contracts and subjected to a criminal investigation. (SAC ¶¶ 36-64). But the Court need not accept as true Plaintiff's legal conclusions that it was similarly situated to the Comparators or that Defendant acted out of malice. *See Iqbal,* 556 U.S. at 678. Defendant argues that Plaintiff has not pleaded sufficient facts to show that it is similarly situated to the Comparators. (Def. Br. 13 ("[T]he SAC is silent regarding whether the purported [C]omparators were on Enhanced Review status at the time that HPD approved them to work on projects; when, if ever, they were removed from Enhanced Review; and if so, under what conditions.")). Plaintiff weakly responds that it cannot substantiate this claim until it receives discovery from Defendant. (Pl. Opp. 7, 16). Even assuming that, with the benefit of discovery, Plaintiff could show the required degree of similarity, its "selective enforcement" claim would still fail, as the SAC does not contain sufficient allegations that Defendant acted with a malicious intent to injure.

The crux of Plaintiff's claim is that Defendant had an "axe to grind" with Plaintiff following the UBC's "smear campaign" (SAC ¶¶ 13-14), resulting in Defendant vindictively barring Plaintiff from HPD-funded contracts and putting Plaintiff through a criminal investigation (Pl. Opp. 16-19). Plaintiff contends that this vindictive singling-out "evidences irrationality and demonstrates bad faith or malice." (*Id.* at 19). But in so arguing, Plaintiff conflates the two-prong test for "selective enforcement." Plaintiff must show that it was treated differently than those similarly situated *and* that the different treatment was due to a malicious purpose. *LaTrieste Rest. & Cabaret, Inc.,* 40 F.3d at 590. Plaintiff would have this Court find that different treatment is itself proof of a malicious purpose. It is not.

There is nothing in the SAC, save Plaintiff's conclusory assertion that Defendant harbored a grudge because of the UBC's campaign, to support a finding that Defendant barred plaintiff from HPD projects or investigated Plaintiff with a malicious intent. Plaintiff's unsupported allegation does not "nudge[ ] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. What is more, the Court finds compelling Defendant's argument that a plausible, non-discriminatory reason for Defendant's decision to deny Plaintiff work on HPD-funded projects is readily apparent —namely, that Plaintiff, unlike the Comparators, was being investigated for possible criminal violations. And for the reasons stated above with respect to Plaintiff's "class of one" claim, the Court will not second-guess the discretion of the DOI and the prosecutors' offices that investigated Plaintiff under a "selective enforcement" theory without any suggestion in the pleadings of bad faith.

As set forth above, Plaintiff has not adequately pleaded any underlying constitutional violations under § 1983. Accordingly, the Court need not reach the question of whether Plaintiff's allegations establish municipal liability under *Monell. See Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5891817

---

## Footnotes

1      This Opinion draws principally from the Second Amended Complaint ("SAC," Dkt. #33) and, for reasons explained below, from certain facts and documents of which judicial notice can be taken. For convenience, the Court refers to Defendant's moving brief (Dkt. #37) as "Def. Br."; to Plaintiff's brief in opposition (Dkt.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 163 of 520

Artec Construction and Development Corp. v. City of New York, Not Reported in Fed....

#38) as "Pl. Opp."; and to Defendant's reply brief (Dkt. #39) as "Def. Reply." The Declaration of Jenna Krueger in Support of the Motion to Dismiss (Dkt. #36) is referred to as "Krueger Decl."

2    Plaintiff does not specify when it was awarded these six contracts; Plaintiff simply says it had these contracts "[d]uring the relevant time period." (SAC ¶ 7).

3    *Engquist* did not discuss claims for selective enforcement and the Second Circuit has not yet addressed the question of whether *Engquist*'s holding can be extended to such claims. *See Emmerling v. Town of Richmond*, 434 Fed.Appx. 10, 12 (2d Cir. 2011) (summary order).

4    The Court understands the SAC to raise a claim that Plaintiff was improperly placed on the Enhanced Review list. (SAC ¶ 33). In its briefing, Plaintiff appears to build on a passing reference in the SAC to Defendant's refusal to remove Plaintiff from the Enhanced Review list with the goal of expanding its claim to include an allegation that Defendant improperly kept Plaintiff on the Enhanced Review list. (*Id.* at ¶ 46; Pl. Opp. 9). To the extent that Plaintiff seeks to raise such a claim, the Court finds it has not been adequately pleaded in the SAC and that, even if it had, it would fail on the merits for the same reasons discussed in the text.

5    Plaintiff also analogizes the government action in *Kusel*—which, that Court held, was not so discretionary as to trigger the *Engquist* bar—to the decision to place Plaintiff on the HPD Enhanced Review list, and Plaintiff argues that the Court should permit that claim to proceed. (Pl. Opp. 12-13). Defendant counters that this analogy in fact misreads the opening brief, in which Defendant argues that *Engquist* bars Plaintiff's claim that Defendant impermissibly disallowed Plaintiff from working on various HPD-funded projects. (Def. Reply 5). The Court agrees, but for a different reason. As noted above, Plaintiff cannot recover on a "class of one" theory for its claim that Defendant improperly placed it on the Enhanced Review list because Plaintiff is in a class of, at least, eight. *Shatney v. LaPorte*, 634 Fed.Appx. 53, 54 (2d Cir. 2016) (summary order) ("[A] plaintiff who is in a 'class of one' may bring an equal-protection claim 'where the plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam))). Because the SAC alleges that Plaintiff was treated identically to the Comparators in its placement on HPD's Enhanced Review list, this allegation cannot form the basis for any recovery, and the Court will not probe Defendant's decision to place Plaintiff on Enhanced Review.

6    "Applicant" is defined as "any potential Sponsor of a Project, without regard to the method used by the Agency to select the Sponsor for such Project, including, but not limited to, any person or entity which has submitted or might potentially submit a qualification statement, proposal, bid, application, or other submission." 28 R.C.N.Y. § 33-01(a)(4).

"Sponsor" is defined as "an Applicant or Selected Applicant, or an entity formed by an Applicant or Selected Applicant and approved by the Agency, which has executed one or more Binding Agreement(s) with the Agency." 28 R.C.N.Y. § 33-01(a)(31).

7    Several of the parties' rational basis arguments center on the propriety of Plaintiff's placement on the Enhanced Review list. (Def Br. 20-21; Pl. Opp. 8-9). As noted throughout this Opinion, the Court will not consider these arguments.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Artemov v. City of New York, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 164 of 520

2024 WL 1436024
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Dmitriy ARTEMOV, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

24-CV-1908 (PKC) (LB)
|
Signed April 3, 2024

**Attorneys and Law Firms**

Dmitriy Artemov, Brooklyn, NY, Pro Se.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*1** Plaintiff Dmitriy Artemov ("Plaintiff") filed this *pro se* action on March 14, 2024, and asserts federal claims pursuant to 42 U.S.C. §§ 1983, 1985, 1988, 2000e-16(a), as well as under New York State and New York City law. The Court grants Plaintiff's request to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915. For the reasons discussed below, Plaintiff is granted thirty (30) days from the date of this Memorandum & Order to submit an amended complaint.

**BACKGROUND**

Plaintiff brings this action against the City of New York, John Doe Police Officers ("Police Officer Defendants"), Spring Creek Towers ("SCT"), [1] and John Doe SCT Public Safety Officers ("Public Safety Officer Defendants") (collectively, "Defendants"). Plaintiff is a 55-year-old transgender woman who resides in SCT. (Compl., ¶¶ 6, 15.) Plaintiff alleges that, on March 7, 2024, she was at a grocery store on the grounds of SCT when the Public Safety Officer Defendants started harassing her. (*Id.* ¶¶ 15–18.) According to Plaintiff, the Public Safety Officer Defendants, without any provocation, "began loudly attracting the attention of the public and provoking the crowd to violence by threateningly shouting obscene insults including threats to life and threats to conduct violence ... accompanied by obscene threatening gestures that offend human dignity[.]" (*Id.* ¶ 18.) As a result, Plaintiff was not able to gain access to a public area and was forced to leave the area for her own safety. (*Id.* ¶ 19.) Plaintiff asserts that she has been harassed by Defendants based on her sexual orientation and gender identity and seeks monetary damages. (*See generally* Compl.)

**LEGAL STANDARD**

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In addition to alleging sufficient facts to state a plausible claim for relief, under Federal Rule of Civil Procedure 8, a plaintiff must provide a short, plain statement of the claims against each named defendant. *Id.* at 677–78 ("[Rule 8] demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). A pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* at 678 (citations and alterations omitted).

In reviewing a *pro se* complaint, the plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (noting that even after *Twombly*, courts "remain obligated to construe a *pro se* complaint liberally"). At the same time, the court must dismiss a case filed by an IFP plaintiff if the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). An action is "frivolous" when either "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy, or the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (internal quotation marks and alterations omitted).

**DISCUSSION**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 165 of 520

Artemov v. City of New York, Not Reported in Fed. Supp. (2024)

## I. Plaintiff's Claims Under Section 1983

**\*2** Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived [them] of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

### A. Plaintiff's Claims Against the City of New York and the Police Officer Defendants

Aside from naming the City of New York and the Police Officers Defendants in the caption of the Complaint, Plaintiff fails to make any factual allegations against these Defendants. Thus, it is unclear whether Plaintiff intends to maintain an action against these Defendants and the extent to which these Defendants were involved in the incident from which Plaintiff's claims arise.

With regard to Plaintiff's claims against the City of New York, to hold a municipality liable under Section 1983, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional [or other federal] right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)); *see also Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020); *Myftari v. Dep't of Fin.*, No. 23-CV-2558, 2023 WL 3628584, at \*2 (E.D.N.Y. May 24, 2023). Although Plaintiff broadly asserts that the acts she complains of "were carried out ... pursuant to the customs, usages, practices, procedures, and rules of the City of New York and the New York City Policy Department" (Compl. ¶ 29), she offers no factual support for this conclusory allegation.

With regard to Plaintiff's claims against the Police Officer Defendants, "[i]t is well settled that, in order to establish a defendant's individually liability in a suit brought under [Section 1983], a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). To the extent that Plaintiff intends to maintain a Section 1983 action against the Police Officer Defendants, she fails to plead any facts to show that the officers had any personal involvement in the alleged rights violations asserted in her Complaint. *See, e.g.*, *Hall v. Suffolk Cnty.*, No. 23-CV-4606, 2023 WL 4747395, at \*3 (E.D.N.Y. July 25, 2023) (dismissing claims against officers where there was no indication that the officers had any personal involvement in the purported constitutional deprivation).

### B. Plaintiff's Claims Against Spring Creek Towers

Spring Creek Towers "is a private corporation that operates a private security force that has been deputized by the New York City Police Department and whose officers have the power to make arrests." *Artemov v. Ramos*, No. 18-CV-2537, 2018 WL 2121595, at \*3 (E.D.N.Y. May 8, 2018) (quoting *Brown v. Starrett City Assocs.*, No. 09-CV-3282, 2011 WL 5118438, at \*1 (E.D.N.Y. Oct. 27, 2011)). When a private corporation, such as SCT, operates a private police force, it is subject to liability under Section 1983 as if it were a municipality. *Id.* However, to prevail on a Section 1983 claim against a municipality, a plaintiff must show that an action pursuant to a municipality's official policy caused the injury. *See Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012). Here, Plaintiff fails to allege facts that would support an inference that an official policy or custom of SCT or SCT's Public Safety Department caused a violation of her federally protected rights. *See Artemov*, 2018 WL 2121595, at \*3.

\* \* \*

**\*3** Accordingly, Plaintiff's claims under Section 1983 are dismissed with leave to amend.

## II. Plaintiff's Claims Under Section 1985

To state a conspiracy claim under Section 1985(3), Plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 166 of 520

Artemov v. City of New York, Not Reported in Fed. Supp. (2024)

privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in [their] person or property or deprived of any right or privilege of a citizen of the United States." *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citing 42 U.S.C. § 1985(3)); *Guillen v. City of New York*, 625 F. Supp. 3d 139, 159 (S.D.N.Y. 2022). A plaintiff must also show that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Cine SK8, Inc.*, 507 F.3d at 791 (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)). Mere conclusory or general allegations of a conspiracy are insufficient to state a claim. *See Doe v. Fenchel*, 837 F. App'x 67, 68–69 (2d Cir. 2021) (summary order) (affirming dismissal of plaintiff's Section 1985 conspiracy claim where the operative complaint did not include facts to support its conclusory allegations); *Baa v. Gonzalez*, No. 22-CV-2602, 2023 WL 5278482, at *8 (E.D.N.Y. Aug. 16, 2023). Plaintiff has failed to plead any plausible facts to support a claim that Defendants acted in concert to deprive her of equal protection of the law.

Accordingly, Plaintiff's claims under Section 1985 are dismissed with leave to amend.

### III. Plaintiff's Claims Under Section 1988

To the extent that Plaintiff seeks attorneys' fees under Section 1988, any such claim fails because Plaintiff, as a *pro se* litigant, cannot recover attorneys' fees. *See Jackson v. Cnty. of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011) (summary order) ("The Supreme Court has spoken clearly that a *pro se* litigant ... may not receive attorney's fees under Section 1988." (citing *Kay v. Ehrler*, 499 U.S. 432, 438 (1991))); *Azaryev v. City of New York*, No. 21-CV-3856, 2021 WL 3861722, at *2 (E.D.N.Y. Aug. 27, 2021).

Accordingly, any such claim is dismissed without leave to amend.

### IV. Plaintiff's Remaining Claims

Plaintiff appears to seek to bring a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(a). (*See* Compl. ¶ 3.) However, Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). There is no indication that Plaintiff was

ever employed by or sought employment with the named Defendants. As such, Plaintiff's claim under Title VII is dismissed without leave to amend.

Finally, to the extent that Plaintiff seeks to allege that she was denied the full and equal use of a public accommodation because of her gender under Title 8 of the Administrative Code of the City of New York ("NYCHRL"), Plaintiff fails to plead sufficient facts for the Court to determine if a violation occurred. *See, e.g., Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (explaining that, to state a claim for gender discrimination under the NYCHRL, a "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent" (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (N.Y. App. Div. 2009))). As such, the Court dismisses Plaintiff's claim under Title 8 with leave to amend.

### LEAVE TO AMEND

**\*4** A *pro se* plaintiff should be given an opportunity to amend the complaint if a "liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009). For the reasons stated above, Plaintiff's claims under Section 1988 and Title VII are dismissed with prejudice; however, Plaintiff may file an amended complaint within thirty (30) days of the date of this Order to assert plausible claims under Sections 1983 and 1985 and Title 8 of the Administrative Code of the City of New York. The amended complaint must clearly identify each legal claim and set forth a short, plain statement of the relevant facts supporting it. Plaintiff must name as Defendants those individuals who were allegedly involved in the deprivation of her rights. For each Defendant named, Plaintiff should include a brief description of what each Defendant did or failed to do, the date and location of each relevant event, and how the Defendant's acts or omissions caused the Plaintiff injury.

### CONCLUSION

The Court grants Plaintiff leave to file an amended complaint within thirty (30) days of this Order. It must be captioned "First Amended Complaint" and bear the same docket number as this Order. All further proceedings are stayed for 30 days.

**Artemov v. City of New York, Not Reported in Fed. Supp. (2024)**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 167 of 520

If Plaintiff does not file an amended complaint within 30 days, or show good cause as to why she cannot comply with this deadline, the action shall be dismissed, and judgment entered. Plaintiff may wish to consult the City Bar Justice Center's Federal *Pro Se* Legal Assistance Project at (212) 382-4729 for free, confidential limited-scope legal assistance.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1436024

---

## Footnotes

1      Spring Creek Towers is a self-contained community consisting of 5,881 residential units located in Brooklyn, New York. *See* Spring Creek Towers: About Us, https://www.springcreektowers.com/aboutus.html (last visited Apr. 3, 2024).

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue-Striped Flag

Appeal Filed by  Aurecchione v. Falco,  2nd Cir.,  April 3, 2025

2025 WL 779278
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Philip S. AURECCHIONE, Plaintiff,

v.

Sheriff Louis FALCO III, et al., Defendants.

7:22-CV-04538 (NSR)
|
Signed March 7, 2025

**Attorneys and Law Firms**

Martin Emilio Souto-Diaz, Amori & Associates, Stroudsburg, PA, Robert C. Barchiesi II, Barchiesi Law PLLC, Bethlehem, PA, for Plaintiff.

Robert Benjamin Weissman, Saretsky Katz Dranoff Weissman & Maynard, LLP, Elmsford, NY, for Defendants Sheriff Louis Falco III, Tom Walsh, Officer Seamus Lyons, Officer Kerri Kralik, Officer Mark Colon, Officer James VanCura, Officer Inv. Budnick.

Gee Won Cha, Steven Neil Schulman, Wesley Eugene Bauman, Office of the Attorney General, New York, NY, for Defendants Dierdre Ryan, Lynn Johnson-Richardson.

AMENDED OPINION & ORDER [1]

NELSON S. ROMÁN, United States District Judge:

**\*1**  Plaintiff Philip S. Aurecchione ("Plaintiff") brings this action under 42 U.S.C. § 1983 ("Section 1983") against the following Defendants: Seamus Lyons, James VanCura, Mark Colon, Kerri Kralik, and Investigator Budnick in their official and individual capacities as law enforcement officers in the Rockland County Sheriff's Department (collectively, the "County Defendants"). Plaintiff asserts four causes of action, including: (1) unlawful search and seizure and unreasonable delay in violation of substantive due process rights against Officers Lyons and Kralik (2) procedural due process violations against Officers Lyons, Kralik, Colon, VanCura, and Budnick; (3) unrelated special conditions of parole and violation of freedom of association in violation of substantive

due process against Officers Ryan and Johnson-Richardson; and (4) unlawful search and seizure in violation of substantive due process against Officer Ryan. On October 25, 2023, Plaintiff filed the Third Amended Complaint ("TAC") (ECF No. 89). Pending before the Court are the County Defendants' motion to dismiss Plaintiff's first two causes of action. (ECF No. 108.) For the following reasons, the Court GRANTS the County Defendants' motion in full.

**BACKGROUND**

**A. Factual Background**

On September 3, 2018, Plaintiff was arrested on state firearm charges and detained in Rockland County Jail. (TAC at ¶ 11.) Plaintiff was also charged with violating the terms of his federal supervised release, which were imposed as part of a prior federal case. (*Id.* at ¶ 12.) Plaintiff was then transferred to federal custody on a writ of habeas corpus. (*Id.* at ¶ 13.) On September 26, 2019, a federal judge sentenced Plaintiff to two 18-month terms of imprisonment for Plaintiff's violation of federal supervised release. (*Id.* at ¶ 15.) On February 7, 2019, Plaintiff pleaded guilty in his New York State ("NYS") case and was sentenced to two to four years of incarceration with his federal sentence. (*Id.* at ¶ 16.) Both Plaintiff's federal and NYS sentences were to run concurrently. (*Id.* at ¶¶ 15-16.) No supervision was to follow either sentence. (*Id.* at ¶¶ 15-16.) The Plaintiff was discharged from federal custody on February 25, 2020 (*Id.* at ¶ 18.)

Plaintiff was incarcerated from September 3, 2018, through February 25, 2020, for a total of 17 months and 22 days. As such, he still owed approximately six months on his minimum state sentence, and he owed more than two-and-a-half years on his maximum state sentence. The Department of Corrections and Community Services ("DOCCS") failed to file a timely detainer with the Bureau of Prisons ("BOP"). (*Id.* at ¶ 18.) On July 23, 2020, Judge Russo of Rockland County Court issued a Certificate of Conviction and Order of Commitment. (Declaration of Robert B. Weissman in Support of County Defendants' Motion to Dismiss ("Weissman Decl.") at Ex. M, ECF No. 72-13.) The Certificate committed Plaintiff into the custody of the Rockland County Sheriff's Department to serve the remainder of his state sentence. (*Id.*)

**\*2**  Following his release from Federal Custody, officials from DOCCS, the Rockland County Sheriff's Office, and Rockland County District Attorney's Office worked to re-arrest the Plaintiff as he still had outstanding time on his

NYS sentence. (*Id.* at ¶ 19.) Officers Lyons and Kralik were assigned to Plaintiff's case (*Id.* at ¶ 22.) Officers Lyons and Kralik sought a warrant from Judge Russo but were denied. (*Id.* at ¶ 23.) Plaintiff's Attorney was present to discuss the warrant and argue against its issuance. (*Id.* at ¶ 24.) Following the denial of the warrant, Plaintiff was not directed to surrender himself to the Rockland County Sheriff's Department to serve the rest of his state sentence. *Id.*

Officers Lyons and Kralik then physically and electronically surveilled the Plaintiff for 11 months. (*Id.* at ¶ 28.) This surveillance was joined by the Town of Newburgh Police Department and the FBI who worked to extract information from Plaintiff's social media and communications providers. (*Id.* at ¶ 29.) Plaintiff was arrested on June 21, 2021, by Officers Lyons Kralik, Colon, Kralik, VanCura, and Budnick. (*Id.* at ¶ 30.) Defendant Officers halted Plaintiff's vehicle, forcibly removed him, and "pushed [Plaintiff's] head against the car with significant force". (*Id.* at ¶ 32.)

Following his arrest, Defendant Officers Lyons and Kralik did not present Plaintiff before a sentencing court, which Plaintiff argues deprived him of his due process rights. (*Id.* at ¶¶ 33-34.) Following his arrest, Plaintiff was brought to Rockland County Jail. (*Id.* at ¶ 34.) After several weeks in Rockland County Jail, the Plaintiff was brought to the Downstate Correctional Facility in Dutchess County, New York without any new orders of re-commitment. (*Id.* at ¶¶ 37-38.) Plaintiff spent several months in custody of DOCCS and was released on May 11, 2022. (*Id.* at ¶ 39.)

On August 25, 2021, Plaintiff retained counsel. (*Id.* at ¶ 41.) Plaintiff's counsel filed a *Habeas* petition for his release from custody and to award him with credit he spent at liberty. (*Id.* at ¶ 41.) DOCCS released Plaintiff under supervised release to Officers Dierdre Ryan and Lynn Johnson-Richardson. (*Id.* at ¶ 42.) On November 10, 2021, Plaintiff's petition was rendered moot due to his release, but he was given 16 months credit for liberty against his Rockland County Sentence. (*Id.* at ¶ 44.) Plaintiff alleges that, although he informed Parole Officers Ryan and Johnson-Richardson about his awarded time credit, they continued to harass him on parole. (*Id.* at ¶ 46.) DOCCS moved to overturn Plaintiff's *Habeas* ruling which was denied. (*Id.* at ¶¶ 48-50.) In response, Plaintiff filed a federal *Habeas* petition challenging his continued detention. (*Id.* at ¶ 51.) DOCCS discharged Plaintiff's sentence before Plaintiff's federal petition could be heard. (*Id.* at ¶ 52.)

During Plaintiff's parole, he was unable to live with his romantic partner due to a conviction from over 20 years ago. (*Id.* at ¶ 56.) Parole Officers Ryan and Johnson-Richardson placed restrictions on Plaintiff's ability to drive, work, and attend commercial driving training. (*Id.* at ¶ 57.) Plaintiff was placed under mandated substance abuse counseling. (*Id.* at ¶ 57.) On May 11, 2022, Plaintiff's parole ceased, and Parole Officers Ryan and Johnson-Richardson were notified of Plaintiff's parole status. (*Id.* at ¶ 59.) Despite this, on May 18, 2022, Parole Officer Ryan entered Plaintiff's property, where she searched his residence, detained, and questioned him. (*Id.* at ¶ 60.) Officer Ryan never notified Plaintiff that his parole had ceased. (*Id.* at ¶ 61.) Plaintiff was formally notified of this termination weeks later. (*Id.* at ¶ 62.)

**B. Procedural History**

**\*3** Plaintiff filed this action on June 1, 2022. (ECF No. 3.) This Court granted Plaintiff leave to amend his pleadings twice. Plaintiff filed his First Amended Complaint on August 27, 2022. (ECF No. 23), and his Second Amended Complaint ("SAC") on October 11, 2022. (ECF No. 42.) On January 23, 2023, Defendants moved to dismiss Plaintiff's SAC. (ECF No. 70.) On September 25, 2023 the Court issued its opinion granting Defendants' motion. (ECF No. 88.)

On October 25, 2023, Plaintiff filed his TAC, alleging substantive and procedural due process violation against County Defendants. (ECF No. 89.) On March 31, 2024, Defendants filed their motion to dismiss the TAC. (ECF No. 108.) On the same day, Defendants filed a memorandum of law in support of their motion to dismiss. ("Defs.' MoL.") (ECF No. 109) as well as a reply memorandum of law ("Reply"). (ECF No. 111.) On March 31, 2024, Plaintiff filed a memorandum of law in opposition to Defendants' motion. ("Opp.") (ECF No. 112.)

## LEGAL STANDARDS

### A. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence," this Court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. Section 1983

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); see *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

To state a claim under Section 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. See *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y.

1999) (stating Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution.").

### C. Law of the Case Doctrine

**\*4** The law-of-the-case doctrine asserts that once "a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). Further, "when a court has ruled on an issue, that decision should generally be adhered to by the court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414, 425 (S.D.N.Y. 2014) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). Such compelling reasons include "major grounds justifying reconsideration [such as] intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (quoting *Doe v. New York City Dept. of Social Services*, 709 F.2d at 782, 789 (2d Cir. 1983)).

### DISCUSSION

Plaintiff brings the following claims:

(1) **Unreasonable Search and Seizure and Unreasonable Delay**, in violation of the Fourth, Fifth, and Fourteenth Amendments against Defendant Officers Seamus Lyons and Kerry Kralik in their official and individual capacities; and

(2) **Procedural Due Process Claim**, in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments against Defendant Officers Seamus Lyons, Mark Colon, Kerry Kralik, James VanCura, and Investigator Budnick in their official and individual capacities.

Defendants move to dismiss these claims on several grounds.

### I. Plaintiff's Dismissed Monell Claims

On September 25, 2023 the Court dismissed claims against Defendants in their official capacity with prejudice. The TAC reiterates these same claims against Defendants. Despite this, Plaintiff requests the Court, *sua sponte*, reconsider its finding.

Motions for reconsideration are governed by Local Civil Rule 6.3 and Fed. R. Civ. P. 60(b). The standard for granting a reconsideration motion is strict. *Shrader v. CSX Transp.*,

*Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Doe v. N.Y. City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983). The motion "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." *In re Optimal U.S. Litig.*, 886 F. Supp. 2d 298, 311-12 (S.D.N.Y. 2012). Reconsideration of a court's previous order is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (internal citation and quotation omitted), aff'd sub nom. *Tenney v. Credit Suisse First Boston Corp.*, Nos. 05 Civ. 3430, 05 Civ. 4759 & 05 Civ. 4760, 2006 WL 1423785, at *1 (2d Cir. 2006). Plaintiff has failed to demonstrate a legal basis for the Court to reconsider its prior ruling. Accordingly, the claims remain dismissed.

## II. Plaintiff's Substantive and Procedural Due Process Claims

### A. Defendant Officers Lyons and Kralik Are Responsible for Substantive Due Process Violations in their Individual Capacity

#### 1. Unlawful Search and Seizure

When a Plaintiff brings a Section 1983 claim "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Section 1983 claims for unreasonable search and seizure implicate the textual source of the Fourth Amendment. The Fourth Amendment protects "against unreasonable searches and seizures ... but upon probable cause." U.S. Const. amend. IV. In considering reasonableness, "a warrantless arrest by a law officer is reasonable ... where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The determination of "whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* Therefore, an officer has a defense against a Section 1983 claim against unreasonable search and seizure if their search was reasonable and justified

by probable cause. *See Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007)) (stating "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... whether the action is brought under state law or under § 1983.") (internal quotations omitted). Probable cause does not need to be considered in a vacuum of one officer's knowledge. An arrest is permissible "even if an arresting officer lacks personal knowledge sufficient to establish probable cause, so long as the officer acts as a result of communication with a ... [fellow] officer and the police as a whole were in possession of information sufficient to constitute probable cause to make the arrest.") *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 386 (E.D.N.Y. 2013) (citing *Annunziata v. City of New York*, 2008 WL 2229903, at *3 (S.D.N.Y. May 28, 2008)) (internal quotations omitted).

**\*5** Here, Plaintiff asserts in his TAC that Officers Lyons and Kralik surveilled him following their denial of a warrant request on September 14, 2020. (TAC at ¶ 61.) However, although no warrant was issued, the Defendants conducted their search of Plaintiff "with county sanction." (*Id.* at ¶ 78.) On this basis, Plaintiff alleges that Defendants violated his Fourth Amendment Rights. In response, Defendants argue that "[t]his is simply a reformulated false arrest claim," which the Court already found was meritless because probable cause existed for Plaintiff's arrest. (Defs.' MoL. at 11.) Defendant's contentions are persuasive. In its September 25, 2023 Opinion, the Court concluded that Officers Lyons and Kralik had probable cause to re-arrest the Plaintiff. (ECF No. 88 at 19-20.) On February 5, 2020, Judge Russo issued a Certificate of Conviction and an Order of Commitment against the Plaintiff. (Weissman Decl. at Ex. M, ECF No. 72-13.) Despite Judge Russo declining to extend a bench warrant to arrest the Plaintiff (TAC at ¶ 67), Judge Russo's Certificate of Conviction provided Defendants Lyons and Kralik with the authority to re-arrest the Plaintiff. Given that Officers Lyons and Kralik had knowledge of the Certificate of Conviction and of Plaintiff's remaining state sentence, there was probable cause to re-arrest the Plaintiff. For these reasons, and those cited in the September 25, 2023 Opinion, Plaintiff's Section 1983 claims for unreasonable search and seizure are dismissed with prejudice.

#### 2. Unreasonable Delay

A Plaintiff may bring a claim of unreasonable delay under the Fourth Amendment if the "individual can prove that his or her probable cause determination was delayed unreasonably." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). The standard for probable cause "is a practical,

nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotations omitted). Examples of a probable cause delay under the Fourth Amendment include "delays for the purposes of gathering additional evidence to justify the arrest, a delay motivated by ill will, or delay for delay's sake." *McLaughlin*, 500 U.S. at 56 (1991). The probable cause determination seeks to limit the government in warrantless arrests against officers who cannot give probable cause as to why the arrest occurred. *Id.* at 45. *See also U.S. v. Pabon*, 871 F.3d 164, 179-181 (2d Cir. 2017) (discussing unreasonable delay under the Fourth Amendment primarily pertains to delays following an arrest, not prior). Such claims of delay can be rendered moot when "they either received probable cause determinations or were released." *McLaughlin*, 500 U.S. at 52 (1991). In asserting the existence of such delays, the Plaintiff "bears the burden of proving the delay was unreasonable." *Case v. City of New York*, 233 F. Supp. 3d 372, 387 (S.D.N.Y. 2017).

Here, and as mentioned *supra*, this Court has concluded that there was probable cause to arrest Plaintiff following Judge Russo's Certificate of Conviction. The Fourth Amendment primarily protects against unreasonable delays *following* an arrest. In his TAC, the Plaintiff alleges delays *prior* to this arrest. Despite this difference, Judge Russo's certificate provided Defendant Officers Lyons and Kralik with the necessary probable cause in either instance. Accordingly, because (1) the Fourth Amendment's protection is confined to delays *following* an arrest, and not prior to an arrest, and (2) there was probable cause to arrest Plaintiff, the Court dismisses Plaintiff's unreasonable delay claim.

Under the Fifth Amendment, "delay prior to arrest or indictment may give rise to a due process claim." *U.S. v. MacDonald*, 456 U.S. 1, 7 (1982). A Plaintiff may successfully bring this claim [argument] if they could prove that the delay "caused substantial prejudice to [Plaintiff's] right[ ] to a fair trial and the delay was an intentional device to gain tactical advantage over the accused." *U.S. v. Marion*, 404 U.S. 307, 324 (1971). The determination of whether or not prejudice has occurred under due process "are fact-specific inquiries that will turn on the particular circumstances of a case." *U.S. v. Santiago*, 987 F. Supp. 2d 465, 489 (S.D.N.Y. 2013). But that "nonetheless, [under these inquiries] there is an indisputably high burden on [one] who argues that delay rises to the level of a due process violation." *Id.* Although the

protection of unreasonable delay under "due process [may] bar[ ] prosecution whenever a defendant suffers prejudice," it must be remembered, "that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid." *U.S. v. Lovasco*, 431 U.S. 783, 789 (1977). The prejudice must be of the nature that violates the basic principles of justice which lie at the base of our civil and political institutions, and which define the community's sense of justice and equity. *Id.* at 790 (internal citations omitted).

**\*6** Here, the Plaintiff has not alleged how his claim of unreasonable delay prejudiced his right to a fair trial, or whether the government engaged in some strategic unfair conduct against him. Under *Lovasco*, to be ripe for adjudication, there must be proof of actual prejudice. It is not enough to simply state Plaintiff suffered an unreasonable delay. Plaintiff asserts that Defendant Officers Lyons and Kralik attempted to receive a warrant following the Certificate of Conviction due to "doubts concerning its authoritative weight." (TAC at ¶ 67.) Following the denial of the warrant, Plaintiff maintains that Defendant Officers engaged in a prolonged surveillance operation against him and that this "delay remains undisclosed and inexplicable." (*Id.* at ¶¶ 68-69.) However, despite the gap between Plaintiff's release and re-arrest, "[t]here is no constitutional right to be arrested." *Hoffa v. U.S.*, 385 U.S. 293, 310 (1966). Plaintiff's TAC provides no factual assertion nor points to evidence of actual prejudice. Instead, Plaintiff offers the Court only conclusory statements concerning an inexplicable surveillance, which does not establish actual prejudice. In this district, courts have generally found "actual prejudice" to mean the "loss of documentary evidence or the unavailability of a key witness." *Santiago*, 987 F. Supp. 2d at 485. In *Santiago*, the defendant was accused of committing a shooting and one of the only witnesses present at the shooting who could offer testimony that undermined the Government's theory of the case went missing. *Id.* There, the court held that the loss of this key witness provided proof of actual prejudice. Similarly, in *United States v. Gross*, the Defendant was accused of making false statements in connection with a mortgage application. There, it was the loss of documents that contained substantial evidence about who made those false statements and when those statements were made that provided proof of actual prejudice. 165 F. Supp. 2d 372 (E.D.N.Y. 2001). No showing has been made to this Court that Plaintiff's alleged surveillance prejudiced him such that he could not receive a fair trial Accordingly, the Court dismisses with prejudice Plaintiff's Section 1983 claims for unreasonable delay. [2]

**B. Defendant Officers Lyons, Colon, Kralik, VanCura, and Investigating Officer Budnick Are Responsible for Plaintiff's Procedural Due Process Violations in Their Individual Capacity**

Plaintiff alleges Defendants violated his due process rights through his arrest, denial of hearings before a Court, and failure to provide Defendant counsel throughout his re-imprisonment. (TAC at ¶¶ 83-95.) In its September 25, 2023 Opinion, this Court previously dismissed this claim without prejudice because Plaintiff failed to plead personal involvement of Defendants. (ECF No. 88.) Accordingly, this Court now dismisses the Plaintiff's claim with prejudice.

The Due Process Clause provides freedom of bodily restraint and confinement as a guaranteed protection under the Constitution. *The Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972). As such, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). In order to bring a due process claim, "a plaintiff must plead that each Government-official defendant, through the defendant's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Under Section 1983, it is not enough to name the Defendant Officers, the Plaintiff must "plead and prove the elements of the underlying constitutional violation directly against the official[s]." *Tangreti v. Bachmann*, 983 F.3d 609, 620 (2d Cir. 2020). Further, a plaintiff cannot "lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct." *Eisenberg v. Cnty. of Westchester*, No. 21-CV-4507 (VB), 2022 WL 768311, at *2 (S.D.N.Y. Mar. 14, 2022) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)).

Plaintiff's TAC alleges Defendant Officers violated his due process rights. However, Plaintiff fails to allege each of their particular involvement in his constitutional deprivation. The TAC asserts "[t]he individually named County Defendant Officers (Lyons, Kralik, Colon, VanCura and Budnick) collectively caused the blatant disregard for Plaintiff's procedural due process rights." (TAC at ¶ 84.) The Plaintiff further states the officers initiated criminal proceedings against Plaintiff without probable cause, acted with malice in effecting the arrest, and left the Plaintiff without any procedural due process following his arrest. (TAC at ¶ 85.) First, it has been ruled that the County Defendants had probable cause to arrest the Plaintiff. (ECF No. 88 at 18.)

Second, on the issue of [for] malice in effectuating the arrest, the Court previously ruled that Defendants had probable cause to arrest Plaintiff. *Id.* Finally, the Plaintiff does not provide any factual basis in the TAC that details how these Officers were *directly involved* in his alleged deprivations to see a sentencing court upon his arrest, to be presented before the court following his transfer from Rockland County Jail, or his lack of legal counsel. "Without more, such vague, conclusory allegations do not satisfy the personal involvement standard." *Collins v. City U. of New York*, No. 21 CIV. 9544 (NRB), 2023 WL 1818547, at *6 (S.D.N.Y. Feb. 8, 2023). Such complaints that "essentially regurgitate[ ] the personal involvement standard, without offering any facts indicating that, or how, an individual in a supervisory role was personally involved in a constitutional violation, cannot withstand dismissal. *Id.* (quoting *Davis v. County of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005)).

**\*7** In conclusory fashion, Plaintiff alleges the County Defendants individually and collectively caused "blatant disregard for the Plaintiff's procedural due process rights" and the duty to present the Plaintiff before the court post-arrest "rested unequivocally" on their shoulders. (TAC at ¶¶ 84, 89.) Plaintiff fails to provide any factual reasoning as to why or how Defendant officers were responsible for his continued deprivation. (*Id.* at 3, 13.) For these reasons, the Court dismisses the Plaintiff's claims with prejudice.

**CONCLUSION**

For the above-mentioned reasons, the County Defendants' motion to dismiss is GRANTED. Plaintiff's claims of substantive due process violations for unreasonable search and seizure and unreasonable delay related to the first cause of action against Defendant Officers Lyons and Kralik are dismissed with prejudice. Plaintiff's claims of procedural due process violations related to the second cause of action against Defendant Officers Lyons, Kralik, Colon, VanCura, and Budnick are dismissed with prejudice. The Clerk of Court is directed to terminate Defendant Officers Lyons, Kralik, Colon, VanCura, and Budnick.

Plaintiff's claims of substantive due process for unrelated special conditions of parole and violations of freedom of association related to the third cause of action against Defendant Parole Officers Ryan and Johnson Richardson remain. Plaintiff's claims of substantive due process violations for unlawful search and seizure related to the fourth

cause of action against Defendant Parole Officer Diedre Ryan remain. Defendants Ryan and Richardson are directed to file an answer to the two remaining causes of action in the Third Amended Complaint by March 26, 2025, and the parties are directed to confer and file a Case Management Plan and Scheduling Order (blank form attached) by April 9, 2025.

Attachment

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Rev. Jan. 2012

Plaintiff(s),

- against -

Defendant(s).

_____ CV _____ (NSR)

### CIVIL CASE DISCOVERY PLAN
### AND SCHEDULING ORDER

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The

provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

   a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b. Depositions shall proceed concurrently.

   c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

**\*8** 10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York

_____

_____

Nelson S. Román, U.S. District Judge

**All Citations**

Slip Copy, 2025 WL 779278

---

## Footnotes

1    The Court issues this Amended Opinion & Order to add clarity to which claims remain and which claims have been dismissed. There have been no substantive changes to this Amended Opinion & Order from the Court's original Opinion & Order issued on March 5, 2025 beyond the specificity of dismissals in the Conclusion.

2    The Court refrains from ruling on the County Defendants' qualified immunity argument. Given Plaintiff's insufficient pleadings, the Court is unable to resolve the defense at this early stage in the proceedings. See *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020).

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 176 of 520

2023 WL 2382637
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,

v.

Suzanne KINTER, Lawrence Bedard, Robert
Webb, Thomas Perry, Eric Blaise, Kevin
Laurin, and Margaret Clancy, Defendants.

9:13-cv-00939 (BKS/ATB)
|
Signed March 6, 2023

**Attorneys and Law Firms**

For Plaintiff: William S. Nolan, Gabriella R. Levine, Jennifer
M. Thomas, Whiteman Osterman & Hanna LLP, One
Commerce Plaza, Albany, New York 12260.

For Defendants: April J. Laws, Johnson & Laws, LLC, 646
Plank Road, Suite 205, Clifton Park, New York 12065.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Chamma K. Brandon brings this action against
the above-named Defendants, employees of Clinton County
Jail ("CCJ"), under 42 U.S.C. § 1983, alleging that during
his 2012 incarceration, he was served meals containing
pork in violation of his Muslim diet and retaliated against
for filing grievances regarding his religious and medical
diets. (Dkt. No. 17). Plaintiff pressed two claims at trial:
(1) that Defendants Corrections Lieutenant Kevin Laurin,
Registered Nurse and Healthcare Coordinator Suzanne
Kinter, Corrections Sergeant Margaret Clancy, Food Service
Manager Lawrence Bedard, and Corrections Officers Robert
Webb and Thomas Perry violated Plaintiff's right to the free
exercise of religion under the First Amendment; and (2) that
Defendants Lt. Laurin, Nurse Kinter, Sgt. Clancy, Bedard,
and Corrections Officer Eric Blaise retaliated against Plaintiff
for filing meal-related grievances in violation of the First
Amendment. (*Id.*). The Court held a three-day bench trial at
which Plaintiff and all Defendants, except Margaret Clancy,[1]
testified.

After carefully considering the trial record, the credibility of
the witnesses, and the submissions of the parties,[2] the Court
finds Plaintiff proved by a preponderance of the evidence
that: (1) Lt. Laurin violated Plaintiff's First Amendment
right to the free exercise of religion; (2) Officers Webb
and Perry are entitled to qualified immunity; (3) Lt. Laurin
and Nurse Kinter retaliated against Plaintiff for engaging
in conduct protected by the First Amendment; and (4)
Plaintiff is entitled to compensatory damages, and punitive
damages are warranted. The Court further finds that Plaintiff
failed to prove by a preponderance of the evidence: (1) his
free exercise claims against Nurse Kinter, Sgt. Clancy, and
Bedard; and (2) his retaliation claims against Sgt. Clancy,
Officer Blaise, and Bedard. The following constitutes the
Court's findings of fact and conclusions of law.

**II. FINDINGS OF FACT**

**A. The Individual Defendants**

Lt. Laurin was a "Corrections Lieutenant at CCJ whose duties
included supervising corrections sergeants and the day-to-day
activities throughout CCJ, as well as overseeing the grievance
program at CCJ." (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)).
Nurse Kinter, a registered nurse, "was the Jail Healthcare
Coordinator whose duties included supervising Registered
Nurses at CCJ and overseeing the medical treatment of
inmates detained at CCJ." (*Id.* ¶ 3(a)(viii)). Sgt. Clancy
"was a Corrections Sergeant at CCJ whose duties included
supervising Corrections Officers [and] documenting reports,"
and assisting Lt. Laurin in overseeing the grievance program.
(*Id.* ¶ 3(a)(vii); Trial Transcript, at 70 ("T. 70")). Bedard
"was the Food Service Manager at CCJ whose duties included
supervising the cooks in the kitchen to make sure food was
provided in compliance with the menu, recipes, and special
diets that the inmates have on file with the kitchen." (Joint
Pre-Trial Stipulation, ¶ 3(a)(v)). Officers Webb, Perry, and
Blaise were "Corrections Officer[s] whose duties included
providing for the safety, security and order of the facility." (*Id.*
¶¶ 3(a)(ix–xi)).

**B. Religious and Medical Diets**

**\*2** CCJ is a 300-bed facility that housed approximately
210 inmates in 2012, the time period relevant to this
action. (T. 284). During the booking and intake process, the
booking officer documented each inmate's religion, if any,
for the purpose of ascertaining whether the inmate required
a religious diet. (T. 293). If so, the booking officer would
fill out a "Special Diet Notification" form for a religious

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 177 of 520

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

diet and "physically bring that [form] to the kitchen." (Dkt. No. 250, ¶ 12; T. 293–94, 446). A CCJ lieutenant, sergeant, and grievance coordinator were also authorized to fill out a Special Diet Notification form documenting an inmate's need for a religious diet. (Pl.'s Ex. 8; Defs.' Ex. 21; T. 343). [3] CCJ medical staff and facility nurses were responsible for approving medical diets and for notifying the kitchen of an inmate's need for a medical diet by sending a Diet Notification form specifying the medical diet to the kitchen. (T. 448). [4]

### C. CCJ Kitchen and Meal Service

Inmates at CCJ received all their meals on trays that the kitchen staff delivered to them in their housing units, or "pods." (T. 296–97). Unless the kitchen had been notified of a medical or religious diet, each inmate received a "regular" or "general population" meal. (T. 455). In addition to the general population diet, the CCJ kitchen prepared "approximately ten" special diets, including diabetic, lactose free, low fat/low cholesterol, low sodium, gluten-free, and "no-pork" or religious diets. (*Id.*). Each day, to ensure each inmate received "the proper meal in [the] right area," Bedard, as food service manager, reviewed the menu and the inmate housing report and prepared a list with each inmate's name, special diet, if any, and the inmate's pod. (T. 441–42). Bedard maintained inmate files and would place all special diet slips—religious or medical—in the inmate's file. (T. 293, 461).

Bedard, several cooks, and up to seven inmates worked in the kitchen. (T. 449). The cooks were responsible for making the meal designated by the menu that day—"whatever soup it is for the day, whatever sandwiches for that day," for example. (T. 443). There was a "food line" in the kitchen, which Bedard described as "a conveyer-type line where the trays are placed on the conveyer from one end to the other end as the food is being served." (T. 443). The cooks were responsible for placing the "main course" and other food items on the trays. (T. 444, 451). Bedard was "not always on [the] food line," but he would, at times, work on the food line serving small items such as condiments, fruit, or a package of cookies. (T. 451). The inmate workers also served on the food line, and one inmate worker was "at the very end to put the trays into the cart" for delivery to the designated pod. (T. 443). Prior to each meal, "sticky note tabs" were prepared for each inmate receiving a special diet. (T. 444). The sticky notes listed the inmate's name and type of diet and were first placed above the food line and then onto the meal tray before the tray was placed onto the cart for delivery. (T. 444 (Bedard testifying that if the inmate had a religious diet, for example,

that inmate's name and "no pork" would be on the tray's label)).

**\*3** Once the trays were placed onto the cart, a corrections officer and inmate worker would escort the cart to "particular pods." (T. 43). The corrections officer in the pod would alert the inmates that meals had arrived and divide the inmates into two lines—"regular gen pop" and "special diet persons"—to receive their trays. (T. 44). If an inmate complained that his meal did not comply with a special diet, the pod corrections officer could check the inmate's file, a copy of which was contained "at the podium" in the inmate's pod, to verify the diet. (T. 487–88). The corrections officer could also call the kitchen, or send the tray back to the kitchen where Bedard or a cook would inspect the tray and, if the tray was not right, replace the incorrect item or the entire meal. (T. 451, 487–88).

### D. Plaintiff

#### 1. Religious Background

Plaintiff, a born Muslim, grew up attending religious services with his father. (T. 35). The *Quran* prohibits Muslims from eating pork. (T. 38). Eating pork is "haram," "a sin," for which "you can be placed in hellfire." (T. 39); *see Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019) ("For Muslims who follow Islamic dietary laws, consuming pork is a sin at any time, regardless of whether the consumption occurs during a holiday or not" and "[t]he Quran expressly commands against it." (citing *Quran* 2:173)). The practice of Islam also prohibits the eating of pork products, or "anything associated" with pork. (T. 39). For this reason, not only is the handling of pork prohibited, but a plate of food containing pork and non-pork products is considered contaminated and inedible. (T. 39).

#### 2. Plaintiff Booked at CCJ - January 2012 and March 2012

Plaintiff was booked into CCJ twice during 2012. During all time periods relevant to this action, Plaintiff was a pretrial detainee. Plaintiff's first stay at CCJ was from January 14, 2012 until March 2, 2012. (Pl.'s Ex. 5; Defs.' Ex. 2; T. 42, 191). No religion is noted on Plaintiff's January 12 booking sheet. (Pl.'s Ex. 5; Defs.' Ex. 2). "On January 14, 2012, Plaintiff was issued a 'no shellfish diet' at CCJ." (Joint Pre-trial Stipulation, ¶ 3(a)(xii)). Plaintiff did not request religious, no-pork meals during this stay. (T. 41–42). If

Plaintiff received a meal with pork in it, he did not complain but he would not eat the meal, either. (T. 41–42). Some form of pork, i.e., sausage, ribs, salami, bologna, was featured on the menu for the general population diet two to four times each week. (T. 48–49, 72–73; Pl.'s Exs. 1, 2).

On March 2, 2012, Plaintiff was "released," though, for reasons that are not relevant here, he was never "physically" "released" from the facility, and he was, instead, arrested and booked into CCJ a second time. (T. 42, 191). Plaintiff's March 2 booking sheet lists his religion as Muslim. (Defs'. Ex. 3). However, the booking officer, who is a not a defendant in this case, did not bring a religious "no-pork" diet slip to the kitchen after Plaintiff's booking, or at any time thereafter. (T. 344, 371). Because Plaintiff identified as Muslim when he was rebooked on March 2, 2012, he should have had a religious diet slip forwarded to the kitchen as of March 2, 2012. (T. 370–71).

### 3. Plaintiff's Requests for Muslim Diet – March to August 2012

"On March 23, 2012, Plaintiff was issued a 'no tomato or tomato product diet,' " because he has severe acid reflux. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiii); T. 46). "On May 21, 2012, Plaintiff was issued a 'low fat, low cholesterol' diet" because he had high cholesterol. (Joint Pre-Trial Stipulation, ¶ 3(a)(xiv); T. 46).

In March, April, and May 2012, Plaintiff received meals with pork two to four times each week. (T. 49, 76–77). If Plaintiff received a meal tray with pork, he did not eat it; he would either give it away, throw it away, or trade with another inmate. (T. 75). If Plaintiff could not consume a food tray because it contained pork, and if he had "commissary," he "would eat commissary" though it "had nothing to really substitute" for a meal and "[i]t was just junk." (T. 75, 79). If he did not have commissary food, he "just wouldn't eat anything." (T. 75). As a result of missing meals, Plaintiff had headaches, fatigue, dizziness, and confusion, and was frustrated. (T. 79). Plaintiff experienced the "angst of knowing" that he was not going to eat. (*Id.*).

**\*4** In May 2012, Plaintiff began complaining to shift corrections officers, who knew he was Muslim and that he was "not supposed to get pork." (T. 78). One officer responded by suggesting that Plaintiff "write a medical," (*id.*), and told him that the medical ward "would address" his

religious dietary needs. (T. 80). On May 28, Plaintiff filed a grievance stating:

> I was denied my meal. I'm on a special diet and the cooks [sic] refused to make the proper accommodations to my diet. The housing unit officer told the trustee to obtain the proper special diet meal and that was to no avail. The housing unit officer called the kitchen in a further attempt to obtain my special diet me[al] and resulted in the cook's absolute refusal.

(Pl.'s Ex. 10). [5] Although it is not referenced in the grievance, Defendants acknowledge that on May 28, Plaintiff stated in writing to CCJ that he was Muslim. (Dkt. No. 250, ¶ 77; T. 202–03).

On June 21, Plaintiff submitted a "Sick Call Request" inquiring about a knee brace and requesting that a "no pork order" be sent to the kitchen and placed in his folder, explaining that he did "not eat pork yet [was] still being served pork during meals." (Pl.'s Ex. 11). Medical staff responded: "given knee brace." (*Id.*). Plaintiff received no response regarding his request for a no-pork diet and continued to receive meals with pork. (T. 82).

On or about July 4, Plaintiff sent another Sick Call Request. (Pl.'s Ex. 12). In it, Plaintiff stated that his inmate folder reflects that he is to have "no fish or shellfish" due to "allergy" and requests that the "kitchen" be notified. (*Id.*). Although the remainder of the request is largely illegible, it appears to seek a no-pork product diet. (*Id.*). The response, from a nurse who is a not a defendant in this case, stated: "Done—for no fish/ shellfish. Need to ask security staff to submit diet slip for pork. Medical does not do religious diets." (*Id.*). When Plaintiff received this response, he showed it to a security officer who said: "we don't do that. We don't do religious diets, that's a medical thing." (T. 83).

On July 6, Plaintiff submitted a third Sick Call Request. (Pl.'s Ex. 13). He wrote: "I've made several attempts to have my meals altered to a no pork or pork products diet. I'm a Muslim and do not consume anything associated with pork. I told the 'Security Staff' [illegible] they directed me to consult medical about this matter. Please make the proper adjustment

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 179 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

to my diet." (*Id.*). On July 9, Nurse Kinter responded: "You will have to speak with jail Sgt. or Lt." (*Id.*). Nurse Kinter explained at trial that she referred Plaintiff to the jail sergeant or lieutenant because she had always been told by "security ... all the way up to the major," that "nurses were not allowed to do religious diets." (T. 389). Plaintiff continued to receive meals with pork in July, August, and September 2012. (T. 86–87). [6]

### 4. Plaintiff's Muslim Diet Grievances and Lt. Laurin's Involvement – September 2012

**\*5** On September 15, 2012, Plaintiff filed a grievance complaining that he was being given trays with food he could not eat due to his medical conditions and that were inconsistent with his "various restrictive diets." (Pl.'s Ex. 14). He further stated that "this is one of several grievances I've made but to no avail." (*Id.*). Plaintiff sought a:

> complete overhaul of the kitchen staff. This is one of many complaints which seems to go unresponded. I've been here for more than 9 mths [sic] and at least 1 time per week there has been a problem with my meals. I've filed several grievances, made countless complaints to shift officers. Still this problem still reoccurs.

(*Id.*). The grievance's "Summary of facility staff attempts to resolve" stated: "Sent tray back to kitchen. Talked with kitchen staff." (*Id.*) The staff individual, who is not a defendant here "stated that everything on inmate Brandon's tray coinsided [sic] with inmate Brandon's diet. The tray was sent back down to D-Pod and Inmate Brandon took the tray and asked for a grievance." (*Id.*).

On September 24, Plaintiff filed a grievance stating that he "can not/do[es] not eat pork or any pork products nor tomatoes" but that he was served a BLT for lunch and that when he "instructed the server to produce another tray," the server later "returned with the same tray stating the kitchen will not accommodate." (Pl.'s Ex. 15). As to the "[a]ction requested," Plaintiff wrote that "stating some sort of action to be conducted seems useless" because he had been in

CCJ "for 250+ days and continuously receive[d] food" he could not eat. (*Id.*). The grievance's "Summary of facility staff attempts to resolve" stated: "called the nurse to see what the inmate 'Brandon' couldn't eat and she stated he is on a low fat low sodium diet and that the inmate is allergic to tomatos [sic]." (*Id.*). Plaintiff did not receive a replacement for the September 24 lunch. (T. 93). Later that day, Plaintiff filed a second grievance: "Again, I'm being denied a dinner (meal). I do not/can not eat pork or pork products or tomatoes. For dinner I was served a salad which had tomatoes & bacon strips.... The officer instructed the server to make accommodations & the server returned with the same tray after picking out the tomatoes." (Pl.'s Ex. 16). Under "Action requested by the grievant," Plaintiff wrote: "I've made countless grievances to what seems to be a useless process. I've went many times without having a meal because of the kitchen's seemingly inability to make simple food accommodations." (Pl.'s Ex. 16). The grievance's "Summary of facility staff attempts to resolve" stated: "I called the nurse to see what the inmate can't have and she stated no tomatoes or low fat low salt items." (*Id.*).

On or about September 26, 2012, Sgt. Clancy, who had been handling Plaintiff's grievances, went to Lt. Laurin with a concern about the number of grievances Plaintiff had submitted about meals. (T. 302, 306–07 (Lt. Laurin testifying that he received Plaintiff's grievance on September 26 and that he began to investigate on September 26 or 27)). Sgt. Clancy "had tried to explain [to Plaintiff] that the meals that [Plaintiff] was receiving were his meals." (T. 302). When Lt. Laurin and Sgt. Clancy investigated, they found Plaintiff had a medical diet in place—low fat, low sodium, no fish, no shellfish, no tomatoes, and no tomato products. (*Id.*). Sgt. Clancy also told Lt. Laurin that Plaintiff was stating that "he wasn't getting his Muslim no pork, no pork products diet." (T. 303). Lt. Laurin "dismissed Sergeant Clancy from doing the grievances" and took them over himself because there was "a problem and [he] needed to find out where the problem was" and see if he "could cure it." (T. 304). On either September 26 or 27, 2012, Lt. Laurin "went down physically" to the kitchen and he and Bedard went through Plaintiff's file together. (T. 305–06). Lt. Laurin explained that "[t]he paper that normally has religious diets that are generated by security staff is a little bit smaller" and he "wanted to make sure that it wasn't being missed." (*Id.*). They "did not find a religious slip" in Plaintiff's file. (*Id.*).

**\*6** Lt. Laurin testified that on either September 9 or 27, he *verbally* notified the kitchen that Plaintiff was to be on a "no

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 180 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

pork or no products" diet. (T. 307, 333–34). The Court does not credit this testimony. Lt. Laurin could not recall who he told about Plaintiff's diet. (T. 307 (Lt. Laurin testifying that he "would have to go to Bedard" but that he did not "know exactly" who he talked to, only that he "talked to somebody down in the kitchen")). Nor could Lt. Laurin accurately state on what date he told the kitchen of Plaintiff's no pork diet, (compare id. (Lt. Laurin testifying that he notified the kitchen on September 26 or 27); with T. 333–34 (Lt. Laurin testifying that he verbally notified the kitchen on September 9)). [7] Indeed, Lt. Laurin's representations regarding when the kitchen was notified—verbally or in writing—of Plaintiff's religious diet have varied greatly in this case. For example, at trial, Lt. Laurin acknowledged that he previously filed an affidavit in this matter, in support of Defendants' motion for summary judgment, that stated: "due to plaintiff's March 2012 declaration that he was a Muslim, plaintiff did have a notification placed in his file that provided him a diet with no pork or no pork products." (T. 372 (citing Pl.'s Ex. 67 (marked for identification))); see infra Section II.D.6. Lt. Laurin further acknowledged that, in that affidavit, he referred to "Exhibit A," a copy of the Special Diet Notification form that the Court has found was not actually given to the kitchen until October 5, 2012. See infra Section II.D.6. The Special Diet Notification form that Lt. Laurin cited in his affidavit is in all respects identical to the Special Diet Notification form that was given to the kitchen on October 5, 2012 except that the date ("10/5/12") is missing. [8] (T. 374–75). Moreover, not only was Lt. Laurin's testimony regarding a verbal notification to the kitchen not credible, but Bedard [9] testified that no one at CCJ told him that Plaintiff should not be served pork or pork products, (T. 469), stated that it was not the general practice for anyone at CCJ to tell him orally about an inmate's medical or religious restrictions, (T. 468), and that he received Plaintiff's religious diet notification on a form, (T. 470).

 **7** On or around September 27, Lt. Laurin went to Plaintiff's housing unit to discuss what was "going on, in terms of" Plaintiff's "religious diet." (T. 91, 97, 304). Lt. Laurin told Plaintiff he was aware Plaintiff is Muslim and that Plaintiff was receiving pork meals and acknowledged "it's wrong, but he said he's going to help." (T. 91). Lt. Laurin told Plaintiff he was "going to look into it and to address these matters." (T. 91–92).

On September 27, Lt. Laurin, as grievance coordinator, issued decisions regarding Plaintiff's September 15 and two September 24 grievances. (Pl.'s Exs. 14, 15, 16). As to the

September 15 grievance, Lt. Laurin wrote: "Kitchen has been informed as of 9/27/2012 that you are low fat, low cholesterol, no tomatoes or tomatoe [sic] products, no fish or shellfish. They did not have that you were Muslim. You will get no pork or pork products." (Pl.'s Ex. 14). As to the first September 24 grievance, Lt. Laurin wrote: "As of 9/27/12 the kitchen was reviewed [sic] of your diet. Lowfat/ low cholesterol, no tomatoes or tomatoe [sic] products, no shellfish or fish and that you are Muslim. Kitchen stated that the bacon is veggie bacon. We will furnish you with a copy of the ingredients." (Pl.'s Ex. 15). As to the second September 24 grievance, Lt. Laurin wrote: "Kitchen is aware of your diet. Bacon is veggie bacon. A copy of the ingredients will be provided to you. I have advised the kitchen that if you get a wrong meal that the whole meal will be redone." (Pl.'s Ex. 16). Plaintiff never received a copy of ingredients listing "veggie bacon" and did not recall ever seeing "veggie bacon" on the menu at CCJ. (T. 94).

On September 29, after issuing the above-referenced decisions, Lt. Laurin further investigated Plaintiff's September 15 and 24 grievances. (Pl.'s Exs. 14, 15, 16 ("Grievance Investigation Form")). Lt. Laurin interviewed Plaintiff, Nurse Kinter, and Bedard. (Pl.'s Exs. 14, 15, 16). In his "Summary of findings," Lt. Laurin wrote: "Inmate Brandon's diets have been documented by medical and a copy of Brandon's special deit [sic] was given to the kitchen staff. Kitchen had not been notified he was Muslim. Kitchen staff has been advised to correct the diet." (Pl.'s Exs. 14, 15, 16). Under "List other relevant information/documentation," Lt. Laurin wrote: "A copy of special diets. Has been buying items in the commissary that he should not have with his diet." (Pl.'s Exs. 14, 15, 16).

### 5. Plaintiff's Medical Diet Grievances – October 1–3, 2012

Plaintiff filed two grievances on October 1, 2012. In the first, Plaintiff wrote that he was "served a sandwich which had tomatoes in it." (Pl.'s Ex. 26). He explained that because of his "medical conditions, he cannot consume any tomatoes/ tomatoes products." (Id.). In the second October 1 grievance, Plaintiff complained that he was "being denied a lunch tray" that complied with his medical special diet. (Pl.'s Ex. 27). Under "Summary of facility staff attempts to resolve" an officer wrote: "called kitchen – spoke with kitchen boss Bedard – new sandwich was being made ... brought down to inmate." (Id.). Lt. Laurin subsequently wrote: "Had a meeting

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 181 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

with the kitchen cook manager and explained no more mistakes if there are mistakes they are to be corrected." (*Id.*).

On October 3, Plaintiff filed a grievance stating that he "cannot eat/consume tomato or tomato products due to my medical conditions which was cleared by medical staff. I was served tomato soup in my lunch tray. Having been served tomato soup denies me a meal." (Pl.'s Ex. 28). The grievance's "Summary of facility staff attempts to resolve" stated that: "the tomato alternative soup was the 3 bean salad in a separate bowl on the meal tray. According to the kitchen all contents of tray was compliant to the diets prescribed to inmate Brandon by medical." (*Id.*). [10]

### 6. Special Diet Notification Form for Religious Diet Filed with Kitchen – October 5, 2012

**\*8** On October 5, 2012, Lt. Laurin "went down to booking, filled out the [religious meal] slip [him]self, put the date on it, brought it down to the kitchen and had them put it right directly in [Plaintiff's] file and mark him as a Muslim, no pork/ no pork products." (T. 306; Pl.'s Ex. 8) Lt. Laurin circled the section of the form for a "Religious" diet and wrote "Muslim no pork or pork products"; he signed the from and dated it "10/5/12." (Pl.'s Ex. 8); *see* Figure 1.

Figure 1: Defendants' Exhibit 21 – Dated Special Diet Notification Form



Lt. Laurin testified that he did not know why he did not provide the "religious slip" earlier and instead waited until October 5. (T. 306). The Court finds that the kitchen was first notified about Plaintiff's religious diet on October 5, 2012, in this Special Diet Notification form. The Court further finds that from September 26 to October 5, Plaintiff continued to be served pork meals and received approximately six pork meals during that week-and-a-half time period. (Pl.'s Exs. 1, 2 (CCJ menus showing pork served two to four times weekly)).

### 7. Meal-Related Grievances – October 9–15, 2012

On October 9, 2012, Plaintiff filed a grievance regarding a meal he received in September:

> I've been served & have consume[d] food items I'm not suppose to consume due to religious beliefs. Through discussion on today's lunch trey [sic] with the shift officer "Coocher" about it containing a ham sandwich. The officer stated it is not ham it is turkey & continued to state, the only pork product served to inmates is the ham steak. He was told it contains pork from the kitchen staff. On September 9th, I was served ham steak for dinner. When I presented it to the shift officer he told me it was made of turkey and no pork/pork [products] ... were included in the ham steak. He continued to state the kitchen doesn't use any

Case 1:25-cv-00968-ECC-ML   Document 54   Filed 11/26/25   Page 182 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

pork products specifically because of the variety of inmates having religious constraints against pork/pork products.

I need someone to get to the bottom of this. 2 different officers making 2 contrary statements.

(Pl.'s Ex. 18). Under "Summary of facility staff attempts to resolve" is written:

> I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that inmate Brandon was a no pork diet. So it is very likely that inmate Brandon recieved [sic] pork on Sept. 9. She also stated that inmate Brandon will no longer receive [sic] pork due to the fact that they now have documentation.

(*Id.*).

On October 10, at approximately 4:30 p.m., Plaintiff filed a grievance stating that he was "served a chef salad with strips of ham." (Pl.'s Ex. 20; Defs.' Ex. 9). The grievance's "Summary of facility staff attempts to resolve" states the corrections officer had the tray returned to the kitchen for replacement. (Pl.'s Ex. 20; Defs.' Ex. 9). Fifteen minutes later, at approximately 4:35 p.m., Plaintiff filed a second grievance stating that instead of replacing the tray in its entirety, the kitchen removed the strips of ham and sent back the same tray. (Pl.'s Ex. 19; Defs.' Ex. 8; Pl.'s Ex. 20; Defs.' Ex. 9). The second grievance's "Summary of facility staff attempts to resolve" states that "Sgt. Gregory" "went [to] the kitchen staff to discuss the tray and that no pork products were to be placed on or near the meal. The cook informed Sgt. Gregory the meat was turkey ham and a replacement tray would not be made." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin investigated these grievances and falsely responded: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin further stated that "the ham you receive is turkey ham sliced or cubed. Your Muslim diet is being served correct. I have included the ingredient label to you." (Pl.'s Ex. 19; Defs.' Ex. 8). Lt. Laurin made a copy of the turkey ham label to show Plaintiff "that it wasn't a pork product, even though it looks like pork." (T. 318; Defs.' Ex. 1).

**\*9** On October 11, Plaintiff filed a grievance seeking copies of his food grievances. [11] (Pl.'s Ex. 34). Lt. Laurin's response stated: "The foil request I have given you should give you the information you are requesting." (*Id.*). In a decision dated October 25, Lt. Laurin stated that it "has always been the practice of the facility to charge 25 cents for any requested copies" and that Plaintiff would receive a copy of his grievances "at no charge when the grievance is accepted or is appealed." (*Id.*).

On October 14, Plaintiff submitted a second grievance seeking copies of past food grievances. (Pl.'s Ex. 35). On October 15, Plaintiff filed two grievances. [12] (Pl.'s Exs. 36, 38). One of the grievances sought copies of past food grievances [13] and the other complained that the peanut butter that was served with his breakfast was "high on cholesterol" and asserted that he needed his "restrictive diets to be followed." (Pl.'s Exs. 36, 38).

### 8. Medical Diets Revoked – October 15–16, 2012

Lt. Laurin had noted during his September 29 investigation into Plaintiff's grievances that Plaintiff had "been buying items in commissary that he should not have with his diet." (Pl.'s Exs. 14, 15, 16). "[E]arly in October," after receiving "an awful lot of grievances from [Plaintiff] that just wouldn't even slow down," Lt. Laurin requested Plaintiff's commissary receipts. (T. 326–27 (explaining that the grievances "were just one right after another, so we have an issue"); *see also* Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Lt. Laurin testified that his purpose in requesting the receipts was "to look over the items [Plaintiff] was purchasing and to see if it was complying with his diet." (T. 327). Upon reviewing Plaintiff's commissary slips, Lt. Laurin noted that "[t]here was some items that [he] felt were contradictory to [Plaintiff's] low sodium/low fat diet," (*id.*), including "[r]amen [chili] soup," which contained tomato products; "squeeze cheese;" "mac and cheese;" and "nutty buddy bars." (T. 211, 327).

On October 15, Lt. Laurin went to Plaintiff's pod to speak with Plaintiff about his "various grievances" and commissary purchases. (T. 113–14, 328). Lt. Laurin "started ... yelling" and asked Plaintiff "to explain" his commissary purchases —Lt. Laurin asked Plaintiff what the "sense" was of Lt. Laurin and other CCJ officials "putting in all this effort" to respond to "all [Plaintiff's] grievances" if Plaintiff was

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 183 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

"turning around and purchasing" "oatmeal cream pies and nutty bars in commissary?" (T. 113–14, 328–29). Plaintiff responded that "sometimes I don't eat anything since I'm not fed anything, so I have to eat something." (T. 115). Lt. Laurin testified that he understood from their discussion of the commissary receipts that Plaintiff had "traded or bartered" commissary items; although Lt. Laurin acknowledged that Plaintiff did not expressly say so. (T. 328–29). Lt. Laurin testified that if Plaintiff had admitted this he would have been "written up" for violating CCJ rules. (*Id.*). Plaintiff had never been questioned about his commissary purchases before. (T. 115).

**\*10** After speaking with Plaintiff, Lt. Laurin went to Nurse Kinter to show her the commissary receipts. (T. 329). Lt. Laurin wanted Nurse Kinter "to be aware that [Plaintiff] was purchasing these items and they weren't compliant with his low fat/low sodium diet." (*Id.*). Lt. Laurin explained that his job was "just to make" Nurse Kinter "aware" of the items Plaintiff had been purchasing, and that he had "done this before in the past" with other inmates. (*Id.*). When asked for examples, Lt. Laurin responded: diabetics, individuals who they had "to put ... on a low sodium diet because they start retaining fluids," and "pregnant females," in an effort "to keep them on a good healthy diet." (T. 330). However, Lt. Laurin acknowledged on cross-examination that CCJ would not revoke a diabetic or pregnant inmate's medical diet based on a review of commissary purchases. (T. 357–58).

The following morning, October 16, Plaintiff "was called to go to sick call." (T. 115). [14] Plaintiff was escorted to the medical ward, where he was seen by Nurse Kinter and Dr. Glen Schroyer, who is not a defendant in this case. (T. 116–17). Nurse Kinter told Plaintiff that they were "taking [Plaintiff's] ... medical – – the dietary restrictions away" because Plaintiff was "not being compliant with [his] diet." (T. 118). Plaintiff "immediately" objected and began asking Dr. Schroyer why Nurse Kinter was "making these statements" and "how" he was "allowing this?" (*Id.*). Dr. Shroyer "didn't say anything" and "shrugged his shoulders." (*Id.*). Regarding the commissary purchases, Plaintiff told Nurse Kinter that "due to the past instances and continuous neglect of my dietary restrictions from the kitchen I never know whether or not I'll receive a meal let alone a meal I can eat." (Pl.'s Ex. 40). Plaintiff then said that if they removed his medical diets he was "not going to just eat anything" and that he could not eat a regular diet and that he was "going to write grievances." (T. 118–19).

Nurse Kinter testified that there were no medical concerns about removing Plaintiff's low fat/low cholesterol diet because "his labs had improved at the time when he was here at the jail" and as it "look[ed] like he wasn't being compliant with his meals ... we had no concern with Mr. Brandon's diet at that time." (T. 437). The "coronary risk evaluation" labs in the record, however, do not support this testimony. (Pl.'s Ex. 66). For example, Plaintiff's cholesterol was 255 (high) in May 2012, 259 (high) in August 2012, and 249 (high) on October 3, 2012. (*Id.*). The other lab results—HDL, LDL, and triglycerides—showed similarly minor fluctuations and all remained flagged as high or low. (*Id.*). Nurse Kinter was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can become ill if they eat foods with high acidity, like tomatoes, but had "[n]o concerns" about that. (T. 419–20, 440). After reviewing Plaintiff's commissary purchases, and finding that he "was buying everything that was against his medical diet," Nurse Kinter "did a new diet slip to start the regular diet, no fish, no shellfish diet," and she "sent it back down to the kitchen, and then that notification went into the doctor's folder." (T. 393). The "Diet Notification" Nurse Kinter sent to the kitchen is dated October 16, and directed the kitchen to "Cancel all previous slips" and place Plaintiff on the "Reg Diet" but "No Shellfish." (Pl.'s Ex. 41).

The same day, October 16, Plaintiff filed a grievance regarding Nurse Kinter's removal of his medical diet. (Pl.'s Exs. 39, 40). Lt. Laurin denied the grievance. (Pl.'s Ex. 40).

On October 17, 2012, Plaintiff submitted two Sick Call Requests. (Pl.'s Ex. 42; Defs.' Ex. 20). The first stated: "I do not eat tomatoes. Tomatoes causes me extreme acid reflux ... yet I was served a dinner of pasta & tomato sauce. The restriction was taken out of my file." (Pl.'s Ex. 42). Plaintiff requested that the restriction be reinstated. (*Id.*). On October 18, Nurse Kinter responded: "This was discussed at visit with M.D. You decided not to follow doctor's recommendations!" (*Id.*). The second Sick Call Request stated that Plaintiff does not eat pork, he is Muslim, he has raised this issue on several occasions, and that his diet was "recently" changed under Nurse Kinter's "directive" and he "need[s] his religious diet reinstated." (Defs.' Ex. 20). Nurse Kinter investigated Plaintiff's request and on October 18, responded: "Your religious diet is still in effect. I checked with kitchen. I don't do anything with religion." (*Id.*; T. 414).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 184 of 520

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

### 9. Served Pork Meal – October 17, 2012

**\*11** On October 17, Plaintiff received a pasta salad. (T. 136). It was labeled "meatless" or "vegetarian" but when Plaintiff "began to ... dig in," he discovered the salad had pork in it. (*Id.*). When Plaintiff compared his tray to that of another Muslim inmate he found his salad was different. (T. 137). When Plaintiff compared his tray to "the general population" trays, he found they were identical. (*Id.*). Plaintiff reported the tray to the officer on duty. (*Id.*). Plaintiff submitted a grievance on October 17 reporting that he had been served a "ham salad" despite having a Special Diet Notification in his inmate file. (Pl.'s Ex. 22). On the grievance, Sgt. Clancy wrote: "I replaced the meal and was given a non-pork meal. And as for the meal slip a new one was placed in file and kitchen was notified." [15] (*Id.*). Plaintiff checked the line next to "I do not accept this resolution and wish to file a formal grievance." (*Id.*). Under "Decision of the Grievance Coordinator," Sgt. Clancy wrote: "Spoke with kitchen @ 1835 [6:35 p.m.]. Was shown file that shows inmate Brandon no shellfish; No pork. Returned and spoke with inmate. Inmate Brandon refuses to accept @ 1844 [6:44 p.m.]." (*Id.*). The next day, Sgt. Clancy told Plaintiff she had investigated the matter and that "the staff chef had made a mistake," and had "put the pork meal on [Plaintiff's] tray instead of the non-pork meal." (T. 141–42; Pl.'s Ex. 22). When Plaintiff asked Sgt. Clancy if she would document that, Sgt. Clancy said "no," and that she was "going to leave it as she had it." (T. 143). Plaintiff testified that as Sgt. Clancy walked away from him, she said to Officer Blaise: "if he grieves another tray, she's going to lock" Plaintiff up. (*Id.*). [16] Lt. Laurin ultimately denied the grievance by attaching, without explanation, his October 12 investigation, which occurred five days before the incident at issue in the October 17 grievance. (Pl.'s Ex. 22).

### 10. Medical Diet Grievances – October 19–27, 2012

On October 19, 2012, Plaintiff submitted three grievances: the first stated that he had received a tray with "hot cereal & buttery toast," which did not comply with his "restrictive diet" for his "high cholesterol condition," (Pl.'s Ex. 43), the second stated that he was served tomato soup for lunch, which causes him "severe ...acid reflux," (Pl.'s Ex. 44), and the third stated that he had been served a salad with tomatoes for dinner, which causes him "severe ...acid reflux," (Pl.'s Ex. 45). Plaintiff filed similar grievances on October 20, 22, 24,

25, 27, 28, 29, 30, 31, and November 1. (Pl.'s Exs. 45–55). On November 2, after investigating, Lt. Laurin issued a decision denying Plaintiff's grievances, noting that "[t]he jails [sic] Health Coordinator and the Jail Physician has [sic] eliminated your diets consisting of low fat, low cholesterol, no fish and no tomatoes or tomato products" because the commissary items Plaintiff had purchased were not compliant "with the Physicians [sic] recommendations." (Pl.'s Ex. 56). Lt. Laurin noted that the "no shell fish" and "religious restrictions for Muslims" were intact. (*Id.*). Plaintiff filed additional grievances regarding his medical diet on November 2, 4, and 9. (Pl.'s Exs. 57, 58, 59).

By October 26, Lt. Laurin had received "several grievances" from Plaintiff, and he spoke with "medical and asked them if there was something we could do." (T. 335–36). Lt. Laurin's "focus was totally on answering his grievances and seeing if we couldn't get some kind of resolution." (T. 336). Lt. Laurin explained that resolving Plaintiff's grievances had "turned into a full-time job" and "was a little overwhelming." (*Id.*). Lt. Laurin estimated that Plaintiff had filed eighteen grievances. (*Id.*). Lt. Laurin also discussed with Nurse Kinter whether there was "something we could do to get [Plaintiff] back on his diet because we needed to come to a conclusion of all this"—meaning that they "needed to make all parties happy." (T. 336–37). [17]

### 11. Served Pork Meal – Late October 2012

The following week, in late October, Plaintiff received a meal with "a label of vegetarian bean soup" that appeared to be "compliant." (T. 152). However, as Plaintiff started to eat, he noticed "small bits of ham chunks swimming in" the soup. (*Id.*). Plaintiff looked around and noticed that the others who received "non-pork meal[s]," had different meals than Plaintiff but that his was the same as "the general population meals." (T. 152). Plaintiff reported the meal to the officer on duty. (*Id.*). The officer "did his own investigation" by comparing Plaintiff's meal to the meals of the other inmates and concluded, like Plaintiff, that although Plaintiff's soup was labeled "vegetarian soup" it was ham soup. (T. 153). The officer "contacted the kitchen." (*Id.*). The officer reported that "Chef Bedard said that he mistakenly used the same ladle spoon to serve [his] tray with another tray," so he "mixed" up the soup on Plaintiff's tray. (T. 153–54). Plaintiff received a replacement meal. (*Id.*). As a result, Plaintiff "started combing through" his meals. (*Id.*).

### 12. Served Pork Meal – November 2012

**\*12**  In November 2012, Plaintiff received a meal with a pasta salad labeled "meatless salad" that contained pepperoni. (T. 155). Plaintiff "immediately" brought the pepperoni to the attention of Officer Webb, who was the corrections officer on duty. (T. 156). Plaintiff told Officer Webb that he did not eat pork and about "the last two instances when [he] received a meal that appeared to have a label that was compliant with [his] religious diet, but the meal itself wasn't," and said, "this happened again and this is pepperoni. (*Id.*). Officer Webb, without looking at the tray, immediately said "oh, that's turkey pepperoni." (*Id.*). Plaintiff explained that it was "pork pepperoni" and "went on to say" that even if it was "turkey," not only would everyone have received it, but it was not "meatless" and the salad was labeled "meatless salad." (T. 155, 157). Plaintiff asked Officer Webb to "[c]ontact the kitchen and just confirm," "[i]f it's turkey, then its turkey. If it's not, then ... [he] would like a replacement of some sort." (T. 157). Officer Webb said he would call. (*Id.*).

After twenty minutes "went by," Plaintiff approached Officer Webb, who was on the phone." (*Id.*). Officer Webb said "oh, so its turkey—turkey pepperoni." (*Id.*). "And then he told [Plaintiff] that he spoke to somebody in the kitchen and he confirmed that it was turkey pepperoni." (*Id.*). When Plaintiff asked who Officer Webb spoke to, Officer Webb said something to the effect that he was not going to tell Plaintiff who it was. (T. 158). Plaintiff stated that he wanted a name because he wanted to submit a grievance. (*Id.*). Officer Webb replied that if Plaintiff grieved the meal, he would not get a replacement meal. (*Id.*). Plaintiff did not receive a replacement meal and there is no evidence that Plaintiff filed a grievance. (T. 159). Defendants did not present any evidence that the kitchen served turkey pepperoni. The Court finds that the pepperoni served to Plaintiff that day contained pork and, crediting Plaintiff's testimony, finds that Officer Webb did not call the kitchen to check whether the pepperoni in the salad was turkey pepperoni.

### 13. Medical Diet Reinstated – November 15–21, 2012

On November 15, Plaintiff submitted a "Sick Call Request" seeking to speak with Nurse Kinter about the removal of his restrictive diets "because of a non-compliance of my diet she said I committed through my commissary purchases." (Pl.'s Ex. 60). Plaintiff requested guidance

regarding appropriate commissary purchases "that won't be deemed as non-compliant so" that his restrictive diets can be "reinstated." (*Id.*). Plaintiff asked if Nurse Kinter "could talk to him about his commissary purchases," and she did. (T. 394). Together, they "went through the commissary options to see what would be better options of what to buy." (T. 394–95). Nurse Kinter crossed off items from the commissary list "that were not recommended for him to purchase." (T. 401). On November 21, Nurse Kinter restored Plaintiff's diets and noted that Plaintiff could "purchase items from commissary that are highlighted." (Pl.'s Ex. 60).

### 14. Assaulted by Another Inmate – November 17–18, 2012

On or about November 17, Plaintiff saw Sgt. Clancy and Officer Blaise in an observation housing unit where Plaintiff was confined. (T. 145). They were "escorting" another inmate, "Tiny," "into the cell next to" Plaintiff. (*Id.*). Plaintiff knew Tiny "had a reputation ... for attacking other inmates," for throwing things at other inmates, including feces and urine, and for spitting. (T. 145–46). As Sgt. Clancy and Officer Blaise were moving Tiny into his cell, Plaintiff heard Tiny and Sgt. Clancy arguing and then heard Sgt. Clancy say, "let's see if he tries this shit on Brandon." (T. 146). Plaintiff testified that after Sgt. Clancy and Officer Blaise left, Tiny began making "racial remarks" to Plaintiff, and that the two of them argued during the night. (T. 147). When Officer Blaise returned the next day during mealtime, Officer Blaise asked Plaintiff to assist in carrying food trays. (T. 148). Plaintiff agreed and began carrying trays. (T. 149). As Plaintiff stood up from his work in front of Tiny's cell, Tiny spit in his face. (*Id.*). Officer Blaise issued an incident report regarding Tiny's conduct. (Defs.' Ex. 23).

### 15. Served Pork Meal – December 25, 2012

**\*13**  On December 25, there were two issues with Plaintiff's meals. (T. 494). At breakfast, Plaintiff told Officer Perry, the corrections officer on duty, that there was butter on his toast. (*Id.*). Officer Perry checked his file, which reflected a "low cal/low fat diet," and "called the kitchen and had his toast replaced." (*Id.*). At lunch, Plaintiff received a meal of barbeque ribs, which he immediately brought to Officer Perry's attention. (T. 161–62). Officer Perry "smirk[ed] and said, come on Brandon ... where's your holiday spirit." (T. 162). They "started arguing immediately." (*Id.*). Plaintiff

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 186 of 520

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

"cursed at him" and "was combative" and "upset." (*Id.*). Plaintiff voiced his frustration of "an entire year of this nonstop" "like I'm a joke to these people." (T. 162–63). Plaintiff filed a grievance stating again that he is Muslim and that he was yet again served a meal with pork. (Pl.'s Ex. 25). Under "[s]ummary of facility staff attempts to resolve," the grievance states: "your meal was addressed and changed to address your needs." (*Id.*). On the grievance, Plaintiff checked the line next to "I do not accept this resolution and wish to file a formal grievance." (*Id.*). The grievance was never forwarded to the grievance coordinator and there is nothing in the record that suggests it proceeded beyond Officer Perry. Defendants provide no explanation for this. [18] Plaintiff testified that despite the statement on the grievance, his meal was not replaced. (T. 164). Having observed the testimony of Plaintiff and Officer Perry, and the credibility and demeanor of each witness on this issue, the Court credits Plaintiff's testimony that his meal was not replaced.

Plaintiff lost fifty pounds during the twelve months he was in the jail. (T. 166).

## III. CONCLUSIONS OF LAW

### A. Legal Standard

"The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996); *see Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 731 (2d Cir. 2001).

### B. First Amendment Free Exercise of Religion

Like prisoners, pretrial detainees "have 'long been understood to retain some measure of' their rights under the Free Exercise Clause." *Brandon*, 938 F.3d at 32 (quoting *Ford v. McGinnis (Ford II)*, 352 F.3d 582, 588 (2d Cir. 2003)). "These rights, however, must be balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.' " *Id.* (quoting *Ford II*, 352 F.3d at 588). Thus, courts must "judge prisoners' free exercise claims 'under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.' " *Id.* (quoting *Ford II*, 352 F.3d at 588). This test requires a prisoner or pretrial detainee to "show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* (quoting *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014)).

If the prisoner or pretrial detainee "satisfies these threshold requirements, a defendant can still avoid liability by showing that his or her conduct is 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Holland*, 758 F.3d at 222).

At trial, Plaintiff established by a preponderance of the evidence that he was entitled to receive a Muslim, no-pork, no pork products diet starting on March 2, 2012, the date he was re-booked into CCJ and listed his religion as Muslim. The importance of avoiding pork and pork products to the practice of Islam was undisputed at trial; the *Quran* prohibits the eating of pork and the eating of pork is considered "a high sin." (T. 38–39). It was also undisputed that Plaintiff's beliefs were sincerely held. (T. 55). Notwithstanding Plaintiff's entitlement to a religious diet, he was served pork meals two to four times weekly—between 62 and 124 pork meals—during the 31-week period from March 2, 2012 to October 5, 2012, the day a Special Diet Notification form directing the kitchen to provide a religious diet was placed in his inmate file. (T. 59–81; Pl.'s Ex. 1). Even after Lt. Laurin gave the kitchen written notice of Plaintiff's entitlement to a Muslim, no-pork, no pork products diet on October 5, Plaintiff was served pork meals at least four times thereafter: on October 17, (Pl.'s Ex. 22); in late October, (T. 152–54); once in November, (T. 155); and on December 25, (Pl.'s Ex. 25). The October meals were replaced, (*see* Pl.'s Ex. 22 T. 154), but the November meal with pepperoni, and the December 25 BBQ pork ribs meal were not replaced.

**\*14** Thus, Plaintiff has established that he was denied a religiously compliant diet from March 2 to October 5, 2012 and served a total of *at least* 66 pork meals from March 2 to December 25, 2012. The Court has no difficulty concluding that the denial of a religious diet for seven months and the service of at least 66 pork meals substantially burdened Plaintiff's sincerely held religious beliefs. *See Brandon*, 938 F.3d at 35–36 (observing that the Circuit previously found the denial "of a single [religious] feast constituted a substantial burden" and concluding that the denial of ten Muslim, no-pork meals "may constitute a substantial burden" (citing *Ford II*, 352 F.3d at 593)). Defendants presented no evidence at trial that the service of pork meals to Plaintiff was reasonably related to a legitimate penological interest. Accordingly, the Court finds Plaintiff's right to the free exercise of religion was violated.

Case 1:25-cv-00968-ECC-ML     Document 54     Filed 11/26/25     Page 187 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

**1. Personal Involvement [19] and Deliberate Indifference**

The Second Circuit has instructed:

> [A]fter *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." [*Ashcroft v.*] *Iqbal*, 556 U.S. [662,] 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 [(2009)]. "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). "The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.' " *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (Gorsuch, J.)).

In this case, to prove the individual Defendants liable under the First Amendment for the violation of his right to free exercise of religion, Plaintiff must also establish that they acted with deliberate indifference. [20] "The 'deliberate indifference standard embodies both an objective and a subjective prong.' " *Morgan v. Dzurenda*, 956 F.3d 84, 89 (2d Cir. 2020) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "Second, the charged official must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* (quoting *Hathaway*, 37 F.3d at 66). As to the second prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk" to the right to free exercise. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (explaining deliberate indifference in pretrial detainee context); *see also id.* (explaining that "[i]n other words, the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively").

**a. Lt. Laurin**

**\*15** To establish a constitutional violation against Lt. Laurin, Plaintiff must show that Lt. Laurin, "through [his] own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618. Lt. Laurin was responsible for supervising the corrections sergeants and the day-to-day activities throughout CCJ, and for overseeing the grievance program at CCJ. (Joint Pre-Trial Stipulation, ¶ 3(a)(vi)). However, there is no evidence in the record indicating that Lt. Laurin had any knowledge regarding, or involvement with, Plaintiff's requests for a Muslim diet before September 26. And because Lt. Laurin's supervisory responsibilities alone are insufficient to subject him to liability, *see Tangreti*, 983 F.3d at 619 (explaining that a supervisor cannot be found liable alone "by reason of ... [his] supervision of others who committed the violation"), the Court finds Plaintiff has failed to prove Lt. Laurin's liability for the service of pork meals, in violation of Plaintiff's free exercise rights, from March 2 to September 26. However, this does not end the inquiry as to Lt. Laurin's liability for it is undisputed that Lt. Laurin became involved on September 26.

When Lt. Laurin began handling Plaintiff's grievances on September 26, he learned that Plaintiff was Muslim, (T. 91 (Plaintiff testifying that Lt. Laurin told him that he was aware Plaintiff was Muslim)), and that he had been receiving noncompliant meals for many months, (*see, e.g.*, Pl.'s Ex. 15 (Plaintiff stating in grievance "I've been here for 250+ days and continuously receive food ... which I can't eat")). When Lt. Laurin searched the kitchen's files, he found the kitchen did not have a religious diet form in Plaintiff's file. (T. 303, 306–07, 341). Lt. Laurin then went to Plaintiff and said he knew Plaintiff was Muslim, that Plaintiff was receiving pork meals, that it was "wrong" and that "he's going to help." (T. 91, 304). On September 29, when Lt. Laurin issued a decision on Plaintiff's grievances, he noted that the "kitchen had not been notified he was Muslim" but that "kitchen staff has been advised to correct the diet." (Pl.'s Ex. 15). This, of course, was untrue because Lt. Laurin had not yet filed a Special Diet Notification form for Plaintiff. Despite personally assuring Plaintiff on September 27 that he would no longer receive pork meals and representing that he had already "advised" the kitchen "to correct the diet," Lt. Laurin did not complete a Special Diet Notification form until October 5—ten days, and thirty meals, later. (Pl.'s Ex. 8). Lt. Laurin had no explanation for not filing the Special Diet Notification form until October 5, (T. 306, 351 (Lt. Laurin testifying that he did not "know

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 188 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

offhand" and speculating that he "probably got tied up in something")), and understood such forms were to be filed the same day as booking, or shortly thereafter. (T. 293–94 (Lt. Laurin testifying that "[o]nce that inmate was booked in," the booking officer "was supposed" to physically bring the religious diet notification slip "down to the kitchen")). Based on this evidence, the Court concludes that as of September 26, Lt. Laurin knew that Plaintiff was entitled to a Muslim diet, and that without a Special Diet Notification form in his kitchen inmate file, there was an excessive risk that Plaintiff would continue to receive pork meals in violation of his religion. And yet, Lt. Laurin inexplicably waited ten days to file the Special Diet Notification form. Therefore, the Court finds that Plaintiff has proven by a preponderance of the evidence that Lt. Laurin recklessly failed to act with reasonable care to mitigate the risk that remaining on a regular diet at CCJ posed to Plaintiff's right to free exercise of religion. *Darnell*, 849 F.3d at 35. Accordingly, Lt. Laurin is liable for the September 26 to October 5 violation of Plaintiff's right to the free exercise of religion.[21]

**\*16** Despite Lt. Laurin's filing of the Special Diet Notification form, Plaintiff was served four pork meals between October 5 and December 25. However, Plaintiff has not shown Lt. Laurin's "individual actions" with respect to these meals led to the violation of Plaintiff's First Amendment rights. Moreover, as the two pork meals Plaintiff was served in October were both replaced immediately, (Pl.'s Exs. 22; T. 154), the burden on Plaintiff's free exercise of religion may have been de minimis. *See Rutherford v. Westchester Cnty.*, No. 18-cv-4872, 2020 WL 433841, at \*7, 2020 U.S. Dist. LEXIS 14113 (S.D.N.Y. Jan. 28, 2020) ("As Plaintiff alleges only a single incident of ham in his halal meal, and as he acknowledges that Defendants attempted to rectify (or at least ameliorate) the situation immediately, he has not alleged a constitutional violation."). But even assuming the service of two pork meals in October constituted a substantial burden, in both instances, the only evidence before the Court as to why Plaintiff was served pork meals suggests that it was due to a mistake in the kitchen. (T. 142, 153–54). While Lt. Laurin was responsible for the day-to-day supervision of the CCJ, and reviewed the grievance regarding the October 17 pork meal, (Pl.'s Ex. 22), there is no evidence connecting him to either meal. *See Tangreti*, 983 F.3d at 619 (explaining that a supervisor cannot be found liable alone "by reason of ... [his] supervision of others who committed the violation").

Plaintiff was also served a pasta salad with pepperoni in November, and barbeque pork ribs on December 25. (T. 155;

Pl.'s Ex. 25). Neither meal was replaced. There is no evidence in the record indicating why Plaintiff received pork meals on these dates. The Court therefore has no basis for finding the service of pork on either date was an intentional act. Moreover, Plaintiff failed to present evidence showing that Lt. Laurin was personally involved in either meal. Therefore, the Court finds Plaintiff has not shown Lt. Laurin's liability for the four pork meals served to Plaintiff between October 17 and December 25.

Accordingly, the Court finds Lt. Laurin is liable for violating Plaintiff's First Amendment right to the free exercise of religion by failing to provide a Muslim diet from September 26 to October 5.

### b. Nurse Kinter

There is evidence that Nurse Kinter knew of Plaintiff's efforts to obtain a religious diet as early as May 28. (*See, e.g.*, Pl.'s Exs. 9, 13). There is also evidence that Nurse Kinter directed Plaintiff to speak to a sergeant or lieutenant at CCJ and that she did not help Plaintiff obtain a religious diet. (Pl.'s Ex. 13). However, Plaintiff failed to prove by a preponderance of the evidence that Nurse Kinter had any authority to do more than direct Plaintiff's inquiries to those with authority to assist him and check to see what diets were on file with the kitchen. Nurse Kinter testified that the nurses at CCJ "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; T. 468 (Bedard testifying that he did not recall a nurse or anyone from the medical facility ever providing him with a religious diet restriction)). The evidence showed that only a booking officer, sergeant or lieutenant, or grievance coordinator could authorize a religious diet. (T. 293, 468; Pl.'s Ex. 8'; Pl.'s Ex. 13). In *Tangreti*, for example, the Second Circuit noted that where the defendant prison official "was not responsible for procuring cameras or for [the correctional facility's] camera policy[,] [t]he district court correctly concluded that apart from discussing this problem with other officials, [the defendant] had no further responsibility to resolve it." 983 F.3d at 619 n.7. Thus, the Court finds that apart from directing Plaintiff to the individuals at CCJ who could authorize religious diets, Nurse Kinter had no additional authority or responsibility to assist Plaintiff in obtaining a religious diet. *Jackson v. Sheehan*, No. 16-cv-6710, 2021 WL 795313, at \*7, 2021 U.S. Dist. LEXIS 38947 (W.D.N.Y. Mar. 2, 2021) ("Jansen and Haimes,

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 189 of 520

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

having performed their functions with respect to Plaintiff's complaint to the limits of their authority, 'had no further responsibility to resolve it.' " (quoting *Tangreti, 983 F.3d at 619 n.7*)). Accordingly, the Court finds Plaintiff failed to prove by a preponderance of the evidence Nurse Kinter's personal involvement in the violation of his right to the free exercise of religion.

### c. Bedard

**\*17** Plaintiff also failed to prove Bedard acted with deliberate indifference or was personally involved in the deprivation of his right to the free exercise of religion. Plaintiff established that Bedard was responsible for ensuring that meals were prepared in compliance with religious diets, and was aware, as of October 5, of Plaintiff's religious diet. (T. 459–60, 469–70; Pl.'s Ex. 8). To the extent Plaintiff seeks to hold Bedard liable for the period before the Special Diet Notification was placed in his inmate folder—March 2 to October 5—Plaintiff has presented no evidence that Bedard knew he was entitled to a no-pork diet during that time period. The Court therefore finds Plaintiff has failed to establish Bedard's liability for the noncompliant meals served from March 2 to October 5. However, as the kitchen served pork meals to Plaintiff four times *after* being notified in writing on October 5 of Plaintiff's no-pork diet, the Court must consider whether Plaintiff has proven Bedard's deliberate indifference and personal involvement in connection with these meals. (See Pl.'s Ex. 22 (served pasta salad with ham on October 17); T. 152–54 (served vegetarian bean soup "with small bits of ham chunks" in late October); T. 155 (served pasta salad with pepperoni in November); Pl.'s Ex. 25 (served barbeque pork rib sandwich on December 25)).

The evidence at trial showed that Bedard acted in a supervisory role with respect to meal service, and although there is some evidence that Bedard was aware Plaintiff was claiming that mistakes were being made with respect to his religious meals, *see* Dkt. No. 22 ("Grievance Investigation Form" dated October 15 indicating that Lt. Laurin interviewed Bedard with respect to serving Plaintiff pork), there was little evidence connecting Bedard to the four pork meals Plaintiff received after the Special Diet Notification was filed with the kitchen. There was no evidence presented at trial that suggested Bedard was involved in preparing or serving Plaintiff's meal tray on October 17. Indeed, the evidence in record shows that Sgt. Clancy spoke with the "kitchen" about this incident and

learned that a "staff chef had a made a mistake." (T. 141–42). The Court therefore finds no basis for holding Bedard liable for this incident. With respect to the soup with ham that Plaintiff was served in late October, Plaintiff testified that he was told that Bedard "mistakenly used the same ladle spoon to serve [Plaintiff's] tray with another tray" which resulted in Plaintiff receiving ham in his soup. (T. 153–54). However, even assuming Bedard mistakenly served Plaintiff ham soup instead of vegetarian bean soup,[22] the Court finds no basis for concluding Bedard acted with deliberate indifference. Indeed, the evidence that each time the kitchen was made aware of a mistake (on October 17 and again in late October), a replacement meal was sent undermines any suggestion of deliberate indifference to the violation of Plaintiff's right to the free exercise of religion. *See, e.g., Rangolan v. County of Nassau*, 217 F.3d 77, 79 (2d Cir. 2000) (finding no deliberate indifference when "the County took steps to protect" a vulnerable inmate "but inexplicably failed to implement them"); *Vail v. City of New York*, 68 F. Supp. 3d 412, 425–26 (S.D.N.Y. 2014) (finding that the plaintiff failed to adequately allege the defendant acted with deliberate indifference because even if the defendant administered the incorrect medication, they "acted quickly after Plaintiff became symptomatic, and therefore they were not reckless"); *Ivey v. City of New York*, Nos. 12-cv-3580, 2013 WL 6838954, at \*3, 2013 U.S. Dist. LEXIS 175884 (S.D.N.Y. Dec. 12, 2013) (granting a motion to dismiss where it was "[im]plausible that [the] defendants [had] acted with 'deliberate indifference' " because "they appeared to have taken immediate steps to provide treatment" "almost immediately" after the plaintiff "was diagnosed with a serious ... condition"). Finally, there is no evidence connecting Bedard, other than in a supervisory role as food service manager, to the third or fourth pork meals Plaintiff was served—pasta salad with pepperoni in November or the barbeque pork ribs on December 25. Accordingly, the Court finds Plaintiff has failed to prove, by a preponderance of the evidence, his free exercise of religion claim against Bedard.

### d. Sgt. Clancy

**\*18** Plaintiff asserts Sgt. Clancy was "personally involved and deliberately indifferent to Plaintiff's Free Exercise rights" because she refused to "record" her finding that Plaintiff had been served pork on Plaintiff's October 17 religious dietary grievance and threatened to "lock" Plaintiff up if he filed another grievance. (Dkt. No. 247 (citing Pl.'s Ex. 22; T. 142–45)). Although Sgt. Clancy did not explicitly state

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 190 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

that Plaintiff received a pork meal on Plaintiff's October 17 grievance, Sgt. Clancy stated that she "replaced the meal" and that Plaintiff "was given a non-pork meal." (Pl.'s Ex. 22). Sgt. Clancy's statement implies that Plaintiff's original meal contained pork, and her efforts to have it replaced reflect Sgt. Clancy's acknowledgement that the original meal was improper and that Plaintiff was entitled to a no-pork meal. (*Id.*). The Court finds no deliberate indifference or personal involvement under these circumstances.

### e. Officers Webb and Perry

Plaintiff's free exercise claim against Officer Perry arises from the pasta salad with pepperoni Plaintiff was served in November 2012. Plaintiff's free exercise claim against Officer Perry stems from Plaintiff's receipt of a meal of barbeque pork ribs on December 25. (T. 161–62). However, for the reasons discussed below, *see supra* Section III.B.2, because it was not "clearly established" in 2012 that the failure to replace a single meal would substantially burden a Muslim inmate's First Amendment rights, *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)), the Court finds Officer Webb and Officer Perry are entitled to qualified immunity, and does not address the merits of Plaintiff's constitutional claims against them, *see id.* at 140 (observing that courts, in their discretion, may "proceed directly to step two of the [qualified immunity] analysis and, if they find that qualified immunity applies, avoid the '[u]nnecessary litigation of constitutional issues' at step one") (quoting *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

### 2. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Francis* 942 F.3d at 139 (quoting *Ricciuti*, 834 F.3d at 167). Thus, even after a prison officer has been found liable for a constitutional violation, "the doctrine of qualified immunity will shield that officer from liability for damages if his [or her] 'conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d

255 (2015)). A court may grant qualified immunity after a finding of liability "if an officer has made a reasonable mistake of law, i.e., if the constitutional violation he [or she] has committed was not a 'clearly established' violation." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 662 (E.D.N.Y. 2017). "The qualified immunity standard is an objective standard, asking not whether the defendant officer acted in good faith or what he himself [or she herself] knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw*, 884 F.3d at 367. Qualified immunity is an affirmative defense that a defendant bears the burden of proving. *Id.* "To the extent that a particular finding of fact [i]s essential to an affirmative defense, ... it [i]s incumbent on [the defendant] to request that the [factfinder] be asked the pertinent question." *Id.* (quoting *Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004)) (markings in original).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). "In making this determination, [courts] consider Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (citing *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). However, "the absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Id.* (quoting *Garcia*, 779 F.3d at 92 (internal quotation marks, alterations, and citations omitted)).

### a. Lt. Laurin

**\*19** "We ... have clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford II*, 352 F.3d at 597 (citing *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975)). Lt. Laurin knew, as of September 26, that Plaintiff was entitled to a Muslim diet, that Plaintiff should have been receiving a Muslim diet since March 2, and that Plaintiff had been wrongfully denied a Muslim diet for approximately seven months. And yet, Lt. Laurin, inexplicably, left Plaintiff on a regular prison diet for ten more days before placing in Plaintiff's kitchen file a Special Diet

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 191 of 520

Notification form advising the kitchen to provide Plaintiff a non-pork diet. Even assuming, as discussed below, that the "law was not clearly established as to how many religiously compliant meals must be denied before the prisoner' religious beliefs are substantially burdened," *Brandon*, 938 F.3d at 39, the Court finds that no reasonable officer, who had no legitimate penological reason for withholding a religious diet, would have believed that allowing an inmate to remain on a regular diet for an additional ten days, during which time the inmate regularly received pork meals he could not eat,[23] was not a substantial burden. *See, e.g.*, *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (explaining that the principle that denying "prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights" was "established in our circuit at least as early as 1975" and that the district court improperly dismissed the plaintiff's claim that "the seven-day restrictive diet imposed upon him ... impinged upon his observance of Ramadan" (citing *Ford II*, 352 F.3d at 597)). Notably, Lt. Laurin does not argue otherwise. Accordingly, Lt. Laurin is not entitled to qualified immunity.

**b. Officers Webb and Perry**

Officers Webb and Perry were each only involved in one incident. The Court finds that, even crediting Plaintiff's allegations, Officers Webb and Perry are entitled to qualified immunity for these isolated incidents. A reasonable officer would not necessarily have known that the failure to replace a single noncompliant meal imposed a substantial burden under existing precedent. Though there need not be a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 575 U.S. at 825, 135 S.Ct. 2042 (internal quotation marks and citations omitted). It was not clearly established in 2012 that the denial of a single religious meal would substantially burden a plaintiff's First Amendment rights. *Compare Brandon*, 938 F.3d at 36 n.11 ("We express no opinion as to whether a single meal or a smaller number of meals spread out over a longer period of time might perhaps be considered isolated incidents, such that the burden they impose is de minimis."); *with Williams v. Does*, 639 F. App'x 55, 57 (2d Cir. 2016) ("The district court relied on non-binding case law when it determined that Williams's burden was *de minimis* because only a few of his meals were delivered prematurely; its reasoning is inconsistent with this Court's case law, which cautions against 'the danger that courts will make conclusory judgments about the unimportance of the religious practice to

the adherent.' " (quoting *Ford II*, 352 F.3d at 593)); *see also Wiley v. Baker*, No. 20-cv-154, 2022 WL 3045042, at *6, 2022 U.S. Dist. LEXIS 138684 (D. Vt. June 10, 2022) (declining to dismiss at the pleading stage because, "given that the case law is not clear on precisely how many missed or untimely meals during Ramadan would constitute a 'substantial burden' to a Muslim inmate, dismissal on 'substantial burden' grounds is inappropriate at this stage of the case"), *report and recommendation adopted*, 2022 WL 3042140, 2022 U.S. Dist. LEXIS 136972 (D. Vt. Aug. 2, 2022); *Brown v. Graham*, No. 07-cv-1353, 2010 WL 6428251, at *15, 2010 U.S. Dist. LEXIS 144188 (N.D.N.Y. Mar. 30, 2010) (holding that even assuming that the "plaintiff was approved to receive a kosher meal throughout his confinement ... the withholding of a single noon meal constituted, at most, a de minimis burden on plaintiff's religious expression"), *report and recommendation adopted*, 2011 WL 1213482, 2011 U.S. Dist. LEXIS 34345 (N.D.N.Y. Mar. 31, 2011), *aff'd*, 470 F. App'x 11 (2d Cir. 2012) ("[T]here is nothing in this record that could support a reasonable jury conclusion that [the defendant's] failure to provide [Plaintiff] a kosher meal on a single occasion rose to the level of a substantial burden on [Plaintiff's] religious freedom."). Thus, Officers Webb and Perry are entitled to qualified immunity.

**C. First Amendment Retaliation**

**\*20** Plaintiff brings three First Amendment retaliation claims: (1) that Lt. Laurin and Nurse Kinter retaliated against him for filing grievances by removing his medical diets; (2) that Sgt. Clancy and Officer Blaise retaliated against him for filing a grievance on October 17 by exposing him to assault by another inmate; and (3) that Bedard retaliated against him for filing grievances by intentionally placing pork in his meals. Defendants argue that Plaintiff has failed to prove his claims by a preponderance of the evidence.

To prove First Amendment retaliation, Plaintiff must establish by a preponderance of the evidence: " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action.' " *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (alteration in original) (quoting *Holland*, 758 F.3d at 225).

**1. Removal of Medical Diets**

Case 1:25-cv-00968-ECC-ML   Document 54   Filed 11/26/25   Page 192 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

Plaintiff filed his first meal-related grievance on May 28, (Pl.'s Ex. 10), and thirteen additional grievances from September 15 to October 15.[24] It is well settled that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (citing *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988)); *see also Brandon*, 938 F.3d at 40 ("The filing of prison grievances is a protected activity.") (citing *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003)). Thus, Plaintiff has proven the first element of his retaliation claims.

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Id.* (quoting *Davis*, 320 F.3d at 353). "The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* (citing *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)). Thus, a retaliation claim may proceed "even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances." *Gill*, 389 F.3d at 381. Such a plaintiff may satisfy the adverse action element by showing that the conduct "would have deterred a similarly situated individual of ordinary firmness." *Brandon*, 938 F.3d at 40 (quoting *Gill*, 389 F.3d at 381).

**\*21** Next, the plaintiff must "establish a causal connection between the defendants' actions and the adverse action." *Id.* at 40. To do so, a plaintiff must show "that the speech played a substantial part in the adverse action," *id.* (quoting *Davis*, 320 F.3d at 354), "in response to which the defendant official can then show that the [adverse] action would have occurred regardless," *Hayes*, 976 F.3d at 272 (citing *Holland*, 758 F.3d at 226). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

On October 16, Nurse Kinter issued a "Diet Notification" form to the CCJ kitchen regarding Plaintiff's "Medical" diet. (Pl.'s Ex. 41). The form, which is signed by Nurse Kinter, directed the "cancel[ation of] all previous slips" and placement of Plaintiff on a "Reg Diet"—"No Shellfish." (*Id.*). It canceled Plaintiff's low fat/low cholesterol, no tomato, no fish medical diet. The cancelation of Plaintiff's medical diet did not deter him from filing further grievances: he filed one the day his medical diet was canceled, (Pl.'s Exs. 39, 40), and

seventeen grievances between October 17 and November 21, the day his medical diet was reinstated, (Pl.'s Exs. 22, 43, 44, 45, 45, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59). However, applying the objective test, the Court finds Plaintiff has proved by a preponderance of the evidence that he suffered an adverse action. Dr. Schroyer issued a medical diet, including a "no shellfish diet" on January 14 to address Plaintiff's shellfish allergies, a "no tomato or tomato products diet" on March 23 to address Plaintiff's severe acid reflux, and a "low fat/low cholesterol diet" on May 21 to address Plaintiff's high cholesterol. (Joint Pre-Trial Stipulation, ¶ 3(a)(xii)–(xiv); T. 45–46). At the time Dr. Schroyer ordered Plaintiff's low fat/ low cholesterol diet, Plaintiff's labs reflected high cholesterol levels, which, Plaintiff understood, placed his health at risk. (T. 129). Plaintiff also understood that the dietary restriction was important to reduce the risks to his health. (T. 129).[25] Because tomatoes caused Plaintiff severe acid reflux, their removal from his diet was necessary to avoid acid reflux. In this case, Plaintiff established that the removal of these diets had the impact of depriving Plaintiff of portions of many of his meals. (*See, e.g.*, Pl.'s Ex. 46 (Plaintiff grieving the removal of "restrictive status" and explaining that it directly exposed him "to foods I can't consume")). Indeed, the grievances Plaintiff filed show that as a result of the revocation of his medial diet, he was deprived of a full or partial meal at least fourteen times during a 21-day period (Pl.'s Exs. 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 55, 57, 58, 59 (Grievances filed between October 19 and November 9)). Thus, Plaintiff has established that the removal of his "low fat/low cholesterol" and "no tomato" diet was an adverse action. *See, e.g.*, *Quezada v. Roy*, No. 14-cv-4056, 2017 WL 6887793, at \*10, 2017 U.S. Dist. LEXIS 210539 (S.D.N.Y. Dec. 14, 2017) (finding, at summary judgment, that "removing Plaintiff from his therapeutic diet plan constitutes an adverse action for purposes of a First Amendment retaliation claim"); *Davis*, 320 F.3d at 353 (finding, at pleading stage, that the plaintiff adequately alleged adverse action based on deprivation of "high fiber diet").

**\*22** In addition, Plaintiff has proven by a preponderance of the evidence that his filing of grievances "played a substantial part" in the adverse action. Lt. Laurin investigated "what [Plaintiff was] doing with commissary" as part of his investigation into Plaintiff's grievances about his medical and religious diets. (T. 326). On September 29, Lt. Laurin noted, in investigating Plaintiff's September 15 and 24 grievances, that Plaintiff was "buying items in the commissary that he should not be with his diet." (Pl.'s Exs. 14, 15, 16). On or about October 2, Lt. Laurin had Plaintiff's commissary receipts

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 193 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

printed. (Defs.' Ex. 22 (commissary receipts "reprinted on 10/02/2012")). Although he had that information on October 2, Lt. Laurin did nothing with it until October 15, when he angrily confronted Plaintiff, asking "[i]f we're getting all these grievances and you're turning around and purchasing these items," what is the "sense of us ... putting in all this effort." (T. 328). Between October 2 and October 15, Plaintiff had filed seven grievances, five of which concerned the food he was being served. (Pl.'s Exs. 18, 19, 20, 34, 35, 36, 38). Although Lt. Laurin understood that Plaintiff was not eating all of what he was buying and that Plaintiff had been regularly receiving pork meals, no part of which he could eat during a significant part of the time period reflected in the commissary receipts, (*see* Defs.' Ex. 22 (receipts from purchases for July, August, and September 2012)), after speaking with Plaintiff, he went directly to Nurse Kinter to inform her about the commissary receipts, (T. 329). Nurse Kinter removed Plaintiff's medical diet the next day. Given the temporal proximity between Plaintiff's grievances and Lt. Laurin's conduct, Lt. Laurin's direct reference to Plaintiff's grievances, and his angry tone, Plaintiff has established his filing of grievances played a substantial role in the removal of his medical diets. Lt. Laurin's comments to Plaintiff on October 15 directly implicated not only the fact that Plaintiff had engaged in protected speech—filing grievances—but also the content of that speech—seeking help ensuring he received meals consistent with his medical diet.

"The defendant official then bears the burden of establishing that the [adverse] action would have occurred 'even absent the retaliatory motivation.' " *Holland v. Goord,* 758 F.3d 215, 226 (2d Cir. 2014) (quoting *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir. 2002)). In *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994), the Second Circuit held that a retaliation defendant satisfies this burden when it is "undisputed that [plaintiff] had in fact committed the prohibited conduct."

Defendants have failed to prove that Plaintiff's medical diets would have been revoked absent the retaliatory motivation. There is no dispute that Plaintiff made the commissary purchases at issue. However, as Lt. Laurin knew, Plaintiff did not eat all the commissary purchases himself. In addition, Plaintiff testified that with respect to the chili ramen, about which Lt. Laurin and Nurse Kinter were purportedly concerned because it contained tomato powder, although he did eat the "noodles several times," that he "couldn't handle" and did not "[u]tilize the [seasoning] packet." (T. 211–12). Moreover, the evidence at trial established that the practice at the jail, in the case of an inmate making unhealthy

commissary purchases, was to procure the medical staff's help in *placing them on* a medical or healthier diet; the practice was never to remove a medical diet of an inmate whose health depended on it. Indeed, Lt. Laurin asserted at trial that "[w]e've done this before in the past" and that it was his "job ... to make" medical "aware" of the inmate's commissary purchases. (T. 329). He stated, for example he had "done this for" diabetics who were not paying "attention" and they have had "to put them on a low sodium diet because they start retaining fluids" and for "pregnant females," and explained that "we try to keep them on a good healthy diet." (T. 330). This testimony might support the unilateral placement of an inmate on a medial diet as it would *benefit* the diabetic or pregnant inmate's health, but it in no way supports the *removal* of a medical diet necessary to an inmate's health, which could only be harmful. Moreover, to the extent it was Lt. Laurin's job to make medical aware, the only inference from the above testimony is that he had a duty to make medical aware that the inmate was eating products harmful to his health—and procure intervention that would help, not harm, the inmate. Lt. Laurin has identified no other reason for the removal of Plaintiff's medical diet other than Plaintiff's purchase of commissary items that did not comply with the "low fat/low sodium" diet, a reason he reaffirmed in personally denying Plaintiff's fifteen subsequent grievances, most of which complained that he was served spaghetti sauce, tomato soup, and tomato slices, which caused him acid reflux, and buttered toast, which was bad for his cholesterol. (Pl.'s Ex. 56). Therefore, Lt. Laurin has not met his burden of establishing as a matter of law that Plaintiff's medical diet would have been removed in the absence of a retaliatory motive.

**\*23** Finally, to the extent Lt. Laurin argues he was not personally involved in this retaliatory act, because only medical staff could decide to remove a medical diet, the Court rejects that argument. (Dkt. No. 250, at 46). Lt. Laurin himself testified that he worked together with Nurse Kinter with respect to medical diets, (T. 329–30 (Lt. Laurin testifying that "[w]e've done this before in the past" and that "we have to put [diabetics] on a low sodium diet because they start retaining fluids" and "we try to keep [pregnant inmates] on a good healthy diet")), and that he brought the commissary receipts directly to Nurse Kinter for the purpose of showing Plaintiff's noncompliance with his medical diets, (T. 329 ("I wanted her to be aware that he was purchasing these items and they weren't compliant with his low fat/low sodium diet.")). In light of these facts, the Court finds it of little consequence that Lt. Laurin could not sign the form removing the medical

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 194 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

diet himself. Thus, for all these reasons, the Court finds that Lt. Laurin's "own individual actions," constitute First Amendment retaliation. *Tangreti*, 983 F.3d at 612 (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

Plaintiff likewise established Nurse Kinter's liability and personal involvement. Nurse Kinter was aware of Plaintiff's grievances because Lt. Laurin interviewed her on September 29 as part of his investigations into Plaintiff's complaints that he was not receiving meals that complied with his medical diets, (*see* Pl.'s Ex. 14 (September 15 grievance: "My food trays are constantly either missing something or stocked with items I'm not supposed to consume due to medical conditions."); Pl.'s Ex. 15 (September 24 grievance: "I cannot eat ... tomatoes."); Pl.'s Ex. 16 (September 24 grievance: "I was served a salad which had tomatoes."); *see also* Pl.'s Ex. 16 ("Grievance Investigation Form" for September 15 and 24 grievances noting that Nurse Kinter was interviewed as part of the investigation); T. 421 (Nurse Kinter testifying that she knew Plaintiff was grieving his meals)). On September 15, Lt. Laurin notified Nurse Kinter about Plaintiff's noncompliant commissary purchases. On September 16, Nurse Kinter summoned Plaintiff to the medical ward and informed him that his medical restrictions were being revoked due to his noncompliant commissary purchase. That same day, Nurse Kinter signed the "Diet Notification" form revoking Plaintiff's medical diets. (Pl.'s Ex. 41).

Nurse Kinter removed Plaintiff's medical diet less than three weeks after she was interviewed in connection with Plaintiff's medical diet related grievances. The close temporal proximity between Plaintiff's grievances and the revocation of Plaintiff's medical diets is circumstantial evidence of retaliatory intent and causal connection. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) ("We have held that the temporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation."). In addition, there is a direct correlation between the subject matter of the protected conduct, the grievances complaining that Plaintiff's medical diet was not being followed and the adverse action, the removal of the medical diet. Finally, Nurse Kinter's inexplicable placement of Plaintiff on a regular diet that would do nothing to help, and could only, as she knew, further harm his cholesterol level and cause Plaintiff severe acid reflux, is evidence of retaliatory intent. (*See* T. 419–20 (Nurse Kinter testifying that she was aware that patients with high levels of cholesterol are at increased risk of heart disease and that patients with acid reflux can get sick if they eat foods with high acidity)); *Burton v. Lynch*, 664 F. Supp. 2d 349, 368

(S.D.N.Y. 2009) (finding that, while the doctor's refusal to examine the plaintiff's elbow and comments that it "look[ed] fine" and that the plaintiff's "allergy to Motrin was Plaintiff's 'problem' " did not "explicitly state an intent to retaliate," they were "consistent with and imply a retaliatory motive," explaining that "[t]he facts corroborating the existence of Plaintiff's injuries and the failings of Dr. Supple's diagnosis and treatment, when taken in conjunction with Plaintiff's allegations of the brusque treatment he received from Dr. Supple, sufficiently allege a 'causal connection' between the filing of the grievance and the adverse action").

**\*24** Further, Nurse Kinter has failed to show that she would have taken the same action in the absence of Plaintiff's grievances. Nurse Kinter testified that Plaintiff had a history of problematic cholesterol and triglyceride levels, (T. 396 (Nurse Kinter testifying that Plaintiff's "ADL's, HDLs, LDLs were a little bit out of whack and we wanted to get them better" and "we needed to ... decrease his triglycerides and ... cholesterol")), that cholesterol can cause, among other health problems, a stroke, heart attack, and blocked artery, and "if somebody has a history of that, we kind of want to get that under control." (T. 396). Nurse Kinter testified that had she felt that removing the medical diet would "make that prisoner in worse condition, I would not have removed that diet" and that she had no concerns about removing Plaintiff medical diet because "his labs had improved." (T. 437). If true, this evidence might support a finding that Nurse Kinter would have removed the medical diets regardless of Plaintiff's grievance, but the evidence before the Court shows that Plaintiff's "labs" were largely the same at the time; they do not show improvement. In addition, as discussed above, there is no evidence that removal of a medical diet was ever used as a tactic for improving an inmate's health at CCJ. Accordingly, the Court finds Plaintiff has proven by a preponderance of the evidence that Nurse Kinter retaliated against him for engaging in conduct protected by the First Amendment.

### 2. Exposing Plaintiff to Assault by Another Inmate

Plaintiff claims that Sgt. Clancy and Officer Blaise retaliated against Plaintiff for filing his October 17 grievance regarding a pork meal, (Pl.'s Ex. 22), by "exposing him to assault by another inmate" on November 18.

Even crediting Plaintiff's testimony that on October 17, Sgt. Clancy commented to Officer Blaise that she would lock Plaintiff up if he filed another grievance and that on

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 195 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

November 17, as she was bringing Tiny into Plaintiff's housing unit, she wondered if Tiny would "tr[y] this shit on Brandon," Plaintiff's retaliation claim against Sgt. Clancy and Officer Blaise fails. By Plaintiff's own admission, he argued with, yelled at, cursed, and called Tiny names, and made racially prejudicial remarks to Tiny "*all night*," the night before the November 18 assault. (T. 147). The Court therefore finds that it was more likely than not Plaintiff's own conduct toward Tiny—not any actions Sgt. Clancy or Officer Blaise may have taken in placing Plaintiff near Tiny—that exposed Plaintiff to Tiny's assault. Accordingly, as Plaintiff failed to prove by a preponderance of the evidence a causal connection between Plaintiff's October 17 protected conduct of filing a grievance, and Tiny's November 18 assault, his retaliation claims against Sgt. Clancy and Officer Blaise are dismissed.

### 3. Intentional Introduction of Pork Into Meals

Plaintiff claims CCJ Food Service Manager Bedard retaliated against Plaintiff for filing meal-related grievances "by introducing pork into meals otherwise labeled meatless." (Dkt. No. 247, at 61–62). Plaintiff filed twenty-nine grievances from May 28 to October 31, the majority of which were food-related. (Pl.'s Exs. 10, 14, 15, 16, 18, 19, 20, 22, 26, 27, 28, 34, 35, 36, 38, 39, 40, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54). Bedard was only aware of Plaintiff's no-pork diet as of October 5, 2012. In his post-trial briefing regarding his retaliation claim against Bedard, Plaintiff specifically refers to the "meals otherwise labeled meatless" he received on October 17, (*see* Pl.'s Ex. 22 (ham salad)), "and on other *dates* in October 2012," (Dkt. No. 247, at 61 (emphasis added)). However, the evidence showed that Plaintiff was served a pork meal on only *one* other occasion in late October—a vegetarian or "meatless" soup containing ham in late October. (T. 152–54).

Even assuming Bedard was aware of Plaintiff's grievances, because there is no evidence that Bedard had any part in the preparation of Plaintiff's tray on October 17, the Court finds Plaintiff's claim of retaliation as to that incident fails for lack of personal involvement. *See supra*, Section III.B.1.c. Bedard was responsible for supervising the cooks in the kitchen to make sure food was provided in compliance with an inmate's special diet, but his supervisory role, without more, is insufficient. *Tangreti*, 983 F.3d at 618. Plaintiff has introduced some evidence that Bedard was responsible for placing the soup that contained pork on Plaintiff's tray in late October. Although temporal proximity between Plaintiff's

filing of grievances in September and October 2012 and the late October service of soup with pork may be circumstantial evidence of retaliatory intent, there is no evidence that shows that the placement of the soup with pork on Plaintiff's tray was anything more than a mistake and the Court notes that this meal was immediately replaced. (T. 153–54). On this record, the Court finds that Plaintiff has failed to establish retaliatory intent. *See Lakram v. Coughlin*, 99 F.3d 402 (2d Cir. 1995) ("Although correctional officials now concede that Lakram's transfer was a mistake, a mistake is insufficient to support a claim of retaliation."). Thus, Plaintiff's First Amendment retaliation claim against Bedard is dismissed.

### 4. Qualified Immunity

**\*25** Lt. Laurin argues that he is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim because he had no authority to rescind medical diets, Plaintiff's claim of retaliation is unfounded, and Lt. Laurin spent time and effort following the removal of Plaintiff's medical diet addressing Plaintiff's grievances on that issue. (Dkt. No. 250, at 55). Nurse Kinter argues that she is entitled to qualified immunity because it was "the jail physician—and not Defendant Kinter who had the final decision as to which medical special diets would be ... removed" and, in any event, one month later she recommended the reinstatement of Plaintiff's medical diet. (Dkt. No. 250, at 56).

These arguments principally concern the merits of Plaintiff's retaliation claim, which the Court has addressed above. The Court has found not only that Lt. Laurin had the authority to procure the revocation (or approval of) a medical diet, but that he procured the revocation of Plaintiff's medical diet in retaliation for Plaintiff's filing of multiple grievances complaining that his medical and religious diets were not being followed. The Court has also found that Nurse Kinter had the express authority to revoke a medical diet and that she revoked Plaintiff's medical diet with retaliatory intent. Nurse Kinter correctly notes that Plaintiff's medical diets were reinstated eventually—after Plaintiff asked for guidance on medically appropriate commissary purchases. But the eventual reinstatement of the medical diet does not undermine the Court's determination that the revocation of that diet was retaliatory. It appears that the medical diet was reinstated to quell the increase in Plaintiff's grievances. (T. 336–37 (Lt. Laurin testifying that he discussed with Nurse Kinter whether there was "something we could to do get [Plaintiff] back on this diet because we needed to come to a conclusion of all

Case 1:25-cv-00968-ECC-ML   Document 54   Filed 11/26/25   Page 196 of 520

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

this"). Although Defendants have not advanced any other arguments regarding their entitlement to qualified immunity, as the following analysis shows, qualified immunity is, in any event, inapplicable here.

First, the filing of grievances was clearly established as a constitutionally protected activity in 2012. *See Gill, 389 F.3d at 384* (the "use of the prison grievance system" is a protected activity); *Franco, 854 F.2d at 589* (holding that prisoner had constitutional right to petition government for redress of grievances, which included cooperating with state investigation of inmate abuse); *Graham, 89 F.3d at 80* (filing of a grievance and attempt to find inmates to represent the grievants is constitutionally protected). Second, no reasonable prison official could have reasonably believed that it was not an adverse action to remove Plaintiff's medical diet which was in place to help get his cholesterol "under control" in order to reduce his risk of, among other things, heart attack and stroke, and without which he would experience "severe acid reflux." *See Davidson v. Chestnut, 193 F.3d 144, 149 (2d Cir. 1999)* (observing that denial of kosher diet is an adverse action that may support retaliation claim); *Davis, 320 F.3d at 352–54* (holding inmate's claim that prison officials denied plaintiff his high fiber diet days after filing inmate grievances sufficiently alleged First Amendment retaliation claim); *Quezada, 2017 WL 6887793, at \*10, 2017 U.S. Dist. LEXIS 210539* ("[D]enial of a therapeutic diet is an adverse action sufficient to form the basis of a retaliation claim."). Finally, the Court has found that both Lt. Laurin and Nurse Kinter acted with retaliatory intent. "[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001).* [26]

**\*26** Accordingly, the Court finds that Lt. Laurin and Nurse Kinter are not entitled to qualified immunity.

### D. Compensatory Damages

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), provides, in relevant part:

(e) Limitation on recovery

No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). The PLRA's limitation on recovery "is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages." *Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022).* [27] Here, Plaintiff alleges physical injury due to a fifty-pound weight loss, headaches, fatigue, hunger, and mental distress. (Dkt. No. 247, at 76). "[T]here is no statutory definition of 'physical injury' as used in section 1997e(e)." *Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999).* However, the physical injury required under § 1997e(e) must be more than de minimis. *Id.* (citing *Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)*). "Physical afflictions that courts have found de minimis include contracting a fungal infection from exposure to sewage and waste, skin rashes, and itching, soreness and cracked skin." *Hong v. Liburd, 18-cv-7201, 2020 U.S. Dist. LEXIS 139145, at \*30 (S.D.N.Y. Aug. 3, 2020)* (internal citations omitted) (citing cases). [28] Even assuming Plaintiff established physical injury, because Defendants are liable for only limited time periods, September 26 to October 5, and October 15 to November 21, and Plaintiff has not presented specific evidence concerning his physical condition during these time period, the Court finds no basis for awarding compensatory damages based on physical, mental, or emotional injury.

Nonetheless, Plaintiff is entitled to compensatory damages for the injury resulting from Defendants' violation of his First Amendment rights. *Toliver v. City of New York, 530 F. App'x 90, 93 n.2 (2d Cir. 2013)* ("[E]ven if Toliver is unable to establish that any of the injuries complained of in this action stemmed from an incident in which he suffered physical injuries, Toliver may still recover damages for injuries to his First Amendment rights, as well as nominal and punitive damages for any other constitutional violations.") (citing *Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002)*); *see also Ford v. McGinnis (Ford I), 198 F. Supp. 2d 363, 366 (S.D.N.Y. 2001)* (explaining that the PLRA "does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself."). Where, as here, a plaintiff is "entitled to recover for the loss of intangible rights," although a jury, or, in this case, the Court, may "not ... award 'speculative damages,' " the amount of monetary damages awarded is "*necessarily arbitrary and unprovable.*" *Kerman v. City of New York, 374 F.3d 93, 125 (2d Cir. 2004)* (emphasis in original) (quoting *Raysor v. Port Auth. of New York & New Jersey, 768 F.2d 34, 39 (2d Cir. 1985)*). In *Kerman*, the plaintiff prevailed on his Fourth Amendment

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 197 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

unlawful seizure claim. 374 F.3d at 121. The Second Circuit held that the jury should have been instructed that the plaintiff was entitled to compensatory damages for his loss of liberty, and explained that: "The damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries, an award of several thousand dollars may be appropriate simply for several hours' loss of liberty." 374 F.3d 93, 125–26 (2d Cir. 2004); *see also Ford I*, 198 F. Supp. 2d at 366 (holding that the "plaintiff may be awarded an amount to compensate him for the denial of his religious meal").

**\*27**  In this case, Plaintiff has proven that he was wrongfully served six meals containing pork from September 26 to October 5, 2012, as a result of Lt. Laurin's failure to place a Special Diet Notification in Plaintiff's inmate folder. Thus, not only was he deprived of six meals in a ten-day period, but the service of each meal violated his First Amendment right to the free exercise of religion. The Court awards Plaintiff $500 per meal for the violation of his First Amendment right to the free exercises of religion, for a total of $3,000. *Cf., Drayton v. City of New York*, No. 17-cv-7091, 2022 WL 16948769, at \*4–5, 2022 U.S. Dist. LEXIS 207165 (E.D.N.Y. Nov. 15, 2022) (offering the plaintiff choice of new trial or accepting reduced compensatory damages award of $10,000 for loss of liberty during the "3 and 30 minutes" he was in wrongful custody, observing that New York cases uphold awards of up to $10,000, in loss of liberty cases, "even without proof of actual damages") (citing inter alia *Hallenbeck v. City of Albany*, 99 A.D.2d 639, 472 N.Y.S.2d 187 (3d Dep't 1984) ($10,000 for three hours); *Woodard v. City of Albany*, 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981) ($7,500 for five hours)); *King v. Zamiara*, 788 F.3d 207, 215–16 (6th Cir. 2015) (affirming award of compensatory damages in the amount of $1,475, equally $5 per day for First Amendment retaliatory transfer to "more restrictive facility").

Plaintiff has also proven that Lt. Laurin and Nurse Kinter retaliated against him for filing grievances by revoking his medical diets from October 16, 2012 to November 21, 2012. During that thirty-seven-day period, Plaintiff regularly received meals, parts of which he could not eat because they were harmful to his cholesterol levels or would cause severe acid reflux. Accordingly, the Court awards Plaintiff $200 per day for each day his medical diets were revoked, for a total of $7,400. *Cf., King*, 788 F.3d at 215–16.

### E. Punitive Damages

"Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' " *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). " 'The terms 'malice' or 'reckless indifference' pertain to the [defendant's] knowledge that [he or she] may be acting in violation of federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). "To be entitled to an award of punitive damages, a claimant must show a 'positive element of conscious wrongdoing.' " *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) (quoting *Kolstad*, 527 U.S. at 538, 119 S.Ct. 2118). Further, punitive damages are appropriate when the defendant's actions call for "deterrence and punishment over and above that provided by compensatory awards." *Wade*, 461 U.S. at 54, 103 S.Ct. 1625.

Here, Lt. Laurin acted recklessly and with callous indifference to Plaintiff's First Amendment right to the free exercise of religion when he waited ten days to implement a religious diet that he knew Plaintiff was entitled to and had been wrongfully denied for the past seven months. Lt. Laurin knew religious diet notification forms were to be filed with the kitchen on the same day as booking, but gave no explanation for waiting ten days after learning one had not been filed on Plaintiff's behalf to do so, speculating only that he may have gotten "tied up" in something. The Court further finds that an award of punitive damages will serve the purposes of deterrence and punishment.

The Court further finds that Lt. Laurin and Nurse Kinter acted recklessly and with an evil motive and intent toward Plaintiff when they removed his medical diets—a particularly vicious action given that they were well aware how concerned Plaintiff was about his health and diet and that he had used commissary purchases, to eat or barter, in order to help make up for the many meals he could not eat because they contained pork. Indeed, they removed his medical meals less than two weeks after Plaintiff began receiving proper religious meals, placing him back in the position of regularly receiving meals he could not eat. The Court further finds that an award of punitive damages will serve the purposes of deterrence and punishment.

**\*28**  Accordingly, Plaintiff is entitled to punitive damages and the Court will hold a hearing to permit evidence regarding

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 198 of 520

the financial conditions of Defendants Laurin and Kinter, and argument concerning an appropriate punitive damages award.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin on his First Amendment free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to judgment in his favor against Kevin Laurin and Suzanne Kinter on his First Amendment retaliation claim; and it is further

**ORDERED** that Suzanne Kinter, Lawrence Bedard, Margaret Clancy, Robert Webb, and Thomas Perry are entitled to judgment in their favor on Plaintiff's First Amendment free exercise claim; and it is further

**ORDERED** that Lawrence Bedard, Margaret Clancy, and Eric Blaise are entitled to judgment in their favor on Plaintiff's First Amendment retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $3,000 on his First Amendment free exercise claim; and it is further

**ORDERED** that Plaintiff is entitled to compensatory damages in the amount of $7,400 on his First Amendment retaliation claim; and it is further

**ORDERED** that Plaintiff is entitled to an award of punitive damages against Kevin Laurin and Suzanne Kinter in an amount to be determined following a hearing on April 18, 2023, at 10:00 a.m.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2023 WL 2382637

---

## Footnotes

1    Prior to trial, the Court appointed Samantha Clancy, Margaret Clancy's daughter, as guardian ad litem for Margaret Clancy due to medical issues. (Dkt. No. 241).

2    In his Proposed Findings of Fact and Conclusions of Law, Plaintiff seeks an award of sanctions in connection with the Special Diet Notification form, one version of which is contained in Defendants' Exhibit 21,(Dkt. No. 247, at 72–75), and a second version is contained in Plaintiff's Exhibit 8, *see infra* Figure 1. The Court addresses this request in an Order to Show Cause that will be issued separately.

3    The CCJ 2012 "Inmate Handbook Rules/Regulations" stated: "There will be NO special diets unless ordered by the facility nurse or doctor, and ONLY for a legitimate medical or religious reason." (Defs.' Ex. 24). However, there was no evidence at trial showing that a facility nurse could order or remove a religious diet. Nurse Kinter testified that the nurses "were always told that the healthcare office, any of us nurses, were not allowed to do religious diets" and that she had never filled out a religious diet slip in the four years she had worked at CCJ. (T. 389; *see also* T. 468 (Bedard testifying that "I would only allow the booking officer to give me the religious diet or a nurse a medical diet")). At most, a facility nurse could check an inmate's kitchen file to ascertain whether that inmate had a religious diet on file. (Defs.' Ex. 20).

4    Information about an inmate's special diet was also contained in a file in the inmate's housing unit, or "pod." (T. 488).

**Brandon v. Kinter, Not Reported in Fed. Supp. (2023)**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 199 of 520

5    Plaintiff did not pursue the grievance after filing; under "Summary of facility staff attempts to resolve," Plaintiff placed a check-mark next to "I accept this resolution." (Pl.'s Ex. 10). The "resolution" is not stated on the grievance form.

6    In 2012, the holy month of Ramadan was between July and August. (T. 87). During Ramadan, Plaintiff was required "to abstain from consuming food or beverage" from sunrise to sundown. (T. 88). In July, Plaintiff told a corrections officer that "Ramadan is coming up" and he was "supposed to fast" and asked who he should "speak to about getting the accommodation of fasting, of receiving a meal prior to the beginning of fast and then a meal after fast" (T. 88–89). Plaintiff testified that he was told that CCJ would not accommodate the fast. (T. 89). Plaintiff also testified that he filed "grievances" related to meals he received with pork during Ramadan. (*Id.*). However, none of this testimony is corroborated.

7    The September 9 date is repeated in a response Lt. Laurin provided to a Prisoner Request Form Plaintiff submitted on October 11 complaining that he was still being served pork and had not received a response to his grievances, (Pl.'s Ex. 21; Defs.' Ex. 16 (Lt. Laurin responding: "You have not received pork or pork products since 9/9/12")), and again in an October 15 response to Plaintiff's October 10 grievance regarding a chef salad with ham, (Pl.'s Ex. 19 (Lt. Laurin responding: "You have not received pork or pork products from the kitchen for a meal since 9/9/2012")). However, given Lt. Laurin's testimony that he did not become aware of Plaintiff's entitlement to Muslim meals until September 26, (T. 302, 306–07), Lt. Laurin's statements to Plaintiff in October that Plaintiff had not received pork since September 9 were false. Had this date appeared once, it might be explained as a typographical error, but Lt. Laurin used it in two separate documents, and again at trial, without explanation. However, as Plaintiff has not argued that Lt. Laurin had personal knowledge of Plaintiff's deprivation of a Muslim diet before September 26, the Court concludes Plaintiff implicitly acknowledges the September 9 date is inaccurate. (*See generally* Dkt. No. 247; *see also id.* at 64–65 (discussing Lt. Laurin's personal involvement and September 26 discovery "that Plaintiff had no religious diet slip on file with the kitchen")).

8    It was undisputed at trial that the *dated* form contained in Defendants' Exhibit 21 was the authentic form. (*See* Figure 1 *infra* Section II.D.6.). At trial, the Court took judicial notice (T. 375–76) that United States Magistrate Judge David E. Peebles issued a Report and Recommendation recommending granting Defendants' motion for summary judgment as to Plaintiff's First Amendment free exercise of religion and retaliation claims in which he noted that the "date of '10/5/12' " appeared to be written in "defendant Laurin's handwriting," and found "it plausible, that the version of this notice produced by defendants in support of their motion has been 'falsified ... by removing the date written on the notification.' " *Brandon v. Schroyer*, 13-cv-939, 2016 WL 1638242, at *4, 2016 U.S. Dist. LEXIS 25003 (N.D.N.Y. Feb. 26, 2016), *adopted by,* 2016 WL 1639904, 2016 U.S. Dist. LEXIS 54634 (N.D.N.Y. Apr. 25, 2016), *affirmed in part and reversed and remanded in part, sub nom., Brandon v. Kinter,* 938 F.3d 21 (2d Cir. 2019). The submission of the undated form to the Court is the subject of an Order to Show Cause that will be issued separately.

9    Bedard acknowledged at trial that he was asked in an interrogatory during discovery: "When was Bedard or anyone with the kitchen staff notified that plaintiff was issued a religious diet?" and that he provided the following sworn response: "the kitchen staff was notified of plaintiff's religious diet from the booking officer on or about March 2, 2012." (T. 464). At trial, Plaintiff argued that "[p]er Defendant Bedard's interrogatory response" the kitchen staff was notified about his religious diet on March 2. (T. 514). However, there was no credible evidence presented at trial that Bedard or anyone in the kitchen knew of Plaintiff's religious diet before October 5.

10    In addition, on October 3, Plaintiff also filed two Prisoner Request Forms, both seeking "a copy of all past food grievances." (Pl.'s Exs. 29, 30). To the first, Lt. Laurin responded: "Copies are 25 cents per page. You will be issued a copy of grievance if accepted or appealed to the CPCRC at no charge." (Pl.'s Ex. 29). To the second, Lt. Laurin responded: "Previously answered." (Pl.'s Ex. 30). Further, on October 5, Plaintiff filed

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 200 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

two Prisoner Request Forms. (Pl.'s Exs. 31, 32). One seeks the address for "Prisoner Legal Services," the "Attorney General Office of New York," and the "closest Legal Aid Society." (Pl.'s Ex. 31). The other seeks copies of "all" his food grievances. (Pl.'s Ex. 32). On October 9, Lt. Laurin responded with three addresses. (Pl.'s Ex. 31). Lt. Laurin's undated response to Plaintiff's request for all food grievances stated "[p]reviously answered." (Pl.'s Ex. 32).

11    On October 11, Plaintiff also filed a Prisoner Request Form stating that he was "still being served pork" and that he "need[ed] these issues addressed." (Pl.'s Ex. 21). Lt. Laurin again falsely responded: "You have not received any pork or pork products since 9/9/12." (*Id.*). Because Plaintiff provided no testimony regarding the factual circumstances underlying this complaint, and the parties do not advance any arguments regarding this complaint, and given that Plaintiff submitted it the day after he filed his October 10 grievances, (Pl.'s Exs. 19, 20), to which Lt. Laurin had yet to respond, the Court concludes that Plaintiff was complaining about the meals he received on October 10 (rather than an additional pork meal).

12    On October 15, Plaintiff also filed a Prisoner Request Form seeking the address for the State Commission of Corrections. (Pl.'s Ex. 37).

13    In a decision dated October 25, regarding the October 14 grievance regarding the lack of response to his prior food grievances, Lt. Laurin stated that three of Plaintiff's grievances had been "mailed" for further appeal, that four were with "the Jail Administrator," and there "were 13 others not counting this one" and that none of Plaintiff's grievances were "being ignored." (Pl.'s Ex. 35). The same day, Lt. Laurin issued a decision regarding the October 15 grievance seeking copies. (Pl.'s Ex. 36 (referring to Pl.'s Ex. 34))

14    Plaintiff was "confused about" being called to go to sick call because typically, inmates were required to "fill out a form to go"—"they don't just call you." (T. 115–16).

15    There was no evidence of a "new" "meal slip" presented at trial.

16    Plaintiff testified that he thought he received a second pork meal later on that day but unlike his testimony about other pork meals, which detailed the type of pork and surrounding circumstances, his testimony was nonspecific and he seemed uncertain. (*See* T. 144 ("I think I received it later on that day -- or like, later on that day I believe I received another meal with pork")). The Court therefore declines to credit this testimony.

17    On October 27, 2012, Plaintiff filed a "Prisoner Request Form." (Pl.'s Ex. 24). The top portion of the form is unreadable. (*Id.*). The response states: "Medical does not do religious diet. See security." (*Id.*). The form is signed by Nurse Kinter and dated October 29. (*Id.*).

18    If an inmate checked the line next to "I do not accept this resolution and wish to file a formal grievance," it was deemed an appeal and sent to the grievance coordinator, who was required to respond to the grievance within five days. (T. 295). Once the grievance coordinator responded, the grievance was returned to the inmate, who then had two days to accept or appeal the response. (T. 295–96).

19    Plaintiff argues that because Defendants did not argue personal involvement on summary judgment, the mandate rule bars "its consideration here." (Dkt. No. 247, at 68). The Court disagrees. "[T]he so-called mandate rule bars re-litigation of issues already decided on direct appeal" and also "prevents re-litigation in the district court" of matters expressly decided or impliedly resolved by the appellate court. *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). In reversing the district court's entry of summary judgment, the Second Circuit did not expressly or impliedly resolve the issue of personal involvement. Moreover, "[t]he role of the appellee is to defend the decision of the lower court. This Court has not held that an appellee is required, upon pain of subsequent waiver, to raise every possible alternate ground upon which the lower court could have decided an issue." *Brown v. City of New York*, 862 F.3d 182, 188 (2d Cir. 2017).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 201 of 520

Brandon v. Kinter, Not Reported in Fed. Supp. (2023)

20    The Second "Circuit has not stated whether a First Amendment free exercise claim requires more than negligence." *Brandon*, 938 F.3d at 38. The parties here assume that it does and advance arguments concerning whether Defendants acted with deliberate indifference in serving Plaintiff pork. (Dkt. No. 247, at 63–67; Dkt. No. 250, at 30–41).

21    Defendants do not dispute that that this ten-day deprivation of a religious diet constituted a substantial burden. *See Brandon*, 938 F.3d at 36 (observing that "when Muslim inmates are served meals containing pork, they are faced with the choice of disobeying the commands of their faith or not eating").

22    There was no corroboration of the report that Bedard mistakenly gave Plaintiff ham soup. Indeed, Bedard testified that it was the "cook's duty" on the food line to serve the main course, including the soup, (T. 444), that he was "not always on th[e] food line," but that when he was, he helped in small ways, such as placing condiments, crackers, or cookies on meal trays. (T. 451).

23    Plaintiff estimated, based on the menu, that he received two to four pork meals per week while on a regular diet. (T. 49).

24    (Pl.'s Ex. 14 (medical diet not followed, filed September 15); Pl.'s Ex. 15 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 16 (served pork and tomatoes in violation of religious and medical diets, filed September 24); Pl.'s Ex. 26 (served tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 27 (served sandwich with tomatoes in violation of medical diet, filed October 1); Pl.'s Ex. 28 (served tomato soup in violation of medical diet and requests copies of food grievances, filed October 2); Pl.'s Ex. 18 (served ham or turkey ham for lunch on October 9 in violation of religious diet and received conflicting information about whether ham steak served on September 9 was turkey or ham, filed October 9); Pl.'s Ex. 19 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 20 (served chef salad with ham in violation of religious diet, filed October 10); Pl.'s Ex. 34 (requests copies of food grievances, filed October 11); Pl.'s Ex. 35 (requests response to grievances about medical and religious diets, filed October 14); Pl.'s Ex. 36 (requests copies of food grievances and objects to charge for copies, filed October 15); Pl.'s Ex. 38 (served peanut butter in violation of medical diet, filed October 15)).

25    Nurse Kinter explained at trial that "cholesterol can cause a lot of different problems in your body," including a stroke, a heart attack, and blocked arteries. (T. 396).

26    Defendants make no arguments and cite no case law to the contrary.

27    Because Plaintiff was incarcerated at the time he commenced this action, (*see* Dkt. No. 1), this provision continues to apply. *Cf. Cano v. City of New York*, 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014) (explaining that "§ 1997e(e) does not bar Plaintiffs, who were *not incarcerated at the time they filed this action*, from seeking any category of damages"); *In re Nassau Cnty. Strip Search Cases*, No. 99-cv-2844, 2010 WL 3781563, at *5, 2010 U.S. Dist. LEXIS 99783 (E.D.N.Y. Sept. 22, 2010) ("PLRA's recovery limitation ... does not apply to plaintiffs not incarcerated at the time the action is brought").

28    No Westlaw cite available.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 202 of 520

Brik v. Brodie, Not Reported in Fed. Supp. (2023)

2023 WL 4373557
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Roman BRIK, Plaintiff,

v.

Margo K. BRODIE; Ann M. Donnelly, Defendants.

23-CV-4330 (LJL)
|
Signed July 5, 2023
|
Filed July 6, 2023

**Attorneys and Law Firms**

Roman Brik, Staten Island, NY, Pro Se.

MEMORANDUM & ORDER OF SERVICE

LEWIS J. LIMAN, United States District Judge:

**\*1** Plaintiff, who is appearing *pro se*, seeks declaratory and injunctive relief in this action against Chief United States District Judge Margo K. Brodie and District Judge Ann M. Donnelly. By order dated July 5, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* (IFP), that is, without prepayment of fees.

**STANDARD OF REVIEW**

The Court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See Fed. R. Civ. P. 12(h)(3)*.

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**DISCUSSION**

**A. Claims against District Judge Ann M. Donnelly**

Plaintiff alleges that District Judge Ann M. Donnelly's actions in his cases before her violated his constitutional rights. He seeks a declaratory judgment that her actions in those cases were unlawful and violated his constitutional rights to due process and equal protection and an injunction enjoining Judge Donnelly from retaliating against him. (ECF 1 at 4.)

"[J]udicial immunity does not bar a claim for prospective injunctive and declaratory relief." *Shtrauch v. Dowd*, 651 F. App'x 72, 73 (2d Cir. 2016) (citing *Pulliam v. Allen*, 466 U.S. 522, 541-43 (1984)). Nevertheless, Plaintiff is not entitled to declaratory relief for his claims against Judge Donnelly because he seeks such relief based on her past conduct. *See id.* at 74 (holding that the plaintiff was not entitled to declaratory relief because he alleged "only past conduct and does not seek to prevent an ongoing or future violation of federal law" (relying on *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996))).

**\*2** Plaintiff does suggest that Judge Donnelly will retaliate against him in the future for his exercise of his First Amendment rights. Even if, under the assignment rules, Plaintiff's future cases are assigned to Judge Donnelly as

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 203 of 520

Brik v. Brodie, Not Reported in Fed. Supp. (2023)

related to another open case before her, he does not allege a "present, continuing violation of federal law," *Blanciak*, 77 F.3d at 698, and there is no reason to assume that she would violate his rights in the future. Because Plaintiff thus does not seek to remedy a harm that is truly prospective, he does show any entitlement to declaratory relief. Plaintiff's remedy for any alleged bias on the part of Judge Donnelly in her judicial decisions is an appeal. *See LeDuc v. Tilley*, No. 05-CV-0157, 2005 WL 1475334, at *7 (D. Conn. June 22, 2005) ("[D]eclaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order.").

The Court therefore dismisses Plaintiff's claims for declaratory and injunctive relief against Judge Donnelly for failure to state a claim on which relief can be granted.

**B. Challenge to Rule 3 of the Rules for the Division of Business Among Judges**

Plaintiff seeks a declaration that assignment of *pro se* cases, under the Rules for the Division of Business for the Eastern District of New York, violates his constitutional rights. He can also be understood as seeking to enjoin enforcement of the relevant rules. Because Plaintiff has been granted permission to proceed IFP, he is entitled to rely on the Court and the U.S. Marshals Service to effect service. [1] *Walker v. Schult*, 717 F.3d 119, 123 n.6 (2d Cir. 2013); *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process ... in [IFP] cases."); Fed. R. Civ. P. 4(c)(3) (the court must order the Marshals Service to serve if the plaintiff is authorized to proceed IFP).

To allow Plaintiff to effect service on Defendant Chief United States District Judge Margo K. Brodie through the U.S. Marshals Service, the Clerk of Court is instructed to fill out a U.S. Marshals Service Process Receipt and Return form ("USM-285 form") for this Defendant. The Clerk of Court is further instructed to issue a summons and deliver to the Marshals Service all the paperwork necessary for the Marshals Service to effect service upon Defendant.

If the complaint is not served within 90 days after the date the summonses are issued, Plaintiff should request an extension of time for service. *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012) (holding that it is the plaintiff's responsibility to request an extension of time for service). Plaintiff must notify the Court in writing if his address changes, and the Court may dismiss the action if Plaintiff fails to do so.

### CONCLUSION

Plaintiff's claim for declaratory and injunctive relief against District Judge Ann M. Donnelly is dismissed.

The Clerk of Court is instructed to (1) send an information package to Plaintiff; and (2) issue a summons for Chief United States District Judge Margo K. Brodie, complete the USM-285 form with the address for this defendant, and deliver to the U.S. Marshals Service all documents necessary to effect service.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

**\*3** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4373557

---

**Footnotes**

1    Although Rule 4(m) of the Federal Rules of Civil Procedure generally requires that a summons be served within 90 days of the date the complaint is filed, Plaintiff is proceeding IFP and could not have effected service until the Court reviewed the complaint and ordered that the summons be issued. The Court therefore extends the time to serve until 90 days after the date the summons is issued.

**Brik v. Brodie, Not Reported in Fed. Supp. (2023)**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 204 of 520

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5089748
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert K. BROWN, Plaintiffs,
v.
The CITY OF NEW YORK et al., Defendants.

No. 12CV3146–LTS–GWG.
|
Signed Sept. 30, 2014.

*MEMORANDUM OPINION AND ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Robert K. Brown ("Plaintiff") brings this action against Defendants the City of New York ("City of New York") and New York City Police Department ("N.Y.P.D.") Officers Marcus McCoy ("McCoy") and Stephen Janec [1] ("Janec," collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, asserting federal claims for false arrest, unlawful imprisonment and malicious prosecution, as well as state law claims for false arrest and intentional infliction of emotional distress, stemming from Plaintiff's December 13, 2010, arrest and subsequent imprisonment. [2] Defendants move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that there was probable cause to arrest the Plaintiff; that any search and/or imprisonment of the Plaintiff was lawful; that Plaintiff fails to state a claim for malicious prosecution; and that, to the extent that Plaintiff intends to bring any state law claims, those claims are meritless. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has considered carefully the parties' submissions and arguments and, for the following reasons, the Defendants' motion is granted in its entirety.

*BACKGROUND* [3]

Plaintiff was arrested on December 13, 2010, shortly after 1:00 p .m., in the vicinity of 84th Street and Park Avenue in Manhattan, New York. (Def. 56.1 St. ¶ 8.) Earlier that day, two men, identified as E.K. and O.M., had called the authorities to report that the van that they were using, which belonged to Wynne Plumbing and Heating, had been broken into while it was parked on 85th Street. (Id. ¶ 6.) Defendants McCoy and Janec responded to the complaint, which they heard about over the police radio. (Id. ¶ 7.) [4]

The two complainants, E.K. and O.M., told Officer McCoy that they had seen Plaintiff in the driver's seat of the van, attempting to start the ignition in the van and that, when E.K. followed Plaintiff as he attempted to flee, the Plaintiff waved a hammer near E.K.'s face and said something to the effect of "wait a second." (Def. 56.1 St. ¶¶ 9–11.) Officer Janec's memo book indicates that he watched a surveillance video of the parked van at 1:25 p.m., after Plaintiff was arrested. (Lulich Decl., Ex. L.) In his opposition to Defendants' motion for summary judgment, Plaintiff repeatedly alleges that, because he cannot be seen in the video, it exonerates him, and that McCoy violated his rights and was complicit in a false arrest and malicious prosecution by suppressing or withholding the "exculpatory" video. The Court has reviewed the security video, a copy of which was provided to the Court by the Defendants. It shows only a partial view of the van and neither the passenger side door of the van, through which the Plaintiff is accused of having entered, nor pedestrian traffic approaching the door on that side of the vehicle is visible. (Lulich Decl., Ex. M.)

E.K. and O.M. identified Plaintiff as the person who had broken into their van and he was arrested near the scene of the crime, at 84th Street and Park Avenue. (Def. 56.1 St. ¶¶ 7–9.) When he was arrested, a backpack containing, among other things, a hammer, screwdrivers and a knife, was vouchered as evidence belonging to the Plaintiff. (Lulich Decl., Ex. H.) Plaintiff denies that the hammer, screwdrivers and knife were his, and asserts that they were actually plumbing tools belonging to E.K. and O.M. that were found on the ground. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. (ECF docket no. 43) at ECF p. 63.) Plaintiff also alleges that he had been "in a pizzaria[sic] having coffee-tea and pastries with a woman at 86th Street and the corner of Lexington Avenue," and then had walked up 84th Street to Park Avenue to pick up a car that he had borrowed, before he was arrested. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. at ECF p. 21.) Plaintiff contends that Defendants McCoy and Janec pulled up in the police car next to Plaintiff and jumped out of the car, that one of the police officers had a gun in his hand and that they handcuffed the Plaintiff and forcefully searched him before putting him in the back seat of the police car. (Pl. Mem. in Opp at ECF p. 21.)

**\*2** Plaintiff alleges that he was then made to wait in the police car with the heater running full blast and that, as a diabetic with high blood pressure and asthma, he suffered from having his blood circulation restricted by the handcuffs with the heat running so high. (*Id.*) According to Plaintiff, when Defendants McCoy and Janec returned to the police car he told them that he was having breathing problems and heart palpitations and they arranged to have an ambulance meet them at the police station and take him to the hospital. (*Id.*)[5] Plaintiff states that he was returned to the police station six to eight hours later, after being treated at the hospital, and that Defendant McCoy, while processing Plaintiff's paperwork, made a comment to the effect of "what was being done to the plaintiff was not right and that this is not what he joined the police department for." (*Id.* at ECF p. 24.) Plaintiff further alleges that Detective Lisa Moran, who had been involved in an arrest of Plaintiff on November 3, 2010, told Plaintiff that "[y]ou will not be getting out of jail this time because I will be making sure of it." (*Id.*)

Plaintiff's arrest was processed at the 19th Precinct and his pants and shirt from the time of his arrest were vouchered as evidence. (Def. 56.1 St. ¶ 12.) Plaintiff alleges that he remained naked (or in his underwear) and handcuffed for approximately ten minutes, before he was given back his "Red, White and Blue Jacket, his underwear, undershirt, and tan boots along with hospital pajamas to wear." (Pl. 56.1 St. ¶ 12.) (*Compare* Pl. Mem. In Opp. at ECF p. 26 with Lulich Decl., Ex. B., Tr. 111:9–112:6 .)

At the time of his arrest, Plaintiff was on parole and was in violation of the conditions of his parole.[6] (Def. 56.1 St. ¶¶ 4–5, 8.) On November 3, 2010, Plaintiff had been arrested for, among other crimes, criminal possession of stolen property and unlawful use of a motor vehicle. (*Id.* ¶ 4.) The November 3, 2010, charges were pending in New York County Supreme Court under case number 2010–05448 at the time of the arrest that forms the basis of Plaintiff's allegations in this case. Plaintiff had not reported the November 3, 2010, arrest to his parole officer and had missed at least four mandatory check-ins with that officer by December 13, 2010. (*Id.* ¶ 5.)[7]

On December 14, 2010, Plaintiff was arraigned for attempted grand larceny in the fourth degree, menacing in the third degree, auto stripping in the third degree, criminal mischief in the fourth degree, and possession of burglar's tools under New York Criminal Court number 2010NY091520. (*Id.* ¶ 13.) E.K. and O.M. identified the Plaintiff as the perpetrator of the break-in of their van and signed affidavits attesting

to this. Plaintiff's bail was set at $1.00 because there was a parole hold on Plaintiff. (Def. 56 .1 St. ¶ 13.)[8] Following his arraignment, Plaintiff was remanded into custody of the New York City Department of Correction ("DOC") for violating his parole—not because of the criminal charges arising out of the December 13, 2010, incident. (*Id.* ¶ 14.)

**\*3** From December 13, 2010, until March 28, 2012, the charges under New York Supreme Court case no.2010–05448 and New York Country Criminal Court docket no. 2010NY091520 were both pending against the Plaintiff as separate actions. (*Id.* ¶ 15.) During the criminal proceedings in New York County Supreme Court case no.2010–0558, Plaintiff was evaluated by at least two mental health professionals and found to be unfit to proceed to trial. (*Id.* ¶ 16.) In July 2011, Plaintiff was transferred to the Mid–Hudson Psychiatric Center, upon an Order of Commitment, and was treated there until September 2011, when he was transferred back into custody at Riker's Island. (*Id.*; Pl. 56.1 St. ¶ 16.)

On March 14, 2012, following a bench trial, Plaintiff was convicted of criminal possession of stolen property in the fourth degree and unauthorized use of a vehicle in the second degree, under case number 2010–05448. (Pl. 56.1 St. ¶ 17; Def. 56.1 St. ¶ 17.)[9] On March 28, 2012, Plaintiff was sentenced to two to four years on each charge. (Def. 56.1 St. ¶ 17.) However, if Plaintiff had been tried and convicted of the charges brought under docket number 2010NY09150, any sentence would statutorily have been required to run concurrently with, and not have exceeded, the sentence already imposed under case 2010–05548. Therefore, on April 10, 2012, the charges relating to the instant arrest under case number 2010NY091520 were dismissed as covered by Plaintiff's conviction in case number 2010–05448. (Def. 56.1 St. ¶ 18.)[10] Neither Defendant McCoy nor Janec testified in any of Plaintiff's criminal proceedings. (*Id.* ¶ 19.) From December 14, 2010, to March 28, 2012, Plaintiff was incarcerated because he violated parole prior to the December 13, 2010, arrest and from March 28, 2012, he was incarcerated pursuant to his conviction in case number 2010–05448. (*Id.* ¶ 22.) The only period during which Plaintiff was held on account of the charges for which he was arrested on December 13, 2010, was from the time of the arrest until his December 14, 2010, arraignment on the charges.

*DISCUSSION*

Under Federal Rule of Civil Procedure 56(a), a Court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that it is entitled to summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a "material fact" is one that might affect the outcome of a suit under governing law. *See Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir.2003). When reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor. *Tufariello v. Long Island R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). However, the party opposing summary judgment must put forth more than a "scintilla of evidence," *Anderson,* 477 U.S. at 252, and "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir.1986) (internal citation omitted). To defeat the motion, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial ." *Anderson,* 477 U.S. at 248.

**\*4** Where a plaintiff is proceeding pro se, the Court must read the plaintiff's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal citation omitted). However, a "pro se party's bald assertions cannot overcome a motion for summary judgment" and the plaintiff must provide the court with "some basis to believe that his version of relevant events is not fanciful." *Yearwood v. LoPiccolo,* No. 95 CV 2544, 1998 WL 474073, at \*3 (S.D.N.Y. Aug. 10, 1998) (internal quotation marks and citations omitted); *see also Saldana v. Local 32B–32J Serv. Emps. Int'l Union,* No. 03 CV 1853, 2005 WL 66895, at \*2 (S.D.N.Y. Jan. 12, 2005) ("[e]ven a pro se plaintiff [ ] cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint").

*Individual Defendants McCoy and Janec*

*False Arrest Claim*

Defendants move for summary judgment on Plaintiff's false arrest claim, which is asserted as a Fourth Amendment violation claim pursuant to 42 U.S.C. § 1983, as well as under New York state law. Plaintiff opposes the motion, arguing that it should be denied because the evidence would support a finding that the arrest was illegal, for lack of probable cause. A section 1983 claim for false arrest is "substantially

the same" in all relevant respects as a claim for false arrest under state law. *See Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Thus, in order to state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); see also *Hart v. City of New York,* No. 11 CV 4678(RA), 2013 WL 6139648, at \*3 (S.D.N.Y. Nov.18, 2013).

"[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006). " 'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Torraco v. Port Authority of New York and New Jersey,* 615 F.3d 129, 139 (2d Cir.2010) (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)). "[T]he probable cause standard is far below that of reasonable doubt." *Husbands v. City of New York,* 335 F. App'x 124, 127 (2d Cir.2009). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir.2013) (internal quotation marks and citation omitted). Courts must look to the totality of the circumstances, keeping in mind that "probable cause does not require absolute certainty." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (internal quotation marks and citations omitted).

**\*5** Police officers do not have an affirmative duty to investigate allegations made by a complaining witness prior to effectuating an arrest. See *Jaegly,* 439 F.3d at 153. Police have probable cause to arrest if they receive "information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Eng'g Soc'y Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), aff 'd, 993 F.2d 1534 (2d Cir.1993). "The veracity of citizen complaints [sic] who are the very victims of the very crime they report to the police is assumed." *Id.* Finally, even "the fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause." *Waldron v. Milana,* ––– F.App'x ––––, 2013 WL 4733215, at \*3 (2d Cir.2013) (internal quotation marks and citation omitted).

Here, it is undisputed that Defendants McCoy and Janec responded to a report made by the two complaining victims, O.M. and E.K., regarding a vehicle break-in the vicinity of 85th Street and Madison Avenue. (Def. 56.1 St. ¶¶ 6–7.) O.M. and E.K. told Defendant McCoy that they saw the Plaintiff attempting to break into the van and E.K. told the police that the Plaintiff held up a hammer and told him to "wait a second." (*Id.* ¶¶ 8–11.) Plaintiff was arrested in the vicinity of Park Avenue and 84th Street, within half an hour of the time of the break-in, after having been identified by the victims. (*Id.* ¶ 8.) These circumstances are sufficient as a matter of law to establish the absolute defense of probable cause. *See, e.g., Bacci v. Fairway Mkt.,* No. 06 CV 2407(DAB), 2008 WL 2139132, at *6–7 (S.D.N.Y. May 19, 2008) (finding probable cause for petit larceny and possession of stolen property where police officers were informed by employee that the employee observed plaintiff attempting to leave with unpaid for items concealed on his person). Plaintiff's argument that probable cause was lacking turns principally on his contention that, having seen the surveillance video immediately after the arrest, Defendant McCoy should have understood that the complainants' accusations were baseless. As explained above, however, the surveillance video does not exonerate Plaintiff because, although he is not seen in it, the van door that he is alleged to have broken into and that side of the van are not visible. Plaintiffs' arguments thus have no evidentiary basis and are insufficient to frame a genuine factual dispute as to the existence of probable cause.

Defendants' motion for summary judgment on Plaintiff's federal and state law false arrest claims as against Defendants McCoy and Janec is granted. To the extent that Plaintiff also asserts claims of false imprisonment, they are dismissed as well, because false arrest and false imprisonment are synonymous under New York law. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991).

*Unlawful Search Claim*

Plaintiff appears to allege that he was subject to an unlawful strip search following his arrest, but he does not assert this cause of action as a separate claim. (See, e.g., Compl. ¶ 4; Pl. Mem. in Opp. at ECF p. 25.) Reading Plaintiff's papers in the light most favorable to him, however, the Court assumes that Plaintiff intends to assert such a claim. According to Plaintiff, after his arrest, while he was being processed, members of the N.Y.P.D.'s Emergency Services Unit collected his clothing and then left him alone and naked or with underwear only for approximately ten minutes before bringing him some hospital pajamas and telling the Plaintiff to put back on his socks, boots and heavy jacket. (Pl. Mem. in Opp. at ECF p. 26.) [11]

**\*6** Even drawing all inferences in Plaintiff's favor, the search of Plaintiff was justified as a matter of law, both as a search pursuant to a lawful arrest and as a reasonable penological measure to protect the safety of the other inmates. *See Illinois v. Lafayette,* 462 U.S. 640, 645–46, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification"; "[a]t the stationhouse, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."); see also *Florence v. Board of Chosen Freeholders of County of Burlington,* —— U.S. ——, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) (holding that the practice of conducting a strip search on all arrestees, regardless of severity of the underlying offense or individualized suspicion of possession of contraband, does not violate the Fourth Amendment). "[I]f an arrestee is taken to the police station, that is no more than a continuation of the custody inherent in the arrest status.... The governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." *Lafayette,* 462 U.S. at 645. However, the Fourth Amendment requires that searches of inmates be reasonable, see *Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (per curiam) (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) and that "the need for a particular search [ ] be balanced against the resulting invasion of personal rights," *Florence,* 132 S.Ct. at 1516 (2012) (citation omitted). In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559 (collecting cases).

Here, there was a reasonable suspicion that Plaintiff was engaged in criminal activity as he was found with burglar's tools and a knife at the time of his arrest near the vicinity of the crime, and was identified by two complaining witnesses. After his arrest, it was reasonable to search Plaintiff when processing him, both for evidence from the alleged crime and for safety reasons. *Arnold v. Westchester Cnty.,* No. 09 CV 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb.3, 2012) ("prison officials have an obligation to take reasonable

measures to protect the safety of the prison's inmates."), *report & rec. adopted* by 2012 WL 841484 (S.D.N.Y. Mar 13, 2012). The approximately ten-minute delay in which Plaintiff was naked or wearing underwear that Plaintiff contends occurred while he was waiting for his clothing to be returned, while likely unpleasant for the Plaintiff, does not make the search unreasonable or unlawful. Defendants' motion for summary judgment is granted as to Plaintiff's unlawful search claim as against Defendants McCoy and Janec.

*Malicious Prosecution Claim*

**\*7** Plaintiff also asserts a section 1983 claim for malicious prosecution in violation of his Fourth Amendment rights. The law imposes "a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004) (citation omitted). To prevail on a section 1983 claim for malicious prosecution, a plaintiff must first establish the elements of a malicious prosecution claim under state law. See, e.g., *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989). "To recover on a claim of malicious prosecution under New York law, a plaintiff must establish four elements: that (1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Russo v. State of N. Y.,* 672 F.2d 1014, 1018 (2d Cir.1982) (internal citations omitted). In addition to satisfying the state law elements, for a section 1983 claim to succeed there must also be a showing of "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *See Rohman v. New York City Transit Authority (N.Y.CTA),* 215 F.3d 208, 215 (2d Cir.2000). Defendants are entitled to summary judgment dismissing Plaintiff's malicious prosecution claim for three principal reasons: there is no evidence that Defendants "initiated" the prosecution within the meaning of the relevant legal standards; there was probable cause to support the prosecution; and the prosecution was not terminated in Plaintiff's favor.

"Initiation in [the context of malicious prosecution] is a term of art," involving more than merely reporting a crime and giving testimony. "It must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act ... One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Rohman,* 215 F.3d at 217 (internal quotation marks and citations omitted). An arrest

alone "cannot serve as the predicate deprivation of liberty required by the Fourth Amendment because it occurred prior to [a defendant's] arraignment and without a warrant." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116–17 (2d Cir.1995). "Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening acts of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Jouthe v. City of New York,* No. 05 CV 1374(NGG), 2009 WL 701110, at \*11 (E.D.N.Y. March 10, 2009) (internal quotation marks and citation omitted).

Plaintiff argues that Defendant McCoy initiated the prosecution against the Plaintiff by signing the criminal complaint and that Defendant Janec helped to initiate the prosecution by signing the supporting affidavit. However, although McCoy swore out the criminal court complaint, the information regarding Plaintiff's alleged activities was obtained from the two complaining victims. Merely signing the criminal complaint and/or reporting the material information known to the officer does not override the independent prosecutorial judgment of the assistant district attorney in deciding whether to bring charges. Plaintiff also seems to allege that Defendants McCoy and Janec initiated the prosecution by withholding the security video from the District Attorney's Office Office, when the video would have allegedly exonerated him. However, there is no evidence in the record to support this contention. In fact, the Voluntary Disclosure Form, signed by the assistant district attorney, indicates that the District Attorney's Office was in possession of the video. (*See* Lulich Decl., Ex. N. "Voluntary Disclosure Form.") There is also no evidence to support Plaintiff's contention that the video exonerates him.

**\*8** Even if Defendants McCoy and Janec could be found to have "initiated" Plaintiff's prosecution, the "existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino,* 331 F.3d at 72 (2d Cir.2003). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, 'except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest.'" *Danielak v. City of New York,* No. 02 CV 2349, 2005 WL 2347095 at \* 10 (E.D.N.Y. Sept.26, 2005) (internal quotation marks and citation omitted), aff'd, 209 F. App'x 55 (2d Cir.2006). "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v.*

*Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996). Here, no new facts came to light after Plaintiff's arrest, and both E.K. and O.M. remained consistent in their identification of plaintiff and their accusations against him. N.Y.P.D. records further show that Defendant McCoy vouchered evidence (e.g. screwdrivers, a hammer etc.) that supported the complaining victims' allegations following plaintiff's arrest, suggesting that the strength of the evidence against plaintiff increased after his arrest. Nor does the record support Plaintiff's allegation that the security video proves his innocence.

As Plaintiff has not established the first two elements of his malicious prosecution claim, the claim necessarily fails. However, there are also no facts from which the Court could infer that defendants were motived by actual malice, see, e.g., *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir.2002) (affirming grant of summary judgment for defendants after the plaintiff failed to present evidence of actual malice), or that the proceedings were terminated in Plaintiff's favor, which only occurs when the final disposition of the case: (1) involves the merits and (2) tends to indicate the accused's innocence as opposed to a dismissal of cumulative charges. See, e.g., *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton,* 289 F.3d at 196. As explained above, the record indicates that the charges were dismissed as duplicative for sentencing purposes of charges on which Plaintiff had already been convicted and sentenced. That outcome is not indicative of Plaintiff's innocence of the dismissed charges. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for malicious prosecution against Defendants McCoy and Janec and that claim is dismissed.

*Municipal Liability*

**\*9** Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the City of New York. In order to state a claim against a municipality under section 1983, a plaintiff must adequately allege that a deprivation of his constitutional rights was caused by an official policy or custom of that municipality. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because Plaintiff has failed to present evidence that demonstrates that his constitutional rights were violated, the city is entitled as a matter of law to summary judgment dismissing Plaintiff's section 1983 claims against it. *See Askins v. Doe No. 1,*

727 F.3d 248, 253 (2d Cir.2013) ("[u]nless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable[;] *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy"). If a plaintiff fails to plausibly allege that municipal employees violated his or her constitutional rights, the plaintiff's *Monell* claim "necessarily fails as well" as against the municipal entity. *Kajoshaj v. New York City Dep't of Educ.,* —— F. App'x ——, 2013 WL 5614113, at \*4 (2d Cir. Oct 15, 2013). [12] Plaintiff's state law claims against the city based on respondeat superior or agency theories, for false arrest, false imprisonment and malicious prosecution are also dismissed, for lack of evidence indicating commission of the underlying violations.

*Remaining State Law Claim*

Plaintiff's papers may be read liberally to assert a state law claim for intentional infliction of emotional distress. As the Court is granting summary judgment dismissing all of Plaintiff's federal causes of action, the Court declines to exercise jurisdiction of any remaining state law claims. See 28 U.S.C. § 1367(c)(3); *see also, Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) ("where the federal claims are dismissed before trial, the state claims should be dismissed as well").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's federal and state law claims for false arrest, false imprisonment, and malicious prosecution, and any federal claim for illegal search, are dismissed. The Court declines to exercise supplemental jurisdiction of any remaining state law claims, which are dismissed without prejudice to litigation in state court.

This Memorandum Order resolves docket entry number 30.

The Clerk of Court is hereby requested to enter judgment in Defendants' favor and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the

purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**All Citations**

**\*10**  SO ORDERED.

Not Reported in F.Supp.3d, 2014 WL 5089748

---

### Footnotes

1   Plaintiff refers to Defendant Janec as "Janee" in his papers.

2   In his Complaint and his opposition to Defendants' Motion for Summary Judgment, Plaintiff also appears to allege that he was subject to an unlawful search, although he does not assert this as a separate claim.

3   Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

4   Plaintiff argues that there was no 911 call made to the police officers. (Pl 56.1 St. ¶ 6; see also Pl. Mem. In Opp. (ECF docket entry no. 43) at ECF pp. 40, 55.) Although Plaintiff cites to a New York City Police Department "Stop, Question & Frisk Report," which indicates that the police officers were not on a radio run on the afternoon of Plaintiff's arrest (*see id.,* Ex. F); the New York City Police Complaint Report from the same incident indicates that the victims' complaint was received by the police over the radio (see Declaration of Aimee K. Lulich ("Lulich Decl."), Ex. E). For the purposes of the instant motion, it does not matter how the police officers first heard about the complaint, as the victims identified the Plaintiff once the officers had arrived on the scene.

5   The claims relating to the handcuffs are mentioned for the first time in his opposition and Plaintiff has not pleaded claims for excessive force in this case.

6   In 2007, Plaintiff had been convicted of unauthorized use of a motor vehicle in the second degree, and sentenced to two to four years in prison. Plaintiff was incarcerated from October 20, 2007, to August 31, 2010, when he was released subject to the conditions of parole. (Def. 56.1 St. ¶ 3.) As part of his parole conditions, plaintiff was required to report any arrest to his parole officer and to check-in with his parole officer once a week. (*Id.*)

7   In his opposition submission, Plaintiff contends that he did report the November 3, 2010, arrest to his parole officer (Pl. 56.1 St. ¶ 5), and denies that his parole was revoked, but his deposition testimony was to the contrary. *See* Lulich Decl., Ex. B., Tr. 78:121–22.

8   Plaintiff disputes that the bail was set at $1.00 because there was a parole hold on Plaintiff, but admits that it was set at $1.00. (Pl. 56.1 St. ¶ 13.)

9   Although the Certificate of Disposition proffered by Defendants refers to a conviction upon a plea, in the sentencing transcript proffered by Plaintiff in his opposition papers, the sentencing judge discusses a bench trial and the evidence presented therein. (*See* Pl. Mem. in Opp., Ex. A, at ECF pp. 90–97; ECF docket entry no. 43–1, at ECF pp. 1–3.)

10  Plaintiff disputes that the charges were dismissed as being "covered by his felony conviction and sentence" and proffers his own assertion that there was a final determination in his favor. (Pl. 56.1 St. ¶ 18.) Defendants'

version is, however, corroborated by the disposition documentation proffered by Plaintiff in his opposition and by Defendants in support of this motion—the Certificate of Disposition of the charges arising from the December 13, 2010, arrest notes "DISM–CONVICTION UNRELATED DKT 5448–2010" and a "Record of Court Action" reads in relevant part "Dismissed as covered by Ind. 5448/2010." (*See* Pl. Opp. Mem., Ex. R., ECF docket entry no. 44–10, at ECF pp. 14–15; Lulich Decl., Ex. J.)

11    Defendants argue that neither of the named Defendant officers conducted the search, but this is a disputed issue of fact, as Plaintiff claims that the Defendants were personally involved or, at the very least, failed to intervene.

12    Furthermore, aside from naked boilerplate allegations against the City of New York in his opposition, the Plaintiff has also not sufficiently demonstrated that the City of New York had a custom, policy, or practice of conducting unlawful arrests, searches, or engaging in malicious prosecution so as to sustain a section 1983 claim.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 214 of 520

Brown v. Peters, Not Reported in F.Supp. (1997)

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 215 of 520

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 217 of 520

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

**B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.**

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

**C. Motion to Dismiss by Herman, Stewart and Stanford.**

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

**D. Plaintiff's "John Doe" Claims.**

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

**E. Discovery Motions.**

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 218 of 520

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

**Footnotes**

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady County Jail;
Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

### DECISION and ORDER

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

**\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

**Footnotes**

1    Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17517312
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Manetirony CLERVRAIN, Plaintiff,

v.

Jonathan ROBBINS, et al., Defendants.

1:22-CV-1248 (MAD/DJS)
|
Signed December 8, 2022

**Attorneys and Law Firms**

MANETIRONY CLERVRAIN, Plaintiff, Pro Se, Anderson, IN 46013.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** The Clerk has forwarded for review what has been docketed as a civil complaint filed by Plaintiff. Dkt. No. 1, Compl. Plaintiff has not paid the filing fee but has submitted an application to proceed *in forma pauperis* ("IFP"), Dkt. No. 2, which the Court has granted.[1]

**I. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**

28 U.S.C. § 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[2] Thus, even if a plaintiff meets the financial criteria to commence an action *in forma pauperis*, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action *in forma pauperis*. *See id.*

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks

redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (*per curiam*); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate *pro se* prisoner complaints).

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (*per curiam*), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556).

**\*2** Although a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

### B. Analysis of the Complaint

A court's initial review of a complaint under § 1915(e) must encompass the applicable standards of the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction ...;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

FED. R. CIV. P. 8(a). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Hudson v. Artuz*, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995)). Moreover, Rule 10 of the Federal Rules of Civil Procedure provides, in part:

**(b) Paragraphs; Separate Statements.** A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Sandler v. Capanna*, 1992 WL 392597, at *3 (E.D. Pa. Dec. 17, 1992).

A complaint that fails to comply with basic pleading requirements presents too heavy a burden for defendants to craft a defense "and provides no meaningful basis for the

Court to assess the sufficiency of [the plaintiff's] claims," and may properly be dismissed. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).

Plaintiff's Complaint clearly does not satisfy these requirements. The nature of the Complaint is unclear. The Complaint recites a wide variety of federal statutes and case law, but a thorough review of the main Complaint and the numerous attachments does not provide clarity as to what federal claim Plaintiff seeks to pursue in this Court. It is unclear what relationship the individuals identified by Plaintiff as Defendants have to Plaintiff and how he alleges they violated his rights.

Given its lack of clarity, the Complaint is clearly subject to dismissal. "[A] court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once 'when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Bruce v. Tompkins Cty. Dep't of Soc. Servs. ex rel. Kephart*, 2015 WL 151029, at *4 (N.D.N.Y. Jan. 7, 2015) (quoting *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991)). Accordingly, the Court recommends that the Complaint be dismissed, but that Plaintiff be afforded an opportunity to amend.

**\*3** The Court advises Plaintiff that should he be permitted to amend his Complaint, any amended pleading she submits must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any such amended complaint, which shall supersede and replace in its entirety the previous Complaint filed by Plaintiff, must contain sequentially numbered paragraphs containing only one act of misconduct per paragraph. Thus, if Plaintiff claims that his civil and/or constitutional rights were violated by more than one defendant, or on more than one occasion, he should include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying (i) the alleged act of misconduct; (ii) the date, including the year, on which such misconduct occurred; (iii) the names of each and every individual who participated in such misconduct; (iv) where appropriate, the location where the alleged misconduct occurred; and, (v) the nexus between such misconduct and Plaintiff's civil and/or constitutional rights.

Plaintiff is further cautioned that no portion of his prior Complaint shall be incorporated into his amended complaint by reference. Any amended complaint submitted by Plaintiff must set forth all of the claims he intends to assert against the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 223 of 520

Clervrain v. Robbins, Not Reported in Fed. Supp. (2022)

defendants and must demonstrate that a case or controversy exists between the Plaintiff and the defendants which Plaintiff has a legal right to pursue and over which this Court has jurisdiction. If Plaintiff is alleging that the named defendant violated a law, he should specifically refer to such law.

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Plaintiff's Complaint be **DISMISSED with leave to amend**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [3] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

## All Citations

Not Reported in Fed. Supp., 2022 WL 17517312

---

## Footnotes

1    Plaintiff has also moved for leave to file electronically. Dkt. No. 3. Given the recommended disposition of this case, that Motion is denied with leave to renew if Plaintiff files a complaint that survives review under section 1915.

2    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

3    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3170384
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Manetirony CLERVRAIN, Plaintiff,

v.

Jonathan ROBBINS, Jean-Max Bellerive,
Josue Pierre-Louis, Garry Conille, Jean-Claude
Theogene, Barthelemy Anteno, Kwasi Amoako-
Attah, and Victor (Ito) Bisono Haza, Defendants.

1:22-CV-1248 (MAD/DJS)
|
Signed May 1, 2023

**Attorneys and Law Firms**

MANETIRONY CLERVRAIN, 4326 South Scatterfield
Road, Suite 153, Anderson, Indiana 46013, Plaintiff, Pro Se.

**ORDER**

Mae A. D'Agostino, United States District Judge:

 **\*1** On November 22, 2022, *pro se* Plaintiff Manetirony
Clervrain ("Plaintiff") filed a complaint against Defendants
consisting of 70 pages of forms and documents, *see* Dkt. No.
1, "recit[ing] a wide variety of federal statutes and case law,"
Dkt. No. 7 at 5, and around two hundred pages of attachments.
*See* Dkt. Nos. 1-1, 1-5, 1-6. On the same day, Plaintiff moved
for leave to proceed *in forma pauperis* ("IFP"), *see* Dkt. No.
2, and to obtain an ECF login and password. *See* Dkt. No. 3.

On December 8, 2022, Magistrate Judge Daniel J. Stewart
granted Plaintiff's motion to proceed IFP. *See* Dkt.
No. 6. Additionally, Magistrate Judge Stewart issued a
Report-Recommendation and Order recommending that the
complaint be dismissed with leave to amend. *See* Dkt.
No. 7. Plaintiff has not filed an objection to the Report-
Recommendation and Order.

When a party declines to file objections to a magistrate judge's
report-recommendation or files "[g]eneral or conclusory
objections or objections which merely recite the same
arguments [presented] to the magistrate judge," the district
court reviews those recommendations for clear error. *O'Diah
v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y.
Mar. 16, 2011) (citations and footnote omitted); *see also*

*McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y.
2007). After the appropriate review, "the court may accept,
reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28 U.S.C.
§ 636(b)(1).

"[I]n a *pro se* case, the court must view the submissions
by a more lenient standard than that accorded to 'formal
pleadings drafted by lawyers.' " *Govan v. Campbell*, 289
F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v.
Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted).
The Second Circuit has held that the court is obligated to
" 'make reasonable allowances to protect *pro se* litigants' "
from inadvertently forfeiting legal rights merely because they
lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting
*Taguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

Having reviewed the December 8, 2022 Report-
Recommendation and Order, Plaintiff's complaint and the
applicable law, the Court finds that Magistrate Judge Stewart
correctly determined that the complaint should be dismissed.
The complaint is largely incomprehensible and suffers from
several deficiencies. Rule 8(a) of the Federal Rules of Civil
Procedure provides that a pleading must contain "a short
and plain statement of the claim showing that the pleader is
entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiff's complaint
is neither short nor plain. *See* Dkt. No. 1. As currently
drafted, and even with the leniency given to a *pro se* litigant's
pleadings, Plaintiff failed to meet pleading standards such
that the Court is unable to meaningfully analyze whether
Plaintiff can allege any colorable claim against Defendants.
*See Canning v. Hofmann*, No. 1:15-CV-0493, 2015 WL
6690170, \*5 (N.D.N.Y. Nov. 2, 2015) ("[H]aving found
that none of the allegations in Plaintiff's meandering and
indecipherable Complaint raise a cognizable cause of action,
the Court concludes that the Complaint fails to state a claim
upon which relief may be granted and is subject to dismissal")
(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

 **\*2** Finally, the Court agrees with Magistrate Judge Stewart
that Plaintiff should be granted an opportunity to amend
out of deference to Plaintiff's *pro se* status. *See Nielsen
v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (" 'Generally,
leave to amend should be freely given, and a *pro se*
litigant in particular should be afforded every reasonable
opportunity to demonstrate that he has a valid claim' ")
(quotation omitted). Should Plaintiff choose to amend the
complaint, the Court urges Plaintiff to review Magistrate

Judge Stewart's suggestions in the Report-Recommendation and Order thoroughly. *See* Dkt. No. 7 at 4-6.

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation and Order (Dkt. No. 7) is **ADOPTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED with leave to amend**; and the Court further

**ORDERS** that Plaintiff shall file his amended complaint within **thirty (30) days** of the date of this Order; and the Court further

**ORDERS** that, if Plaintiff fails to file an amended complaint within thirty (30) days of the date of this Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case without further order from this Court; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3170384

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 1448314
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chong Lee DAN, Plaintiff,

v.

State of NEW YORK, et al., Defendants.

1:24-CV-01233 (MAD/PJE)
|
Signed May 20, 2025

**Attorneys and Law Firms**

Chong Lee Dan, c/o Jan Levine, 688 Rte. 20, Cairo, New York 12413, Plaintiff pro se.

**REPORT-RECOMMENDATION & ORDER**

PAUL J. EVANGELISTA, United States Magistrate Judge

### I. In Forma Pauperis

**\*1** Plaintiff pro se Chong Lee Dan commenced this action on October 8, 2024, with the filing of a complaint, and, in lieu of paying this Court's filing fee, an application for leave to proceed in forma pauperis ("IFP"). *See* Dkt. Nos. 1, 2. Plaintiff provides that his income is $2000.00 per month, he has $3000.00 in savings, and his monthly expenses total $145.00. *See* Dkt. No. 2. However, plaintiff states that his income has "decreased to zero, except for work within walking distance."[1] *Id.* On balance,[2] the undersigned concludes that plaintiff financially qualifies to proceed IFP.[3] Next, plaintiff's complaint must be assessed pursuant to 28 U.S.C. §§ 1915, 1915A.[4]

### II. Standard of Review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleading stage, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 678). However, the Court need not accept as true "legal conclusions." *Iqbal*, 556 U.S. at 678. A pro se complaint is entitled to special solicitude and must be liberally construed, meaning that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

Nevertheless, even where a plaintiff has paid the filing fee, a district court may dismiss the complaint sua sponte if it determines that it lacks subject matter jurisdiction or that the complaint is frivolous. *See* FED. R. CIV. P. 12(h)(3); *Fitzgerald v. First E. Seventh Street Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000) (per curiam); *see Tyler v. Carter*, 151 F.R.D. 537 (S.D.N.Y. 1993), *aff'd*, 41 F.3d 1500 (2d Cir. 1994) ("The question is whether such claims asserted by a fee-paying plaintiff are subject to sua sponte dismissal by a district court under Rule 12(b)(6). I hold that they are. A plaintiff asserting fantastic or delusional claims should not, by payment of a filing fee, obtain a license to consume limited judicial resources and put defendants to effort and expense. The policies arguing against sua sponte Rule 12(b)(6) dismissals do not apply in these circumstances."). "An action is 'frivolous' when either: (1) 'the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy'; or (2) 'the claim is based on an indisputably meritless legal theory.' " *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)) (additional internal quotation marks and citations omitted). Further, a complaint that is "so confused, ambiguous, vague[,] or otherwise unintelligible that its true substance, if any, is well disguised," "fails to comply with Rule 8 [of the Federal Rules of Civil Procedure]." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995).

**\*2** The Court is required to construe pro se pleadings liberally and interpret them to raise the "strongest [claims] that they suggest." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted). At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by

pro se litigants," and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]" *Triestman*, 470 F.3d at 477 (internal citations, quotation marks, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191-92 (2d Cir. 2008). "The [Second Circuit]'s 'special solicitude' for pro se pleadings has its limits, because pro se pleadings still must comply with ... the Federal Rules of Civil Procedure." *Kastner v. Tri State Eye*, No. 19-CV-10668 (CM), 2019 WL 6841952, at *2 (S.D.N.Y. Dec. 13, 2019) (quoting *Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir. 1994)). [5]

III. **Discussion**

A. **Complaint** [6]

In his thirty-two-page, type-written complaint, plaintiff seeks to sue the State of New York; County of Greene; Town of Cairo; Ryan Schrader, Deputy Sheriff, Green County Sheriff's Office, in his official and individual capacities; Kaitlyn Raynor, Deputy Sheriff, Greene County Sheriff's Office, in her official and individual capacities; Shawn Marriott, Sergeant, Greene County Sheriff's Office, in his official and individual capacities; Scott Christman, Sergeant, Greene County Sheriff's Office, in his official and individual capacities; Peter Kusminsky, Sheriff, Greene County Sheriff's Office, in his official and individual capacities; John Vandenburgh, owner of JR's Transmission; Mark J.F. Schroeder, New York State Department of Motor Vehicles employee, in his official and individual capacities; Shawn S. Groden, County Administrator, Greene County, in his official and individual capacities; John Watts, Town Supervisor, Town of Cairo, in his official and individual capacities; Edward I. Kaplan, County Attorney, Greene County, in his official and individual capacities; Joseph Stanzione, District Attorney, Greene County, in his official and individual capacities; Jennifer Sandleitner, Assistant District Attorney, Greene County, in her official and individual capacities; and Angelo F. Scaturro, Public Defender, Greene County, in his official and individual capacities. *See* Compl. at 3-6.

Plaintiff's complaint arises out of an August 19, 2023, incident. *See generally* Compl. Plaintiff was parked at a gas station in Cairo, New York. *See id.* at 6. He contends that, as he was "preparing to enter" the gas station's convenience store, defendant Ryan Schrader, of the Greene County Sheriff's Office, "initiated an encounter concerning an expired temporary Maryland tag on Plaintiff's private property, the subject of this civil rights complaint." *Id.* Plaintiff states that his vehicle, a 2005 Chevrolet Astro, "was purchased by Plaintiff as private property for persona, family, or household goods or consumer goods, not for commercial use, profit, or gain." *Id.* Plaintiff expressed his belief to defendant Schrader that he had "no need" for a "valid tag" and gave Schrader

> fair notice by public record as filed at the Caldwell County, NC Register of Deeds, BK 2095, PG 420-421. That document's text presented here as being material to this encounter ab initio of the legal requirement to operate the term "motor vehicle" to a definition pursuant to the US Constitutional and federal laws as follows. Federal regulations recognize traveling and driving are different activities at 40 CFR 395.1.(j)(1) with the phraseology of "traveling but not driving." The term "drive" is ranching parlance to drive cattle to market, a commercial activity. The United States Supreme Court case, Interstate Commerce Commission vs. Brimson 154 US 447 recognized the state's authority to regulate the privilege of using public roads for commercial activity, as in "driving." It recognized the state's authority did not extend to the right of "traveling" the public roads when tending to the ordinary activities of daily living. "Power given to Congress to regulate interstate commerce does not carry with it authority to destroy or impair those fundamental guarantees of personal rights that are recognized by the Constitution as inheriting the freedom of the citizen." The United States Supreme Court case recognizes travel as a Constitutionally protected right while driving is a privilege.

**\*3** *Id.* at 7.

Plaintiff contends that "[t]he United States Code reflects this protected right by requiring commercial activity as an element in defining the term 'motor vehicle' 18 USC31 a (6)." Compl. at 7. He further provides, "[t]he United States Code elaborates on 'commercial activity' 18 USC31 a (10)." *Id.* Plaintiff contends that "a 'motor vehicle' is defined to the activity of moving passengers or property for a fare, fee, rate or other compensation" which "must be in evidence for something to be deemed a motor vehicle and subject to the motor vehicle code." *Id.* at 8. Plaintiff states that he "believe[s] that anyone with an oath to support the Federal Constitution that fails to operate the term 'motor vehicle' as Constitutionally defined commits perjury of that oath and acts against Me without authority." *Id.*

Plaintiff expressed his viewpoint to defendant Schrader who had also asked plaintiff to show his driver's license, and plaintiff told Schrader that he did not have one as he was not required to have one. *See* Compl. at 8-9. At some point in the interaction between plaintiff and defendant Schrader, defendant Raynor arrived. *See id.* at 10. Plaintiff contends that Schrader told him that to drive in New York State, he needs a valid driver's license and vehicle registration, which he does not have. *See id.* at 10. Defendant Schrader issued plaintiff "two citations, one for unlicensed op and one for unregistered vehicle, all right?" *Id.* at 11. Defendant Schrader stated that because of a lack of a valid license or registration, is vehicle would be towed. *See id.* Plaintiff contends that Schrader confirmed that he informed his supervisor, defendant Shawn Marriott, "of the public record, the issue of New York State Uniform Traffic Tickets and the impoundment of the Plaintiff's private property." *Id.*

Plaintiff states that the impoundment of his "private property left him without a safe place to lay his head at night and without a means to travel, stranding him in Cairo, NY." Compl. at 12. Plaintiff states that he is being forced to stay at a tent on a friend's property which is an "emotionally stressful living situation" which is "compromising the privacy of these friends." *Id.* Plaintiff further provides that the impoundment of his vehicle "interfered with the Plaintiff's ability to support himself in maintaining his chosen lifestyle, compromising his mental, spiritual, and physical well-being." *Id.* His "economic situation and lifestyle before the encounter were marginal but sustainable; the Defendants' seizure of his private property exacerbated this situation." *Id.*

Plaintiff's vehicle was towed to JR's Transmission, which plaintiff claims is operated by John VanDenburgh. *See* Compl. at 13. Plaintiff pleaded not guilty to the traffic tickets at the Town of Cairo Municipal Court, "requested a supporting deposition," "filed a motion for dismissal, a copy of the public record that Deputy Schrader received, *see* Line 34., a notice on US attorney and an affidavit of sovereign status with the Cairo Municipal Court clerk." *Id.* Plaintiff provides that his case from the Cairo Municipal Court was dismissed in its entirety "for lack of a supporting deposition," which plaintiff believes did not give him

**\*4** a fair opportunity to present the facts of the case with the continued application of the transportation code to Plaintiff's

private property, insistence on payment of impoundment fees, and forced contracts with the New York State Department of Motor Vehicles to operate commercially as a condition for the return of the private property.

Id. at 14.

Plaintiff provides that JR's Transmission would not release his vehicle without payment of the tow and impound fees. *See* Compl. at 14. Plaintiff sought "relief" from the Cairo Municipal Court and "was told there was nothing they could do to assist with gaining the release of the Plaintiff's private property." *Id.* Plaintiff sought similar "relief from the public defender, district attorney, and county attorney" in Greene County "without results." *Id.* "Of all the County of Greene officials and agents contacted, the Plaintiff was informed of the requirement to pay the impound fees and present a valid driver's license." *Id.* Plaintiff called the Greene County Sheriff's Office. *Id.* Christman "claimed he did not understand why the charges had been dismissed," "insisted on applying a definition of the term 'motor vehicle' other than the United States Code defines it to the Plaintiff and his private property," and "declined to discuss the definitions of driving and traveling as given in the Code of Federal Regulations." *Id.* Plaintiff "notified" the County Administrator, Public Defender, District Attorney, County Attorney, Sheriff's Office, "all officials of the County of Greene," and the Town of Cairo Supervisor by e-mail on May 11, 2024, but plaintiff did not receive any response. *Id.* at 15.

Plaintiff states "Defendants' failure to provide a supporting deposition created a legal problem, as in giving Plaintiff a dismissal of all charges while the Defendants continued the deprivation of Plaintiff's rights to private property and substantive and procedural due process." Compl. at 15.

Plaintiff attended "a 50-H hearing at the Greene County Office Building with Defendant Edward I. Kaplan and Attorney James j. Burns of Murphy Burns LLP." Compl. at 15. Plaintiff states that he "recognized that Mr. Burns had in his possession a copy of the Notice of Claim by Administrative Process mailed certified to ten of the Defendants." *Id.* Plaintiff states that on June 25, 2024, he "filed an affidavit into the public record at the Greene County Clerk's Office ... the Defendants being made aware of this public record by a certified mailing alleging the Defendants

are engaged in a seditious conspiracy to overthrow the Constitution and violate his God-given rights." *Id.* Plaintiff did not receive a response to this notice. *Id.*

Plaintiff purports to bring this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, the Administrative Procedure Act of 1946, New York State Penal Code, [7] and New York State common [8] law. [9]

**\*5** More specifically, plaintiff states that, pursuant to 42 U.S.C. § 1983, "defendants are jointly and severally liable for damages caused by depriving Plaintiff of rights protected by the United States Constitution's 4[th], 5th, and 14th Amendments under color of the New York State Vehicle and Traffic Law." Compl. at 18. He also contends that defendants engaged in malicious prosecution in violation of section 1983. *See* Compl. at 19-20. Plaintiff contends that defendants violated these rights by using/applying a definition of the term "motor vehicle" other than how he believes it is defined and interpreted in the United States Code and Code of Federal Regulations. Compl. at 17-18. Plaintiff contends that defendant VanDenburgh "jointly engaged with State officials in the action, was acting under the color of New York State Vehicle and Traffic Law" and he is not "require[d] to be an officer of the State, it is enough that he was a willing participant." *Id.* at 17.

Plaintiff contends that, pursuant to 42 U.S.C. § 1985, defendants "conspired to deprive the Plaintiff of his private property rights by operating the term 'motor vehicle' other than as defined by the United States code." Compl. at 18. Plaintiff further contends that, in an effort to "conceal this conspiracy, Defendant Ryan Schrader, a member of and influenced by this conspiracy failed to provide a supporting deposition" and "failed to keep his verbal contract to allow Plaintiff to 'explain all this to the judge and let the judge figure it out.' " *Id.* Plaintiff states that defendants "conspired with the objective of accomplishing the generation of additional revenue for the State of New York, the County of Greene, the Town of Cairo, and JR's Transmission depending on how the revenue and fines are to be split." *Id.* He contends defendants all "agreed/conspired to subject noncommercial users of New York Public roads, the Plaintiff, to the unauthorized application of the United States Constitution's interstate commerce clause. This operates as a constructive fraud and an abuse of power by the Defendants." *Id.* at 18.

Plaintiff seeks to sue all defendants pursuant to 42 U.S.C. § 1986 for "action for neglect to prevent" insofar as they

failed "to prevent operating the term 'motor vehicle' other than as defined by the United States Code as the direct and proximate cause for the callous disregard for the deprivation of the Plaintiff's federally protected rights" and, thus, should be held "liable for neglect to prevent the initial and continued damages and deprivation of the Plaintiff's rights as protected by the United States Constitution's 4th, 5th, and 14th Amendments by operating the term 'motor vehicle' other than as defined by the United States Code." Compl. at 20-21. Plaintiff argues that all defendants "were notified of the deprivation of the Plaintiff's rights initiated by and of the continuance of their neglect in preventing the operation of the term 'motor vehicle' other than as defined by the United States code." *Id.* "That Defendants, especially those in positions of superiority and power, given notice of their illegal conduct and a reasonable opportunity to correct it would continue in this illegal conduct is egregious and outrageous for public officials." *Id.*

Plaintiff contends that defendants violated 18 U.S.C. § 1589 [10] and the Thirteenth Amendment by requiring him to participate in "forced labor." Compl. at 21. He argues that defendants' "unauthorized application of the Constitution's interstate commerce clause, are attempting to extract a use tax from the Plaintiff in the form of a driver's license and registration, when not legally required, operate as forced labor/involuntary servitude" and plaintiff is "partially of African descent and, because of the history of the enslavement of black people in America takes extreme issue with the subject of forced labor." *Id.* Plaintiff contends that defendants, "with deliberate indifference, have failed to observe the United States Constitution's 13th Amendment's prohibition of slavery and involuntary servitude." *Id.*

**\*6** Plaintiff seeks to sue State of New York, County of Greene, and Town of Cairo for "deprivation of substantive due process" pursuant to *Monell.* Compl. at 22-24. He contends that "Defendants acted pursuant to one or more interrelated de facto policies (even if not official written edicts), practices, and customs of civil rights violations and unconstitutional practices of the State of New York, County of Greene, and Town of Cairo, see Line 122." [11] Compl. at 22. Plaintiff alleges that "their policy, practice, and custom" of "approv[ing], authoriz[ing], and acquiesce[ing] in the unlawful and unconstitutional conduct of defining the term 'motor vehicle' by a definition other than the definition given by the United States Code by its respective employees and agents" violates his constitutional rights under the Fourth, Fifth, Thirteenth, and Fourteenth Amendments.

Compl. at 22-24. Plaintiff further alleges that "the Corporate Defendants" failed to train defendant Schrader in "the authorized application of the United States Constitution's interstate commerce clause." *Id.* Plaintiff additionally argues that defendant Shrader acted with deliberate indifference to his constitutional rights by failing to enact on his "duty of care to investigate Plaintiff's claim of 'no requirement' for a valid registration as evidence of passengers or property being moved for any fare, fee, rate charge, or other consideration as the element that triggers that requirement." *Id.* at 29.

Next, plaintiff contends that "[t]he Corporate Defendants" violated the Administrative Procedure Act, which he cites as 5 U.S.C. § 551 et seq. (1946). Compl. at 16. Plaintiff provides that he "is challenging the Corporate Defendants' right to enforce their policy or guidance rules on the Plaintiff without substantive due process and an order from a Judicial Judge." *Id.* Plaintiff "demands a Judicial review of the Corporate Defendants' misconduct for abuse of discretion, as authorized by the United States Administrative Procedure Act of 1946." *Id.*

Plaintiff further seeks to proceed under New York state law for libel, slander, and intentional infliction of emotional distress. *See* Compl. at 27-28. Plaintiff also seeks to proceed under New York State common law for false imprisonment. *See* Compl. at 25. Plaintiff states that defendant Schrader "without authority, confined Plaintiff to the area behind Plaintiff's private property against his will under the threat of assault and battery." Compl. at 25 (citing line 47, Compl. at 9) ("Defendant Ryan Schrader walked back to the Sheriff's cruiser, ordering the Plaintiff to confine himself to an area in the rear of the private property. 'Sit right there for a second.' the Plaintiff complied for apprehension of being physically assaulted for failure to do so."). [12]

Plaintiff also seeks to proceed pursuant to several state criminal laws, Robbery in the Second Degree (New York Penal Code § 160.10); Coercion in the third degree, New York Penal Code § 136.60(2); Official Misconduct, New York Penal Code 195.00; Assault, New York Penal Code § 120 (potential for assault). Compl. at 24-25, 28-29.

Plaintiff seeks compensatory damages, totaling $1,200,000 from the State of New York, $600,000 from Greene County, $300,000 from Town of Cairo, $200,000 from Ryan Schrader, $200,000 From Kaitlyn Raynor, $200,000 from Shawn Marriott, $200,000 from Scott Christman, $200,000 from Peter J. Kusminsky, $200,000 from Mark J.F.

Schroeder, $300,000 From Shaun S. Groden, $300,000 from Jason Watts, $300,000 from Edward I. Kaplan, $300,000 from Joseph Stanzione, $300,000 from Jennifer Sandleitner, $300,000 from Angelo F. Scaturro, and $100,000 from John Vandenburgh. *Id.* at 31-32. Plaintiff also seeks "[d]eclaratory and injunctive relief against the State of New York, County of Greene, And Town of Cairo's enjoining policies, practices, and customs to encourage the operating of the term 'motor vehicle' by no other definition than the definition given by the United States Code" and "ordering the State of New York, County of Greene, and Town of Cairo "to institute policies, procedures, and training for law enforcement agencies of these entities to bring them into compliance with constitutional standards." *Id.* at 32. Plaintiff further requests "attorney's fees and the cost of this action pursuant to 42 USC 1988." Id.

## B. **Analysis**

**\*7** First, plaintiff's claims against the State of New York are barred by sovereign immunity. The law is well established that under the Eleventh Amendment to the United States Constitution, the State of New York and its subdivisions are immune from suits brought under Section 1983. *See Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana*, 134 U.S. 1, 11 (1890)); *see also Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (applying Eleventh Amendment immunity to claims under § 1983). "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting Section 1983." *Id.* "Sovereign immunity bars not only suits against states themselves, but also suits for damages against state officials acting in their official capacities." *Chapman v. City of Albany*, No. 1:23-CV-686 (LEK/PJE), 2025 WL 259011, at \*5 (N.D.N.Y. Jan. 24, 2025). Thus, plaintiff's claims for monetary damages against the following state officials in their official capacities also must be dismissed for sovereign immunity, Ryan Schrader, Kaitlyn Raynor, Shawn Marriott, Peter J. Kusminsky, Mark J.F. Schroeder, Shawn S. Groden, Jason Watts, Edward Kaplan, Joseph Stanzione, Jennifer Sandleitner, Angelo Scaturro, and Scott Christman. *See id.*; *see also Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the dismissal is due to the court's lack of subject matter jurisdiction[.]"); 18 U.S.C. § 1915A(b)(1) ("On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the

complaint – (2) seeks monetary relief from a defendant who is immune from such relief.").

Second, plaintiff's complaint must otherwise be dismissed for failure to state a claim upon which relief can be granted and frivolity. *See* 28 U.S.C. § 1915A(b)(1). Plaintiff's complaint fails to set forth any cognizable constitutional claim. Plaintiff is far from the first person to attempt to get out of the requirements to have a valid driver's license or vehicle registration by arguing that state vehicle and traffic laws violate his constitutional rights nor is he the first to specifically contend that the definition of motor vehicle in 18 U.S.C. § 31 applies only to commercial use of motor vehicles or that 49 C.F.R. § 395 recognizes a difference between traveling or driving and that such statute and regulation mean that their particular use of their vehicle is exempt from the license and/or registration requirements. *See generally* Compl. However, as will be explained below, plaintiff's arguments based on this faulty premise, like for those who came before him, are without merit and must be dismissed.

The Supreme Court of the United States has made clear,

> In the absence of national legislation covering the subject, a state may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles, [ ]those moving in interstate commerce as well as others. And to this end it may require the registration of such vehicles and the licensing of their drivers, charging therefor reasonable fees graduated according to the horse-power of the engines,[ ] a practical measure of size, speed, and difficulty of control. This is but an exercise of the police power uniformly recognized as belonging to the states and essential to the preservation of the health, safety, and comfort of their citizens; and it does not constitute a direct and material burden on interstate commerce.

*Ali v. Siwek*, No. 23-CV-354-LJV, 2023 WL 9184481, at *3 (W.D.N. Y Dec. 18, 2023), *appeal dismissed sub nom. Ali v. Mathewson*, No. 24-52, 2024 WL 5295532 (2d Cir. July 26, 2024) (quoting *Hendrick v. Maryland*, 235 U.S. 610, 622 (1915) (alterations omitted)). It is well-settled that "the states may enact laws requiring owners of motor vehicles to register those vehicles." *Ali*, 2023 WL 9184481, at *3; *see also Ali*, 2023 WL 9184481, at *3 n.4 (citing *Munz v. Harnett*, 6 F. Supp. 158, 159-60 (S.D.N.Y. 1933)) ("[A] state as an exercise of the police power may prescribe uniform regulations covering the ownership and operation" of motor vehicles and observing that "there cannot be the slightest doubt of the validity of [the] requirement" that motor vehicles be registered) (citing, *inter alia, Hendrick*, 235 U.S. at 622).

**\*8** In *Ali*, the plaintiff contended, as relevant here, that the defendants were attempting to "force him into a contract" and violating his rights by requiring him to pay a fee before returning his impounded vehicle. 2023 WL 9184481, at *2-3. Like plaintiff here, the plaintiff in *Ali* believed that the vehicle and traffic laws did not apply to him or his situation. Although plaintiff here attempts to ground his belief in constitutional and statutory interpretation, rather than contractual terms as in *Ali*, the necessary outcome does not differ. *See id.* at *3 n.4 (citing *Munz v. Harnett*, 6 F. Supp. 158, 159-60 (S.D.N. Y 1933); *see also Spector Motor Serv. v. Walsh*, 139 F.2d 809, 814-15 (2d Cir. 1943) ("First, we should note the now established and undenied power of a state to impose a registration or license fee on those using motor vehicles in the state ....") (collecting cases)); *Scalpi v. Town of East Fishkill*, No. 14-CV-2126 (KMK), 2016 WL 831956, at *5 (S.D.N.Y. Feb. 29, 2016) *appeal dismissed* 16-1299 (2d Cir. June 3, 2016) ("[T]he State's authority to regulate the use of its roads is well established.") (collecting cases); *Laine v. City of Livermore*, 695 F. App'x 260, 261 (9th Cir. 2017) ("Contrary to [the plaintiff's] contentions, vehicle registration requirements are not unconstitutional." (citing Hendrick)); *Perkins v. Ivey*, 772 F. App'x 245, 246 (5th Cir. 2019) (quoting *Hendrick*, 235 U.S. at 622) ("The Supreme Court ruled long ago that states may regulate the operation 'of all motor vehicles' that drive within their borders, and 'may require the registration of such vehicles and the licensing of their drivers' pursuant to their constitutionally protected police power."); *Earl v. Harris*, No. 23-1063, 2023 WL 3580700, at *1 (3d Cir. May 22, 2023) (noting that "the Supreme Court has long recognized a state's right to use its police powers to 'require the registration of [motor] vehicles and the licensing of their drivers' " and finding the plaintiffs' challenge to that

proposition to be "baseless") (quoting *Hendrick*, 235 U.S. at 622).

Plaintiff attempts to argue that there is a difference, grounded in statute and federal regulations, between driving and traveling, designating the former a privilege and the latter a Constitutionally-protected right. *See generally* Compl. However, plaintiff arguments are frivolous. *See Allen v. N.Y. State Dep't of Motor Vehicles*, 991 N.Y.S. 2d 701, 723 (N.Y. App. Div. 2014) (noting that "[the Constitution] does not recognize a fundamental 'right to drive' "); *see also Crandall v. New York State Dep't of Motor Vehicles*, No. 1:10-CV-918 (GLS/RFT), 2011 WL 2295742, at *2 (N.D.N.Y. June 8, 2011) (holding that there is no fundamental right to operate a motor vehicle; rather, it "is a revocable privilege that is granted upon compliance with statutory licensing provisions.").

Plaintiff takes issue with the fact that 18 U.S.C. § 31's definition of "motor vehicle" is specific to uses where the operator is engaging in a commercial activity. He asserts that, because he was not engaging in a commercial activity while operating his motor vehicle, he is exempt from any licensing or registration requirements. However, 18 USC § 31 is "a criminal statute" which explicitly states, "In this chapter, the following definitions apply .... There is no indication that such definitions, which are presented in a criminal context, would apply outside the context of 18 U.S.C. § 31 ...." *In re Guancione*, No. C-12-3910 EMC, 2012 WL 4120243, at *2 (N.D. Cal. Sept. 18, 2012); *see also Leith v. State of Missouri Highway Patrol*, No. 05-4399-CV-SFJG, 2007 WL 869508, at *2 (W.D. Mo. Mar. 20, 2007) ("Plaintiff wrongly believes that he may drive his unregistered vehicle without a valid driver's license and without a title on the public highways in Missouri. Plaintiff argues that he is not subject to Missouri licensing laws because his car is not a motor vehicle given that it is not used in commerce."; "[T]he motor vehicle definitions used in ...18 U.S.C. § 31 do not apply to plaintiff."); *Williams v. City of Battle Creek*, No. 25-CV-10270, 2025 WL 714441, at *3 (E.D. Mich. Mar. 5, 2025) ("Title 18 is not a source of any general right to travel."; "Critically, Title 18 does not cover the entire subject of motor vehicle regulation. Instead, sections of this Title criminalize select and narrowly defined conduct as it relates to commercial vehicles. Title 18 does not address state vehicle registration requirements, much less preempt the Michigan Vehicle Code."). Thus, to the extent plaintiff suggests that 18 U.S.C. § 31 or any other portion of Title 18 applies here to exempt him from the state vehicle and

traffic laws, such claims fail to state a claim upon which relief can be granted and are frivolous.

**\*9** Similarly, plaintiff cites 49 C.F.R. § 395.1(j)(1) to argue that "federal regulations recognize traveling and driving" as different activities. Compl. at 7. However,

> 49 C.F.R. § 390.1 et seq., [ ] sets definitions for the Federal Motor Carrier Safety Administration's promulgated regulations for commercial vehicles. Notably, each of these definition-providing statutes explicitly states that the definitions therein apply only to their respective statutory chapters or subchapters, not the entirety of the United States Code [ ]or to any state's laws. *See* 18 U.S.C. § 31(a)(6) (noting that the definitions therein apply only to "this chapter," Chapter 2 – Aircraft and Motor Vehicles (§§ 31 – 40A)); 49 C.F.R. § 390.1 (noting that the definitions therein apply only to "this subchapter," "Subchapter B – Federal Motor Carrier Safety Regulations"). Congress has thus expressed an intent that these definitions be construed narrowly, rather than as a substitute for any possible state statutory definitions. More importantly, neither of these statutes – each covering the narrow topic of driving commercial vehicles – actually conflicts with how the State applies or enforces its driver's license and vehicle registration requirements against private individuals like [the plaintiff].

*Redman v. Sununu*, No. 21-CV-267-JL, 2021 WL 6880649, at *10 (D.N.H. Nov. 24, 2021), *report and recommendation adopted sub nom. Redman v. Governor*, No. 21-CV-267-JL, 2022 WL 410072 (D.N.H. Feb. 10, 2022). Thus, to the extent plaintiff contends that 49 C.F.R. 395.1(j)(1) or any other section of the CFR supports his contention that he was traveling but not driving, and, thus, exempt from the licensing and registration requirements, those arguments are entirely without merit and are frivolous and fail to state a basis for any constitutional violation. [13]

**\*10**  In sum, there is no federal law or regulation differentiating between travel and driving that is applicable in plaintiff's situation and no Supreme Court precedent supporting plaintiff's position. Instead, there is well-settled law stating that a state has a right to enforce its vehicle and traffic laws requiring licensing and registration of motor vehicles. It is clear that no constitutional right was violated by any requirement that he be required to have a valid license and registration to operate his motor vehicle. Thus, plaintiff's constitutional rights were not violated by this requirement nor

the requirement that he pay the impound fee for the return of his vehicle.

As there is no underlying constitutional violation, there can be no conspiracy to commit a constitutional violation. See *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) ("A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights.") (internal citation omitted). Moreover, to proceed pursuant to Section 1985 for a conspiracy to violate one's constitutional rights, a plaintiff must make a showing of a "class-based animus," which plaintiff has not alleged here. *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 291 (2d Cir. 1992). "Section 1986 addresses 'neglect to prevent' conspiracies under § 1985. Thus, where no cause of action lies under § 1985, no cause of action can lie under § 1986." *Dill v. Vill. of Gowanda*, 952 F. Supp. 989, 995 (W.D.N.Y. 1997) (quoting *Levy v. City of New York*, 726 F.Supp. 1446 (S.D.N.Y. 1989)). Accordingly, it is recommended that plaintiff's section 1983 claims, section 1985 conspiracy claims, and section 1986 "neglect to prevent" claims against all defendants be dismissed for failure to state a claim upon which relief can be granted and frivolity.

"[T]here is no requirement that a court address every single potential ground for dismissal where it is clear that a claim should be dismissed"; however, the undersigned would be remiss not to note that there exist several additional grounds for dismissal. *Gerken v. Gordon*, 1:24-CV-0435 (MAD/CFH), 2024 WL 4608307, at *5 (N.D.N.Y. Oct. 29, 2024) (quoting *Dees v. Zurlo*, No. 1:24-CV-1 (MAD/DJS), 2024 WL 2291701, at *13 (N.D.N.Y. May 21, 2024)) (citing, *inter alia*, *Curtis v. Greenberg*, No. 22-252-CV, 2023 WL 6324324, *2 n.3 (2d Cir. Sept. 29, 2023)). Thus, they will be mentioned briefly for the sake of completeness of review.

Plaintiff has failed to demonstrate that John Vandenburgh, owner of JR Transmission – where plaintiff's vehicle was apparently towed and impounded – is a state actor. Nothing in plaintiff's complaint plausibly suggests he was acting under the color of state law. In addition to any claim against him being subject to dismissal for failure to state a claim and frivolity, any claims against Vandenburgh brought under section 1983 may be dismissed for this reason. Plaintiff contends, for purposes of his section 1983 claims against him that Vandenburgh "jointly engaged with state officials in the action, was acting under the color of the New York State Vehicle and traffic law" and contends that "under color of law doesn't require Defendant Jon VanDenburgh to be an officer of the State, it is enough that he was a willing participant." Compl. at 17. Although plaintiff correctly identifies this principle, his claim fails because there can be no conspiracy to commit a violation of constitutional rights if there is no violation of a constitutional right. Further, plaintiff proffers no support for any argument that Vandenburgh was engaged in a conspiracy with state actors merely because plaintiff's vehicle was transported to his garage, and he requires a fee to release the vehicle.

**\*11** To the extent plaintiff seeks to bring a claim for malicious prosecution against all defendants pursuant to section 1983,[14] Compl. at 19-20,

> [t]here is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. See *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *Joyner v. County of Cayuga*, No. 5:20-CV-60 (MAD/TWD), 2020 WL 1904088, at *8 (N.D.N.Y. Apr. 17, 2020) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001)).

*Pittman v. Edwards*, No. 5:20-CV-319 (GLS/ATB), 2020 WL 4194479, at *5 (N.D.N.Y. June 22, 2020), *report and recommendation adopted*, No. 5:20-CV-319 (GLS/ATB), 2020 WL 4192547 (N.D.N.Y. July 21, 2020). To assert a claim for malicious prosecution under the Fourth Amendment, a plaintiff must demonstrate he was arrested without probable cause as there can be no federal civil rights claim for false arrest where the involved officers had probable cause. *See, e.g.*, *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118-19 (2d

Cir. 1995), cert. denied, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

Plaintiff was ticketed for operating a vehicle without a license and without valid registration. *See generally* Compl. He concedes that he did not have a valid license or registration, but contends they were not required. *See id.* at 8-11. Thus, in addition to failing to state a cause of action due to a lack of any constitutional violation, plaintiff has failed to demonstrate that defendants did not have probable cause to ticket him for these violations of the vehicle and traffic law. Thus, his malicious prosecution claim may also be dismissed on for this reason.

Further, plaintiff fails to explain how defendants, only two of whom are prosecutors – Stanzione and Sandleitner [15] – were personally involved in any malicious prosecution. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).

**\*12** Plaintiff's claims that the vehicle and traffic laws, or the defendants' application of these laws to his use of his motor vehicle, violate the Thirteenth Amendment's prohibition against slavery and involuntary servitude also fails to state a claim upon which relief can be granted and frivolity. Plaintiff contends that because defendants, collectively, seek to "extract a use from the Plaintiff in the form of a driver's license and registration, when not legally required," this amounts to "forced labor/involuntary servitude." Compl. at 21. As this argument is premised upon the false belief that defendants cannot validly enforce the vehicle and traffic law or that such laws are violative of his constitutional rights, this claim fails. Further, to the extent plaintiff seeks to proceed pursuant to 18 U.S.C. § 1589, this is a criminal statute that has no applicability to plaintiff's claims here. Plaintiff has no authority to compel or enforce federal criminal law as there exists no private right of action to enforce this statute. *See see also McFadden v. Ortiz*, 5:12-CV-1244 (MAD/ATB), 2013 WL 1789593, at \*3 (N.D.N.Y. Apr. 26, 2013)

As to plaintiff's cause of action under the Administrative Procedure Act of 1946, 5 U.S.C. § 551, *et seq.*, plaintiff's claims are without merit because there is no requirement to provide substantive due process or a Court order as there is

no constitutionally-protected right involved. *See* Compl. at 16. Further, the Administrative Procedure Act applies only to federal agencies. *See* 5 U.S.C.A. § 701. None of the named defendants are federal agencies. The Second Circuit rejected the theory that a state agency could be a quasi-federal agency for purposes of the Administrative Procedure Act. *See New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 534-35 (2d Cir. 2010) (though concluded that it did not apply in this case).

Plaintiff also claims, in the "title" section on the first page of his complaint that defendants collectively violated the "Constitution's Spending Clause, Article I, Section 8, Clause 1. Compl. at 1. Plaintiff's only other mention of the Spending Clause is within his *Monell* cause of action wherein he claims that the State of New York, County of Greene, and Town of Cairo's alleged policy, custom, or practice of applying/enforcing an unconstitutional definition of motor vehicle, which violates his and others; substantive due process, "violates the United States Constitution's spending clause regarding federal funding." Compl. at 22. [16] In addition to the grounds for dismissal above, as the undersigned concluded that the plaintiff has stated no constitutional violation, such claim is also subject to dismissal for failure to state a claim upon which relief can be granted and frivolity.

Addressing plaintiff's *Monell* claims, he also only conclusorily pleads the existence of a formal policy or custom. *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at \*13 (S.D.N.Y. Mar. 26, 2015) ("[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details."). "Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), a complaint does not 'suffice if it tenders naked assertion [s] devoid of further factual enhancement.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiff bases his claim upon the collective defendants' [17] "policy" to "misinterpret" the definition of "motor vehicle" and the failure to train employees on the "proper" definition of motor vehicle or traveling versus driving. Compl. at 22-23. However, as the undersigned has concluded that the underlying claims are without merit, any claims grounded in *Monell* for the existence of a policy/custom or failure to train are without force and must be similarly dismissed as

frivolous and for failure to state a claim upon which relief can be granted.

**\*13**  As for plaintiff's libel, slander, intentional infliction of emotional distress, and false imprisonment claims, as the undersigned recommends dismissal of all federal claims, the undersigned further recommends that the Court decline to extend supplemental jurisdiction to review these claims. "Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp.3d 515, 528 (N.D.N.Y. 2016).[18]  Even if, *arguendo*, the Court were to reach these state law claims, because plaintiff bases his claims for libel, slander, intentional infliction of emotional distress, and false imprisonment on the allegation that defendants' interpretation and application of the term "motor vehicle" and "traveling" versus "driving" violates his constitutional rights, and that claim is entirely without merit, these state law claims fail to state claims upon which relief could be granted and are frivolous.

Insofar as plaintiff seeks to proceed pursuant to various provisions of New York State Penal Law, in addition to recommending that the Court decline to exercise supplemental jurisdiction over these claims, such claims must also be dismissed because plaintiff cannot seek the initiation of a criminal prosecution, an arrest, or enforcement of any state penal law. *See Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981) (holding that there can be no private initiation of a criminal prosecution or arrest); *see also McFadden*, 2013 WL 1789593, at *3 (affirming that there is no private right of action to enforce state or federal criminal statutes). Accordingly, in addition to recommending dismissal of the complaint against New York State for sovereign immunity and the remainder in its entirety for frivolity, plaintiff's state law claims for assault, robbery in the second degree, coercion in the third degree, and official misconduct also may be dismissed for failure to state a claim.

### IV. **Conclusion**

In sum, plaintiff's complaint, insofar stated against the State of New York and the state officials in their official capacities for monetary damages, is barred by sovereign immunity. The remainder of plaintiff's complaint should be dismissed as frivolous as it "is based on an indisputably meritless legal

theory.' " *Livingston*, 141 F.3d at 437, and for failure to state a claim upon which relief can be granted. Generally, "[a] pro se complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gerken*, 2024 WL 4608307, at *15 (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citation and internal quotation marks omitted)). "However, if the problems with a complaint are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to re-plead would be 'futile' and 'should be denied.' " *Id.* (citing *Edwards v. Penix*, 388 F. Supp. 3d 135, 144-45 (N.D.N.Y. 2019)) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). Here, the deficits in plaintiff's complaint are substantive and cannot be cured by a better pleading; thus, it is recommended that plaintiff not be afforded an opportunity to amend.

For the reasons set forth herein, it is hereby:

**ORDERED**, that plaintiff's in forma pauperis application, dkt. no. 2, is, **GRANTED**; and it is

**\*14  RECOMMENDED**, that plaintiff's complaint, insofar asserted against the State of New York and against the following individual defendants in their official capacities for monetary damages, Schrader, Raynor, Marriott, Kusminsky, Schroeder, Groden, Watts, Kaplan, Stanzione, Sandleitner, Scaturro, and Christman, *see generally* dkt. no. 1, be dismissed without prejudice [19] and without leave to amend on sovereign immunity grounds,[20] 28 U.S.C. § 1915A(b)(2), § 1915(e)(2)(B)(iii); and it is further

**RECOMMENDED**, that the remainder of plaintiff's complaint, Dkt. No. 1, be **DISMISSED** in its entirety with prejudice and without opportunity to amend based on frivolity and failure to state a claim upon which relief can be granted, 28 U.S.C. § 1915(e)(2)(B)(i), (ii); and it is further

**RECOMMENDED**, that the Court decline to exercise supplemental jurisdiction over plaintiff's state law claims; and it is

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on plaintiff in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *See* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72. [21]

**All Citations**

Slip Copy, 2025 WL 1448314

---

# Footnotes

1    Plaintiff does not provide how much income he receives, if any, from "work within walking distance." Dkt. No. 2.

2    The undersigned observes that plaintiff paid the filing fee in another action he filed in this District, 1:25-CV-0122 (MAD/PJE), *Dan v. Hochul*, commenced on January 27, 2025. This Court has deemed these cases related. In *Dan v. Hochul*, plaintiff raises essentially identical claims against defendant Hochul that he raises against the defendants in this action, all arising from the same underlying incident. A motion to dismiss is pending in that action.

3    Plaintiff is advised that, despite being granted IFP status for this action, he is still required to pay any costs or fees he may incur in connection with this action.

4    Despite the statutory language referring to incarcerated individuals, these requirements apply equally to non-prisoner pro se litigants seeking to proceed in forma pauperis. *See* N.D.N.Y. L.R. 72.3(d) ("Unless the Court orders otherwise, any civil action that a non-prisoner pro se litigant commences shall be referred to a Magistrate Judge for the purpose of review under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A when an application to proceed in forma pauperis is filed.").

5    Unless otherwise noted, the Court has provided plaintiff copies of the unpublished cases cited herein.

6    The Court's citation to this document is to the pagination located at the header of each page, generated by the Court's electronic filing and case management software.

7    Plaintiff seeks to proceed on the following claims under New York State Penal Code: Robbery in the Second Degree, Coercion in the Third Degree, and Official Misconduct. *See* Compl. at 24-28.

8    Plaintiff indicates that he seeks to bring the following state law claims pursuant to this Court's supplemental jurisdiction: false imprisonment, libel, slander, and negligent infliction of emotional distress. *See* Compl. at 25-28, 30-31.

9    Plaintiff states, in a "title" on the first page of his complaint, that the action is commenced pursuant to, among things, "The United States Constitution's Spending Clause, Article I, Section 8, Clause 1." Compl. at 1.

10    18 U.S.C. § 1589 is a criminal code, relating to persons who "knowingly provides or obtains the labor or services of a person" by, among other things, force, threats of force, physical restraint, threats of physical restraint, means of serious harm or threats of serious harm to that person or another, "by means of the abuse or threatened abuse of law or legal process," or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

11    Line 122 of the complaint states "This federal law was 'Enacted into law in 1946, and the key to this law is that it states that the government's administrative policies must be in harmony with the Constitution." (Compl. at 16, ¶122).

12    Plaintiff states that Schrader returned from his cruiser "[a] minute and a half later." Compl. at 9.

13    Further, the 131-year-old United States Supreme Court case on which plaintiff purports to rely, *Interstate Commerce Commission v. Brimson*, 154 U.S. 447 (1894), has never been interpreted by any court of law to hold what plaintiff states it does. *See* Compl. at 7. This case does not recognize a constitutional, fundamental right to drive or address a meaningful distinction between traveling and driving or operating a motor vehicle for "private" use, as it applies in this context. Indeed, it does not provide any support for plaintiff's arguments. *See Gen. Tobacco & Grocery Co. v. Fleming*, 125 F.2d 596, 599 (6th Cir. 1942) ("In *Interstate Commerce Clause v. Brimson*, 154 U.S. 447 ... 'The inquiry whether a witness before the commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination.' Moreover, the opinion asserts that the regulatory power of Congress over interstate commerce carries no power to destroy or impair fundamental guarantees of personal rights recognized by the Constitution as inhering in the freedom of the citizen. It was held that a citizen, in a proceeding brought in a Circuit Court of the United States by the Interstate Commerce Commission to compel him to answer particular questions and to produce particular books in his possession, was free to contend before that court that 'he was not legally bound to produce the books, papers, etc., ordered to be produced; or that neither the questions propounded nor the books, papers, etc., called for relate to the particular matter under investigation, nor to any matter which the Commission is entitled under the Constitution or laws to investigate.' "). Plaintiff has provided no valid authority supporting his position. *See, e.g.*, *Matthew v. Honish*, 223 F. App'x 563 (7th Cir. 2007) (finding "meritless" the pro se plaintiff's argument that state requirements of licensure and registration violated his right to travel as there is no fundamental right to drive. That the plaintiff contended that his inability to have a driver's license denied him " 'a single mode of transportation- in a car driven by himself ... does not impermissibly burden his right to travel.") (quoting *Miller v. Reed*, 176 F. 3d 1202, 1206-06 (9th Cir. 1999)).

14    Although plaintiff does not explicitly state the Constitutional amendment pursuant to which he seeks relief, a claim for false arrest under section 1983 is brought for violations of the Fourth Amendment. *See Oakes v. Cooke*, 858 F. Supp. 330, 335 (N.D.N.Y. 1994)("In *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Supreme Court acknowledged the validity of section 1983 malicious prosecution claims and held that the right to be free from prosecution without probable cause, which forms the very essence of a malicious prosecution claim, arises under the Fourth Amendment.").

15    Even if plaintiff were, *arguendo*, able to overcome all other defects, Stanzione and Sandleitner likely would also be protected by absolute prosecutorial immunity. *See Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987); *see also Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995).

16    Plaintiff does not indicate that he is seeking to bring a claim as a federal taxpayer for an alleged violation of the Spending Clause, Article I, Section 9, Clause 1, of the United States Constitution or that he is challenging the exercise of congressional power under the taxing and spending clause.

17    Plaintiff further fails to demonstrate how, the State of New York, a nonmunicipal entity can be held liable under *Monell*.

18    Plaintiff refers to a 50h proceeding at which he contends he "was hoping for a resolution of the matter." Compl. at 15. Although the exact claims in this state court proceeding are unclear, to the extent plaintiff may possibly seek review in of the unsuccessful outcome of any such proceeding in this Court, it is well-settled that

this Court cannot perform what is, in effect, an appellate review of such state court judgment under *Rooker-Feldman. See McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir. 2010).

19    Generally, when the Court lacks subject matter jurisdiction, a dismissal must be without prejudice. *See, e.g.*, *Miller v. Brightstar Asia*, Ltd., 43 F.4th 112, 126 (2d Cir. 2022) ("A dismissal for lack of jurisdiction must be without prejudice rather than with prejudice.").

20    Although dismissed based on sovereign immunity grounds, the dismissal as it relates to the State defendants may also be considered a dismissal based on frivolity. *See, e.g.*, *Canfield v. State of New York*, 6:24-CV-1357 (GTS/TWD), 2025 WL 1288747, at *2 (N.D.N.Y. May 5, 2025) (citing *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999)) ("[a] complaint will be dismissed as 'frivolous' when 'it is clear that the defendants are immune from suit' " in a case involving absolute immunity).

21    If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. *See* FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal federal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal federal holiday. *See id.* § 6(a)(1)(c).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 234722
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Diane J. DAVIS, Plaintiff,

v.

Julie CAMPBELL, as the assigned Judge of Chenango
County Family Court; and Karen Peters, as Chief
Judge, New York State Supreme Court Appellate
Division, Third Judicial Department, Defendants.

No. 3:13–CV–0693 (LEK/ATB).
|
Jan. 22, 2014.

**Attorneys and Law Firms**

Diane J. Davis, pro se.

### DECISION and ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on June 26, 2013, by the Honorable Andrew T. Baxter, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.1. Dkt. No. 3 ("Report–Recommendation"). *Pro se* Plaintiff Diane J. Davis brought this civil rights action challenging the legality of state-court child custody proceedings that occurred in Chenango County Family Court in 2011 and 2012.[1] Report–Rec. at 2–9. Plaintiff names as defendants two state-court judges, Julie Campbell and Karen Peters ("Defendants"), and seeks declaratory and injunctive relief. *See generally* Report–Rec.; Dkt. No. 1 ("Complaint"). Because Plaintiff applied to proceed *in forma pauperis,* Judge Baxter reviewed the Complaint pursuant to 28 U.S.C. § 1915. Report–Rec. at 1. Judge Baxter recommends that Plaintiff's Complaint be dismissed in its entirety because it fails to state a claim on which relief may be granted, and because Defendants are immune from suit. *See* Report–Rec. at 13–18. Plaintiff timely filed Objections to the Report–Recommendation. Dkt. No. 5 ("Objections").

A district court must review *de novo* any objected-to portions of a magistrate judge's report-recommendation or specific proposed findings or recommendations therein and "may

accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b); *accord* FED. R. CIV. P. 72(b); *see also Morris v. Local 804, Int'l Bhd. of Teamsters,* 167 F. App'x 230, 232 (2d Cir.2006); *Barnes v. Prack,* No. 11–CV–0857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. *Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011); *Barnes,* 2013 WL 1121353, at \*1; *Farid v. Bouey,* 554 F.Supp.2d 301, 306–07 & n. 2 (N.D.N.Y.2008); *see also Machicote v. Ercole,* No. 06 Civ. 13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument.").

Judge Baxter recommends dismissal because, *inter alia,* Defendants are protected by judicial immunity. Report–Rec. at 13–15. Plaintiff states in her Objections that she intended to sue the courts on which Defendants sit: Chenango County Family Court and the New York State Supreme Court Appellate Division, Third Judicial Department ("Third Department"). Objs. at ¶¶ 7–9, 15. However, these courts are also immune from suit. As branches of the New York State Unified Court System, the Chenango County Family Court and the Third Department are "arms of the state" and are therefore protected by sovereign immunity, which bars suits in federal court against states and state officials acting in their official capacities. *See, e.g., Gollomp v. Spitzer,* 568 F.3d 355, 386 (2d Cir.2009); *Bey v. Brooklyn Fam. Ct.,* No. 11–CV–5209, 2012 WL 1145933, at \*2 (E.D.N.Y. April 5, 2012); *McKnight v. Middleton,* 699 F.Supp.2d 507, 521 (E.D.N.Y.2010). Accordingly, allowing Plaintiff leave to amend the Complaint and name the state courts as defendants would not remedy its deficiencies.

**\*2** The remainder of Plaintiff's Objections are irrelevant, conclusory, or duplicative of arguments that were before Judge Baxter.[2] *See generally* Objections. The Court therefore reviews the remainder of the Report–Recommendation for clear error and finds none.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 3) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Court hereby certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this matter would not be taken in good faith; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order upon Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

## ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

The Clerk has sent to the court a civil rights complaint, together with an application to proceed in forma pauperis ("IFP"), filed by pro se plaintiff, Diane J. Davis. (Dkt.Nos.1, 2).

### I. *IFP Application*
A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 2). This court agrees, and finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327; *Harkins v. Eldridge,* 505

F.2d 802, 804 (8th Cir.1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

### II. *Complaint*
**\*3** In this civil rights complaint, plaintiff is challenging proceedings that occurred in the Chenango County Family Court in 2011 and 2012, relative to the custody of her grandson and relative to a neglect petition that was filed against her. (Compl.) (Dkt. No. 1). Plaintiff alleges that she had custody of the child for seven years (2005–2012), during which time the child's father was serving a criminal sentence for sexual abuse. (Compl.¶ 6). Plaintiff claims that when the child's father was released from custody, he attempted to reestablish contact with the child, however, the child reported that his father had molested him during visitation. (Compl.¶¶ 8–10).

Notwithstanding these allegations, the father filed a custody petition in the Chenango County Family Court to obtain custody of the child from plaintiff. At the same time, plaintiff filed cross-petitions to modify the father's visitation rights because of the alleged abuse. (Compl.¶ 11–12). Plaintiff alleges that her first assigned attorney requested that the Family Court relieve him because "the child's father made many custody petitions," and the attorney would not be able to represent plaintiff properly. (Compl.¶¶ 13–14). Defendant Campbell, the Family Court Judge, assigned Andrew Puritz, Esq., who plaintiff alleges "had no time for Plaintiff whatsoever." (Compl.¶ 15).

Plaintiff claims that the child's school reported the child's allegations of sexual abuse to the Chenango County Child Protective Service ("CPS"). (Compl.¶ 16). Plaintiff also states that she "would file new petitions as new allegations came in," but that after plaintiff had filed three petitions in an eight-month period, defendant Campbell issued an order prohibiting plaintiff from filing petitions on her own and directing that any petition be filed by her attorney, Mr. Puritz. (Compl.¶¶ 17–18). However, plaintiff claims that Mr. Puritz refused "several times" to file petitions on plaintiff's behalf. (Compl. ¶ 19). Plaintiff claims that by forbidding her from filing "new" petitions pro se, and requiring her to proceed with counsel, without giving plaintiff an opportunity to be heard, defendant Campbell was violating plaintiff's federal constitutional rights.

Plaintiff alleges that she continued to report the child's allegations of sexual abuse to the Child Abuse Hotline. (Compl.¶ 25). Plaintiff claims that one of the CPS workers failed to properly report the allegations, and in July of 2011, plaintiff reported the CPS worker to the "hotline." Plaintiff claims that the individual on the telephone "got really mad" and told plaintiff that she would be hearing from the CPS worker in question "within the hour." (Compl. ¶¶ 26–27). The CPS worker called plaintiff and made arrangements to meet at the "victim's advocate's office," but told plaintiff that Mr. Puritz would not "do anything for her." Plaintiff also claims that, in retaliation for reporting the CPS worker, she filed a neglect petition against plaintiff. (Compl.¶¶ 29–30).

 **\*4** Plaintiff claims that as a result of the neglect petition, defendant Campbell "took" the child from plaintiff's custody without notice or hearing, and placed the child with his father, "a convicted level III child molester, without any precautions against the continuing sexual abuse reported by the child." (Compl.¶ 31).

Attorney Puritz was assigned to represent plaintiff on the neglect case, but plaintiff claims that Attorney Puritz never filed a petition to have the child returned to plaintiff or even told plaintiff that such a procedure was available. (Compl.¶ 32). Plaintiff alleges that Attorney Puritz did not represent her properly and consistently ignored her telephone calls and letters. Attorney Puritz told plaintiff that he knew that the child was going to be taken, but never informed plaintiff. (Compl.¶ 34). Plaintiff states that there was a "court hearing," but plaintiff never received notice from the court. (Compl.¶ 35). Instead, the notice went to Mr. Puritz, and he failed to notify plaintiff. Attorney Puritz appeared for the hearing, but

did not request an adjournment so that plaintiff could get notice and an opportunity to be heard. (Compl.¶ 36).

Plaintiff claims that the CPS drove to plaintiff's house 15 minutes before the removal hearing [1] was to start, to notify plaintiff of the hearing. Plaintiff was not home and states that her twin sister did not accept service "because notice was insufficient." (Compl.¶¶ 37–40). Plaintiff states that she made multiple applications for another attorney "because Mr. Puritz did not want to do his job." (Compl.¶ 41).

Plaintiff alleges that when she managed to get Mr. Puritz on the telephone, he told her that he had 70 cases along with plaintiff's neglect case, he had to take care of his "paying clients" first, and he had no time for her case. (Compl.¶¶ 43–45). Plaintiff states that she reported this conversation to the Clerk of the Family Court and to the "Public Defender's Office." Plaintiff claims that the Public Defender's Office took plaintiff's application for new counsel, but defendant Campbell refused to appoint a new attorney without an explanation. (Compl.¶¶ 46–47). Plaintiff "believes" that the refusal to appoint new counsel, knowing that the assigned attorney refused to do his job, was an unconstitutional "policy" of the Family Court. (Compl.¶¶ 48–49).

Plaintiff states that during the pendency of the child neglect proceedings against plaintiff, the child's father filed a custody petition to have custody returned to him. The neglect petition against the plaintiff and the custody petition filed by the child's father were scheduled to be heard together. Trial for both petitions was scheduled for January 23, 2012. (Compl.¶¶ 50–51).

The complaint states that at the end of December "2012," [2] she became "fed up" with Mr. Puritz's refusal to work, and with the assistance of her "extended family," collected enough money for a retainer and hired private counsel. [3] (Compl.¶ 52). Plaintiff alleges that her new attorney immediately began working and filed the notarized "consent to change attorneys." (Compl.¶ 53). Counsel served the document on Mr. Puritz, but he did not transfer plaintiff's file for two weeks, notwithstanding the impending trial date. (*Id.*)

 **\*5** Plaintiff's new counsel continued to act on plaintiff's behalf in Family Court and filed witness lists for the trial. The attorney also filed an ex parte application for the funds, necessary to subpoena factual witnesses and to call expert witnesses. (Compl.¶¶ 54–55). Counsel also filed an application to adjourn the trial. (Compl.¶ 55). At the same

time, the child's father filed a motion to disqualify plaintiff's retained counsel because counsel's husband represented the child's father in the criminal case that resulted in his conviction. (Compl.¶ 56). Notwithstanding plaintiff's opposition to the disqualification, defendant Campbell granted the motion, and on January 18, 2012, reinstated Attorney Puritz as counsel for plaintiff, without plaintiff's consent. (Compl.¶¶ 57–61).

Plaintiff claims that defendant Campbell forced her to proceed to trial with unprepared counsel, who had an "obvious grudge" against plaintiff for firing him. (Compl.¶ 67). Attorney Puritz did not represent her properly and did not have her best interests in mind when he handled her three-week trial. (Compl.¶ 65, 69). Specifically, plaintiff alleges that Attorney Puritz did not make proper objections, and "in fact, ... made no hearsay objections," refused to call all of plaintiff's desired witnesses, and he allowed CPS to introduce records that were sealed and inadmissible. (Compl.¶¶ 70–73). Defendant Campbell even offered to help Attorney Puritz subpoena witnesses, although she had not given the same assistance to retained counsel. (Compl.¶ 72).

The custody and neglect petitions were decided against plaintiff, and all her visitation with the child was terminated. (Compl.¶¶ 74–75). Plaintiff states that she appealed to defendant Peters's court (the Appellate Division, Third Department) and "initially" proceeded pro se on the appeal. (Compl.¶ 75). Plaintiff claims that defendant Campbell refused to give plaintiff access to her file for the appeal, claiming "a policy" that only attorneys could look at the file and telling plaintiff she should hire an attorney or ask for assigned counsel. (Compl.¶ 76).

Plaintiff states that she was nervous that her appeal would be dismissed as untimely, so she asked the Appellate Division for assigned counsel. (Compl.¶ 77). The first attorney assigned by the Appellate Division had a conflict, and a second attorney, Sam D. Castellino, was appointed. (Compl.¶ 80). Plaintiff was unhappy with Mr. Castellino's performance. (Compl.¶¶ 82–91). Plaintiff did not share Mr. Castellino's view that plaintiff should "work with" Social Services and claims that Mr. Castellino refused to seek relevant records and exhibits. (Compl.¶¶ 82, 86–88). Plaintiff alleges that, although Mr. Castellino asked for reversal of Judge Campbell's decision, he also suggested that plaintiff be placed under CPS supervision, a proposal with which plaintiff strongly disagreed. (Compl.¶ 89). Mr. Castellino also refused to raise issues of judicial bias,

prejudice, misconduct, and ineffective representation at trial. (Compl.¶ 90).

**\*6** Plaintiff ultimately asked Mr. Castellino to withdraw, and he did so. (Compl.¶ 91). Plaintiff was appointed another attorney, Ms. Corbett. (Compl.¶ 92). However, plaintiff became displeased with Ms. Corbett's performance when Ms. Corbett decided to use Mr. Castellino's appellate brief, rather than write her own, knowing that Mr. Castellino's brief contained the offer to have plaintiff supervised by CPS. (Compl.¶¶ 93–94). Ms. Corbett also told plaintiff that Mr. Castellino was a friend of hers, that he did a "fabulous job" on the appeal, and that Mr. Puritz did an "excellent" job as plaintiff's trial counsel. She suggested that plaintiff go to counseling for six months and then reapply for visitation with the child. (Compl.¶ 95).

Plaintiff states that she also learned that there was a "cap" on attorneys fees in the Appellate Division, and that with the rate of $75.00 per hour, an attorney can only afford to spend 62 hours and 40 minutes working on a file, even if the case required much more. Plaintiff states that she was never given access to her file so that she could assess the magnitude of her own record. Plaintiff seeks to challenge the "cap rule" of the Appellate Division on "the grounds of equal protection and access to courts." (Compl.¶¶ 97–104).

Plaintiff states that, from her conversations with "several attorneys," she believes that attorneys are "deadly afraid" to raise issues of judicial bias, prejudice, and misconduct. (Compl.¶ 105). Because of this fear, plaintiff believes that her right to raise relevant issues has been prejudiced, and she states that she has "reversible issues" on appeal based on defendant Campbell's bias. (Compl.¶ 106). Plaintiff complains that defendant Peters's court consistently assigns counsel who are "related to the Respondent" or who would not work for her "fully" because of restrictions in compensation or fear of sanctions. (Compl.¶ 107).

Plaintiff asks for declaratory and injunctive relief:

(1) declare unconstitutional the "rule or policy" of the Chenango Family Court prohibiting pro se appellants access to their own file;

(2) declare unconstitutional the "rule or policy" of the Chenango County Family Court forbidding the filing of new petitions by pro se litigants who are represented by assigned counsel in pending proceedings;

(3) declare unconstitutional the "rule or policy" of the Chenengo County Family Court to "impose" assigned counsel who "refuse" to do their work properly on indigent litigants; and

(4) declare unconstitutional the "rule or policy" of the Appellate Division to cap compensation of assigned counsel.

(Compl. at pp. 12–13). For each of the above requests, plaintiff asks the court to enjoin the enforcement of the policy and to appoint a federal court monitor to "verify" compliance. (*Id.*)

### III. *Abstention*

#### A. Legal Standards

Pursuant to *Younger v. Harris,* 401 U.S. 37, 43–45 (1971), the District Court is without jurisdiction under the abstention doctrine if there is an ongoing state proceeding; where an important state interest is implicated; and the plaintiff has an avenue open for review of constitutional claims in state court. *See Parent v. New York,* 485 F. App'x 500, 503 (2d Cir.2012) (quoting *Younger, supra; Liberty Mut. Ins. Co. v. Hurlbut,* 585 F.3d 639, 647 (2d Cir.1997)). The *Younger* doctrine originally applied only to criminal proceedings, but is now applicable to civil actions as well, including state administrative proceedings. *Id.* (citations omitted). The doctrine also applies to claims for declaratory and injunctive relief. *Id.*

#### B. Application

**\*7** Plaintiff states in her complaint that appellate counsel was given until June 7, 2013 to decide whether to use former counsel's brief on appeal or to submit her own brief. (Compl.¶¶ 92–94). Based on a deadline of June 7, 2013 for determining whether to file a brief or use Mr. Castellino's brief, it appears that plaintiff's state court appeal is still pending in the Appellate Division. Thus, there is an ongoing state court proceeding, and the first criterion in the abstention analysis is met.

With respect to the second factor, it has been held that the "resolution of domestic matters has been recognized as an important state interest." *Parent,* 485 F. App'x at 503–504 (citing *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 12–13 (2004) (" '[T]he whole subject of the domestic relations of husband and wife, parent and child belongs to

the laws of the States and not to the laws of the United States.' ")). The case also involves matters challenging the constitutionality of judges' actions. It has been held that "few interests can be considered more central than a state's interest in regulating its own judicial system." *Spargo v. New York State Com'n on Judicial Conduct,* 351 F.3d 65, 75 (2d Cir.2003) (citing *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 848 (1978)). Because this case involves custody matters, domestic relations, and the conduct of state court judges in the course of exercising their jurisdictions, the case falls within the area of important state interest. Thus, the second factor also weighs in favor of abstention.

Finally, plaintiff has failed to show that there is no avenue for any constitutional claims in state court. Plaintiff must demonstrate that state law bars the effective consideration of her constitutional claims. *Spargo,* 351 F.3d at 78. The relevant question is whether the state's procedural remedies could provide the relief sought, not whether they *will* provide the constitutional ruling that plaintiff seeks. *Id.* at 79. Simply because a state court has not ruled in plaintiff's favor does not render the remedy inadequate for purposes of the abstention doctrine. *Parent,* 485 F. App'x at 504.

Although plaintiff in this case complains bitterly about her various assigned attorneys, she has named as defendants only the Family Court judge assigned to her case and the Chief Judge of the Appellate Division. She claims that she has been told that attorneys will not raise issues of judicial bias or misconduct. The first three of four claims for relief involve only the alleged "policy" of the Family Court. (Compl. at 12). To the extent that plaintiff alleges that the Family Court judge engaged in some sort of misconduct, the State of New York provides a mechanism to file complaints against state court judges. *See* N.Y. Jud. Law § 41–47. New York has created the State Commission on Judicial Conduct to review complaints against judges, relating to the conduct, qualifications, fitness to perform, or the performance of official duties of *any judge. Id.* § 41(1). The governing statute is accompanied by specific regulations. N.Y.Code Comp.Code & Regs., tit. 22, § 100.2. These provisions are also reflected in the New York State Constitution, with review of the Commission's decisions in the New York Court of Appeals. N.Y. Const., Art. 6, § 22(d).

**\*8** Thus, plaintiff could raise whatever misconduct claims she wishes under New York law and regulations. Where state remedies are available, the federal court should assume that state procedures will afford an adequate remedy, in the

absence of "unambiguous authority" to the contrary. *Diamond "D" Construction Corp. v. McGowan,* 282 F.3d 191, 202 (2d Cir.2002) (quoting *Pennzoil v. Texaco,* 481 U.S. 1, 15 (1987)). Plaintiff's conclusory claims of bad faith or retaliation are insufficient to establish that she cannot receive a full and fair adjudication in the state court. *See Bobrowsky v. Yonkers Courthouse,* 777 F.Supp.2d 692, 710 n .27 (S.D.N.Y.2011) (conclusory allegations will not overcome the presumption that plaintiff will receive a fair adjudication in state court).

Therefore, even assuming that the court had jurisdiction over plaintiff's claims, the final abstention requirement weighs in favor of the court declining jurisdiction. Even if the court were not to abstain, dismissal would be appropriate.

## IV. *Judicial Immunity*

### A. Legal Standards

With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireless v. Waco,* 502 U.S. 9, 9–10 (1991). Judicial immunity has been created for the public interest in having judges who are "at liberty to exercise their functions with independence and without fear of consequences." *Huminski v. Corsones,* 396 F.3d 53, 74 (2d Cir.2004). Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 12 (1976) (citing *Pierson v. Ray,* 386 U.S. 547, 554 (1967)). Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). The only two circumstances in which judicial immunity does not apply is when he or she takes action "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles,* 502 U.S. at 11–12.

### B. Application

In this case, plaintiff has named two judges as the only defendants: the Family Court Judge assigned to her case and the Chief Judge of the Appellate Division, Third Department. Every action alleged to have been taken by either judge was in her judicial capacity and within her jurisdiction. The handling of plaintiff's file and the appointment of counsel is well within their judicial functions. Neither of the exceptions to judicial immunity exist in this case. The Second Circuit has specifically held that a Family Court judge's determination of reasonable attorneys fees is a judicial act that is entitled

to absolute immunity. *Bliven v. Hunt,* 579 F.3d 204, 212 (2d Cir.2009).

Judicial immunity relief does not bar a claim for prospective injunctive relief against a judicial officer acting in her judicial capacity, *Pulliam v. Allen,* 466 U.S. 522, 541–42 (1984). However, Congress has statutorily provided for such immunity by amending section 1983 to provide that in "any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983, as amended by Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104–317, 110 Stat. 3847, 3853 (1996).

**\*9** In this case, plaintiff does not allege that any declaratory relief was unavailable in state court, and generally, declaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order. *LeDuc v. Tilley,* No. 05–CV–157, 2005 WL 1475334, at \*7 (D. Conn. June 22, 2005) (citing cases). Plaintiff has appealed the Family Court Judge's order, and that appeal appears to be pending.

The doctrine of judicial immunity also does not shield judges from claims for prospective declaratory relief." *LeDuc,* 2005 U .S. Dist. LEXIS 12416, at \*18. In this case, plaintiff's request for declaratory relief is purely retrospective. She seeks a declaratory judgment that past actions that occurred in the context of the Family Court proceedings violated her constitutional rights.[4] Although she states her requests for "relief" in future terms and refers to the judges' actions as "policies," essentially, in her first three claims, she is asking the court to invalidate the actions of the Family Court Judge.[5] Plaintiff's appeal of those orders and the ultimate custody decision is still pending. Thus, both judges are entitled to judicial immunity as to all claims.[6]

## V. *Merits*

### A. Fee "Cap"

The court must also note that plaintiff's fourth cause of action misstates the law that is the basis for her claim. Plaintiff asks the court to declare the "policy" of the Appellate Division to "cap compensation of assigned counsel at 62.7 hours of their work ...." (Compl. at 13). The fee cap is not defendants' "policy." It is a statutory provision. New York County Law § 722–b provides for the representation

of persons accused of a crime or parties before the Family or Surrogates Court. Section 722–b(1) (b) provides that attorneys so appointed shall receive $75.00 per hour and reimbursement for expenses reasonably incurred. This includes trial, appellate and other types of representation. The statute provides that for "representation on an appeal, compensation and reimbursement shall be fixed by the appellate court ." *Id.* § 722–b(3). While it is true that there is a "cap" on fees of $4,400.00, the statute provides that in extraordinary circumstances, the trial *or appellate court* may provide for compensation in excess of the limit and for payment of compensation and reimbursement before the completion of representation. *Id.*

The allegations in the complaint are unclear. Although plaintiff argues that the fee cap is unconstitutional, she seems to be aware that attorneys may request additional compensation. *See* Compl. ¶ 103 ("Upon information and belief, none of these attorneys applied for additional compensation ....") Plaintiff seems to argue that it was "unlikely" that her attorneys "read the entire record in a matter of days," and thus, they did not have enough time to work on her appeal. She states that "[m]erely to read 1,800 pages of the record requires 90 hours of work, and that does not include legal research, drafting or putting the record together, including tables of contents which is a job in itself." (Compl.¶ 101). Plaintiff assumes that if it takes 90 hours of work, but an attorney can only devote approximately 62 hours of work prior to reaching the cap, her attorneys must not have had sufficient time to prepare a proper appeal because they never asked for additional compensation. She appears to blame the cap for this problem.

**\*10**  Plaintiff's allegations fail to state a constitutional claim. She is speculating that because her attorneys did not ask for more money (that she is aware of), they must not have spent enough time on her appeal and thus, plaintiff's access to courts, due process, and equal protection rights were violated. There is absolutely no basis for this claim. She was not affected by the fee cap, [7] and in any event, neither of the defendants would have had any responsibility for the statute or for any attorney failing to ask for additional compensation.

### B. Hybrid Representation

#### 1. Legal Standard

As stated above, there is no constitutional right to "hybrid" representation. *Collins v. Beaver,* No. 03–CV–416, 2005 WL 1801603, at *11 (E.D.N.Y. July 27, 2005). This is true under

either New York law or federal law. *Id.* (citing *People v. White,* 73 N.Y.2d 468, 479, *cert. denied,* 493 U.S. 859 (1989)). Even a criminal defendant has no right to file a pro se supplemental brief. *Id.* Although indigents have a right to appear pro se and a right to appointed counsel, those rights may not be exercised at the same time. *Id.* (citing *Ennis v. LeFevre,* 560 F.2d 1072, 1075 (2d Cir.1977).

#### 2. Application

Plaintiff claims that the Family Court's "rule or policy" preventing "new pro se petitions by individuals represented by assigned counsel" is unconstitutional. Plaintiff appears to believe that the fact that plaintiff was filing multiple petitions claiming new instances of alleged abuse of the child, these constituted "new" petitions that she was entitled to file pro se, even though she was represented by counsel on the custody issue. Plaintiff was not entitled to do so, and she was not denied access to courts when the Family Court limited her filings to those made by her assigned attorney. No constitutional claim has been stated.

### VI. *Amendment*

A pro se litigant's complaint should not be dismissed "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). In this case, plaintiff is suing two judges. Based upon the doctrines of abstention and of judicial immunity, plaintiff would be unable to amend the complaint to state a valid claim against either of these two judges. Thus, this court will recommend that, if this report is adopted, the court deny leave to amend.

**WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's motion for IFP status (Dkt. No. 2) is **GRANTED ONLY FOR PURPOSES OF FILING THIS COMPLAINT,** and it is further

**RECOMMENDED,** that plaintiff's complaint be **DISMISSED IN ITS ENTIRETY FOR FAILURE TO STATE A CLAIM AND BASED ON IMMUNITY,** pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii)-(iii), and it is

**RECOMMENDED,** that if the court approves this recommendation, it further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3), and it is

**\*11 ORDERED,** that the Clerk serve a copy of this Order upon Plaintiff in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE*

*APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 234722

---

## Footnotes

1  For a full discussion of Plaintiff's allegations, reference is made to the Report–Recommendation.

2  Plaintiff objects to the referral of her Complaint to a magistrate judge. Objs. ¶¶ 30–32, 34. However, under 28 U.S.C. 636(b), the Court may designate a magistrate judge to submit recommendations as to dispositive matters, and the Court may accept, reject, or modify those recommendations.

1  Plaintiff occasionally includes dates in her complaint. However, it is difficult to determine what hearing plaintiff is discussing. She states in ¶ 35 that after the child was taken there was "also a court hearing" of which she never received notice. However, in ¶ 37, she discusses a "removal hearing" of which she was improperly "notified" by CPS driving to plaintiff's house 15 minutes prior to the hearing. It is unclear whether these are the same, or two separate hearings.

2  Plaintiff may mean December of 2011 because the trial date was January 2012. (Compl.¶ 51).

3  Plaintiff does not include her retained attorney's name in the complaint.

4  As stated above, plaintiff also asks that the court appoint a "federal court monitor" to verify compliance. (Compl. at 12–13).

5  It is meritless to assert, *inter alia,* that because she claims that she was appointed counsel that did not perform to her liking, it was the "rule or policy" of the Chenengo County Family court to "impose upon indigent litigants assigned counsel who refuse to do their work properly and who are fired for cause." (Compl. at 12).

6  The court would point out that state law also supports this application of judicial immunity. In *Swain v. New York,* 294 A.D .2d 956, 741 N.Y.S.2d 788, 789 (4th Dep't 2002), the Appellate Division held that the allegedly negligent acts of the court and its clerks in conjunction with the assignment of counsel who allegedly failed to perfect plaintiff's timely appeal were "cloaked with judicial immunity." (citations omitted), *leave to app. den.* 99 N.Y.2d 501, 752 N.Y.S.2d 588 (2002).

7  The adequacy of fees for assigned counsel has been the topic of various suits in both state and federal court, most of which have been brought by assigned counsel, challenging either the hourly rate or the procedures by which attorneys are appointed in criminal cases. *See e.g. Bliven, supra; Zeigler v. New York,* No. 5:11–CV–37, 2013 WL 2461453 (N.D.N.Y. June 7, 2013) (assigned counsel attorneys and criminal defendants challenging the adequacy of assigned counsel compensation); *Campbell v. Poole,* No. 04–CV–6261, 2008 WL 2561998, at *2 (W.D.N.Y. June 26, 2008) (discussing alleged inadequacy of fees in relation to a petitioner's habeas corpus application based on ineffective counsel); *Levinson v. Lippman,* 4 N.Y.3d 280, 794 N.Y.S.2d 276, 827 N.E.2d 259 (2005) (attorneys challenged validity of court rule providing for administrative review of fee awards

in excess of statutory limits-rule held valid); *New York County Lawyers Ass'n v. State,* 192 Misc.2d 424, 745 N.Y.S.2d 376 (N.Y.Sup.Ct.2002) (New York County attorneys challenging the caps on amounts payable to assigned counsel—granting preliminary injunction raising the rate paid to counsel, until the legislature modified N.Y. County Law § 722–b and N.Y. Judiciary Law § 35, raising the rates payable to assigned counsel).

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML   Document 54   Filed 11/26/25   Page 248 of 520

Frost v. CVR Associates Inc., Not Reported in Fed. Supp. (2019)

2019 WL 6340993
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Yvonne FROST, Plaintiff,

v.

CVR ASSOCIATES INC., et al., Defendants.

1:19-CV-9190 (CM)
|
Signed 11/26/2019

**Attorneys and Law Firms**

Yvonne Frost, New York, NY, pro se.

ORDER OF DISMISSAL

COLLEEN McMAHON, Chief United States District Judge:

**\*1** Plaintiff, appearing *pro se*, brings this frivolous action. By order dated November 21, 2019, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis* ("IFP"). The Court dismisses this action for the reasons set forth below.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or portion thereof, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *see also Denton v. Hernandez,* 504 U.S. 25, 33 (1992) (holding that a "finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston,* 141 F.3d at 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory.") (internal quotation marks and citation omitted).

**DISCUSSION**

Because of Plaintiff's history of filing frivolous and vexatious actions, by order dated November 7, 2019, the Court barred Plaintiff from filing future civil actions IFP in this Court without first obtaining from the Court leave to file. *See Frost v. New York City (HRA),* 1:19-CV-8936, 6 (S.D.N.Y. Nov. 7, 2019). Although the filing bar does not apply to this action, which was filed before the filing bar was issued, this action is not a departure from Plaintiff's pattern of frivolous and vexatious filings.

Plaintiff alleges, "Love do not hurt. If you love my baby you would not hurt him. The government have put me in a position and made it difficult – very difficult for me to choose between my baby and their job." (ECF 2, p. 5.) She also alleges that

> They will kill Uriel if I don't go. Someone said "I said no." Jesus said "that is a nice gift you have they would try to take it." Now government want me purchase a house from them. If I turn around and purchase or take these keys that means I am letting them walk free for all the wrongs they have done to me in sexual assaults.

(ECF 2, p. 5-6.)

Even when read with the "special solicitude" due *pro se* pleadings, *Triestman,* 470 F.3d at 475, Plaintiff's claims rise to the level of the irrational, and there is no legal theory on which she can rely. *See Denton,* 504 U.S. at 33; *Livingston,* 141 F.3d at 437. The Court therefore dismisses this action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

**\*2** District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione,* 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend.

## CONCLUSION

The Clerk of Court is directed to assign this matter to my docket and note service on the docket. Plaintiff has consented to electronic service of Court documents. (ECF 3.)

Plaintiff's action is dismissed as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6340993

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Follow by   Lewis v. Hanson,   N.D.N.Y.,   April 9, 2020

2011 WL 1453789
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Susan Lee HARE, Plaintiff,
v.
James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).
|
April 14, 2011.

OPINION

SWEET, District Judge.

**\*1**  Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2**  Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

**\*3**  Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation

claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment); *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez. [1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiff's allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory

and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal for her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " *Graham,* 89 F.3d at 79 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See Graham,* 89 F.3d at 79 (quoting *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by

corrections officers is insufficient on its own to establish a denial of due process...." [3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also Moore v. Casselbeny,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

### Plaintiff's Claim that She was Unable to File a Grievance is Dismissed

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have a cognizable § 1983 claim. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, \*3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to

exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### Plaintiff's Claims of Verbal Abuse are Dismissed

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y. 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at \* 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ( "Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at \*6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370, at \*1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at \*3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus." Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at \*6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare

Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make such a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free

Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment motions[4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section § 1983.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " *Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987)).

**\*10** With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were

"substantially burdened." *Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (*See* Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. *See Gill,* 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harrassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

**\*11** Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even when the evidence is viewed most favorably to Plaintiff—rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

***Plaintiff's Reference to Additional Witnesses Does Not Merit a Denial of Summary Judgment***

Plaintiff claims that Defendants' motions for summary judgment should be denied on the grounds that two witnesses have yet to file affidavits. Four months have passed since Defendants filed their motions for summary judgment, and Plaintiff has not attempted to submit these additional affidavits. Furthermore, Plaintiffs' description of what their witnesses will say demonstrates that they would not rescue her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez verbally abuse and physically threaten her in the chapel on August 18, 2008 and in the subsequent meeting on that same day (to the extent that these are separate instances). As was discussed above, Lopez's alleged verbal abuse does not support a § 1983 claim for cruel and unusual punishment, as Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant Collins at BHCF at the time Lopez prevented Plaintiff from entering her work assignment as Catholic Chaplain's Clerk, again without specifying when this occurred. Lopez's alleged refusal to allow Plaintiff to work as Catholic clerk is insufficient to support § 1983 claim, as Lopez holds no right to her prison assignment. To the extent that Collins's affidavit would support Plaintiff's allegation that Lopez falsely reported her absent from work in retaliation for the Plaintiff's complaints, Plaintiff has not established that her complaints motivated the allegedly false reporting. Furthermore, Plaintiff cannot establish that the adverse action of her removal from her position as Catholic clerk was caused by the allegedly false reports, as Hayden cited other valid reasons for his decision to remove her.

***Conclusion***

**\*12** For the reasons stated above, Defendants' motions for summary judgment are granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1453789

---

## Footnotes

1    To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

2    Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is addressed, infra. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis for Hayden's decision to dismiss Plaintiff.

3    A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

4    As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice her religions are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Follow by   Lewis v. Hanson,   N.D.N.Y.,   April 9, 2020

2011 WL 1453789

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Susan Lee HARE, Plaintiff,

v.

James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).

|

April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

**\*3**  Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation

claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment); *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez.[1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiffs allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory

and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal for her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " *Graham,* 89 F.3d at 79 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See Graham,* 89 F.3d at 79 (quoting *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process...." [3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also Moore v. Casselbeny,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

### Plaintiff's Claim that She was Unable to File a Grievance is Dismissed

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have a cognizable § 1983 claim. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, \*3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to

exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### Plaintiff's Claims of Verbal Abuse are Dismissed

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986).) Hare does not claim that any actual physical harm was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y. 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at \* 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ( "Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at \*6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370,

at \*1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at \*3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus." Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at \*6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare

Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make such a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her, and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free

Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

**b. The Alleged Denial of Plaintiff's Right to Practice Her Religion**

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment motions[4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section § 1983.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " *Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987)).

**\*10** With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were

"substantially burdened." *Ford v. McGinness,* 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (*See* Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. *See Gill,* 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

**\*11** Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even when the evidence is viewed most favorably to Plaintiff— rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986)) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

***Plaintiff's Reference to Additional Witnesses Does Not
Merit a Denial of Summary Judgment***

Plaintiff claims that Defendants' motions for summary
judgment should be denied on the grounds that two witnesses
have yet to file affidavits. Four months have passed since
Defendants filed their motions for summary judgment,
and Plaintiff has not attempted to submit these additional
affidavits. Furthermore, Plaintiffs' description of what their
witnesses will say demonstrates that they would not rescue
her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez
verbally abuse and physically threaten her in the chapel on
August 18, 2008 and in the subsequent meeting on that
same day (to the extent that these are separate instances). As
was discussed above, Lopez's alleged verbal abuse does not
support a § 1983 claim for cruel and unusual punishment, as
Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant
Collins at BHCF at the time Lopez prevented Plaintiff
from entering her work assignment as Catholic Chaplain's
Clerk, again without specifying when this occurred. Lopez's
alleged refusal to allow Plaintiff to work as Catholic clerk
is insufficient to support § 1983 claim, as Lopez holds
no right to her prison assignment. To the extent that
Collins's affidavit would support Plaintiff's allegation that
Lopez falsely reported her absent from work in retaliation
for the Plaintiff's complaints, Plaintiff has not established
that her complaints motivated the allegedly false reporting.
Furthermore, Plaintiff cannot establish that the adverse action
of her removal from her position as Catholic clerk was caused
by the allegedly false reports, as Hayden cited other valid
reasons for his decision to remove her.

***Conclusion***

 **\*12**  For the reasons stated above, Defendants' motions for
summary judgment are granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1453789

---

## Footnotes

1    To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her
deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County
of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each
party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the
last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is
inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

2    Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is
addressed, infra. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis
for Hayden's decision to dismiss Plaintiff.

3    A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for
the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d
Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish
that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

4    As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice
her religions are not contained in her complaint, but come from her deposition testimony and other filings,
they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Follow by    Lewis v. Hanson,    N.D.N.Y.,    April 9, 2020

2011 WL 1453789

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Susan Lee HARE, Plaintiff,

v.

James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).

|

April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See*

Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

**\*3** Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation

claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment); *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez.[1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiff's allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory

and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal for her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " *Graham,* 89 F.3d at 79 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks[2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See Graham,* 89 F.3d at 79 (quoting *Lowrance,* 20 F.3d at 535).

### *Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed*

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by

corrections officers is insufficient on its own to establish a denial of due process...."[3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also Moore v. Casselbeny,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

### *Plaintiff's Claim that She was Unable to File a Grievance is Dismissed*

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have a cognizable § 1983 claim. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, \*3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to

exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### Plaintiff's Claims of Verbal Abuse are Dismissed

**\*7** Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y. 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at \* 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at \*6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370,

at \*1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at \*3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus.*" *Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at \*6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

### Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed

#### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare

Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make such a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment motions[4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section § 1983.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " *Harris v. Lord,* 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987)).

**\*10** With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were

"substantially burdened." *Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (*See* Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. *See Gill,* 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

**\*11** Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even when the evidence is viewed most favorably to Plaintiff— rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

***Plaintiff's Reference to Additional Witnesses Does Not
Merit a Denial of Summary Judgment***

Plaintiff claims that Defendants' motions for summary
judgment should be denied on the grounds that two witnesses
have yet to file affidavits. Four months have passed since
Defendants filed their motions for summary judgment,
and Plaintiff has not attempted to submit these additional
affidavits. Furthermore, Plaintiffs' description of what their
witnesses will say demonstrates that they would not rescue
her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez
verbally abuse and physically threaten her in the chapel on
August 18, 2008 and in the subsequent meeting on that
same day (to the extent that these are separate instances). As
was discussed above, Lopez's alleged verbal abuse does not
support a § 1983 claim for cruel and unusual punishment, as
Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant
Collins at BHCF at the time Lopez prevented Plaintiff
from entering her work assignment as Catholic Chaplain's
Clerk, again without specifying when this occurred. Lopez's
alleged refusal to allow Plaintiff to work as Catholic clerk
is insufficient to support § 1983 claim, as Lopez holds
no right to her prison assignment. To the extent that
Collins's affidavit would support Plaintiff's allegation that
Lopez falsely reported her absent from work in retaliation
for the Plaintiff's complaints, Plaintiff has not established
that her complaints motivated the allegedly false reporting.
Furthermore, Plaintiff cannot establish that the adverse action
of her removal from her position as Catholic clerk was caused
by the allegedly false reports, as Hayden cited other valid
reasons for his decision to remove her.

***Conclusion***

**\*12** For the reasons stated above, Defendants' motions for
summary judgment are granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1453789

---

## Footnotes

1   To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her
    deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County
    of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each
    party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the
    last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is
    inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

2   Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is
    addressed, infra. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis
    for Hayden's decision to dismiss Plaintiff.

3   A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for
    the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d
    Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish
    that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

4   As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice
    her religions are not contained in her complaint, but come from her deposition testimony and other filings,
    they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4882774
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Silvio R. ILLESCAS, Plaintiff,

v.

Anthony ANNUCI, Vassar Brothers Medical
Center, Dr. Daniel E. Laurie, Dar Sajin A. Pillai,
Dr. Jesse Wolstein, Dr. Hector I. Ojeda-Martinez,
Sehrish Shahid, Dr. Robert U. Mmerole, Defendants.

21-cv-8473 (NSR)
|
Signed November 25, 2024

**Attorneys and Law Firms**

Silvo R. Illescas, Coxsackie, NY, Pro Se.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

 **\*1**  *Pro se* Plaintiff Silvio R. Illescas ("Plaintiff") initiated this action on October 13, 2021, alleging deprivation of rights under 42 U.S.C. § 1983 ("Section 1983") claiming violations of the Eighth Amendment and Fourteenth Amendment, as well as Article I, § 5 of the New York State Constitution, against Defendant Vassar Brothers Medical Center ("Vassar Brothers"), Defendant Doctor Daniel E. Laurie ("Laurie"), care physician provider, Defendant Doctor Sajin A. Pillai ("Pillai"), medical doctor provider, Defendant Doctor Hector I. Ojeda-Martinez ("Ojeda-Martinez"), medical doctor provider, Sehrish Shahid ("Shahid"), physician provider, Defendant Doctor Robert U. Mmerole ("Mmereole"), medical doctor provider, (together, "Vassar Defendants"), Defendant Anthony J. Annucci ("Annucci"), acting commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"), and Defendant Doctor Jesse M. Wolstein ("Wolstein"), primary care physician provider.

Presently before the Court are Vassar Defendants, Annucci and Wolstein's Motions to Dismiss Plaintiff's claims as against them pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). For the following reasons, the motions are GRANTED.

**BACKGROUND**

The following facts are derived from the Second Amended Complaint ("Am. Compl.") and are taken as true and constructed in the light most favorable to the Plaintiff at this stage.

Plaintiff is an inmate at Green Haven Correctional Facility. (Am. Compl. p. 3.) On April 9, 2020, at around 3:00 AM, Plaintiff was awakened from his sleep and ordered to prepare himself for a trip to "an outside hospital." (Am. Compl. ¶ 1.) At that point, the Empire State Ambulance Corp was in the lobby awaiting Plaintiff. (Am. Compl. ¶ 3.) Plaintiff was then transported to Vassar Brothers Medical Center, arriving at 4:05 AM. (Am. Compl. ¶ 7.) At 4:29 AM, Dr. Bruce Gendron performed "an XR chest on Plaintiff's chest" and diagnosed Plaintiff with "bilateral lower lung infiltrates." (Am. Compl. ¶ 9.) Dr. Jesse M. Wolstein was the primary care physician provider and diagnosed Plaintiff with "[a]cute hypoxemic respiratory failure, Covid-19 virus infection, and pneumonia." (Am. Compl. ¶ 10.) Dr. Hector I. Ojeda-Martinez further diagnosed Plaintiff with "[a]bnormal liver enzymes and elevate[d] troponin." (Am. Compl. ¶ 11.) Dr. Robert U. Mmerole diagnosed Plaintiff with "[c]ough and ... non-ST elevated myocardial infarction." (Am. Compl. ¶ 12.) Nurse Caroline M. Devlin and Amber Funk also diagnosed Plaintiff with shortness of breath. (Am. Compl. ¶ 13.)

After performing an assessment of Plaintiff, Wolstein prescribed Plaintiff with a series of medication, and, thereafter, Plaintiff was "transported to an isolated room to begin with Covid-19 regimen test-trial." (Am. Compl. ¶¶ 17-19.) Plaintiff states that no member of Vassar Brothers Medical Center "warned him [of] the potential serious side effects" of his medication regiment. (Am. Compl. ¶ 20.) That same day at approximately 1:00 PM, Plaintiff was told by an "unknown doctor with face mask" that he had a fifty percent chance of survival. (Am. Compl. ¶ 21.) This caused the Plaintiff to panic, thinking he was going to die because he did not ask the purposes of the medication he was prescribed. (Am. Compl. ¶ 22.)

 **\*2**  Based on the foregoing, Plaintiff brings Section 1983 claims alleging violations of the Eighth Amendment.

## PROCEDURAL HISTORY

On October 13, 2021, Plaintiff commenced this action against the Defendants in his Complaint. (ECF No. 1). On December 7, 2022, the Court issued an Opinion and Order dismissing the Complaint's claims in its entirety, granting Plaintiff leave to file an Amended Complaint. (ECF No. 95). Then, on July 31, 2023, Plaintiff filed his First Amended Complaint (ECF No. 117). Finally, on November 15, 2023, Plaintiff filed his Second Amended Complaint ("Am. Compl") (ECF No. 149). The Second Amended Complaint is the operative Complaint. On May 13, 2024, Annucci filed his motion to dismiss and his memorandum of law in support ("Annucci Motion") (ECF Nos. 177 and 178), Wolstein filed his motion to dismiss, memorandum of law in support, and reply affirmation in support of his motion ("Wolstein Motion") (ECF Nos. 180, 181 and 204), and Vassar Defendants filed their motion to dismiss and memorandum of law in support ("Vassar Motion") (ECF Nos. 182 and 183). On August 2, 2024, Plaintiff filed oppositions to Annucci, Wolstein, and Vassar Defendants' respective motions to dismiss (ECF Nos. 196 and 197, "196 Opposition" or "196 Opp." and "197 Opposition" or "197 Opp.", respectively.) On September 10, 2024, Annucci filed a reply in support of his motion to dismiss ("Annucci Reply") (ECF No. 206), Wolstein filed a reply in support of his motion to dismiss ("Wolstein Reply") (ECF No. 205), and Vassar Defendants filed a reply in support of their motion to dismiss ("Vassar Reply") (ECF No. 207). Finally, on September 25, 2024, Plaintiff filed an additional opposition to the Defendants' respective oppositions (ECF No. 208, "208 Opposition" or "208 Opp.")

## LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") provides in relevant part, that a case is properly dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. When resolving a Rule 12(b)(1) motion for lack of lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986). Plaintiff bears the burden of demonstrating by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996).

### B. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly,* 550 U.S. at 555). The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether the Plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

### C. Section 1983

**\*3** Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004). To assert a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York,* No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell,* 592 F.3d

121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. See *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution.")

### D. Law-of-the-Case Doctrine

The law-of-the-case doctrine "holds that when a court has ruled on an issue, that decision should generally be adhered to by the court in subsequent stages unless cogent and compelling reasons militate otherwise." *Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414, 425 (S.D.N.Y. 2014) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). *See also In re Peters*, 642 F.3d 381 (2d Cir. 2011) (noting that while not binding the law-of-the-case doctrine counsels against a court revisiting prior rulings absent compelling reasons such as the need to correct a clear error or prevent manifest injustice); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100 (S.D.N.Y. 2010) (same).

### E. *Pro Se* Pleading Standard

Where a litigant is *pro se*, the Court is empowered to consider "new facts raised in opposition papers to the extent they are consistent with the complaint, treating the new factual allegations as amending the original complaint." *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018). A Court may consider "new claims appearing for the first time in the briefing if 'the claims could have been asserted based on the facts alleged in the complaint.' " *Vlad-Berindan v.MTA New York City Transit*, No. 14-cv-675, 2014 WL 6982929, at *5 (S.D.N.Y.2014) (citing *Rosado v. Herard*, No. 12-cv-8943, 2013 WL 6170631, at *3 (S.D.N.Y. 2013)). Courts are to read a *pro se* litigant's papers "liberally" and "interpret them to raise the strongest argument that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 791 (2d Cir. 1994).

### DISCUSSION

Plaintiff brings claims pursuant to § 1983, alleging several Eighth Amendment violations. The Court addresses them in turn.

### A. Whether Annucci was Sufficiently Involved for Section 1983's Personal Involvement Requirement

This Court previously dismissed Plaintiff's Section 1983 claim for failure to demonstrate Annucci's personal involvement in any alleged deprivation of constitutional rights. (Doc. No. 95, Op. and Order, 12/7/22, pp. 10-11.) Plaintiff's Second Amended Complaint and opposition letters are similarly deficient, offering no further substantive allegations that would indicate Annucci's involvement in any purported constitutional violations. Therefore, the law-of-case doctrine favors dismissing Plaintiff's claim against Annucci once more.

To restate the relevant standard, in order to bring forward a Section 1983 claim, a plaintiff must demonstrate each defendant's personal involvement in the constitutional deprivation. *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996). Personal involvement is defined as "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Id.* A defendant "may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Id.* A defendant "may not be held responsible unless he was personally involved in the alleged constitutional violations." *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000).

**\*4** The Court finds that Plaintiff has still failed to allege sufficient personal involvement necessary to state a Section 1983 claim against Annucci. Except for naming Annucci as a Defendant (Am. Compl. p. 4), the Second Amended Complaint does not offer substantive allegations demonstrating Annucci's involvement in any deprivation of constitutional rights. Plaintiff's opposition papers similarly do not offer any substantive allegations that would indicate Annucci's personal involvement as required to effectuate a Section 1983 claim. (196 Opp., 197 Opp., and 208 Opp.) Plaintiff seems to suggest that Annucci received complaints from Plaintiff (*see* 208 Opp. p. 4), but "[a]mple Second Circuit case law makes clear that a Plaintiff does not state a claim where he alleges only that a supervisory official received reports of wrongdoing." *Samuels v. Fischer*, 168 F. Supp. 3d 625, 637 (S.D.N.Y. 2016) (citations omitted); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that DOCCS Commissioner was not personally involved simply because Plaintiff wrote complaint letters to him).

Annucci cannot be held liable solely by virtue of his title as Acting Commissioner of DOCCS. *See Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 196 (S.D.N.Y. 2004) (noting that a defendant "in a § 1983 action is not liable simply on the basis of holding a high position of authority"). Without any further factual averments suggesting any personal involvement on the part of Annucci, the Second Amended Complaint remains deficient for the same reasons articulated in the Court's prior opinion. Therefore, the Second Amended Complaint, as currently written, has not stated a plausible Section 1983 claim against Annucci, and the Court grants Annucci's motion to dismiss Plaintiff's claims without prejudice.

**B. Whether the Vassar Defendants and Wolstein are State Actors for the Purposes of Section 1983 Liability**

The Court previously dismissed Plaintiff's Section 1983 claim against the Vassar Defendants and Wolstein on the grounds that they did not qualify as state actors for the purposes of imposing Section 1983 liability. (Doc. No. 95, Op. and Order, 12/7/22, pp. 6-7.) Plaintiff's Second Amended Complaint and opposition letters do not offer further substantive allegations that would justify a finding that the Vassar Defendants and Wolstein are state actors. As a result, the law-of-case doctrine counsels against deviating from the Court's prior ruling on the inapplicability of Section 1983 to the Vassar Defendants and Wolstein and favors dismissing Plaintiff's Section 1983 claim against the Vassar Defendants and Wolstein once more.

To reiterate the relevant standard, in order to prosecute a Section 1983 claim a Plaintiff must demonstrate that he suffered injury at the hands of a state actor or private party acting under color of state law. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002). Importantly, courts in this circuit have held that "mere conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Id.* Three tests are employed to ascertain whether a private entity's conduct can be considered state action: the compulsion test, the nexus test, and the public function test. *Wilson v. HSBC Bank, USA*, No. 16-CV-8405 (NSR), 2018 WL 1449204, *14 (S.D.N.Y. Mar. 22, 2018).

Plaintiff's Second Amended Complaint details Plaintiff's experiences with the Vassar Defendants and Wolstein, and his grievances with his treatment. (Am. Compl. ¶¶ 7-8, 20.) Such allegations do demonstrate that the Vassar Defendants and Wolstein were involved in administering care to an inmate. However, without pleading anything further, Plaintiff cannot satisfy any of the three state action tests. Plaintiff does not assert that the Vassar Defendants and Wolstein acted under any "coercive power or significant encouragement ... that the[ir] choice[s] must be in law deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). *See also McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) (affirming dismissal of § 1983 claim where private entity was not compelled by state to provide its services). Likewise, Plaintiff does not demonstrate a sufficient nexus between the Vassar Defendants, Wolstein and the government, given that while the Vassar Defendants and Wolstein were treating an inmate, they were doing so "in the ordinary course of diagnosis or treating an illness or injury." *Cf Johnson v. City of New York*, 2021 WL 4896477 (S.D.N.Y. Aug. 23, 2021) (finding sufficiently close nexus between hospital and the government where treatment was administered for investigatory purposes rather than in the hospital's general function of treating the public).

**\*5** As to whether the Vassar Defendants and Wolstein were performing a public function, the relevant consideration is whether the conduct at issue is "traditionally the exclusive prerogative of the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974). State action "may be found in situations where an activity that traditionally has been the exclusive, or near exclusive function of the State has been contracted out to a private entity." *Horvath v. Westport Libr. Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004). Here, Plaintiff does not offer any allegations that the Vassar Defendants and Wolstein were performing a public function, and it is difficult to envision the functioning of a private hospital providing care to the public being construed as an "exclusive or near exclusive function of the State." To the contrary, "[a]s a general rule, private hospitals do not act under color of state law for § 1983 purposes." *Thomas v. Beth Israel Hosp. Inc.*, 710 F. Supp. 935, 941 (S.D.N.Y. 1989). Courts have reiterated that "[u]nless certain rare conditions exist, private hospitals ... are not state actors for purposes of Section 1983." *Amofa v. Bronx-Lebanon Hosp. Ctr.*, 2006 WL 3316278 (S.D.N.Y. Nov. 13, 2006). As a result, the Vassar Defendants and Wolstein cannot be construed to be taking action that is tantamount to state action. Plaintiff's Second Amended Complaint and opposition letters therefore fail to demonstrate the Vassar Defendants and Wolstein's actions should be attributed to the state under any of the three state action tests.

The only additional further substantive allegations Plaintiff offers is when Plaintiff writes: "[e]ven though Dr. Wolstein may not qualify as a state actor" he "certainly qualif[ies] as

'private entity,' who violated plaintiff's federal rights." (197 Opp., p. 3.) Such an argument only offers a legal conclusion "couched as a factual allegation." *Iqbal*, 556 U.S. 662 at 678. *See Fahie v. Rivera*, 2009 WL 2780144, *2 (S.D.N.Y. Aug. 31, 2009)* (holding that Plaintiff failed to demonstrate hospital defendants acted under color of state law when Plaintiff only offered conclusory assertions that hospital defendants violated his rights). As acknowledged *supra*, conclusory allegations surrounding a private entity's conduct are not enough demonstrate that that they were a state actor or acting under the color of law for the purposes of Section 1983 liability. *Ciambriello*, 292 F.3d 307, 324. Additionally, this allegation is not enough to carry a Section 1983 claim against a private entity, as the "color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or unlawful." *Heicklen v. U.S. Dep't of Homeland Sec.*, 2011 WL 3841543 (S.D.N.Y. Aug. 30, 2011) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)). Thus, mere claims of discriminatory conduct on the part of a private actor are not, without more, enough to form the basis of a plausible Section 1983 claim. Lastly, while Wolstein did provide care to an inmate, the Second Amended Complaint and Plaintiff's opposition letters do not allege that Wolstein was employed by the government nor that he was under contract to provide medical care to inmates. As a general matter, providing care to an inmate does not, without more, justify imposing Section 1983 liability on a private party. *See Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (finding that physician was not acting under color of law where physician was "not employed by the Bureau of Prisons, nor was he under contract with the state to render medical services to prison inmates").

Accordingly, the Court finds that Plaintiff's Second Amended Complaint and opposition papers remain deficient for reasons the Court articulated in its prior opinion. The Court therefore concludes that Plaintiff has not plausibly alleged a viable Section 1983 claim against the Vassar Defendants and Wolstein and grants the Vassar Defendants and Wolstein's respective motions to dismiss Plaintiff's claims without prejudice.

## CONCLUSION

For the foregoing reasons, the Court GRANTS each of the moving Defendants' motion to dismiss Plaintiff's Eighth Amendment claims. Specifically, the Court grants Defendant Jesse M. Wolstein's motion to dismiss, Defendant Anthony Annucci's motion to dismiss, and Defendants Vassar Brothers Medical Center, Doctor Daniel E. Laurie, Doctor Sajin A. Pillai, Doctor Hector I. Ojeda-Martinez, physician provider Sehrish Shahid and Doctor Robert U. Mmereole's motion to dismiss.

**\*6** *Pro se* Plaintiff is granted leave to file a Third Amended Complaint (blank form attached hereto) by January 6, 2025. *Pro se* Plaintiff is advised that the Third Amended Complaint will replace, not supplement, the Second Amended Complaint, and so any claims that he wishes to pursue must be included in the Third Amended Complaint. Should *pro se* Plaintiff file a Third Amended Complaint, the Defendants are directed to answer or otherwise respond by January 30, 2025, and the parties are directed to complete and file a Case Management Plan and Scheduling Order (blank form attached) by February 20, 2025. If *pro se* Plaintiff fails to file a Third Amended Complaint within the time allowed, those claims that were dismissed without prejudice shall be deemed dismissed with prejudice.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____          _____CV_____
Write the full name of each plaintiff.     (Include case number if one has been
                                           assigned)

          -against-                        AMENDED
                                           COMPLAINT
_____                  (Prisoner)

_____                  Do you want a jury trial?
_____                      ☐ Yes   ☐ No

_____
Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore not contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may contain only: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

**I.     LEGAL BASIS FOR CLAIM**

State below the federal legal basis for your claim, if known. This form is designed primarily for
prisoners challenging the constitutionality of their conditions of confinement; those claims are
often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a
"Bivens" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐ Other:_____

**II.    PLAINTIFF INFORMATION**

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____
First Name              Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name
you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency
and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

_____
County, City                            State           Zip Code

**III.   PRISONER STATUS**

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee
☐ Civilly committed detainee
☐ Immigration detainee
☐ Convicted and sentenced prisoner
☐ Other:_____

Page 2

Rev. 5/20/16

## IV. DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 4:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Page 3

## V. STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Page 4

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

_____

_____

_____

_____

**VI.   RELIEF**

State briefly what money damages or other relief you want the court to order.

_____

_____

_____

_____

_____

_____

**VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

_____         _____
Dated                                               Plaintiff's Signature

_____
First Name                  Middle Initial          Last Name

_____
Prison Address

_____
County, City                          State              Zip Code

Date on which I am delivering this complaint to prison authorities for mailing: _____

UNITED STATES DISTRICT COURT                                Rev. Jan. 2012
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

 

                                          **CIVIL CASE DISCOVERY PLAN**
                  Plaintiff(s),      **AND SCHEDULING ORDER**

    - against -

 

                  Defendant(s).    _____ CV _____ (NSR)

----------------------------------------------------------------X

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.   All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.   This case [is] [is not] to be tried to a jury.

3.   Joinder of additional parties must be accomplished by _____.

4.   Amended pleadings may be filed until _____.

5.   Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6.   First request for production of documents, if any, shall be served no later than _____.

7.   Non-expert depositions shall be completed by _____.

   a.   Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

   b.   Depositions shall proceed concurrently.

   c.   Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8.   Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.   Requests to Admit, if any, shall be served no later than _____.

10.  Expert reports shall be served no later than _____.

11.  Rebuttal expert reports shall be served no later than _____.

12.  Expert depositions shall be completed by _____.

13.  Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.  **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

**All Citations**

Slip Copy, 2024 WL 4882774

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1335865
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Martin JOHNSON, Plaintiff,

v.

THE CITY OF NEW YORK, Assistant District
Attorney Robert Henoch, Captain of Corrections Martin,
Corrections Officer Schmidt, Corrections Officer Brown
and Unidentified Correction Officers, Defendants.

No. 00CIV.3626(SHS).
|
Sept. 15, 2000.

OPINION AND ORDER

STEIN, D.J.

**\*1** Martin Johnson has brought this action pursuant to 42 U.S.C. § 1983 seeking monetary damages on the grounds that the defendants—the City of New York, an Assistant District Attorney, and certain Corrections Officers—violated his constitutional rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from an attack by fellow inmates against whom he had arranged to testify. Johnson also asserts two tort claims. The Assistant District Attorney moves to dismiss the complaint as it pertains to him pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted and the complaint is dismissed as to ADA Henoch.

BACKGROUND

The facts are taken from plaintiff's complaint and are assumed to be true for purpose of this motion. In May of 1998 Johnson was arrested for allegedly selling crack cocaine. Complaint at 4. Shortly after his arrest, he entered into a cooperation agreement with ADA Henoch to testify against several of his co-defendants. [1] *Id.* ADA Henoch allegedly "assured" plaintiff at that time that he "would protect him[ ]" from possible retaliation by his co-defendants. *Id.* Johnson claims that he was being held in Beacon, a housing area on Rikers Island, which was in "the same general area" as where the

people against whom he was to testify were held and that he alerted ADA Henoch of this fact. *Id.* ADA Henoch "explicitly assured [him] that he would be safe" and that "he would be placed in protective custody." *Id.* at 4–5. Plaintiff also alerted defendant Corrections Officers Martin, Schmidt, Brown and "Unidentified Correction Officers" to his danger. *Id.* at 5.

On February 24, 1999, plaintiff was attacked by fellow inmates "who called him a snitch as they beat and kicked him." *Id.* As a result of the beating, Johnson suffered a fractured ankle, injuries to his head, neck and legs, and damage to his retina that required surgery. *Id.* ADA Henoch, after learning of the attack on plaintiff, "acknowledged [his] prior request for protection." *Id.*

As noted above, Johnson has filed this action against the City of New York, Correction Officers Martin, Schmidt, Brown, and ADA Henoch and the ADA has moved to dismiss the complaint on the grounds that it fails to state a constitutional claim for which relief may be granted and that he is entitled to either absolute or qualified prosecutorial immunity.

DISCUSSION

When reviewing a motion to dismiss, a court must accept as true the factual allegations of the complaint and must view the pleadings in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *See Jamison v. Dee,* 2000 WL 502871 (S.D.N.Y. April 27, 2000) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993)). Dismissal of the complaint is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

I. *Absolute Immunity*

**\*2** It is well-established that prosecutors are absolutely immune from suits for damages arising from actions which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)). Whether a prosecutor has absolute immunity "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). Such functions include the decision to bring charges against a defendant, *see Gan,*

996 F.2d at 530, presenting evidence to a grand jury, *see Barret v. United States,* 789 F.2d 565, 571–72 (2d Cir.1986), and the evaluation of evidence prior to trial. *See Kalina v. Fletcher,* 522 U.S. 118, 126, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Absolute immunity is not available, however, when a prosecutor "undertakes conduct that is beyond the scope of his litigation-related duties." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987).

*Barbera v. Smith,* 836 F.2d 96, 100, is closely analogous to this action. In *Barbera,* the Second Circuit held that a prosecutor was not entitled to absolute immunity where he twice refused to provide a cooperating witness with police protection. *Id.* at 98. The witness had agreed to testify in return for a more lenient sentence and was murdered by a contract killer hired by the target of the prosecutor's investigation. *Id.* The Court found that "the government was still seeking evidence, including testimony from [the victim], that would enable it to prosecute ..." and that "this task [providing protection] was [not] so intimately associated with the judicial phase of the criminal process ..." as to entitle the prosecutor to absolute immunity. *Id.*

Here, as in *Barbera,* defendant's activities were not "so intimately associated with the judicial phase of the criminal process" as to entitle him to absolute immunity from suit. *See Gan,* 996 F.2d at 531 ("the claim that [the prosecutor] failed to protect [plaintiff] asserts conduct that plainly is not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings. Accordingly, if [defendant] is to be accorded immunity ... it can only be qualified immunity ."). Therefore absolute immunity is not available to the district attorney in this action.

## II. *Qualified Immunity*

In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 72 L.Ed .2d 396 (1982)). Dismissal for failure to state a claim is thus appropriate where the complaint itself presents the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The United States Supreme Court has also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before

the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *See also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987) (citing *Procunier v. Navarette,* 434 U.S. 555, 565 (1978) (prison officials entitled to dismissal of claims of violating prisoner's First and Fourteenth Amendment rights by interfering with mail where such rights had not been clearly established)). Even when viewed in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, *Mills,* 12 F.3d at 1174, Johnson's allegations regarding the District Attorney do not state a violation of a clearly established constitutional right. Thus, dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is appropriate. *See, e.g., Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990).

**\*3** Qualified immunity shields government actors performing discretionary functions from " 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Lennon v. Miller,* 66 F.3d 416, 420 (2nd Cir.1995) (quoting *Harlow,* 457 U.S. at 818.) To determine whether a right was clearly established at the time defendant acted, the Court must consider: "(1) whether the right in question was defined 'with reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Gan,* 996 F.2d at 532 (quoting *Jermosen v.. Smith,* 945 F.2d 547, 550 (2d Cir.1992)).

The District Attorney claims that he is entitled to qualified immunity because, even if he had a constitutional duty to protect Johnson, it was not a clearly established duty. The Due Process Clause itself does not require the State to protect "the life, liberty, [or] property of its citizens against invasion by private actors." *Deshaney v. Winnebago County Dep't of Soc. Serves,* 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989). Therefore, as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The only judicially recognized exceptions to this rule are custodial relationships where "the State takes a person into its custody and holds him there against his will," *Id.* at 199–200, 109 S.Ct. at 1005 (the "special relationship" exception), or when the government affirmatively creates or increases the danger an individual is placed in. *See Dwares v. City of N.Y.,* 985 F.2d 94, 98–99 (2d Cir.1993) (the "state-created danger" exception).

Special relationships that have given rise to a governmental duty to protect against third-person attacks include "custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child." *Gan,* 996 F.2d at 532 (citing cases).

The Second Circuit has also recognized the state-created danger exception to *DeShaney's* general rule. *See Dwares,* 985 F.2d at 99 (police officers agreed in advance with members of a group to allow the group to assault the plaintiff, did not interfere during the beating and did not arrest those who assaulted the plaintiff); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (arresting officers returned gun to robbery victim and drove him to the scene of suspect's arrest, where the victim shot the suspect); *see also Freeman v. Ferguson,* 911 F.2d 52, 54 (8th Cir.1990) (reversing dismissal on qualified immunity grounds against police chief who instructed subordinates to ignore victim's request for protection from her husband, who was the chief's friend).

**\*4** Johnson contends that the District Attorney's proffer of the cooperation agreement and assurance that he would protect plaintiff conferred upon the District Attorney a constitutional duty to protect Johnson. [2] Plaintiff claims that the prosecutor's duty to protect him was clearly established by *DeShaney* and by *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison officials may be held liable under Eighth Amendment for denying humane conditions of confinement only if they know that inmates face substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it). However, neither *DeShaney* nor *Farmer* clearly establish the law regarding plaintiff's allegations. While the very action in question need not have been previously held unlawful for a constitutional right to be clearly established, *Duncan v. Kean,* 1995 WL 649931, \*3 (S.D.N.Y. Nov. 6, 1995) (citing *Aveni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994)), it must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

The Second Circuit has twice considered and rejected claims against prosecutors for failure to protect a witness from attack by a third party. *See Barbera,* 836 F.2d at 100–01; *Gan,* 996 F.2d at 533–34. In *Gan,* a panel of the Second Circuit wrote that

"[p]laintiffs have not called to our attention any case before or since [*Barbera* ] ... in which the lodging of a complaint with law enforcement officials, or the complainant's compliance with a request to identify suspects, either singly or in combination, has been held (a) to create a relationship that gives the complaining witness a constitutional right to protection, or (b) to impose a corresponding duty on a prosecutor."

*Id.* at 533–34.

Here, as in *Gan,* plaintiff points to no case, and the Court is aware of none, where it has been held that a prosecutor's alleged promise to protect an inmate who agrees to testify creates a special relationship that gives rise to a constitutional right to protection from a third party. Nor is the Court aware of any decision which has held that the mere proffer of a cooperation agreement by a prosecutor so increases the danger to an inmate that it creates a constitutional duty for the prosecutor to protect the inmate from potential attacks by third persons. A *prison official's* willful failure to protect an inmate from another inmate's violent actions violates the Constitution if the officer was "deliberate[ly] indifferen[t] to the consequences of his conduct for those under his control and dependent upon him," *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). However, no corresponding duty has been found to exist between an inmate and prosecutor.

Based on the limited caselaw in existence at the time of the alleged attack, and particularly because of the absence of any caselaw which holds that any state actor other than a prison official owes a duty to protect an inmate from another inmate's violent actions, it cannot be said that it was clearly established that defendant ADA Henoch had created or assumed a special relationship with Johnson imbuing him with a constitutional duty to protect him. Therefore, this Court "need not decide whether [it] would hold that these circumstances create such a right and corresponding duty, for in the absence of any such holdings and in the face of the general rule articulated in *DeShaney,* it could not have been clear to a reasonable

prosecutor that his failure to provide protection ... would have violated [plaintiff's] rights under the Constitution." *Gan,* 996 F.2d at 534. Defendant Henoch is therefore entitled to qualified immunity.

### III. *The Pendent State Claims*

**\*5** The ADA's motion to dismiss plaintiff's pendent state law claims is likewise granted. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the state law claims against ADA Henoch are dismissed without prejudice. *See United Mine Workers of America v. Gibbs,* 338 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Carnegie–Mellon University v. Cohill,*

484 U.S. 343, 350 n. 7, 98 L.Ed.2d 720 (1988); *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 757 (2d Cir.1986).

### IV. *CONCLUSION*

For the reasons set forth above, the prosecutor's motion to dismiss is granted and the complaint is dismissed as against the assistant district attorney.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2000 WL 1335865

---

### Footnotes

1    The complaint states that plaintiff entered into the cooperation agreement with ADA Henoch on June 18, 1999. Complaint at 4. Plaintiff's opposition, however, states the cooperation agreement was entered into in "June of 1998". Opposition at 2. In addition, plaintiff has recently sought—successfully—to amend the complaint to allege that the agreement was made in June of 1998. Accordingly, this Court will assume that plaintiff entered into the cooperation agreement with defendant in June, 1998.

2    Johnson does not specify whether he is claiming defendant Henoch owed a duty to protect him based on the special relationship or state-created danger exception to the *DeShaney* rule. For the purpose of this motion, both arguments will be addressed.

---

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Distinguished by Johnson v. Naqvi, D.Conn., April 29, 2021

2013 WL 5441353
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael JONES, Plaintiff,

v.

Brian FISCHER et al., Defendants.

No. 9:10–cv–1331 (GLS/ATB).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

Michael Jones, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Krista A. Rock, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Michael Jones commenced this action against defendants Brian Fischer, Tersea David, David Rock, K. Rabideau, L. Whalen, Lt. Chase, J. Eggleston,[1] S. Meskunas, A. Prack, C. Leon, and C.O. Lincon, pursuant to the First, Eighth, and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983, and the Americans with Disabilities Act (ADA). (*See generally* Am. Compl ., Dkt. No. 5.) Jones alleged that defendants violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (*Id.*)

The remaining defendants, L. Whalen, Lt. Chase, J. Eggleston, S. Meskunas, A. Prack, and C. Leon, filed a motion for summary judgment, requesting that the remainder of the claims and defendants be dismissed.[2] (Dkt. No. 54.) Jones' remaining claims include: (1) an Eighth Amendment claim against Leon regarding Jones' medically prescribed diet; and

(2) Due Process and First Amendment retaliation claims against defendants Eggleston, Meskunas, Prack, Whalen, and Chase with respect to allegedly false misbehavior reports and two disciplinary hearings. (Dkt. Nos. 44, 60 at 2.) In a Report–Recommendation and Order (R & R) dated July 22, 2013, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted and Jones' amended complaint be dismissed in its entirety as to all defendants.[3] (Dkt. No. 60.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–CV–484, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error.[4] *See id.* at \*4–5.

### III. *Discussion*

Jones purports to object to the R & R on various grounds, all of which boil down to arguments he previously raised in his response to defendants' motion for summary judgment, (*compare* Dkt. No. 56, *with* Dkt. No. 61), and all of which Judge Baxter considered and rejected.

First, with respect to his Eighth Amendment claim, Jones objects on the theory that genuine issues of material fact exist with respect to: (1) what Leon's intentions were when he removed Jones from his medical diet because (a) it is unclear whether Leon removed Jones from his medical diet after having a conversation with another officer, and (b) if Leon had, in fact, seen Jones exchange food, Leon would have told Jones, (Dkt. No. 61 at 2–3); (2) whether defendant Leon had the authority to remove Jones from his diet, (*id.* at 3); (3) whether the date of the alleged incident took place on July 14, 2010, as Jones contends, or on July 15, 2010,

as defendants contend, (*id.* at 3–4); and (4) whether removal from the medical diet caused Jones' blood pressure to rise to the point that he had to be placed on high blood pressure medication, (*id.* at 4). As noted above, however, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected them. (Dkt. No. 56 at 4–5; Dkt. No. 60 at 4–19.)

**\*2** Second, with respect to his due process claim, Jones objects on the theory that genuine issues of material fact exist on three grounds: (1) whether the denial of documentary evidence was a due process violation because he was denied the opportunity to review copies of all of the handwriting samples that were used to compare with the handwriting in the threatening letter, (Dkt. No. 61 at 7–8, 10); (2) whether there was sufficient evidence to support Eggleston's conclusions in the Tier III disciplinary hearing because she did not make an independent determination, (*id.* at 10); and (3) whether the special housing unit conditions created atypical hardship that constituted an Eighth Amendment violation, (*id.*). Again, Jones raised these arguments in his response to defendants' motion for summary judgment, and Judge Baxter considered and rejected each of them. (Dkt. No. 56 at 6–9; Dkt. No. 60 at 20–40.)

Finally, with respect to his retaliation claim, Jones objects on the ground that there is a genuine issue of material fact that exists as to whether the actions of defendants were taken in retaliation of Jones' grievances. (Dkt. No. 61 at 11–12.) This argument, too, was raised in Jones' response to defendants' motion for summary judgment, and considered and rejected by Judge Baxter. (Dkt. No. 56 at 9–10; Dkt. No. 60 at 40–45.)

All of Jones' objections, therefore, are general and do not warrant *de novo* review. *See Almonte,* 2006 WL 149049, at \*4. After carefully reviewing the record, the court finds no clear error in the R & R and adopts it in its entirety.

## IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 22, 2013 Report–Recommendation and Order (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 54) is GRANTED; and it is further

**ORDERED** that the amended complaint, (Dkt. No. 5), is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter was referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

## I. *Background*

In his amended civil rights complaint, plaintiff alleged that defendants violated his rights to proper medical care, due process, and his right to be free from cruel and unusual punishment. (Dkt. No. 5). Defendants initially made a motion to dismiss, based upon their allegation that plaintiff had "three strikes" pursuant to 28 U.S.C. § 1915(g) and therefore, should not be entitled to proceed in forma pauperis. (Dkt. No. 32). The defendants' motion was rendered moot when plaintiff paid the filing fee on December 1, 2011.

**\*3** On December 19, 2011, defendants filed a second motion to dismiss for failure to state a claim, addressed to the merits of the amended complaint. (Dkt. No. 37). On May 1, 2012, I recommended granting the motion in part, and on May 23, 2012, Chief Judge Sharpe adopted my recommendation, dismissing some, but not all of plaintiff's claims. (Dkt.Nos.44, 45). On December 28, 2012, the remaining defendants filed a motion for summary judgment, pursuant to Fed.R.Civ.P. 56, addressed to the remainder of the amended complaint. (Dkt. No. 54). Plaintiff has responded in opposition to the motion, and defendants filed a reply. (Dkt.Nos.56, 59).

The remaining claims are as follows:

(1) An Eighth Amendment claim regarding plaintiff's medically prescribed diet against defendant Leon only.

(2) Due process and First Amendment retaliation claims with respect to allegedly false misbehavior reports and two disciplinary hearings against defendants Eggleston, Meskunas, Prack, Whalen, and Chase.

For the following reasons, this court agrees with defendants and will recommend dismissal of the entire complaint against all remaining defendants.

## DISCUSSION

### II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

Although the court briefly discussed the facts in its prior ReportRecommendation (Dkt. No. 44), additional evidence has been added to the record, in support of the summary judgment motion,[1] in the form of affidavits, documents relating to the claims, and plaintiff's deposition of September 28, 2012. (Dkt. No. 54–1–54–12). Thus, the court will discuss the additional facts as relevant to the issues raised in the pending motion.

### III. *Medical Diet*

#### A. Facts

**\*4** In the amended complaint, Plaintiff claims that on June 14, 2010, while he was incarcerated at Clinton, defendant Leon told plaintiff that he was removing plaintiff's name from the "special diet meal list." (Amended Complaint (AC) at 6, ¶ (h)).[2] Plaintiff alleges that when he asked why he was being removed from this list, defendant Leon stated that plaintiff knew why, and it was because " 'I was [sic] you eating toast.' "[3] (*Id.*) Plaintiff claims that his "special diet" was low sodium, based upon plaintiff's high blood pressure. As a result of his removal from the diet, plaintiff states that he experienced headaches and dizziness. (*Id.* at 6, ¶ (i)) When he went to the facility clinic, he was allegedly told that due to his elevated blood pressure, he would have to be monitored to determine whether he should be placed on medication. (*Id.*) Plaintiff filed a grievance against defendant Leon. (*Id.* at 6(j)).

During his deposition, plaintiff testified that he was first placed on a special low sodium diet due to his "above normal" blood pressure when he was incarcerated at Shawangunk Correctional Facility. (Pl.'s Dep. at 15)[4] (Dkt. No. 54–9; Rock Decl. Ex. B). Plaintiff stated that his blood pressure was not "too high," and that the special diet helped "somewhat." (*Id.* at 17). Plaintiff was on the special diet while he was incarcerated at Eastern, Clinton, Upstate, and Coxsackie Correctional Facilities. (*Id.* at 18).

The incident with defendant Leon took place while plaintiff was confined at Clinton Correctional Facility. Plaintiff testified that defendant Leon was one of the "head cooks" at the Clinton Annex. On June 14, 2010, plaintiff states that he came into the mess hall for breakfast, and as he was "on the line getting close to receiving [his] tray, he saw an officer speaking to defendant Leon, and pointing at plaintiff. (*Id.* at 20, 22). After plaintiff sat down with his tray, defendant Leon walked over to plaintiff and asked whether his name was "Jones." (*Id.* at 20). Plaintiff acknowledged that he was Jones, and defendant Leon walked away. (*Id.*)

Plaintiff testified that when he came back for the lunch meal, he went to the diet line to pick up his tray, but was told that he was no longer on the list for the special diet. Plaintiff stated that when he asked defendant Leon why, he said " 'You know what you did.' " (*Id.*) Plaintiff testified that he "never could figure out why he took my name off the diet list." (*Id.* at 22). During the deposition, plaintiff stated that he did not recall defendant Leon saying anything else. (*Id.* at 23). According to plaintiff, the only difference between the special diet and the regular meal was the sodium content. (*Id.*)

Plaintiff acknowledged that in order to participate in a special diet program, he had to sign a "contract," agreeing to certain things. (*Id.* at 24). When asked whether he could "trade food with other inmates," plaintiff stated that it depended on the kind of food, and that although he was allowed to eat bread, he could not eat bread with butter. (*Id.*) Plaintiff testified that he never cheated on the diet, and he never traded food with any inmates. (*Id.* at 26).

**\*5** Plaintiff testified that later on in the day, he became dizzy, so he sought medical attention by putting himself on the list for sick call. (*Id.* at 27). Plaintiff stated that when he told the nurse about his symptoms, she took his blood pressure and noticed that it was elevated. (*Id.* at 28). Plaintiff told the nurse that he had been removed from the special diet, and the nurse made plaintiff an appointment to see a doctor. (*Id.* at 29). Plaintiff testified that when he saw the doctor, he told plaintiff that he was going to put him back on the special diet. (*Id.*) Plaintiff states that he was off of the diet for about a month. (*Id.* at 30). When asked whether he knew the procedure to put an inmate back on a special diet list, plaintiff stated that it depended on the "circumstances [of] the removal." (*Id.*)

Plaintiff testified that he filed a "basic inmate" grievance about his removal from the diet, but that he also wrote to the medical health director in Albany and the Commissioner of the Department of Corrections and Community Services ("DOCCS"). (*Id* .) When asked what he thought defendant Leon did "wrong," plaintiff stated that defendant Leon

> had no authority to remove me from the diet, he wasn't a doctor and he's a cook, so that was outside of his jurisdiction. The only thing he should have done was reported me to the doctor, let them [sic] make a decision [sic] what they was [sic] going to

do if something occurred that wasn't supposed to happen.

(*Id.* at 31). Defense counsel asked plaintiff: "Is that why you're suing Leon?" Plaintiff answered: "Yes, it is." (*Id.*) When plaintiff was asked if defendant Leon did anything else to violate plaintiff's constitutional rights, plaintiff stated that he could not answer the question because he had not completed discovery. (*Id.*)

Defendant Leon has filed an affidavit, together with exhibits, in support of the summary judgment motion. (Dkt. No. 54–4; Leon Aff.) Defendant Leon states that he is the Head Cook at Clinton and has held that position since 2007, overseeing the preparation and distribution of food for 2,800 inmates, including those inmates who are medically-ordered therapeutic diets. (Leon Aff. ¶ 2). He is responsible for ensuring that the appropriate quantities of food are available to the inmates and for the prevention of waste. (*Id.*) Therapeutic diets "generally involve a modification of servings of food items from the general facility menu." (*Id.* ¶ 4).

Inmates who receive a therapeutic diet get their food trays by going through a separate diet line, and each food tray is individually prepared for the inmate by a food server in order to meet the requirements of the particular diet. (*Id.* ¶ 5). Inmates are required to comply with their therapeutic diets, and the diets are treated the same as if they were a prescription for medication. There is also a presumption that the inmate is eating the appropriate food because the diets are monitored. If an inmate eats only intermittently, or does not eat, the tests used to monitor the inmate's condition will not provide the physician with a correct appraisal of the effect of the diet on the inmate's condition. (*Id.* ¶ 6). The failure of an inmate to follow his diet also creates problems for the food service personnel, who must serve 2,800 inmates per day, while maintaining quality and preventing waste. Therapeutic meals are prepared for individual inmates, pursuant to a prescription, and if the meals are not eaten, they must be thrown away. (*Id.* ¶ 7).

**\*6** On June 1, 2010, a "Controlled A" diet was ordered for plaintiff by his doctor. (Leon Aff. ¶ 8 & Ex. A). A "Controlled A" diet consists of enhanced fiber, low fat, low cholesterol, and low sodium foods. [5] (*Id.*) In order to participate in the diet, plaintiff signed the "Therapeutic Diet Request Form and Attendance Agreement," which states that attendance is

mandatory, his eating would be monitored, and if he did not comply with the diet, he could be subject to disciplinary action or removal from the program, "or both." (*Id.* ¶ 9 & Ex. A). The agreement is signed by plaintiff and witnessed by a nurse. (*Id.* Ex. A).

The Therapeutic Diet Meal Attendance policy is attached to defendant Leon's affidavit. (Leon Aff. Ex. B at 17). The policy states that non-compliance with the meal plan or failure to participate in three diet meals per week is a violation of the attendance policy. Violation of the attendance policy can result in counseling, removal from the diet meal program or disciplinary action. (*Id* ). Inmates are expected to accept their trays and "avoid food swapping." (*Id.*) The policy also states that

> Health Services will be notified in writing by the food service supervisor when diet meal service has been discontinued due to attendance policy violation. Discontinuance of the therapeutic meals due to noncompliance should be documented in the medical record.

(*Id.*) One of defendant Leon's responsibilities as Head Cook is to monitor the inmates' compliance with their special diets. (Leon Aff. ¶ 12). Defendant Leon states that he is required to report any incidents of non-compliance to his supervisor, Food Administrator ("FA") David Timmons. (*Id.*) FA Timmons then relays that information to the Director of Health Services, who ultimately makes the determination of whether the inmate should be "removed from the diet." (*Id.* ¶ 13).

Defendant Leon states that on June *15,*[6] 2010, he saw plaintiff exchanging and taking other inmates' "regular" food, which "constituted non-compliance" with his "therapeutic diet regimen." (Leon Aff. ¶ 14). As a result, on the same day, defendant Leon wrote a note to his supervisor, FA Timmons, informing him of the plaintiff's violation. (*Id.* ¶ 15 & Ex. C). FA Timmons would then be responsible for sending the information to the Director of Health Services. (*Id.*) Defendant Leon states that the *"actual cancellation* of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (*Id.* ¶ 16) (emphasis added). Sometimes the inmate is "removed" from his special diet,

sometimes he is not. (*Id.*) Defendant Leon states that in reporting plaintiff's non-compliance, he was not acting with any malicious intent or deliberate indifference. (*Id.* ¶ 18).

FA Timmons[7] has also submitted an affidavit, which includes the documents generated by plaintiff's grievance related to this incident. (Timmons Aff. Ex. B; Dkt. No. 54–10.) FA Timmons confirms in his affidavit, that defendant Leon properly reported plaintiff's non-compliance with the therapeutic meal plan on the same day that the violation occurred. (Timmons Aff. ¶ 26 & Ex. C). Plaintiff filed his grievance on June 17, 2010, two days after the incident. (*Id.* Ex. C at 2).

**\*7** On June 17, 2010, during the grievance investigation, defendant Leon stated in a memorandum to Nancy Rattlif, Inmate Grievance Supervisor, that "I saw inmate Jones ... exchanging and taking other inmates [sic] regular food on 6–15–2010, this puts him on [sic] violation of his diet contract." (*Id.* Ex. C at 7). The Inmate Grievance Resolution Committee ("IGRC") responded that the "cook" stated that plaintiff was observed exchanging and taking other inmates' regular food "and removed him from diet." (*Id.* Ex. C at 9). The "dissenting" opinion stated that "removing from medical diet should only be done by medical personnel." (*Id.*) Plaintiff appealed, indicating that he wished to be put back on the diet, and the Superintendent "granted" plaintiff's request on July 15, 2010, stating that "[o]nly the medical provider may remove an inmate from a therapeutic diet."[8] (*Id.* Ex. C at 5).

Although it is unclear why a favorable result would be appealed, plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC").[9] The CORC's decision is dated October 6, 2010, "accepts" the action requested "in part," and indicates that it considered the facts and circumstances of the case, including the "recommendation of the Division of Health Services." (*Id.* at 1). The CORC confirmed that plaintiff was observed trading food while on the diet "and was appropriately removed in accordance with the signed contract." (*Id.*) Plaintiff was cautioned to "comply" with the contract in the future to avoid "similar difficulties." The CORC found insufficient evidence to substantiate malfeasance by the staff and noted that plaintiff had been transferred. (*Id.*)

In response to defendants' motion for summary judgment, plaintiff has submitted a variety of medical records, many of which contain blood pressure measurements, in an attempt to argue that the removal from his therapeutic diet caused his

blood pressure to be permanently elevated such that he was no longer able to control it with diet alone. (Pl.'s Exs. I, J, K, J–2).

### B. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*8** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

The denial of a medically prescribed diet may, under certain circumstances, rise to the level of an Eighth Amendment violation. *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir.1983); *Mandala v. Coughlin,* 920 F.Supp. 342, 353 (E.D.N.Y.1996); *Johnson v. Harris,* 479 F.Supp. 333, 336–37 (S.D.N.Y.1979)). The objective component requires the plaintiff to show evidence of some adverse health impact cause by the discontinuance or failure to provide the special diet. *Hall v. County of Saratoga,* No. 1:10–CV–1120, 2013 WL 838284, at \*7 (N.D.N.Y. Mar. 6, 2013) (citing *Davidson v. Desai,* 817 F.Supp.2d 166, 190 (W.D.N.Y.2011)). The subjective, deliberate indifference, component must be demonstrated by proof that corrections personnel intentionally denied access to, or interfered with the prescribed treatment. *Abdush–Shahid v. Coughlin, supra.* The plaintiff also has a duty to inform staff that he is not receiving his medically prescribed diet, and if he fails to do so, deliberate indifference does not exist. *Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400, 2009 WL 1401645, at \*9 (N.D.N.Y. May 14, 2009) (citing *LaBounty v. Gomez,* No. 94 Civ. 3360, 1998 WL 214774, at \*2 (S.D.N.Y. May 1, 1998)).

### C. Application

The plaintiff was prescribed the "Controlled A" diet, consisting of enhanced fiber, low cholesterol, and low sodium. It is clear that plaintiff did not receive his therapeutic diet for approximately one month between June 15 and July 15 of 2010.

Plaintiff signed an agreement that he would not deviate from the diet and would not miss meals. He was well aware

that the failure to do so could result in counseling, removal from the diet, and/or disciplinary action.[10] The evidence submitted shows that on June 15, 2010, defendant Leon reported to his supervisor, FA Timmons, in writing, that plaintiff was in violation of his special meal agreement. The handwritten note at the bottom of the "Interdepartmental Communication" form states that "[the] inmate was eating [a] regular meal." (Leon Aff. Ex. C). Plaintiff testified that he did not know why defendant Leon took his name off the list, but at one point, states that defendant Leon told plaintiff that he was seen eating toast.

 **\*9** Plaintiff argues that because he was off of his diet for "so long," his blood pressure went so high that he could no longer monitor it with diet, and he had to be prescribed medication. However, plaintiff sought medical attention from a nurse "the next day" after his name was taken off the list because he was allegedly feeling dizzy. Plaintiff stated that when he went to sick call, "they" could see his blood pressure had gone up. (Pl.'s Dep. at 27–28). Plaintiff stated that the nurse told him that she would make an appointment for plaintiff to see his doctor, and the doctor said that he would put plaintiff back on the diet. (*Id.* at 29). Moreover, plaintiff filed a grievance two days after the incident, which was immediately investigated. On July 15, 2010, he was placed back on the special diet. The court notes that July 15, 2010 was the same day that the Superintendent granted plaintiff's grievance.

Defendant Leon states that he saw plaintiff eating food that was not on the diet menu and reported the violation to his supervisor. If plaintiff were already eating foods that were not authorized on the diet, the fact that defendant Leon discontinued the diet meals did not affect plaintiff's health; his own violation of the diet rules was the cause of any problems.[11] Refusal to comply with proper treatment, including violations of the diet and the failure to attend meals according to the contract has been held to be sufficient to grant summary judgment in the defendant's favor. *See e.g. Abdush–Shahid,* 933 F.Supp. at 180 (plaintiff's removal from the special diet was not deliberate indifference where plaintiff refused to eat the special meals); *Hucks v. Artuz,* No. 99 Civ. 10420, 2003 WL 22019744, at \*6 (S.D.N.Y. Aug.22, 2003) (evidence that an inmate refuses to comply with medical treatment was sufficient for summary judgment); *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003) (citations omitted) (same).

There appears to have been no actual cancellation of plaintiff's special diet,[12] only a temporary discontinuance, apparently initiated by defendant Leon.[13] FA Timmons states that the "actual cancellation" of a therapeutic diet can only be approved and effectuated by the Director of Health Services." (Timmons Aff. ¶ 27). Defendant Leon's only recourse was to report the violation to FA Timmons, which was done in this case.

There is no question that defendant Leon had no authority to *cancel* a diet request, and it is unclear whether he had the authority to discontinue the meals while cancellation was being contemplated by the Director of Health Services.[14] The policy itself implies that a diet may be "discontinued," pending possible cancellation by Health Services. (Leon Aff. Ex. B at 17). The policy states that Health Services will be *notified* in writing by the food service supervisor "when diet meal service has been *discontinued* due to attendance policy violation." (*Id.*) (emphasis added). This sentence implies that "discontinuance" is different from "cancellation." The diet is "discontinued" because of the violation, but then the medical department is notified and must then decide whether to "cancel" the therapeutic diet order.

 **\*10** Even assuming that defendant Leon had no authority to "discontinue" giving plaintiff the special meals, and even if plaintiff's medical condition had been seriously impacted by the one-month interruption of his special diet, there is absolutely no indication that defendant Leon took the action he did with deliberate indifference to plaintiff's serious medical needs. The therapeutic meal policy specifically provides that an inmate may be put back on the program through the facility sick call procedures. (Timmons Aff. Ex. B at 17). Defendant Leon knew of the policy, and he sent his memorandum to defendant Timmons on the same day that the violation occurred. Thus, defendant Leon acted knowing that the medical staff would evaluate whether plaintiff needed to be placed back on the special diet for medical reasons. By requesting sick call and filing a grievance, plaintiff essentially asked to be placed back on the special diet within days of being advised by defendant Leon that plaintiff was no longer on the list. The length of time that plaintiff ultimately spent "off" of the diet was not under defendant Leon's control.[15] The court notes that the grievance investigation report implies that the procedure followed was discussed with "Dr. Johnson" and ultimately, it appears that plaintiff's grievance was granted because only medical personnel should be allowed to even "discontinue" giving inmates the therapeutic diet.[16]

In *Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011), the court granted summary judgment in favor of a defendant who removed an inmate from the special meal program, finding that there was nothing in the record to indicate that the defendant had the requisite intent in either of two instances in which he asked for the plaintiff's special dietary status to be revoked. Each time that the defendant asked for a revocation of the inmate's dietary status, the defendant had determined that plaintiff had violated the rules of the mess hall or of the special diet itself. *Id.* In *Collazo,* once it was determined that the plaintiff's violations were the result of a misunderstanding, the special diet was restored.

Defendant Leon has presented evidence that he reported plaintiff's violation of the special diet, not to jeopardize his health, but in an effort to make sure that plaintiff properly participated in the therapeutic diet program. Plaintiff admits that he was seen in the medical department the day after his special diet was discontinued. Plaintiff's special diet was restored after plaintiff filed a grievance about the discontinuance. Plaintiff has not submitted any evidence or facts to rebut the defendant's showing. Therefore, summary judgment may be granted in favor of defendant Leon on the Eighth Amendment claim, given the complete lack of evidence suggesting that he acted with deliberate indifference to plaintiff's serious medical needs.

#### IV. *Disciplinary Hearings/Retaliation*

**A. Facts**

**\*11** Defendants have included additional facts about plaintiff's due process and retaliation claims regarding his two disciplinary hearings.

**1. Threatening Letter**

Plaintiff claims that on July 26, 2010, defendant Chase improperly confined plaintiff in the Special Housing Unit ("SHU") and issued a misbehavior report, charging him with threats, rioting, false statements, and impersonation. (AC ¶ 6–s). Defendant Chase has filed an affidavit stating that, as part of his duties as a Corrections Lieutenant, he investigates charges of serious misconduct by inmates. (Chase Aff. ¶ 5; Dkt. No. 54–2). Lt. Chase states that on July 23, 2010, he was Acting Captain at Clinton Annex, and one of his responsibilities was to open all mail addressed to Captain Holdridge. (Chase Aff. ¶ 8). On that date, defendant Chase opened a letter that was purportedly from an inmate named A. Alexander. The letter contained allegations against two

corrections officers, and ended with a threat that the writer and "other inmates" in his housing unit would " 'do all we have to do to get these officers off the unit.' " (*Id.* ¶ 9). A copy of the letter is attached to defendant Chase's affidavit as Exhibit A.

Defendant Chase brought the letter to the attention of Housing Sergeant Giambruno, and they began an investigation with the help of Corrections Counselor, defendant Laura Whalen. (*Id.* ¶ 10). Following an interview with inmate Alexander, they determined that he did not write the letter. Defendants then began comparing the handwriting in the letter to the handwriting of other inmates in the unit, including plaintiff. Similarities between plaintiff's handwriting and the handwriting in the letter caused defendants Chase and Whalen to conclude that plaintiff was the true author of the letter. Defendant Chase then wrote the misbehavior report and had plaintiff confined to SHU on July 26, 2010, pending the Tier III disciplinary hearing. (Chase Aff. ¶¶ 14–15 & Ex. C).

Defendant Chase denies that he took this action in retaliation for any grievance written by plaintiff. (*Id.* ¶ 16). Defendant Chase alleges that the letter raised the possibility of a serious threat to the safety and security of the facility, and he believed that the investigation conducted by the officers "conclusively established" that plaintiff was the author of the letter. (*Id.* ¶ 17). Defendant Chase states that, at the time he wrote the misbehavior report, he was not aware that plaintiff filed grievances against defendant Leon, Officer Lincoln, or any other individual. (*Id.* ¶ 19). Defendant Chase states he had a good faith basis for writing the report, and plaintiff was ultimately found guilty of the violation. (*Id.* ¶ 20). Defendant Chase states that he is not, and has never been, involved with Clinton's food service program or with plaintiff's special diet in any way. (*Id.* ¶ 22).

In his affidavit, defendant Chase also explains the method by which they determined that plaintiff was the author of the letter, even though defendant Chase has never taken a course in handwriting analysis. Defendants Chase and Whalen compared the handwriting in the letter to the handwriting of eight porters in plaintiff's housing unit. (Chase Aff. ¶ 26). The penmanship of each sample differed sufficiently so that the samples could not be confused, and there was no need to distinguish among similar samples. (*Id.* ¶ 30). Defendant Whalen was plaintiff's counselor, was familiar with his handwriting, and concurred with defendant Chase's analysis. (*Id.*)

**\*12** Defendant Whalen has also filed an affidavit in support of the summary judgment motion. (Whalen Aff.) (Dkt. No. 54–11). Defendant Whalen states that anonymous or forged notes are common in the prison environment, and it is often necessary to identify the authors. (Whalen Aff. ¶ 7). She saves all correspondence and any other documents that she receives from inmates, and she has been asked at times to participate in investigations involving the identification of an inmate's handwriting. (*Id.* ¶¶ 7–8).

On July 23, 2010, she was asked to assist defendant Chase and Lieutenant Giambruno in investigating the letter described above. Once the defendants determined that Alexander had not written the letter, they put together a list of porters housed in the same building for a comparison of their handwriting to the letter in question. After looking at a sample of plaintiff's handwriting, defendant Whalen determined that some of the characteristics in his writing were very similar to the threatening letter, but that the samples of the handwriting of other inmates in the unit did not match the letter. (Whalen Aff. ¶¶ 9–14).

The defendants then examined additional samples of plaintiff's handwriting and concluded that plaintiff was the true author of the letter. Defendant Whalen states that the comparison they conducted would not have required an expert in handwriting analysis, and it was "immediately obvious" that plaintiff's sample was the only one that bore any resemblance to the handwriting in the threatening letter. (*Id.* ¶¶ 15–19). Defendant Whalen has participated in many such investigation and states that she is confident that defendants drew the correct conclusion about the author. (*Id.* ¶ 23).

The disciplinary hearing was held before defendant Eggleston, who at the time in question, was an Education Supervisor for DOCCS. [17] She was often asked to conduct Tier III disciplinary hearings. (Eggleston Aff. ¶ 2). She held the Tier III disciplinary hearing against plaintiff from July 29, 2010 through August 5, 2010. A copy of the transcript of the hearing is attached as Exhibit B to defendant Eggleston's affidavit. At the conclusion of the hearing, defendant Eggleston found plaintiff guilty of the charges and imposed a penalty of 45 days in SHU, plus 45 days from a previously suspended sanction, and included 90 days loss of privileges, together with a two month loss of good time. (Eggleston Aff. ¶ 11 & Ex. A at 1).

Defendant Eggleston states that she did not violate any of plaintiff's due process rights, she did not conduct an "off-the-record" conversation about the charges with defendant Chase, she agreed to show plaintiff the letter that he was accused of writing and to check on the availability of the letters used for comparison, but denied as unreasonable, plaintiff's request that she obtain writing samples from all inmates housed in plaintiff's unit. (*Id.* ¶¶ 20–23).

### 2. Phone Program Violation

**\*13** Defendant Whalen filed a misbehavior report against plaintiff, dated July 27, 2010. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 4 & Ex. A). [18] The misbehavior report states that on July 23, 2010, plaintiff was moved from Building 14 to Building 11–A2, pending an investigation. A review of the telephone records showed that plaintiff had exchanged his personal identification number ("PIN") with another inmate in Building 14 so that plaintiff could circumvent his keeplock status. Defendant Whalen states that this was established by records, showing that four telephone calls were made, using plaintiff's PIN, to a telephone number listed on his personal telephone list, belonging to "Anthony Mosley." These calls were made after plaintiff was placed on keeplock status and could not have made the telephone calls. (Whalen Aff. ¶ 25; Meskunas Aff. ¶ 5 & Ex. A at 4). The misbehavior report states that plaintiff gave his PIN to another inmate, who used the number to call Mr. Mosley—on plaintiff's telephone list—on plaintiff's behalf. *Id.* Plaintiff was charged with a telephone program violation, exchanging PINs, and refusing a direct order. (Meskunas Aff. ¶ 4).

On July 28, 2010, plaintiff met with his employee assistant. (Meskunas Aff. ¶ 7 & Ex. A at 7). Defendant Meskunas held a disciplinary hearing between August 2, 2010 and August 10, 2010, and a copy of the transcript of the hearing is attached to his affidavit as Exhibit B. Defendant Meskunas refused to call Mr. Mosley as a witness for plaintiff. (Meskunas Aff. Ex. A at 5). The denial was in writing and indicated that the requested witness could not give relevant evidence because the inmate who placed the call already testified. (*Id.* ¶¶ 16–18). At the conclusion of the hearing, plaintiff was found guilty of two of the three charges. [19] (Meskunas Aff. Ex. A at 1). Defendant Meskunas imposed a penalty of two months loss of telephone and commissary privileges. (*Id.* ¶ 19 & Ex. A at 1–2). The determination was affirmed by defendant Prack. (Meskunas Aff. ¶ 20 & Ex. C).

### B. Legal Standard

### 1. Due Process

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. See *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

**\*14** If a liberty interest is found to exist, due process requires advance notice of the charges against the inmate and a written statement of reasons for the disposition. *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), The inmate should also have the ability to call witnesses and

present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation). [20]

### 2. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the

absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

### C. Application

#### 1. Due Process

##### a. Threatening Letter

**\*15** Defendants first argue that plaintiff has failed to establish a liberty interest and that, in any event, he was afforded the requisite due process with respect to the disciplinary hearing. [21] As a sanction for writing the letter in question, plaintiff received a 45–day term of confinement in SHU, the reinstatement of a prior suspended 45–day term, and a two month recommended loss of good time. The period of SHU confinement was 90 days. Defendant Eggleston also declined to give plaintiff credit for the time he spent in pre-hearing confinement from July 26, 2010 until the conclusion of the hearing. She ruled that his SHU time would begin to run on the date that the hearing concluded. The extra time could be considered additional confinement relating to the charges. Although defendant Eggleston also recommended a loss of good time, plaintiff is serving a life sentence and is not entitled to earn good time. (Prack Aff. ¶ 18 & Ex. B). Thus, the "deprivation" of good time credits did not affect plaintiff's term of imprisonment, and does not count toward creating a liberty interest in this case. The only sanction that the court may consider is the time that plaintiff spent in confinement as a result of these charges. [22] In his response to the motion for summary judgment, plaintiff alleges that he spent 106 days in SHU. (Pl.'s Resp. at 2) (Dkt. No. 56).

As stated above, typically, sanctions of SHU confinement of less than 101 days do not implicate a liberty interest protected by due process unless the conditions were more severe that "normal" SHU conditions. *Palmer, supra.* There is no indication in plaintiff's amended complaint that the conditions in SHU were any more severe than those experienced in SHU generally. In fact, plaintiff testified at his deposition that he received one hour per day recreation, got his meals, was able to have books, was able to have writing materials, and the same was true for the time he spent in SHU at Upstate in connection with this charge. (Pl.'s Dep. at 52–53). Thus, plaintiff did not have a liberty interest that was protected by due process in his first disciplinary hearing, even if plaintiff spent a few extra days in SHU, more than the 101 days cited in the case law. The plaintiff's due process claims could be

dismissed on this basis, however, the court will also consider the merits.

Even assuming that plaintiff did have a liberty interest, he received all the process to which he was entitled. He argues that defendant Eggleston spoke to defendant Chase ex-parte for seven minutes prior to his testimony at the disciplinary hearing. In the amended complaint, plaintiff argued that defendant Eggleston denied him the right to review the eight samples that were used for comparison and did not make an independent appraisal of the evidence. Plaintiff claims that defendants Chase and Whalen are not handwriting experts and have no basis for finding that plaintiff's handwriting matched that of the letter. Plaintiff argued that defendant Eggleston improperly directed that plaintiff's SHU sentence should run from the conclusion of the hearing, rather than giving him credit for the time that he served in pre-hearing confinement. In his response to defendants' motion for summary judgment, he now argues that defendant Eggleston violated plaintiff's right to present evidence because she refused to obtain writing samples from *all* of the inmates in the housing unit before finding that the handwriting on the suspect letter matched plaintiff's handwriting. [23] (Pl.'s Resp. at 7).

#### i. Seven Minute Conversation

**\*16** Defendant Eggleston denies plaintiff's allegations and states that the transcript of the hearing belies plaintiff's claim that any off-the-record, ex parte conversations occurred. (Eggleston Aff. ¶¶ 16–19). A review of the transcript shows that there is no basis for plaintiff's allegations. During the hearing, the telephone rang, defendant Eggleston answered, and she had a conversation with the individual on the other end. (Eggleston Aff. Ex. B at 25). From the conversation, it is apparent that the person on the other end of the telephone was defendant Chase, and at the end of the conversation, defendant Eggleston stated that "Lieutenant Chase is coming." (*Id.*)

While they were waiting for defendant Chase, defendant Eggleston and plaintiff discussed obtaining documents. (*Id.* at 25–26). Plaintiff complained that he should have obtained documents at least 24 hours before the hearing, and complained that he needed the time to prepare a defense. Defendant Eggleston then asked if plaintiff needed more time, and he said yes, but that he still would like defendant Chase to come and testify because plaintiff had some questions. (*Id.* at 26). Defendant Eggleston stated "Okay. What we're going

to do then at this time, I am going to adjourn this hearing, or stop the tape." Plaintiff said "Right." (*Id.*) The tape was stopped at 9:45 a.m. "so that [defendant Eggleston could] evaluate Lieutenant Chase's materials." Plaintiff agreed, and defendant Eggleston also stated that she would evaluate what they could give plaintiff to look at. (*Id.*) Thus, plaintiff agreed to stopping the tape recording, and the tape was off until 10:05 a.m. Defendant Chase then testified about his investigation. (*Id.* at 27–41).

There is no indication that plaintiff was asked to step out of the room at any time as he alleges in the amended complaint. (AC at 9 ¶ u). In any event, if plaintiff was not present during the alleged conversation, it is unclear how he would have known that defendant Chase discussed the subject matter of the investigation with defendant Eggleston.[24] In her affidavit, defendant Eggleston specifically states that "it was [her] invariable practice as Hearing Officer never to have a witness in the hearing room without the inmate being present." (Eggleston Aff. ¶ 19). She correctly states that the transcript shows that, from the time of defendant Chase's arrival until the conclusion of his testimony, plaintiff was present. (*Id.*) (citing Ex. B at 26–41).

Plaintiff was afforded the opportunity to question defendant Chase about his investigation during the testimony. Defendant Whalen and Sergeant Giambruno also testified at the hearing. (*Id.* at 44–47). Inmate Alexander testified at the hearing as a witness for plaintiff. (*Id.* at 50–58). Inmate Alexander testified that he did not believe that plaintiff wrote the letter because he always typed his letters. (*Id.* at 57).

At the end of the hearing, when plaintiff was noting all of his objections, he objected to the "seven minute conversation" that defendant Eggleston had with defendant Chase "off the record" before he testified. (*Id.* at 82). Defendant Eggleston stated on the record, that she did not have a seven minute conversation with defendant Chase, and that whatever discussion she had with him "had nothing to do with this investigation." (*Id.*) As reflected in the portion of the transcript referred to in footnote 24 above, the plaintiff accepted the defendant Whalen's response to his objection during the hearing. No reasonable fact finder could credit plaintiff's conclusory allegation regarding an ex parte communication, given the clearly contradictory evidence in the record.

### ii. Documentary Evidence

**\*17** Plaintiff claims that his due process rights were violated because defendant Eggleston refused to produce the handwriting samples taken from the other porters on the unit. The court also notes that at the hearing, plaintiff asked for handwriting samples from *all* inmates in his housing unit and samples from other members of the Inmate Liaison Committee ("ILC").[25] Plaintiff was given the threatening letter and the samples of his own handwriting that were used as a comparison. (Eggleston Aff. Ex. B at 22–23). Defendant Eggleston stated that plaintiff's samples and the threatening letter were the only "pertinent" samples, and that she was not going to produce the samples from the other eight porters, obtain samples from other ILC members or obtain samples from 50 other inmates on the unit.[26] (*Id.* at 6, 17–18, 42–43).

Plaintiff claims that defendant Eggleston did not give appropriate reasons for her refusal. A hearing officer does not violate due process by excluding irrelevant or unnecessary evidence or testimony. *Kawalinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991)); *Chavis v. vonHagn,* No. 02–CV–119, 2009 WL 236060, at \*62 (W.D.N.Y. Jan. 30, 2009) (citing *Kawalinski, supra* ).

It is clear from defendant Eggleston's comment that she believed she had the "pertinent" information, and that she believed the samples of the other inmates' handwriting that were determined not to match the threatening letter were not relevant to the hearing. She specifically stated that asking for handwriting samples from all the ILC members was not a reasonable request, as was plaintiff's request for samples from all the inmates on the unit. (Eggleston Aff. Ex. B at 9). Defendant Eggleston noted that there were no other members of the ILC in plaintiff's dorm, other than Alexander, and the threatening letter referred to officers who worked in plaintiffs and Alexander's housing unit. (*Id.* at 17–18). Defendant Eggleston credited defendant Whalen's and defendant Chase's testimony that none of the other samples matched the letter, thus producing the samples taken from the eight porters was also not necessary. Plaintiff had the opportunity to argue that *his* samples did not match the threatening letter. Thus, defendant Eggleston was justified in refusing to produce or obtain the requested evidence.

### iii. Sufficiency of the Evidence

Defendant Chase and Whalen compared the threatening letter with samples of plaintiff's handwriting and samples of the handwriting of eight porters who lived on the same unit. They

both testified at plaintiff's hearing, and stated that plaintiff's was the only sample that came close to the handwriting in the threatening letter. Plaintiff had the opportunity to question them. Defendant Whalen also testified that she was plaintiff's counselor and was familiar with his handwriting, but that when she was approached to help with the investigation "at no time was a specific inmate directed to [her]." (Eggleston Aff. Ex. B at 45–47). Plaintiff was allowed to present his witnesses, including the inmate who was impersonated in the letter.

**\*18** Sergeant Giambruno also testified that he was involved in the investigation, and he remembered comparing the threatening letter to three or four different inmates' samples, given to him by officers. (*Id.* at 48). He stated that he compared a couple of samples from plaintiff's unit and some from another building who had previously been housed in plaintiff's unit. However, Sergeant Giambruno did not find enough similarities in any of the letters. (*Id.* at 49). When he was not successful in finding a match, he turned a copy of the letter over to defendant Whalen, and ended his involvement in the case. (*Id.*) He was not involved in determining that plaintiff's handwriting was a match for the threatening letter. (*Id.*)

The proof relied upon by defendant Eggleston constituted at least "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e.g., Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at *2 (M.D.Pa. Dec.21, 2005), *aff'd,* 259 F. App'x 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at *3 (W.D.N.C. Apr.2, 2007), *aff'd,* 242 F. App'x 19 (4th Cir.2007) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at *2 (E.D.Ark. Mar.9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards).

Defendant Eggleston read a lengthy decision into the record that is supported by at least "some" evidence. (*Id.* at 87). She stated that she discussed the witnesses that she found were credible and the witnesses that were less relevant. She explained why she made her determination, discussed the sentence, and reminded plaintiff of his right to appeal. (*Id.* at 87–88).

The court notes that this determination was later administratively reversed after plaintiff filed an Article 78 proceeding challenging the determination. (Prack Aff. ¶ 21 & Ex. D). Defendant Prack states that this was "[d]ue to an overabundance of caution." (*Id.*) Notwithstanding that reversal, the hearing officer's failure to make an independent examination of the handwriting would not have violated plaintiff's federal due process rights. *See, e.g., Monier v. Holt,* 2005 WL 3531369, at *2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at *2 (hearing officer who accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at *3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[27]

**\*19** In his response to the motion for summary judgment, plaintiff cites various New York State cases. *See e.g. Hill v. LeFevre,* 124 A.D.2d 383, 507 N.Y.S.2d 330 (4th Dep't 1986). This case discussed confidential testimony by an individual who did not testify in the inmate's presence. Plaintiff cites the "substantial evidence" standard, however, as stated above, the sufficiency standard for federal due process is "some" or a "modicum" of evidence. Plaintiff also cites state law cases in which it was determined that the hearing officer erred in failing to make her own determination of whether the plaintiff's handwriting was similar to the subject letter. *See Odom v. Goord,* 271 A.D.2d 723, 705 N.Y.S.2d 433 (3d Dep't 2000). In *Odom,* the court stated that although the corrections officer was not legally qualified to render an opinion that two documents contained the same handwriting, the hearing officer was so qualified. *Id.* 271 A.D.2d at 724.

As stated above, the standard for review of disciplinary hearings in state court is stricter than for federal due process purposes. In any event, in this case, defendant Eggleston had the samples of plaintiff's own writing to compare to the

unknown author's threatening letter, and she did compare them. Plaintiff is complaining that defendant Eggleston did not look at the *other* inmates' letters to make an independent determination of whether defendants chose the correct inmate as the author. (Pl.'s Resp. at 8). The cases cited by plaintiff do not apply, and even if the evidence had been insufficient for state law purposes, that did not rise to the level of a constitutional violation.

### iv. Credit for Time Served in Pre–Hearing Confinement

Finally, plaintiff alleges that it was error for defendant Eggleston to make plaintiff's sanction run from the time of the hearing, rather than giving him credit for time served in keeplock prior to the hearing. Defendant Eggleston states in her affidavit that giving credit for time served is a common practice, but the decision to grant such credit is within the discretion of the hearing officer and is not a procedural requirement. (Eggleston Aff. ¶ 33). Defendant Eggleston "rarely" granted credit for time served, and she believed it would have been "particularly inappropriate" in this case because of plaintiff's lengthy disciplinary history and because the suspension of a prior disciplinary sanction did not deter plaintiff from repeated offenses. (*Id.* ¶ 34).

The court notes that, other than a section stating that any disciplinary penalty imposed in a Tier III hearing is to run consecutively to "any other like penalty previously imposed" unless *"the hearing officer"* determines that the penalties shall run concurrently and advises the inmate, there are *no regulations* governing credit for pre-hearing confinement. N.Y. Comp.Code R. & Regs., tit.7, § 254.7(a)(2) (emphasis added). This section clearly leaves the determination of whether to run penalties consecutively or concurrently up to the hearing officer, without any procedural requirement other than notice to the inmate. The federal due process requirements do not contain any reference to the sanctions imposed or when the sanction must begin to run after an inmate is found guilty of the violation. Thus, there is no due process implication to this claim.

### b. Telephone Violation

**\*20** The sanction imposed after plaintiff's second disciplinary hearing consisted only of a short period of deprivation of privileges. The length of plaintiff's confinement was not affected. Based on *Sandin,* this court finds that plaintiff had no liberty interest protected by due process with respect to the disciplinary hearing held by

defendant Meskunas. Thus, any due process claim relating to that hearing may be dismissed.

### 2. *Retaliation*

Plaintiff alleges that the two misbehavior reports discussed above were filed against him in retaliation for his grievance against defendant Leon. In their affidavits, both defendants Chase and Whalen state that they did not know about plaintiff's grievance against defendant Leon, and they did not issue any false or retaliatory misbehavior reports. (Chase Aff. ¶¶ 19–23; Whalen Aff. ¶¶ 24–33).

During plaintiff's deposition, he was asked which grievance he believed resulted in retaliation. (Pl.'s Dep. at 32). Plaintiff stated that "it was a number of grievances and complaints," but then he stated that only one was a grievance, and "the rest of them I think were complaints. I don't recall there being actual grievances." (*Id.*) Plaintiff specified the grievance against defendant Leon as the formal grievance that caused the alleged retaliation. (*Id.*) Plaintiff testified that when he was going to the grievance hearing, he was sitting in the hallway, and an officer asked plaintiff to tell him the subject matter of the grievance. (*Id.* at 33). When plaintiff explained the facts of the grievance, the officer told plaintiff that "it's not a good thing to write grievances against people in Clinton, especially somebody that's well liked like Leon." (*Id.*) Plaintiff could not name the officer who allegedly gave plaintiff this information. He described the officer as "[h]eavy-set, about 5′7″ or 8″, brown hair, about 260 pounds ...." (*Id.*)

Plaintiff claims that the unknown officer gave plaintiff a hard time about a permit for his wedding band approximately one week after the above conversation. Plaintiff attributes this verbal harassment to the fact that he told the officer about the Leon grievance. (*Id.* at 35). Plaintiff testified that he wrote a "complaint" against this unknown officer. (*Id.*) It does not appear that this "complaint" was a formal grievance because plaintiff states he wrote to the Superintendent and was interviewed by a Sergeant about this issue. (*Id.* at 35–38). Plaintiff also explained that in retaliation for the grievance against Leon, and in retaliation for his wife's complaints, plaintiff's wife was harassed at various times when she was visiting. (*Id.* at 38–41). Plaintiff stated that Officer Lincoln was involved in this harassment, and unnamed officers were "whispering and pointing" at plaintiff and his wife.[28] (*Id.* at 39–30).

Plaintiff also alleges that the July 23, 2010 incident and misbehavior report were in retaliation for the Leon grievance and plaintiff's wife's complaints about poor treatment during her visits. (*Id.* at 41). Plaintiff claims that on July 23, 2010, his housing unit was searched, and he was taken to SHU. He testified that he knew these actions were in retaliation for the Leon grievance and other complaints because, after he was taken to SHU, defendant Chase interviewed plaintiff and asked him about "the complaints." (*Id.* at 42). Plaintiff told Chase "what was going on and why." (*Id.*) Plaintiff claimed that defendant Chase told plaintiff that writing complaints was not viewed favorably at Clinton, [29] and that Chase could "do anything he want[ed] because he was in charge." (*Id.*)

**\*21** Although plaintiff discussed defendant Chase at great length during the deposition, there was really no indication of how he or defendant Whalen would have known about a grievance against defendant Leon or any other complaint, formal or otherwise, made by plaintiff. Defendant Whalen only became involved in the misbehavior report regarding the threatening letter because defendant Whalen was a corrections counselor, who kept all correspondence sent to her by inmates, and who was asked to assist in the investigation of the threatening letter by examining samples of plaintiff's handwriting. (Whalen Aff. ¶¶ 4, 7, 9, 11). They looked at a number of samples of inmates' writing by putting together a list of the porters housed in the same building as plaintiff for a handwriting comparison. (*Id.* ¶¶ 11–12).

Plaintiff speculates that this misbehavior report and the telephone violation charge were retaliatory based upon an alleged statement by an unknown officer and a claim that defendant Chase told plaintiff that writing grievances was not a good idea. However, plaintiff claims that this alleged retaliation was committed by officers against whom he had not written any grievances, and it is unclear how either defendant Chase or defendant Whalen would have become aware of plaintiff's grievance against defendant Leon.

In his response to the motion for summary judgment, plaintiff also speculates that his letters of complaint regarding visitation, addressed to other officers, found their way to defendant Chase. A few of the complaint letters were forwarded to Captain Holdridge, and defendant Chase testified at plaintiff's disciplinary hearing that he was Acting Captain and was reading Captain Holdridge's mail. (Pl.'s Resp. at 10–11). One of the letters attached as an exhibit states that plaintiff's "July 5, 2010 letter regarding staff complaint" was referred to Captain Holdridge. (Pl.'s Ex. N). No July

5, 2010 letter was attached. [30] The next two letters are dated July 9, 2010 and July 13, 2010 and are addressed to Superintendent LaValley. (Pl.'s Ex. O). Both letters complain about visitation and Officer Lincoln. The response from Superintendent LaValley states that at the time of the incident, defendant Chase "intervened and remedied the situation *in [her] favor."* [31] (Pl.'s Ex. P) (emphasis added).

Thus, plaintiff has not established a nexus between his protected activity and the alleged retaliation. Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). In this case, plaintiff's current speculation that defendant Chase retaliated against plaintiff based on two letters forwarded to Captain Holdridge that defendant Chase may have seen, is unfounded. This is particularly true because in Superintendent LaValley's letter, he states that defendant Chase resolved the visitation issue in plaintiff's wife's favor.

**\*22** Finally, defendants also argue that even if plaintiff had made the appropriate showing, they would have taken the same action, notwithstanding any retaliatory motive. Defendants point out that plaintiff was found guilty of the conduct charged in the misbehavior reports. The charges in question were supported by documentary evidence, and notwithstanding the reversal of the first hearing, a review of the letters and plaintiff's handwriting shows that defendants had a reasonable basis for the charges. The PIN violation

was also supported by evidence documenting the telephone calls made using plaintiff's PIN when he would have been unable to make the telephone calls. Thus, plaintiff's claims of retaliation may be dismissed. *See Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (where the record clearly demonstrates that the inmate in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, the defendants meet their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report, and are entitled to summary judgement on a retaliation claim).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED,** and the amended complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5441353

---

## Footnotes

1   The court notes that Eggleston's name is misspelled on the docket, and the court directs the Clerk to amend the docket to reflect the proper spelling of Eggleston's name. (Dkt. No. 54, Attach.3.)

2   The court notes that J. Carver was named as a defendant in Jones' initial complaint, (Dkt. No. 1), but was omitted in Jones' amended complaint, (Dkt. No. 5), and subsequently dismissed as a defendant in a Decision and Order by U.S. District Judge Thomas J. McAvoy, (Dkt. No. 6 at 5, 9). In that same Decision and Order, C.O. Lincon also was dismissed as a defendant, and Jones' conspiracy claims and claims that he was denied adequate warmth or food portions at Upstate Correctional Facility were dismissed. (*Id.* at 5–9.) Thereafter, defendants filed a motion to dismiss for failure to state a claim. (Dkt. No. 37.) Magistrate Judge Andrew T. Baxter recommended granting that motion, in part, and dismissing the complaint in its entirety against Fischer, David, Rock, and Rabideau (and, therefore, dismissing Jones' ADA claims). (Dkt. No. 44 at 39–40.) That recommendation was adopted by this court. (Dkt. No. 45.)

3   The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

4   "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 WL 149049, at *6.

1   Defendants' original motion was to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion is directed to the face of the complaint. The court may also consider documents or exhibits that are attached to the complaint or incorporated by reference. *See Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). With a motion for summary judgment, the court may consider additional evidence beyond the complaint to determine whether there are no disputed questions of material fact and whether summary judgment for either party is appropriate, as stated in the standard set forth above. *See Fed.R.Civ.P. 56(c)(1)-(4).*

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2    Plaintiff has numbered the pages of his amended complaint at the bottom. He has also identified paragraphs on each page by letter. However, plaintiff begins each cause of action with a new set of letters, beginning with ¶ (a). Thus, to properly cite to the amended complaint, the court will first cite the bottom page of the document and then cite to the lettered paragraph in which the cited facts are stated.

3    Other documents in the record have clarified that there is a typographical error in the amended complaint. It is apparent that plaintiff meant that defendant Leon "saw" plaintiff eating toast.

4    The deposition transcript has its own numbered pages which are different than the page numbers assigned by the court's CM/ECF system. The court will use the pages that are on the deposition transcript itself.

5    Plaintiff's testimony that the only difference between the standard inmate diet and his therapeutic diet was the sodium content was not accurate. (*See* Pl.'s Dep. at 23).

6    Plaintiff now disputes the date of the incident. In his response to the motion for summary judgment, he states that the incident occurred on July 14, 2010 at breakfast, not on July 15, 2010 at lunch time. (Dkt. No. 56 at 4). First, plaintiff must mean "June" not "July," and second, plaintiff's own exhibit indicates that the date was June 15, 2010. (Dkt. No. 56–1, Ex. A). The Inmate Grievance Complaint is dated *June 15, 2010,* and the first sentence states that *"on the above date,* I went to the *noon* meal and was told be Cook Colos [sic] that he has removed my name off the diet list." (*Id.*) (emphasis added). Because plaintiff's own exhibits contradict his statement regarding the date and time of the incident, there is no question of fact, even if such a dispute would have made a difference.

7    FA Timmons has not named as a defendant in plaintiff's action.

8    One of plaintiff's exhibits shows that he was placed back on the therapeutic diet on July 17, 2010. (Pl.'s Resp. Ex. B; CM/ECF p .7).

9    The "Appeal Statement" says only "see body of grievance." (Timmons Aff. Ex. C at 5). The body of the grievance states that plaintiff wishes to be placed back on the special diet list and "no retaliation" be commenced as a result of the grievance. (*Id.* at 6). It is possible that plaintiff appealed because the Superintendent's decision did not address the issue of retaliation. The CORC did address that issue, stating that it is against DOCCS regulations to retaliate against inmates for good faith use of the grievance procedure, and if an inmate feels that he has been the subject of retaliation he "may pursue a complaint that reprisal occurred through the grievance mechanism." (*Id.*)

10   Plaintiff has signed several of these "contracts." The earliest one submitted by plaintiff is dated June 26, 2009. (Pl.'s Ex. L at CM/ECF p. 44). Plaintiff has also submitted requests dated September 8, 2009; December 17, 2009; June 1, 2010; August 25, 2010; and November 5, 2010. (*Id.* at CM/ECF pp. 39–43).

11   The court notes in passing that plaintiff has submitted copies of his medical records. On July 14, 2010, the day before he was placed back on the special diet, and when he had been off of the therapeutic diet for approximately one month, plaintiff's blood pressure was 129/83. (Pl.'s Ex. I at 1). One week after he started the diet again, his blood pressure was back up to 147/90 in one arm and 146/96 in the other arm. (*Id.* at 2). The provider ordered a "BP med eval." In August of 2010, plaintiff's blood pressure was 139/92, and on October 21, 2010, his blood pressure was 118/64. (Pl.'s Ex. J–2 at CM/ECF pp. 114, 117). On August 21, 2010, plaintiff's blood pressure was 139/92, and there was an order for a low sodium diet signed at Upstate Correctional Facility on August 25, 2010. (*Id.* at CM/ECF pp. 114, 115). While plaintiff had a few extremely high readings in August of 2011 (more than one year after this incident), after he was prescribed Catapress and another blood pressure medication, in September of 2011, his blood pressure readings were 120/86 and 138/85. (Pl.'s Ex. J at CM/ECF p. 29). On September 6, 2011, plaintiff complained that he had headaches associated with his blood pressure, but his blood pressure reading was 120/86 that day, and ten days later,

on September 16, 2011, it was still relatively low. (*Id.* at CM/ECF p. 29). There is no question that plaintiff has high blood pressure, which was poorly controlled from time to time. However, there is no evidence that defendant Leon's conduct in reporting plaintiff's violation of the therapeutic meal rules was the cause of any serious problems plaintiff experienced with his blood pressure.

12    A diet "cancellation" would be registered on the same form as the diet request and attendance contract. There is a space on the form for a "DIET REQUEST" and a "DIET CANCELLATION." (Timmons Aff. Ex. A). The policy provides that if the diet order is cancelled, and the inmate's name is removed from the list, "documentation of the supporting reasons for cancellation or removal MUST be placed in the inmate's medical record." (Timmons Aff. Ex. B at 10). There is no such documentation in this record.

13    Defendant Leon does not concede that he initially discontinued giving plaintiff his special diet, but there appears to be no question that plaintiff did not receive the therapeutic diet for one month. The grievance documents show that the IGRC stated that the "Cook stated Jones was observed exchanging [sic] taking other inates [sic] regular food on 6–15–10 which put him in violation of contract and *removed him from diet.* Must request reinstatement to diet meal with medical." (Leon Aff., Ex. B at 9) (emphasis added). The "dissenting opinion" stated that "removing from medical diet should only be done by medical personnel." (*Id.*) The investigative report on appeal, written by M. Ratliff, after interviewing defendant Leon, states that plaintiff "was observed exchanging and taking other inmates [sic] regular food on 6–15–10 which put him in violation of the diet contract and *he was removed from diet."* (*Id.* at 14) (emphasis added). A meeting was scheduled with a doctor to "address this procedure," and on the next day, Deputy Superintendent of Programs ("DSP") Keysor wrote that "only medical will remove from diet. 3 missed meal—warning given—2nd offense, medical *notified."* (*Id.*)

14    The court notes that plaintiff's grievance was granted to the extent that he was ordered back on the diet because, according to the Superintendent's response, only the medical department could remove someone from the therapeutic diet.

15    Defendants argue that the "removal" from plaintiff's medical diet was caused by "someone else, namely the medical personnel who possessed the sole authority to effectuate that removal." (Def.'s Br. at 11) (Dkt. No. 54–12). However, FA Timmons states that he "would have" discussed the report with medical personnel who then "would have" made a determination of whether to cancel the diet. (Timmons Aff. ¶ 26). It is not clear from the affidavit that this is exactly what happened. FA Timmons states that sometimes an inmate is removed from the special diet and sometimes he is not. (*Id.* ¶ 28). FA Timmons also states that the Form 3273 is not used when addressing an issue of non-compliance with the Attendance Agreement: "that is an administrative matter handled between the Director of Food Services and the Director of Health Services." (*Id.* ¶ 29). Although it is unclear, this may mean that unless the diet is actually canceled by the Director of Food Services, no form is used, and there is no record of the action taken.

16    The notation states "7/15/10 pe [sic] DSA Keysor-only medical *will remove* from diet." (Leon Aff. Ex. B at 14). It appears that the DSP was indicating that in the future, the procedure to follow was that after 3 missed meals, an inmate would be warned, and after the "2nd offense," the medical department would be notified. (*Id.*)

17    Defendant Eggleston is currently retired. (Eggleston Aff. ¶ 2).

18    Although defendant Whalen states that her misbehavior report is attached to her affidavit as Exhibit C, there is no such exhibit in the record. However, the misbehavior report has been attached to defendant Meskunas's affidavit in Exhibit A. The court will cite to the copy in the Meskunas affidavit.

19    Plaintiff was found not guilty of the refusal to obey an order. (Meskunas Aff. Ex. A at 1).

20    "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept.12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978)).

21    Defendant Prack, the Acting Director of Special Housing and Inmate Programs and Inmate Disciplinary Program also argues that plaintiff has not shown sufficient personal involvement by defendant Prack. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Because I find no constitutional violation in this case, I need not reach the issue of personal involvement.

22    Although in its Report, recommending denial of the defendants' motion to dismiss, this court found that plaintiff had a liberty interest in the first hearing, the court was not aware that plaintiff was unable to earn good time credits. (Dkt. No. 44 at 39).

23    This basis for his due process claim was not raised in the amended complaint. (*See* AC at 9, ¶¶ u, w). Generally, a party may not raise new claims in his or her response to a motion for summary judgment. *See Brown v. Raimondo,* 9:06–CV–0773, 2009 WL 799970, at *2, n. 2 (N.D.N.Y. March 25, 2009) (Report–Recommendation of Treece, M.J., *adopted by* Suddaby, J.) ("The Court notes that opposition papers [on summary judgment motions] are not the proper vehicle to instill new causes of action or add new defendants."), *aff'd,* 373 F. App'x 93 (2d Cir.2010); *Smith v. Greene,* 9:06–CV0505, 2011 WL 1097863, at *3, n. 5 (N.D.N.Y.Feb.1, 2011) (Baxter, M.J.) ("[P]laintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion."), *adopted by,* 2011 WL 1097862 (N.D.N.Y. March 22, 2011) (Suddaby, J.); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment); *Shaheen v. McIntyre,* 9:05–CV–0173, 2007 WL 3274835, at *1, 9 (N.D.N.Y. Nov.5, 2007) (McAvoy, J., *adopting* Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment). Because, plaintiff did not raise this issue in the amended complaint, defendant Eggleston did not address it in her affidavit. Notwithstanding the above, and because this is an alternative finding, the court will consider the merits of this claim in addition to the other bases for plaintiff's due process claim against defendant Eggleston.

24    The court also notes that the transcript contradicts plaintiff's assertion in the amended complaint that defendant Eggleston told plaintiff to step out. The transcript reads as follows:

Jones: ... I'm objecting to the seven minute conversation you had with Chase off the record before he testified.

Eggleston: I didn't have a seven minute conversation with him.

Jones: Yes it was. Yes. When he came in you all was discussing ... what was the nature of the investigative material. You told him to step out.

Eggleston: That didn't have nothing [sic], that had nothing to do with this investigation.

Jones: Okay. All right All right. [sic] That's cool.....

(Eggleston Aff. Ex. B at 82).

25    Inmate Alexander was the Vice Chairperson of the ILC, and plaintiff's theory was that someone on the ILC wrote the letter, pretending to be Alexander in order to get Alexander into trouble. (Eggleston Aff. Ex. B. at 14).

26    Initially, defendant Eggleston stated that although she was not going to obtain 50 samples, she would "do probably a reasonable number like three." (Eggleston Aff. Ex. B at 5). She then asked plaintiff "which inmates would you like," but plaintiff did not give her any names and continued to request all the inmates.

27    In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). Neither of these cases applies here. Both defendants Chase and Whalen testified regarding their investigation, there were no confidential informants, and plaintiff was allowed to question both of the defendants. His theory that they should have reviewed more handwriting samples and that defendant Chase was unreliable because he was not a handwriting expert does not implicate federal due process rights. This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination.

28    Any claims relating to these alleged incidents were dismissed after the defendants' first motion. (Dkt. Nos. 44, 45–1 at 32–33).

29    Whatever plaintiff told defendant Chase during this interview could not have been the reason for retaliation. The investigation of the threatening letter was already underway.

30    This might be a typographical error by Superintendent LaValley because two letters of complaint were referred to Captain Holdridge, (Pl.'s Ex. N, Q), but the letters in Exhibit O are dated July 9, and July 13.

31    Neither plaintiff nor his wife, ever mentions defendant Chase by name, but plaintiff's letter states that his wife spoke to "a Lieutenant," who stated he would take care of the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 51). Plaintiff's letter then states: "After that I was call [sic] down to the visiting room approximately five minutes later." (*Id.*) Plaintiff's wife also mentions that she spoke to "a lieutenant" who remedied the situation. (Pl.'s Ex. O; Dkt. No. 56–1, CM/ECF p. 52). Plaintiff's wife stated that the time elapsed was 15 minutes, but in any event it was clear that the "lieutenant," who we now know from Superintendent LaValley's letter was defendant Chase, helped plaintiff and his wife during the incident.

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 310 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

🚩 KeyCite Yellow Flag

Declined to Extend by    Broadwater v. County of Onondaga,    N.D.N.Y.,
March 11, 2024

2020 WL 1904088
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael JOYNER, Plaintiff,

v.

COUNTY OF CAYUGA; Cayuga County Sheriff's
Department; City of Auburn; Shawn I. Butler, Chief of
Auburn Police Department, as an Individual and in his
official capacity; Cayuga County District Attorney's
Office; Jon E. Budelmann, as an Individual and in
his capacity as District Attorney for Cayuga County;
and Anthony Spinelli, as an Individual and in his
capacity as an Auburn City Police Officer, Defendants.

5:20-CV-60 (MAD/TWD)
|
Signed 04/17/2020

**Attorneys and Law Firms**

OF COUNSEL: JARROD W. SMITH, ESQ., OFFICE OF
JARROD W. SMITH, 11 South Main Street, P.O. Box 173,
Jordan, New York 13080, Attorneys for Plaintiff.

OF COUNSEL: JEFFREY R. PARRY, ESQ., OFFICE OF
JEFFREY R. PARRY, 7030 East Genesee Street, Fayetteville,
New York 13066, Attorneys for Plaintiff.

OF COUNSEL: FRANK W. MILLER, ESQ., GIANCARLO
FACCIPONTE, ESQ., OFFICE OF FRANK W. MILLER,
6575 Kirkville Road, East Syracuse, New York 13057,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

 *1 On or about February 18, 2020, Plaintiff filed a complaint
against Defendants City of Auburn, Shawn L. Butler, County
of Cayuga, Cayuga County District Attorney's Office, Jon
E. Budelmann, and Anthony Spinelli, asserting eight claims

pursuant to 42 U.S.C. §§ 1983 and 1988, and state law.
See Dkt. No. 5. Specifically, Plaintiff's complaint alleges the
following causes of action: (1) false arrest under the Fourth
and Fourteenth Amendments; (2) malicious prosecution
under the Fourth and Fourteenth Amendments; (3) negligent
failure to train or supervise; (4) state law false arrest; (5)
state law false imprisonment; (6) intentional and negligent
infliction of emotional distress under New York State law;
(7) negligence; and (8) deliberate indifference to medical care
under the Eighth Amendment. See Dkt. No. 5 at ¶¶ 40-114.
Currently before the Court is Defendants' motion to dismiss
the complaint in its entirety. See Dkt. No. 9.

**II. BACKGROUND**

According to the complaint, on August 10, 2018, Plaintiff
was the passenger in a vehicle that was driven by 140 Wall
Street, allegedly in violation of an order of protection for
Linda Fitzsimmons and Lee Joyner, who both reside at that
address. See Dkt. No. 5 at ¶¶ 24-25. Plaintiff resides at 145
Wall Street, several houses down from 140 Wall Street, on the
opposite side of the street. See id. at ¶ 25. Plaintiff was not the
driver of the vehicle and had no control over how the driver
was delivering him to his home. See id.

On August 13, 2018, Plaintiff was arraigned on two felony
complaints charging him with two counts of Criminal
Contempt in the First Degree based on the alleged violation of
the order of protection. See id. at ¶ 22. At the conclusion of his
arraignment, Plaintiff was remanded to the Cayuga County
Jail. See id. Plaintiff claims that "Defendant police officer
lacked the requisite requirement of having probable cause to
arrest the Plaintiff; and did falsely arrest and imprison the
Plaintiff." Id. at ¶ 23.

On October 4, 2018, Defendant Jon E. Budelmann, in his
capacity as Cayuga County District Attorney, presented
Plaintiff's charges to a grand jury, which "No Billed" the case.
See id. at ¶ 26. At this point, Plaintiff was released from
custody. See id.

During the fifty-three days during which Plaintiff "was being
illegally imprisoned," he slipped and fell at the Cayuga
County Jail. See id. at ¶ 31. According to Plaintiff, on August
31, 2018, a water pipe burst at the Cayuga County Jail near
Plaintiff's cell while he was already locked in for the night
and sleeping. See id. at ¶ 32. Plaintiff was woken by a
bursting water pipe that was turned off by a Cayuga County

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 311 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Correctional officer. *See id.* at ¶ 33. "The first burst of the water pipe [occurred] when the Cayuga County Correctional officer shut the water of" between "12:00 midnight and 2:00 a.m." *Id.* at ¶ 34. "Plaintiff was woken by a bursting water pipe; and observed and heard that the correctional officer was going to turn off the water and clean up the water spill. At that time, there was no water in Plaintiff's cell." *Id.*

**\*2** Unbeknownst to Plaintiff, water from the burst pipe went underneath his locked cell door "and flooded his room while he was in bed and asleep." *Id.* at ¶ 35. "At around 6:30 am-7:00 am, Plaintiff got out of his bed to use the toilet in his cell. Plaintiff slipped and fell on the wet floor of his cell. The water on the floor was all near the toilet in his cell. There was a huge puddle of water between Plaintiff's bunk and the toilet in his cell." *Id.* at ¶ 36. Plaintiff claims that he slipped and fell, hitting his head and neck on his bunk, and his lower back on the floor, causing severe injuries. *See id.* at ¶ 37. At the time that Plaintiff had fallen and injured himself, a second water leak had occurred in the pod in which he was being held. *See id.* at ¶ 38. Plaintiff claims that, as a result of the fall, he suffered a herniated disc in his neck and a lower lumbar strain. *See id.* at ¶ 39. Plaintiff also claims that he suffers from numbing of his toes and finger tips. *See id.*

### III. DISCUSSION

#### A. Standard of Review
A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

#### B. Documents Considered in Deciding Motion to Dismiss
In their reply to the motion to dismiss, Defendants submitted several documents in further support of their motion. *See* Dkt. No. 16-1. These documents include (1) the August 10, 2018 criminal complaint charging Plaintiff with Criminal Contempt in the First Degree, (2) the order of protection that Plaintiff allegedly violated, (3) the affidavit of Linda Fitzsimmons that formed the basis for Defendant's underlying criminal charge, and (4) the incident narrative report of Defendant Spinelli dated August 15, 2018 relating to the criminal complaint filed against Plaintiff. *See id.* at 1-6.

**\*3** In deciding a motion to dismiss for failure to state a claim, the court considers the complaint, materials incorporated into the complaint by reference, materials integral to the complaint, and facts that are capable of judicial notice. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

In the present matter, the Court finds that these documents are not properly considered at the motion to dismiss stage. The Court acknowledges that there are cases in which courts have considered similar police records at the pleading stage. *See Betts v. Shearman*, No. 12-cv-3195, 2013 WL 311124, \*3 (S.D.N.Y. Jan. 24, 2013) (considering incident report and accusatory instrument that "provide[d] crucial details" about the plaintiff's prosecution), aff'd *on qualified immunity*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 312 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

*grounds*, 751 F.3d 78 (2d Cir. 2014); *cf. Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118, 2003 WL 1809471, *4 (E.D.N.Y. Apr. 7, 2003) (considering incident report and police complaint that the plaintiff had conceded were "implicitly" incorporated into his conspiracy allegations). The better view, however, adopted by a majority of courts in our Circuit, is that these kinds of police records are not "integral" to a false arrest complaint. *See Bejaoui v. City of New York*, No. 13-CV-5667, 2015 WL 1529633, *4–5 (E.D.N.Y. Mar. 31, 2015) (noting disagreement and declining to consider extrinsic police reports); *Alvarez v. Cty. of Orange*, 95 F. Supp. 3d 385, 394-95 (S.D.N.Y. 2015) (collecting cases). A document is not "integral" simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff relied on the document in preparing his complaint. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156-57 (2d Cir. 2006); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Most typically, "the incorporated document is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but for which some reason ... was not attached to the complaint." *Global Network Commc'ns*, 458 F.3d at 157. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, there is "no indication in the record that plaintiff relied on these documents in drafting the complaint." *Allyn v. Rockland Cty.*, No. 12-cv-5022, 2013 WL 4038602, *4 (S.D.N.Y. July 30, 2013), *affirmed*, 646 Fed. Appx. 60 (2d Cir. 2016). To the contrary, Plaintiff relies on his own perceptions and recollections, while only making passing reference to the criminal complaint and order of protection. Furthermore, it is not beyond dispute that the police report and narrative are a truthful description of the police officer's basis to arrest Plaintiff. To accept the truth of the documents offered by Defendants at this stage would amount to a premature determination that the arresting officers and the alleged victim are more credible than Plaintiff. To make such a determination at this stage would not be appropriate, and therefore the Court will not consider the facts adduced in these documents. The Court will, however, take judicial notice of the existence of the criminal complaint, supporting affidavit, and order of protection. *See Williams v. City of New York*, No. 14-cv-5123, 2015 WL 4461716, *1 (S.D.N.Y. July 21, 2015) (noting that the court "may take judicial notice of the procedural history of plaintiff's criminal case, but not of the truth of the arresting officers' version of events"); *see also Ribaudo v. Desimone*,

No. 3:18-cv-1190, 2019 WL 1906269, *4 (M.D. Pa. Apr. 5, 2019) (holding that "even if judicial notice is taken of these documents, 'a court may take notice of such documents only to establish their existence and legal effect, or to determine what statements they contained ... not for the truth of the matters asserted' ") (quoting *Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 223 (N.D.N.Y. 2014)) (other citation omitted).

## C. *Monell* and Supervisory Liability

**\*4** "Under the standards of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality can be held liable under [42 U.S.C. § 1983] if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). Liability under Section 1983 "is imposed on the municipality [only] when it has promulgated a custom or policy that violates federal law and, pursuant to that policy, a municipal actor has tortiously injured the plaintiff." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones*, 691 F.3d at 80. Thus, for a municipality to be held liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).

"Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.' " *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, *4 (D. Vt. Apr. 8, 2013) (quoting *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011)). Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit required a plaintiff to allege one of the following categories for supervisory liability under § 1983:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 313 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In order to succeed on his *Monell* and supervisory liability claims, a plaintiff must first "identify obvious and severe deficiencies" in the policies of the municipal and supervisory defendants and "show a causal relationship" between those deficiencies and his alleged deprivations. *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007). However, to the extent that a plaintiff premises his claims on a failure to train or supervise, such failure "may constitute an official policy or custom [only] if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195. Similarly, a supervisory defendant is liable only for the creation or continuation of policy that leads to a pattern of unconstitutional conduct or if he demonstrated deliberate indifference in failing to act on information that a pattern of unconstitutional conduct was occurring. *See Colon*, 58 F.3d at 873.

"To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones*, 691 F.3d at 81.

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train [or supervise] [w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen

a training program that will cause violations of constitutional rights.

**\*5** *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 61 (citation omitted). [1]

**D. Cayuga County District Attorney's Office and Auburn Police Department**

Plaintiff names the Cayuga County District Attorney's Office as a named Defendant in this case. The caselaw is clear, however, that a district attorney's office is not an entity subject to suit under 42 U.S.C. § 1983. *See Michels v. Greenwood Lake Police Dep't*, 387 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (citing cases); *Griffith v. Sadri*, No. 07-CV-4824, 2009 WL 2524961, \*8 (E.D.N.Y. Aug. 14, 2009). Similarly, Plaintiff has listed the Auburn Police Department as an entity responsible for several of the alleged constitutional violations. *See* Dkt. No. 5 at ¶¶ 51-82. As with the District Attorney's Office, the Auburn Police Department (which is not listed as a Defendant in the caption of the complaint), the Court finds that it must be dismissed because a police department is not an independent, suable entity separate from the municipality in which the police department is located. *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (citation omitted); *Krug v. City of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing cases); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 315 (S.D.N.Y. 2008) (citing cases).

Accordingly, the Court dismisses Plaintiff's claims against the Cayuga County District Attorney's Office and the Auburn Police Department.

**E. False Arrest**

In their motion to dismiss, Defendants contend that, based on Plaintiff's own allegations, probable cause was present to believe that he committed the offense for which he was arrested. *See* Dkt. No. 9-1 at 14-16. Defendants claim that Plaintiff "admits that he was charged with violating duly issued orders of protection issued for Linda Fitzsimmons and Lee Joyner, who reside at 140 Wall Street in the City of

Auburn. *See id.* at 15 (citing Dkt. No. 5 at ¶ 24). Defendants further claim that Plaintiff "admits he was 'driven by' 140 Wall Street on August 10, 2018." *Id.* (citing Dkt. No. 5 at ¶ 25). Defendants contend that the fact that Plaintiff claims that he was not driving the vehicle "has no bearing on whether the order of protection was reasonably deemed violated by police authorities, and Plaintiff is careful not to deny that he was in fact at 140 Wall Street on the date in question, which is *a per se* violation of the order." *Id.* In response, Plaintiff argues that since he "was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance and, as it cannot be denied that he was 'no billed' by the Grand Jury, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 16.

**\*6** In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *See Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citation omitted). To prevail on a false arrest claim under New York law, a plaintiff has to prove the following: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19-20 (citing *Weyant*, 101 F.3d at 852). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same). Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the eyewitness' veracity. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119). The question is whether the facts known to the arresting officer, at

the time of the arrest, objectively provided probable cause to support the arrest. *See Gonzalez*, 728 F.3d at 155.

In the present matter, the Court finds that Defendants' motion to dismiss Plaintiff's false arrest claim must be denied as to Defendant Spinelli. The complaint sufficiently alleges, albeit barely, that Defendant Spinelli lacked probable cause to arrest Plaintiff for the crime of Criminal in the First Degree. Indeed, it is unclear from the complaint whether Plaintiff's conduct was, in fact, in violation of the order of protection. [2]

However, to the extent that Plaintiff attempts to assert a false arrest claim against any other named Defendant, the claim must be dismissed. Plaintiff's complaint is devoid of any facts that would permit the Court to find that any other Defendant was personally involved in the alleged false arrest. Aside from conclusory allegations merely reciting the underlying law, Plaintiff fails to include any facts that plausibly allege the personal involvement of any municipal or supervisory Defendant. For example, Plaintiff alleges that "Defendant Butler, Defendant City and Defendant County have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public." Dkt. No. 78 at ¶ 78. While this allegation accurately reflects what is required to hold municipal and supervisory officials personally liable for the acts of other, the simple recitation of the relevant law is insufficient to withstand a motion to dismiss. Rather, Plaintiff was required to allege facts, specific to his case, demonstrating how these municipal and supervisory Defendants were personally involved in the alleged unconstitutional conduct, which he has failed to do. Simply put, the legal conclusions in Plaintiff's complaint, devoid of any supporting facts, fail to plausibly allege supervisory or municipal liability as to this claim.

**\*7** Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's false arrest claim as to Defendant Spinelli.

### F. Malicious Prosecution

In their motion to dismiss, Defendants argue that Plaintiff's malicious prosecution must be dismissed because the complaint fails to set forth facts plausibly alleging that the prosecution was initiated without probable cause or that any named Defendant acted with the requisite malice. *See* Dkt.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 315 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

No. 9-1 at 16-17. In response, Plaintiff states as follows: "As the plaintiff was arrested for traveling on a public road in route to his own home and in violation of no Order, law or ordinance, as it cannot be denied that he was 'no billed' by the Grand Jury and as he spent 53 days in jail for no reason whatsoever, it would seem plausible to this writer that any court would agree to the plausibility of Plaintiff's claims." Dkt. No. 10 at 17 (citing *Swierkiezicz v. Sorema*, 534 U.S. 506 (2002)). Plaintiff brings his malicious prosecution claim against the City of Auburn, Auburn Police Department, Cayuga County, and Defendant Butler. *See* Dkt. No. 5 at ¶¶ 51-82. While Plaintiff may be confident in the viability of his claim, this Court finds that Plaintiff has failed to plausibly allege facts supporting a claim for malicious prosecution. [3]

To prevail on a Section 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must plausibly allege four elements to support a malicious prosecution claim: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quotation and other citations omitted); *see also Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (quotation omitted). Initiating a criminal proceeding against a person without probable cause, coupled with a deprivation of liberty, is a Fourth Amendment violation. *See Murphy v. Lynn*, 118 F.3d 938, 944-45 (2d Cir. 1997) (citation omitted).

**\*8**  The Second Circuit has held that although "police officers do not generally 'commence or continue' criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted).

Recently, the New York Court of Appeals acknowledged that it has " 'never elaborated on how a plaintiff in a malicious prosecution case demonstrates that the defendant commenced

or continued the underlying criminal proceeding.' " *Torres v. Jones*, 26 N.Y.3d 742, 760-61 (2016) (quotation omitted). "But, by suggesting that a defendant other than a public prosecutor may be liable for supplying false information to the prosecutor in substantial furtherance of a criminal action against the plaintiff, we have implicitly recognized that such conduct may, depending on the circumstances, constitute the commencement or continuation of the prosecution." *Id.* at 761 (citations omitted); *see also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (noting that proof establishing "that the police witnesses" have falsified evidence may create liability for malicious prosecution); *Hopkinson v. Lehigh Val. R.R. Co.*, 249 N.Y. 296, 300-01 (1928) (noting that the falsification of evidence and presentation of that evidence to the prosecutor can constitute commencement of a prosecution).

### 1. Initiation of Criminal Prosecution

In the present matter, the Court finds that Plaintiff's malicious prosecution claim must be dismissed. Initially, the Court finds that Plaintiff has failed to adequately allege that any named Defendant initiated the prosecution against him. While Defendant Spinelli filed the criminal complaint against him, nothing in the complaint suggests his participation in Plaintiff's prosecution beyond that. Nearly all cases in which law enforcement officers were found to have initiated or continued a prosecution for purposes of a malicious prosecution claim involve officers who provided knowingly false and/or fabricated evidence to unwitting prosecutors. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Ramos v. City of New York*, 285 A.D.2d 284, 299 (1st Dep't 2001). There is a rebuttable presumption that criminal proceedings are initiated by prosecutors, not arresting officers. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (citation omitted). "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail. *See Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

Plaintiff's complaint is devoid of any allegations that Defendant Spinelli engaged in any of the conduct identified above that would permit the Court to find that Plaintiff plausibly alleged that any party other than the District Attorney initiated the prosecution against him. As such, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal.

Case 1:25-cv-00968-ECC-ML     Document 54     Filed 11/26/25     Page 316 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

### 2. Malice

Plaintiff's complaint is also devoid of any facts supporting an inference that the prosecution was instituted with malice. As Defendants correctly note, Plaintiff misconstrues the standard on a motion to dismiss. While Plaintiff is not required to "prove" that Defendants acted in a malicious manner to sustain his claim, he is certainly required to plead enough facts that would make such a conclusion plausible. Plaintiff's complaint fails to plead any facts that would support the inference that any named Defendant (or their employees) acted with the requisite malice to support a malicious prosecution claim. Rather, the complaint simply alleges that he was subjected to normal processes of law. The number of days that Plaintiff spent in jail is irrelevant to this consideration, as is the fact that he was "no billed" by the Grand Jury. Plaintiff does not allege that he had previous interactions with any of the named Defendants, or that his interactions with them during his arrest and subsequent prosecution would indicate a malicious intent. Finally, as to the supervisory and municipal Defendants, Plaintiff has failed to put forth any facts in support of this claim. Rather, the complaint contains nothing but legal conclusions without providing any basis for the Court to conclude that Plaintiff has plausibly alleged a malicious prosecution claim against these Defendants.

**\*9** Accordingly, the Court finds that Plaintiff's malicious prosecution claim is subject to dismissal on this alternative ground.

### 3. Prosecutorial Immunity

Prosecutors sued under 42 U.S.C. § 1983 enjoy absolute immunity " 'from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process." ' " *Okongwu v. County of Erie*, No. 14CV832, 2017 WL 2686454, \*3 (W.D.N.Y. June 22, 2017) (quoting Doe *v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). The prosecutor enjoys this absolute immunity because he or she is acting in a quasi-judicial capacity. *See Okongwu v. County of Erie*, No. 14CV832, 2018 WL 1383233, \*3 (W.D.N.Y. Mar. 19, 2018). The function performed by the prosecutor defines the scope of this immunity. *See Imbler*, 424 U.S. at 430; *Warney*, 587 F.3d at 121. Acts of advocacy before a court, or preparation to advocate, are absolutely immune, *Imbler*, 424 U.S. at 430-31; *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), while administrative duties or investigatory functions are not

so immune, *Imbler*, 424 U.S. at 431 n.33; *Buckley*, 509 U.S. at 273; *Warney*, 587 F.3d at 121. "This protection encompasses 'all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation.' " *Peters*, 848 F. Supp. 2d at 385 (quoting *Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986)). As noted by the Second Circuit, "thus, to establish [absolute] immunity, the 'ultimate question' is 'whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they engaged in the challenged conduct.' " *Warney*, 587 F.3d at 121 (quoting Doe *v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996)).

Absolute immunity extends from the initiation of a prosecution and presenting a case at trial, *Boria v. Hicks*, No. 5:17-CV-00486, 2017 WL 2983304, \*4 (N.D.N.Y. June 14, 2017), through the decision to end it, *see Okongwu*, 2017 WL 2686454, at \*4, as well as post-conviction defense of proceedings and the decision whether to vacate a conviction, *Warney*, 587 F.3d at 123; *Peters*, 848 F. Supp. 2d at 387. Absolute immunity applies in the preparation for the initiation of judicial proceedings, but not to the investigative or administrative duties of a prosecutor. *See Warney*, 587 F.3d at 122. In *Peters*, the court listed activities that are investigative or administrative that do not deserve absolute immunity, such as orchestrating a sting operation, authorizing wiretaps, coercing confidential informant to consent to a wire, releasing information to the media, assisting in the execution of a warrant, or supervising and interacting with law enforcement agents to acquire evidence. *See Peters*, 848 F. Supp. 2d at 386 (citing cases).

In the present matter, the Court finds that Defendant Budelmann, as Cayuga County District Attorney is entitled to absolute prosecutorial immunity. In the complaint, Plaintiff alleges that "[o]n October 4, 2018, Defendant district attorney presented Plaintiff's criminal charges to the Grand Jury of Cayuga County where the grand jury 'No Billed' the case; and Plaintiff was released from his illegal confinement at the Cayuga County Jail." Dkt. No. 5 at ¶¶ 26, 91. Further, Plaintiff claims that "Defendant district attorney knew at the time of Plaintiff's case being presented to the Grand Jury of Cayuga County that he would not prevail due to the lack of probable cause." *Id.* at ¶ 29. These allegations make clear that Defendant Budelmann has been sued relating to his role in presenting the case to the grand jury; conduct for which he is entitled to absolute prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 661-62 (2d Cir. 1995) (holding that "that prosecutors are immune from § 1983

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 317 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

liability for their conduct before a grand jury") (citations omitted); *Bernard v. County of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) (citations omitted). Accordingly, Plaintiff's claim of malicious prosecution against Defendant Budelmann is subject to dismissal on this alternative ground.

**\*10** Finally, to the extent that Plaintiff seeks to impute the conduct of Defendant Budelmann to Cayuga County, the claim must necessarily be dismissed. The Second Circuit Court of Appeals has unequivocally held that "prosecutorial acts may not fairly be said to represent official policy of the County," because "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988) (internal quotation omitted); *see also Doe v. Smith*, 704 F. Supp. 1177, 1184 (S.D.N.Y. 1988). Since Defendant Budelmann was acting on behalf of the State of New York, and not Cayuga County, any alleged misconduct on Defendant Budelmann's part cannot be imputed to Cayuga County.

### G. Negligent/Intentional Infliction of Emotional Distress
In his sixth cause of action, Plaintiff alleges claims of negligent and intentional infliction of emotional distress against Defendants Butler, Spinelli, and Budelmann. *See* Dkt. No. 5 at ¶¶ 96-98. Defendants contend these claims fail as a matter of law. *See* Dkt. No. 9-1 at 19-20.

As to the claim of negligent infliction of emotional distress, it is well settled that a " 'plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.' " *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015) (quoting *Secard v. Dep't of Soc. Servs. of Cnty. of Nassau*, 204 A.D.2d 445, 612 N.Y.S. 2d 167, 168 (2d Dep't 1994)). This is precisely what Plaintiff is attempting to do here. Tacking on a claim for negligent infliction of emotional distress without any other facts or assertions is insufficient under the relevant law. Moreover, even if this claim could be considered independent of Plaintiff's false arrest claim, it is still subject to dismissal because Plaintiff has not alleged any facts demonstrating that Defendants breached a duty owed to Plaintiff. As such, the Court grants Defendants' motion to dismiss as to Plaintiff's claim of negligent infliction of emotional distress.

As to the intentional infliction of emotional distress claim, it too must be dismissed. "Intentional infliction of emotional distress has four elements: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.' " *Greenaway*, 97 F. Supp. 3d at 239-40 (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 596 N.Y.S. 2d 350, 612 N.E. 2d 699, 702 (1993)). "The 'extreme and outrageous conduct' must 'go beyond all possible bounds of decency' and be 'atrocious, and utterly intolerable in a civilized community.' " *Id.* (quotation and other citation omitted).

Here, Plaintiff claims that Defendants Budelmann, Spinelli, and Butler engaged in "extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff." Dkt. No. 5 at ¶ 97. Notably absent from the complaint is any explanation what this "extreme and outrageous conduct" was. " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 302 (1983) (quotation omitted). The threadbare facts alleged by Plaintiff, which include the fact that he was arrested and eventually released after the grand jury refused to indict, fall far short of this strict standard.

**\*11** Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claims for negligent and intentional infliction of emotional distress.

### H. Negligence
In his seventh cause of action, Plaintiff asserts a claim for negligence. *See* Dkt. No. 5 at ¶¶ 100-04. In this claim, Plaintiff argues that his arrest, Defendants' failure to "follow the criminal law of the State of New York," and Plaintiff's fifty-three days of incarceration, were the product of Defendants' negligence. *See id.*

"To prevail on a claim for negligence under New York law, a plaintiff must establish '(1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff.' " *Frederique v. County of Nassau*, 168 F. Supp. 3d 455, 485 (E.D.N.Y. 2016) (quotation omitted). "However, '[u]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence.' " *Id.* (quotation and other citation omitted). Moreover, it is well settled that, "[u]nder New York law, a

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 318 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Boose v. City of Rochester*, 71 A.D.2d 59, 421 N.Y.S.2d 740, 743 (4th Dept. 1979)) (other citation omitted).

In the present matter, the Court finds that Plaintiff's negligence claim must be dismissed as it is simply redundant of Plaintiff's claims of false arrest, false imprisonment, and malicious prosecution. Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

## I. Deliberate Indifference to Serious Medical Needs

In his eighth cause of action, Plaintiff claims that "Defendant Medical Staff and Defendant Cayuga County Sheriff's Department" were deliberately indifferent to his medical care and treatment after he was injured when a water pipe broke outside his cell on August 31, 2018. *See* Dkt. No. 5 at ¶¶ 105-14.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). A pretrial detainee's claims are evaluated under the Due Process Clause because, " '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner — neither cruelly and unusually nor otherwise.' " *Id.* (quotations omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29 (citation omitted). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a *'mens rea'* prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.* "The reason that the term 'subjective prong' might be a misleading description is that, as discussed below, the Supreme Court has instructed that 'deliberate indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what a person

actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

**\*12** Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," which includes the risk of serious damage to "physical and mental soundness." *Id.* at 30 (citations omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). For example, the Second Circuit has " 'held that prisoners may not be deprived of their basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.' " *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

" '[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Darnell*, 849 F.3d at 30 (quotations omitted). "Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation." *Id.* (citations omitted).

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. *See Darnell*, 849 F.3d at 32. Courts have traditionally referred to this second element as the "subjective prong." "But 'deliberate indifference,' which is roughly synonymous with 'recklessness,' can be defined either 'subjectively' in a criminal sense, or 'objectively' in a civil sense." *Id.* As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong." *Id.*

Under the second prong of the deliberate indifference analysis, the Court must consider whether the defendants "acted intentionally to impose the alleged condition, or

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 319 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Under this standard, the plaintiff "must prove that [the defendants] acted intentionally or recklessly, and not merely negligently.' " *Id.* at 36.

In the present matter, the Court finds that Plaintiff has failed to plausibly allege a claim of deliberate indifference under the Fourteenth Amendment. Initially, the Court notes that the "medical staff" at the Cayuga County Jail were not named as defendants in this action. Rule 10(a) requires a plaintiff to "name all the parties" in the Complaint. *See* Fed. R. Civ. P. 10(a). Although the naming of pseudonymous defendants is permissible where a plaintiff requires discovery to learn the true identities of the defendants, the plaintiff subsequently must amend the complaint to reflect the discovered identities and effect service on the named parties within the 120-day time period set forth in Rule 4(m). *See Petty v. Cty. of Franklin*, 478 F.3d 341, 345–46 (6th Cir. 2007).

Here, Plaintiff has not brought suit against any pseudonymous defendants, and only makes reference to these unidentified individuals in the body of the complaint. If Plaintiff had intended to sue then-unknown members of the medical staff at the jail, he should have brought suit against "John and/ or Jane Doe" defendants, who could be identified through discovery. Upon obtaining their identities, Plaintiff would then be required to amend his complaint to reflect the Doe defendants' identities. *See Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) (holding that a plaintiff "may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery") (citations omitted); *see also Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (holding that "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery"). Here, Plaintiff has not brought suit against unknown members of the medical staff at the Cayuga County Jail or providing any facts that would permit Defendants to assist in obtaining their identities. As such, the only potential deliberate indifference claim asserted in the complaint is a municipal liability claim against Defendant Cayuga County.

**\*13** In his complaint, Plaintiff has alleged that a water pipe burst outside his cell during the night, the water was turned off, and at some point during the night it pooled near his cell's toilet. *See* Dkt. No. 5 at ¶¶ 109-13. At sometime between 6:30 a.m. and 7:00 a.m., Plaintiff claims that he got out of bed to use the toilet in his cell and slipped and fell on the wet floor. *See id.* at ¶ 110. Plaintiff alleges that, when he fell, he hit his head and neck on his bunk and his lower back on the floor, causing severe injuries, including a herniated disc in his neck and lower lumbar strain. *See id.* at ¶¶ 111-13. Plaintiff claims that, "[a]fter the injury up and until Plaintiff was released on October 4, 2018[,] Plaintiff was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." *Id.* at ¶ 114.

Initially, the Court notes that nothing in the complaint indicates that Plaintiff's alleged injury was caused by a municipal custom, policy, or usage, as is required to find a plausible claim against Defendant Cayuga County. Rather, Plaintiff claims that a water pipe leaked outside his cell during the night and that a "correctional officer ... turn[ed] off the water and clean[ed] up the water spill. At that time, there was no water in Plaintiff's cell." Dkt. No. 5 at ¶ 108. When the second pipe leaked, some water entered Plaintiff's cell, which caused Plaintiff to fall. *See id.* at ¶ 109. This isolated incident, involving a bursting water pipe, is woefully insufficient to plausibly allege municipal liability for Plaintiff's alleged injury. *See Connick*, 131 S. Ct. at 1360; *see also Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) ("[I]t is well established that a single incident does not give rise to an unlawful practice by subordinate officials so permanent and well-settled as to constitute custom or usage") (internal quotation marks omitted); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir. 2009) (finding that allegations of, at most, four prior incidents of misconduct "falls far short of establishing a practice that is 'so persistent or widespread' as to justify the imposition of municipal liability") (internal quotation marks omitted).

Even assuming that Plaintiff had asserted this claim against an individually named Defendant, the claim would still be dismissed. To satisfy the second prong of a deliberate indifference claim, Plaintiff must plausibly allege facts suggesting that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though [they] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. At best, the facts set forth in the

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 320 of 520

complaint describe negligence on the part of the correctional staff, which is insufficient to support a claim of deliberate indifference. *See id.* at 36.

Finally, to the extent that Plaintiff is basing his claim on the alleged deprivation of medical care after his accident, Plaintiff has failed to provide any factual basis in support of his conclusory assertion that he "was denied medical treatment for his injuries that he suffered inclusive of medication and treatment from a physician." Dkt. No. 5 at ¶ 114. The complaint fails to allege that he brought his alleged injuries to the attention of the correctional or medical staff at the Cayuga County jail (or even identify any such individual).

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's deliberate indifference claim.

### IV. CONCLUSION

After carefully the entire record in this matter, parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**\*14 ORDERS** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part**; [4] and the Court further

**ORDERS** that Defendants City of Auburn, Butler, Cayuga County, Cayuga County District Attorney's Office, and Budelmann are **TERMINATED** as Defendants in this action; and the Court further

**ORDERS** that Defendants' letter motion a portion of the argument raised in their motion to dismiss (Dkt. No. 15) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1904088

---

### Footnotes

1    As discussed in more detail below, Plaintiff's complaint fails to set forth any facts sufficient to find either supervisory or municipal liability against any of the named Defendants for any of the listed causes of action.

2    Although the Court is permitting this claim against Defendant Spinelli to survive, the Court has serious doubts about whether the claim would survive a properly supported motion for summary judgment. If the Court were to consider the contents of the criminal complaint, supporting affidavit, and Defendant Spinelli's narrative, the claim would undoubtedly be dismissed. This, however, highlights why the Court believes that it is inappropriate to rely on the contents of these documents at this stage. Without the benefit of discovery, Plaintiff has been unable to question the veracity of the statements contained in those documents. That being said, the criminal complaint and affidavits paint a much less sympathetic picture than the one set out in Plaintiff's complaint.

3    Throughout his response, Plaintiff repeatedly states that "the Court is respectfully reminded that it may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g.*, Dkt. No. 10 at 17, 18 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73). Further, Plaintiff repeatedly contends that he "has no duty at this stage to prove his case." *Id.* These basic tenets are not in dispute. What Plaintiff fails to appreciate, however, is that a complaint must be supported by facts specific to his case, not merely broad assertions of the relevant law poorly disguised as facts. For example, Plaintiff alleges that Defendants engaged in "extreme and outrageous conduct," but fails to explain how any of the conduct alleged could possibly be considered extreme and outrageous. Further, Plaintiff seems to be operating under the assumption that the Court is required to use its imagination to come up

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 321 of 520

Joyner v. County of Cayuga, Not Reported in Fed. Supp. (2020)

with a hypothetical set of facts that could have been pled that would render the claims plausible. *Iqbal* and *Twombly*, however, place no such burden on the Court. Rather, it is incumbent on the plaintiff to set forth the necessary facts specific to his or her case to render the asserted claims plausible.

4    As a result of this Memorandum-Decision and Order, the only remaining claim is Plaintiff's false arrest claim against Defendant Spinelli.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4055163
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Julie KONDZIELA, Plaintiff,

v.

COUNTY OF ERIE, Erie County Sheriff, Timothy
B. Howard, Deputy Daryl Demari, individually
and as Erie County Sheriff's Deputy, Deputies
John Doe and Jane Doe, individually and as
Erie County Sheriff's Deputies, Defendants.

No. 09–CV–601S.
|
Sept. 12, 2011.

**Attorneys and Law Firms**

David Charles Crowther, Tronolone & Surgalla, P.C., Buffalo, NY, for Plaintiff.

David J. Sleight, Buffalo, NY, for Defendants.

### DECISION AND ORDER

WILLIAM M. SKRETNY, Chief Judge.

### I. INTRODUCTION

*\*1* In this action, Plaintiff asserts claims under the Fourth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983, as well as claims under Article I, § 12 of the New York State Constitution, pursuant to 29 U.S.C. § 1367(a). Plaintiff's claims arise from her arrest by Erie County Sheriff's deputies in Grand Island, New York on April 1, 2008. Plaintiff seeks money damages in the amount of $27,000,000 for Defendants' violations. Presently before this Court is Defendants' motion to dismiss Plaintiff's complaint in its entirety. For the reasons discussed below, Defendants' motion to dismiss is granted. [1]

### II. BACKGROUND

**A. Facts**

In adjudicating Defendant's motion to dismiss, this Court assumes the truth of the following factual allegations contained in the complaint. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.3d 59, 63 (2d Cir.1997).

Plaintiff is a resident of Grand Island, Erie County, in the State of New York. (Complaint ("Comp."), ¶ 3.) Defendant, the County of Erie, is a municipal corporation duly organized under the laws of the State of New York. (*Id.* at ¶ 4.) Defendant Sheriff Timothy Howard is an elected official and an employee of the County of Erie. (*Id.*) The remaining defendants are all police officers also employed by the County of Erie. (*Id.* at ¶¶ 6–7 .)

On April 1, 2008, at approximately 5:00 P.M., Plaintiff was pulled over by Deputies Daryl Demari and John Doe while driving in the town of Grand Island, Erie County. (*Id.* at ¶ 12.) The stop was prompted by an electronic scan, which revealed that the vehicle's registration was suspended. (*Id.* at ¶ 13.) Further investigation revealed that Plaintiff's driver's license had also been suspended. (Declaration of James W. Carey, ("Carey Decl."), Docket No. 2, Ex. C) Plaintiff was handcuffed and placed under arrest. (Comp.¶ 14.) Although Plaintiff states that she was not provided with an explanation for her arrest, (*id.* ¶ 16), she was given the opportunity to make a phone call to her girlfriend. (Carey Decl., Ex. B, 20:8–20:22.) During that conversation, Plaintiff told her girlfriend that the police had said that her license was bad and that she was being arrested. (*Id.*)

During her arrest, Plaintiff informed the officers that she suffered from multiple sclerosis. (Comp.¶ 19.) She further told them that she required her auto-injector in order to self-administer her daily medication. (*Id.*) On Plaintiff's directions, the officers searched, but could not locate, the auto-injector in Plaintiff's vehicle and did not permit Plaintiff to look for it herself. (Carey Decl., Ex. B, 21:9–22:1.)

After failing to find the auto-injector, Deputies Demari and John Doe took Plaintiff to the Erie County Holding Center. (*Id.* at ¶ 21.) There, Plaintiff was searched both over and under her clothing by Defendant Officer Jane Doe, in the presence of Deputy Demari. (*Id.* at ¶ 22.) In addition, Plaintiff was instructed to take off her shoes, which were specially crafted to help Plaintiff with her multiple sclerosis. (*Id.* at ¶¶ 24–25.) Plaintiff was at the holding center for approximately two hours before being released. (*Id.* at ¶ 26.)

**\*2** Plaintiff now seeks to recover damages for violations of her right to be free from unreasonable search and seizures under the Fourth Amendment of the United States Constitution and Article I, § 12, of the New York State Constitution, inadequate medical care under the Fourteenth Amendment of the United States Constitution, and conspiracy to commit the same. [2]

**B. Procedural History**

Plaintiff commenced this action on June 29, 2009, by filing a complaint in the United States District Court for the Western District of New York. Defendant filed the instant motion to dismiss Plaintiff's complaint in its entirety on July 21, 2009.

### III. DISCUSSION

**A. Legal Standard**

Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of the claim. Fed.R.Civ.P. 8(a)(2). But the plain statement must "possess enough heft to show that the pleader is entitled to relief." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007); Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir.2008). Legal conclusions, however, are not afforded the same presumption of truthfulness. See Ashcroft v. Iqbal, ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.")

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. at 1945 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility is present when the factual content of the complaint allows for a reasonable inference that the defendant is liable for the misconduct alleged. Iqbal, 129 S.Ct. at 1949. The plausibility standard is not, however, a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 1950; Fed.R.Civ.P. 8(a)(2).

A two-pronged approach is thus used to examine the sufficiency of a complaint. First, statements that are not entitled to the assumption of truth—such as conclusory allegations, labels, and legal conclusions—are identified and stripped away. See Iqbal, 129 S.Ct. at 1950. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." [3] Id.

**B. Plaintiff's Fourth Amendment Claim**

**\*3** Defendant moves to dismiss Plaintiff's unlawful search claim on the ground that no facts are alleged to support finding the search unreasonable. Plaintiff states that she was touched "underneath her shirt ... underneath [her] breasts ... down through the front of [her] underwear" and that the officer's hand went "through the middle of the buttock." (Carey Decl., Ex. B, 41:9–42:19.) Based on this description, this Court finds that Plaintiff has asserted no facts rising to the level of a violation of the Fourth Amendment of the United States Constitution or Article I, § 12 of the New York State Constitution. [4]

It is well settled in the Second Circuit that the Fourth Amendment precludes prison officials from performing strip searches and body cavity searches of arrestees charged with misdemeanors unless they have reasonable suspicion that the arrestee is concealing contraband or a weapon. Marriot v. County of Montgomery, 426 F.Supp.2d 1, 7 (N.D.N.Y.2006). In Vassallo v. Lando the plaintiff was searched and told to roll up his pant legs and lift the bottom of his t-shirt to expose his waistband. 591 F.Supp.2d 172, 197–98. The court concluded that this did not constitute a strip search, distinguishing it from cases like Phaneuf v. Fraikin, where plaintiff removed her skirt completely and pulled her undergarments away from her body. See 448 F.3d 591, 598 (2d Cir.2006). Similarly here, Plaintiff has only stated that her pants were brought down a little below her hip bone. (Carey Decl., Ex. B, 41:13–42:12.) This does not rise to the level of a strip search. Having concluded that the present case did not entail a strip search, this Court concludes that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial

detainees." *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiff has not presented this Court with any case law challenging as reasonable a holding center's power to search, but not strip search, an arrestee. *Id.* at 540–41. Consequently, Defendants' motion to dismiss Plaintiff's unlawful search claim will be granted.

## C. Plaintiff's Inadequate Medical Care Claim

Defendant also moves to dismiss Plaintiff's claim that she was denied medication. Plaintiff alleges that she was denied two medical necessities related to her Multiple Sclerosis. First, an auto injector that provides a medicinal shot and must be used on a daily basis. Second, her prescription shoe lifts, which help maintain her balance. Pre-trial detainees suffering from inadequate medical care by the state may bring claims under the Due Process Clause of the Fourteenth Amendment. *Thomas v. Nassau County Corr. Ctr.,* 288 F.Supp.2d 333, 337 (E.D.N.Y.2003). The standard for proving a constitutional claim for inadequate medical care is "deliberate indifference to a prisoner's serious medical needs." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The first part of this standard requires that the deprivation of care be objectively serious. *Id.* at 338. Sufficiently serious deprivations have been found where "officials deliberately delayed care as a form of punishment, ignored life threatening and fastdegenerating conditions for three days, or delayed major surgery for over two years." *Id.* at 339. Here, Plaintiff was in custody for approximately two hours. She gave herself the necessary medicinal shot that evening, after being released. She was without her shoes only for the duration of her detention. At no point did Plaintiff fall. In fact, at no point did Plaintiff suffer any injury as a result of being deprived of either of her medical necessities.

**\*4** Plaintiff's descriptions, in general, describe only what amounts to an unpleasant pair of hours spent in a holding facility. While this Court does not doubt that the experience proved emotionally shocking for the Plaintiff, such circumstances do not rise to the level of seriousness constituting a violation of Plaintiff's due process rights under the Fourteenth Amendment. *See id.* at 338–39 (even if treatment delayed, Plaintiff must show worsening or deterioration as result of delay).

Consequently, Defendants' motion to dismiss Plaintiff's denial of medication claim will be granted.

## D. Plaintiff's Unlawful Arrest Claim

Lastly, Defendant moves to dismiss Plaintiff's claim that she was denied the reasons for her arrest. Plaintiff asserts that Defendants' failure to inform her why she was being arrested constitute a violation of her constitutional rights.

At the outset, this Court notes that a police officer's failure to inform an arrestee of the grounds for which he is being arrested does not constitute a constitutional violation. *Murphy v. Sr. Investigator Neuberger,* No. 94 Civ. 7421, 1996 WL 442797, at \*8, n .5 (S.D.N.Y. Aug. 6, 1996); *People v. Hampton,* 44 A.D.3d 1071, 844 N.Y.S.2d 399, 400 (N.Y.App.Div.2007). However, New York law requires that a police officer making a warrantless arrest must inform the suspect of his authority and the purpose and reason for such an arrest. N.Y .C.P.L. Art. 140.15(2). An arrest made without explaining the basis for detention is unlawful under New York law. *People v. Henry,* 152 Misc.2d 848, 579 N.Y.S.2d 565, 571 (N.Y.Sup.Ct.1991).

Here, Plaintiff made a phone call following her arrest during which she stated that she was being arrested and that the police had told her there was a problem with her driver's license. (Carey Decl ., Ex. B, 20:20, 33:16–34:2; 71:16–71:20.) Additionally, her complaint states that she was stopped because an electronic scan of her license plate indicated that the vehicle's registration was suspended. (Complaint ¶ 13.) However, other parts of her testimony highlight Plaintiff's belief that she had not been given the reason for her arrest, including that she was apparently told that there was a warrant out for her arrest. (*See* Carey Decl., Ex. B, 24:21–25:11; 44:18–44:22; *but see* 30:16–31:1; 32:5–33:6).

On a motion to dismiss, this Court must presume as true all Plaintiff's nonconclusory factual allegations. *Iqbal,* 129 S.Ct. at 1950. These must nudge the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Plaintiff's testimony reveals that the officers did provide Plaintiff with some information, although Plaintiff did not believe this explained the cause of her arrest. Although there appears to be some doubt whether, under New York law, sufficiency of warning can be inferred from circumstance, *see Henry,* 579 N.Y.S.2d at 571, here it was not the fact that Plaintiff was actually driving with a suspended license and registration that gave her notice of why she was being arrested, but Plaintiff's own testimony demonstrating her awareness of the grounds for the arrest. *Cf. People v. Marsh,* 20 N.Y.2d 98, 281 N.Y.S.2d 789, 228 N.E.2d 783, 785–86 (N.Y.1967) (arrest for traffic infraction permissible). This is

corroborated by the fact that she was able to make a phone call describing the problem and what was happening as a result. On this basis, this Court will therefore grant Defendants' motion to dismiss Plaintiff's remaining claim.

### E. Defendants' Remaining Arguments

 **\*5** Defendants also argue that neither the County nor Defendant Howard can be held liable for the actions of the deputy officers because the county has not assumed liability, Defendant Howard specifically is not liable for his deputies while they engage in criminal justice functions, and the deputies are not liable because they are entitled to qualified immunity. Because this Court grants Defendants' motion to dismiss on the merits, it need not consider these further arguments.

### IV. CONCLUSION

Plaintiff has conceded various of Defendants' arguments and withdrawn claims accordingly. Defendants' Motion to Dismiss as to these claims is granted. On those claims that remain, for the reasons discussed above, Defendants' Motion to Dismiss is granted.

### V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 2) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4055163

---

### Footnotes

1    In support of their Motion to Dismiss, Defendants filed a Memorandum of Law, the Declaration of James W. Carey, Esq., and a Reply Declaration. (Docket Nos. 2, 3, 11.)

     In opposition to Defendants' Motion to Dismiss, Plaintiff filed a Response Memorandum and the Affidavit of David C. Crowther, Esq. (Docket Nos. 6, 7.)

2    Plaintiff originally brought nine causes of action. Plaintiff now concedes that there was probable cause to arrest and withdraws her claim to the contrary. (Affidavit of David C. Crowther ("Crowther Aff."), Docket No. 7, ¶ 8.) Plaintiff also concedes that she was not held at the holding center for an unreasonable amount of time, and withdraws that claim as well. (*Id.*) Similarly, Plaintiff does not contest Defendants' immunity on various other of Plaintiff's claims, leaving the aforementioned causes of action. (Plaintiff's Memorandum of Law, Docket No. 6, 5–6 .)

3    Although seemingly inconsistent with the command to treat well-pleaded factual allegations as true, this plausibility inquiry appears to include consideration of whether more likely or alternative explanations for the complained-of conduct exist. *See, e.g., Iqbal,* 129 S.Ct. at 1951–52 ("But given more likely explanations, [the allegations] do not plausibly establish this purpose."); *Twombly,* 550 U.S. at 567–68 (finding that plaintiff's allegations were not suggestive of antitrust conspiracy in the face of an "obvious alternative explanation" for the allegations in the complaint).

4    The right to be free from unreasonable search and seizures under the Fourth Amendment and Article I, § 12 of the New York State Constitution are largely coextensive. *Febres v. City of New York,* 238 F.R.D. 377, 392 (S.D.N.Y.2006). "This court has repeatedly stated that the proscription against unlawful searches and seizures contained in N.Y. Constitution, article I, § 12 conforms with that found in the 4th Amendment, and

that this identity of language supports a policy of uniformity between State and Federal courts." *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439, 445 (N.Y.1985). Consequently, if this Court finds that Plaintiff's Fourth Amendment rights have not been violated it will also conclude that Plaintiff's parallel rights under the New York State Constitution have not been violated. *See Febres,* 238 F.R.D. at 392.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 327 of 520

Kraemer v. City of New York, Not Reported in Fed. Supp. (2020)

2020 WL 1974204
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Thomas KRAEMER, Plaintiff,

v.

The CITY OF NEW YORK; NYPD; DOI; Andrew
Guinan, DOI Inspector; Ditsrict Counsel 37; U.S.
Marshal, SDNY; Michael Edelstein; Mickey Cekovic;
Lisa Spitale, Esq.; Marcie Romberger, Esq.; Shannon
Moore, Esq; Amy (Fontno) DeRaymond; Raymond
DeRaymond, Attorney; County of Northampton Office
of the County Executive; Northampton County Court;
Northampton County MH/MR; Milestones Community
Healthcare Inc.; Northampton County Sheriff; Gretchen
Kraemer, Deputy; the Easton Area School District;
Freya Koger, Ph.D; the City of Easton; Easton Police;
CVS Health Corporate; Xequiel Hernandez, Dr.;
DermOne; Cha J. Yu, Dr.; Lamont McClure, Defendants.

19-CV-6671 (VEC)
|
Signed 04/24/2020

**Attorneys and Law Firms**

Thomas Kraemer, New York, NY, pro se.

Joshua Alan Weiner, New York City Law Department, New
York, NY, for Defendant the City of New York.

Zachary Bannon, DOJ-USAO, New York, NY, for Defendant
U.S. Marshal.

Nicholas J. Ferrar, Law Offices of Nicholas J. Ferrar, Garden
City, NY, for Defendants Michael Edelstein, Mr. Michael
Edelstein.

Gerard Joseph Geiger, Newman Williams, Stroudsburg, PA,
for Defendants County of Northampton Office of the County
Executive, Northampton County MH/MR, Northampton
County Sheriff, Gretchen Kraemer, Lamont McClure.

Brian J. Taylor, King, Spry, Herman, Freund & Faul, LLC,
Bethlehem, PA, for Defendant the Easton Area School
District.

Edward George Sponzilli, Norris, McLaughlin & Marcus,
Bridgewater, NJ, for Defendant the City of Easton.

Christine Sara Varghese, Sophia Ree, Landman Corsi
Ballaine & Ford PC, New York, NY, for Defendant CVS
Health Corporate.

ORDER

VALERIE CAPRONI, United States District Judge:

 **\*1** WHEREAS Plaintiff, acting *pro se*, has filed a 186-
page complaint, with hundreds of pages of additional exhibits,
alleging a wide-ranging plot between allegedly omnipotent
federal, state, and local authorities (judicial and executive)
and the mother of Plaintiff's child to torture, kidnap,
and traffic that child while undertaking extensive efforts
to undermine Plaintiff's efforts to seek justice, including
by attempted murder through poisonous gas—allegedly
administered by Plaintiff's landlord—and multiple hit-and-
run attempts, *see, e.g.*, Dkts. 1, 15, 20–27;

WHEREAS the Complaint is riddled with entirely
implausible allegations, including of pervasive surveillance
and surreptitious communications, such as nose-swipes,
sniffs, and a seemingly omnipresent cabal committed to
discrediting and harming Plaintiff, *see, e.g.*, Dkt. 1 at 41, 145;

WHEREAS another judge in this district has previously
observed that Plaintiff's "filing history evinces a pattern
of vexatious, duplicative, and nonmeritorious litigation,"
and that Plaintiff's "dense, repetitive, and difficult to
decipher" submissions "needlessly force the Court to expend
considerable resources," *see* Order of Dismissal, *Kraemer v.
Edelstein et al.*, No. 17-CV-2910, Dkt. 14 at 10 (S.D.N.Y.
Sep. 19, 2017);

WHEREAS Plaintiff has been barred from filing any action
*in forma pauperis* without judicial approval, *see* Bar Order,
*Kraemer v. Edelstein et al.*, No. 17-CV-2910, Dkt. 16
(S.D.N.Y. Nov. 1, 2017);

WHEREAS Plaintiff has previously alleged, in a separate
action commenced on December 8, 2014, coordinated efforts
by many of the Defendants in this case to kidnap, imprison,
and torture his daughter, *see* Transfer Order, *Kraemer v.
Fontno et al.*, No. 14-CV-9343, Dkt. 11 (S.D.N.Y. Mar. 18,
2015);

WHEREAS that 2014 action was transferred to the Eastern
District of Pennsylvania, *id.*, which soon dismissed Plaintiff's

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 328 of 520

Kraemer v. City of New York, Not Reported in Fed. Supp. (2020)

claims as frivolous on multiple grounds, including *res judicata*, *see* Memorandum Opinion, *Kraemer v. Fontno et al.*, No. 15-CV-01521, Dkt. 8 at 1, 8 (E.D.P.A. June 10, 2015);

WHEREAS Plaintiff has previously litigated and lost another action, in 2010, in the Eastern District of Pennsylvania, against many of the same Defendants and arising out of the same perceived abuse of his daughter, [1] *see* Memorandum Opinion, *Kraemer v. Commonwealth of Pennsylvania et al.*, No. 10-CV-04868, Dkt. 122 (E.D.P.A. Sep. 15, 2011);

WHEREAS Plaintiff's present complaint arises out of the same transaction or occurrence as his previous complaints but is rebranded as a Racketeer Influenced and Corrupt Organizations Act (RICO) claim, tying together virtually all the grievances aired in his prior cases;

WHEREAS Plaintiff alleges injuries that occurred as early as the year 2000, *see, e.g.*, Dkt. 1 at 8, 14;

**\*2** WHEREAS one of the many Defendants moved to dismiss on various grounds, including statute of limitations [2] and *res judicata*, Dkt. 18;

WHEREAS the statute of limitations for a civil RICO action is four years, which begins to run from Plaintiff's discovery of his RICO injury and is not extended by later predicate acts [3];

WHEREAS, to obviate extensive and repetitive briefing by the numerous Defendants, the Court stayed the remaining Defendants' time to respond to the Complaint and ordered Plaintiff to show cause why his action should not be dismissed as time-barred because he became aware of his alleged RICO injuries likely as early as 2000 [4] and certainly no later than 2010 or 2014, when he litigated the same allegations against many of these Defendants, [5] Dkt. 28;

WHEREAS the Court further ordered Plaintiff to show cause why the action is not barred by *res judicata*, Dkt. 28;

WHEREAS the Court further ordered Plaintiff to show cause why the action should not otherwise be dismissed as factually frivolous, Dkt. 28;

**\*3** WHEREAS Plaintiff's written response indicates that he entered the Thurgood Marshall United States Courthouse and demanded to meet personally with the undersigned because

he doubted the authenticity of the Order, which was conveyed via ECF notice, Dkt. 29;

WHEREAS Plaintiff appears to accuse the Clerk's Office and the Pro Se Unit's staff of using Defendants' secret signals and joining in the coordinated plot against him, Dkt. 29;

WHEREAS Plaintiff's written response continued to dispute the authenticity of the Court's order and demand an in-person hearing, without addressing the statute of limitations and *res judicata* grounds for dismissal, Dkt. 29;

WHEREAS the Court informed Plaintiff that the previous order was, in fact, authentic, and reminded him of the need to respond to the substance of the Order to Show Cause, Dkt. 30;

WHEREAS Plaintiff thereafter submitted an affidavit that was again non-responsive to the statute of limitations or *res judicata* grounds for dismissal, instead demanding the right to engage in discovery, Dkts. 32–33;

WHEREAS Plaintiff filed a separate 103-page response, which rehashes his convoluted allegations and largely ignores the *res judicata* and statute of limitations issues, except to tangentially cite to criminal cases involving RICO claims prosecuted by the federal government, which are subject to different limitations rules, [6] Dkt. 34 at 3; and

WHEREAS Plaintiff has continued to submit voluminous filings totaling nearly two thousand pages—none of which addresses the statute of limitations or *res judicata* issues—after the deadline to respond to the Order to Show Cause had elapsed, *see* Dkts. 36–38, 40–45, 47;

IT IS HEREBY ORDERED that this action is dismissed because Plaintiff failed to show cause why this action should not be dismissed as frivolous. First, the action is clearly precluded by the four-year statute of limitations applicable to civil RICO actions. Plaintiff does not dispute that he has been aware of his injuries since before 2015—he instead argues that the limitations period does not apply. *See, e.g.*, Dkt. 34 at 2 ("Accordingly, there are verifiable predicate offenses for which there is no time-bar."); Dkt. 34 at 6 n.7 ("There is no time bar for attempted murder, the attempted murder of federal judge applicants victim(s), or torturing a federal judge applicants trafficking victim (EK) to silence her speech while he was being vetted by Congress and the President."). Because Plaintiff's litigation history and present allegations

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 329 of 520

Kraemer v. City of New York, Not Reported in Fed. Supp. (2020)

indisputably show that he was aware of his RICO injuries long before 2015, the action, on its face, is time-barred.

Alternatively, Plaintiff has failed to show cause why this action is not barred by *res judicata*, because his RICO claims could have been alleged in his earlier cases, which involved essentially the same enterprise, albeit with a slightly different cast. *See Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir. 1992) ("Claim preclusion prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided."); *Ruderer v. Dep't of Justice*, 389 F. Supp. 549, 550 (S.D.N.Y. 1974) ("Plaintiff cannot escape the effect of prior adverse determinations by clothing the claim(s) in different garb." (citation omitted)).

 **\*4** Finally, the case is also dismissed because the allegations are "fanciful" and factually frivolous, even when liberally construed. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992) ("[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them."). "A plaintiff asserting fantastic or delusional claims should not, by payment of a filing fee, obtain a license to consume limited judicial resources and put defendants to effort and expense." *Tyler v. Carter*, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd*, 41 F.3d 1500 (2d Cir. 1994). While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources. *See, e.g.*, Dkt. 1 at 54–55 (alleging coordinated efforts by police, AMC movie theaters, the Apple store, Duane Reade, CVS, Dunkin Donuts, FedEx, Hudson Yards, McDonald's, New York University, Starbucks, Staples, T-Mobile, and others to surveil, mock, and harass Plaintiff); *Raoul v. City of New York Police Dep't*, No. 14-CV-1787, 2015 WL 1014204, at \*2 (E.D.N.Y. Mar. 6, 2015) (concluding

that plaintiff's claims were factually frivolous because they "are based purely on wide-ranging, incoherent allegations of a massive conspiracy by numerous federal, state, and local government entities to persecute him through tactics ranging from aerial drone surveillance to messages beamed directly into his mind"). As the Second Circuit has held, courts need not entertain conspiracy theories based on "pure speculation and conjecture." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011); *see, e.g.*, Dkt. 1 at 60–61 (alleging that FBI and NYPD conspired with Jewish landlords in attempt to murder Plaintiff in order to protect federal judge from human-trafficking liability). Further expenditure of resources in this case is particularly unwarranted because Plaintiff has already had several attempts, in at least two districts, to litigate the perceived misconduct. *See Papadopoulos v. Gazes*, No. 14-CV-3713, 2014 WL 3928940, at \*5 (S.D.N.Y. Aug. 12, 2014) ("The factual allegations in the Complaint are fanciful, fantastic, and unmoored from reality. Worse yet, they are precisely the same fanciful allegations as have been dismissed time and time again.").

For the foregoing reasons, the complaint is dismissed as legally and factually frivolous, notwithstanding Plaintiff's payment of the filing fee. Leave to amend, which has not been requested, is denied as futile because the multiple defects in this case are not the result of inartful pleading and cannot be cured by yet another attempt to re-litigate Plaintiff's perceived persecution.

The Clerk of Court is respectfully directed to terminate all pending motions and deadlines and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1974204

---

### Footnotes

1    In the interest of brevity, the Court simply notes that Plaintiff has litigated and lost at least two other actions with related facts. *See* Order of Dismissal, *Kraemer v. Edelstein*, No. 15-CV-9839 (S.D.N.Y. Jan. 26, 2016); Order of Dismissal, *Kraemer v. Fontno*, No. 15-CV-1755 (S.D.N.Y. Apr. 1, 2015).

2    *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 330 of 520

Kraemer v. City of New York, Not Reported in Fed. Supp. (2020)

answer motion to dismiss. Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.").

3    *See Rotella v. Wood*, 528 U.S. 549, 554 (2000) (reaffirming rejection of last predicate act rule); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997) ("[T]he last predicate act rule creates a limitations period that is longer than Congress could have contemplated."); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013) ("In RICO cases, we have applied a discovery accrual rule, under which the limitations period begins to run when the plaintiff discovers or should have discovered the RICO injury." (citation omitted)); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148–49 (2d Cir. 2012) (holding that discovery accrual rule announced in *Rotella* continues to be controlling law).

4    The complaint alleges that Plaintiff's daughter was trafficked in 2000, with additional predicate acts occurring in 2006, 2012, and 2013. *See, e.g.*, Dkt. 1 at 8–9, 11.

5    District courts may *sua sponte* dismiss cases as frivolous to preserve judicial resources, even when the plaintiff has paid the filing fee rather than proceed *in forma pauperis*. *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) ("[A]s courts of first instance, district courts are especially likely to be exposed to frivolous actions, and thus have an even greater need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources. Accordingly, we hold that district courts may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee."); *Tyler v. Carter*, 151 F.R.D. 537, 540 n.2 (S.D.N.Y. 1993) (*sua sponte* dismissing action as frivolous as to all defendants pursuant to Rule 12(b)(6) even though only some defendants moved to dismiss), *aff'd*, 41 F.3d 1500 (2d Cir. 1994).

6    *Klehr*, 521 U.S. at 188 ("We recognize that RICO's criminal statute of limitations runs from the last, *i.e.*, the most recent, predicate act. But there are significant differences between civil and criminal RICO actions, and this Court has held that criminal RICO does not provide an apt analogy.").

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 331 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

KeyCite Yellow Flag

Distinguished by   Berrio v. City of New York,   S.D.N.Y.,   January 10, 2017

KeyCite Overruling Risk

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2004 WL 2429811

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Caryll KRAMER, Plaintiff,

v.

THE CITY, NEW YORK CITY NEW YORK
POLICE DEPARTMENT, Police Officer Craig De
Oliviera, Detective Patrick Kennedy, Sheld 2041, and
Unidentified New York City Police Officers Defendant.

No. 04 Civ.106 HB.
|
Nov. 1, 2004.

OPINION & ORDER

BAER, J.

**\*1** Plaintiff, Caryll Kramer brought a civil rights claim, under 42 U . S.C. § 1983, against Defendants, the City of New York ("City"), New York City Police Department ("NYPD"), Police Officer Craig De Oliviera ("Oliviera"), Detective Patrick Kennedy ("Kennedy"), Shield 2041, and Unidentified New York City Police officers (collectively, "Defendants"). Pursuant to Federal Rule of Civil Procedure 56, Defendants move for summary judgment.[1] For the reasons set forth below, Defendants motion for summary judgment is GRANTED.

I. *BACKGROUND*

A. Factual Background

Noel Kramer had consulted the same physician, Dr. Jonathan Raskin ("Raskin"), for over 12 years. In fear, Noel Kramer asked Raskin to run tests to determine whether, in fact, Plaintiff had attempted to kill him. Raskin, aware of Plaintiff's alleged alcoholism, alleged abusiveness, and his patient's belief that his wife had attempted to poison him (Raskin Dep. at 23:5—24:16), ran tests in April 2001, and the results

indicated that the arsenic level in Noel Kramer's blood were seven times greater than normal. (Raskin Dep. at 21:7—15).

In response to consistent illness because of his wife's food and fear for his safety, on May 10, 2001, Noel Kramer, accompanied by Oliviera and a nurse's aide, entered the 17th Precinct and lodged a complaint, which alleged that his wife, the Plaintiff here, had attempted to poison him. In support of his allegation, Noel Kramer informed the police of (1) a lab analysis that indicated an increased level of arsenic (N.Y.PD Compl. Rep. # 2001–17–0032932); (2) "that his doctor couldn't explain why he had such high levels of arsenic in his system"; (3) that his wife would not allow anyone else to prepare his food; and, (4) that his relationship with his wife had significantly deteriorated. (Kennedy Dep. at 18:23 —24:2).

To discern the legitimacy of Noel Kramer's criminal complaint, the New York County District Attorney's Office directed that newly prepared food be tested for poison. (Hughes Dep. at 23:22—24:14). On the evening of May 10, 2001, at the direction of the Assistant District Attorney, Noel Kramer returned to his apartment and ordered food. The police entered the apartment and Plaintiff refused to follow the police officer's directions. (Heiman Dep. at 22:11). Plaintiff went for her purse and Heiman pushed the pocketbook away and looked inside to make sure there were no weapons. (Heiman Dep. at 22:11; Kennedy Dep. at 66:10 —67:22; Sullivan Dep. at 31:2—19; Pl. Dep. at 137:9— 138:22). The Detectives handcuffed Plaintiff and escorted her out of the apartment. (Pl. Dep. at 139:16—20). Plaintiff never complained or sought treatment for any injuries that resulted from the arrest and never sought medical treatment for any injuries she allegedly sustained as a result of being handcuffed. (Pl. Dep. at 147:7—151:23).

Upon arrival at the 17th Precinct, the police locked Plaintiff in a holding cell. (Pl. Dep. at 156:4—9). Plaintiff was in the holding cell for several hours, but not searched until she requested to use the bathroom. (Pl. Dep. at 154:19—155:23).

On the evening of the arrest, while at the 17th Precinct, Plaintiff requested the use of the ladies room twice. (Pl. Dep. at 154:23). During both occasions, a female law enforcement officer escorted Plaintiff into the bathroom where Plaintiff "had to bear" her "derriere." (Pl. Dep. at 154:18—24). The following morning, May 11, 2001, Plaintiff was escorted to Central Booking and later that day arraigned for attempted murder in the second degree and resisting arrest. Bail was set

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 332 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

at $100,000. (N.Y. County Dock. No.2001NY041680, dated May 11, 2001).

**\*2** In response to the arrest, Noel Kramer cancelled all of his wife's credit cards, changed all the joint bank accounts over to his name, and stopped payments on Plaintiff's health insurance. (Pl. Dep. at 174:17—183:15). On November 16, 2001, the charges against Plaintiff were dismissed after the District Attorney's Office failed to prosecute.

## B. Procedural History

On April 29, 2002, Plaintiff filed an action against the City, the NYPD, Oliviera, and Noel Kramer in New York County Supreme Court. *Kramer v. New York,* No. 108657/02 (N.Y.Sup.Ct. Nov. 26, 2003). Plaintiff alleged that on May 10, 2001 she was falsely arrested and maliciously prosecuted because of the accusations fabricated by Noel Kramer and Oliviera. In response, Oliviera filed a motion for summary judgment to dismiss the State Court action. On November 26, 2003, Judge Soto dismissed the malicious prosecution charge, but the false arrest and imprisonment, intentional infliction of emotional distress, libel/slander, and defamation of character charges against Oliviera survived. *Id.*

On January 7, 2004, Plaintiff filed a Federal action based on the same May 10, 2001 events. The action alleged that Plaintiff's civil rights were violated, pursuant to 42 U.S.C. § 1983, and named the City, the NYPD, Kennedy, and Oliviera as defendants. The City and NYPD consented to the removal of the state-law action to federal court. On March 26, 2004, Judge Soto stayed the state law claims against Oliviera and, pursuant to Plaintiff's request, dismissed the allegations against Noel Kramer.

## II. *APPLICABLE STANDARD*

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities,

and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (*per curiam* ); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. *Donohue,* 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III. *DISCUSSION*

**\*3** Pursuant to Fed.R.Civ.P. 56, Defendants move for summary judgment contending that at this stage of the litigation: plaintiff's false arrest claim should be dismissed because there was probable cause; plaintiff's malicious prosecution claim is barred by the doctrine of collateral estoppel, the *Rooker–Feldman* doctrine, and also fails as a matter of law; plaintiff fails to state a claim under the Equal Protection and Due Process Clauses of the Fourteenth Amendment; any purported conspiracy claim must be dismissed; Detective Patrick Kennedy is entitled to qualified immunity; and, plaintiff's state law claims should be dismissed as a matter of law.

## A. False Arrest

Plaintiff alleges that Kennedy lacked the requisite information that would lead a reasonable person to conclude that Plaintiff had committed or is about to commit a crime and, therefore, failed to have probable cause to justify an arrest. *See Boyd v. City of N.Y.,* 336 F.3d 72 (2d Cir.2003). Plaintiff's § 1983 claim for false arrest "derives from an individual's right to remain free from unreasonable seizures." *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). This includes the right to remain free from arrest absent probable cause. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). When reviewed in the light most favorable to Plaintiff, *Saucier v. Katz,* 533 U.S. 194, 201 (2001), the complaint alleges that the police arrested Plaintiff without probable cause in violation of the constitution. *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) ("The right not to be arrested without probable cause is a clearly established right.").

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 333 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

However, at the time of the arrest, it was "equally well established that the existence of probable cause is an absolute defense to a false arrest claim and affords the arresting officer qualified immunity from litigation." *Caldarola,* 298 F.3d at 162. "Probable cause is a complete defense to a cause of action for false arrest." *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999) (internal citation omitted). "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino v. City of N.Y.,* 331 F.3d 63, 77 (2d Cir.1999) (internal citation omitted).

Noel Kramer walked into the 17th Precinct on May 10, 2001 and alleged that his wife was attempting to murder him. In support of his allegations, Noel Kramer informed the police of (1) consistent illness which he believed resulted from his wife's food preparation; (2) his wife's unwillingness to allow anyone but herself to prepare his dinner; and, (3) a deteriorating marriage. Noel Kramer also provided the police with information regarding lab results that indicated a high level of arsenic in his blood and corroboration of the test results by a nurses' aid. (Pl. Dep. at 123:23—124:9; NYPD Compl. Rep. # 2001–17–0032932). Taken together, these allegations establish probable cause to arrest Plaintiff and "there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004).

**\*4** Accordingly, this claim must be dismissed.

B. Qualified Immunity[2]

Assuming *arguendo* that Plaintiff was falsely arrested, the individual defendants are still entitled to qualified immunity. Qualified immunity shields a government official acting in an official capacity from suit for damages under Section § 1983 provided that the official did not violate "clearly established rights of which an objectively reasonable official would have known." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Kent v. Katz,* 312 F.3d 568, 573 (2d Cir.2002). The focus of a qualified immunity analysis is on "objective circumstances rather than an officer's subjective motivation." *Bradway v. Gonzales,* 26 F.3d 313, 319 (2d Cir.1994) (citation omitted). "The Supreme

Court has stated that the immunity accorded officials by this doctrine protects all but the plainly incompetent or those who knowingly violate the law, and added that if officers of reasonable competence could disagree on the legality of an act, immunity should be recognized." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996).

Moreover, even if Plaintiff's constitutional rights were violated, Detective Kennedy is still entitled to qualified immunity because of Kennedy's "belief that his conduct was lawful was reasonable." *Cowan,* 352 F.3d at 762. *See also Saucier,* 533 U.S. at 202 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.").

Accordingly, Defendant Kennedy is entitled to qualified immunity.

C. Malicious Prosecution Claim

Under New York law, collateral estoppel occurs if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Vargas v. City of N.Y.,* 377 F.3d 200, 204 (2d Cir.2004). When claimed, the moving party must demonstrate that the non-moving party's previous claim was actually and necessarily decided and that Plaintiff had a full and fair opportunity to litigate those issues. *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

As I have previously noted, "under the *Rooker–Feldman* doctrine, lower federal courts lack subject matter jurisdiction over claims that effectively challenge state court judgments," based on comity and the firmly-established principle that only the Supreme Court can review a final decision of a state court. *Allianz Ins. Co. v. Cavagnuolo,* No. 03 Civ. 1636, 2004 WL 1048243 at \*4 (S.D.N.Y. May 7, 2004) (Baer, J.) (*citing to Kropelnicki v. Siegel,* 290 F.3d 118, 128 (2d Cir.2002)).[3] The essence of the *Rooker–Feldman* doctrine "is that inferior federal courts have no subject matter jurisdiction over cases that effectively seek review of judgments of state courts and that federal review, if any, can occur only by way of a certiorari petition to the Supreme Court." *Moccio v. New York State Office of Court Admin,* 95 F.3d 95, 197 (2d Cir.2000). *Rooker–Feldman* bars those claims that were adjudicated in a prior state court action, as well as those claims that are

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 334 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

"inextricably intertwined" with the state court judgment. We have held that "inextricably intertwined means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion." *Santini v. Conn. Hazardous Waste Mgmt. Serv.,* 342 F.3d 118, 126 (2d Cir.2003) (*quoting and citing Moccio,* 95 F.3d at 197). This doctrine protects the integrity of state court judgments and must, therefore, be invoked "if adjudication of a claim in federal court would require the court to determine that a state court judgment was erroneously entered or was void." *Kropelnicki,* 290 F.3d at 129.

**\*5** The Plaintiff's claim for malicious prosecution, which followed the November 16, 2001 dismissal of the criminal case, necessitates federal court review of the state court's determination of Plaintiff's civil complaint issued on November 26, 2003. In particular, New York State Supreme Court Judge Soto adjudicated, among other things, the malicious prosecution claim and entered a final judgment:

> On this cause of action [Malicious Prosecution], the complaint on its face fails to allege an essential element —the termination of the criminal proceedings in plaintiff's favor, which has been held to mean a termination on the merits. Failure to establish any one of the four requisite elements defeats the entire claim."

*Kramer v. New York,* No. 108657/02 (N.Y.Sup.Ct. Nov. 26, 2003). The decision constitutes a final judgment for the purposes of the *Rooker–Feldman doctrine. See Alleyne v. City of N.Y.,* 225 F.Supp.2d 391, 394 (S.D.N.Y.2002) (holding that "a party may not evade these rules and principles of federalism by recasting his claims pending in state court as a civil rights action under 42 U.S.C. § 1983."). Plaintiff has had an opportunity to litigate the claim already once in state court and now seeks a second bite at the apple in federal court. In order to succeed on the malicious prosecution claim, this Court would have to overturn the state court decision and "[a] plaintiff ... 'may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action'." *Brooks–Jones v. Jones,* 916 F.Supp. 280,

281—282 (S.D.N.Y.1996). Accordingly, Plaintiff's malicious prosecution claims must be dismissed.

Accordingly, Plaintiff's malicious prosecution claim must be dismissed.

D. Fourteenth Amendment Violation

Plaintiff argues that the Defendants violated her rights under the Fourteenth Amendment by favoring the allegations of Oliviera over Plaintiff. To establish an equal protection violation, plaintiffs must prove purposeful discrimination, *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987), directed at an identifiable or suspect class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

Plaintiff's equal protection claim is facially deficient. An equal protection claim requires "purposeful discrimination, directed at an identifiable or suspect class." *Id.* at 1057 (internal citation omitted). Kramer has made no such class allegation. Instead, Plaintiff's claim is based on the particular circumstances of her arrest. While it is possible for Plaintiff to allege a "class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000), Plaintiff is "required to show either that there was no rational basis for the unequal treatment received or that the denial of the application was motivated by animus." *Harlen Assoc. v. Vill. of Mineola,* 273 F.3d 494, 500 (2d Cir.2001) (internal citation omitted).

**\*6** Plaintiff has failed to present any evidence of unequal treatment sufficient to defeat summary judgment. *See Foy v. City of N.Y.,* No. 03 Civ. 7318, 2004 WL 2033074 (S.D.N.Y. Sept. 10 2004) (Baer, J.). Indeed, the available evidence demonstrates the Plaintiff's "arrest was not arbitrary, irrational, or motivated by animus of any sort." *Id.,* 2004 WL 2033074 at \*3. As was already stated, *see supra at* 4– 5, the police officers had probable cause to arrest Plaintiff and received fair and equal treatment. Accordingly, this claim must be dismissed.

E. Impermissible Search Leading to Damage to Reputation

Plaintiff alleges that, because of the NYPD's unlawful entrance and search of Plaintiff's apartment and handbag, Plaintiff's reputation in the community was impaired and she was otherwise injured. (Complaint, ¶ 20).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 335 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

The Supreme Court stated that reputation alone is not a protected liberty interest. *Siegert v. Filley,* 500 U.S. 226, 233 (1991). Plaintiff must demonstrate damage to her reputation "coupled with some other tangible element in order to rise to the level of a protectable liberty interest." *Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994). This requirement is commonly known as "stigma plus." *Valmonte,* 18 F.3d at 999. Defamation or damaged reputation alone fails to trigger a constitutional deprivation of a liberty interest. *See Siegert v. Gilley,* 500 U.S. 226, 233–34 (1991). "The stigma prong requires [Plaintiff] to show that the ... defendants' statements [or action] will result in stigma, public opprobrium and damage to [her] reputation." *Martinez v. City of N .Y.,* No. 00 Civ. 7914, 2003 WL 2006619 at *6 (S.D.N.Y. Apr. 30, 2003). If Plaintiff demonstrates sufficient stigma, she must also satisfy the "plus" requirement. In the Section 1983 context, a plaintiff who alleges governmental defamation must demonstrate:

> The utterance of a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and some tangible and material state-imposed burden or alteration of his or her status or of a right in addition to the stigmatizing statement.

*Paul v. Davis,* 424 U.S. 693, 701–702 (1976).

Here, the stigma-plus standard is not satisfied. Plaintiff fails to demonstrate that Defendants, as state actors, "altered or extinguished a right or status that was previously recognized under state law." *Avello v. Hammons,* 963 F.Supp. 262, 266 (S.D.N.Y.1997). Plaintiff has never attempted to obtain employment (Pl. Dep. at 196:21—24) and the pecuniary loss she suffered was a direct result of Noel Kramer's decision to cease financial support. (Pl. Dep. at 97:22—98:24; 172:19 —183:15). Furthermore, Plaintiff has not presented any evidence that would suggest that Plaintiff has been unable to garner employment. Any pecuniary loss cannot be attributed to the Defendants and, as such, Plaintiff cannot establish anything more than purported damage to her reputation resulting from her arrest.

**\*7** Accordingly, Plaintiff's damage to reputation must be dismissed.

F. Conspiracy Claim

Plaintiff alleges that under the circumstances, the friendship between Oliviera and Noel Kramer permit an inference that there was a meeting of the minds sufficient to establish a conspiracy liability theory.

To demonstrate a 42 U.S.C. § 1983 conspiracy, a plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324—25 (2d Cir.2002). In *Ciambriello,* the Second Circuit explained that "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.*[4] The Second Circuit deemed the factual allegations inadequate in *Ciambriello* because plaintiff had "not provided any details of time and place and failed to specify in detail the factual basis necessary to enable defendants intelligently to prepare their defense." *Hernandez v. Goord,* 312 F.Supp.2d 537, 546 (S.D.N.Y.2004).[5] While Section 1983 claims "are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence," *Hernandez,* 312 F.Supp.2d at 546, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002).

While Plaintiff extensively itemizes each instance of Noel Kramer interacting with the police department and Oliviera, neither the Complaint nor opposition to Defendants' motion for summary judgment articulates a single example of an impermissible agreement or *quid pro quo* arrangement. Plaintiff fails to present even a scintilla of evidence regarding the existence, or even inference, of any specific agreement to violate Plaintiff's rights, whether such an agreement was entered into, the nature of the agreement, or specific acts in furtherance of the agreement. Friendship alone is insufficient to support the existence of a conspiracy.

Accordingly, Plaintiff's conspiracy claim must be dismissed.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 336 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

## G. State Law Claims

### 1. *Libel and Slander*

According to Plaintiff, Detective Kennedy and the NYPD disclosed false and defamatory information regarding Plaintiff to various newspapers. In particular, Plaintiff points to a May 15, 2001 New York Daily News article, which identified Plaintiff, her alleged attempt to poison her husband, her husband's sickness every time his wife cooked for him, her unwillingness to permit others to prepare food, and Noel Kramer's wealth. (Pl.Ex. O). Plaintiff also points to a New York Times article that paints a similar picture.

**\*8** In order to establish a *prima facie* case for slander or libel under New York law, "all of the following elements are required: (1) a false and defamatory statement of and concerning the plaintiff; (2) publication by defendant of such a statement to a third party; (3) fault on part of the defendant; and, (4) injury to plaintiff." *Idema v. Wager,* 120 F.Supp.2d 361, 365 (S.D.N.Y.2000).

However, New York law recognizes "an absolute and qualified privilege for law enforcement personal, depending on the circumstances, and requires a showing of actual malice before a plaintiff will be allowed to prevail in a defamation action." *Regan v. Sullivan,* 557 F.2d 300, 309 n. 11 (2d Cir.1977). To overcome the qualified privilege:

> [T]he plaintiff must challenge the defendant's good faith and allege that [ ]he acted either with actual malice (i.e., [ ]he made a defamatory statement with the knowledge that it was false or with reckless disregard as to whether it was false), or with common law malice (i.e., [ ]he made the defamatory statement solely with the desire to injure the plaintiff).

*Perks v. Town of Huntington,* 251 F.Supp.2d 1143, 1165 (E.D.N .Y.2003). Mere allegations of libel and slander are not enough. *Shamley v. ITT Corp.,* 869 F.2d 167, 173 (2d Cir.1989). A plaintiff must present evidentiary facts that support this conclusion. *Id.* To survive a motion for summary judgment, a plaintiff must present "evidence in admissible form sufficient to raise a triable issue whether the statements

were made with malice." *County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 317 F.Supp.2d 383, 389 (S.D.N.Y.2004). "A plaintiff does not make the requisite showing of malice simply by conclusorily labeling the defamation malicious." *Id.* at 390 (*citing to Shamley v. ITT Corp.,* 869 F.2d 167, 173 (2d Cir.1989)). A plaintiff must present evidentiary facts that support this conclusion. *Id.* "This burden may not be met by surmise, conjecture and suspicion nor by mere conclusions, expressions of hope or unsubstantiated allegations or assertions." *Id.*

Assuming the statements made to the newspapers by law enforcement personnel were false, the Complaint fails to allege that the statements were made with the requisite malice. Malice, which "means spite or ill will," defeats the privilege "only if it is the one and only cause for the publication." *Id.* at 390 (collecting cases). Plaintiff failed to present a scintilla of evidence that would suggest the police falsely commented on the incident out of spite or because of any ill will towards Plaintiff. The Defendants' statements were "neither gratuitous nor irrelevant references to a prior incident that allegedly involved plaintiff." *Lee v. City of Rochester,* 677 N.Y.S.2d 848, 851 (N.Y.A.D. 4 Dep't 1998). The references to Plaintiff, assuming erroneous, were germane to the police investigation and "[a] police officer may give details of past and present incidents that would interest or affect the public." *Id.* Absent any evidence that the comments made to the press regarding Plaintiff were made in spite or ill will, the officer's statements appear to have merely been a reasonable mistake and, therefore does not establish either constitutional or common-law malice. [6]

**\*9** Accordingly, Plaintiff's libel and slander claim must be dismissed.

### 2. *Invasion of Privacy*

Plaintiff claims an invasion of privacy from the NYPD's unlawful entrance into Plaintiff's apartment and the searches of her person, her purse, and the apartment. (Pl. Dep. at 21). The record is unclear whether the police actually entered the apartment to arrest Plaintiff. [7] In her deposition, Plaintiff alleged that she refused the police entry into her apartment when they sought to arrest her on May 10, 2001, and that the police in response forcibly took her from the entrance of her apartment to arrest her (without actually entering the apartment). (Pl. Dep. at 137:6—140:25). The Supreme Court has held that arrest warrants are required to arrest suspects

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 337 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

within their homes, absent consent or exigent circumstances. *Payton v. New York,* 445 U.S. 573 (1980).

The reasonableness of a police determination of consent to enter is judged by the objective standard of whether the facts available at the moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises without a warrant. *Illinois v. Rodriguez,* 497 U.S. 177 (1990). In this case, the owner of the apartment and potential victim of the alleged crime gave the police permission to enter the apartment when he filed his complaint earlier on May 10, 2001. (Kennedy Dep. at 62:16—20; Hughes Dep. at 23:22—24:14; 31:2—16). Thus, whether or not the police entered Plaintiff's apartment to arrest her, the entry was made on a reasonable belief of consent to enter the apartment by a person with actual authority to grant such consent. Without a Fourth Amendment violation in the manner of her arrest or the entry into her apartment, defendants did not violate Plaintiff's reasonable expectations of privacy.

Accordingly, Plaintiff's invasion of privacy claim must be dismissed.

### 3. *Intentional Infliction of Emotion Distress*

Under New York law, to state a claim for intentional infliction of emotional distress, Plaintiff must demonstrate: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and, (4) severe emotional distress." *Hart v. Westchester County Dep't of Soc. Serv.,* 160 F.Supp.2d 570, 579 (S.D.N.Y.2001). "Liability has been found *only* where the conduct has been so *outrageous* in character, and so *extreme* in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Arena v. Agip,* No. 95 Civ. 1529, 2000 WL 264312 at \*4 (S.D.N.Y. Mar. 8, 2000) (emphasis added).

There is no evidence in the record from which a fair-minded trier of fact could reasonably conclude that the conduct of these defendants constitutes either extreme or outrageous conduct. *See, e.g., Rall v. Hellman,* 726 N.Y.S.2d 629 (1st Dep't 2001); *Andrews v. Bruk,* 631 N.Y.S.2d 771 (2d Dep't 1995). Under the facts presented here, *see supra* at 4–11, the Court concludes that the record lacks any evidence even remotely satisfying this rigorous threshold and upon which a

rational fact-finder could find liability. *Brown v. City of N.Y.,* 306 F.Supp.2d 473, 481 (S.D.N.Y.2004).

**\*10** Accordingly, Plaintiff's claim of intentional infliction of emotional distress must be dismissed.

### 4. *Unlawful Strip Search*

Plaintiff contends that when she was forced to expose her derrière, the police officers engaged in an unlawful strip search while at the police precinct.

The Constitution mandates that searches of individuals, even those arrested or incarcerated, be reasonable under the circumstances. *Bell v. Wolfish,* 441 U.S. 520, 559 (1979). The reasonableness of a strip search turns on the scope of the intrusion, the manner in which the search is conducted, the justification for initiating the search, and the place in which the search is conducted. *Id.* (citations omitted). The Fourth Amendment prohibits strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses absent a "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charge, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v.. Dell,* 804 F.2d 796, 802 (2d Cir.1986). Several courts within this circuit have applied this particularized or individualized reasonable suspicion test to strip searches of felony arrestees. *See Sarnicola v. County of Westchester,* 299 F.Supp.2d 259, 270 (S.D.N.Y.2002) (holding that the mere arrest for felony drug charges does not permit strip search absent reasonable suspicion that the individual is secreting drugs or other contraband within body cavities); *Murcia v. County of Orange,* 226 F.Supp.2d 489, 494 (S.D.N.Y.2002) (policy to strip search felony arrestees arriving at correction facility is unconstitutional).

In this case, the officer satisfies even a heightened standard of particularized reasonable suspicion that the plaintiff was secreting contraband within her body cavity. Plaintiff was arrested for attempted murder. Plaintiff was alleged to have attempted to murder her husband by poisoning him with arsenic, a substance that is capable of being carried in a container small enough to be hidden in a body cavity. *See Covino v. Patrissi,* 967 F.2d 73, 79 (2d Cir.1992) (drugs and contraband often found in body cavities); *Storms v. Coughlin,* 600 F.Supp. 1214, 1219 (S.D.N.Y.1984) (same); *see also* 48 AMJUR POF 2d 431 at § 1 (description of arsenic). Perhaps most significant is the fact that plaintiff was searched *only* upon the two occasions she indicated she had to use the restroom. (Pl. Dep. at 154:16—155:17). This raised the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 338 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

reasonable suspicion that plaintiff may have been secreting arsenic or other contraband within her and would take the opportunity to use the restroom to expunge it.

Additionally, the nature of the strip search itself was not unreasonable. The scope of the search was minimal insofar as plaintiff was only requested "to bear" her "derriere." (Pl. Dep. at 154:22). She was not forced to undergo a visual body cavity search. *See Sec. and Law Enforcement Empl. v. Carey,* 737 F.2d 187, 207—08 (2d Cir.1984) (distinguishing strip searches from more intrusive visual body cavity searches). She was not even asked to disrobe. Moreover, the search was conducted by a female officer in a holding cell without anyone else present. (Pl. Dep. at 154—55.) There is also evidence of the reasons for the search. The plaintiff testified she was not searched in any way when she first was placed in the holding cell. (Pl. Dep. at 155:6—10). It was only upon each of her two requests to use the restroom that she was searched by the officer, presumably suspicious that such requests were really efforts to destroy hidden contraband. (Pl. Dep. at 154 —155). The search was thus not gratuitous or unjustified. Although one court in this jurisdiction has utilized a list of factors to be assessed under *Weber's* particularized reasonable suspicion test, *see Sarnicola,* 299 F.Supp.2d at 271—74, the circumstances here are nevertheless adequate to satisfy that test. The search of plaintiff was not unreasonable.

**\*11** Accordingly, Plaintiff's claim of unlawful strip search must be dismissed

### 5. *Assault and Battery*

The Plaintiff alleges that she suffered an assault and battery when the Detectives pushed and handcuffed her, as the handcuffs caused her to suffer black and blue marks, pain, and swelling. (Pl. Dep. at 139:16—19; 141:1—7).

In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force. *Green v. City of N.Y.,* No. 01 Civ.1996, 2004 WL 213009 at \*3 (S.D.N.Y. Jan. 5, 2004).[8] Under federal or state law, a plaintiff must demonstrate that "the amount of force used was objectively unreasonable" based upon a consideration of "the perspective of the officer at the time of the arrest." *Anthony v. City of N.Y.,* No. 00 Civ. 4688, 2001 WL 741743 at \*13 (S.D.N.Y. Jul. 2, 2001) (*quoting Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996)). Where there has been an unlawful arrest, any degree of force is unreasonable and excessive. *See Black*

*v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at \*6 (S.D.N.Y. Sep. 5, 2002).

Here, we have already determined that the Detectives had probable cause and Plaintiff's arrest was lawful. *See supra* at 4. As Plaintiff does not allege that the officers used excessive force during the arrest, her claim of assault and battery should be dismissed.[9] Assuming an allegation of excessive force, the Plaintiff has not offered any evidence to show that the any force used against her was objectively unreasonable and the record supports the officers extremely limited use force when arresting her. While the Plaintiff states that she only complained to the officers who drove her from the 17th Precinct to Central Booking at Centre Street about how the tightness of the handcuffs (Pl. Dep. at 153:6—12) and the Plaintiff admitted that she did not tell Kennedy or the other detectives that arrested her that the handcuffs were too tight during her journey to the 17th Precinct. (Pl. Dep. at 152:12 —24; 153:2—5). In addition, the Plaintiff admits that she did not sustain any physical injuries when the Detectives "pushed" her out of the apartment. (Pl. Dep. at 140:22—25). The Plaintiff's statements strongly imply that force was not used at all, much less unreasonable force, as the manner in which the Plaintiff was pushed did not hurt her at all, and the manner in which the Plaintiff was handcuffed clearly did not injure her at the time.

Accordingly, Plaintiff's claim of assault and battery should be dismissed.

### 6. *Negligent Hiring and Retention*

Plaintiff's claim that City and NYPD carelessly and recklessly hired, retained, trained, supervised, and promoted the officers who investigated and/or arrested the Plaintiff as well as Oliveira. The result of City and NYPD's negligent practices were the intentional torts listed above.

### a. *Detective Kennedy, Shield 2041, and Unidentified NYC Police Officers*

**\*12** The City concedes that the individual defendants were employed by it on the date in question and, with the exception of Oliviera, acted *within* the scope of their employment. (Pl. Mtn. Sum. J. at 22). Plaintiff, therefore, has no claim for negligent training and supervision in light of this concession. *Colodney v. Continuum Health Partners, Inc.,* No. 03 Civ. 7276, 2004 WL 829158 at \*9 (S.D .N.Y. Apr. 15, 2004) (holding that "[w]hen an employee is acting within the scope

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 339 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

of her employment, her employer may be held liable for the employee's negligence only under a theory of *respondeat superior,* and no claim may proceed against the employer for negligent hiring or retention."). [10]

*b. Oliviera*

The Plaintiffs' claims for negligent hiring, retention, and supervision cannot provide a basis for liability against Oliviera. Under New York law, a plaintiff cannot establish a negligent hiring claim when the alleged employee acted outside the scope of his employment and was not under the City's supervision or control. *Estevez–Yalcin v. Children's Vill.,* 331 F.Supp.2d 170 (S.D.N.Y.2004). The "employer is only liable for the actions of an employee where the employee was engaged in the furtherance of the employer's business and the employer was, or could have been, exercising some control, directly or indirectly, over the employee's activities." *Mahmood v. City of N.Y.,* No. 01 Civ. 5899, 2003 WL 21047728 at *2—3 (S.D.N.Y. May 8, 2003). As this district recently noted:

> [A]n employee's actions are not within the scope of employment unless the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business. Thus, where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job-related, his actions cannot be said to fall within the scope of his employment.

*Id.,* 2003 WL 21047728, at *2—3 (citations omitted).

Here, the issue is whether Noel Kramer's friend and police officer, Oliviera, acted in his official capacity when he accompanied Noel Kramer to the police station. (Pl.Ex. Q, 54—56). The facts indicate that Oliviera acted in his personal capacity as a friend of Noel Kramer and not as a New York City police officer. First, Oliviera was off-duty when he made the decision to go to the 17th Precinct with Noel Kramer. (Heiman Dep. at 166:9—10). Second, no NYPD supervisor authorized Oliviera to go to the 17th Precinct with Noel Kramer. (Sullivan Dep. at 166:5—7). Third, Oliviera never spoke in his official capacity or acted on behalf of the NYPD while at the police station. Fourth, Oliviera never assisted with the search, spoke with any of the detectives, or carried an official assignment when you testified at Plaintiff's arraignment. (Sullivan Dep. at 166:12—167:14). It is well-settled that conduct "where an employee's conduct is brought on by a matter wholly personal in nature, the source of which is not job-related, his actions cannot be said to fall within the scope of his employment" and, therefore, this claim must be dismissed.

### IV. *CONCLUSION*

**\*13**  For all of the foregoing reasons, Plaintiff's motion for Summary Judgment is GRANTED. The Clerk is instructed to close this motion and any other open motions and remove this case from my docket.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 2429811

---

### Footnotes

1    In addition, for the sake of judicial economy, Defendant Oliveira's Motion to Dismiss will be adjudicated in tandem with NYC's motion for summary judgment. *See Ellis v. Guarino,* No. 03 Civ. 6562, 2004 WL 1879834 (S.D.N.Y. Aug. 24, 2004).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 340 of 520

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

2    The determination of whether police officers are entitled to qualified immunity is to be determined independent of the merits of the underlying action. *Washington Square Post # 1212 v. Madura,* 907 F.2d 1288, 1297 (2d Cir.1990) (citation omitted).

3    This Court has no authority to review final judgments of a state court judicial proceeding, except for general constitutional challenges and reviews pursuant to an application for a writ of habeas corpus. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16 (1923); *D.C. Ct. of App. v. Feldman,* 460 U.S. 462, 482—86 (1983). Thus, "[a] plaintiff ... 'may not seek a reversal of a state court judgment simply by casting his complaint in the form of a civil rights action'." *Brooks–Jones v. Jones,* 916 F.Supp. 280, 281—282 (S.D.N.Y.1996).

4    *See Toussie v. Powell,* 323 F.3d 178, 185 n. 3 (2d Cir.2003) ( "[W]e do not have occasion to examine the pleading requirements for [Section] § 1983 conspiracy claims. In particular we do not consider whether our previous statements on the pleading requirements for such conspiracy allegations, ... [requiring more than conclusory allegations to avoid dismissal] ... remain valid in light of ... *Leatherman v. [Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993) ] ... and *Swierkiewicz [v. Sorema N.A.,* 534 U.S. 506 (2002) ]....").

5    *See also Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993).

6    Under the *New York Times* standard, a plaintiff need not prove that actual ill will was the sole motivating factor for the publication of the defamatory statement, but "must demonstrate that the statements [were] made with [a] high degree of awareness of their probable falsity.... In other words, there must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication ." *Liberman v. Gelstein,* 80 N.Y.2d 429, 438 (1992) (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). Accordingly, a defendant must act with "reckless disregard" for the truth. *Liberman,* 80 N.Y.2d at 439. *See, e.g., Time, Inc. v. Pape,* 401 U.S. 279, 289–92 (1971) (finding that deliberate omission of the word "allegation" or its equivalent in an article describing a government report, while erroneous, was insufficient to create a jury issue regarding actual malice); *Reliance Ins. Co. v. Barron's,* 442 F.Supp. 1341, 1350 (S.D.N.Y.1977). ("We must affirm the longstanding principle that inaccuracy itself will not demonstrate actual malice in a libel case."); *Suozzi v. Parente,* 616 N.Y.S.2d 355, 359 (1st Dep't 1994) (holding that "misinterpretation of a source or the resolution of an ambiguity adversely to the plaintiff or in accordance with a particular political view" does not constitute actual malice)

7    While Plaintiff testified at her deposition that the police never actually entered the apartment, Officer Kennedy, in his deposition, claimed that the police did enter. (Kennedy Dep. at 66:7).

8    Under New York law, an assault is an intentional placing of another person in fear of imminent harmful or offensive contact. *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001). A battery is an intentional wrongful physical contact with another person without consent. *Id.* at 203. An assault claim must allege facts that support a finding that the defendant intentionally placed the plaintiff in reasonable fear of imminent harmful or offensive bodily contact. *Black v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at *6 (S.D.N.Y. Sept. 5, 2002). To sustain a battery claim, a plaintiff must introduce evidence tending to show that the defendant intentionally and wrongfully engaged in physical contact with the plaintiff without the plaintiff's consent. *Id.,* 2002 WL 31002824 at *5.

9    As the plaintiff, in her complaint, does not allege facts that indicate that the officers used "objectively unreasonable force" against her during the arrest, but simply alleges that that the officers' contact in arresting, handcuffing and transporting her was "unnecessary and unlawful and was offensive" to her, (State Complaint, Paragraphs 23–26) there is no need to evaluate her claim under an "objectively unreasonable" standard. *See Black v. Town of Harrison,* No. 02 Civ.2097, 2002 WL 31002824 at *6 (S.D.N.Y. Sept. 5, 2002) (where the

Kramer v. City of New York, Not Reported in Fed. Supp. (2004)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 341 of 520

court found that the Plaintiff was not solely relying on an unlawful arrest claim due to alleged facts indicating that the police hit the Plaintiff's head upon a dresser, and left her handcuffed for 15 minutes).

10    *See, e.g., Griffin v. City of N.Y.,* 287 F.Supp.2d 392 (S . D.N.Y.2003); *see also Karoon v. N.Y.C. Transit Auth.,* 659 N.Y.S.2d 27 (1st Dep't 1997).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1421152
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Phillip LEIB-PODRY, Plaintiff,
v.
Geofferey TOBIAS et al., Defendants.

22-cv-8614 (VEC)(JW)
|
Signed February 13, 2024

**Attorneys and Law Firms**

Phillip Leib-Podry, New York, NY, Pro Se.

Amanda Leigh Tate, Juan C. Gonzalez, Rubin Paterniti Gonzalez Rizzo Kaufman, LLP, New York, NY, for Defendant Geoffrey Tobias.

Caryn Leslie Lilling, Katherine Herr Solomon, Mauro Goldberg & Lilling, LLP, Woodbury, NY, for Defendants Princeton Insurance Company, MedPro Group, Berkshire Hathaway.

## REPORT & RECOMMENDATION

JENNIFER E. WILLIS, United States Magistrate Judge.

**\*1 TO THE HON. VALERIE E. CAPRONI, United States District Judge:**

*Pro se* Plaintiff Leib-Podry filed this lawsuit on October 7, 2022. Dkt. No. 2. Liberally construed, Plaintiff's complaint asserts state law causes of action for (i) medical malpractice, (ii) battery, (iii) sexual assault, (iv) conspiracy, and a federal claim for (v) unfair trade practices. See generally Dkt. No. 2; see also Dkt. No. 5 [1]; see also Defendant's Memorandum of Law, Dkt. No. 35 at 10 (acknowledging Plaintiff's Complaint "liberally construed" asserts these causes of action); see also Insurance Defendant's Memorandum of Law, Dkt No 40 at 32 (acknowledging Plaintiff's Complaint "liberally construed" may assert a claim for unfair trade practices). In December 2022, the case was referred to this Court for all dispositive motions. Dkt. No. 7.

On June 1, 2023, Defendants Geoffery Tobias, Berkshire Hathaway, MedPro Group, and Princeton Insurance Company moved to dismiss [2] the Complaint. Dkt. Nos. 33,

38. On July 26, 2023, Plaintiff submitted an Opposition to the Motions to Dismiss. Dkt. No. 49. Defendants submitted their Replies in August 2023. Dkt. Nos. 56, 58.

**\*2** Because each of Plaintiff's claims is either time-barred, fails to state a claim, or is factually frivolous, Defendants' Motions to Dismiss should be GRANTED.

## I. BACKGROUND

Plaintiff's three-and-a-half page complaint alleges many facts, some relevant and others entirely extraneous to the allegations in this case. See generally Dkt. No. 2. Typically a court must accept the facts in the complaint as true at the motion to dismiss stage, but a court is allowed to reject facts and allegations that it deems frivolous and irrational. Denton v. Hernandez, 504 U.S. 25, 33 (1992); Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011); see also Neitzke v. Williams, 490 U.S. 319, 324-25 (1989). For reasons stated more fully below, I find the facts in this Complaint to be frivolous and irrational.

Plaintiff alleges the events described in the Complaint occurred "between January 23, 2017 and the present time" and April 2017 in locations in "New York County ... and locations in Englewood New Jersey ...". Dkt. No. 2 at 1. The Complaint alleges that Plaintiff resides "in New York County" and that Defendants "operate businesses from outside New York State". Dkt. No. 2 at 1. Plaintiff says that "all appointments before the [medical] procedure took place at 815 Park Avenue" and also asserts that certain other events occurred "at 815 Park Avenue" and "at Englewood Hospital" but does not otherwise specify where many of the alleged events occur.

Plaintiff's primary claim, which takes up the majority of space in the Complaint, alleges that Defendant Dr. Tobias performed an "extremely dangerous procedure" on Plaintiff's nose using a "nylon plastic suture," which Plaintiff describes as "an exceedingly dangerous and wholly unacceptable procedure that has no purpose whatsoever but to harm the patient." Dkt. No. 2 at 1. Plaintiff alleges that Dr. Tobias "needlessly remov[ed] a significant portion of the internal structure" of their nose, resulting in "[i]rritation and severe pain" and "other physical damage to [Plaintiff's] face." Id. at 2. Plaintiff alleges that Defendant Tobias "appeared gratified and pleased to have damaged [Plaintiff's] appearance." Dkt. No. 2 at 3. Plaintiff asserts that use of the nylon suture "falls far below

existing standards of care." Id. at 2. Later in the Complaint, Plaintiff also indicates that the use of "these non-absorbable polymers ... in any patient, would always cause [plaintiff] to become a victim of others for a variety of reasons ..." Id.

Plaintiff also claims "without further surgery the procedure is likely to lead to a malignancy (i.e. cancer) and the risk continues to increase over time." Dkt. No. 2 at 3. Plaintiff alleges that since the surgery, Plaintiff has been "harassed repeatedly and handcuffed without a substantiated or legitimate reason by the police other than that the alterations in my appearance and voice, though other officers have been both understanding and comforting toward me since that time." Additionally, Plaintiff claims that the nasal procedure "led to repeated and countless rapes and assaults by others." Dkt. No. 2 at 3.

Plaintiff claims that he "did not consent to the surgical procedure" but instead "was made to submit to the surgery by compulsion." Id. at 2-3 The compulsion is described as "demeaning remarks" about Plaintiff's appearance, insistence by Defendant Dr. Tobias that the surgery was necessary, and a follow-up phone call from the doctor's assistant. Id.

**\*3** The Complaint next turns to Defendant Dr. Tobias' insurers: Princeton Insurance, Berkshire Hathaway, and the MedPro Group. While Plaintiff alleges "cosmetic treatments ... can treat the effects of rape and abuse without harming the patient or even asking the patient to speak," in this situation, insurance coverage of Defendant Dr. Tobias allowed him to "perform unnecessary surgery." Dkt. No. 2 at 2. Plaintiff alleges that "it is reasonable to presume that Berkshire Hathaway companies provide coverage to many doctors who perform similar ... reconstructive nasal procedures that have no meaning or purpose other than to defraud the patient." Id. at 2. Plaintiff also claims, that the "CEO of Berkshire Hathaway acts as one of the world's foremost philanthropists, but it appears he has failed to direct funds to the development of replacements for these outdated polymers that cause children and vulnerable people who would otherwise be advantaged to become victims of the rest of the population on a grand scale, while the unnecessary use of these polymers provides a pipeline of income to both doctors and Berkshire Hathaway companies." Dkt. No. 2 at 2.

Next, Plaintiff asserts that Dr. Tobias "sexual[ly] assault[ed]" them. Id. at 3. Plaintiff claims Dr. Tobias' "motivations" in rendering medical "care" "were sexual, aggressive, and malicious in nature." Id. at 2. Plaintiff asserts "Dr. Tobias

wore a suit in his clinical practice during the appointments before the procedure, which effectively prevented [Plaintiff] from being able to sense these motivations." Id. Plaintiff also avers that on the date of the procedure, Dr. Tobias "used his left hand to move the surgical gown [Plaintiff] was wearing shortly before [Plaintiff] received anesthesia, exposing [Plaintiff's] leg to [Dr. Tobias]. Further Plaintiff alleges that during a follow-up appointment, Dr. Tobias "breath[ed] heavily in [Plaintiff's] face," and on another occasion, "rubbed his genitals against" Plaintiff "when [Plaintiff] stood up" to leave the examination room. Id.

Plaintiff also asserts that all this is "interrelated and can be described as a conspiracy against [Plaintiff's] rights." Id. Plaintiff claims that Dr. Tobias' assistant told Plaintiff "to schedule surgery and return to his office," adding that after the procedure the assistant "joined [Dr. Tobias] in the examination room and watched him examine" Plaintiff and, that then "[b]oth this assistant and Geoffrey Tobias sexually violated [him] on a scale far beyond what is easily imaginable." Id. Plaintiff alleges "others have repeatedly mimicked those sexual and cruel behaviors when interacting with [Plaintiff]." Id.

Plaintiff also says that "my physical qualities and appearance have always been the only aspects of myself valued by others, even though I skipped ahead in school, was proficient in multiple programming languages by the 8th grade, and have a variety of additional capacities." Dkt. No. 2 at 3. Plaintiff also recounts that "my mother was found hanged by a rope also made of nylon and died shortly thereafter when I was 15. She had worked with 'Bill' Gates at Microsoft in fundamental roles that included designing MSN 'the Microsoft Network' which provided free email to the public." Dkt. No. 2 at 3. Dkt. No. 2.

Lastly, in describing damages, Plaintiff states the "amount outwardly and blatantly owed [to plaintiff] is one trillion dollars." Dkt. No. 2 at 3. At another point Plaintiff states, "I am demanding U.S. dollars valu[ed] ... twenty-two billion .... This is the sum that is necessary to repair my appearance, to keep me safe, and to return my freedom to pursue happiness, success, and love.... It is comprised of 18 billion as actual and essential compensation, the amount required to return my personal stature, including a 1 billion margin for security, according to information from Forbes regarding distribution of wealth among billionaires of different ages at this time, and 4 billion as punitive damages." Dkt. No. 2 at 3. Plaintiff also indicates that the amount of damages must be high

enough to enable him "the freedom to provide solutions to the public for non-absorbable polymers and to complete the development and implementation of technologies that repair damage similar to that which Geoffrey Tobias inflicted upon me." Dkt. No. 2 at 3.

## II. LEGAL STANDARD

**\*4** To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Caldwell v. Sutton, No. 19-CV-5236 (VEC), 2020 WL 4057750, at \*2 (S.D.N.Y. July 20, 2020)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." Caldwell *supra* (citing Keiler v. Harlequin Enters., Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted)). For a Plaintiff "to 'nudge[ ] their claims across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " Citizens United v. Schneiderman, 882 F.3d 374 (2d Cir. 2018) (cleaned up).

Generally, the Court accepts all factual allegations in a complaint as true and draws all reasonable inferences in the light most favorable to a plaintiff. Caldwell *supra*, (citing Gibbons v. Malone, 703 F.3d 595, 599 (2d Cir. 2013); In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)). The Court is not, however, bound to accept allegations that are "irrational," "fanciful," "fantastic," or "delusional." Denton v. Hernandez, 504 U.S. 25, 33 (1992); Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011); see also Neitzke v. Williams, 490 U.S. 319, 324-25 (1989). Nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Twombly, 550 U.S. at 555).

The pleading standard is "generally lower for a *pro se* litigant." Caldwell *supra* at \*2; see also McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988)("*pro se* litigants ... deserve more lenient treatment than those represented by counsel."). "A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers." Id. (citing Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted)). "[T]he court must construe *pro se* submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006).

Courts ordinarily owe *pro se* litigants "special solicitude" because the lack of legal training and experience makes them more "likely to forfeit important rights through inadvertence." Caldwell *supra*, (citing Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010)). Notwithstanding that solicitude, a court "cannot invent factual allegations that a *pro se* plaintiff has not pled." Caldwell *supra*, (citing Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010)). "Even *pro se* plaintiffs ... cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level." Licorish-Davis v. Mitchell, No. 12-CV-601 (ER), 2013 WL 2217491, at \*3 (S.D.N.Y. May 20, 2013)(citing Jackson v. NYS Dep't of Labor, 709 F.Supp.2d 218, 224 (S.D.N.Y. 2010)).

## III. DISCUSSION

Liberally construed, Plaintiff's complaint asserts state law causes of action for (i) medical malpractice, (ii) battery, (iii) sexual assault, (iv) conspiracy, and a federal claim for (v) unfair trade practices. See generally Dkt. No. 2; see also Dkt. No. 5; see also Defendants' Memorandum of Law, Dkt. No. 35 at 10 (acknowledging Plaintiff's Complaint "liberally construed" asserts these causes of action); see also Insurance Defendants' Memorandum of Law, Dkt No. 40 at 32 (acknowledging Plaintiff's Complaint "liberally construed" may assert a claim for unfair trade practices). Each of these claims is not only time-barred, but also factually frivolous.

### 1. The Complaint is Irrational and Factually Frivolous
**\*5** Plaintiff sought, and was granted leave to, proceed *in forma pauperis* (IFP). Dkt. No. 1; Dkt. No. 3. Under "the IFP statute, a court *must* dismiss an action if it determines that the action is frivolous or malicious." See Leonard v. United States, No. 23-CV-8571 (LTS), 2023 WL 8258263, at \*3 (S.D.N.Y. Nov. 27, 2023) (citing 28 U.S.C. § 1915(e) (2)(B)(i))(emphasis added). Even where the filing fee was paid, courts "have ... inherent authority to *sua sponte* dismiss

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 345 of 520

Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)

frivolous suits." Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011); Yi Sun v. Saslovsky, No. 1:19-CV-10858 (LTS), 2020 WL 6828666, at *2 (S.D.N.Y. Aug. 6, 2020)(citing Greathouse v. JHS Sec. Inc., 784 F.3d 105, 119 (2d Cir. 2015)). "But on top of that, Section 1915(e)(2)(B)(i) grants a judge 'the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.' " Samuel v. Bellevue Hosp. Ctr., No. 07 CIV. 6321 (NRB), 2008 WL 3895575, at *3 (S.D.N.Y. Aug. 22, 2008), aff'd, 366 F. App'x 206 (2d Cir. 2010).

Courts have found a "finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." Denton v. Hernandez, 504 U.S. 25, 33 (1992); Nobile v. Queen Laticia of Spain, No. 1:23-CV-9081 (LTS), 2023 WL 8258336 (S.D.N.Y. Nov. 27, 2023). A complaint is " 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' – that is, if they are 'fanciful,' 'fantastic,' or 'delusional.' " Leonard supra at *3 (citing Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011)); see also Neitzke v. Williams, 490 U.S. 319, 324-25 (1989).

Even when read with the "special solicitude" due pro se pleadings, here, Plaintiff's claims "rise to the level of the irrational." See Frost v. CVR Assocs. Inc., No. 1:19-CV-9190 (CM), 2019 WL 6340993, at *1 (S.D.N.Y. Nov. 26, 2019).

Plaintiff's complaint is replete with irrational claims and wholly irrelevant details. First, Plaintiff provides few concrete details about any of the allegations. See generally Dkt. No. 2. Second, Plaintiff also frequently makes conclusory statements with either no detail or only an implausible explanation provided. Id. For example, Plaintiff says "I was made to submit to surgery by compulsion" but says the manner of the compulsion was "demeaning remarks regarding my appearance and persistence that the procedure was necessary." Id. at 3.

Third, Plaintiff makes assertions that appear delusional and irrational. Plaintiff claims "without further surgery the procedure is likely to lead to a malignancy (i.e. cancer) and the risk continues to increase over time." Id. Plaintiff also asserts that Dr. Tobias "wore a suit" in his clinical practice during the appointments before the procedure, which "effectively prevented [Plaintiff] from being able to sense [Tobias's] motivations." Id. "The only purpose of the procedure he performed was to gain power over me." Id. at 3. Another example is that Plaintiff alleged Dr. Tobias's assistant "joined

Geoffrey Tobias in the examination room and watched him examine me. A piece of non-absorbable plastic (nylon) had been placed in my nose and not in hers. Both this assistant and Geoffrey Tobias sexually violated me on a scale far beyond what is easily imaginable ..." Dkt. No. 2 at 3.

Fourth, Plaintiff blends allegations against Tobias with allegations against unnamed others. Plaintiff says that the nasal procedure "led to repeated and countless rapes and assaults by others." Dkt. No. 2 at 3. Plaintiff alleges Dr. Tobias "chuckled in response to complaints I made regarding the results of the procedure .... and he appeared gratified and pleased to have damaged my appearance. Since that time, others have repeatedly mimicked those sexual and cruel behaviors when interacting with me." Dkt. No. 2 at 2.

 *6  Furthermore, for a Complaint alleging a sexual assault, Plaintiff provides no detail about the alleged sexual assault beyond claiming that Dr. Tobias "rubbed his genitals" against Plaintiff "when he stood to leave." Dkt. No. 2 at 2.

Instead, Plaintiff's Complaint is filled with irrelevant details, many that appear entirely delusional. For example, the Complaint includes the irrelevant fact that Plaintiff skipped grades in school, Plaintiff learned computer programming and Plaintiff's mother worked for Bill Gates and later died by apparent suicidal. Dkt. No 2 at 3. The Complaint also details that Plaintiff has been harassed by police since his surgery due to "alterations in [Plaintiff's] appearance and voice." Id. at 2. In addition, without explanation of context, Plaintiff avers that the "CEO of Berkshire Hathaway acts as one of the world's foremost philanthropists, but it appears he failed to direct funds to the development of replacements for these outdated polymers." Id.

Plaintiff's damages claim, too, is infused with irrational and fanciful allegations. At one point, Plaintiff states the damages are one trillion dollars. Dkt. No. 2 at 3. At another point saying, "I am demanding U.S. dollars valu[ed] on the day [Defendant] response is due to these complaints[,] twenty-two billion as financial restitution and absolutely no less than that amount." Dkt. No. 2 at 3. This sum includes actual damages as well as a "1 billion margin for security, according to information from Forbes regarding distribution of wealth among billionaires of different ages at this time, and 4 billion as punitive damages." Dkt. No. 2 at 3. Plaintiff, who professes no medical expertise, also indicated that the amount of damages must be high enough to enable them "the freedom to provide solutions to the public for non-

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 346 of 520

Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)

absorbable polymers and to complete the development and implementation of technologies that repair damage similar to that which Geoffrey Tobias inflicted upon me." Dkt. No. 2 at 3.

Moreover, Plaintiff's inclusion of unfair trade practice claims along with objections to the "extremely dangerous procedure [of] a nylon plastic suture ... designed entirely to defraud the patient," in a Complaint that purports to allege a sexual assault indicates a level of irrationality. Dkt. No. 2 at 2. Plaintiff includes no detail on how "nylon plastic sutures," the most commonly used sutures in the world, are "extremely dangerous" or could result in the damages he alleges. Dkt. No. 2.

Taking all of the allegations together, the Court concludes that, on balance, the Complaint is " 'factually frivolous' " as the allegations are fanciful, fantastic, and delusional. See Leonard *supra* at *3 (citing Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011)); see also Neitzke v. Williams, 490 U.S. 319, 324-25 (1989).

In addition to the reasons described below, this is an independent basis to dismiss the Complaint. See Denton *supra*; Nobile v. Queen Laticia of Spain, *supra*.

### 2. Medical Malpractice

Plaintiff's allegations liberally construed purport to assert a cause of action for medical malpractice. As Plaintiff's complaint is unclear as to whether the actions complained of occurred in either New York or New Jersey, the Court will consider the statutes of limitations under both states.

**\*7** In New York, medical malpractice claims must be brought within two and a half years. See N.Y. C.P.L.R. § 214-a; Lohnas v. Luzi, 30 N.Y.3d 752, 755 (2018); Polardo v. Adelberg, No. 22-CV-2533 (KMK), 2023 WL 2664612, at *18 (S.D.N.Y. Mar. 28, 2023), appeal dismissed sub nom. Poplardo v. Adelberg, No. 23-604, 2023 WL 4504459 (2d Cir. June 8, 2023); see also Bridges v. Corr. Servs., No. 17-CV-2220 (NSR), 2022 WL 1500633, at *7 (S.D.N.Y. May 12, 2022). In New Jersey, the statute of limitations is two years. See N.J.S.A. 2A:14-2 (2-year period from accrual).

The "statute of limitations ... runs from the date of the alleged negligent act or omission that caused the patient's injury." See Lohnas *supra* at 755; Poplardo at 18 *supra,* and Bridges at 7 *supra*. Plaintiff alleges receiving treatment "in January 23,

2017"[3] and on "April 18, 2017 and ... within days of that time." Dkt. No. 2 at 1. Therefore, the Plaintiff's last date to file a claim for medical malpractice was October 17, 2019, in New York and April 18, 2018, in New Jersey.

Plaintiff did not start this lawsuit until October 7, 2022. Dkt. No. 2. Therefore, the medical malpractice claim is time-barred and should be dismissed.

### 3. Intentional Tort of Battery

To the extent Plaintiff asserts that Plaintiff did not give consent to the medical procedure, Plaintiff asserts a claim for battery. See generally Dkt. No. 2; see also Gomez-Kadawid v. Lee, 2022 WL 676096 *11 (S.D.N.Y. 2022); Meyers v. Epstein, 232 F.Supp.2d 192, 196 (S.D.N.Y. 2002); Messina v. Matarasso, 284 A.D.2d 32, 35-36 (1st Dep't 2001); see also Colucci v. Oppenheim, 326 N.J.Super. 166, 180 (App. Div. 1999)(citing Whiteley-Woodford v. Jones, 253 N.J.Super. 7, 10 (App. Div. 1992)).

The tort of battery has a statute of limitations of one year in New York. See N.Y. C.P.L.R. § 215(3); Potter v. Zucker Hillside Hosp., 176 A.D.3d 884 (2019). Even if governed by New Jersey law, which requires commencement within 2 years of accrual, the claim would still be time-barred. See N.J.S.A. 2A:14-2.

Given that Plaintiff alleges the events happened "in January 23, 2017" and on "April 18, 2017 and ... within days of that time," the Plaintiff's last date to file a claim for battery was April 18, 2018 in New York and April 18, 2019 in New Jersey. Dkt. No. 2 at 1.

Plaintiff did not start this lawsuit until October 7, 2022. Dkt. No. 2. Therefore, the battery claim is time-barred and should also be dismissed.

### 4. Sexual Assault

Plaintiff alleges Dr. Tobias "breath[ed] heavily in [Plaintiff's] face"; and on another occasion, "rubbed his genitals against" Plaintiff "when [Plaintiff] stood up" to leave the examination room. Dkt. No. 2 at 3. Liberally construed this may make out an allegation of sexual assault.

A cause of action for sexual assault is subject to a one-year statute of limitation in New York. Krioutchkova v. Gaad Realty Corp., 28 A.D.3d 427, 428, 814 N.Y.S.2d 171, 173 (2006) (citing CPLR 215[3]; Yong Wen Mo v. Gee Ming

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 347 of 520

Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)

Chan, 17 A.D.3d 356, 358, 792 N.Y.S.2d 589); Johnson v. NYU Langone Health, No. 22-CV-09456 (JHR), 2023 WL 6393466, at *2 (S.D.N.Y. Sept. 30, 2023).

**\*8** It is worth noting that in May 2022 the New York legislature enacted the Adult Survivors Act (ASA) which, in relevant part, "created a one-year revival period, starting November 24, 2022, during which adult survivors of sexual assault could sue their abusers despite the expiration of the previously applicable statutes of limitation." Carroll v. Trump, 650 F. Supp. 3d 213, 218 (S.D.N.Y. 2023). However, the Court concludes that the Adult Survivors Act does not apply to this claim.

First, as discussed above, the Court must conclude that Plaintiff's claims are "fanciful," "fantastic," and "delusional." See Gallop v. Cheney, 642 F.3d 364, 368 (2d Cir. 2011); see also Neitzke v. Williams, 490 U.S. 319, 324-25 (1989). Plaintiff's claims are severely irrational and logically disconnected. See *supra* Sec. 1. Therefore, Plaintiff does not allege facts warranting equitable tolling of the claims or revival under the Adult Survivors Act. See generally Jones v. N.Y.P.D., No. 23-CV-9515 (LTS), 2024 WL 325361 (S.D.N.Y. Jan. 29, 2024); see also Frost v. CVR Assocs. Inc., No. 1:19-CV-9190 (CM), 2019 WL 6340993, at *1 (S.D.N.Y. Nov. 26, 2019).

Second, this Complaint was filed in October 2022, before the ASA became effective. See N.Y. C.P.L.R. 214-j (McKinney) ("every civil claim or cause of action .... which would constitute a sexual offense" ... is hereby revived, and action thereon may be commenced *not earlier than six months after*, and not later than one year and six months after the effective date of this section.")(emphasis added); see also Jones v. Cattaraugus-Little Valley Cent. Sch. Dist., No. 19-CV-707S, 2022 WL 2124608, at *9 (W.D.N.Y. June 13, 2022)("Because Plaintiff commenced this action before the date the New York legislature authorized for the commencement of suits under the CVA, and because this Court finds no equitable reasons to relieve Plaintiff from the dates set by the New York legislature, the District's motion for summary judgment will be granted.").

Third, for a claim to be revived pursuant to the ASA, "a defendant's underlying conduct must 'constitute a sexual offense as defined in article one hundred thirty of the penal law' and have been 'committed against such person who was eighteen years of age or older.' " See N.Y. C.P.L.R. 214-j; see also Johnson v. NYU Langone Health, No. 22-

CV-09456 (JHR), 2023 WL 6393466, at *2 (S.D.N.Y. Sept. 30, 2023) (citing N.Y. Penal Law § 130.52(1)[4] and discussing that an allegation a defendant "put his bare hand between the plaintiff's buttocks cheeks," does not meet the requisite standard for revival under the Adult Survivors Act.). The claim here does not allege anything that would constitute a sexual offense under NY CPL 130. Thus, for that additional reason, the ASA does not apply here.

**\*9** Thus, since the Adult Survivors Act does not apply and Plaintiff alleges the events happened on "January 23, 2017" and on "April 18, 2017 and ... within days of that time," the Plaintiff's last date to file a claim alleging a sexual assault in New York was April 18, 2018. Therefore, these claims are time-barred under New York law.

Under New Jersey law, Plaintiff had two years to file a lawsuit alleging sexual assault. See N.J.S.A. 2A:14-2(a) ("Except as otherwise provided by law, every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued ...."); see generally Doe v. Est. of C.V.O., 477 N.J. Super. 42, 303 A.3d 678 (App. Div. 2023). Therefore Plaintiff's last date to file a complaint in New Jersey was April 18, 2019.

Plaintiff did not start this lawsuit until October 2022. Dkt. No. 2. Therefore, Plaintiff's sexual assault claims are time-barred.

### 5. Conspiracy

Plaintiff's Complaint asserts the actions against them are "interrelated and can be described as a conspiracy against [Plaintiff's] rights." Id.

However, a "conspiracy to commit a [tort] is never of itself a cause of action." Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986). "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." Id. see also Carlson v. American Intern. Group, Inc., 30 N.Y.3d 288, 310 (2017) ("New York does not recognize a freestanding claim for conspiracy.").

Under New York law, to establish a claim of civil conspiracy, a "plaintiff must demonstrate the primary tort, plus the following four elements: [1] an agreement between two or more parties; [2] an overt act in furtherance of the agreement

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 348 of 520

Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)

[that constitutes an independent tort or wrongful act]; [3] the parties' intentional participation in the furtherance of a plan or purpose; and [4] resulting damage or injury." Cohen Brothers Realty Corp. v. Mapes, 181 A.D.3d 401, 404 (1st Dep't 2020). New Jersey law is the same. See e.g. Brown ex rel. Est. of Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 517 (D.N.J. 2002); Assadourian v. Harb, No. CIV.A. 06-896 GEB, 2010 WL 4446632, at *4 (D.N.J. Nov. 1, 2010), aff'd, 430 F. App'x 79 (3d Cir. 2011).

Plaintiff has not alleged any of the elements of a conspiracy. There is no alleged agreement and no alleged underlying tort that is not time-barred. See generally Dkt. No. 2. Plaintiff does not say when any alleged conspiracy occurred. For these reasons, the conspiracy claims against the Defendants should also be dismissed.

### 6. Unfair Trade Practices
Although a claim for unfair trade practices is not contained in the Complaint, in the response to Judge Swain's Order to Show Cause on the issue of subject matter jurisdiction, Plaintiff alleged that "federal question jurisdiction appears to exist .... federal law bans unfair or deceptive acts." See Dkt. No. 5. [5]

Any claim of a violation under federal law for unfair or deceptive trade practices would be governed by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, which does not provide a private right of action. Hannan v. Rose, 2020 WL 3965341, * 10 (S.D.N.Y. Feb. 28, 2020)(citing Naylor v. Case & McGrath, Inc., 585 F.2d 557, 561 (2d Cir. 1978))("it is clear that no private right of action arises under [15 U.S.C. § 45]") (collecting cases); see Oliver v. U.S. Bancorp, No. 14-CV-8948, 2015 WL 4111908, at *6 (S.D.N.Y. July 8, 2015); Shostack v. Diller, No. 15cv2255 (GBD) (JLC), 2015 WL 5535808, at *9 (S.D.N.Y. Sept. 16, 2015) report and recommendation adopted, 2016 WL 958687 (S.D.N.Y. Mar. 8, 2016); Rotblut v. Ben Hur Moving & Storage, Inc., 585 F. Supp. 2d 557, 560 (S.D.N.Y. 2008); see also Yerushalayim v. Liecthung, No. 19CV4101 (AMD) (LB), 2019 WL 3817125, at *3 (E.D.N.Y. Aug. 13, 2019) (same); Gray v. Capstone Fin., No. 120-CV-0896(GLS) (CFH), 2020 WL 6526086, at *7 (N.D.N.Y. Sept. 22, 2020), report and recommendation adopted, No. 120-CV-896(GLS) (CFH), 2020 WL 6504625 (N.D.N.Y. Nov. 5, 2020). Since no private right of action exists, only the government can allege a federal unfair trade practices claim. Therefore, Plaintiff's federal unfair trade practice claims should be dismissed.

**\*10** Similarly, in New Jersey, N.J.S.A. § 17:29B-1 et seq., which regulates trade practices in the business of insurance, "does not create individual or private causes of action." Pierzga v. Ohio Cas. Group of Ins. Companies, 504 A.2d 1200, 1204 (N.J. Super. Ct. App. Div. 1986)(citing N.J.S.A. § 17:29B-1 et seq.; see also Nationwide Mut. Ins. Co. v. Caris, 170 F. Supp. 3d 740 (D.N.J. 2016))("no private right of action for policyholders against their insurers based on UCSPA violations ..."); Rothschild v. Foremost Ins. Co., 653 F.Supp.2d 526, 537 (D.N.J. 2009).

New York, on the other hand, does permit private plaintiffs to bring lawsuits for "unfair and deceptive trade practices." See generally New York General Business Law ("GBL") § 349(a) (prohibiting "[d]eceptive acts or practices in the conduct of any business, trade or commerce ...") and § 349(h)(permitting a private right of action); see also Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 37 N.Y.3d 169, 176 (2021)("To ensure the broadest enforcement of the statute, the legislature added a private right of action for injunctive and monetary relief (GBL § 349[h]). Thus, in addition to the Attorney General, individuals and businesses may bring an action under GBL § 349."); Feinberg v. Federated Dept. Stores, Inc., 15 Misc. 3d 299, 304 (Sup Ct, New York County 2007).

However, unfair or deceptive trade practice claims under New York's GBL § 349 are "subject to the three-year limitations period." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777 (2012); Marshall v. Hyundai Motor Am., No. 12–CV–3072 (KMK), 51 F. Supp. 3d 451 (S.D.N.Y. 2014); see Malek v. AXA Equitable Life Ins. Co., No. 20-CV-04885(DGA)(YS), 2023 WL 2682408, at *8 (E.D.N.Y. Mar. 29, 2023); see also Nachman v. Tesla, Inc., No. 22-CV-5976(RPK)(ST), 2023 WL 6385772, at *3 (E.D.N.Y. Sept. 30, 2023).

Given that Plaintiff alleges the events happened in "in January 23, 2017" and on "April 18, 2017" the Plaintiff's last date to file a claim under New York's GBL § 349 was April 18, 2020. Dkt. No. 2 at 1. Since the Complaint was not filed until October 2022, Plaintiff's state law unfair trade practice claims should also be dismissed. Dkt. No. 2.

### 7. Leave to Amend
Generally, "pro se litigants should be given leave to amend a complaint if a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)(citing Gomez v.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 349 of 520

Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)

USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). However, in light of the fact that even liberally construed, these claims are time-barred and factually frivolous no leave to amend should be granted. See Licorish-Davis v. Mitchell, No. 12-CV-601 ER, 2013 WL 2217491, at *10 (S.D.N.Y. May 20, 2013); Frost v. CVR Assocs. Inc., No. 1:19-CV-9190 (CM), 2019 WL 6340993, at *1 (S.D.N.Y. Nov. 26, 2019).

**8. Other Grounds for Dismissal Not Considered**

The Court declines to reach Defendants' remaining arguments for dismissal. [6]

### IV. RECOMMENDATION

For all the foregoing reasons, the Court recommends that the Motions to Dismiss be GRANTED in their entirety and the case be closed.

### V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*11** Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed. R. Civ. P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court. Any requests for an extension of time for filing objections must be directed to Judge Caproni. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1421152

---

### Footnotes

1    Judge Swain previously issued an Order to Show Cause to Plaintiff to demonstrate subject matter jurisdiction. Dkt. No. 4. Plaintiff submitted a declaration at Dkt. No. 5 that alleged diversity jurisdiction, that the Berkshire Hathaway, MedPro Group, and Princeton Insurance Company Defendants are "active" in New York, and that "federal question jurisdiction appears to exist .... federal law bans unfair or deceptive acts." See Dkt. No. 5. While not included in the Complaint, the Court will consider these claims.

2    Defendants raise numerous arguments in their Motions to Dismiss. See Dkt. Nos. 33 at 1 ("Pursuant to N.Y. C.P.L.R. § 214-a, dismissing the claim sounding in medical malpractice as time-barred and, in any event, pursuant to Fed. R. Civ. P., Rules 8(a)(2) and 12(b)(6), for failure to state a claim upon which relief may be granted; and/or (b) Pursuant to N.Y. C.P.L.R. § 215(3) or § 214-a, dismissing the claim sounding in the intentional tort of battery as time-barred and, in any event, pursuant to Fed. R. Civ. P., Rules 8(a) (2) and 12(b)(6), for failure to state a claim upon which relief may be granted; and/or (c) Dismissing any conspiracy claim for failure to state a claim upon which relief may be granted; and/or (d) Pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1915(e)(2)(B)(i), dismissing the complaint as patently frivolous, irrational and vexatious; or (e) Pursuant to Fed. R. Civ. P., Rule 12(b)(7) and Rule 19, dismissing the complaint for failure to join an indispensable party; or (f) Striking plaintiffs' claim for punitive damages; and/or (g) Assuming the complaint asserts a substantial claim, then pursuant to Fed. R. Civ. P. 17 and N.Y. C.P.L.R. §§ 1201 and 3211, dismissing the complaint for want of capacity; or (h) Pursuant to Fed. R. Civ. P., Rule 17, compelling plaintiff to appear for a competency hearing; and (i) Granting moving defendant such other and different relief as the Court may deem just and proper."); Dkt. No. 40 at 10 (Defendants "move to dismiss this action as

**Leib-Podry v. Tobias, Not Reported in Fed. Supp. (2024)**

Case 1:25-cv-00968-ECC-ML   Document 54   Filed 11/26/25   Page 350 of 520

it is frivolous, this Court does not have jurisdiction over the defendants, and plaintiff fails to state a claim for relief.").

3   Plaintiff alleges receiving treatment "between January 23, 2017 and the present time" but the Complaint alleges no other dates besides the January and April dates nor any continuing treatment. See generally Dkt. No. 2.

4   The Court also concludes that Plaintiff has not made out an allegation for Sexual Abuse in the Third Degree under CPL § 130.55. While Plaintiff alleges "on one occasion [Dr. Tobias] rubbed his genitals against me when I stood up and tried to leave the examination room" this does not sufficiently allege a violation of CPL § 130.55, which requires a defendant to subject "another person to sexual contact without the latter's consent" with "sexual contact" defined as "any touching of the sexual or other intimate parts of a person *for the purpose of gratifying sexual desire of either party* ..." See N.Y. Penal Law § 130.00 (McKinney)(emphasis added). While Plaintiff alleges that Dr. Tobias's interest in performing the surgery was "sexual in nature" the allegation that Dr. Tobias rubbed his genitals against the Plaintiff as Plaintiff left the room does not sufficiently allege that Dr. Tobias did so "for the purpose of gratifying" either his own or Plaintiff's sexual desires. Therefore, the Complaint does not allege a violation of CPL § 130.

5   Generally, allegations must be included on the face of the Complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002). However, as Plaintiff is *pro se*, the Court will consider this claim.

6   Defendants raise numerous arguments in their Motions to Dismiss. See Dkt. Nos. 33 and 40.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2697452

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Sally LYDDY, et al.

v.

BRIDGEPORT BOARD OF EDUCATION, et al.

Civil No. 3:06CV1420(AHN).

|

Sept. 11, 2007.

**Attorneys and Law Firms**

John W.L. Walshe, Bridgeport, CT, for Sally Lyddy.

Carolyn Roberts Linsey, Jeffers & Ireland, Fairfield, CT, Matthew Scott Hirsch, Law Offices of Matthew S. Hirsch LLC, Trumbull, CT, for Bridgeport Board of Education.

*RULING ON PENDING MOTIONS*

ALAN H. NEVAS, United States District Judge.

**\*1** The plaintiffs, Sally Lyddy ("Lyddy") and Maria Marcoccia ("Marcoccia"), bring this Title VII employment action against the City of Bridgeport ("City"), the Bridgeport Board of Education ("Board"), and Andrew Cimmino ("Cimmino"), the principal of Thomas Hooker School ("School"). Lyddy, a former teacher at the School, and Marcoccia, the School's former sexual harassment officer, both still work in the Bridgeport school system. They allege that when they worked at the School, they suffered sexual harassment and discrimination as a result of Cimmino's "sexual antics," which they say the Board condoned, permitted and refused to stop. In addition to their Title VII claims against all defendants, Lyddy and Marcoccia also allege a "negligent and/or intentional" infliction of emotional distress against Cimmino, and an "attempted due process" claim against the City.

The City, the Board and Cimmino have moved to dismiss the complaint [docs. 26 & 28] and to strike numerous allegations [docs.26 & 30]. Lyddy and Marcoccia have moved to disqualify counsel for the City [docs.52 & 53]. For the following reasons, the motions to dismiss and strike are GRANTED in part and DENIED in part. The motions to disqualify counsel are DENIED.

*STANDARD*

The function of a Rule 12(b)(6) motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984). When considering a motion to dismiss, the court must accept the facts alleged in the complaint as true, draw all reasonable inferences from those facts in the light most favorable to the plaintiff, and construe the complaint liberally. *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). The district court may dismiss a claim only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S., 544 127 S.Ct. 1955, 1960 (2007);[1] *see also Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007). Although detailed factual allegations are not required, a plaintiff must provide the grounds of her entitlement to relief beyond mere "labels and conclusions." A "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic,* 127 S.Ct. at 1964–65. The complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and demonstrate a right to relief. *Id.* Conclusory allegations are not sufficient. Under the plausibility standard, a claim must be amplified "with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d at 157–58.

*DISCUSSION*

The City and Cimmino move to dismiss Lyddy's and Marcoccia's Title VII claim. The City maintains that they do not allege that it is their employer and thus it cannot be liable under Title VII. Cimmino maintains that the Title VII claim against him must be dismissed because there is no individual liability under Title VII. Cimmino moves as well to dismiss the second count, in which Lyddy and Marcoccia allege a claim against him for negligent and/or intentional infliction of emotional distress. The City also moves to dismiss the third count, which alleges an attempted due process violation, on the grounds that the complaint does not allege what rights were abridged or the manner in which they were abridged. The Board joins in moving to dismiss this count to the extent it is brought against it. The City, the Board, and Cimmino

move to dismiss the fourth count on the grounds that it does not articulate a legally cognizable cause of action.

**\*2** The City, the Board, and Cimmino also move to strike numerous paragraphs of the complaint on the grounds that the allegations are immaterial, scandalous, and impertinent.

Lyddy and Marcoccia move to disqualify counsel for the City on the ground that counsel's simultaneous representation of the City and the Board presents an impermissible and insoluble conflict of interest.

I. *Title VII Claim Against the City & Cimmino*

The City maintains that the Title VII claim against it must be dismissed because Lyddy and Marcoccia do not, and cannot, allege that it was their employer. The City is correct.

Throughout the complaint, Lyddy and Marcoccia only allege that the Board was their employer. For example, in paragraph 4, the complaint alleges that "the Board is the employer of plaintiffs." In paragraph 9(a), it alleges that "the Board engaged in employment discrimination." Paragraph 10 alleges that "Lyddy has been employed by the Board since 1990 ... Marcoccia has been employed by the Board since approximately 1988." Paragraph 25 alleges that "[d]espite the complaints made by plaintiffs to the Board, ... the Board failed and refused to terminate" Cimmino's sexual harassment of them. And in paragraph 26, it says that Cimmino's sexual harassment, abuse, and discrimination was ratified and condoned by the Board and the Board's failure to terminate or restrain him rendered his conduct to be a policy of the Board. In contrast, the City is mentioned only in paragraph 5, which states that "the City ... is a municipal corporation with authority to review the Board's acts and actions." The complaint simply does not allege any involvement of or acts by City officials, as opposed to Board officials, in the alleged conduct forming the basis of the Title VII claim.

The existence of an employer-employee relationship is the touchstone of liability under Title VII. *Gulino v. New York State Educ. Dept.,* 460 F.3d 361, 370 (2d Cir.2006). It is well settled that under Title VII an employee may only sue her employer. *E.g., Nanton v. City of New York,* No. 05civ8989(DLC), 2007 WL 2319131 (S .D.N.Y. Aug. 10, 2007). To discern the existence of an employment relationship, the court must start with traditional indications of employment under the common law of agency. *Gulino,* 460 F.3d at 379. This involves an examination of whether the putative employer had any role in hiring, promoting,

demoting, or compensating the employee and the extent to which it had control over the day-to-day activities of the employee. *Id.* (citing *Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730 (1989)). There must be a relationship where the level of control is direct, obvious and concrete, not merely indirect or abstract. *Id.*

Here, not only do Lyddy and Marcoccia allege that the Board, not the City, is their employer, there is also nothing in the alleged facts from which the court could determine, based on traditional agency principles, that the City is their employer. [2] Moreover, such a finding would be contrary to Connecticut statutes which make it clear that local boards of education, not municipalities, are charged with maintaining public schools and implementing the state's educational interests. In fact, Connecticut statutes give local school boards the express authority to employ and dismiss the schools' teachers and staff. Conn. Gen.Stat. § 10–220; Conn. Gen.Stat. § 10–241 ("Each school district shall be a body corporate and shall have the power to sue and be sued; ... and to employ teachers, ... and pay their salaries."); Conn. Gen.Stat. § 10–151 (governing procedures by which local school boards promote, terminate, and compensate teachers).

**\*3** In the absence of any allegation that the City is the employer of Lyddy or Marcoccia, or any facts from which the court could determine that the City had any control over the terms and conditions of their employment or day-to-day activities, and in light of the provisions of the Connecticut statutes which expressly delegate control over public schools to local school boards, including the employment of teachers and staff, it does not appear that Lyddy and Marcoccia can prove any facts to support their Title VII claim against the City.

The Title VII claim against Cimmino must also be dismissed because individuals, including supervisors, are not liable under Title VII. *E.g., Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004); *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995); *Martin v. Town of Westport* 329 F.Supp.2d 318, 325 (D.Conn.2004). Rather, as noted, liability under Title VII is limited to employers.

Because the allegations in the complaint are not sufficient to state a claim for relief under Title VII that is plausible on its face as to the City and Cimmino, and because it appears beyond doubt that they can prove no set of facts in support of their Title VII claim against either of these defendants,

count one of the complaint against them is dismissed with prejudice. [3]

## II. *Emotional Distress Claim Against Cimmino*

The second count of the complaint alleges that Cimmino conducted himself "for the negligent and/or joint purposes of inflicting emotional distress upon plaintiffs and divesting them of their right to have their grievances redressed." [4] Cimmino moves to dismiss this count on the grounds that the alleged conduct is not extreme and outrageous and that it did not occur in the context of the termination of employment.

### A. *Intentional Infliction of Emotional Distress*

To establish a claim for intentional infliction of emotional distress, a plaintiff must allege that: (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *E.g., Golnik v. Amato,* 299 F.Supp.2d 8, 14–15 (D.Conn.2003). In addition, to be actionable, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' ... Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient." *Appleton v. Bd. of Educ.,* 254 Conn. 205, 210–11 (2000). It is for the court to determine in the first instance whether the alleged conduct of a defendant, as a matter of law, satisfies these requirements. *Id.* at 210; *Ancona v. Manafort Bros., Inc.,* 56 Conn.App. 701, 712 (2000).

**\*4** In the employment context, courts carefully review intentional infliction of emotional distress claims. *Grigorenko v. Pauls,* 297 F.Supp.2d 446, 448 (D.Conn.2003) ("Intentional infliction of emotional distress claims are often pleaded but rarely get very far under the *Appleton* standard."); *Golnik v. Amato,* 299 F.Supp.2d at 15 (citing cases).

Lyddy and Marcoccia do not identify the specific conduct that forms the basis of this claim, but the court construes the claim to be based only on Cimmino's alleged conduct that was

directed at them, [5] consisting of (1) flaunting a device used to heighten sexual arousal, (2) wearing a tie bearing a painting of a naked woman, (3) leaving a sexually oriented newspaper on Marcoccia's desk, (4) bragging about his visits to a nudist camp and showing pictures of himself at the camp, (5) boasting about his trips to "S & M" clubs and inviting Lyddy to accompany him to one, (6) frequently stating he could get rid of anyone he wanted, (7) filing a criminal complaint accusing Lyddy and Marcoccia of complicity in connection with financial irregularities in an after-school program even though the charges had been found to be without merit by the Board and Internal Affairs, and that this coincided with the death of Lyddy's husband.

The court does not, however, need to decide whether this alleged conduct is sufficiently extreme and outrageous because the claim is otherwise deficient for failing to allege the other essential elements of an intentional infliction of emotional distress claim, i .e., that Cimmino intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct and that his conduct was the cause of the alleged emotional distress. *E.g., Golnik v. Amato,* 299 F.Supp.2d at 14–15. Accordingly, because the factual allegations are not sufficient to state such a claim that is plausible on its face, it is dismissed with leave to replead.

### B. *Negligent Infliction of Emotional Distress*

A cause of action for negligent infliction of emotional distress is limited to conduct arising out of the termination of employment. *Perodeau v. City of Hartford,* 259 Conn. 729, 762–63 (2002) ("[A]n individual municipal employee may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment."). Cimmino's alleged conduct did not occur in the termination of employment. Indeed, both Lyddy and Marcoccia are still employed by the Board. Thus, this claim is dismissed with prejudice.

## III. *Due Process Violation*

In the third count, Lyddy and Marcoccia allege that the City [6] "has attempted to abridge [their] due process rights by allowing defendant Cimmino's extortion attempts to proceed, by conducting a criminal investigation of them and threatening prosecution." The City maintains that these

allegations are insufficient to allege a civil rights claim. The court agrees.

**\*5** This claim is deficient in a number of ways. First, there is no direct cause of action under the Fourteenth Amendment. *E.g., Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 732 n. 3 (7th Cir.1994) (holding that there is no direct cause of action under the Fourteenth Amendment and that Congress provided a means to vindicate these rights in 42 U.S.C. § 1983); *Turpin v. Mailet,* 591 F.2d 426, 427 (2d Cir.1979) (same). However, in light of the court's obligation to construe complaints liberally, even those filed by attorneys, the court construes it as alleging a violation of § 1983. *See e.g., Leonard P'ship v. Town of Chenango,* 779 F.Supp. 223 (N.D.N.Y.1991).

Second, there can be no recovery under § 1983 for an attempted constitutional violation; only a claim of actual deprivation is cognizable under the statute. *Hale v. Townley,* 45 F.3d 914, 920 (5th Cir.1995); *Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992); *Dixon v. City of Lawton,* 898 F.2d 1443, 1449 (10th Cir.1990); *Dooley v. Reiss,* 736 F.2d 1392, 1394–95 (9th Cir.1984); *Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980); *Ashford v. Skiles,* 837 F.Supp. 108, 115 (E.D.Pa.1993); *Defeo v. Sill,* 810 F.Supp. 648, 658 (E.D.Pa.1993). "[T]he mere attempt to deprive a person of his [constitutional] rights is not, under usual circumstances, actionable under section 1983." *Andree v. Ashland County,* 818 F.2d 1306, 1311 (7th Cir.1987).

Third, even construing this count as asserting a § 1983 claim does not save it from dismissal because it contains only broad and conclusory statements and not any specific allegations of fact which indicate the deprivation of a constitutional right. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987); *Martinez v. Brevard County Parks & Recreation,* No. 6:06–cv–116–Orl–18DAB, 2006 WL 4694730 (M.D.Fla. Apr. 05, 2006). It also does not identify the protected liberty interest or property interest that was allegedly deprived and does not state whether the alleged due process violation is substantive or procedural. *See Hennessy v. City of Long Beach,* 258 F.Supp.2d 200, 206 (E.D.N.Y.2003); *Huff v. West Haven Bd. of Ed.,* 10 F.Supp.2d 117, 121–22 & n. 11 (D.Conn.1998).

Fourth, even if a § 1983 violation had been properly pleaded, the claim would be deficient because there is no allegation of any policy or custom of the City that caused the asserted constitutional deprivation under the guidelines established by the Supreme Court. *See Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91 (1976) (holding that a municipality may be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue); *see also e.g., Jenkins v. City of New York,* 478 F.3d 76 (2d Cir.2007); *Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 137 (2d Cir.1999).

For all of these reasons, the third count is defective on its face and is dismissed with prejudice.

IV. *Fourth Count*

**\*6** The fourth count of the complaint states that "plaintiffs pray that defendants be prohibited from continuing their harassment of plaintiffs as described above and specifically that they be prohibited from their attempts to engage in any activity related to the criminal prosecution of plaintiffs until the resolution of this case." The defendants assert that this claim is legally deficient. The court agrees.

In so far as this count purports to set forth a claim for relief, it is deficient because a claim for relief must contain a recitation of operative facts that give rise to an enforceable right. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187 (2d Cir.1943). To properly allege a claim for relief, a plaintiff must provide a short and plain statement showing that the pleader is entitled to relief so that the defendant is given fair notice of what the claim is and the grounds on which it rests. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007). The fourth count does not contain a statement of the claim showing that Lyddy and Marcoccia are entitled to relief or the grounds on which the claim rests.

Rather than stating a claim for relief, the fourth count appears to set forth a prayer for temporary injunctive relief. As such, as a procedural matter, it is not properly asserted as a separate count of the complaint. *See* Fed.R.Civ.P. 10(b). As a substantive matter, such relief can not be granted because under Rule 65(d), an injunction must be more specific than a simple command that the defendants obey the law. *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41 (2d Cir.1996) (holding it improper to issue an injunction barring a defendant from making threats of spurious lawsuits); *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 748 (2d Cir.1994) (noting that an injunction cannot be broadly worded to generally prohibit unlawful activity); *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1531 (11th Cir.1996) (noting that appellate courts will not countenance injunctions that merely require someone to obey the law); *Epstein Family P'ship v. Kmart Corp.,* 13 F.3d 762, 771 (3d Cir.1994) ( "[I]njunctions, which carry possible contempt penalties for their violation must be tailored to

remedy the specific harms shown rather than to enjoin all possible breaches of the law.").

Indeed, to the extent Lyddy and Marcoccia seek to enjoin or impose unwarranted burdens on the City's ability to prosecute criminal conduct, such relief would only be appropriate in exceptional circumstances, if at all. *See Wooley v. Maynard, 430 U.S. 705 (1977)* (noting that as a general rule, a court will not enjoin the enforcement of a criminal statute, even if unconstitutional, because doing so would seriously impair the state's interest in enforcing its criminal laws and implicate the concerns for federalism, and that to justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights). This is not such an exceptional case.

**\*7** Accordingly, the fourth count, in so far as it is intended to be a claim for relief, is dismissed with prejudice.

## V. *Motion to Strike*

The City, the Board, and Cimmino all move to strike the following allegations of the complaint: (1) the language in paragraph 12 which characterizes Cimmino's conduct as "sexual antics ... reminiscent of the boom-boom room" and mentions an alleged instance where Cimmino restrained a boy with masking tape and another where he put a kindergarten boy across his legs and massaged his buttocks; (2) the language in paragraph 13 that the school superintendent treated Lyddy and Maroccia not as victims, but as perpetrators and their allegations as an embarrassment; (3) the language in paragraph 15 that Cimmino was "perhaps emboldened by his employer's failure to discipline him;" and (4) paragraphs 19, 22, and 27 in their entirety.

Although motions to strike are generally disfavored, they may be granted if the allegations have no bearing on the claims alleged, are likely to prejudice the movant, or have "criminal overtones." *G.I. Holdings, Inc. v. Baron & Budd,* 238 F.Supp.2d 521, 555 (S.D.N.Y.2002); *see also* Fed.R.Civ.P. 12(f) (stating that redundant, immaterial, impertinent, or scandalous matter may be stricken from any pleading).

With regard to the allegations in paragraph 12 which characterize Cimmino's conduct as "sexual antics" reminiscent of a "boom-boom room," the court agrees that they improperly cast a derogatory and salacious light on the allegations and are irrelevant and immaterial and thus they are stricken. The court disagrees, however, that the allegations

relating to Cimmino's conduct vis-a-vis students are irrelevant to the sexual harassment claim and thus these allegations are not stricken.

With regard to paragraphs 13 and 15, the defendants are correct that it is improper for Lyddy and Maroccia to allege their interpretation of the facts or to surmise as to the reasons for any alleged conduct, i.e., that the superintendent treated them as perpetrators not as victims (paragraph 13), and that Cimmino was "perhaps emboldened by his employer's failure to discipline him" (paragraph 15). These assertions are stricken.

With regard to paragraphs 19 and 27, the allegations relating to Lyddy's and Maroccia's personal lives and health, i.e., (1) that the filing of the criminal complaint against Lyddy and Maroccia coincided with the death of Lyddy's husband (paragraph 19) and (2) that the emotional distress Lyddy and Maroccia suffered "has not been lessened by their personal health issues" and the details of those health issues (paragraph 27) are immaterial and irrelevant and are stricken. The remaining allegations in these paragraphs appear to be relevant and are not stricken.

Paragraph 22, which only contains statements about the prominence of the "Lyddy clan" in the Bridgeport area and the details of certain family members' accomplishments, is stricken in its entirety as irrelevant and immaterial.

## VII. *Motions to Disqualify Counsel For the City*

**\*8** Lyddy and Maroccia move pursuant to rules 1.7,[7] 1.8(b), and 1.9(2)[8] of the Connecticut Rules of Professional Conduct to disqualify counsel from jointly and simultaneously representing both the City and the Board. They assert that counsel's joint representation of both defendants creates an insoluble conflict "stemming from the cross claims which independent counsel for each would plead against the other ... center[ing] around accusations that the other's action/inaction, misconduct/inattention, hiring policies/mismanagement/lack of supervision and so forth brought them in as defendants to this action."

Even if the motions to disqualify had merit, and even if Lyddy and Maroccia had standing to assert such a conflict of interest,[9] the motions are denied as moot in light of the fact that the claims against the City are dismissed.

*CONCLUSION*

For the foregoing reasons, the motion of the City and the Board [doc. # 26] to dismiss is GRANTED. Cimmino's motion to dismiss [doc. # 28] is GRANTED. The motions to strike [docs.26 and 30] are GRANTED in part and DENIED in part. Lyddy and Marcoccia shall file an amended complaint consistent with this ruling within 30 days. Lyddy's and

Marcoccia's motions to disqualify counsel [docs.52 and 53] are DENIED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2697452

---

## Footnotes

1    In *Bell Atlantic,* the Supreme Court indicated that the accepted rule of *Conley v. Gibson,* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, had outworn its usefulness and that it was time to adopt a new and heightened pleading standard ." *127 S.Ct. at 1968* (*quoting Conley v. Gibson,* *355 U.S. 41, 45–46 (1957)*). After *Bell Atlantic,* the Second Circuit questioned whether the Court intended the stricter standard for assessing the adequacy of pleadings announced in *Bell Atlantic* should apply generally or only in antitrust cases, and concluded that "the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible plausibility standard." *Iqbal v. Hasty,* *490 F.3d 143, 157–58 (2d Cir.2007)*.

2    Although Lyddy and Marcoccia assert in their opposition papers that under general agency principles the City can be deemed their employer because they are paid out of the City treasury, this factual assertion is not alleged in the complaint and thus cannot be considered by the court. *Henthorn v. Dep't of Navy,* *29 F.3d 682, 688 (D.C.Cir.1994)* (noting that factual allegations in briefs or memoranda of law may not be considered when deciding a Rule 12(b)(6) motion); *cf. Behrens v. Pelletier,* *516 U.S. 299, 309 (1996)* (noting that the facts alleged in the complaint control for the purpose of a motion to dismiss).

3    Lyddy and Marcoccia assert in their opposition papers that the first claim, even though it only alleges that the City deprived them of their rights "as provided by Title VII of the Civil Rights Act of 1964, § 710, et seq. as amended *42 U.S.C. § 2003, et seq*[,]" somehow also states a "common law tort" claim against the City, but they do not identify the nature of this "common law tort," nor do they allege any acts or conduct by the City to support any tort claim. Although the court must, on a motion to dismiss, liberally construe a complaint, *Gregory v. Daly,* *243 F.3d 687, 691 (2d Cir .2001)*, this does not mean that it must construe a complaint to include a claim that is not pleaded. *Augienello v. Coast–to–Coast Fin. Corp.,* *64 Fed. Appx. 820 (2d Cir.2003)*. In the absence of any factual allegations supporting such a tort claim and the grounds on which it rests, this supposed claim, assuming it is alleged, is also dismissed. *Amron v. Morgan Stanley Inv. Advisors, Inc.,* *464 F.3d 338, 343 (2d Cir.2006)* (dismissing a complaint for failing to give the defendant fair notice of what the claim is and the grounds on which it rests). However, if Lyddy and Marcoccia wish to pursue such a tort claim they shall file an amended complaint within 30 days setting forth sufficient factual allegations to afford the defendants fair notice of the claim and the grounds on which it is based and is plausible on its face. *Bell Atlantic Corp. v. Twombly,* *127 S.Ct. at 1960*.

4    This allegation as to Cimmino's purpose is irrelevant in determining whether there is a viable claim of emotional distress because the dispositive issue is whether "the employer's conduct, not the motive behind the conduct, is extreme or outrageous." *Miner v. Town of Cheshire,* *126 F.Supp.2d 184, 195 (D.Conn.2000)*);

*Huff v. West Haven Bd. of Educ.,* 10 F.Supp.2d 117, 123 (D.Conn.1998) ("The employer's motive ... is not relevant to whether the act was outrageous; it is the act itself which must be outrageous.").

5    The complaint additionally alleges that Cimmino (1) restrained a student with masking tape over his mouth and body, (2) put a kindergarten boy across his lap and massaged his buttocks, and (3) gave a staff member thong underpants. Because this conduct was directed at third persons and not at either Lyddy or Marcoccia, it falls within the ambit of bystander emotional distress, which allows recovery, within certain limitations, for emotional distress as a result of harm done to a third party. *Clohessy v. Bachelor,* 237 Conn. 31, 49 (1996). However, to maintain such a claim, the *Clohessy* court set forth four requirements: First, the plaintiff bystander must be closely related to the injury victim. Second, the bystander's emotional injury must be caused by the contemporaneous sensory perception of the event or conduct that causes the injury. Third, the injury to the victim must be substantial, resulting in either death or serious physical injury. Finally, the plaintiff bystander must have sustained a serious emotional injury—that is, "a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstance." *Id.* at 52–54. Lyddy and Marcoccia do not make any of these allegations. Thus, the conduct that was directed at third parties and not directly at them cannot be considered in assessing Cimmino's conduct for the purpose of the claim for intentional infliction of emotional distress.

Moreover, in light of the fact that the emotional distress claim is only alleged as to Cimmino, the conduct of other Board members and the unidentified police detective, who allegedly called Lyddy at home on the day of her husband's funeral to tell her there was a warrant for her arrest and called Marcoccia and warned her that if she retained a lawyer a warrant for her arrest would be issued within 48 hours, is also not relevant.

6    The third count is only brought against the City. It does not name the Board in apparent recognition of the fact that a plaintiff may assert a claim under § 1983 simultaneously with a Title VII claim only if the two claims are sufficiently distinguishable. *See Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 576 (2d Cir.1989). Indeed, "although Title VII supplements and overlaps § 1983, it remains an exclusive remedy when a state or local employer violates only Title VII." *Moche v. City Univ. of N.Y.,* 781 F.Supp. 160, 168 (E.D.N.Y.1992) (quoting *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1576 (5th Cir.1989)).

7    Rule 1.7 of the Rules of Professional Conduct sets forth the general rule on conflicts of interest in an attorney-client relationship. *Burton v. Mottolese,* 267 Conn. 1 (2003). Subsection (a) of the Rule provides: "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) Each client consents after consultation."

8    Rule 1.9 of the Rules of Professional Conduct governs disqualification of counsel for a conflict of interest relating to a former client. The rule states that: "A lawyer who has formerly represented a client in a matter shall not thereafter: (1) Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or (2) Use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known."

9    Because of the substantial costs associated with disqualification of a party's counsel, and because disqualification is often misused by opposing parties as a procedural weapon and a technique of harassment, standing to seek disqualification is ordinarily limited to present or former clients who would be adversely affected by the continuing representation, whether or not they are parties to the present litigation. *Restatement (Third) of the Law Governing Lawyers* § 6. Thus, as a general rule, courts do not allow parties who are not directly affected to invoke the interests of a client with whom they are not in privity. *Id.; see also Premium Prods. Sales Corp. v. Chipwich, Inc.,* 539 F.Supp. 427, 435 (S.D.N.Y.1982) ("[U]nless the integrity of the

action currently before the court is threatened ..., the courts must refrain from imposing the burdens of an attorney disqualification on a client and leave the matter to state or federal disciplinary proceedings."); *United States Football League v. Nat'l Football League,* 605 F.Supp. 1448, 1452 (S.D.N.Y.1985) (citing authorities for the proposition that disqualification motions are "often interposed for tactical reasons" and produce unnecessary delay).

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 359 of 520

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1**  Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

**III. DISCUSSION**

## A. Review of a magistrate judge's decision

**\*2** If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933686, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

## B. *In Forma Pauperis* application

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information.

However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

## C. Sufficiency of the complaint

### 1. Legal Standard

**\*3** In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

### 2. Application

#### a. Color of state law

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.*

County of Westchester, 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals, Inc.,* No. 08–CV–0430, 2009 WL 3068217, *1 (2d Cir. Sept. 28, 2009); see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish

their personal involvement in any alleged constitutional deprivation. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See Abrahams v. Incorporated Village of Hempstead,* No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo,* that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

### c. Venue

Venue in federal-question cases is generally determined by 28 U.S.C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if

there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." *Concession Consultants, Inc. v. Mirisch,* 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

**\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by *Villalobos v. Smith,*  S.D.N.Y.,  July 12, 2022

2015 WL 1321685
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Michael MORAN, Plaintiff,
v.
COUNTY OF SUFFOLK and John
Doe, the person intended to be the police
officer who shot plaintiff, Defendants.

No. 11 Civ. 3704(PKC)(GRB).
|
Signed March 24, 2015.

**Attorneys and Law Firms**

Michael Caliguiri, Ralph G. Bell, Bauman & Kunkis, New York, NY, for Plaintiff.

Arlene S. Zwilling, Hauppauge, NY, for Defendants.

### *MEMORANDUM AND ORDER*

PAMELA K. CHEN, District Judge.

 **\*1** Plaintiff Michael Moran ("Plaintiff") initiated this proceeding against defendants County of Suffolk (the "County") and a John Doe police officer under 42 U.S.C. § 1983 alleging that the use of unreasonable deadly force against him violated his rights under, *inter alia,* the Fourth Amendment of the United States Constitution. (Dkt. 1 ("Complaint" or "Compl.").) Plaintiff also asserts claims under state law and common law, including claims for assault and battery and negligence. Presently before the Court is the County's motion for summary judgment. For the reasons set forth below, the County's motion is granted and the case is dismissed.

### *BACKGROUND*

#### I. *Factual Background*

Unless otherwise stated, the following facts are taken from Plaintiff's Rule 56.1 Statement (Dkt. 23 ("Pl.St.")), and all reasonable inferences are drawn in Plaintiff's favor as the non-moving party. [1]  *See Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

On August 4, 2010, at around 4:00 p.m., Plaintiff was waiting for his girlfriend outside a Dunkin Donuts located in West Babylon, New York. (Pl.St.¶ 3.) Plaintiff was sitting on a bench and had with him a black fabric backpack containing his laundry. (*Id.* ¶ 5.) Plaintiff observed two police cars enter the Dunkin Donuts parking lot. (*Id.*¶ 4.) After a few moments, Plaintiff picked up his backpack and walked to the entrance of the Dunkin Donuts. (*Id.* ¶ 5.) From outside, Plaintiff saw his girlfriend in handcuffs and struggling with police officers. (*Id.* ¶ 6; Dkt. 21 (Declaration of Ralph G. Bell, dated Mar. 17, 2014 ("Bell Decl.")) Ex. A at 150–51, 154.)

Suffolk County Police Officers Robert Bodenmiller ("Bodenmiller"), Jennifer Price ("Price"), and Charles Erdmann ("Erdmann") had gone to the Dunkin Donuts in response to a call about an emotionally disturbed woman in the vicinity. (Pl. St. ¶¶ 8, 11, 24; *see, e.g.,* Bell Decl. Ex. B at 15–18.) Officers Bodenmiller and Price identified Plaintiff's girlfriend as someone who matched the description they were provided, and were in the process of detaining and questioning her. (Bell Decl. Ex. B at 24–38.) At the time, Bodenmiller and Price each had a baton, mace, a taser, and a Glock semiautomatic handgun. (Pl.St.¶ 23.)

Plaintiff ran inside and stopped just inside the entrance and dropped his backpack to the ground next to his left foot. (*Id.* ¶¶ 7, 35–36; Bell Decl. Ex. A at 158–60.) [2]  Plaintiff testified that Price, who was closest to him, approached him and instructed him to "calm down." (Pl. St. ¶ 38; Bell Decl. Ex. A at 161.) Bodenmiller "observed a dark colored object" in Plaintiff's right hand. (Pl.St.¶ 8.) Bodenmiller did not see Plaintiff point the object. (*Id.*¶ 9.) Nor did Plaintiff raise his hands toward the officers or verbally threaten them. (*Id.* ¶¶ 10, 12–14.) Bodenmiller saw Price turn towards Plaintiff, but did not hear her say anything or see her raise her hands. (*Id.* ¶ 15.) Bodenmiller further stated that Plaintiff did not lunge or jump at Price. Price never requested Bodenmiller's assistance or indicate to him that she felt threatened. (*Id.* ¶¶ 17–18.)

 **\*2** Without saying anything to Plaintiff, Bodenmiller fired two shots, aiming for Plaintiff's "center mass." (*Id.* ¶¶ 19–20, 41.) Bodenmiller testified that he had been trained to fire twice at the center mass of a subject when in close proximity, and, "[i]f the threat does not stop" to take a third shot to the head. (Bell Decl. Ex. B at 57–58.) Plaintiff was struck with

two bullets, one in the right index finger and one at the "rib line." (Pl.St.¶ 21.) Plaintiff heard "three pops" and felt pain in his stomach before falling to his knees and landing on his right side. (*Id.* ¶ 42.) No weapon or black object was ever found or recovered on or near Plaintiff's person following the shooting. (*Id.* ¶ 22.) Neither Price nor the third officer, Erdmann, drew their weapons during the incident. (*Id.* ¶¶ 17, 25.)

Two months after the shooting, Price issued Plaintiff a ticket for "obstructing governmental administration" at the instruction of one of her supervisors. (*Id.* ¶ 26.)

About a year after the shooting, on September 27, 2011, the Suffolk County Police Department issued a Department Directive regarding the "Use of Force–Use of Firearms and Deadly Physical Force" (hereinafter "Use of Force Directive" or "Directive"). (Bell Decl. Ex. H at 24–1.) The purpose of the Directive was to "establish[ ] the limits within which the use of deadly force, particularly the use of firearms, by members of the Suffolk County Police Department is permitted, and outlines certain situations in which the use of firearms, or other means of deadly force, is not permitted." (Pl. St. ¶¶ 28, 29; Bell Decl. Ex. H at 24–1.) Under the "Rules and Regulations" section of the Directive, "[a]n officer may discharge a firearm *only* in" specified situations, including "Confrontational Situations" defined as "[w]hen reasonable and necessary to defend an officer or another from what the officer reasonably believes to be the use, or imminent use, of deadly force." (Pl. St. ¶ 30; Bell Decl. Ex. H at 24–2 (emphasis in original).) The Use of Force Directive further provides that "[s]ince all possible combinations of circumstances cannot be envisioned ... a police officer may use deadly force as an emergency measure to avoid the imminent unlawful use of deadly force which is about to occur by reason of a situation occasioned or developed through no fault of the officer; and, which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability of avoiding such injury clearly outweighs the desirability of avoiding the conduct sought to be prevented by [the Directive's] Rules and Procedures." (Bell Decl. Ex. H at 24–4.)

Plaintiff alleges that Bodenmiller is the subject of another excessive force suit claiming that Bodenmiller wrongfully "utilized a shield to restrain" a prisoner, who subsequently died in police custody on May 6, 2011. (Bell Decl. Ex. B at 10–11; Pl. St. ¶ 27.)

## II. *Procedural History*

**\*3** Plaintiff commenced this action on August 1, 2011, naming as defendants the County and a John Doe as "the person intended to be the police officer who shot plaintiff." (Compl. at 1.) The County answered on August 16, 2011. (Dkt.3.) On September 6, 2011, Plaintiff submitted a letter to Magistrate Judge William. D. Wall requesting discovery regarding the identity of the police officer "in order that said individual may be correctly named and served in the lawsuit." (Dkt.4.) Following a pretrial conference, Judge Wall issued an order dated October 6, 2011 requiring that "[m]otions to join new parties or amend the pleadings" be filed by March 22, 2012 and that discovery be completed by June 14, 2012. (Dkt. 7–1 at 1.) On or around November 8, 2011, Plaintiff served a summons for John Doe "n/k/a Robert Bodenmiller" [3] via substitute service at the Suffolk County Police Department. (Dkt 8 at 2 (Proof of Service for John Doe).) Plaintiff did not, however, amend the Complaint to name Bodenmiller. Indeed, to this day, Plaintiff has not sought to amend the Complaint to name Bodenmiller as a defendant.

Thereafter, on June 20, 2012, Defendants furnished Plaintiffs with the Police Department's Internal Affairs file regarding the shooting, which indicated that Bodenmiller was the officer who shot Plaintiff. (*See* Dkt. 11; Bell Decl. Ex. H.) Plaintiff then deposed Bodenmiller on July 10, 2013. (Bell Decl. Ex. B.) On October 15, 2013, discovery concluded and the parties filed a joint proposed pretrial order that still indicated a "John Doe" on the caption. (Dkt. 16 at 1.) At a conference held on October 22, 2013, the Court granted the County leave to file its summary judgment motion.

## *LEGAL STANDARD*

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173 (2d Cir.2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* Because Plaintiff, as the non-moving party, has the "burden of proof at trial" on his claim, the County's ability to satisfy this standard as to any "essential element" of a claim "necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett,* 477 U.S. 317,

322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and entitles the County to summary judgment.

In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry,* 336 F.3d at 137 (citation and quotation omitted). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quotations and citations omitted). That party must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty., New York,* 541 F.3d 464, 471 (2d Cir.2008) (quotations and citation omitted).

## DISCUSSION

**I. *Plaintiff's Claims against the John Doe Police Officer***

**\*4** The Court initially addresses the parties' dispute regarding which defendants are involved in this action. Plaintiff alleges that the John Doe police officer named in the Complaint, now known to be Bodenmiller, used excessive force in violation of Plaintiff's constitutional rights. (Compl.¶¶ 8, 14.) In response to the County's summary judgment motion, Plaintiff asserts that the case must proceed against the John Doe officer because no summary judgment motion was filed on behalf of the John Doe officer, "now known to be Bodenmiller." (Dkt. 22 ("Pl.Mem.") at 11). The County disputes Plaintiff's contention on the basis that Bodenmiller has not been and cannot now be made a party to this case. (Dkt. 24–8 ("Reply") at 3.) The Court agrees.

Although Bodenmiller indisputably is the officer who shot Plaintiff, Plaintiff did not amend the Complaint to substitute Bodenmiller as the John Doe Defendant prior to the expiration of the applicable statute of limitations, nor, for that matter, has he done so at any point in this litigation. Plaintiff's failure to timely amend the Complaint is fatal to his claims against the John Doe Defendant.

Section 1983 claims arising in New York have a statute of limitations of three years. *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004). Here, Plaintiff's claim accrued on August 4, 2010, and the limitations period expired on August 4, 2013. Plaintiff filed his Complaint on August 1, 2011, naming as defendants the County and "John Doe, the person intended to be the police officer who

shot plaintiff." (Compl. at 1.) Plaintiff's claim against the County is timely. As to the individual officer Defendant, the general rule is that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)). Substitutions of a party's name for John Doe, therefore, "may only be accomplished" if the amended pleading relates back to the date of the complaint under Federal Rule of Civil Procedure 15(c). *Aslanidis,* 7 F.3d at 1075. Since Plaintiff did not amend his Complaint to substitute Bodenmiller for the John Doe Defendant, Plaintiff's claims against Bodenmiller are timely only if he is permitted to file an amendment that "relates back" to the Complaint, filed on August 1, 2011. *See Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 541, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010) ("Rule 15(c of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."); *Laureano v. Goord,* No. 06 Civ. 7845(SHS) (RLE), 2007 WL 2826649, at \*5 (S.D.N.Y. Aug. 31, 2007) ("When the statute of limitations would otherwise bar an amendment, Rule 15(c) allows the claim if it 'relates back' to the original complaint." (citing Fed.R.Civ.P. 15(c)(3)).

**\*5** Plaintiff's counsel has not attempted to substitute Bodenmiller either by moving to amend the Complaint, or by addressing the amendment issue in his opposition to the County's motion for summary judgment. Though it appears that Plaintiff would prefer the Court ignore the amendment issue, the Court considers *sua sponte* whether Plaintiff should be granted leave to file an amended complaint. The Court finds that he should not.

### A. Relation Back Under Rule 15(c)(1)(C)

Rule 15(a) instructs courts that "leave to amend [a complaint] 'shall be freely given when justice so requires.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citation omitted). Nevertheless, a motion to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies ..., or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery,* Inc., 551 F.3d 122, 126 (2d Cir.2006); *see Monahan v. N.Y.C. Dep't of Corr.* 214 F.3d 275, 283 (2d Cir.2000) (Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or

futility."). An amendment is futile if the claim to be added would be barred by the applicable statute of limitations. *Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000).

"Rule 15(c) (1)(C) provides the federal standards for relation back." *Hogan,* 738 F.3d at 517. Under Rule 15(c)(1)(C), an amendment to change the party against whom a claim is asserted will relate back only if all of the following specifications are met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity,* the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Hogan,* 738 F.3d at 517 (quoting *Barrow v. Wethersfield Police Dep't.,* 66 F.3d 466, 468–69 (2d Cir.1995) (emphasis in Hogan); see Fed.R.Civ.P. 15(c)(1)(C)(i)-(ii).

With respect to what constitutes "mistaken identity" for purposes of permitting relation back under Rule 15(c), the Second Circuit in *Barrow* held that:

> Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly added defendants *were not named originally because the plaintiff did not know their identities* . Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning he identity of the parties (under certain circumstances), but not the failure to identify individual defendants when the plaintiff knows that such

defendants must be named cannot be characterized as a mistake.

**\*6** 66 F.3d at 470 (emphasis added). [4]

In other words, where a plaintiff is mistaken about the identity of the *proper party* to be sued, an amendment to name that party may relate back under Rule 15(c). *Id.* at 469. [5] However, where the plaintiff knows who the proper party is, just not by name, there is no mistake about identity that will permit relation back under Rule 15(c). *See Hogan,* 738 F.3d at 518 ("This Court's interpretation of Rule 15(c)(1) (C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistaken identity.' ") In that situation, any amendment to add the proper party's name, once determined, must be made within the statute of limitations. *See id.* at 517 (reiterating that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued").

Here, Plaintiff was not mistaken about the identity of the proper John Doe officer to sue; rather, he simply did not know the officer's name when he filed suit. In initiating this action, Plaintiff intended to sue the "police officer who shot plaintiff" on August 4, 2010. (Compl. at 1.) Plaintiff identified that officer as "John Doe" in the Complaint because he did not know Bodenmiller's name at the time, not because of any mistake regarding Bodenmiller's role in, or liability for, the shooting. Though Plaintiff was unaware of Bodenmiller's identity, he was not mistaken about the need to name Bodenmiller as a defendant. (*See* Dkt. 4 (Plaintiff's letter requesting discovery from the County regarding the John Doe's officer's identity, and indicating that the officer had to be "correctly named ... in the lawsuit")); *Barrow,* 66 F.3d at 470 (Rule 15(c) does not permit relation back where the "plaintiff knows that [the] defendant[ ] must be named"). Thus, Plaintiff's failure to name Bodenmiller in this suit does not constitute a mistake under Rule 15(c)(1)(C)(ii). *See Bender v. City of New York,* No. 14 Civ. 4386(LTS)(GWG), 2015 WL 524283, at \*3–4 (S.D.N.Y. Feb. 10, 2015) (under *Barrow,* "[plaintiff] cannot satisfy Rule 15(c)(1)(C)(ii), as the John Doe defendants were unnamed because [plaintiff] did not know their names at the time she filed the complaint; rather, she first learned this information only when the named defendants made their initial disclosures"); *Ceara v. Deacon,* No. 13 Civ. 6023(KMK), 2014 WL 6674559, at \*4 (S.D.N.Y. Nov.25, 2014) (plaintiff's reason for not serving officer within

the three year period—that he did not know the identity of the defendant-was insufficient to satisfy the mistake element of Rule 15(c)(1)(C)); *Vasconcellos v. City of New York,* No. 12 Civ. 8445(CM), 2014 WL 4961441, at *5–6 (S.D.N.Y. Oct.2, 2014) ("[u]nder a straightforward application of *Barrow,*" plaintiff's failure "to identify the Officer Defendants by name in her original suit because she did not know their identities" "cannot be characterized as a mistake" for purposes of Rule 15(c)); *Strada v. City of New York,* No. 11 Civ. 5735(MKB), 2014 WL 3490306, at *9 (E.D.N.Y. July 11, 2014) ("*Barrow* precludes this Court from finding that [p]laintiff's failure to amend the Complaint to name the individual officers was a mistake contemplated by Rule 15(c)."); *Ulloa v. City of New York,* No. 13 Civ. 5795(AKH), 2014 WL 1100226, at *2 (S.D.N.Y.Jan.6, 2014) ("a plaintiff's lack of knowledge as to the identity of John Doe defendants cannot be considered a 'mistake' (citation omitted)). Accordingly, Rule 15(c)(1)(C) does not provide a basis to allow Plaintiff to amend the Complaint to name Bodenmiller and relate the claims back to the date of the original Complaint.

**B. Relation Back Under Rule(c)(1)(A)**

**\*7** In addition to relation back under Rule 15(c), the Courts must examine the "controlling body of limitations law," and apply state law if it provides "a more forgiving principle of relation back than the one provided" by Rule 15(c). *Hogan,* 738 F.3d at 518 (quoting Fed.R.Civ.P. 15, Advisory Comm. Notes 1991); *see* Fed.R.Civ.P. 15(c)(1) (an amended pleading also relates back to an earlier pleading if "the law that provides the applicable statute of limitations allows relation back"). The Court will thus examine whether a claim against Bodenmiller would be timely under the relevant provisions of the New York Civil Practice Law and Rules ("CPLR").

### 1. *Section 203 of the CPLR*

A party may seek relation back for a previously unknown defendant under CPLR § 203(c), New York's general relation back statute. *Strada,* 2014 WL 3490306, at *6 (citing *Bumpus v. New York City Transit Auth.,* 66 A.D.3d 26, 883 N.Y.S.2d 99, 106 (App.Div.2009)). Under § 203, courts allow claims against a new defendant to "relate back to timely filed pleadings when (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but

for a mistake as to the identity of the proper parties, the action would have been brought against him as well." *JCG v. Ercole,* No. 11 Civ. 6844(CM)(JLC), 2014 WL 1630815, at *15 (S.D.N.Y. Apr. 24, 2014) (quoting *Fisher v. Cnty. of Nassau,* No. 10 Civ. 0677(JS)(ETB), 2011 WL 4899920, at *5 (E.D .N.Y. Oct. 13, 2011)), *report and recommendation adopted,* 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

Here, Plaintiff cannot avail himself of § 203 for the same reasons that Rule 15(c) does not apply. Plaintiff cannot establish the third prong of the test under § 203, which, like Rule 15(c), requires a mistake as to the identity of the proper party to be sued. As discussed above in the Rule 15(c) context, the failure to name a defendant whom the plaintiff knows must be named does not constitute a "mistake." "The third prong of § 203(c) 'employs the same standard as the federal rule.' " *Bender,* 2015 WL 524283, at *6 (quoting *Sloane v. Town of Greenburgh,* No. 01 Civ. 11551(MBM), 2005 WL 1837441, at *3 (S.D.N.Y. July 27, 2005)). Since Plaintiff cannot satisfy Rule 15(c)'s mistake element, he also cannot satisfy the third prong of § 203(c). Any claim against Bodenmiller therefore would not relate back to the date of the Complaint under CPLR § 203. *See, e.g., Strada,* 2014 WL 3490306, at *9.

### 2. *Section 1024 of the CPLR*

CPLR § 1024 allows "[a] party who is ignorant, ... of the name or identity of a person who may properly be made a party[ ][to] proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known[,] all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly." Under CPLR § 306–b, once a John Doe complaint is filed, a plaintiff must serve it on the correct defendant within 120 days after the commencement of the action.

**\*8** The Second Circuit recently held that CPLR § 1024 is more forgiving in relating back complaints compared to the federal standard under Rule 15(c). *See Hogan,* 738 F.3d at 518; *accord Ceara,* 2014 WL 6674559, at *5; *Strada,* 2014 WL 3490306, at *5. To invoke § 1024, a plaintiff must show that: (1) the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name;" and (2) the plaintiff "describe[d] the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan,* 738 F.3d at 519 (alteration, citations and internal quotation marks omitted). "Due diligence in this context requires that a plaintiff 'show

that he or she made timely efforts to identify the correct party before the statute of limitations expired .' " *Strada,* 2014 WL 3490306, at *5 (quoting *Justin v. Orshan,* 14 A.D.3d 492, 788 N.Y.S.2d 407, 408 (N.Y.App.Div.2005)).

Plaintiff's inexplicable failure to amend the complaint—despite learning Bodenmiller's identity shortly after filing the Complaint—cannot satisfy the due diligence requirement of § 1024. Early in this litigation, Plaintiff sought discovery of the identity of the John Doe police officer so "that said individual may be correctly named and served[.]" (Dkt.4.) Plaintiff then served a summons for John Doe, "n/k/a Robert Bodenmiller[,]" at the Suffolk County Police Department on or about November 8, 2011 (*see* Dkt. 8 at 2)—several months before the March 22, 2012 court-imposed deadline for joining new parties or amending the Complaint, and almost two years before the expiration of the statute of limitations on August 4, 2013. Yet Plaintiff did not seek to amend the Complaint in the time between November 8, 2011 and August 4, 2013. Plaintiff still did not act to amend the Complaint after the County furnished an Internal Affairs report on June 20, 2012 that named Bodenmiller as the officer who shot Plaintiff. Nor did Plaintiff seek to amend the Complaint after conducting a deposition of Bodenmiller on July 10, 2013. Even after the County raised this issue in its summary judgment motion papers, Plaintiff did not seek to amend. Moreover, Plaintiff offers no explanation for his failure to amend the Complaint or seek an extension of the time in which to do so. Because Plaintiff learned the true identity of the John Doe Defendant prior to the expiration of the statute of limitations, he cannot invoke § 1024 to now add Bodenmiller as a defendant to this action. *See Strada,* 2014 WL 3490306, at *6 (plaintiff did not exercise due diligence where, *inter alia,* defendant provided plaintiff with the names of the officers involved prior to the expiration of the statute of limitations, and plaintiff did not attempt to amend the Complaint). *Cf. Ceara,* 2014 WL 6674559, at *5 (plaintiff acted with due diligence because plaintiff made efforts to ascertain defendant's full identity, apprised the court of his efforts, and promptly filed an amended complaint within thirty days of learning defendant's name).

**\*9** Accordingly, an amendment to substitute Bodenmiller for the John Doe Defendant would not relate back to the filing date of Plaintiff's Complaint under federal or state law. Given that the statute of limitations has run, amending the Complaint to add Bodenmiller would be futile. Regrettably, Plaintiff has buried his head in the sand, to his peril, with respect to this fatal flaw in his Complaint. The Court is thus constrained

from granting Plaintiff leave to file an amended complaint, and Plaintiff's claim against the John Doe Defendant must be dismissed.

## II. *Plaintiff's Claims Against the County*

### A. Section 1983 Claim

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). In this action, Plaintiff's claims arise under the Fourth Amendment's prohibition against unreasonable seizures.[6]

Because municipalities may not be held vicariously liable for the actions of their employees, a § 1983 claim against a municipality must be premised on the theory that the municipality maintained a policy, practice, or custom that caused the plaintiff's constitutional injury. *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983."). Courts in this Circuit apply a two-prong test to § 1983 claims brought against a municipality. *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985). A "plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* (citation omitted). Next, a plaintiff must establish a " 'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.' " *Hayes v. Cnty. of Sullivan,* 853 F.Supp.2d 400, 439 (S.D.N.Y.2012) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412(1989)); *accord Abreu v. City of New York,* 657 F.Supp.2d 357, 360 (E.D.N.Y.2009) (quoting *Canton,* 489 U.S. at 385).

A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or

(4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *See Parker v. City of Long Beach,* 563 F. App'x 39 (2d Cir.2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 62 (2d Cir.2014) (widespread and persistent practice); *Hines v. Albany Police Dep't,* 520 F. App'x 5, 7 (2d Cir.2013) (actions of policymakers); *Schnitter v. City of Rochester,* 556 F. App'x 5, 8 (2d Cir.2014) (failure to train or supervise); *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir.2009) (formal policy and act of a person with policymaking authority for the municipality).

**\*10** Plaintiff alleges, in sum and substance, that the County was deliberately indifferent to his rights due to its failure to properly train or supervise its officers, including Bodenmiller. (Compl.¶¶ 10–11.) Plaintiff points to two alleged policies in support of his claims: (1) the Use of Force Directive, which Plaintiff contends is "so vaguely worded" that it provides no meaningful guidance on when officers may exercise deadly force, and (2) Bodenmiller's deposition statement that he was trained to fire two shots aimed at a subject's center mass. (Pl. Mem. at 12–13.) Plaintiff asserts that the combination of these two policies created "a situation where Bodenmiller was shooting to kill" with only a vague directive on when he should use deadly force, thereby causing a deprivation of Plaintiff's constitutional rights. (*Id.* at 13–14.)

Deliberate indifference with respect to the failure to train or supervise municipal employees exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation' "; and (3) " 'the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Wray v. City of New York,* 490 F.3d 189, 195–96 (2d Cir.2007) (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)). The plaintiff must show the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Cash v. Cnty. of Erie,* 654 F.3d 324, 334 (2d Cir.2011) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 128 (2d Cir.2004)); *see Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 396 (S.D.N.Y.2009) ("To sustain a *Monell* claim based on a failure to supervise or discipline, the plaintiff must demonstrate that the decision-maker was on notice of a potentially serious problem of unconstitutional

conduct, that the need for corrective action was obvious, and that the decision-maker failed to investigate or take action in circumstances suggesting deliberate indifference to the rights of those being harmed.")

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626, (1997)). Without actual or constructive "notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Nevertheless, "in a narrow range of circumstances," a municipality can be found to be deliberately indifferent based on a single incident where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick,* 131 S.Ct. at 1360–61; *see Canton,* 489 U.S. at 390 n. 10. The violation of constitutional rights must be a "highly predictable consequence" of the failure to train or supervise. *Connick,* 131 S.Ct. at 1361 (internal quotation marks omitted).

**\*11** Even construing the evidence in the record most favorably to Plaintiff, no rational jury could conclude that the standard for municipal liability, under a failure to train theory or any other theory, has been met. Plaintiff fails to proffer evidence sufficient to permit a trier of fact to find that the County has acted with deliberate indifference in designing its training program or that the deficiencies he cites led to the violation of his rights by Bodenmiller. Most significantly, Plaintiff points to no evidence of similar violations by purportedly untrained officers that may have notified the County of any deficiencies with the County's training of its officers with respect to the use of deadly force and civilian encounters. The record is devoid of evidence that before the events of August 4, 2010, the County knew of a pattern or even one incident involving use of excessive force or improper deadly force by Suffolk County police officers. *See Connick,* 131 S.Ct. at 1360 ("pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference" on a failure to train theory). Although Bodenmiller testified that he is a named defendant in another suit involving allegation of excessive force, there is no indication that that

event occurred before August 4, 2010. (Bell Decl. Ex. B at 10–11.) Plaintiff's submissions suggest that, to the contrary, the incident occurred afterwards on May 6, 2011. (Pl.St.¶ 27.) Nor is there any evidence indicating that the other alleged incident involved a use of force comparable or similar to the August 4, 2010 shooting. Thus, nothing suggests that the County condoned or ignored repeated constitutional violations.

To the extent Plaintiff relies on a single-incident theory of liability (*see* Pl. Mem. at 13), that claim also fails because Plaintiffs cannot show that the use of force training provided by the County to its police officers is tantamount to a lack of training. To make this showing, Plaintiffs must prove that the County's police officers have an "utter lack of an ability to cope with constitutional situations," *Connick,* 131 S.Ct. at 1363, and that "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights," *Canton,* 489 U.S. at 390. *Accord Breitkopf v. Gentile,* No. 12 Civ.1084 (JFB)(AKT), 2014 WL 4258994, at *23 (E.D.N.Y. Aug. 29, 2014). Here, it is uncontroverted that the County provided some use of force training to Bodenmiller and his fellow officers. (*See, e.g.,* Pl. St. ¶ 19; Bell Decl. Ex. B at 57–58.) Bodenmiller testified that he was trained at the police academy, and annual training thereafter at the precinct, on the use of deadly physical force. (Bell Decl. Ex. B at 88–89.) Bodenmiller also testified to his understanding that he was "allowed to use deadly force when [he] reasonably believe[d] that deadly force is being used against [him] or a third person." (*Id* . at 89.) Where, as here, a plaintiff challenges the adequacy of training rather than the failure to train at all, courts repeatedly have held that a plaintiff cannot rely on the single-incident theory of municipal liability. *See, e.g., O'Brien v. Barrows,* 556 Fed. App'x. 2, 5 (2d Cir.2014) ("failing to provide an armed police officer with *any* training about the constitutional limitations on the use of deadly force could constitute deliberate indifference" (emphasis in original)); *Breitkopf,* 2014 WL 4258994, at *23 ("Since *Connick,* some courts have concluded that a plaintiff cannot rely on the single-incident theory where she challenges the adequacy and not the lack of the existence of training."); *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 391–93 (S.D.N.Y.2013) (collecting cases denying summary judgment based on lack of any training, and dismissing claims challenging adequacy of training).

**\*12** Plaintiff's contention that the Use of Force Directive evidences the County's deliberate indifference by failing to

provide sufficiently specific guidance on the use of deadly force also fails for the reasons already stated. *See Yang Feng Zhao,* 656 F.Supp.2d at 394 (no triable issue of fact based on assertion that training was deficient in not providing guidance about when to believe a suspect's denial of guilt and when to avoid questioning). Furthermore, the Directive was issued in September 2011—over a year after Plaintiff was shot in August 2010—a fact seemingly overlooked by both parties. (Bell Decl. Ex. H at 24–1; *see* Reply at 4–7). It is difficult to see how any purported deficiency in the as-yet-unadopted Directive caused Bodenmiller to improperly implement deadly force against Plaintiff.

Lastly, even assuming *arguendo* that some iteration of the Use of Force Directive was in effect at the time of the shooting, such a policy, coupled with the training that Bodenmiller received about shooting twice at a subject's center mass, is still insufficient to establish the County's deliberate indifference. As previously discussed, Plaintiff has not presented any evidence tending to show that the improper use of force was a common problem in the County's police force. Nor has Plaintiff offered any evidence about deficiencies in the County's Use of Force Directive or training and how any additional or other training might have altered Bodenmiller's actions. Thus, Plaintiff cannot show that the shooting was caused by a County policy, as opposed to Bodenmiller's failure to follow the training he received. *See Amnesty Am.,* 361 F.3d at 129–30 ("The elements of an identified training deficiency and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability."). [7] Accordingly, the County is entitled to summary judgment on Plaintiff's § 1983 claim.

**B. Plaintiff's State Law Claims**

Plaintiff asserts various state law claims against the County and John Doe Defendant that appear to allege excessive force, assault and battery, and negligent hiring, training, and supervision of police officers. (Compl.¶¶ 17–31.) To the extent these claims allege negligent training or supervision by the County based on the same facts upon which the Plaintiff's Section 1983 claim against the County is based, the Court dismisses them, with prejudice, for the same reasons discussed above. *See Henry–Lee v. City of New York,* 746 F.Supp.2d 546, 566 (S.D.N.Y.2010) ("To prevail on a [state law] claim for negligent hiring, training, supervision, or

retention, a plaintiff must prove that a municipality's failure to properly train, hire, retain, or supervise 'its police officers in a relevant respect evidences a *deliberate indifference* to the rights of its inhabitants.' " (quoting *Jackson v. City of New York,* 192 A.D.2d 641, 596 N.Y.S.2d 457, 458 (1993)) (emphasis added)). As for the remaining state law claims against both Defendants, the Court declines to exercise supplemental jurisdiction over them under 28 U.S.C. § 1367, and dismisses them without prejudice.

**CONCLUSION**

**\*13** The Court accordingly grants the County's motion for summary judgment in its entirety, and dismisses Plaintiff's Complaint. All of Plaintiff's claims, except his state law claims that do not allege negligent training and supervision by the County and his state law claims against the John Doe Defendant, are dismissed with prejudice. The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1321685

---

## Footnotes

1    The Court declines Plaintiff's invitation to deny the County's motion based on the County's failure to comply with Local Rule 56.1. (*See* Pl. Mem. at 10.) Although the County's 56.1 Statement does not set forth undisputed material facts supported by citations to competent evidence (*see* Dkt. 24–1), as required by the Rule, the Court exercises its "broad discretion to ... to overlook a party's failure to comply with local court rules[,]" and conducts its own review of the record. *See* Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001). Accordingly, where relevant, the Court cites to supporting evidence in the record.

2    Plaintiff's account differs from the officers' in this regard; Price and Erdmann testified that Moran approached the officers "aggressively" or in a "slow run." (*See* Bell Decl. Exs. C. at 72 & D at 44, 58.) Bodemiller testified that Moran "was charging towards Officer Price." (*Id.* Ex. B at 44.) Plaintiff also denies having any object in his right hand. (Pl.St.¶ 39.)

3    The acronym "n/k/a" refers to the phrase "now known as."

4    While there has been some debate over the continuing vitality of *Barrow* after the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), the Court finds that *Barrow* remains good law, and that, unlike *Krupski, Barrow* is directly relevant to the facts presented here. *See, e.g., Morales v. Cnty. of Suffolk,* 952 F.Supp.2d 433, 437 (E.D.N.Y.2013) (finding that *Krupski* did not address the key issue in *Barrow, i.e.,* "whether a plaintiff's lack of knowledge as to the identity of 'John Doe' Defendants can be considered a 'mistake' or 'error' " and citing decisions concluding that "*Barrow* remains good law after *Krupski.*" ).

5    In *Barrow,* the Second Circuit cited the example of this type of mistake contained in the Advisory Committee Notes for Rule 15(c): "when a defendant mistakenly sues an agency of the government without knowing that the cause of action requires the defendant to sue an agency head." 66 F.3d at 469.

6    Although Plaintiff also asserts claims under the due process clause and the Eighth Amendment, "[a]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see Taylor v. Nassau Cnty.,* 11 Civ. 0934(SJF), 2012 WL 5472554, at \*1 n. 2 (E.D.N.Y. Nov. 5, 2012) (addressing excessive force claim brought under Fourth and

Fourteenth Amendment under Fourth Amendment only). The Eighth Amendment, which applies to claims of excessive force brought by convicted prisoners, is also unavailable to Plaintiff. *See Graham,* 490 U.S. at 394; *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

7    Indeed, as discussed, Bodenmiller testified that he received use of force training when he first became a County police officer and annually thereafter and that his understanding of the County's use of force policy was that he was "allowed to use deadly force when [he] reasonably believe[d] that deadly force is being used against [him] or a third person." (Bell Decl. Ex. B at 89.)

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2569085
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ronald MOYE, Plaintiff,
v.
The CITY OF NEW YORK; Sgt. Nelson Caban,
P.O. Paul Jeselon, P.O. Samuel Fontanez, P.O.
Edward Simonetti, P.O. Matthew Boorman, P.O.
Frank Papa, P.O. Tawaina O'Neal, P.O. Brennan;
P.O. John; and A.D.A. Dustin Chao, Defendants.

No. 11 Civ. 316(PGG).
|
July 3, 2012.

### MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, District Judge.

*1 Plaintiff Ronald Moye has brought claims against the City of New York, former New York County Assistant District Attorney Dustin Chao, and eight members of the New York City Police Department ("NYPD") under 42 U.S.C. § 1983 and state law. Moye claims that Chao is liable for damages under Section 1983 and state law for malicious prosecution, abuse of process, denial of a fair trial, fabrication of evidence, conspiracy "to inflict an unconstitutional injury," and intentional and negligent infliction of emotional distress. (Am. Cmplt., Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Claims) Chao has moved to dismiss the Amended Complaint on grounds of absolute immunity. For the reasons stated below, Chao's motion to dismiss will be granted.

### BACKGROUND

For purposes of deciding Defendant Chao's motion to dismiss, the Court has assumed that the following facts presented in the Amended Complaint are true.

### I. *MOYE'S ARREST*

On or about March 12, 2002, at approximately 8:00 p.m., NYPD officers Paul Jeselson and Tawaina O'Neal were stationed on the rooftop of an apartment building on the south side of West 118th Street near the corner of Morningside Avenue conducting nighttime narcotics surveillance. (Am.Cmplt.¶¶ 19, 22) Plaintiff's car was located on the north side of West 118th Street, near Manhattan Avenue. (*Id.* ¶ 21) Officer Jeselson claimed that he observed Plaintiff "extend his hand from the driver's side window and hand a small glassine" to another individual—later arrested —who, in turn, handed it to an unapprehended customer. (*Id.* ¶ 20) The Defendant officers moved in and arrested Moye in the vicinity of 352 West 118th Street. (Am.Cmplt.¶¶ 12, 25)

At the time of the arrest, and later at the 28th Precinct, the officers searched Moye and his car and found United States currency, both in Moye's possession and inside the vehicle. (*Id.* ¶ 27) The Defendant officers unnecessarily grabbed Moye, pushed him, and placed excessively tight handcuffs on him (*id.* ¶ 30), causing him to suffer bruises to and numbness in his wrists. (*Id.* ¶ 32)

Moye was indicted on March 22, 2002, for Criminal Possession of a Controlled Substance in the Third Degree. (Am. Cmplt. ¶ 35; Schwartz Decl., Ex. A) Plaintiff alleges that the police officer defendants "conspired [to give] and gave false testimony and intentionally placed false evidence before the grand jury." [1] (Am.Cmplt.¶ 35)

### II. *MOYE'S FIRST TRIAL*

Moye's first trial began on January 14, 2003. (Schwartz Decl., Ex. B) A.D.A. Chao introduced photographs at trial which he claimed showed the position of Plaintiff s car as it was parked on West 118th Street. (Am.Cmplt.¶ 38) Chao, Officer Jeselson, and Officer Papa were present when a District Attorney's office photographer took these photos in June 2002 from the March 12, 2002 observation point. (*Id.* ¶¶ 41–42, 44) Although the photographs were intended to convey the vantage point of the officers on the night of the arrest, they did not replicate the "nighttime conditions." (*Id.* ¶ 45) According to Moye, these photographs nonetheless showed that the officers could not have seen Plaintiff extend his hand from the driver's side window and pass a small glassine to another individual, because the driver's side could not be seen from the vantage point of the rooftop observation post, even with binoculars. (*Id.* ¶¶ 46, 48) At trial, Officer Jeselson admitted that "he was not able to see the driver's side of the vehicles in the photographs." (*Id.* ¶ 47) Jeselson nonetheless claimed that he had been able to see Moye's hand "during the nighttime observation." (*Id.* ¶ 39) The first trial ended in a mistrial, with the jury unable to reach a verdict. (*Id.* ¶ 49)

### III. *MOYE'S SECOND TRIAL*

**\*2** In February 2003, A.D.A. Chao, Officers Brennan and Jeselson, and D.A's Office photographer Nancy Badger returned to West 118th Street to take more photographs. (*Id.* ¶ 53) They repositioned the car on an angle in order to make it appear that the officers would have been able to see Moye's hand outside the driver's side window on the night of his arrest. (*Id.* ¶¶ 55–60) With the car positioned in this fashion, Jeselson and Chao instructed Badger to take photographs of Officer Brennan's hand outside the driver's side window in an effort to simulate what the officers have seen that night. (*Id.* ¶¶ 60–61) Jeselson and Chao then had Brennan move the car back to a curbside position "where additional photographs [were] taken at a wide angle to falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶ 63)

At Moye's second trial, Chao introduced these new photographs and elicited testimony from Jeselson in which he used the photographs to support his claim that he was able to see Moye's hand from the rooftop observation post. (*Id.* ¶¶ 66, 74) However, Badger testified that, in taking the new photographs, "the defendants moved the vehicle to an angle where the hand could be visible." Defendants then returned the vehicle to its curbside position and took additional photographs that "falsely give the impression that the close-ups were merely enlargements of the vehicle parked along the curb." (*Id.* ¶¶ 81–84)

In summation, Moye's lawyer argued that Jeselson had lied about his observations from the roof and the positioning of the car in the photographs introduced by the prosecution.

(*Id.* ¶ 85) In response, A.D.A. Chao argued that Officer Jeselson had no opportunity to frame the defendant, because Chao had been present at the observation post:

"[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

"And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's

office. Well, if Officer Jeselson thought he was going to get away with it—

"[DEFENSE counsel]: Mr. Chao is vouching for his witness.

"THE COURT: Overruled.

"[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE counsel]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE counsel]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

**\*3** "THE COURT: Overruled.

"[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the rooftop also. I have no other answer other than the fact that she is mistaken....

"[DEFENSE counsel]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

*People v. Moye,* 52 A.D.3d 1, 5 (1st Dep't 2008); *see also* (Am. Cmplt. ¶¶ 87–92.

Moye was convicted at his second trial and sentenced to four-and-a-half to nine years' imprisonment. (Am.Cmplt.¶¶ 13–14)

### IV. *THE CHARGES AGAINST MOYE ARE DISMISSED*

On appeal, the First Department vacated the conviction in a 3–2 decision. *People v. Moye,* 52 A.D.3d 1. The First Department found that "the prosecutor improperly vouched

for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Office Jeselson." *Id.* at 6. The New York Court of Appeals agreed that Chao had engaged in impermissible vouching for his witness, affirmed the reversal of the conviction, and remanded the case to Supreme Court. *People v. Move,* 12 N.Y.3d 743, 744 (2009). After remand, the New York County District Attorney's Office dismissed the case on October 21, 2009. (Am.Cmplt.¶¶ 16, 37)

### DISCUSSION

### I. *IMMUNITY*

Chao argues that the claims against him must be dismissed because his actions are protected by absolute immunity. [2]

Section 1983 "purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights." *Kalina v. Fletcher,* 522 U .S. 118, 123 (1997). In order to state a claim under Section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

"Although section 1983 imposes liability upon every person who deprives another of a constitutional right under color of state law, the doctrines of absolute and qualified immunity shield prosecutors and law enforcement officers from liability related to their official acts." *Day v. Morgenthau,* 909 F.2d 75, 77 (2d Cir.1990). While Section 1983 does not explicitly provide for such immunity, the Supreme Court and Second Circuit have ruled that "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

**\*4** As the Second Circuit has explained:

> Such immunities are of two types: absolute and qualified. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Absolute immunity is reserved for officials who perform "special functions" and deserve absolute protection from damages liability. Among these are prosecutors, and persons working under their

direction, when they function as advocates for the state in circumstances "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. at 430–31. *See also Hill v. City of New York,* 45 F.3d at 660 (extending absolute prosecutorial immunity to persons acting under the direction of prosecutors in performing functions closely tied to the judicial process).

By contrast, only qualified immunity applies to law enforcement officials, including prosecutors, when they perform investigative functions. *Buckley v. Fitzsimmons,* 509 U.S. at 273. ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.") (internal quotation marks and citations omitted); *accord Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir.2000).

*Bernard v. Cnty. of Suffolk,* 356 F.3d 495, 502–03 (2d Cir.2004).

Absolute immunity extends only so far as necessary to protect the judicial process. *Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). Nonetheless,

> [t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.' " *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) (quoting *Imbler,* 424 U.S. at 430–31, 96 S.Ct. at 995).

*Pinaud,* 52 F.3d at 1147. The Court addresses the parameters of absolute prosecutorial immunity below.

### A. *Legal Standard for Absolute Prosecutorial Immunity*

A prosecutor who, as here, is sued in his or her individual capacity, may assert absolute or qualified immunity as a defense. Courts may grant a Rule 12(b)(6) motion to dismiss on grounds of absolute immunity where the facts establishing the defense appear in the complaint. *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at \*4 (E.D.N.Y. Mar. 27, 2007) (citing *Hill,* 45 F.3d at 663) (absolute immunity may be decided on a Rule 12(b) (6) motion where facts establishing the defense may be

"gleaned from the complaint")). Moreover, district courts are encouraged to determine the applicability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery.[3] *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)); *United States v. Colbert,* No. 87 Civ. 4789, 1991 WL 183376 at *4 (S.D.N.Y. Sept. 11, 1991). This approach is appropriate given that "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler,* 424 U.S. at 419 n. 13. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley,* 509 U.S. at 270 (1993) (citing *Burns,* 500 U.S. at 486).

**\*5** Prosecutorial immunity to Section 1983 claims is grounded in the immunity to tort liability that prosecutors enjoy under the common law. *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011) That immunity arises from the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* (citing *Imbler,* 424 U.S. at 423). Immunity protects the proper functioning of the prosecutor's office by insulating the exercise of prosecutorial discretion. *Kalina,* 522 U.S. at 125. Prosecutors are therefore "absolutely immune from suit only when acting as advocates and when their conduct involves the exercise of discretion." *Flagler,* 663 F.3d at 546 (citing *Kalina,* 522 U.S. at 127).

The Supreme Court addressed the question of absolute immunity for prosecutors in *Imbler,* where it held that prosecutors are entitled to absolute immunity for damage suits under Section 1983 for all acts "intimately associated with the judicial phase of the criminal process," including "initiating a prosecution and ... presenting the State's case [at trial]." *Imbler,* 424 U.S. at 430.

Later, in *Buckley,* 509 U.S. at 273, the Supreme Court considered whether the prosecutor defendants were entitled to absolute immunity for "investigative" work they performed well before seeking an indictment, involving an effort to connect the plaintiff to a bootprint left at a murder scene. Although the Court rejected the prosecutors' claim for absolute immunity, the Court cautioned that it had

not retreated ... from the principle that acts undertaken by a prosecutor

preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273 (internal citations and quotations omitted).

Whether a prosecutor has absolute immunity for a particular act thus "depends principally on the nature of the function performed, not on the office itself." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993). "Such functions include the decision to bring charges against a defendant, presenting evidence to a grand jury, and the evaluation of evidence prior to trial." *Johnson v. City of New York,* No. 00 CIV 3626(SHS), 2000 WL 1335865, at *2 (S.D.N.Y. Sept. 15, 2000) (citing *Kalina,* 522 U.S. at 126). Furthermore, this "application of immunity is not limited to the duties a prosecutor performs in the courtroom." *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994) (citing *Buckley,* 509 U.S. at 272).

**\*6** "[A] district attorney is [not only] absolutely immune from civil liability for initiating a prosecution and presenting the case at trial," but also "immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged." *Hill,* 45 F.3d at 661 (citations omitted). Prosecutorial immunity from Section 1983 damages liability is broadly defined, covering "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Dory,* 25 F.3d at 83. The Second Circuit has been "mindful of the Supreme Court's admonition that 'the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987) (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett v. United States,* 798 F.2d

565, 571 (2d Cir.1986) ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....")

Because absolute immunity extends broadly to all acts committed by a prosecutor in his or her role as an advocate, it protects prosecutors against claims that they conspired to, or actually presented, fabricated evidence at trial:

> absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate. This would even include ... allegedly conspiring to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because "[t]he immunity attaches to his function, not to the manner in which he performed it." Barrett v. United States, 798 F.2d 565, 573 (2d Cir.1986); see also Daloia v. Rose, 849 F.2d 74, 75 (2d Cir.1988) (per curiam) (holding ... that prosecutor was immune from § 1983 liability for knowingly presenting false testimony). As much as the idea of a prosecutor conspiring to falsify evidence [is disturbing] ... there is a greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties. See Imbler, 424 U.S. at 426–428.

Dory, 25 F.3d at 83. [4]

Although courts have declined to establish a bright-line test based on the stage of a criminal proceeding, "absolute prosecutorial immunity has generally been found in cases where some type of formal proceeding had been commenced or was being commenced by the conduct at issue." Tabor v. New York City, No. 11 CV 0195 FB, 2012 WL 603561, at *4 (E.D.N.Y.2012) (citing Barbera v. Smith, 836 F.2d at 99. In contrast, where formal proceedings have not begun and the prosecutor is acting in an investigative capacity—such as by providing the police with legal advice on investigative techniques—qualified immunity generally applies. Id. While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, see Buckley, 509 U.S. at 274 n. 5, "the Court's treatment of the issue demonstrates that the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct." Cousin v. Small,

325 F.3d 627, 633 (5th Cir.2003); accord Barbera, 836 F.2d at 99 (noting "that in each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts"); see also DiBlasio v. Novello, 344 F.3d 292, 300–01 (2d Cir.2003) ( "In assessing whether absolute immunity should attach to a prosecutor ... we have focused on the timing of the conduct at issue....") Thus, in interpreting Buckley, the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand, with only the former entitling a prosecutor to absolute immunity. Smith v. Garretto, 147 F.3d 91, 94 (2d Cir.1998).

**\*7** In assessing a prosecutor's claim of absolute immunity, the court employs a "functional approach," see, e.g., Burns, 500 U.S. at 486, which looks to "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1988); see also Van de Kamp v. Goldstein, 555 U.S. 335, 335–336 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of ... 'functional' considerations"). The court must inquire whether the actions in question are part of a prosecutor's traditional function and whether they are closely associated with the judicial process. Blouin v. Spitzer, 356 F.3d 348, 357 (2d Cir.2004) (a court must examine the "nature of the function performed" in assessing whether absolute immunity will attach.); Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir.1996).

### B. Analysis

#### 1. Malicious Prosecution, Abuse of Process

To the extent that the Amended Complaint seeks to hold Chao liable for initiating the prosecution of Moye, absolute immunity is clearly applicable. Shmueli v. City of New York, 424 F.3d 231, 237 (2d Cir.2005) ("[T]he prosecutor is shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive."); see also Hill, 45 F.3d at 660–61 (holding that prosecutors and those working under their direction are absolutely immune for claims relating to the initiation of a prosecution and for conduct before a grand jury). Plaintiff s federal and state law claims alleging malicious prosecution and abuse of process will therefore be dismissed. [5]

### 2. *Creation of Misleading Photographs, Conspiracy to Present False Evidence at Trial*

Moye alleges that Chao, in preparation for Moye's second trial, returned to West 118th Street and instructed Nancy Badger—the District Attorney's office photographer—to take photographs that inaccurately represented the position of Moye's car on the night of his arrest. Chao then presented these photographs at the second trial. (Am.Cmplt.¶¶ 38, 40, 50, 50–54, 66–67) Moye alleges that these photographs gave the false impression that the police in the observation post would have been able to see Moye's hand outside the driver's side window. (*Id.* ¶ 60) Moye further argues that absolute immunity does not extend to Chao's role in obtaining these allegedly misleading photographs, because obtaining such evidence is "not a traditional prosecutorial function" and was "done for the purpose of misleading the second jury." (Pltf. Opp. Br. at 10–11)

Prosecutors' absolute immunity applies "not just for presentation of testimony," however, but also to preparatory conduct "relating to their advocacy." *Dory,* 24 F.3d at 83. The Supreme Court and the Second Circuit have emphasized that ' "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.... Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.' " *Barbera,* 836 F.2d at 100 (quoting *Imbler,* 424 U.S. at 431 n. 33); *see also Barrett,* 798 F.2d at 571 ("The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation....").

**\*8** Chao obtained the photographs at issue after Moye's first trial and in preparation for Moye's second trial. Accordingly, his involvement in obtaining these photographs took place long after formal criminal proceedings had been commenced. *See Deskovic v. City of Peekskill,* Nos. 07–CV–8150 (KMK), 07–CV–9488 (KMK), 2009 WL 2475001, at \*10 (S.D.N.Y. Aug. 13, 2009) ("[i]n assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant") (citing *DiBlasio,* 344 F.3d at 300–01).

Furthermore, in directing that these new photographs be taken, Chao was performing in his role as a prosecutor preparing for trial: he sought to obtain these visual depictions of the crime scene in order to strengthen his case. (Am. Cmplt. ¶ 64 (purpose of second set of photographs was "to show that P.O. Jeselson could see a hand coming out of the car window on the date of plaintiff' s arrest")). Although Chao was working with the police, he was acting within his role "as [an] advocate for the State." *Burns,* 500 U.S at 491. Courts have consistently found absolute immunity applicable where, as here, a Section 1983 plaintiff is relying on post-indictment misconduct by a prosecutor aimed at obtaining additional evidence to support pending charges at trial. *See, e.g., Deskovic,* 2009 WL 2475001, at \*5, \*11, \*13 (plaintiff contended that A.D.A. had, post-indictment, conspired to procure false scientific evidence that he later introduced at trial; granting A.D.A.'s motion to dismiss Section 1983 claims on absolute immunity grounds, because the A.D.A.'s alleged misconduct took place after indictment during the "judicial phase of the criminal process"); *Bertuglia v. City of New York,* No. 11 Civ. 2141(JGK), 2012 WL 906958, at \*21 (S.D.N.Y. Mar. 19, 2012) (granting motion to dismiss state law claims against A.D.A. defendant based on post-indictment evidence-gathering activities; absolute immunity applicable because "the Complaint does not allege facts that create a plausible inference that [the prosecutor] was not acting as an advocate seeking to strengthen her case against an indicted defendant"); *Zahrey v. City of New York,* No. 98–4546, 2009 WL 54495, at \*30–\*31 (S.D.N.Y. Jan. 7, 2009) (granting absolute immunity to A.D.A. alleged to have engaged in post-indictment effort to fabricate evidence); *KRL v. Moore,* 384 F.3d 1105 (9th Cir.2004) (granting A.D.A. absolute immunity for alleged misconduct related to his role in obtaining a post-indictment search warrant seeking evidence to corroborate pending charges); *Cousin v. Small,* 325 F.3d 627, 635 (5th Cir.2003) (granting absolute immunity to A.D.A. accused of fabricating evidence post-indictment; "at the time of [A.D.A.] Jordan's ... conversations with Rowell, in which Jordan allegedly told Rowell to implicate Cousin falsely in the murder and coached him on how to testify, Jordan was acting as an advocate rather than as an investigator. The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause. Jordan therefore is entitled to absolute immunity with respect to this claim."); *see also Peay v. Ajello,* 470 F.3d 65, 68 (2d Cir.2006) (affirming dismissal on absolute immunity grounds of Section 1983 claim brought against Assistant State's Attorney based on alleged conspiracy to present false evidence at trial); *Dory,* 25 F.3d at 83 ("absolute immunity protects a prosecutor from § 1983 liability for ... allegedly conspiring to present false evidence at a criminal trial").

**\*9**  Because Chao is alleged to have obtained the misleading photographs post-indictment, in preparation for Moye's second trial, and in an effort to strengthen his case as the State's advocate, he is entitled to absolute immunity for this alleged misconduct.

### 3. *Misconduct at Trial*

Moye alleges that Chao elicited false testimony from Officer Jeselson at trial, that he buttressed Jeselson's false testimony through introduction of the misleading photographs, and that he then vouched for the truth of Jeselson's testimony in his summation.

A prosecutor's presentation of false evidence, or subornation of perjury at trial, is protected by absolute immunity. *Jones v. King,* No. 10 Civ. 0897(PKC), 2011 WL 4484360, at \*4 (S.D.N.Y. Sept. 28, 2011) ("The claim that [the prosecutor] 'conspir[ed] to present false evidence at a criminal trial' is barred.... The prosecutor enjoys absolute immunity 'despite allegations of his "knowing use of perjured testimony...." ' ") (citations omitted); *Bertuglia,* 2012 WL 906958, at \*23 (prosecutors are entitled to absolute immunity for allegations that they "coerced and harassed various witnesses into giving false testimony"); *Urrego v. United States,* No. 00 CV 1203(CBA), 2005 WL 1263291, at \*2 (E.D.N.Y.2005) ("It is settled law that when a prosecutor presents evidence to a grand jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the evidence presented was false."); *Johnson v. Scott,* No. CV–91–1467(CPS), 1993 WL 36131, at \*2 (E.D.N.Y. Feb. 5, 1993) (A.D.A. entitled to absolute immunity related to witness perjury, because this "concern[ed] ... the presentation of the State's case against the plaintiff); *see Imbler,* 424 U.S. at 430–31 (granting prosecutors absolute immunity for their conduct "in presenting the State's case," including permitting a fingerprint expert to give false testimony, suppressing important evidence, and introducing a misleading artist's sketch into evidence.).

The analysis does not change because Plaintiff alleges a conspiracy to commit these acts. *Shmueli,* 424 F.3d at 237–38 ("principles [of absolute immunity] are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy") (citing *Dory,* 25 F.3d at 83); *Bernard.* 356 F.3d at 503; *Hill,* 45 F.3d at 659 n. 2 (when the underlying activity at issue is covered by absolute immunity, the "plaintiff derives no benefit from alleging a conspiracy").

Plaintiff also argues that Chao acted outside his prosecutorial role when he vouched for Jeselson's testimony during summation. Because a prosecutor's summation is part of presenting the State's case, courts agree that a prosecutor's conduct during summation is protected by absolute immunity. *See Robinson v. Rome,* No. 11–CV–1411(NGG)(LB), 2011 WL 1541044, at \*3 (E.D.N.Y.2011) (finding A.D.A.s immune from suit for claims related to, *inter alia,* an improper summation); *Johnson,* 1993 WL 36131, at \*2 (granting absolute immunity to prosecutor where plaintiff alleged that A.D.A. "express [ed] to the jury her opinion as to the truth of the testimony of her witnesses during her summation").

**\*10**  In sum, to the extent that Moye's claims against Chao are based on his conduct at trial, those claims are covered by absolute immunity.

* * * *

The Court concludes that Chao has absolute immunity for all of Moye's claims, whether based on federal or state law, and whether founded on theories of malicious prosecution, abuse of process, denial of a fair trial, fabricated evidence, conspiracy, or intentional or negligent infliction of emotional distress.

### *CONCLUSION*

Chao's motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2569085

---

### Footnotes

1    The Amended Complaint does not disclose what false testimony or other false evidence was laid before the grand jury. Moreover, there is no suggestion that Chao was involved in presenting false testimony or false evidence to the grand jury.

2    Because Moye sues Defendant Chao in his individual capacity (Am .Cmplt.¶ 9), his claims are not barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("To the extent that ... a [Section 1983] claim is asserted against a [state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment.").

3    District courts likewise evaluate the applicability of absolute immunity before assessing whether a plaintiff has sufficiently alleged a constitutional violation. *Pinaud,* 52 F.3d at 1148 n. 4 (citing *Buckley,* 509 U.S. at 261).

4    By contrast, discretionary prosecutorial actions that are not "intimately associated with the judicial phase of the criminal process" are entitled only to qualified immunity. *See Buckley,* 509 U.S. at 270–75; *Burns,* 500 U.S. at 491–95. A prosecutor is "absolutely immune from liability under section 1983 [only] for acts 'within the scope of [their] duties in initiating and pursuing a criminal prosecution.' " *Day,* 909 F.2d at 77 (quoting *Imbler,* 424 U.S. at 410). Thus, when a prosecutor acts in an investigative or administrative capacity, absolute immunity is not available. *Hill,* 45 F.3d at 661. For example, immunity is not available when a prosecutor releases information or evidence to the media, *Buckley,* 509 U.S. at 276–78; authorizes or directs the use of wiretaps, *Powers v. Coe,* 728 F.2d 97, 103 (2d Cir.1984); or performs the functions normally performed by the police, such as assisting in the execution of a search or seizure. *See Buckley,* 509 U.S. at 273. The Supreme Court has also withheld absolute immunity for conduct unrelated to advocacy, such as giving legal advice, *Burns,* 500 U.S. at 492–96, or acting as a complaining witness. *Kalina,* 522 U.S. 118, 129–31; *see also Ying Jing Gan,* 996 F.2d at 533 (finding that prosecutor was not entitled to absolute immunity where he allegedly exposed a witness to retaliation and failed to provide adequate protection for the witness).

5    Absolute immunity is a defense not only to Section 1983 claims but to related state law claims. *See Shmueli,* 424 F.3d at 238 (dismissing Section 1983 and related state law malicious prosecution claims); *Arum v. Miller,* 331 F.Supp.2d 99, 112 (E.D.N.Y.2004) (dismissing abuse of process and civil conspiracy claims on grounds of absolute prosecutorial immunity); *Imbler,* 424 U.S. at 424 (same principles require conferral of absolute immunity for damage claims against prosecutors under Section 1983 and state law).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    8

1996 WL 442797
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric W. MURPHY, Plaintiff,

v.

Sr. Investigator John NEUBERGER, Investigator
Harry Mulhall, Officer R. Croft, Officer Karen W. Hill,
Officer Kilgallon, Officer Charles Mays, C.O. Robert
Fernandez, Assistant Attorney General Nancy Snyder,
Attorney General G. Oliver Koppell, Commissioner
Anthony J. Schembri, New York City Department of
Corrections, City of New York, State of New York,
Jane Doe #1-7, and John Doe #1-7, Defendants.

No. 94 Civ. 7421 (AGS).
|
Aug. 6, 1996.

*OPINION & ORDER*

ALLEN G. SCHWARTZ, District Judge:

**\*1** Plaintiff Eric W. Murphy brings this action *pro se* against various New York City and New York State defendants seeking monetary and declaratory relief under 42 U.S.C. §§ 1983, 1985, and 1986 on the grounds that defendants violated his civil rights as secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments. Defendants have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that plaintiff has failed to state a claim upon which relief can be granted. For the reasons discussed below, defendants' motions to dismiss plaintiff's federal civil rights claims are denied as to plaintiff's claims of false arrest, illegal search, and failure to arraign. As to the remainder of plaintiff's federal claims, defendants' motions are granted. In addition, the Court hereby dismisses plaintiff's state law claim.

*FACTS*

Plaintiff is a former New York City Corrections Officer. This case stems from investigations by state officials into alleged tax evasions by plaintiff and the events arising from this inquiry. Plaintiff has sued the State of New York, City of New York, New York City Department of Corrections, and various

State and City officials in both their official and personal capacities for violations of his constitutional rights.

According to plaintiff's complaint and affidavit [1], plaintiff went to the New York State Department of Law in Albany, New York on August 5, 1993 where he met with New York State defendant Senior Investigator John Neuberger (sued herein as "Neuberger") in the presence of State defendant Investigator Harry Mulhall ("Mulhall") and another employee of the New York State Department of Law. Compl., ¶¶ 11, 13; Affidavit of Eric W. Murphy dated October 11, 1994 ("Murphy Aff."), ¶ 7. Neuberger allegedly handed a sheet of paper to plaintiff which stated that plaintiff had failed to file an income tax return. Murphy Aff., ¶ 8. Plaintiff denied the allegations. Murphy Aff., ¶ 9. After plaintiff refused to identify himself, plaintiff alleges Neuberger forced him to relinquish his off-duty weapon through coercion, searched and seized his personal property "without a lawful warrant or permission," and "placed [him] in chains" against his will while Defendant Mulhall and the other officer/supervisor looked on. Compl., ¶¶ 13, 16; Murphy Aff., ¶ 13. Plaintiff also alleges the state officers did not read him his *Miranda* rights and did not present him with a lawful warrant for his arrest. Compl., ¶ 14. Moreover, plaintiff maintains he was never brought before a "neutral judge for a 'probable cause' hearing." Compl., ¶ 17. Plaintiff allegedly learned that it was "common practice to refuse a hearing on probable cause, that [it] is a common practice to refuse a hearing for charges and/or bail until submitting to fingerprinting." Murphy Aff., ¶ 19.

On April 21, 1994, plaintiff received a written request from New York City defendant Corrections Officer Robert Fernandez ("Fernandez") to appear at the New York City Department of Corrections ("DOC") headquarters at 9:00 a.m. on April 22, 1994. Compl., ¶ 20. Plaintiff's affidavit indicates that he was called to the DOC to discuss alleged "deranged" letters that plaintiff had been writing to Assistant Attorney General Nancy Snyder ("Snyder"). Murphy Aff., ¶ 40. Plaintiff believes the room into which he was called was equipped with recording devices. Murphy Aff., ¶ 30. After plaintiff refused to speak or identify himself, plaintiff alleges State defendant Investigator R. Croft ("Croft") grabbed plaintiff and "put him in chains" while Fernandez, State defendant Investigator Charles Mays ("Mays"), and another officer from the State Department of Law observed. Compl., ¶ 22. Again plaintiff alleges that the state officers did not present him with a lawful warrant for his arrest, did not inform him that he was under arrest, and did not read him his *Miranda* rights. Compl., ¶ 23. The state officers took plaintiff

Case 1:25-cv-00968-ECC-ML     Document 54     Filed 11/26/25     Page 382 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

to Manhattan Criminal Court to be "booked." Murphy Aff., ¶ 39. Plaintiff then alleges he was forced to pay Mays a $500.00 ransom. Compl., ¶ 27; Murphy Aff., ¶ 41.

 **\*2**  On July 12, 1994, Corrections Department attorney Robert Moriber ordered plaintiff to report to the Inspector General's office at the DOC. Compl., ¶ 29, Murphy Aff., ¶ 47. State defendant Investigator Karen Hill ("Hill") and two other state police officers allegedly began to interrogate plaintiff. Compl., ¶ 30. When plaintiff refused to speak or identify himself, the officers allegedly arrested plaintiff and "forcibly put cuffs on him." Compl., ¶ 32. According to plaintiff, the state officers did not inform him that he was under arrest, did not read him his *Miranda* rights, and did not present him with a lawful warrant. Compl., ¶ 31. Hill and the other two officers brought plaintiff to Manhattan Criminal Court and then transported him to Albany in the back seat of a small car where he was "driven for over 4 hours in a cramped, painful position with hands chained behind his back." Compl., ¶¶ 34, 37. Hill allegedly met State defendant Investigator William Kilgallon (sued herein as "Kilgallon") "somewhere on the New York State Thruway where Plaintiff was then taken against his will by Defendant Kilgallen [sic], shackled in chains, taken to Albany Police Court in Albany, New York, and deposited there to be 'booked' on open charges." Compl., ¶ 38.

Plaintiff alleges he was kept in "shackles" with his hands behind his back for 8 hours and, by the time he was taken to Albany City Court, he was "in severe pain, had not slept, eaten or used the men's room for over 24 hours." Compl., ¶ 39; Murphy Aff., ¶ 53. While in jail, plaintiff allegedly went eight days without appearing before a judge and was allegedly forced to undergo psychological examinations. Compl., ¶¶ 40, 41. Moreover, because he refused to sign any papers while at the jail, plaintiff alleges he was placed in solitary confinement for over 100 hours without cause and was forced to sleep under bright, hot lights. Compl., ¶ 44.

Plaintiff's complaint also includes allegations of a conspiracy to deprive him of his constitutional rights. Compl., ¶ 53. In addition, plaintiff contends defendants City of New York ("City") and State of New York ("State") are parties "to one or more contracts authorized by the State of New York and the United States Code and General Statutes, between themselves and the [DOC], New York State Police Department, and New York State Attorney Generals Office." Compl., ¶ 64. Defendants DOC, City, and State allegedly violated these contracts. Compl., ¶ 65. Plaintiff provides no

other meaningful details regarding his purported breach of contract claim.

## DISCUSSION

A. *Standard in Deciding a Motion to Dismiss*

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the function of the district court is to assess the legal feasibility of the complaint, not to weigh the evidence that may be offered at trial. *Odom v. Columbia University,* 906 F.Supp. 188, 193 (S.D.N.Y. 1995) (citing *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir. 1990)). All factual allegations in the complaint must be accepted as true and the complaint must be viewed in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir. 1991). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir. 1994)(quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In addition, where the plaintiff is proceeding *pro se,* the court must construe the complaint liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972)(*per curiam*); *Platsky v. CIA,* 953 F.2d 26, 28 (2d Cir. 1991)(per curiam).

B. *Section 1983 Claims*

 **\*3**  Title 42, United States Code, Section 1983 ("Section 1983") provides that "[e]very person who, under color of [state law] subjects, or causes to be subjected, any ... person within the jurisdiction [of the United States] to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity ...." 42 U.S.C. § 1983. The Supreme Court has interpreted the "plain words" of this statute as imposing liability "only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and its laws." *Rizzo v. Goode,* 423 U.S. 362, 370-71, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976), *quoted in Herrera v. Scully,* 815 F.Supp. 713, 721 (S.D.N.Y. 1993).

1. *Lack of Personal Involvement*

It is well settled in the Second Circuit that a plaintiff must assert direct and personal involvement of the defendant in

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 383 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

the alleged constitutional deprivations in a claim brought under Section 1983. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). Failure to set forth facts pertaining to such personal involvement results in a "fatally defective" complaint. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir. 1987).

Moreover, the doctrine of respondeat superior does not apply in a Section 1983 action; a showing of personal responsibility on the part of the defendant is required. *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973). The only circumstances under which direct participation may not be necessary is when a supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989)(quoting *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir. 1989)).

Because plaintiff fails to allege personal involvement on the part of some of the defendants, his claims against them must be dismissed. Plaintiff appears to include former New York City Department of Corrections Commissioner Anthony J. Schembri ("Schembri") and former State Attorney General G. Oliver Koppell (sued herein as "Koppel") in his broad allegation that all the defendants deprived him of his constitutional rights as secured under the Fourth, Fifth, Eighth, and Fourteenth Amendments. Although the caption of plaintiff's complaint names Schembri and Koppell as defendants, plaintiff's complaint is entirely devoid of any allegations of either Schembri or Koppell's personal involvement in violating plaintiff's constitutional rights. It is insignificant that Schembri and Koppell were in high positions of authority at the time plaintiff filed his complaint, as this is an "insufficient basis for the imposition of personal liability." *McKinnon,* 568 F.2d at 934. Plaintiff sets forth no facts indicating that either Schembri or Koppell demonstrated gross negligence or deliberate indifference by failing to act with regard to the alleged unconstitutional practices that occurred during plaintiff's arrests or his post-arrest periods of detention. Plaintiff has therefore failed to state a claim against Schembri and Koppell and the claims against these defendants are dismissed.

**\*4** Plaintiff also fails to set forth sufficient facts to indicate personal involvement on the part of City defendant Fernandez. Plaintiff does not implicate Fernandez in the events surrounding the alleged arrests and detentions of August 5, 1993 or July 12, 1994. As to the alleged April 22,

1994 arrest, plaintiff claims the request to appear at the DOC was delivered by Fernandez and that Fernandez was present at the DOC on April 22, 1994 when the alleged constitutional violations occurred. However, plaintiff does not allege that Fernandez participated in any of the events that caused his alleged deprivation of constitutional rights. Plaintiff only contends that "Fernandez never said or did anything to come to [his] aid ...." Murphy Aff., ¶ 37. Because Fernandez did not subject, or cause plaintiff to be subjected, to a deprivation of constitutional rights, plaintiff's claims against Fernandez must be dismissed for failure to state a claim.

Plaintiff's allegations with regard to State defendant Snyder only concern her involvement in the alleged conspiracy and her alleged orders to arrest plaintiff. *See* Compl., ¶¶ 18, 42; Murphy Aff., ¶¶ 43, 61. Her alleged involvement with regard to the conspiracy and false arrest claims are discussed further below. As to the remainder of plaintiff's claims, plaintiff sets forth no facts indicating that Snyder had any involvement. Consequently, plaintiff's remaining claims against Snyder are dismissed for failure to state a claim.

In its memorandum of law, the State asserts that plaintiff has failed to set forth facts regarding the personal involvement of State defendants Mulhall, Croft, and Kilgallon in plaintiff's arrests and detentions. Based on the allegations of plaintiff's complaint and affidavit, the Court cannot agree. Plaintiff implicates State defendant Mulhall in the events of August 5, 1993 when defendants allegedly searched plaintiff and seized his personal property without a lawful warrant and failed to read plaintiff his *Miranda* warnings. Compl., ¶¶ 13-14; Murphy Aff., ¶ 16. State defendant Croft allegedly forced plaintiff's hands into chains and was present during the search of plaintiff and his belongings on April 22, 1994. Compl., ¶¶ 22-23; Murphy Aff., ¶¶ 33-34. State defendant Kilgallon allegedly "shackled [plaintiff] in chains" and transported him to Albany City Court on July 12, 1994. Compl., ¶ 38; Murphy Aff., ¶ 51. Despite the conclusion that there are sufficient allegations of personal involvement on the part of these State defendants, plaintiff's claims against them must be dismissed for failure to allege a constitutional violation on all but three grounds, as discussed further below.

### 2. *Eleventh Amendment Bar*

Plaintiff asserts claims against the State of New York and various State officials in their official capacities. For the reasons that follow, these claims are dismissed.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 384 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

In the absence of consent, the Eleventh Amendment bars a suit in federal court in which a State or one of its agencies or departments is named as a defendant, regardless of the nature of the relief sought. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). Moreover, a State is not considered a "person" within the meaning of Section 1983 and thus cannot be held liable pursuant to that statute. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). Accordingly, plaintiff's claims against the State of New York are dismissed.

**\*5** Eleventh Amendment immunity from suit in federal court is extended to state officials sued in their official capacity "when a suit against state officials is in fact a suit against a State ... regardless of whether it seeks damages or injunctive relief." *Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 909. As the Supreme Court reasoned in *Will,* "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will,* 491 U.S. at 71, 109 S.Ct. at 2312. Thus, when the State is the "real, substantial party in interest," meaning that damages would be paid from public funds in the state treasury, the State can invoke its sovereign immunity despite the naming of individual defendants. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974)(quoting *Ford Motor Co. v. Dept. of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)).

Plaintiff seeks substantial monetary relief against the former Attorney General of the State of New York, an Assistant Attorney General, and eight State investigators, all of whom were acting in their official capacities as employees of the State of New York. Plaintiff does not dispute this. Although plaintiff names these defendants as parties, the source of recovery is the State. Therefore, plaintiff's claims against the defendants in their official capacities are barred by the Eleventh Amendment. [2]

### 3. *Allegations of Constitutional Violations*
Plaintiff alleges that defendants violated his constitutional rights as protected under the Fourth, Fifth, Eighth, and Fourteenth Amendments. Reading plaintiff's complaint and affidavit liberally, this Court concludes that plaintiff has set forth facts sufficient to support his claims of false arrest, illegal search, and failure to arraign. Defendants' motions to dismiss are denied as to these claims. All other claims in plaintiff's complaint are dismissed.

### a. *Sufficient Constitutional Claims*

Plaintiff alleges that defendants violated his Fourth Amendment right to be free from "unreasonable ... seizures" by arresting him without a warrant and without probable cause and then failing to bring him before a magistrate for a probable cause hearing. *See, e.g.,* Compl., ¶¶ 14, 17. Moreover, he alleges his right to due process under the Fifth and Fourteenth Amendments was violated when he was arrested and his personal property searched and seized without a lawful warrant. Compl., ¶ 58.

The Fourth Amendment has been construed to require that an arrest be grounded in probable cause. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225-26, 13 L.Ed.2d 142 (1964). Probable cause exists when there are "facts and circumstances 'sufficient to warrant a prudent man in believing that the [[[suspect] had committed or was committing an offense.'" *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975)(citation omitted), *quoted in Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996).

**\*6** The Fourth Amendment further requires prompt judicial determination of probable cause as a prerequisite to an extended restraint on liberty following an arrest without a warrant. *Gerstein v. Pugh,* 420 U.S. at 125, 95 S.Ct. at 868-69. The *Gerstein* Court concluded that a defendant may only be detained for as long as it takes to process "the administrative steps incident to arrest," but left it to the individual states to integrate the probable cause hearing into their various pretrial procedures. *Gerstein,* 420 U.S. at 114, 95 S.Ct. at 863. However, if a suspect is not brought before a magistrate to establish probable cause, the suspect must be released, *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 437 (7th Cir. 1986), *cert. denied* 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987), as the consequences of failing to promptly administer probable cause determinations could be far "more serious than the interference occasioned by arrest." *Gerstein,* 420 U.S. at 114, 95 S.Ct. at 863.

In *Williams v. Ward,* the Second Circuit addressed the issue of the permissible length of prearraignment detention for persons arrested in New York City. 845 F.2d 374 (2d Cir. 1988). In its interpretation of *Gerstein,* the Court concluded that the determination of probable cause may constitutionally occur within seventy-two hours of the initial arrest. *Id.* at 387. In *County of Riverside v. McLaughlin,* the Supreme Court

attempted to resolve the ambiguity created by *Gerstein* and established that "prompt" generally means within 48 hours of the warrantless arrest. 500 U.S. 44, 57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991). A longer delay presumptively violates the Fourth Amendment. *Powell v. Nevada,* 511 U.S. 79, 114 S.Ct. 1280, 1283, 128 L.Ed.2d 1 (1994).

An arrest supportable by less than probable cause may be actionable under Section 1983 as a claim for false arrest, provided the "seizure" in question is "unreasonable." *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir. 1991). In order to state a claim for false arrest, a plaintiff must show that (1) the officer intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement and did not consent to it; and (3) the confinement was not otherwise privileged. *Lowth,* 82 F.3d at 569. The Second Circuit has held, however, that a Section 1983 claim for false arrest is barred if the plaintiff was subsequently convicted of the offense for which he was arrested. *Cameron v. Fogarty,* 806 F.2d 380, 388 (2d Cir. 1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). *See also Malady v. Crunk,* 902 F.2d 10, 11 (8th Cir. 1990); *King v. Goldsmith,* 897 F.2d 885, 886 (7th Cir. 1990); *Walker v. Schaeffer,* 854 F.2d 138, 143 (6th Cir. 1988). *But see Rose v. Bartle,* 871 F.2d 331, 351 (3d Cir. 1989)(stating that favorable termination of a criminal proceeding is not an element of a Section 1983 false arrest claim). Entry of a guilty plea, even if the plea is to a charge lesser than that for which the plaintiff was arrested, also operates as a defense to a Section 1983 action for false arrest. *Roundtree v. City of New York,* 778 F.Supp. 614, 619 (E.D.N.Y. 1991).

**\*7** Just as the Fourth Amendment prohibits seizures of persons without probable cause, generally a search must be conducted pursuant to a lawful warrant. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978). However, an individual lawfully arrested may be searched without a warrant incident to the arrest. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973)(lawful custodial arrest authorizes "a full search of the person" arrested).

Plaintiff alleges with regard to each arrest that he was neither presented with a lawful warrant nor arrested with probable cause. Compl., ¶¶ 16, 23, 31. Plaintiff further contends that he was not brought before a magistrate for a probable cause hearing when he was arrested and that he was detained in the Albany Correctional Facility "for 8 consecutive days without seeing a judge." Compl., ¶¶ 17, 36, 41. Taking these facts

to be true, as is necessary on a motion to dismiss, plaintiff sets forth facts sufficient to constitute a false arrest claim.[3] Lacking probable cause, the defendants could have acted with an unreasonable and unconstitutional level of intrusion in restraining plaintiff's freedom of movement. Further, plaintiff does not simply maintain that his arraignments were delayed, but that they never occurred. If plaintiff was denied probable cause hearings and detained for eight days without seeing a judge, as he contends, a clear violation of his Fourth Amendment rights has transpired. *See Powell,* 511 U.S. at ——, 114 S.Ct. at 1283 (where a suspect's arrest was not validated by a magistrate until four days elapsed, the court stated that the delay was presumptively unreasonable under *McLaughlin*'s 48-hour rule). Plaintiff therefore states a claim for false arrest and failure to arraign[4] and defendants' motions to dismiss are denied with respect to these claims.

Because an arrest must be "lawful" in order to justify any search incident to arrest, plaintiff also states a claim for the alleged unlawful search and seizure of his papers and effects as prohibited by the Fourth Amendment. Consequently, defendants' motions to dismiss are denied with regard to this claim, as plaintiff sufficiently states a claim of illegal search under the Fourth Amendment.

### b. *Insufficient Constitutional Claims*

Although a federal court will construe a *pro se* plaintiff's inartful pleading liberally, *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972)(*per curiam*); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988), a *pro se* plaintiff cannot completely avoid the pleading requirements of the Federal Rules of Civil Procedure. *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983). This Circuit has established that "a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6)." *Martin v. N.Y. State Dept. of Mental Hygiene,* 588 F.2d 371 (2d Cir. 1978)(per curiam); *Gant v. Wallingford Board of Education,* 69 F.3d 669 (2d Cir. 1995). Due to the capacity of "unfounded suits under §§ 1983 and 1985 to disrupt the delivery of services by public officers, courts have dismissed suits that pleaded violations of constitutional rights in conclusory fashion without specification of the facts constituting a violation." *Barr v. Abrams,* 641 F.Supp. 547, 552 (S.D.N.Y. 1986), *aff'd,* 810 F.2d 358 (2d Cir. 1987).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 386 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

**\*8** Plaintiff claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment by the "unreasonable actions of defendants on August 5, 1993, and July 12, 1994, depriving Plaintiff of his right to go to work, and the companionships [sic] of his family while he was incarcerated." Compl., ¶ 57. The Eighth Amendment, however, does not attach until after conviction and sentencing, as "it was designed to protect those convicted of crimes." *Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 1409, 51 L.Ed.2d 711 (1977). Since none of plaintiff's allegations concern events occurring after he was convicted and/or sentenced, plaintiff's Eighth Amendment claim is dismissed.

Plaintiff's claim that he was never read his *Miranda* rights is also dismissed for failure to state a claim upon which relief may be granted. The Supreme Court has repeatedly held that the *Miranda* warnings are not themselves required by the Constitution but are rather prophylactic measures to insure that a suspect's Fifth Amendment rights are not violated. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 305-07 & n. 1, 105 S.Ct. 1285, 1291-92 & n. 1, 84 L.Ed.2d 222 (1985). The appropriate remedy for the failure to read a suspect his *Miranda* warnings is the exclusion of any self-incriminating evidence, not a civil rights action. *Neighbour v. Covert,* 68 F.3d 1508, 1510 (2d Cir. 1995); *Turner v. Lynch,* 534 F.Supp. 686, 689 (S.D.N.Y. 1982). Plaintiff's claim regarding defendants' failure to read plaintiff his *Miranda* warnings is therefore dismissed.

Plaintiff also seeks recovery on the grounds that defendants used excessive force in the course of his arrests. In *Graham v. Connor,* the Supreme Court held that an excessive force claim invokes the protections of the Fourth Amendment which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person. 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). An excessive force claim must thus be analyzed under the Fourth Amendment "reasonableness" standard. *Id.* The *Graham* Court advised that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. Factors to consider include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

It is proper to dismiss an excessive force claim under Rule 12(b)(6) when a plaintiff does not allege an unreasonably excessive use of force. *Roundtree v. City of New York,* 778 F.Supp. 614, 621 (E.D.N.Y. 1991). Plaintiff appears to allege that defendants used excessive force by placing him in handcuffs and requiring him to keep his hands in handcuffs behind his back while being driven from Manhattan Criminal Court to Albany Police Court. *See* Compl., ¶¶ 13, 22, 32, 37. Under the Fourth Amendment "reasonableness" test, such actions do not rise to the level of a constitutional violation of plaintiff's Fourth Amendment rights. *See Soares v. State of Connecticut,* 8 F.3d 917, 922 (2d Cir. 1993) (recognizing that "there is still no clear authority on whether and under what circumstances, if any, a person has a constitutional right not to be handcuffed in the course of an arrest"). Although the injuries suffered need not be permanent or severe to recover under an excessive force claim, *see Robinson v. Via,* 821 F.2d 913, 924 (2d Cir. 1987), plaintiff's complaint does not allege any injuries resulting from the use of handcuffs. Plaintiff only asserts that he was forced to travel to Albany in a "painful, cramped, dehumanizing position." Murphy Aff., ¶ 50. Because the facts alleged do not constitute excessive force, plaintiff's claim is dismissed. [5]

### 4. *Monell Liability*

**\*9** Plaintiff seeks to hold the City and the DOC liable for the alleged violations of his civil rights that occurred in connection with his three arrests. Plaintiff seeks to establish municipal liability based on the existence of a municipal policy that deprived plaintiff of his constitutional rights and the doctrine of respondeat superior. For the reasons discussed below, plaintiff's claims against the City and the DOC are dismissed.

In *Monell v. New York City Department of Social Services,* the Supreme Court held that a municipality may be held liable as a "person" within the meaning of Section 1983 for violations of civil rights caused by the municipality's policy or custom. 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Sarus v. Rotundo,* 831 F.2d 397, 400 (2d Cir. 1987). A municipal policy may be inferred from the informal acts or omissions of supervisory officials, even though the policy "has not received formal approval through the body's official decisionmaking channels." *Turpin v. Mailet,* 619 F.2d 196, 199 (2d Cir. 1980)(quoting *Monell,* 436 U.S. at 690-91, 98 S.Ct. at 2036). However, proof of a single incident of alleged constitutional activity is not sufficient to impose liability under Section 1983 absent an official custom, practice or policy which can be attributed to the municipal policymaker. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 387 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985). Moreover, neither *Monell* nor its progeny "authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir. 1994).

The *Monell* Court specifically declined to read Section 1983 as imposing "liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell,* 436 U.S. at 692, 98 S.Ct. at 2036. Thus, municipal liability under Section 1983 cannot be founded upon the doctrine of respondeat superior.

Because plaintiff fails to allege any sustainable constitutional violations on the part of a municipal employee, namely Fernandez, plaintiff's claims against the City under *Monell* must be dismissed. As discussed above, plaintiff has failed to set forth facts alleging personal involvement on the part of Fernandez in the alleged deprivation of plaintiff's constitutional rights. Consequently, plaintiff's claims against the City must be dismissed, as *Monell* liability cannot be found where a municipal officer inflicted no constitutional harm. [6] *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). [7]

Unlike the City, a municipal entity liable under *Monell,* the DOC is not a suable entity. Section 396 of the New York City Charter states that unless otherwise provided, "all actions and proceedings for the recovery of penalties ... shall be brought in the name of the City of New York and not in that of any agency." *Jolly v. New York City Dept. of Corrections,* 89 Civ. 4520, 1989 WL 153053, at *3 (S.D.N.Y. Dec. 13, 1989). This language has been strictly construed, even against *pro se* plaintiffs. *Torres v. New York City Dept. of Corrections,* 93 Civ. 6296, 1995 WL 63159, at *1 (S.D.N.Y. Feb. 15, 1995). Plaintiff's claims against the DOC are therefore dismissed.

**\*10** Moreover, plaintiff's claim that the City and the DOC are liable under the doctrine of respondeat superior also fails, as a municipality cannot be held vicariously liable for the unconstitutional actions of its employees merely because it is their employer. As discussed above, the DOC is not a suable entity. Plaintiff's claims against the City and the DOC on this ground are thus insufficient and are dismissed.

5. *Absolute Immunity*

To the extent that they are being sued in their individual capacities, all of the State defendants contend that they are entitled to absolute immunity from plaintiff's claims, or in the alternative, qualified immunity. For the reasons set forth below, the Court rejects the State's attempt to cloak all of these defendants with absolute immunity. However, the Court concludes that the defense of absolute immunity is an additional basis for dismissing the claims against State defendant Koppell.

The Supreme Court made clear in *Imbler v. Pachtman* that prosecutors are immune from liability in suits under Section 1983 that arise from their prosecutorial actions in initiating and presenting the State's case in court. 424 U.S. 409, 427, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976). Absolute immunity from liability has been deemed necessary for prosecutors in order to "enable them to function independently and effectively, without fear or harassment." *Id.* at 571.

The scope of absolute immunity will extend to all "activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation ...." *Barrett v. United States,* 798 F.2d 565, 571-72 (2d Cir. 1986). Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615, 125 L.Ed.2d 209 (1993). The examination of the functional nature of the prosecutorial behavior, rather than the status of the person performing the act, is determinative in the absolute immunity analysis. *Imbler,* 424 U.S. at 430, 96 S.Ct. at 994. Prosecutors are afforded only qualified immunity from suit when they act in an "investigative" or "administrative" capacity. *Id.*

Plaintiff makes no specific allegations in his complaint as to Koppell. Koppell's involvement appears to be limited to his duties as Attorney General. This prosecutorial role entitles Koppell to absolute immunity under *Imbler.*

Plaintiff's allegations with regard to Snyder pertain to her involvement in an alleged conspiracy to deprive plaintiff of his constitutional rights and her alleged orders to arrest plaintiff. *See* Compl., ¶¶ 18, 42; Murphy Aff., ¶¶ 43, 61. As discussed further below, plaintiff's allegations of a conspiracy are dismissed on other grounds. As to plaintiff's claims concerning the alleged orders to arrest him, the sparse facts before the Court make the functional analysis that is necessary in deciding the absolute immunity defense impossible. If Snyder's actions concern the pre-trial or trial

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 388 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

phases of a case against plaintiff, which it appears they most likely do, then she is clearly entitled to absolute immunity. *See Cook v. Houston Post,* 616 F.2d 791, 793 (5th Cir. 1980)(where a prosecutor was entitled to absolute immunity for the factual investigation necessary to prepare a case). If, however, Snyder's involvement relates to a nonadvocacy function, such as assisting the investigators in actually executing the arrest, then she is only entitled to qualified immunity. *See Barr v. Abrams,* 810 F.2d at 362 (recognizing the meaningful distinction between filing a criminal information and procuring an arrest warrant, on the one hand, and executing the arrest warrant on the other; the former is entitled to absolute immunity while the latter is in the realm of qualified immunity). Because the factual record before the Court is undeveloped, the Court is unable to determine precisely what Snyder's role was in plaintiff's arrests. Consequently, the Court cannot accord Snyder absolute immunity at this stage. However, Snyder is entitled to qualified immunity for all claims except those concerning the false arrest, as discussed further below.[8]

**\*11** Although the State argues that Neuberger, Mulhall, Croft, Hill, Kilgallon, and Mays -- investigators in the Criminal Prosecutions Bureau of the Attorney General's Office -- are entitled to absolute immunity, the Court does not agree. The allegations contained in plaintiff's complaint indicate the investigators' activities were of an investigatory nature, rather than a prosecutorial nature. In *Barr v. Abrams,* a case in some respects similar to the present case, this Court held that investigators on the Attorney General's staff were entitled to qualified immunity, rather than absolute immunity. *See Barr v. Abrams,* 641 F.Supp. at 554. Although the investigators will not be accorded absolute immunity, all their actions -- except those arising from the false arrest, illegal search, and failure to arraign -- are protected by qualified immunity, as discussed further below.

6. *Qualified Immunity*

The State argues that to the extent that any of the State defendants are not entitled to absolute immunity, they are entitled to qualified immunity. As to the claims for which plaintiff has set forth insufficient allegations of constitutional violations, qualified immunity is an additional basis for dismissing plaintiff's complaint against Snyder and the investigators on the Attorney General's staff. However, as to plaintiff's constitutionally sufficient claims -- false arrest, illegal search, and failure to arraign -- the Court concludes that the State defendants are not entitled to qualified immunity.

Government officials are protected by qualified immunity from suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cartier v. Lussier,* 955 F.2d 841, 843 (2d Cir. 1992)(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Qualified immunity only applies in suits against officials in their personal capacity. *See generally Kentucky v. Graham,* 473 U.S. 159, 165-68, 105 S.Ct. 3099, 3104-07, 87 L.Ed.2d 114 (1985). Because qualified immunity is intended to shield public officials from the burdens and expense of litigation, "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

In assessing whether Snyder, Neuberger, Mulhall, Croft, Hill, Kilgallon, and Mays are entitled to qualified immunity on plaintiff's claim of false arrest, it is first necessary to discern whether the right to be free from false arrest is "clearly established." *Jeffries v. Harleston,* 21 F.3d 1238, 1248 (2d Cir. 1994). To determine if plaintiff's claim implicates a clearly established right, a court must consider whether (1) the right was defined with "reasonable specificity"; (2) the relevant decisional law supports the existence of the right; and (3) under pre-existing law, a reasonable defendant official would have understood that his actions were unlawful. *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir. 1993). Plaintiff's allegations clearly concern a right that is defined with a clarity such that a reasonable defendant would understand from existing law that his or her actions were unlawful. *See Soares v. State of Connecticut,* 8 F.3d 917, 920 (2d Cir. 1993)(recognizing the clearly established right not to be arrested without probable cause).

**\*12** Snyder and the investigators, however, might still be accorded qualified immunity if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991). It is unclear from the undeveloped record before the Court whether it was objectively reasonable for the defendants to believe that they had probable cause to arrest plaintiff. This factual uncertainty compels denial of defendants' qualified immunity defense. *See Day v. Morgenthau,* 909 F.2d 75, 78

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 389 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

(2d Cir. 1990) (holding that the qualified immunity issue could not be resolved on the face of the complaint, as the complaint did not identify what facts were known to the defendants at the time of the arrest and search); *Holmes v. Artuz,* 95 Civ. 2309, 1995 WL 634495, at *2 (S.D.N.Y. Oct. 27, 1995)(denying qualified immunity defense on a Rule 12(b)(6) motion due to sparse factual record before the court).

Plaintiff's allegations of an illegal search and failure to arraign concern Neuberger, Mulhall, Croft, Hill, Kilgallon, and Mays. Both of these claims also implicate "clearly established rights." *See United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973)(affirming the right not to be searched incident to arrest unless the arrest is lawful); *County of Riverside v. McLaughlin,* 500 U.S. 44, 61, 111 S.Ct. 1661, 1672, 114 L.Ed.2d 49 (1991)(recognizing that one of the most important Fourth Amendment rights concerning "unreasonable seizures" is the right of a suspect arrested without a warrant to be brought before a magistrate as soon as reasonably possible). The Court believes that the law is sufficiently clear that, assuming the truth of the plaintiff's allegations, defendants should have known that their conduct violated the clearly established constitutional rights of plaintiff. With regard to the illegal search, it is again unclear whether defendants could have reasonably believed that their arrest of plaintiff was lawful and that therefore their search was lawful. Accordingly, these defendants are not entitled to qualified immunity for their alleged illegal search of plaintiff or their alleged failure to arraign plaintiff, but they may be after the record is more fully developed.

As to the remainder of plaintiff's allegations, plaintiff has failed to set forth facts sufficient to allege any constitutional violations, as discussed further above. Thus defendants were "objectively reasonable" in their belief that they were not violating any clearly established law. Defendants Snyder, Neuberger, Mulhall, Croft, Hill, Kilgallon, and Mays are therefore entitled to qualified immunity for all claims except those concerning the false arrest, illegal search, and failure to arraign. [9]

C. *Section 1985(3)* and *1986* *Claims*
In the introduction to his complaint, plaintiff alleges that defendants conspired to deprive him of his constitutional rights in violation of 42 U.S.C. § 1985 ("Section 1985"). The State defendants quite correctly assumed in their supporting memorandum that plaintiff brings this claim under 42 U.S.C. § 1985(3), as none of the other sections appears applicable.

Plaintiff also submits a claim under 42 U.S.C. § 1986 ("Section 1986") against the DOC, New York City, and New York State, alleging that these defendants failed to prevent the conspiracy to violate his constitutional rights. For the reasons discussed below, plaintiff's claims under Sections 1985(3) and 1986 are dismissed.

**\*13** Section 1985(3) prohibits conspiracies undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws." *Jews for Jesus v. Jewish Comm. Rel. Council of N.Y.,* 968 F.2d 286, 290 (2d Cir. 1992). The Second Circuit has recognized an action under Section 1985(3) where a plaintiff is "injured by a private conspiracy to interfere with his [or her] constitutional rights, so long as there is 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* at 290-91 (citing *Colombrito v. Kelly,* 764 F.2d 122, 130 (2d Cir. 1985)(quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1797-98, 29 L.Ed.2d 338 (1971))). The Supreme Court since *Griffin* has not required that the discriminatory animus be racial in character. *Levy v. City of New York,* 726 F.Supp. 1446, 1453 (S.D.N.Y. 1989). However, the alleged conspiracy must be "directed at a class or group and must involve a showing of discriminatory animus." *Id.* at 1454.

The Second Circuit has "repeatedly held that complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir. 1977)(per curiam)(citing *Black v. United States,* 534 F.2d 524 (2d Cir. 1976)). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993). Even a *pro se* plaintiff must allege some factual basis to substantiate his conclusion that defendants conspired together to deprive him of his constitutionally protected interests. *McGaney v. Scully,* 664 F.Supp. 151, 152 (S.D.N.Y. 1987). A complaint brought under a civil rights statute will thus be dismissed unless it contains "some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987).

Plaintiff's claim that defendants conspired to deprive him of his constitutional rights fails for two reasons. First, plaintiff fails to set forth any specific facts concerning the alleged conspiracy. Plaintiff's only allegations concerning the conspiracy claim consist of vague, conclusory statements such as the following: "Defendant Hill and the other state

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 390 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

officer were working in 'concert'[on July 12, 1994] ... by making no attempts to control the officer or help the plaintiff" (Compl., ¶ 35); the alleged July 12, 1994 "abduction had been ordered by Defendant Snyder in concert with Defendant DOC" (Compl., ¶ 42); and "[a]ll of the Defendants ... acted wantonly, recklessly, willfully and maliciously, and 'in concert' with additional state and city officers showing a deliberate indifference towards Plaintiff and Plaintiff's rights, protected and guaranteed by the Constitution ...." (Compl., ¶ 51).

**\*14** Second, plaintiff's complaint and affidavit do not indicate that plaintiff is a member of an identifiable group targeted for discrimination. Plaintiff does not claim any membership or affiliation in relation to his claims which would allow the Court to find that the alleged conspiracy is directed at any class or group. Plaintiff thus fails to allege any type of "class-based animus" as required by *Griffin.* Consequently, plaintiff's claim of conspiracy under Section 1985(3) must be dismissed.

Plaintiff's claim under Section 1986 must also be dismissed. The Second Circuit has held that "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994). Because plaintiff's claim under Section 1985(3) is insufficient, his claim under Section 1986 is also dismissed.

D. *Pendent State Contract Claim*
In his complaint, plaintiff asserts a claim arising under New York State contract law. Plaintiff maintains that the DOC, New York City, and New York State were "in violation of their authorized contracts on the mornings of August 5, 1993, April 22, 1994, and July 12, 1994 when defendant officers and officials, either directly or indirectly arrested, search [sic], seized property, and incarcerated Plaintiff without a lawful warrant or a victim's complaint." Compl., ¶ 65.

Because plaintiff fails to state a claim upon which relief may be granted, the Court dismisses plaintiff's state contract claim. The allegations in plaintiff's complaint are vague and conclusory. Plaintiff fails to identify what contracts were breached and how defendants breached such contracts. Plaintiff's allegations are thus not sufficient to sustain a breach of contract claim against defendants and must be dismissed.

E. *Plaintiff's Purported Summary Judgment Motion*
The Court notes that plaintiff, in his response to defendants' motions to dismiss, purports to have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. However, plaintiff has failed to annex to the notice of motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried, as required by Local Rule 3(g). Because plaintiff has not complied with Local Rule 3(g) and because he is plainly not entitled to the relief he seeks at this early stage of the case, prior to discovery, plaintiff's purported motion for summary judgment is denied in all respects.

*CONCLUSION*

For the reasons set forth above, all claims against New York State, former State Attorney General Koppell, New York City, the DOC, and City defendants Schembri and Fernandez are dismissed. With regard to the remaining defendants, their motions to dismiss for failure to state a claim are denied as to plaintiff's claims of false arrest, illegal search, and failure to arraign. As to the remainder of plaintiff's claims of various other constitutional violations, defendants' motions to dismiss are granted. Plaintiff's state law contract claim is also dismissed.

**\*15** The plaintiff and counsel for the State defendants are directed to attend a conference with the Court on August 19, 1996 at 4:30 p.m. in Courtroom 14C, United States Courthouse, 500 Pearl Street, New York, New York for the purpose of scheduling further proceedings in this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 442797

---

**Footnotes**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 391 of 520

Murphy v. Sr. Investigator Neuberger, Not Reported in F.Supp. (1996)

1    The facts alleged in plaintiff's complaint are assumed to be true for the purposes of the motions before this Court. Because plaintiff is *pro se,* the Court will also treat the allegations of plaintiff's affidavit dated October 11, 1994, and filed the same day as the complaint, as true. *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972)(per curiam)(courts should construe *pro se* complaints liberally and apply a more flexible standard in determining the sufficiency of a *pro se* complaint).

2    Plaintiff contends in his "Answer to Motion to Dismiss by Defendants ... and Cross Claim for Summary Judgment in Favor of the Plaintiff Murphy" ("Plaintiff's Answer") that the Eleventh Amendment is not a barrier to suits against state officials even when a judgment will have to be satisfied out of the state treasury. Plaintiff's Answer, ¶ 22. However, the case plaintiff cites in support of this contention, *Fitzpatrick v. Bitzer,* is distinguishable from the present case. 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). *Fitzpatrick* involved an award of back pay and attorneys' fees in a Title VII action where express congressional authority exists for such awards against a state. *Fitzpatrick,* 427 U.S. at 457, 96 S.Ct. at 2672. In the present case, the State has not offered its consent and is therefore immune from plaintiff's suit. *See Edelman,* 415 U.S. at 662-63, 94 S.Ct. at 1355.

    Plaintiff also argues that the Eleventh Amendment is not a bar where there is no likelihood of the State being liable in damages for the actions of the defendants. Plaintiff's Answer, ¶ 22. However, as discussed above, the Supreme Court has held that where a suit is brought against a state official in his official capacity, the suit is barred by the Eleventh Amendment because the source for potential damages would be the state treasury. *See Ford Motor Co.,* 323 U.S. at 464, 65 S.Ct. at 350.

3    Plaintiff's claim for false arrest could be deficient if he was convicted or pled guilty to some offense, even one of a lesser charge. *See Cameron v. Fogarty,* 806 F.2d 380, 388 (2d Cir. 1986); *Roundtree v. City of New York,* 778 F.Supp. 614, 619 (E.D.N.Y. 1991). However, none of the parties has raised this issue which, in any event, is more appropriate for summary judgment.

4    Plaintiff also alleges in his Answer that he had to wait three to six hours each time he was summoned to appear at the NYCDC. (Plaintiff's Answer, ¶ 1). This claim does not implicate a constitutional violation.

5    Plaintiff asserts various other allegations in his complaint and affidavit including: plaintiff did not use the men's room for over 24 hours during his July 12, 1994 arrest (Murphy Aff., ¶ 53); recording devices were in the room where plaintiff was interrogated on April 22, 1994 (Murphy Aff., ¶ 30); defendants never told plaintiff he was under arrest (Compl., ¶ 31); defendants required that plaintiff's fingerprints be taken before his probable cause hearing on August 5, 1993 (Murphy Aff., ¶ 19); defendants forced plaintiff to sleep under bright, hot lights (Compl., ¶ 44); and plaintiff was forced to undergo psychological examinations during his July 12, 1994 detention (Compl., ¶ 40).

    None of these allegations rises to the level of a constitutional violation. Although plaintiff did not use the men's room for over 24 hours, he does not claim that the defendants refused to allow him to do so. Even if such had been the case, not permitting an arrestee to go to the bathroom "cannot be characterized as significant in a constitutional sense." *Stewart v. City of Wichita, Kan.,* 827 F.Supp. 1537, 1539 (D.Kan. 1993). Similarly, plaintiff does not allege that defendants used the recording devices, only that the devices may have been present in the room. Even if the devices were used, it is unclear what constitutional rights would be implicated.

    Although defendants allegedly never told plaintiff he was under arrest, this alleged violation of New York Criminal Procedure Law section 140.15 does not suffice as a constitutional violation. *See Kladis v. Brezek,* 823 F.2d 1014, 1018 (7th Cir. 1987)(concluding that neither the Sixth Amendment nor the Fourth Amendment provided a suspect with the right to be informed of the reason for his arrest). Moreover, New York Criminal Procedure Law section 140.20 requires that all "recording, fingerprinting and

other preliminary police duties" be completed *before* bringing an arrestee before a local criminal court. Defendants were thus complying with state law in taking plaintiff's fingerprints prior to his hearing. The use of bright lights, although possibly discomforting, also does not amount to a constitutional violation. *See Fillmore v. Ordonez,* 829 F.Supp. 1544, 1568 (D.Kan. 1993)(court held that restraints that are reasonably related to the institution's interest in maintaining jail security, such as an electronic surveillance system with around-the-clock beeping and soft lighting or a hard, uncomfortable mattress, are not a violation of constitutional rights).

Plaintiff's claim that he was forced to undergo psychological examinations does not implicate the named defendants. Plaintiff does not allege that defendants placed him in a facility for psychological treatment and evaluation, under which circumstances a determination of probable cause would have been necessary. *See Rex v. Teeples,* 753 F.2d 840, 842 (10th Cir. 1985). If plaintiff was forced to undergo psychological evaluations while detained in the Albany Correctional Facility, and proper procedures were not followed, such actions do not involve the named defendants. Because plaintiff has failed to allege facts supporting defendants' personal involvement in the psychological evaluations as necessary in a claim under Section 1983, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), plaintiff's claim stemming from the psychological examinations must be dismissed.

6    In his Answer, plaintiff cites various cases discussing when municipal liability may lie under Section 1983. All of the cases, however, deal with situations in which the court found a constitutional violation. Because this Court has determined that plaintiff has failed to set forth facts alleging personal involvement on the part of Fernandez in the deprivation of plaintiff's constitutional rights, these cases are inapposite.

7    The Court also notes that plaintiff has failed to set forth facts demonstrating that a municipal policy or custom caused the alleged constitutional deprivations. Plaintiff alleges that he was arrested and searched without probable cause and never brought before a neutral magistrate. Plaintiff does not allege any other instance of misconduct or that policy-making City officials were directly involved in the alleged constitutional violations. Vague or conclusory allegations unsupported by specific factual references do not state a claim under Section 1983. *Walden v. Wishengard,* 745 F.2d 149, 153 (2d Cir. 1984)(neither pleading nor affidavit demonstrated that allegedly unconstitutional arrest was the product of official government policy). Thus plaintiff's conclusory allegation that the City "failed and neglected to properly train and supervise its employees" is also insufficient to state a claim. Compl., ¶ 60.

8    Plaintiff contends in his Answer that Snyder should be denied absolute immunity. Although these arguments are moot, the Court will briefly address them. First, plaintiff seems to argue that Snyder is not entitled to absolute immunity because she acted maliciously or corruptly. *See* Plaintiff's Answer at 12. However, in *Imbler* the Court indicates that absolute prosecutorial immunity is not defeated by a showing that the prosecutor acted wrongfully or even maliciously. 424 U.S. at 427 and n.27, 96 S.Ct. at 993 and n.27. Second, plaintiff argues that prosecutors' actions as "private citizens," which are outside the scope of their authority, are not entitled to immunity. Plaintiff's Answer, ¶ 32. Because plaintiff's claims against not only Snyder but all defendants involve their official duties, this argument is also without merit.

9    In his Answer, plaintiff contends that defendants are not entitled to qualified immunity as they were not acting in good faith. Plaintiff's Answer, ¶ 63. This contention does not alter the conclusion that defendants are accorded qualified immunity for those claims that fail to allege a constitutional violation of which any of the State defendants should have been aware. As to the sufficiently pleaded constitutional allegations, plaintiff's contentions are moot.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML  Document 54  Filed 11/26/25  Page 393 of 520

Muzumala v. Unknown Federal Agents, Not Reported in Fed. Supp. (2023)

2023 WL 5530308
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joshua MUZUMALA, Plaintiff,

v.

UNKNOWN FEDERAL AGENTS, et al., Defendants.

22-CV-7851 (LTS)
|
Signed August 28, 2023

**Attorneys and Law Firms**

Joshua Muzumala, Bronx, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** Plaintiff, who is appearing *pro se*, brings this action asserting claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1981, 1983, 1985, and 1986. He alleges that federal agents and others conspired to violate his rights in the States of New York and Louisiana. By order dated January 23, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees. For the reasons set forth below, the Court dismisses this action.

STANDARD OF REVIEW

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)

(internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

BACKGROUND

Plaintiff brings this action alleging a wide-ranging campaign of harassment and surveillance by private individuals and government actors to deprive him of his rights and have him deported. [1] Named as defendants are: (1) "[u]nknown federal agents" (*id.* ¶ 26); (2) John Doe 1, "a federal agent most likely from immigration enforcement" (ECF 2, ¶ 25); (3) John Doe 2 and Jane Doe 1 (collectively "Doe couple"), a couple who were Plaintiff's neighbors in New Paltz, New York; (4) John Doe 3, a resident of Brooklyn, New York, "engaged" by John Doe 1 and the unknown federal agents (*id.* ¶28); (5) the University of New Orleans; (6) John Doe 4, a sergeant employed by the University of New Orleans Campus Police; (7) John Doe 5, a police officer employed by the University of New Orleans Campus Police; (8) Neal Maroney, a professor at the University of New Orleans; (9) John Doe 6, an employee of the Bowery Residents' Committee's ("BRC") Boulevard Men's Residence, [2] a homeless shelter in Manhattan; and (10) Susan Brady, a doctor employed by BRC. The following is a summary of the information in the complaint, which is 96 pages long and contains 390 numbered paragraphs. [3]

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 394 of 520

Muzumala v. Unknown Federal Agents, Not Reported in Fed. Supp. (2023)

## A. Defendants targeted harassment of Plaintiff at the New Paltz Garden Apartments in New Paltz, New York

**\*2** Plaintiff, who identifies himself as being "a male of African descent," moved to the United States in 2006, and since then has obtained multiple degrees. (ECF 2, ¶ 8.) [4] In September 2019, Plaintiff moved to New Paltz, New York, to enroll at the State University of New York at New Paltz ("SUNY New Paltz"). Plaintiff lived in an apartment complex close to campus called New Paltz Gardens, where he may have been the only Black resident. He "experienced xenophobia and racial animus" from a couple, John Doe 2 and Jane Doe 1, who lived in the same building. (*Id.* ¶ 10.) The Doe couple expressed their "angst" that Plaintiff had moved into the building by committing "inimical" acts towards him. This included saying that Plaintiff was "weird and sad," playing audio of monkey sounds loudly while "talking about Black people in a disparaging sense," and screaming, "[W]hy are you here?" and "Get out of here." (*Id.* ¶51.) Because of the "ongoing bias incidents" from the couple, Plaintiff asked to be released from his lease, but his request was denied, and instead he was allowed to move to another apartment in a different building within the complex. (*Id.*)

However, the Doe couple's harassment continued. They "influenced residents around Plaintiff's new apartment building and organized proxies to perpetrate the harassment of Plaintiff." (*Id.* ¶ 11.) For example, on his first day in the new apartment, a resident above him screamed, "[S]omebody get the monkey out of here." (*Id.* ¶ 52.) Plaintiff also heard Jane Doe 1 telling residents in the new building, "[W]e had to treat him like shit to get him out." (*Id.*) Plaintiff believes that the Doe couple "had for some reason become fixated with making [him] uncomfortable in his apartment and in the community." (*Id.*)

In April 2020, at about the time that Plaintiff's application for permanent residency was being processed by the United States Citizenship and Immigration Services, he noticed a change in the tenor of the harassment, as it "had started including intimations that [he] would be deported." (*Id.* ¶ 12.) Plaintiff believes that the Doe couple had involved "immigration enforcement," consisting of John Doe 1 and unknown federal agents, in the harassment "for the purposes of interfering with Plaintiff's petition for permanent residence" and "to try to get [him] removed from the country" (*Id.* ¶¶ 12, 53.) For the next seven months, the harassment escalated, forcing Plaintiff to move to

Poughkeepsie, New York, in September 2020, hoping that it would stop.

## B. Defendants' harassment of Plaintiff continued in Poughkeepsie, New York

The Doe couple, John Doe 1, the unknown federal agents, and "their proxies tracked and followed" Plaintiff to Poughkeepsie, where they obtained access "under federal authority" to apartments adjacent to Plaintiff's apartment and "would surveil Plaintiff, including, but not limited to casting aspersions about [him], and alleging that [he] was a criminal and was getting deported." (*Id.* ¶¶ 16, 57.) In November 2020, Plaintiff received a positive Covid-19 test and informed his landlord of the test so that his neighbors could be informed. A few days later, Jane Doe 1 with unknown individuals drove into a parking lot adjacent to Plaintiff's apartment and screamed, "[D]ie already," after mentioning details about Plaintiff's Covid test. (*Id.* ¶ 62.)

## C. Plaintiff moved to Brooklyn, New York, where Defendants' harassment continued

In December 2020, Plaintiff decided to move to Brooklyn, New York, but all the defendants followed him there and continued the harassment, "[a]t one point, using [a] loudspeaker from an unmarked police car saying, '[Y]ou cannot hide from us.' " (*Id.* ¶ 18.) The defendants used local residents and their "proxies," including John Doe 3, who would verbally harass Plaintiff, "echoing false allegations that Plaintiff was a criminal and was getting deported." (*Id.* ¶ 69.)

On May 21, 2021, Plaintiff's petition for permanent residency was approved. When the defendants found out about the approval, Plaintiff heard Jane Doe 1 saying, "[W]e will keep doing this until we run him out of the country." (*Id.* ¶ 77.) The defendants "had made pursuing Plaintiff a personal matter and had become excessively obsessed with attempting to have Plaintiff deported from the United States." (*Id.* ¶ 79.)

## D. Defendants tracked and followed Plaintiff to New Orleans, Louisiana

**\*3** In June 2021, Plaintiff decided to move to New Orleans, Louisiana, to attend the University of New Orleans, where he had been accepted into a Ph.D. program. Defendants again tracked him down and "repeatedly engaged in a course of conduct that would severely demonize, and defame Plaintiff." (*Id.* ¶ 21.) Defendants escalated their surveillance and harassment of Plaintiff, by (1) using "through-the-wall x-

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 395 of 520

Muzumala v. Unknown Federal Agents, Not Reported in Fed. Supp. (2023)

ray surveillance equipment," which caused radiation (*id.* ¶¶ 22, 105); (2) using proxies such as John Doe 4, who Plaintiff heard saying at a desk in the university library, " '[N]obody wants him. He's got to go,' and '[H]e is a weird guy,' " using language similar to language that had been used by John Doe 1, the unknown federal agents, the Doe couple, and their other proxies (*id.* ¶107); (3) "weaponizing surveillance equipment to furtively cause Plaintiff extreme pain and discomfort" (*id.* ¶ 111); and (4) subjecting Plaintiff to "ionizing radiation several times a day" (*id.* ¶ 120). Plaintiff sought assistance from the campus police, but it soon "appeared that university police were doing the bidding of Defendants John Doe 1 and [u]nknown federal agents," including following him around because they "viewed [him] as a safety concern." (*Id.* ¶¶ 102, 104.)

On September 28, 2021, Defendant Neal Maroney, a professor, responded to Plaintiff's attempt to clarify a question in class with "discriminatory and abusive language" by screaming, "[L]et's get rid of this shit." (*Id.* ¶ 124.) This language was consistent with that used by the defendants, and left Plaintiff "feeling out of place, afraid, embarrassed and unwelcome in his class." (*Id.*) Several days later, Maroney, several of Plaintiff's classmates, John Doe 1, and other unidentified individuals gathered in the hallway of a lecture hall at the university. Plaintiff believes they were having a conversation about him, which included using a "viewing device" to look at his brain. (*Id.* ¶ 128.) Plaintiff began "experiencing a severe headache, including pain and a burning sensation on the surface of his head and neck, and feeling extreme weakness in his arms and legs." (*Id.*) Defendants continued to target Plaintiff with "harassment and violence," leaving him "extremely traumatized." (*Id.* ¶¶ 131-141.)

### E. Plaintiff returned to New York and Defendants followed

Plaintiff feared for his safety, and on November 10, 2021, he withdrew from the University of New Orleans and returned to New York. Plaintiff sought temporary housing from the City of New York, and was housed in several shelters. However, Defendants had followed him and, in the shelters, continued their harassment, which included (1) using surveillance equipment and ionizing radiation to cause him pain; (2) housing him with roommates who threatened him and exposed him to second hand smoke and illicit substances; (3) conspiring with social service workers to get him to transfer to a mental health and substance abuse facility; (4) tracking and following him to Covid-19 isolation hotels; and

(5) "advanc[ing] a false narrative that Plaintiff had a mental illness" (*id.* ¶ 189).

On December 29, 2021, Plaintiff attended a psych evaluation with Defendant Susan Brady, who asked why he was in temporary housing. He informed her of the actions taken against him by the Doe couple, John Doe 1, the unnamed federal agents, and their proxies, "tracking, following, surveilling, and harassing" him, which prevented or made it difficult for him to pursue his "education and employment goals." (*Id.* ¶ 191.) Instead of "identify[ing] the illegal immigration pursuit as the barrier in [his] current circumstances, and begin[ning] the process of addressing it," Defendant Brady diagnosed Plaintiff with schizophrenia. (*Id.* ¶¶ 192, 194.) Plaintiff, who had no history of mental illness, was "shocked, surprised and dismayed by the diagnosis," and decided that it was likely that Defendant Brady had been "influenced by John Doe 1 and the [u]nknown federal agents" in an effort to discredit him and "manufacture aggravating factors" to prevent him from getting future benefits. (*Id.* ¶ 194, 198.) After the diagnosis, Plaintiff was transferred to several mental health and substance abuse facilities, where he continued to face difficulties.

**\*4**  Plaintiff brings this action seeking injunctive relief and money damages.

### DISCUSSION

Under the IFP statute, a court must dismiss an action if it determines that the action is frivolous or malicious. 28 U.S.C. § 1915(e)(2)(B)(i). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). A complaint is " 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless' – that is, if they are 'fanciful,' 'fantastic,' or 'delusional.' " *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton*, 504 U.S. at 32-33) (finding as frivolous and baseless allegations that set forth a fantastical alternative history of the September 11, 2001 terrorist attacks); *see also Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989) (A claim is frivolous when it "lacks an arguable basis either in law or in fact."); *Livingston*, 141 F.3d at 437("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory." (internal quotation marks and citation

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 396 of 520

Muzumala v. Unknown Federal Agents, Not Reported in Fed. Supp. (2023)

omitted)). Moreover, a court has "no obligation to entertain pure speculation and conjecture." *Gallop*, 642 F.3d at 368.

Plaintiff's complaint is premised upon his belief that, the Doe couple, multiple federal agents, and their proxies mounted a campaign of harassment against him in an effort to have him deported, and then tracked and monitored his activities with x-ray equipment from New Paltz to New Orleans and back to New York. The defendant's actions included subjecting him to "ionizing radiation," "weaponizing surveillance equipment" against him, looking at his brain through a "viewing device," and causing him other harms. (ECF 2 ¶¶ 111, 120, 128.) However, a "[p]laintiff's beliefs – however strongly he may hold them – are not facts." *Morren v. New York Univ.*, No. 20-CV-10802, 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022). Plaintiff provides no factual basis for his assertions that he was victim of a broad conspiracy perpetrated by the Doe couple, federal immigration agents, and their proxies. *See Lefkowitz v. John Wiley & Sons, Inc.*, No. 13-CV-6414, 2014 WL 2619815, at *10 (S.D.N.Y. June 2, 2014) (complaint must set forth facts showing basis for information and belief); *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010) (even where necessary evidence is in "exclusive control of the defendant, ... plaintiff must still set forth the factual basis for that belief").

The Court finds that Plaintiff does not provide any plausible factual support for his claims and that they rise to the level of the irrational. *See Livingston*, 141 F.3d at 437. Plaintiff has provided the court with a narrative full of details of what he believes – that he is a victim of a broad conspiracy perpetrated by Defendants with the initial goal of his deportation, and later to deprive him of his rights. Despite all of the details provided, Plaintiff has pleaded no factual predicate in support of his assertions. Plaintiff's allegations amount to conclusory claims and suspicions that are not plausible and must be dismissed as frivolous. *See Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (holding that "the district court did not err in *sua sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal 'fusion centers' and the New York State Intelligence Center, which put a

'digital marker' on him in order to collect his personal data and harass him."); *Khalil v. United States*, No. 17-CV-2652, 2018 WL 443343, at *4 (E.D.N.Y. Jan. 12, 2018) (dismissing complaint where "[p]laintiff allege[d] a broad conspiracy involving surveillance of and interference with his life by the United States and various government actors" because his allegations were "irrational and wholly incredible").

**\*5** District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Plaintiff's complaint does not suggest that he is in possession of facts that would cure the identified deficiencies. *See Gallop*, 642 F.3d at 369 (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188, 2019 WL 3034866, at *7 (S.D.N.Y. July 11, 2019) (declining to grant leave to amend as to certain claims in the absence of any suggestion that additional facts could remedy defects in the plaintiff's pleading). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend and dismisses the action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

## CONCLUSION

Plaintiff's complaint is dismissed as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i). All other pending matters in this case are terminated.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5530308

Case 1:25-cv-00968-ECC-ML Document 54 Filed 11/26/25 Page 397 of 520

Muzumala v. Unknown Federal Agents, Not Reported in Fed. Supp. (2023)

## Footnotes

1    This action is the second of three complaints Plaintiff filed in this court arising from the same events. In the first action, *Muzumala v. Mayorkas,* No. 22-CV-3789 (JGK) (S.D.N.Y. filed May 9, 2022) ("*Muzumala I*"), Plaintiff asserted claims under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.,* alleging that the United States Immigration and Customs Enforcement ("ICE") and the Federal Bureau of Investigation ("FBI") failed to adequately respond to his document requests. He also brought statutory and constitutional claims against officials stemming from his belief that private individuals and government agents are trying to have him deported. On June 22, 2022, Judge John G. Koeltl dismissed Plaintiff's claims against the officials and his assertions concerning the government actors' efforts to deport him. *See Muzumala I,* 2022 WL 2916610 (S.D.N.Y. July 22, 2022). Judge Koeltl allowed the FOIA claims to proceed. A motion to dismiss filed by ICE and the FBI is pending in that case.

   Plaintiff's third case, filed after submission of this action, is *Muzumala v. The City of New York*, No. 22-CV-8423 (LTS) (S.D.N.Y. filed Oct. 3, 2022) ("*Muzumala III*"). In that action, he asserted constitutional claims under 42 U.S.C. § 1983, arising from his shelter experiences in New York City. On February 21, 2023, the Court dismissed most of the claims, but granted Plaintiff leave to amend. *See Muzumala III*, ECF 1:22-CV-8423, 12. Plaintiff subsequently filed a second amended complaint, which remains pending.

   There is some duplication of allegations among Plaintiff's three actions. In all three actions, he describes events occurring in New Paltz, Poughkeepsie, Brooklyn, and New Orleans, involving federal agents and their proxies attempting to have him deported. In both this action and *Muzumala III,* Plaintiff discusses some of the same shelter experiences and names Dr. Susan Brady as a defendant. The Court will not address in this order matters that have been addressed in *Muzumala I* and *Muzumala III*.

2    BRC is a nonprofit organization that, among other things, manages shelter facilities in partnership with the New York City Department of Homeless Services. *See* https://www.brc.org/ (last visited Aug. 16, 2023); https://www.nyc.gov/site/dhs/about/bowery-residents-committee.page (last visited Aug. 16, 2023).

3    On February 2, 2023, the Court received a motion from Plaintiff requesting leave to submit an amended complaint. (ECF 10.) On April 10, 2023, the Court denied Plaintiff's motion as unnecessary because he could amend his complaint once as of right within a certain timeline under Rule 15(a) of the Federal Rules of Civil Procedure. (ECF 11.) The Court directed Plaintiff, if he chooses, to submit his amended complaint within 45 days, and that, if he did not file an amended complaint within that time, the Court will treat the original complaint as the operative pleading. (*Id.*) Plaintiff did not file an amended complaint.

4    The Court quotes the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless otherwise indicated.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

On Reconsideration *Nussbaum v. Spider, Inc.*, E.D.N.Y., October 30, 2009

2009 WL 2762785
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Channan NUSSBAUM, Plaintiff,
v.
SPIDER, INC., and Paul White, Defendants.
Paul White, Plaintiff,
v.
Channan Nussbaum, Defendant.

Nos. 09–CV–2025 (JS)(ETB), 09–CV–2026 (SJF)(AKT).
|
Aug. 24, 2009.

**Attorneys and Law Firms**

Daniel Hirschel, Esq., Valley Stream, NY, for Plaintiff
Channan Nussbaum.

Paul White, Melville, NY, pro se.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

**\*1** Presently pending before the Court is the Complaint of
Channan Nussbaum ("Nussbaum" or "Plaintiff"), removed
from state court pursuant to 28 U.S.C. § 1446(a), and
the Complaint of *pro* se Plaintiff Paul White ("White" or
"Defendant"). Nussbaum's and White's Complaints involve
similar claims, and White's Complaint names Nussbaum as a
Defendant. In the interests of judicial economy, as set forth
in more detail below, the Court ORDERS that the Clerk of
Court consolidate these two cases under the earlier-filed case,
docket number 09–CV–2025.

*BACKGROUND*

On May 21, 2002, Nussbaum filed a Complaint in the
Supreme Court of the State of New York, County of
Suffolk, against Spider, Inc. ("Spider") and White, alleging
various state law claims, including breach of contract.
(09–CV–2025, Exhibit A, E.D.N.Y. filed May 13, 2009.)
Nussbaum's Complaint maintains that Spider and White did
not compensate him for his work as a software developer in
accordance with the terms of their written agreement.

On May 13, 2009, White filed a Notice of Removal pursuant
to 28 U .S.C. § 1446(a), maintaining that removal is
appropriate because the action involves a federal question
arising under the United States Copyright Act, 17 U.S.C. §
101. (09–CV–2025, E.D.N.Y. filed May 13, 2009). On the
same day, White filed a Complaint as a Plaintiff, *pro se,* in
this Court against Nussbaum, alleging breach of contract and
unjust enrichment claims. (09–CV–2026). White contends
that Nussbaum breached the parties' written agreement by
refusing to repair a software program and by releasing the
software program to third parties.

*DISCUSSION*

Under Rule 42 of the Federal Rules of Civil Procedure, "[i]f
actions before the court involve a common question of law
or fact, the court may: (1) join for hearing or trial any or all
matters at issue in the actions; (2) consolidate the actions;
or (3) issue any other orders to avoid unnecessary cost or
delay." Fed.R.Civ.P. 42(a). The trial court has broad discretion
to determine whether consolidation is appropriate. *Johnson
v. Celotex Corp.,* 899 F.2d 1281, 1284–85 (2d Cir.1990).
Moreover, a district court can consolidate related cases *sua
sponte. Devlin v. Transp. Commc'ns Int'l Union,* 175 F.3d 121,
130 (2d Cir.1999).

Consolidation is appropriate in order to serve the interests of
judicial economy. *Jacobs v. Castillo,* 09–CV–953, 2009 WL
1203942, at *373 (S.D.N.Y. Apr. 23, 2009) (citing *Johnson
v. Celotex Corp.,* 899 F.2d 1281, 1284–85 (2d Cir.1990)).
Specifically, consolidation of cases with common questions
of law or fact is favored to avoid unnecessary costs or
delay, *Johnson,* 899 F.2d at 1284, and to expedite trial
and eliminate unnecessary repetition and confusion. *Devlin,*
175 F.3d at 130 (internal citations omitted). The paramount
question, however, is whether savings of expense and gains

of efficiency can be accomplished without sacrifice of justice. *Johnson,* 899 F.2d at 1285 ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial.").

**\*2** The Second Circuit has long adhered to the first-filed doctrine in deciding which case to dismiss where there are competing litigations. *Kellen Co. v. Calphalon Corp.,* 54 F.Supp.2d 218, 221 (S.D.N.Y.1999). Where there are several competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second. *Id.* (internal quotation marks, alterations, and citations omitted); *accord Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991); *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989). The first-filed rule seeks to conserve judicial resources and avoid duplicative litigation. *See Adam,* 950 F.2d at 92; *First City Nat'l Bank & Trust Co.,* 878 F.2d at 80; *Kellen,* 54 F.Supp.2d at 221.

Here, the two Complaints concern common parties, as well as common questions of law and fact. Both Complaints allege breach of contract claims relating to the written agreement between Nussbaum, White, and Spider. Thus, the Court ORDERS the following: The Clerk of Court shall (1) consolidate the two above captioned cases under the first case filed, docket number 09–CV–2025, and (2) close the case with docket number 09–CV–2026 and direct any further filings in that case to 09–CV–2025. A copy of this Order will be sent to all parties at the addresses listed with the Court.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2762785

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 24243989
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Salvatore OGNIBENE, Plaintiff,

v.

NIAGARA COUNTY SHERIFF'S DEPARTMENT,
Niagara County District Attorney's Office, Samuel
Novara, Esq., Town of Wheatfield Court, Niagara
County Court, Niagara County Supreme Court, New
York State Appellate Division, 4 TH Judicial Dept.,
and New York State Court of Appeals, Defendants.

No. 03–CV–0678E(SR).
|
Dec. 1, 2003.

**Attorneys and Law Firms**

Salvatore Ognibene, Niagara Falls, NY, pro se.

DECISION AND ORDER

ARCARA, J.

*INTRODUCTION*

**\*1** Plaintiff has filed this *pro se* action seeking relief under
42 U.S.C. § 1983 (Docket No. 1, 3) and has requested
permission to proceed *in forma pauperis* (Docket No.
2). Plaintiff claims that the defendants have violated his
constitutional rights in relation to an arrest that occurred on
July 10, 1997 for which plaintiff was given an Adjournment
in Contemplation of Dismissal ("ACD")[1] on November 17,
1997 in the Town of Wheatfield (New York) Town Court.
(Complaint, ¶ 5). Apparently, plaintiff later filed some type
of motion or appeal in the Town Court of Wheatfield seeking
to dismiss the ACD. (Docket No. 3, Table of Contents).[2]
This motion was denied and appeals ensued through the state
court system all the way to the New York Court of Appeals,
which denied plaintiff leave to appeal on or about September
17, 2003. (Complaint, ¶¶ 5–10; Table of Contents, ¶¶ 2–6).
For the reasons discussed below, plaintiff's request to proceed
as a poor person is granted and the complaint is dismissed
pursuant to 28 U.S.C. § 1915(e)(2)(B).

*DISCUSSION*

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a), plaintiff is granted permission to proceed *in
forma pauperis*. Section 1915(e)(2)(B) of 28 U.S.C. provides
that the Court shall dismiss a case in which *in forma pauperis*
status has been granted if, at any time, the Court determines
that the action (i) is frivolous or malicious; (ii) fails to state
a claim upon which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from such
relief.

In evaluating the complaint, the Court must accept as true all
factual allegations and must draw all inferences in plaintiff's
favor. *See King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999).
Dismissal is not appropriate "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Conley v. Gibson,*
355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This
rule applies with particular force where the plaintiff alleges
civil rights violations or where the complaint is submitted *pro
se." Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

Based on its evaluation of the complaint, the Court finds that
plaintiff's claims must be dismissed pursuant to 28 U.S.C. §
1915(e)(2)(B)(ii) because they fail to state a claim upon which
relief may be granted.

*Plaintiff's Allegations*

Plaintiff alleges that his constitutional rights were violated
and therefore brings this action pursuant to 42 U.S.C. § 1983.
In order to state a claim under § 1983, plaintiff must allege
(1) that the challenged conduct was attributable at least in part
to a person acting under color of state law, and (2) that such
conduct deprived plaintiff of a right, privilege, or immunity
secured by the Constitution or laws of the United States.
*Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993).

Plaintiff names as defendants: (1) the Niagara County
Sheriff's Department ("Sheriff's Department"), the law
enforcement agency that responded to his daughter's "911"
telephone call, which occurred while plaintiff was admittedly
striking her in his home on July 10, 1997, and took plaintiff
into custody (Complaint, Statement of Claim, ¶¶ 1–3); (2)
the Niagara County District Attorney's Office ("DA's Office")

that, assumably, prosecuted plaintiff following this arrest; (*id.,* ¶¶ 4–5); (3) Samuel J. Novara, plaintiff's defense counsel in the proceedings in Town Court (*id.,* ¶ 6); (4) the Town of Wheatfield Town Court ("Wheatfield Town Court"), "Presiding" Town Justice Robert Cliffe, where plaintiff was prosecuted and obtained an ACD on November 17, 1997 (*id.,* ¶ 5); (5) the Niagara County Court ("County Court"), "Presiding" Judge, Hon. Peter Broderick, the court to which plaintiff appealed on or about April 14, 2000 (Complaint; Table of Contents, ¶ 3); (6) the New York Supreme Court, Niagara County ("State Supreme Court"), "Presiding" Justice, Hon. John Lane, the court to which plaintiff appealed on or about February 16, 2001 and which denied his request for relief on or about June 13, 2001 (Table of Contents, ¶ 3); (7) the New York State Supreme Court, Appellate Division, Fourth Department ("Appellate Division"), "Presiding" Justice Pine, and Justices Hayes, Hurlburt, Kehoe and Burns, the court to which plaintiff further appealed and which dismissed plaintiff's appeal on April 23, 2002 for failure to prosecute (Complaint, Statement of Claim, ¶ 8; Table of Contents, ¶ 6 A—B); and (8) the New York Court of Appeals ("Court of Appeals"), "Presiding" Justice, Hon. Judith Kaye, which denied plaintiff leave to appeal on or about September 17, 2003. (Complaint, ¶ 10; Table of Contents, ¶ 7).

**\*2** The plaintiff's complaint, liberally construed, appears to allege a violation of plaintiff's civil rights based upon claims of false arrest and false imprisonment on July 10–11, 1997 arising out of his arrest (Complaint, Statement of Claim, ¶¶ 2–4), and the "faulty procedures" of the prosecutor and the courts. The complaint also alleges that the prosecutor and the courts named as defendants failed to insure that plaintiff obtained his *Miranda* warnings and his "right" to give a statement, and that they failed to insure that he obtained his various Sixth Amendment rights, such as the right to a speedy public trial, the right to an impartial jury, the right to notice of the charges against him, the right to confront witnesses, the right to compulsory process, and the right to counsel. (*Id.,* ¶¶ 4–10). The complaint also includes a claim of either a violation of § 1983 or legal malpractice or both against plaintiff's defense attorney. (*Id.,* ¶ 6).

### Claims against Sheriff's Department, DA's Office and Wheatfield Town Court

Plaintiff's claims against the Sheriff's Department, the DA's Office and the Wheatfield Town Court must be dismissed.

First, plaintiff's § 1983 claims against these three defendants accrued at the earliest on July 10, 1997 when he was arrested, and at the latest either on November 17, 1997, when the charges against him were resolved by means of an ACD (Complaint, Statement of Claim, ¶¶ 3–5; Table of Contents, ¶¶ 1–2), or on March 28, 2000, when a motion plaintiff made in the Town Court was denied. (Table of Contents, ¶ 2). The statute of limitations for an action filed under 42 U.S.C. § 1983 in a federal court sitting in New York is three years. *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Jewell v. County of Nassau,* 917 F.2d 738, 740 (2d Cir.1990). Therefore, any and all claims against these defendants are time barred.

Second, the claims against the Sheriff's Department, the DA's Office, and the Wheatfield Town Court must also be dismissed because there is no allegation that any of the individual government officials, such as the Town Justice, deputies or assistant prosecutors, were acting pursuant to a policy or custom of the Town of Wheatfield or Niagara County. In the absence of such an allegation, the complaint fails to state a claim for relief and must be dismissed. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipalities are not subject to § 1983 liability solely on the basis of a respondeat *superior* theory. *Collins v. City of Harker Heights,* 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Monell,* 436 U.S. at 694.

Additionally, to the extent that the plaintiff may have intended to sue the Town Justice individually (Complaint, Defendant's Information), in addition to or instead of the Town Court, the Town Justice would be entitled to absolute judicial immunity. *See Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (internal quotations and citation omitted). The same would be true with respect to the District Attorney or any Assistant District Attorneys involved in the prosecution of plaintiff. Prosecutors are entitled to absolute immunity from suits brought under § 1983 "arising out of [their] prosecutorial duties that are 'intimately associated with the judicial phase of the criminal process.' " *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), *cert. denied,* 520 U.S. 1115 (1997). Accordingly, the claims against the Sheriff's Department, the DA's Office, the Wheatfield Town Court and, to the extent he is a defendant herein, the Town Justice, Robert B. Cliffe, are dismissed.

*Claims against County Court, State Supreme Court, Appellate Division, and Court of Appeals*

**\*3** Plaintiff's complaint purports to allege that these courts somehow violated his numerous Sixth Amendment rights. In reality, however, what plaintiff is alleging is that these courts were in error when they denied or dismissed his various requests to overturn the ACD disposition of the charges arising from the July 10, 1997 incident. These claims too must be dismissed.

To the extent the plaintiff names various state courts as defendants and seeks either legal or equitable relief against them under § 1983, they are immune from such suit under the Eleventh Amendment. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). As agencies or arms of the State of New York, the courts are immune from suit under the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114; *see also Saint–Fleur v. City of New York,* 2000 WL 280328, \*2 (S.D.N.Y., Mar.14, 2000) (collecting cases); *Fields v. Walthers,* No. 94–CV–1659, 1997 WL 204308 at \*2 (N.D.N.Y. April 5, 1997) ("For Eleventh Amendment purposes, governmental entities of the state that are considered 'arms of the state' receive Eleventh Amendment immunity."). Accordingly, plaintiff's claims against the County Court, the State Supreme Court, the Appellate Division, and the Court of Appeals must be dismissed.

*Claims against Samuel Novara*

The complaint names Samuel Novara, plaintiff's defense counsel, as a defendant, and either alleges a § 1983 claim or a state common law legal malpractice claim, or both, against him. In any event, the claim or claims pled against this defendant must be dismissed. First, assuming that plaintiff intended to sue defense counsel under § 1983, such a claim must be dismissed because criminal defense counsel are not "state actors" for purposes of the "state action" requirement of § 1983. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Second, assuming that plaintiff intended to sue his defense counsel for legal malpractice in relation to the handling and disposition of his criminal matter, this Court declines to exercise supplemental jurisdiction, 28 U.S.C. § 1367, over said claim because all the federal claims

have been dismissed at the initial stage of the litigation. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003); 28 U.S.C. § 1367(c)(3); *see also Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir .2001) (noting that dismissal of pendent state law claims is appropriate where all federal claims have been dismissed and "it appears that the state issues substantially predominate") (internal quotation marks omitted). Accordingly, the complaint is dismissed without prejudice as against defendant Novara.

*CONCLUSION*

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a). Accordingly, plaintiff's request to proceed *in forma pauperis* is granted and, for the reasons discussed above, the complaint is dismissed with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), except with respect to the state common law legal malpractice claim against defendant Samuel Novara, which is dismissed without prejudice.

**\*4** The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

*ORDER*

IT HEREBY IS ORDERED, that plaintiff's request to proceed *in forma pauperis* is granted;

FURTHER, that the complaint is dismissed with prejudice, except with respect to the state common law legal malpractice claim against defendant Samuel Novara, which is dismissed without prejudice; and

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 24243989

---

## Footnotes

1    *See* N.Y.Crim. Proc. Law § 170.55. This disposition cannot be obtained without the consent of both parties and the court. *Id.*

2    Shortly after filing the complaint, plaintiff filed what he entitled a "Table of Contents" which outlines the dates of the various court filings and dispositions that are at issue in his complaint. This Court will treat this Table of Contents as a document attached to the complaint and incorporated by reference in the complaint. *Chance v. Armstrong,* 143 F.3d 698, 698 n. 1 (2d Cir.1998) ("the court may consider facts set forth in exhibits attached as part of the complaint as well as those in the formal complaint itself"); *see Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

---

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3902741

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Anthony Wayne OLIPHANT, Plaintiff,

v.

Robert VILLANO, et al., Defendants.

Civil No. 3:09cv862 (JBA).

|

Sept. 6, 2011.

**Attorneys and Law Firms**

Anthony Wayne Oliphant, Cheshire, CT, pro se.

Kerry L. Keeney–Curtin, Scott M. Karsten, Karsten & Tallberg, LLC, West Hartford, CT, for Defendants.

**RULING ON MOTIONS**

JANET BOND ARTERTON, District Judge.

**\*1** Plaintiff Anthony Wayne Oliphant, currently incarcerated at Cheshire Correctional Institution, filed suit *pro se* [1] against New Haven police officers, Hamden police officers, and State of Connecticut Department of Corrections personnel, under the Fourth, Eighth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 and for common-law assault and battery. Some of the Hamden police defendants, specifically Michael Sigmon, Joseph Venditto, Michael Narwocki, Ronald Glifort, Eric Goclowski, Robert O'Neil, and Darlene Passadera (collectively the "Hamden Defendants") move [Doc. # 113] to dismiss Plaintiff's claims against them pursuant to Fed.R.Civ.P. 12(b)(6), and Defendants Joyner, Davis, Howze, Smith, and Levy of the New Haven police (collectively the "New Haven Defendants") [2] move [Doc. # 115] for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). In response, Plaintiff moves [Doc. # 132] for leave to amend his complaint, which proposed amendment he says would "correct[ ] and remed[y] all [ ] alleged[ ] deficiencies claimed by the Defendants." For the following reasons, Defendants' motions to dismiss and for judgment on the pleadings will be granted in part and denied in part, and Plaintiff's motion to amend his complaint will be granted. [3]

**I. Hamden Defendants**

**A. Facts**

The facts Plaintiff alleges are set out more fully in the Court's [Doc. # 17] Initial Review Order and Order on Pending Motions. Plaintiff's only allegations relating to the Hamden Defendants who move to dismiss are that they accompanied Hamden police Officer Villano to Plaintiff's home on September 25, 2006 after "Deedra Dixon told the Hamden–Police that [P]laintiff [was] attacking Rhonda M. Dixon, falsely" (Am.Compl.¶¶ 35–37), and that later that evening, those Defendants returned again with Villano to Plaintiff's home, at which point Villano "severely kick[ed Plaintiff's] backdoor repeatedly over-and-over" causing "egregious damage to the inside doorframe of Plaintiff's backdoor" and yelled obscenities at Plaintiff (*Id.* ¶¶ 40–44). During the first visit on September 25, 2006, "Plaintiff stay[ed] inside of his dwelling until both Hamden–Police and the Dixon family, who were making physical threats, with impunity, all had departed the area." (*Id.* ¶ 40.) Plaintiff does not explain how the second police visit on September 25, which continued into the early morning on September 26, ended.

Plaintiff's only allegation as to Passapera is that when Plaintiff called 911 that night, Passapera, a Hamden police dispatcher, would not connect him to the New Haven Police Department, but on September 26, 2006, when he again called 911, Passapera did ultimately connect him to the New Haven Police.

**B. Discussion** [4]

*1. False Imprisonment*

Plaintiff claims that among others, the Hamden Defendants falsely imprisoned him in violation of the Fourth Amendment. In Connecticut, "false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." [5] *Russo v. City of Bridgeport,* 479 F.3d 196 at 204 (2d Cir.2007) (quoting *Outlaw v. City of Meriden,* 43 Conn.App. 387, 392 (1996)). The restraint must be accomplished "through the exercise of force." *Berry v. Loiseau,* 223 Conn. 786, 820 (1992). A Section 1983 claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures," *Weyan v. Okst,* 101 F.3d 845, 852 (2d Cir.1996), and "[a] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554 (1980).

**\*2** Plaintiff alleges that because Officer Villano, who accompanied the Hamden Defendants, kicked the back door of his house and screamed threatening profanities at him, he could not leave his house until after Villano left the premises, allegations which if true could state a claim for false imprisonment against Villano. The Hamden Defendants argue that Plaintiff does not allege that they personally restrained him in any way, and therefore, he has failed to state a false imprisonment or arrest claim against them. However, Plaintiff does allege that they were present while Villano was kicking and screaming, which is sufficient at this stage to plead failure to intervene. Police officers "have an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in their presence by other officers." *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (internal citations omitted). Thus, Hamden Defendants' motion to dismiss Plaintiff's false imprisonment claim as to Michael Sigmon, Joseph Venditto, Michael Narwocki, Ronald Glifort, Eric Goclowski, Robert O'Neil is denied. However, there is no allegation that Passapera, a telephone dispatcher, had a "realistic opportunity to intervene to prevent the harm from occurring," a necessary showing for a failure to intervene claim, *see id.,* and therefore, Defendants' motion to dismiss Plaintiff's false imprisonment claim against Passapera is granted.

### 2. Excessive Force

Plaintiff also claims that the Hamden Defendants used excessive force against him in violation of the Fourth Amendment. The only physical force against Plaintiff is alleged to have occurred later during his detention on October 6, 2006 by non-moving Defendants Sheppard and Onofrio. Defendants' personal involvement in alleged constitutional deprivations is required under Section 1983. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010). Because Plaintiff does not allege the presence of any of the Hamden Defendants during that confrontation, that encounter cannot give rise to an excessive force claim against them.

Construing Plaintiff's claim as related to Villano's "severely kick[ing]" and "egregiously damag[ing]" his doorframe as a claim of failure to intervene, the Hamden Defendants argue that such property damage does not amount to a constitutional violation. They rely on *Hudson v. Palmer,* in which the Supreme Court held that the deprivation of an inmate's property by a prison guard was not a Fourth Amendment violation, because he had meaningful post-deprivation remedies under state law. 468 U.S. 517 (1984). Defendants also point to *Andulan v. City of Seattle,* in which police serving a search warrant damaged property within the plaintiff's home, which was deemed not to constitute excessive force. No. C07–500RBL, 2008 WL 786628, \*8 (W.D.Wash. Mar. 21, 2008). Here, unlike in *Hudson,* the Hamden Defendants do not claim that Plaintiff had available post-deprivation remedy for damage to his doorframe, and thus Plaintiff's allegations of egregiousness could be construed as alleging unreasonable or malicious property damage, which in the Second Circuit can give rise to an excessive force claim. *See, e.g., Pina v. City of Hartford,* No. 07cv657(JCH), 2009 WL 1231986, \* 8 (D.Conn. Apr. 29, 2009) (" '[I]t is well recognized that officers executing search warrants on occasion must damage property in order to perform their duty,' ... [and b]efore an officer can be liable for property damage resulting from a lawful search, the plaintiff must establish that the police acted unreasonably or maliciously in bringing about the damage.") (quoting *Cody v. Emllo,* 59 F.3d 13, 16 (2d Cir.1995)). Therefore, Plaintiff has sufficiently pleaded a failure to intervene claim against Hamden Defendants for Villano's excessive force, *see Anderson,* 17 F.3d at 557,[6] and the Hamden Defendants' motion to Plaintiff's excessive force claims against Sigmon, Venditto, Narwocki, Glifort, Goclowski, and O'Neil is denied. However, in the absence of any facts from which it can be inferred that Passapera had a reasonable opportunity to intervene, this claim is dismissed as to her.

### 3. Due Process

**\*3** Plaintiff claims violations of his procedural due process rights by Hamden Defendants based on the same facts underpinning his Fourth Amendment claims. To succeed on a claim of procedural due process deprivation under the Fourteenth Amendment—that is, a lack of adequate notice and a meaningful opportunity to be heard—a plaintiff must first establish that state action deprived him of a protected property interest. *Mathews v. Eldridge,* 424 U.S. 319, 334 (1976).[7] As Plaintiff does not allege that any of the moving Hamden Defendants have deprived him of a property or

liberty interest, his procedural due process claims against them are dismissed.

Plaintiff also claims violations of his substantive due process rights. State action is violative of substantive due process rights where it was " 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Village of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 431 (2009) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833 (1998)). Conduct that is "intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849. The unconstitutional conduct Plaintiff alleges by the moving Hamden Defendants is that they accompanied Villano to Plaintiff's house after Deedra Dixon's report of assault. These factual allegations do not set forth conduct that could shock the contemporary conscience, and Plaintiff's substantive due process claim against moving Hamden Defendants is dismissed.

### 4. Equal Protection

Plaintiff claims violations of the Equal Protection Clause of the Fourteenth Amendment, alleging that "Plaintiff at all times mentioned, herein, is an African–American and a member of a racial minority [w]ho was subjected to racial discrimination and was denied full equal benefits of the laws by defendants." (Am.Compl.¶ 2.) This allegation is conclusory and does not contain any facts showing the facial plausibility of an equal protection claim, and Plaintiff's equal protection claim against Hamden Defendants is therefore dismissed.

### 5. State Law Assault and Battery

Finally, Hamden Defendants move to dismiss Plaintiff's assault and battery claims. A civil assault is defined as "the intentional causing of imminent apprehension of harmful or offensive contact with another." *Dewitt v. John Hancock Mutual Life Ins. Co.,* 5 Conn.App. 590, 594 (1985). The Connecticut Supreme Court has held that "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Alteiri v. Colasso,* 168 Conn. 329, 334 n. 3 (1975). Plaintiff has not alleged facts from which it can be inferred that any Hamden Defendant intended to cause him imminent apprehension of harmful or offensive contact or that any Hamden Defendant came into

physical contact with Plaintiff. Thus, his assault and battery claims against the Hamden Defendants are dismissed.

## II. New Haven Defendants

### A. Facts alleged

**\*4** Plaintiff also sues Officers Joyner, Davis, Smith, and Levy in their individual and official capacities for violations of the Fourth and Fourteenth Amendments.[8] He alleges that late at night on September 26, 2006, with Rhonda Dixon, her three brothers, and Officer Villano in his front yard, he called the New Haven Police and requested assistance, in response to which Officers Levy, Howze, and Smith arrived at approximately 11:45 p.m. (Compl.¶¶ 46–51.) Plaintiff further alleges that Levy, Howze, and Smith then aided Officer Villano in towing Plaintiff's car. (*Id.* ¶¶ 54–55.) Plaintiff filed a "citizen-police complaint" with Officer Joyner on September 28, 2006 about this towing, which he says Joyner never processed. (*Id.* ¶ 56.) On September 29, 2006, he met with Officer Davis at the New Haven Department of Police Service, who he says took down information about a criminal complaint which Plaintiff sought to have brought against the Dixons and Officer Villano for trespass and threatening. Although Davis assigned Plaintiff's criminal complaint an investigation number, Plaintiff alleges that there was ultimately no investigation. (*Id.* ¶ 60.)

### B. Discussion[9]

#### 1. Fourth Amendment False Arrest and Excessive Force

Plaintiff does not allege that New Haven Defendants physically restrained him or used any force against him, nor does he describe any unconstitutional actions in which they could have intervened. Accordingly, Plaintiff's false arrest and excessive force claims against New Haven Defendants are dismissed.

#### 2. Procedural Due Process

Plaintiff claims that the New Haven Defendants also violated his procedural due process rights, which the New Haven Defendants characterize as based on allegations that they failed to provide him with assistance during the altercation with the Dixons and Villano on September 26, 2006; that the Citizen–Police Complaint filed with Joyner was never investigated; and that the criminal complaint made to Davis against members of the Dixon family and Villano was never investigated. Plaintiff also alleges that the New Haven

Defendants "assisted ... Villano in 'conversion' of plaintiff's vehicle parked on his private property" by having it towed. (Compl.¶¶ 54–55.)

Insofar as Plaintiff claims that the New Haven Defendants' failure to intervene during his altercation with the Dixons and Villano violated the Due Process Clause of the Fourteenth Amendment, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't Soc. Servs.,* 489 U.S. 189, 195–96 (1989). An exception to this rule applies where "the officer in some way had assisted in creating or increasing the danger to the victim," which may implicate the victim's rights under the Due Process Clause. *Okin v. Village of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 437 (2d Cir.2009) (internal citations omitted). Plaintiff alleges no facts from which it can be inferred that New Haven Defendants increased or created any danger posed by the Dixons or Officer Villano.

**\*5** As to Plaintiff's allegations that Officers Joyner and Davis failed to investigate his complaints, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another," and therefore "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *See In re Attorney Disciplinary Appeal,* No. 10–90018, ––– F.3d ––––, 2011 WL 2090822 (2d Cir. May 27, 2011) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). Plaintiff's allegations of failure to conduct criminal investigations therefore do not implicate violations of his Fourteenth Amendment rights.

However, Plaintiff's allegations that Officers Levy, Howze, and Smith helped Officer Villano illegally tow Plaintiff's car, depriving him of a property interest, without providing him an opportunity to be heard before or after, are sufficient at this stage to state a claim for procedural due process Fourteenth Amendment claim. *See, e.g., Perry v. McDonald,* 280 F.3d 159, 173–74 (2d Cir.2001) (revocation of obscene vanity plates did not violate the plaintiff's procedural due process rights where she was given notice and afforded a post-revocation hearing, as "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.' ") (quoting *Mathews,* 424 U.S. at 348). Thus, New

Haven Defendants' motion to dismiss is denied as to Plaintiff's allegations that Officers Levy, Howze, and Officer Smith helped Villano unlawfully tow his car.

### *3. Equal Protection*

The deficiencies in Plaintiff's equal protection claim against Hamden Defendants apply to his equal protection claim against New Haven Defendants as well. Although he proposes amending his complaint to allege that his car was towed from his property as "overt discrimination" and that such treatment is different "from others similarly situated" (Proposed Am. Compl. ¶¶ 56–57), Plaintiff does not allege any basis for inferring either a discriminatory intent or effect related to New Haven Defendants' actions, nor the existence of any comparators or how he was treated differently from them. He has therefore failed to state a claim under the Equal Protection Clause against New Haven Defendants.

### *4. Assault and Battery*

For the same reasons Plaintiff's assault and battery claims against the Hamden Defendants are dismissed, so too are his assault and battery claims against New Haven Defendants; Plaintiff does not allege any facts giving rise to an inference that New Haven Defendants exchanged threatening communications with him or came into physical contact with him.

### III. Conclusion

Accordingly, Hamden Defendants' [Doc. # 113] Motion to Dismiss is DENIED in part as to Plaintiff's false imprisonment and excessive force claims against Sigmon, Venditto, Narwocki, Glifort, Goclowski, and O'Neil and GRANTED as to all other claims again them and as to all claims against Officer Passapera; and New Haven Defendants' [Doc. # 115] Motion for Judgment on the Pleadings is DENIED in part, as to Plaintiff's Fourteenth Amendment procedural due process claims against Smith, Howze, and Levy and GRANTED as to all other claims. Plaintiff's [Doc. # 132] Motion to Amend is GRANTED.

**\*6** IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3902741

## Footnotes

1    "A document filed *pro se* is to be liberally construed." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

2    Defendants Robert Villano, Mark Sheppard, William Onofrio, M. McNeil, Brian Murphy, James Dzurenda, Jeffrey McGill, Fred Levesque, Morris, Wayne Choinski, and Mumin do not move to dismiss.

3    Fed.R.Civ.P. 15(a) provides that "[t]he court should freely give leave when justice so requires," and "a Rule 15(a) motion [to amend a complaint] should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 603 (2d Cir.2005). Hamden and New Haven Defendants oppose Plaintiff's motion to amend on the basis that it contains nothing more than the deficient conclusory allegations of his original Complaint. However, Plaintiff has added new allegations that support his Fourth Amendment claims, discussed *infra,* such as that Villano caused extensive damage to his door frame. Thus, absent any prejudice aside from the late date of amendment, Plaintiff's [Doc. # 132] Motion to Amend is granted.

4    To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

5    "Claims for false arrest ... brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest ... under state law." *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003).

6    Plaintiff also alleges Villano's yelling profane threats as examples of excessive force, but "[v]erbal harassment itself does not rise to the level of a constitutional violation." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *see also Ramriez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983.").

7    Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are not created by that amendment; they are defined by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972) (cited in *Spinelli v. City of New York,* 579 F.3d 160, 168–69 (2d Cir.2009)).

8    A Section 1983 suit against a municipal officer in his official capacity is considered a suit against the municipality itself, *Brandon v. Holt,* 469 U.S. 464 (1985), and therefore the officer may be held liable only if the municipality is liable for an unconstitutional "policy" or "custom" under the principles of *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690–91 (1978). *See Brandon,* 469 U.S. at 472–73. Because Plaintiff does not allege that New Haven Defendants acted pursuant to a policy or custom, his official-capacity claims are dismissed and the Court will only consider his claims against New Haven Defendants in their individual capacities.

9    Motions for judgment on the pleadings brought pursuant to Fed.R.Civ.P. 12(c) are analyzed in accordance with the same standard used for motions to dismiss for failure to state a claim, stated above. *See Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 11807650
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Marvin E. OWENS, Plaintiff,
v.
E. PEREZ, et al., Defendants.

CASE NO. 3:17cv657(RNC)
|
Signed December 6, 2017

**Attorneys and Law Firms**

Marvin E. Owens, Suffield, CT, Pro Se.

Raymond J. Rigat, Berchem Moses PC, Milford, CT, Richard G. Kascak, Jr., City of Bridgeport Office of the City Attorney, Bridgeport, CT, for Defendant Fitzgerald.

RECOMMENDED RULING

Donna F. Martinez, United States Magistrate Judge

 **\*1** The plaintiff, Marvin E. Owens, who is self-represented, brings this action pursuant to 42 U.S.C. § 1983. The defendants named in the case caption are Detective Perez, Captain Fitzgerald, State's Attorney Kevin Dunn, Detective Cotta, Internal Affairs Officer E. Rivera, Lieutenant Garcia and the Bridgeport Police Department. (Doc. #1.) Pending before the court is the plaintiff's motion for leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915. (Doc. #2.) Based on the financial information submitted by the plaintiff, the motion is granted. However, the undersigned recommends that certain of the claims and defendants be dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B).

I. Legal Standard
The same statute that authorizes the court to grant in forma pauperis status to a plaintiff also requires the court to evaluate the complaint and determine whether it should advance. Under 28 U.S.C. § 1915(e)(2)(B), the court "shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); Neitzke v. Williams, 490 U.S. 319, 325 (1989).

In evaluating whether a plaintiff has stated a claim for relief, the court must "accept as true all factual allegations in the complaint and draw all reasonable inferences" in plaintiff's favor. Cruz v. Gomez, 202 F.3d 593, 596 (2d Cir. 2000). Courts "must construe pro se complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002). "[A] complaint must provide factual allegations, not just legal conclusions, and the factual allegations must support a plausible claim for relief." Washburn v. Sherry, No. 3:15CV226(RNC), 2016 WL 777890, at \*1 (D. Conn. Feb. 26, 2016) (citing to Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A complaint satisfies the plausibility standard when it pleads facts that allow the court to draw a reasonable inference that one or more of the named defendants is liable for the alleged constitutional violation." Washburn, 2016 WL 777890, at \*1.

II. Allegations [1]
The plaintiff complained to defendant Officer Rivera of Internal Affairs about a May 21, 2015 incident involving another officer, Officer Novia. [2] Rivera refused to conduct a full investigation and "closed out" the complaint. The plaintiff complained to defendant Garcia.

 **\*2** The plaintiff was arrested in December 2015 for violating a protective order. The plaintiff gave State's Attorney Dunn evidence of the plaintiff's innocence, which showed he should not be prosecuted. Dunn moved up the plaintiff's court date from January 13, 2016 to January 8, 2016. The plaintiff pleaded guilty on January 8, 2016. [3] He pleaded guilty due to "duress."

In March 2016, a domestic violence complaint was filed against the plaintiff. The information provided by the complainant was false. Defendant Fitzgerald, who was investigating the claim, "failed to give plaintiff due process [in that] plaintiff was not notified of [the] complaint by Detective Fitzgerald or given [an] opportunity to answer or give [a] statement to [Defendant Fitzgerald] [about the] complaint." (Doc. #1 at 4.) Defendant Perez applied for an arrest warrant. On August 10, 2016, defendant Fitzgerald arrested the plaintiff.

In connection with this arrest, defendant Fitzgerald seized the plaintiff's Suzuki motorcycle without probable cause.

In addition, on August 11, 2016, Bridgeport police officers "misle[d] animal control to believe that after the plaintiff's arrest on [August 10, 2016] there was an animal at plaintiff's home in need of rescue." (Doc. #1 at 10.) An animal control employee, led by Bridgeport police, entered the plaintiff's home without a warrant and removed his dog.

Also in August 2016, defendant Fitzgerald told the local press that the plaintiff was a "suspect" in a threat called into Bridgeport City Hall but that there was no probable cause to arrest the plaintiff for that crime. The plaintiff was not charged with any crimes concerning the incident. The local press reported Fitzgerald's statement.

During the pendency of the plaintiff's divorce, police arrived at the plaintiff's house. Defendant Cotta, who was a friend of the plaintiff's wife, allowed her to remove a flat screen tv from the residence, notwithstanding a court order that assets were not to be divided.

In August 2016, defendant Cotta told the plaintiff's son that the police were conducting an investigation regarding the plaintiff's motorcycle. This led the plaintiff's son to believe that the plaintiff was involved in "illegal activities." Cotta advised the plaintiff's son not "to get involved" in the plaintiff's "affair." The defendant Cotta also disclosed that the plaintiff had a domestic violence case involving a "woman other than plaintiff son's mother."

The plaintiff alleges "harassment by Bridgeport Police Department." (Doc. #1 at 3.) He complained to defendant Perez about "all [the] violations of plaintiff's rights which [Perez] ignored." (Doc. #1 at 10.)

The complaint alleges violation of 42 U.S.C. §§ 1983, 1985 and 1986, 18 U.S.C. § 242 and Conn. Gen. Stat. § 53a-157.

III. Discussion

Liberally construing the plaintiff's allegations, he appears to challenge the constitutionality of his December 2015 and August 2016 arrests and prosecutions. Those claims are foreclosed.

**\*3** Under Connecticut law and section 1983, a plaintiff must show that the prosecution terminated in his or her favor in order to state a claim of malicious prosecution or false arrest. See Roberts v. Babkiewicz, 582 F.3d 418, 420 (2d Cir. 2009) (to prevail on malicious prosecution claim under Connecticut law, plaintiff must prove, inter alia, that the criminal proceeding terminated in plaintiff's favor) (citing McHale v. W.B.S. Corp., 187 Conn. 444, 447 (1982)); Miles v. City of Hartford, 445 Fed. Appx. 379, 383 (2d Cir. 2011) (the Second Circuit has expressly held, invoking Connecticut law, that favorable termination is an element of a section 1983 sounding in false imprisonment or false arrest.)

Jaynes v. Walkley, No. 3:15CV1420(VAB), 2016 WL 1573442, at *3 (D. Conn. Apr. 19, 2016)(internal quotation marks omitted.) The plaintiff pleaded guilty in January 2016 to the violation of protective order charge for which he was arrested in December 2015. "That is not a favorable termination." Vializ v. Crespo, No. 3:12CV724(RNC), 2012 WL 6597465, at *1 (D. Conn. Dec. 18, 2012)(plaintiff's guilty plea "prevents him from proving a claim for false arrest"); see Diruscio v. Miller, No. 3:11CV1556(RNC), 2012 WL 1379630, at *4 (D. Conn. Apr. 19, 2012) (plaintiff "cannot recover damages under § 1983 for false arrest or malicious prosecution when he has been convicted of the charges at issue.")

To the extent plaintiff challenges his arrest as procured by fraud or false statements, such claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994). In Heck, the Supreme Court held that, "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87. The plaintiff has not so alleged. Therefore, the plaintiff's claims regarding his December arrest and prosecution should be dismissed. See, e.g., Poventud v. City of N.Y., 750 F.3d 121, 131-32 (2d Cir. 2014) (recognizing Heck's bar to malicious prosecution claims); Whaley v. Lopez, No. 12CV2889(SJF)(ARL), 2012 WL 3137900, at *8 (E.D.N.Y. July 30, 2012)(false arrest

claim alleging that arrest was procured by false statement barred by <u>Heck</u> unless and until conviction is reversed, expunged, declared invalid or otherwise called into question upon habeas review); Fernandez v. Alexander, 419 F. Supp. 2d 128, 132 (D. Conn. 2006) (plaintiff's claims for lack of probable cause for his arrest and misleading statements in the search warrant affidavits barred by <u>Heck</u> because "[i]f the court were to rule in [plaintiff's] favor on his claims ... the validity of his conviction necessarily would be called into question").

Insofar as the plaintiff alleges that State's Attorney Dunn violated the plaintiff's constitutional rights in connection with the December arrest and prosecution, that claim is foreclosed for an additional reason. State prosecutors have absolute immunity in connection with the decision whether or not to commence a prosecution and for conduct "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430 (1976). "Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." Giraldo v. Kessler, 694 F.3d 161, 165 (2d Cir. 2012)(quotation marks and citations omitted). The plaintiff has not stated any viable claims as to defendant Dunn.

**\*4** Turning to the plaintiff's August 2016 arrest, the plaintiff does not allege a favorable termination and the State of Connecticut's website reflects that these charges remain pending.[4] Because this criminal matter did not terminate in the plaintiff's favor, it cannot be the basis of false arrest and/ or malicious prosecution claims. Those claims also should be dismissed.

The plaintiff goes on to state that the defendants violated his due process rights. First, he alleges that they did not notify him of the complaints before he was arrested. This fails to state a cognizable constitutional claim. See Todd v. White Lake Twp., 554 F. Supp. 272, 276 (E.D. Mich. 1983)("no constitutional right to be told of an investigation"), aff'd, 738 F.2d 440 (6th Cir. 1984). To the extent that the plaintiff alleges a due process violation when he complains that there was no probable cause for his arrests, this is duplicative of his false arrest claim under the Fourth Amendment and cannot be the basis of a due process claim. See Tyus v. Newton, No. 3:13cv1486(SRU), 2015 WL 5306550, at \*6 (D. Conn. Sept. 10, 2015)(dismissing due process claim premised on false arrest allegations); Pinter v. City of New York, 976 F. Supp.2d 539, 573 (S.D.N.Y. 2013) ("There is no cause of action for

false arrest or unlawful stop under the Due Process Clause of the Fourteenth Amendment.") Accordingly, the due process claims should be dismissed.

The plaintiff alleges that a "detective and/or police illegally entered" his home "with no warrant" but does not allege that the entry was made by any of the named defendants. This claim should be dismissed. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Because the plaintiff has not alleged personal involvement by any of the named defendants, this claim should be dismissed.

The plaintiff's claim alleging "harassment by Bridgeport Police Department" also should be dismissed. To the extent that the plaintiff seeks to bring a constitutional claim against the Bridgeport Police Department, that claim should be dismissed because the Bridgeport Police Department is not a proper defendant. "To state a cause of action under [42 U.S.C.] § 1983, a plaintiff must allege facts sufficient to show that (1) some person deprived him of a federal right, and (2) such person acted under color of state law." Moorish Sci. Temple of Am., Inc. v. Smith, 693 F.2d 987, 989 (2d Cir. 1982). A municipal police department is not a "person" within the meaning of section 1983 and therefore not subject to suit under section 1983. See Salaman v. Bullock, No. 3:05cv876(JCH), 2007 WL 879130, at \*2 (D. Conn. Mar. 15, 2007)(holding that "a municipal police department is not subject to suit under section 1983 because it is not an independent legal entity"); Edwards v. Stewart, No. 3:15cv1257(CSH), 2016 WL 3906572, at \*2 n.2 (D. Conn. July 14, 2016)("It is basic under both federal and Connecticut law that municipal police departments are not entities capable of being sued.")

The plaintiff alleges that defendant Fitzgerald seized the plaintiff's Suzuki motorcycle with "no cause." Liberally construed, the plaintiff appears to allege an unconstitutional seizure claim. The plaintiff also alleges that defendant Fitzgerald identified him to the press as a "suspect" in a threat called into Bridgeport City Hall and that this statement was false. The § 1983 seizure and state law defamation claims as to defendant Fitzgerald should proceed.

**\*5** The plaintiff lists Officer Pabon in the body of the complaint but not the caption. Fed. R. Civ. P. 10(a) requires

Owens v. Perez, Not Reported in Fed. Supp. (2017)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 413 of 520

that a plaintiff list all defendants in the caption of a complaint. Because Officer Pabon is not listed in the caption, the court does not consider him to be a defendant. See, e.g., Robles v. Armstrong, No. 3:03cv1634(DFM), 2006 WL 752857, at *1 (D. Conn. Mar. 17, 2006) ("Because the John and Jane Does are not listed in the caption of the amended complaint, they are not defendants and the court does not consider claims against them."); Gilhooly v. Armstrong, No. 3:03cv1798(MRK)(WIG), 2006 WL 322473, at *2 (D. Conn. Feb. 9, 2006) ("Because [plaintiff] has not included [certain parties] in the caption of his Complaint, they are not defendants in this action at this time and the Court will not consider any claims against them.").

But, even if the plaintiff named Pabon in the caption, the complaint fails to state a claim. The plaintiff alleges that Pabon "wrote and filed [a] false police report" in March 2016 to "incriminate [the] plaintiff." To the extent the plaintiff alleges that Pabon was involved in the March 2016 complaint underlying the plaintiff's subsequent arrest in August, any Fourth Amendment claims as to that arrest fail for the reasons already stated.

The plaintiff's allegations against defendant Cotta - i.e., that he was a friend of the plaintiff's ex-wife and that he made certain statements to the plaintiff's son - fail to state any cognizable claim. The plaintiff also alleges that Cotta permitted the plaintiff's ex-wife to remove a television from the plaintiff's home in violation of a court order in his divorce case. To the extent that the plaintiff contends that Cotta should have investigated or pursued a claim against the plaintiff's wife for this conduct, this fails to state a constitutional claim. See Badolato v. Adiletta, No. 3:10CV1855(JBA), 2012 WL 3062035, at *4 (D. Conn. July 26, 2012)(defendant officers' failure to pursue a criminal complaint failed to state a due process violation); Lunini v. Grayeb, 395 F.3d 761, 770 (7th Cir. 2005) (finding that an officer's failure to arrest an individual involved "an ordinary exercise of police discretion" that did not "implicate[ ] [the plaintiff's] rights under the Equal Protection Clause ...."). The complaint also does not state a denial of access to the courts claim because the plaintiff failed to allege that he suffered an "actual injury." See Akande v. Warden, Corrigan Corr. Inst., No. 3:08CV882(AWT), 2009 WL 3838836, at *2 (D. Conn. Nov. 16, 2009) ("To state a claim for denial of access to the courts, a plaintiff is required to demonstrate that the defendants acted deliberately and maliciously and that he suffered an actual injury.")

To establish an actual injury, the plaintiff must allege facts showing that the defendants took or were responsible for actions that hindered his efforts to pursue a legal claim, prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts.... The right of access to the courts is ancillary to the underlying claim, without which [a plaintiff] cannot have suffered injury by being shut out of court.... Thus, to establish an actual injury, the plaintiff must show that his underlying claim was not frivolous and that his pursuit of that claim was frustrated by the defendants' actions.... [T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope.

Hedge v. Semple, No. 3:16CV575(MPS), 2017 WL 3097492, at *2 (D. Conn. July 20, 2017). Here, the plaintiff does not allege any "facts showing that [Cotta] w[as] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim, prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts." Akande, 2009 WL 3838836, at *2. See Fedor v. Kudrak, 421 F. Supp. 2d 473, 483 (D. Conn. 2006)(plaintiff's claim that defendant officers failed to enforce a court order in plaintiff's divorce action permitting him to remove certain items from his home failed to state a denial of access to the courts claim where plaintiff "does not allege that he was actually prevented from initiating litigation").

*6 The plaintiff's allegations that defendants Rivera and Garcia failed to investigate his complaint regarding another officer also fail to state a cognizable constitutional claim. "Simply, there is no constitutional right to an investigation by government officials." Vested Bus. Brokers, Ltd. v. Cty. of Suffolk, No. 16CV4945, 2017 WL 4122616, at *7 (E.D.N.Y. Sept. 15, 2017). See Oliphant v. Villano, No. 3:09CV862(JBA), 2011 WL 3902741, at *5 (D. Conn. Sept. 6, 2011)(plaintiff's allegation that officers failed to investigate his complaints failed to state a constitutional claim).

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 414 of 520

Owens v. Perez, Not Reported in Fed. Supp. (2017)

The plaintiff brings claims pursuant to 42 U.S.C. §§ 1985 and 1986. "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). "In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.' " Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003). The plaintiff also must show that the conspiracy was motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). The plaintiff fails to allege facts to support a claim of conspiracy on the part of the defendants. Nor does the plaintiff allege that the actions of any defendant were taken because of his race or other class-based discriminatory animus. The plaintiff's § 1985 claim should be dismissed. See Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Section 1986 provides no substantive rights. "Rather, it provides a remedy for the violation of section 1985. As a result, a prerequisite for an actionable claim under section 1986 is a viable claim under section 1985." Brown v. Semple, No. 3:16CV1144 (SRU), 2017 WL 4246776, at *12 (D. Conn. Sept. 25, 2017) ("Because [plaintiff] has not stated a section 1985 claim, his section 1986 is not actionable and is dismissed. See 28 U.S.C. § 1915(e)(2)(b)(ii).") See Dwares v. City of New York, 985 F.2d 94, 101 (2d Cir. 1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.").

Finally, the plaintiff's claims asserting violation of Conn. Gen. Stat. § 53a-157 and 18 U.S.C. § 242 should be dismissed. These are criminal statutes and do not provide a private right of action. Sheehy v. Brown, 335 F. App'x 102, 104 (2d Cir. 2009)("[F]ederal criminal statutes do not provide private causes of action"); Kloth-Zanard v. Bank of Am., No. 3:15CV1208(MPS), 2017 WL 4429694, at *4 (D. Conn. Oct. 5, 2017)(dismissing claim alleging violation 18 U.S.C. § 242 because there is no private right of action under this statute).

IV. Conclusion

For these reasons, the plaintiff's claims alleging an unconstitutional seizure of his motorcycle and a state law defamation claim as to defendant Fitzgerald should proceed. All other claims and defendants should be dismissed without prejudice.

**\*7** Any party may seek the district court's review of this recommendation. See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rules for Magistrate Judges. Failure to object timely to this ruling precludes any further judicial review of the decision. Knox v. Countrywide Bank, 673 F. App'x 31, 33–34 (2d Cir. 2016). See Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"; Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992) (failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11807650

---

**Footnotes**

1    As indicated, "the court must accept as true all factual allegations in the complaint." Bentley v. Tri-State of Branford, LLC, No. 3:14CV1157(VAB), 2017 WL 3392547, at *2 (D. Conn. Aug. 6, 2017).

**Owens v. Perez, Not Reported in Fed. Supp. (2017)**

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 415 of 520

2    Officer Novia is not a defendant in this case. He is, however, named as a defendant in another action filed by the plaintiff. See Owens v. Connecticut et al., 3:16cv898(RNC). In that earlier-filed case, the plaintiff alleges, among other things, that Officer Novia arrested him on May 21, 2015 without probable cause.

3    The court takes judicial notice of the plaintiff's state criminal conviction which may be accessed via the following website: http://www.jud.state.ct.us/index.asp. See O'Neal v. E. Hampton Town, No. CV160579, 2017 WL 4174788, at *3 (E.D.N.Y. Aug. 28, 2017) ("[J]udicial notice may be taken of public records, including arraignments, arrest reports, criminal complaints and indictments, and certificates of disposition.")

4    The docket number is F02B-CR16-0291855-S.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2977797
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anthony C. PARRISH, Plaintiff,

v.

ORANGE COUNTY LAW ENFORCEMENT
AGENCY-M.P.D., T/O Crawford P.D., Judge
Richard J. Guertin, A.D.A. David J. Byrne, 18-
B Lawyer Christopher Gurda, 18-B Lawyer
Mathew D. Witherow, 18-B Lawyer Alex
Smith, P.O. Valastro, P.O. Ortiz, Defendants.

25-CV-1674 (LLS)
|
Signed October 20, 2025

**Attorneys and Law Firms**

Anthony C. Parrish, Goshen, NY, Pro Se.

ORDER TO AMEND

LOUIS L. STANTON, United States District Judge:

**\*1** Plaintiff Anthony C. Parrish, who currently is incarcerated in the Orange County Correctional Facility in Goshen, New York, brings this action, *pro se*, under 42 U.S.C. § 1983. He alleges that Defendants violated his constitutional rights during an arrest in the City of Middletown, Orange County, New York, as well as during his criminal proceedings in an Orange County courthouse. By order dated April 2, 2025, the Court granted Plaintiff's request to proceed *in forma pauperis* ("IFP"), that is, without prepayment of fees. [1] For the following reasons, the Court grants Plaintiff 60 days' leave to file an amended complaint.

**STANDARD OF REVIEW**

The Court must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2) (B), 1915A(b); *see* Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P.

12(h)(3). While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original).

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to make a short and plain statement showing that the pleader is entitled to relief. A complaint states a claim for relief if the claim is plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To review a complaint for plausibility, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the pleader's favor. Iqbal, 556 U.S. at 678-79 (citing Twombly, 550 U.S. at 555). The Court need not accept, however, "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff brings this action asserting claims arising from his arrest and subsequent prosecution. He names as Defendants (1) the Orange County Law Enforcement Agency M.P.D., which the Court understands to be the Middletown Police Department ("MPD"); (2) MPD Officer Ortiz and Crawford Police Department Officer Valastro; (3) City of Middletown Judge, Richard J. Guertin; (4) Assistant District Attorney ("ADA") David J. Byrne; and (5) Christopher Gurda, Mathew D. Witherow, and Alex Smith, defense lawyers presumably assigned to represent Plaintiff in his criminal proceedings.

**\*2** The following facts are drawn from the complaint. [2] On June 6, 2024, Plaintiff was "unlawfully arrested and detained at gunpoint by law enforcement in Middletown, N.Y.," following the release of a bulletin "that was put out for Plaintiff as a person of interest for questioning in relation to a crime that was committed in a nearby Town of Crawford, N.Y." (ECF 1, at 6.) Plaintiff asserts that "no probable cause existed" for his arrest. (*Id.* at 5.)

On June 10, 2024, Plaintiff's grand jury proceeding at an Orange County courthouse commenced. (*Id.* at 6.) According to Plaintiff, "no one showed up" on behalf of Plaintiff, the "Prosecution" or the "Damaged Party." (*Id.*) Nonetheless, the Court "still remanded" him to custody and thereafter appointed Gurda to represent him. (*Id.*) Several days later, after June 13, 2024, when Plaintiff alleges the statute of limitations had run on the crime for which he was arrested, Gurda waived Plaintiff's right to "testify on his [own] behalf," without his consent. (*Id.*) A motion filed (either by or for Plaintiff) addressed "this unlawful, unfair action" of waiver but was "erroneously denied." (*Id.*) At that time, the trial court granted Plaintiff a reassignment of counsel but "denied [his simultaneous] motion to be brought back before a grand jury for a fair legal proceeding." (*Id.*) Plaintiff further alleges that he had "no legal representation [at his] felony arrai[ ]gnment" because his "assigned counsel had [a] conflict of interest." (*Id.*)

Plaintiff alleges he suffered "mental/emotional stress," as has his "wife, children, [and] family." (*Id.* at 6.) He also alleges that he endured "financial stress" due to the "loss of [his] wages and employment." (*Id.*) Plaintiff seeks both "injunctive and monetary relief." (*Id.*)

## DISCUSSION

The complaint does not state a claim against any of the named defendants. First, Plaintiff cannot state a claim against Judge Guertin, who likely presided over Plaintiff's criminal proceedings, because this judicial officer is immune from liability. Second, Plaintiff's claims against ADA Byrne, who presumably prosecuted Plaintiff, must be dismissed under the doctrine of prosecutorial immunity. Third, the federal claims against Plaintiff's defense counsel cannot proceed because these private individuals cannot be held liable under Section 1983. Fourth, Plaintiff's claims against the two police officers, who the Court assumes effectuated Plaintiff's arrest, do not state sufficient facts suggesting that Plaintiff may pursue his claims against these two individuals. Fifth, Plaintiff's claims against the MPD are subject to dismissal because Plaintiff does not state a claim against the police department.

Finally, to the extent Plaintiff seeks this Court's intervention in his ongoing criminal proceedings, the Court declines to intervene.

## A. Judicial Immunity (Judge Richard J. Guertin)

Judges are absolutely immune from suit for damages for any actions taken within the scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209 (citations omitted). This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994).

**\*3** Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when the judge takes action that, although judicial in nature, is taken "in absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Here, Plaintiff names as a defendant Judge Guertin, presumably because this judicial officer presided over Plaintiff's criminal proceedings in Orange County. Plaintiff does not state any facts, however, that suggest Judge Guertin acted beyond the scope of his judicial responsibilities or outside his jurisdiction. *See Mireles*, 502 U.S. at 11-12. Rather, Plaintiff disagrees with the manner in which his criminal proceedings unfolded. For example, the complaint includes allegations showing Plaintiff's disagreement with the trial court's decision to remand Plaintiff and deny Plaintiff's motion seeking dismissal under the statute of limitations. (*See* ECF 1, at 6.) Because these allegations show that Plaintiff sues Judge Guertin for "acts arising out of, or related to, individual cases before him," this defendant is immune from suit for such claims. *Bliven*, 579 F.3d at 210. Accordingly, the Court dismisses Plaintiff's claims against Judge Guertin because they seek "monetary relief" against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and they are consequently frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute]."); *see also* 28 U.S.C. § 1915A(b)(1) (including "frivolous" grounds for dismissal of civil actions by prisoner seeking redress from governmental entity, officer, or employee).

**B. Prosecutorial Immunity (Assistant District Attorney David J. Byrne)**

Prosecutors are immune from civil suits for damages for acts committed within the scope of their official duties where the challenged activities are not investigative in nature but, rather, are " 'intimately associated with the judicial phase of the criminal process.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (absolute immunity is analyzed under a "functional approach" that "looks to the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks and citations omitted)). This immunity applies to, among other prosecutorial actions, the decision whether to prosecute someone. *See Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (among the prosecutorial actions protected from damages liability by the doctrine of prosecutorial immunity are "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas").

In addition, prosecutors are absolutely immune from suit for acts that may be administrative obligations but are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 70-72 (2d Cir. 2019) (holding that Assistant District Attorneys' direction as to where a criminal defendant would be arraigned was in preparation for a court proceeding in which the prosecutors were acting as advocates, and prosecutors were therefore shielded by absolute immunity (citing, *inter alia, Van de Kamp*)).

**\*4** Here, Plaintiff's claims against ADA Byrne, who likely is the prosecutor assigned to Plaintiff's criminal case, appear to be based solely on Byrne's conduct within the scope of his official duties. Because Byrne is immune from suit when allegations concern the initiation of a prosecution or the presentation of the State's case against the plaintiff, Byrne is absolutely immune from liability in this lawsuit. Accordingly, the Court dismisses these claims because they seek monetary relief against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(b)(iii), and consequently are frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Collazo v. Pagano*, 656 F. 3d 131, 134 (2d Cir. 2011) (holding that claim against prosecutor is frivolous if it arises from conduct that is "intimately associated with the judicial phase of the criminal process").

**C. Private Actors (Christopher Gurda, Matthew D. Witherow, and Alex Smith)** [3]

A claim for relief under Section 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties therefore generally are not liable under the statute. *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties.").

Absent special circumstances suggesting concerted action between an attorney and a state representative, *see Nicholas v. Goord*, 430 F.3d 652, 656 n.7 (2d Cir. 2005) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)), the representation of a defendant by private counsel in state criminal proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under Section 1983, regardless of whether that attorney is privately retained, court-appointed, or employed as a public defender. *See Bourdon v. Loughren*, 386 F.3d 88, 90 (2d Cir. 2004) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 324-25 (1981)); *Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997) ("[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42 U.S.C. § 1983.").

Defendant Gurda, Witherow, and Smith are private attorneys who are not alleged to have worked for any state or other government body, even though the trial court assigned them to represent Plaintiff during his criminal proceedings. *See Bourdon*, 386 F.3d at 90 (holding that court-appointed lawyers are not state actors). As such, they are not subject to suit under Section 1983, and the Court therefore dismisses these claims for failure to state a claim. *See 28 U.S.C. §§ 1915(e)(2)(B)(ii)*.

**D. Failure to State a Claim (Police Officers Ortiz and Valastro; Middletown Police Department)**

Plaintiff names two police officers as defendants in this action: Officer Valastro of the Crawford Police Department and Officer Ortiz of the Middletown Police Department. [4] The Court construes the complaint as asserting false arrest and

malicious prosecution claims against these two defendants. The Court also construes the complaint as asserting a municipal liability claim against the MPD and the City of Middletown.

### 1. False Arrest Claim

 **\*5**  A claim for false arrest under Section 1983 incorporates the elements of a false arrest claim under state law. *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). To state a false arrest claim under New York law, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Liranzo v. United States*, 690 F.3d 78, 95 (2d Cir. 2012). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks omitted)).

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 84-85 (quoting *Weyant*, 101 F.3d at 852). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations and citations omitted). Generally, the "[p]olice have probable cause to arrest if they receive information from a putative crime victim, unless the circumstances raise doubt as to the person's veracity." *Id*.

Here, Plaintiff does not include enough facts to state a false arrest claim against either officer because he does not describe the circumstances of his arrest or the actions of the officers who arrested him. Plaintiff does not mention either officer by name in the body of his complaint. Rather, he states that "law enforcement made an unlawful arrest of Plaintiff" in Middletown, New York, "without [his] being a suspect of a crime" and where "[n]o identification was made to give probable cause for arrest." (ECF 1 at 5-6.) Without describing the relevant events leading up to and during the arrest, the complaint does not set forth allegations that plausibly suggest that either officer falsely arrested him. Accordingly, the Court grants Plaintiff leave to reassert his false arrest claim

to provide facts suggesting that his arrest was effectuated without probable cause.

### 2. Malicious Prosecution

To state a claim for malicious prosecution, a plaintiff must allege facts showing: (1) that the defendant initiated or continued a prosecution against the plaintiff; (2) that the defendant lacked probable cause to commence the proceeding or believe the proceeding could succeed; (3) that the defendant acted with malice; and (4) that the prosecution was terminated in the plaintiff's favor. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). "To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022).

Here, Plaintiff does not state whether his criminal proceedings are ongoing or terminated in his favor. Because Plaintiff does not provide sufficient information for the Court to consider this claim, the Court grants Plaintiff 60 days' leave to reassert his malicious prosecution claim.

### 3. Middletown Police Department

Plaintiff seeks to maintain a Section 1983 claim against the Orange County Law Enforcement Agency and specifically the Middletown Police Department. Because Plaintiff seeks to bring claims against the MPD, the Court construes the complaint as asserting a municipal liability claim against the MPD and the City of Middletown. [5]

 **\*6**  When a plaintiff sues a municipality under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under ... section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). In other words, to state a Section 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones*

*v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff does not include any facts suggesting that the MPD or the City of Middletown adopted a policy, custom, or practice that caused him to suffer a constitutional harm. Rather, Plaintiff's claims appears to be based entirely on the alleged misconduct of Officer Ortiz who presumably arrested Plaintiff on June 6, 2024. Even when read liberally, the complaint omits any fact linking the alleged false arrest to any municipal policy or custom. *See Fisk v. Letterman,* 501 F. Supp.2d 505, 527 (S.D.N.Y. 2007) ("[A] single incident of unconstitutional conduct by a non-policymaking employee of the City will generally not suffice to establish liability [under Section 1983].") (internal quotation marks and citation omitted). The Court therefore grants Plaintiff leave to reassert his claims against the MPD and the City of Middletown to state facts plausibly suggesting that a policy, custom, or practice caused the violation of his rights.

## E. Injunctive Relief Regarding Ongoing Criminal Proceedings

The Court construes Plaintiff's complaint seeking injunctive relief as seeking this Court's intervention in his going criminal proceedings. This Court, however, cannot intervene in those proceedings under a doctrine established in the United States Supreme Court case *Younger v. Harris,* 401 U.S. 37 (1971). In *Younger,* the Supreme Court held that a federal court may not intervene in a pending state court criminal proceeding in the absence of special circumstances. A federal court must abstain from exercising jurisdiction if "(1) there is an ongoing state criminal proceeding; (2) the claim raises important state interests; and (3) the state proceedings provide an adequate opportunity to raise the constitutional claims." *Schlagler v. Phillips,* 166 F.3d 439, 442 (2d Cir. 1999). "[I]t is [clear] that a state's interest in the administration of criminal justice within its borders is an important one." *Hansel v. Town Ct. for Town of Springfield, N.Y.,* 56 F.3d 391, 393 (2d Cir. 1995). Moreover, "a pending state prosecution [ordinarily] provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler v. Helfant,* 421 U.S. 117, 124 (1975).

Where a plaintiff can show special circumstances suggesting bad faith, harassment, or irreparable injury that is both serious and immediate, a federal court should not abstain from exercising jurisdiction. For example, if a "proceeding was initiated with and is animated by a retaliatory, harassing, or

other illegitimate motive," abstention may not be warranted. *Diamond "D" Const. Corp. v. McGowan,* 282 F.3d 191, 199 (2d Cir. 2002). Moreover, where a plaintiff claims irreparable injury, "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Younger,* 401 U.S. at 46 (internal quotation marks and citation omitted).

**\*7** The Court must abstain from intervening in Plaintiff's ongoing criminal proceedings because the State of New York has a clear interest in adjudicating this criminal matter and Plaintiff does not plead any facts suggesting that he cannot *raise* his claims in his state court proceeding; Plaintiff's disagreement with the trial court's decisions does not itself warrant intervention. Moreover, the complaint does not plead facts showing any exceptional circumstances suggesting bad faith, harassment, or irreparable injury. The Court therefore abstains from exercising jurisdiction and dismisses the action for lack of subject matter jurisdiction. *See Diamond "D" Const. Corp.,* 282 F.3d at 197 ("[W]hen Younger applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter.").

## LEAVE TO AMEND

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione,* 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988). Indeed, within the Second Circuit, "[a] *pro se* party should be granted leave to amend if 'a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Janakievski v. Exec. Dir., Rochester Psych. Ctr.,* 955 F.3d 314, 320 (2d Cir. 2020) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)). Because Plaintiff may be able to allege additional facts to state valid claims under Section 1983, the Court grants Plaintiff 60 days' leave to amend his complaint to detail his false arrest and malicious prosecution claims against Officers Ortiz and Valastro, and his municipal liability claims against the MPD and the City of Middletown.

In the "Statement of Claim" section of the amended complaint form, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant. If he has an address for any named defendant, Plaintiff must provide it. Plaintiff should include all of the information in the

amended complaint that Plaintiff wants the Court to consider in deciding whether the amended complaint states a claim for relief. That information should include:

1. the names and titles of all relevant people;

2. a description of all relevant events, including what each defendant did or failed to do, the approximate date and time of each event, and the general location where each event occurred;

3. a description of the injuries Plaintiff suffered; and

4. the relief Plaintiff seeks, such as money damages, injunctive relief, or declaratory relief.

Essentially, Plaintiff's amended complaint should tell the Court: who violated his rights and how; when and where such violations occurred; and why Plaintiff is entitled to relief.

Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, **any facts or claims that Plaintiff wants to include from the original complaint must be repeated in the amended complaint.**

### CONCLUSION

Plaintiff is granted leave to file an amended complaint that complies with the standards set forth above. Plaintiff must submit the amended complaint to this Court's Pro Se Intake Unit within 60 days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 25-CV-1674 (LLS). An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court dismisses Plaintiff's claims against Judge Richard J. Guertin, Assistant District Attorney David J. Byrne, Christopher Gurda, Mathew D. Witherow, and Alex Smith. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

**\*8** SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____    _____CV_____
Write the full name of each plaintiff.    (Include case number if one has been
                                          assigned)

                        -against-             **AMENDED
                                              COMPLAINT**
                                              (Prisoner)

                                          Do you want a jury trial?
_____           ☐ Yes    ☐ No

Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

---
**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.
---

Rev. 5/20/16

## I.  LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other: _____

## II.  PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____
First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

_____
County, City                State                Zip Code

## III.  PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

## IV.  DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 2:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 3:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

Defendant 4:

First Name          Last Name          Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                State                Zip Code

## V.  STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.          7

VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | Plaintiff's Signature |
|---|---|

| First Name | Middle Initial | Last Name |
|---|---|---|

Prison Address

| County, City | State | Zip Code |
|---|---|---|

Date on which I am delivering this complaint to prison authorities for mailing:

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

**VI.   RELIEF**

State briefly what money damages or other relief you want the court to order.

Page 5

Page 6

**All Citations**

Slip Copy, 2025 WL 2977797

---

**Footnotes**

1    Prisoners are not exempt from paying the full filing fee even when they have been granted permission to proceed IFP. *See* 28 U.S.C. § 1915(b)(1).

2    The Court quotes from the complaint verbatim. All spelling, grammar, and punctuation are as in the original unless noted otherwise.

3    Although Plaintiff names three 18-B lawyers as Defendants, he only describes actions by Christopher Gurda and Matthew D. Witherow. For the purposes of this order, the Court assumes that Alex Smith also represented Plaintiff in his criminal proceedings.

4    Plaintiff sues the officers in their official capacity. When police officers are sued in their official capacity under Section 1983, such lawsuits are functionally equivalent to a suit against the governmental entity that the officers represent. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (holding that where claims against a municipality were dismissed, claim against police officers in their official capacity was also properly dismissed because it was essentially a claim against the municipality). In light of Plaintiff's *pro se* status, the Court construes Plaintiff's claims against Valastro and Ortiz as brought against them in their personal capacity.

5    Unless otherwise authorized by a municipal charter, municipal agencies and departments are not suable entities, and thus do not have the capacity to be sued, as opposed to the respective municipalities themselves. *See Edwards v. Arocho*, 125 F.4th 336, 354 (2d Cir. 2024) ("A plaintiff cannot bring a claim against a municipal agency that does not have the capacity to be sued under its municipal charter." (emphasis in original)). Under the Middletown City Charter, the Police Commission is the final policymaking body for law enforcement. *See* Middletown City Charter, Title VII §§ 127–129; *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 659 (S.D.N.Y. 2000) (referencing the Middletown City Charter and holding that plaintiff "has made no showing that any decision of the Police Commission led to his arrest, or that [any named defendant] was a final policymaker."). At this early stage, the Court will assume without deciding that the Middletown Police Department is a suable entity.

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 425 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

2008 WL 11438085
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ted PERRY, Plaintiff,
v.
COUNTY OF WESTCHESTER, Defendant.

Case No. 06-CV-3000 (KMK)
|
Signed 03/31/2008

**Attorneys and Law Firms**

Pamela D. Hayes, Esq., Law Office of Pamela D. Hayes, Esq., New York, New York, Counsel for Plaintiff.

Stuart E. Kahan, Esq., Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP, White Plains, New York, Counsel for Defendant.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** On April 19, 2006, Plaintiff Ted Perry ("Plaintiff") filed this employment discrimination suit against Defendant County of Westchester ("Defendant"). Before the Court is Defendant's Motion for Summary Judgment, seeking dismissal of Plaintiff's Complaint. For the reasons stated herein, Defendant's Motion is GRANTED.

I. Background

A. Employment and Disciplinary History

The following facts are undisputed, except where indicated. Plaintiff, an African-American man, began his employment with Defendant in June 1988 as a seasonal laborer in the Department of Parks Recreation and Conservation. (Def.'s Revised Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ¶¶ 1-2 ("Def.'s 56.1 Stmt"); Pl.'s Revised Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) ¶¶ 1-2 ("Pl.'s 56.1 Stmt").) Shortly thereafter, in July 1988, Plaintiff was promoted to a full-time Maintenance Laborer, Grade IV. (Def.'s 56.1 Stmt ¶ 3; Pl.'s 56.1 Stmt ¶ 3.) In 1992, Plaintiff was promoted to the position of

Maintenance Mechanic II, Grade VII. (Def.'s 56.1 Stmt ¶ 4; Pl.'s 56.1 Stmt ¶ 4.)

Later, in 1993, Plaintiff's title was reclassified to the position of Housekeeper, Grade VII. (Def.'s 56.1 Stmt ¶ 5; Pl.'s 56.1 Stmt ¶ 5.) The titles of two other employees – Roger Emery ("Emery") and John Ponce ("Ponce"), both of whom are Caucasian – were also reclassified to Housekeeper, but, unlike Plaintiff, these employees filed a union grievance regarding this reclassification. (Def.'s 56.1 Stmt ¶¶ 6-7; Pl.'s 56.1 Stmt ¶¶ 6-7.) Emery and Ponce were successful in their grievance and had their positions reclassified to Maintenance Mechanic. (Def.'s 56.1 Stmt ¶ 8; Pl.'s 56.1 Stmt ¶ 8; Aff. of Stuart E. Kahan, Ex. H ("Kahan Aff.").)

In the fall of 1995, Plaintiff was suspended for approximately sixty days without pay in connection with an altercation between Plaintiff and a co-worker. (Def.'s 56.1 Stmt ¶¶ 9-12; Pl.'s 56.1 Stmt ¶¶ 9-12; Kahan Aff., Ex. J.) Plaintiff was soon thereafter reassigned to the Division of General Maintenance in November 1995. (Def.'s 56.1 Stmt ¶ 13; Pl.'s 56.1 Stmt ¶ 13.) Years later, in 2000, Plaintiff was reassigned to Croton Point Park, and in 2001, Plaintiff was again reassigned to the Bronx River Parkway Reservation, where he reported to superintendent Robert Bates ("Bates"). (Def.'s 56.1 Stmt ¶¶ 21-22; Pl.'s 56.1 Stmt ¶¶ 21-22.)

Plaintiff was issued a warning notice by Bates on May 14, 2002 for "refus[ing] to do the work assigned to him and [for leaving the] work site without permission." (Def.'s 56.1 Stmt ¶ 23; Pl.'s 56.1 Stmt ¶ 23.) On October 24, 2002, Bates issued to Plaintiff another warning notice, citing Plaintiff for "time abuse." (Def.'s 56.1 Stmt ¶ 25; Pl.'s 56.1 Stmt ¶ 25.) According to Plaintiff, on November 8, 2002, he missed several hours of work to answer a jury summons in the Bronx County Courthouse. (Def.'s 56.1 Stmt ¶ 26; Pl.'s 56.1 Stmt ¶ 26.) Plaintiff alleges that on the following work day, November 12, 2002, Bates reprimanded Plaintiff for attending jury duty and told him that his pay would be docked for the time missed. (Def.'s 56.1 Stmt ¶ 27; Pl.'s 56.1 Stmt ¶ 27.) [1] Defendant claims that Plaintiff's time was never docked for jury duty (Def.'s 56.1 Stmt ¶ 28), but Plaintiff insists that it was (Decl. of Pl. Tedry Perry in Opp'n to Def.'s Mot. for Summ. J. ¶ 14 ("Pl.'s Decl."). On November 25, 2002, Plaintiff was issued another warning notice, this time for taking time off on November 18, 2002, though he had already used up all of his available time. (Kahan Aff., Ex. Y.) Plaintiff, however, denies missing work on November 18, 2002, and insists that this warning notice was actually for the time he missed

attending jury duty. (Pl.'s Decl. ¶ 14.) Yet more warning notices were issued to Plaintiff on December 30, 2002, for failing to produce a driver's license, and on January 24, 2003 and January 27, 2003, for calling in sick with no sick leave balance. (Kahan Aff, Ex. AA, BB.)

**\*2** On May 2, 2003, Plaintiff injured his back while working, which he did not report until May 5, 2003. (Def.'s 56.1 Stmt ¶¶ 34-35; Pl.'s 56.1 Stmt ¶¶ 34-35.) Also on May 5, Plaintiff was issued a warning notice for inappropriate conduct and insubordination. (Kahan Aff., Ex. DD.) That was the last day Plaintiff went to work. Plaintiff was issued two more warning notices, on May 8, 2003 and May 9, 2003, both for failing to report to work and failing to call in. (Def.'s 56.1 Stmt ¶ 37; Pl.'s 56.1 Stmt ¶ 37.) Thereafter, Plaintiff began collecting worker's compensation and social security disability benefits. (Def.'s 56.1 Stmt ¶ 39; Pl.'s 56.1 Stmt ¶ 39.) Defendant officially terminated Plaintiff's employment on October 28, 2004. (Def.'s 56.1 Stmt ¶¶ 44-45; Pl.'s 56.1 Stmt ¶¶ 44-45.)

### B. Plaintiff's Allegations of Discrimination

Plaintiff alleges that Defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff claims that he was subjected to disparate treatment and a hostile work environment when he was forced to work out-of-title – while his Caucasian co-workers were not – from 1995 through May 5, 2003, performing dangerous and undesirable tasks that had no relationship to his job duties and that ultimately resulted in his back injury. (Compl. 3-4, 7-8.) [2] Further, Plaintiff asserts that, from 1999 to 2003, he was subjected to a hostile work environment when he was disciplined for minor infractions, while Caucasian employees were not disciplined for the same or worse behavior. (*Id.* 3.) One incident highlighted by Plaintiff is alleged to have taken place in November 2002, when Plaintiff claims to have had his pay docked for attending jury duty. Plaintiff asserts that Caucasian employees – in particular, Jason Aubry ("Aubry") – were never docked pay for attending court appearances. (*Id.* 4-5, 7.)

In sum, Plaintiff alleges that:

> Plaintiff has continually been disciplined and treated in a disparage [sic] fashion, due to his race. He was forced to work out of title since

1995 when he was required to perform tasks which had no relationship to his duties. He was docked for performing legitimate duties, such as jury duty, all the while white employees were given time off to go to court. He was disciplined, while other white employees were not disciplined for the same or worse behavior. Said discrimination occurred solely because of Plaintiff's race, and amounted to a hostile environment.

(*Id.* 1-2.)

### C. Procedural History

On October 5, 1999, Plaintiff filed a complaint alleging harassment on account of his race with the Westchester County Equal Employment Opportunity/Affirmative Action Office ("EEO/AAO"). (Def.'s 56.1 Stmt ¶ 14; Pl.'s 56.1 Stmt ¶ 14.) In February 2000, the EEO/AAO determined that there existed no evidence of racial discrimination or harassment, and in May 2000, the EEO/AAO closed its file on Plaintiff's complaint. (Def.'s 56.1 Stmt ¶¶ 15-16; Pl.'s 56.1 Stmt ¶¶ 15-16.) Plaintiff filed a complaint dated June 2, 2000 with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination and retaliation premised on a continuing violation spanning from August 2, 1999 to April 14, 2000. (Def.'s 56.1 Stmt ¶ 17; Pl.'s 56.1 Stmt ¶ 17.) In June 2001, the EEOC issued to Plaintiff a Dismissal and Notice of Rights Letter, in which it "adopted the findings of the State or Local Fair Employment Practices Agency that investigated this charge." (Def.'s 56.1 Stmt ¶ 19; Pl.'s 56.1 Stmt ¶ 19.) Plaintiff never filed a lawsuit in connection with these claims. (Def.'s 56.1 Stmt ¶ 20; Pl.'s 56.1 Stmt ¶ 20.)

**\*3** On August 11, 2003, Plaintiff filed another complaint alleging discrimination with the New York State Department of Human Rights ("NYSDHR"). (Def.'s 56.1 Stmt ¶ 40; Pl.'s 56.1 Stmt ¶ 40.) In this complaint, Plaintiff claimed that he had been treated disparately by Defendant due to his race from 1999 until May 5, 2003, and that he had been assigned undesirable tasks at work since 1999. (Kahan Aff., Ex. GG.) The NYSDHR determined on September 28, 2005, that there existed no probable cause to support Plaintiff's allegations of discrimination. (Def.'s 56.1 Stmt ¶ 42; Pl.'s 56.1 Stmt ¶ 42.) On January 17, 2006, the EEOC issued to Plaintiff a Dismissal

and Notice of Rights letter. (Def.'s 56.1 Stmt ¶ 43; Pl.'s 56.1 Stmt ¶ 43.)

Plaintiff initiated the present lawsuit on April 19, 2006, alleging: (i) employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-5(f) (Compl. 8); and (ii) racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (*id.* 6). Discovery closed on January 3, 2007. On February 26, 2007, Defendant filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b), seeking summary judgment in its favor on the following grounds:

> (a) portions of plaintiff's complaint are time barred pursuant to the 300 day limitations period set forth [in] 42 U.S.C. § 2000e-5(e); (b) plaintiff may not seek damages due to his termination from employment since plaintiff failed to exhaust administrative remedies; (c) the plaintiff has failed to make out a prima facie case of racial discrimination via disparate treatment since the plaintiff cannot prove that he was subjected to an adverse employment action or that a reasonable inference of racial discrimination can be reached based upon defendant's actions; (d) assuming that plaintiff has met the minimal requirements for a prima facie case of racial discrimination, the County presented a race neutral reason for its employment decisions regarding [Plaintiff] and the plaintiff cannot prove that the County's actions were mere pretext; (e) the plaintiff's claim based upon the existence of a hostile work environment must be dismissed because there is no evidence that such an environment existed; and (f) plaintiff's Section 1981 claim must be dismissed.

(Def.'s Mem. of Law in Supp. of Def. County of Westchester's Mot. for Summ. J. 1-2 ("Def.'s Mem.").)

Plaintiff did not file opposition papers by the March 12, 2007 deadline set by Judge Colleen McMahon, to whom this case was originally assigned. On June 28, 2007, Judge McMahon issued an order, stating: "Plaintiff's opposition was due March 12, 2007. The court has not received any response. Plaintiff has 30 days to file a response to the motion. If no response has been filed, the motion will be deemed submitted and the court will decide it without benefit of any response." (Docket No. 27.) Plaintiff failed to file opposition papers within the thirty-day deadline set by Judge McMahon on June 28, 2007. On August 6, 2007, the case was reassigned to this Court. Plaintiff finally filed opposition papers on August 22, 2007 – without explanation as to the delay or permission from the Court to do so. The Court held oral argument on March 11, 2008. For reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted) ).

**\*4** The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at \*2 (S.D.N.Y. May 23, 2006). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (noting the caution with which the Second Circuit reviews the grant of summary judgment in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions[,]" but stating that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact" (internal quotation marks omitted) ).

B. Applicable Time Limitations

In its Motion for Summary Judgment, Defendant argues that Plaintiff is not entitled to base his claim on any discrete acts of alleged discrimination occurring before October 14, 2002 because such acts are more than 300 days before Plaintiff's NYSDHR complaint was filed. [3] (Def.'s Mem. 3.) Further, Defendant argues that acts of alleged discrimination that served as the basis of Plaintiff's 1999 complaint with the NYSDHR may not form the basis of Plaintiff's present claim because Plaintiff failed to file suit on those acts within ninety days of the EEOC's June 11, 2001 Notice of Rights letter. (*Id.* 5-6.)

To these arguments, Plaintiff responds that his present claims are not dependent on any discrete acts occurring before those time periods but insists that consideration of past acts is appropriate in demonstrating the existence of a hostile work environment and validating a theory of a continuing violation based on disparate treatment and out-of-title work. (Pl.'s Mem. of Law in Opp'n to Def. County of Westchester's Mot. for Summ. J. Pursuant to Fed. R. of Civ. P. 56(b) 4 ("Pl.'s Mem.") ) ("These instances provide the Court with a history of how the underlying cause of action came to pass and does not specifically ask for action on events which started years earlier. It merely demonstrates the theory of a continuing violation.").)

**\*5** The Supreme Court has made clear that discrete acts occurring more than 300 days before Plaintiff filed his complaint with the NYSDHR are not actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the ... 300-day time period after the discrete discriminatory act occurred."). Recently, in *Ledbetter v. Goodyear Tire & Rubber Co.*, the Supreme Court elaborated:

> A new violation does not occur, and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.... [C]urrent effects alone cannot breathe life into prior, uncharged discrimination....

127 S. Ct. 2162, 2169 (2007)

Acts that were the subject of Plaintiff's 1999 EEO/AAO and EEOC complaints are also not actionable because Plaintiff failed to bring suit on those acts within ninety days from receipt of the EEOC Notice of Rights letter. To the extent that the second right-to-sue letter, dated January 2006, is based on the same facts as the first, Plaintiff cannot complain about those claims in this lawsuit. *See Lo v. Pan Am. World Airways,* 787 F.2d 827, 828 (2d Cir. 1986) (per curiam) (denying claims where second EEOC complaint was based on same facts as earlier lapsed right-to-sue letter). However, the June 2001 right-to-sue letter will not preclude the current suit "to the extent that plaintiff's Complaint is based on allegations in the second [EEOC complaint] which did not appear in the first [EEOC complaint]." *Dahbany-Miraglia v. Queensboro Cmty. Coll.,* No. 03-CV-8052, 2004 WL 1192078, at *7 (S.D.N.Y. May 27, 2004). Time-barred acts will only be considered to the extent that they constitute "background evidence in support of a timely claim." *Morgan,* 536 U.S. at 113 ("The existence of past acts and the employer's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."); *see also Williams v. British Airways, PLC,* 06-CV-5085, 2007 WL 2907426, at *11 n.20 (E.D.N.Y. Sept. 27, 2007) ("[C]ertain incidents, even if time-barred, 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' " (quoting *Morgan,* 536 U.S. at 112) ).

The continuing violation theory is a tolling mechanism that rarely permits recovery for otherwise untimely violations. *See Santiago v. Newburgh Enlarged City Sch. Dist.,* 485 F. Supp. 2d 327, 331 (S.D.N.Y. 2007) ("Very few acts qualify as continuing violations, so as to trigger a continuous tolling of the statute of limitations."). A hostile work environment claim is a type of continuing violation based on the "cumulative affect of individual acts," which together constitute "one unlawful employment practice." *See Morgan,* 536 U.S at 115. "It does not matter, for purposes of the [time limitation in the] statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *accord Santiago,* 485 F. Supp. 2d at 331 ("[I]n a hostile work environment case, acts outside the 300 day limit that contribute to an ongoing hostile work environment are actionable under a continuing violation theory."). The Supreme Court, however, has rejected the notion "that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." *Ledbetter,* 127 S. Ct. at 2172.

**\*6** To the extent Plaintiff is able to establish that there existed a hostile work environment during his employment with Defendant, recovery may be premised even on untimely acts as long as they – in conjunction with timely acts – created a hostile work environment. The Court notes, however, that even if the past acts contributed to a hostile work environment under a continuing violation theory, those acts would not be actionable to the extent that they formed the basis of Plaintiff's 1999 complaint. Plaintiff's opportunity to file suit on those alleged violations has long since passed and no tolling doctrine will revive them at this point. With respect to Plaintiff's disparate treatment claim based on adverse employment actions, Plaintiff can only rely on discrete acts of alleged discrimination occurring within the 300-day period preceding Plaintiff's August 11, 2003 EEOC complaint. *See Morgan,* 536 U.S. at 113.

### C. Plaintiff's Request to Supplement the Record

On March 13, 2008, after March 11 oral argument, Plaintiff's counsel submitted to the Court an application to supplement the record with a new affidavit from Plaintiff and with what appears to be the minutes of a meeting held on November 9, 1999.[4] According to Plaintiff's counsel, these additional submissions "clearly show Plaintiff was treated differently, that everyone knew about it ... and [that] Plaintiff was held to a different standard which was discriminatory and caused him to suffer damages." (Letter from Pamela D. Hayes, Esq., to the Court, dated March 17, 2008.) Notably absent from Plaintiff's counsel's recent submissions is an explanation as to why it has taken until now to submit these items to the Court – over a year after Plaintiff's full response to Defendant's Motion was due.

"Under Fed. R. Civ. P. 6(b)(2), the Court has discretion to allow plaintiff to submit new evidence if the Court determines that plaintiff's failure to submit such evidence in a timely fashion 'was the result of excusable neglect.' " *Davidson v. Scully,* 148 F. Supp. 2d 249, 251 (S.D.N.Y. 2001) (quoting *Davidson v. Keenan,* 740 F.2d 129, 132 (2d Cir. 1984) ). "The determination whether neglect is 'excusable' in a particular case rests with the sound discretion of the district court." *Keenan,* 740 F.2d at 132. In making the equitable

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 430 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

determination of whether failure to make a more timely submission of new evidence constitutes excusable neglect, the factors that the Court may consider include: " 'the danger of prejudice' to the non-moving party, 'the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.' " *Scully*, 148 F. Supp. 2d at 251-52 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993) ).

Here, the Court has little trouble finding that Plaintiff (or, really his counsel) has failed to meet the excusable neglect burden. The information Plaintiff seeks to add was available to him long ago (over a year) and obviously any first-hand testimony he offers has always been available to him. Moreover, Defendant is plainly prejudiced by the late use of this information as it likely would have been the subject of rigorous inquiry during Plaintiff's deposition and other discovery. Nor is there good faith. Plaintiff's counsel only tendered these new offerings when it was clear that her initial representations were exposed as wholly unsupported by the record as it existed at the time the Motion was fully briefed. Thus, the Court finds the extraordinary delay here to be inexcusable. Therefore, Plaintiff's request to supplement the record with the March 13 submissions is denied.

### D. Plaintiff's Claims of Employment Discrimination

**\*7** Plaintiff claims he was the victim of employment discrimination. To establish a claim of racial discrimination, Plaintiff must show that either: "(1) an adverse employment action under circumstances giving rise to an inference of discrimination based on race; or (2) harassment on the basis of race that amounts to a hostile work environment." *Williams*, 2007 WL 2907426, at \*11 (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ). Plaintiff asserts claims of racial discrimination based on each of these theories, so the Court will consider them in turn.

### 1. Disparate Treatment Claim & the *McDonnell Douglas* Framework

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). The

Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of racial discrimination. *Id.* Plaintiff's burden in establishing a prima facie case is "de minimis." *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). However, a party's bald assertions, without more, are insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegation of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at \*3 (S.D.N.Y. Sept. 28, 2006) ("To avoid summary judgment ... the non-moving party must offer 'some hard evidence' of its version of the facts, not merely rely on conclusory allegations or speculation."); *During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL 2276875, at \*4, \*8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

The establishment of a prima facie case gives rise to a presumption of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At that point, the burden of production (not persuasion) shifts to the defendant "to provide a legitimate, nondiscriminatory reason for [its] decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (hereinafter *RECAP*) (citing *Reeves*, 530 U.S. at 142 and *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d. Cir. 1999) ). A defendant's burden in this regard is not high; indeed, a defendant need not prove that it was actually motivated by these legitimate reasons. *See Deravin v. Kerik*, No. 00-CV-7487, 2007 WL 1029895, at \*6 (S.D.N.Y. Apr. 2, 2007) (citing *Burdine*, 450 U.S. at 254).

If the defendant makes a satisfactory showing, the presumption of discrimination disappears and the burden shifts back to the plaintiff. *See id.* The plaintiff must then "prove that the defendant[ ] intentionally discriminated against [him] on a prohibited ground." *RECAP*, 294 F.3d at 49. In other words, the plaintiff must show that defendant's "articulated, legitimate, non-discriminatory reasons were

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 431 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

pretextual." *Id.* (internal quotation marks omitted); *accord Feingold*, 366 F.3d at 152 ("If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.' " (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) ) ); *Deravin*, 2007 WL 1029895, at \*6 ("The plaintiff 'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " (quoting *Burdine*, 450 U.S. at 254) ).

**\*8** Under *McDonnell Douglas* and its progeny, the plaintiff has the ultimate burden of proving discrimination, regardless of whether the defendant offers evidence of a legitimate reason for the adverse employment action at issue. *See St. Mary's Honor Ctr.*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253; *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 292 (S.D.N.Y. 2005) (holding that plaintiff ultimately has the burden of proving employer's discriminatory animus to survive summary judgment).

### a. Prima Facie Case

A plaintiff may establish a prima facie case of disparate treatment by demonstrating: "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold*, 366 F.3d at 152.

Because Plaintiff is an African-American man, he belongs to a protected class and thereby satisfies the first prong of his prima facie case. Defendant is willing to assume, as is the Court, that Plaintiff was qualified for the position he held while working for Defendant, satisfying the second prong. (Def.'s Mem. 9.) Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because Plaintiff failed to satisfy the third and fourth prongs of his prima facie case.

### i. Adverse Employment Action

An adverse employment action is a " 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted). The Second Circuit has "defined adverse employment action broadly to include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' " *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) ); *accord Feingold*, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." (internal quotation marks omitted) ).

Plaintiff argues that the following constitute adverse employment actions: (1) the alleged docking of Plaintiff's pay for attending jury duty on November 8, 2002 (Pl.'s Mem. 11); and (2) the out-of-title work Plaintiff was allegedly forced to perform, particularly on May 2, 2003, which led to his back and neck injury and significant loss of earning potential (*id.* 9-11). [5] Defendant argues that neither of these constitutes an adverse employment action. (Def.'s Mem. 10, 12-15.)

**\*9** Plaintiff alleges that he was docked pay for the several hours of work he missed on November 8, 2002, when he answered a jury summons in Bronx County. (Pl.'s Mem. 11; Compl. 4.) On November 25, 2002, Bates issued to Plaintiff a warning notice, in which Bates wrote: "Mr. Perry has used up all his time and continues to take off. On November 18, 2002 [he] used 3 ½ hrs. [leave without pay]. This is warning no. 2." (Kahan Aff., Ex. Y.)

Defendant argues that Plaintiff was never docked pay for attending jury duty on November 8, 2002, but that he was docked 3.30 hours of pay for being absent on November 18, 2002. In support of this position, Defendant submitted Plaintiff's leave history, which shows that Plaintiff was not docked any time on November 8, 2002, and that he was docked 3.30 hours on November 18, 2002. (Kahan Aff., Ex. W.) Defendant also offered affidavits from Joan Vassari, Defendant's director of personnel, and Bates, Plaintiff's then-supervisor, both of whom swear that Plaintiff was never docked pay for attending jury duty. (Aff. of Joan Vassari ¶ 13 ("Vassari Aff."); Aff. of Robert Bates ¶ 8 ("Bates Aff."); Dep.

of Joan Vassari 11 ("Vassari Dep.") ("[An employee] would never be docked for jury duty.").)

The only evidence in the record that supports Plaintiff's claim that he was docked pay for attending jury duty on November 8, 2002, is his own deposition testimony and his own declaration, in which Plaintiff claims that Bates told him that he would be docked for attending jury duty. (Dep. of Ted Perry 81-82 ("Pl.'s Dep."); Pl.'s Decl. ¶ 14.) Plaintiff swears that he was not absent from work on November 18, 2002, arguing instead that the time he took off for jury service was not docked from his paycheck until the following pay period on November 18, 2002. Plaintiff claims that the November 25, 2002, warning notice was actually for the time Plaintiff missed on November 8, 2002. (Pl.'s Decl. ¶ 14.)

Thus, with regard to whether Plaintiff was docked pay for jury duty, the Court has before it conflicting evidence, giving rise to a factual question suited for a jury. Therefore, construing the evidence in the non-movant's favor, the Court assumes for purposes of this Motion that Plaintiff was docked pay for attending jury duty.

Assuming therefore that Plaintiff's pay was docked for his jury duty service, the next question is whether such a docking of pay qualifies as an adverse employment action; in other words, whether it constitutes a "materially adverse change in the terms and conditions of employment." *See Galabya*, 202 F.3d at 640 (internal quotation marks omitted). For purposes of this Motion, the Court is willing to assume that it does. *See Cunningham v. Consol. Edison Co.*, No. 03-CV-3522, 2006 WL 842914, at *17 (E.D.N.Y. Mar. 28, 2006) ("[D]ocking of an employee's pay is an adverse employment action."); *see also Hicks v. Baines*, 99-CV-315, 2006 WL 1994808, at * (W.D.N.Y. July 14, 2006) ("The only specific allegations that arguably evince an adverse employment action are the docking of two hours of [one plaintiff's] pay ... and the docking of 15 minutes of [the other plaintiff's] pay...."). Therefore, Plaintiff satisfies the third prong of his prima facie case with respect to the jury duty issue.

Plaintiff argues that he also suffered an adverse employment action when he was forced to work outside of his Housekeeper title – often performing the duties meant for employees with higher pay grades – beginning in 1995. [6] (Pl.'s Mem. 12.) New York State Civil Service Law § 61(2) prohibits out-of-title work by declaring that "[n]o person shall be appointed, promoted or employed under any title not appropriate to the duties to be performed and, except upon assignment by proper

authority during the continuance of a temporary emergency situation, no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position...." New York courts have further defined out-of-title work to encompass situations "when an employee has been assigned ... to perform the duties of a higher grade, without a concomitant increase in pay, frequently, recurrently and for long periods of time." *Sprague v. Governor's Office of Employee Relations*, 786 N.Y.S.2d 634, 635 (App. Div. 2004) (internal quotation marks omitted) (ellipses in original). [7] However, "not all additional duties constitute out-of-title work, and the mere fact that there may be some overlap between two particular positions does not mandate a finding that a petitioner is being compelled to perform out-of-title work." *Woodward v. Governor's Office of Employee Relations*, 718 N.Y.S.2d 465, 467 (App. Div. 2001).

**\*10** Plaintiff claims that his working out-of-title eventually led to a back injury when, on May 2, 2003, he was ordered to move several concrete bumpers. (Compl. 3-4; Pl.'s Decl. ¶ 17.) This injury resulted in a partial permanent disability and loss of Plaintiff's earning potential, which, according to Plaintiff, constituted an adverse employment action. (Pl.'s Mem. 9-11; Compl. 7.)

Defendant disputes Plaintiff's claim that he was working out-of-title or that he was performing the work of a higher salary grade employee. (Def.'s Mem. 13.) Defendant cites *Healy v. County of Nassau*, 796 N.Y.S.2d 377, 379 (App. Div. 2005), for the proposition that "work is not considered 'out-of-title' where it is related to, similar in nature to, or a reasonable outgrowth of, the 'in-title' work." According to Defendant, the job assignments that Plaintiff was asked to complete either fell under his title of Housekeeper or were "reasonably related to" the Housekeeper job description (Def.'s Mem. 14.), and, in either case, were based on the needs of the Department (*id.* 19).

The Court finds a genuine issue of material fact as to whether the assignments given to Plaintiff – particularly the May 2, 2003 assignment – were out-of-title, in-title, or reasonably related to in-title work. In order for Plaintiff to establish that allegedly out-of-title assignments, particularly the assignment to move concrete bumpers, constituted an adverse employment action, Plaintiff must demonstrate that such assignments resulted in a " 'materially adverse change' in the terms and conditions of [his] employment." *Galabya*, 202 F.3d at 640. If what Plaintiff claims is true – that he was assigned duties outside of his Housekeeper title that somehow

Case 1:25-cv-00968-ECC-ML Document 54 Filed 11/26/25 Page 433 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

were typically performed by employees in a higher pay grade – then Plaintiff will have satisfied his minimal burden of demonstrating that he suffered an adverse employment action, at least with regard to out-of-title work performed within the 300-day-period preceding the filing of Plaintiff's NYSDHR complaint. *See Santiago*, 485 F. Supp. 2d at 335-36 (referring to employer's refusal to compensate employee's performance of out-of-title duties as discrete act). Defendant has failed to adequately demonstrate that there exists no genuine issue of material fact with regard to whether Plaintiff's pay was concomitant with the duties he was assigned. Therefore, for purposes of this Motion, the Court assumes that Plaintiff suffered an adverse employment action by being assigned out-of-title work usually performed by employees with a higher pay grade.

### ii. Inference of Discriminatory Intent

To establish his prima facie case, and thereby shift the burden of production to Defendant, Plaintiff must establish an inference of discrimination. Though not required, this is most commonly done by demonstrating that other similarly situated persons, not of Plaintiff's protected class, were treated more favorably than he was in the workplace. *See Abdu-Brisson*, 239 F.3d at 467-68. Indeed, Plaintiff has chosen this approach to make his case. To be similarly situated, these persons must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). Evidence of disparate treatment, however, cannot be based on conclusory allegations. *See Finney v. Planned Parenthood of N.Y. City, Inc.*, No. 02-CV-7942, 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003) (granting summary judgment where only evidence of disparate treatment was plaintiff's own conclusory allegations); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (internal quotation marks omitted) ).

\*11 Defendant argues that even if Plaintiff did suffer adverse employment actions, Plaintiff failed to establish that such actions took place under circumstances giving rise to an inference of discriminatory intent. (Def.'s Mem. 16-18.) Plaintiff relies on the alleged disparate treatment between him and his Caucasian co-workers (in particular, Aubry, Emery and Ponce) to support his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent. (Pl.'s Mem. 12-13.) More specifically, Plaintiff claims that he was constantly disciplined and forced to do undesirable out-of-title work, while his Caucasian co-workers were not. According to Plaintiff, this disparate treatment demonstrates that the adverse employment actions he suffered were motivated by racial discrimination.

In 1993, Emery, Ponce and Plaintiff had their positions reclassified to that of Housekeeper – the position Plaintiff still held when his employment with Defendant ended. After filing a grievance, Emery and Ponce had their positions reclassified to Maintenance Mechanic, which, according to Plaintiff, left them "open to higher salaries and promotion opportunities." (Pl.'s Decl. ¶¶ 7-8.) Plaintiff claims that he was not allowed to grieve his reassignment. (*Id.* ¶ 8.) Plaintiff makes this argument with no proof whatsoever.

As previously noted, after oral argument, Plaintiff submitted to the Court an application to supplement the record with what appears to be the minutes from a meeting that took place in November 1999. According to Plaintiff, this document demonstrates that "Defendant treated Plaintiff differently from the white County employees (Mr. Em[e]ry and Mr. Ponce), thereby showing that Defendant ... was fully aware that Plaintiff's title was supposed to have been changed and was not." (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 17, 2008.) Despite Plaintiff's urging, this document cannot be used to create an issue of fact because the meeting minutes are inadmissible hearsay. *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); *Witkowich v. Gonzales*, 05-CV-7756, 2008 WL 701280, at *10 n.11 (S.D.N.Y. Feb. 25, 2008) ("[I]nadmissible hearsay ... [cannot] be used to defeat summary judgment."). Further, as discussed above, Plaintiff has failed to demonstrate to the Court that excusable neglect was to blame for this document not being added to the record earlier. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (plaintiff was permitted to supplement the summary judgment record because the new evidence was not previously available, plaintiff exercised good faith, and only minimal delays would result). Moreover, even if admissible,

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 434 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

these minutes do Plaintiff no good, for they fail to rebut Defendant's argument that Plaintiff was always free to grieve his assignment, but never did. Plaintiff claims he was unaware of this option, a claim contradicted by the minutes themselves, but Plaintiff still fails to tender any evidence that Defendant engaged in any conduct blocking Plaintiff's efforts to grieve his assigned title.

Without this inadmissible and tardy information, Plaintiff has no admissible evidence showing that Defendant prohibited him from grieving his reassignment, that Defendant had an affirmative obligation to notify Plaintiff of his right to grieve his reassignment or to help him do it, or that Defendant helped Emery and Ponce to grieve their status. Moreover, this alleged act of discrimination was a discrete act occurring several years before Plaintiff initiated legal action. Therefore, the Court will not entertain Plaintiff's argument that discriminatory intent can be inferred from Emery and Ponce being reclassified to the Maintenance Mechanic position after filing grievances.

Plaintiff also focuses on what he sees as the disparate treatment between him and Aubry. Plaintiff claims that he was docked for attending jury duty, but that when Aubry had to appear in court on several occasions, he was given time off and never had his pay docked. (Compl. 4-5; Pl.'s Dep. 117 ("Jason used to go to jail for long periods of time and come back and have his job and nothing said or nothing done.").) [8] Also, Plaintiff alleges that Aubry was permitted to drive County vehicles without a license – even though one was required for his position – but that Plaintiff was disciplined for failing to produce a driver's license – even though his position did not require that he have such a license. (Compl. 5; Pl.'s Mem. 13; Kahan Aff., Ex. AA.) Indeed, according to Plaintiff, he was disciplined for not having a license, while Defendant actually helped Aubry obtain his license. (Pl.'s Mem. 13.) Further, Plaintiff claims that he was constantly disciplined for minor infractions, while Aubry committed much more serious infractions and was not similarly disciplined or docked pay. (Id. 13; Compl. 4-5; Pl.'s Decl. ¶ 19; Kahan Aff., Ex. GG ("In contrast to Mr. Aubry, I have been written up for numerous incidents, none of which are as grave as the incidents involving Mr. Aubry.").)

 **\*12** Plaintiff offers no evidence to support his argument that Aubry went undisciplined while committing infractions similar to or worse than those committed by Plaintiff. Plaintiff was disciplined many times during the course of his employment with Defendant, mostly for infractions such as time abuse and insubordination, and he offers no proof

that those were improperly imposed sanctions. (Def.'s 56.1 Stmt ¶¶ 9-12, 23, 25, 29-33, 36-37.) Moreover, Defendant submitted unrefuted evidence demonstrating that Aubry was in fact disciplined for time abuse, at least during 2003 and 2004. (Kahan Aff., Exs. LL-NN.) In fact, the evidence shows that, because of his excessive absenteeism, Aubry was denied salary increments on August 13, 2003, November 10, 2003, and February 19, 2004, and that he was denied an unpaid leave of absence on February 2, 2004. (Id., Ex. MM.) Further, an Amended Notice of Charges dated April 15, 2004, was issued to Aubry, detailing 169 charges and specifications brought against him by Defendant for time abuse spanning from January 16, 2003, through April 5, 2004. (Id., Ex. LL.) Aubry resigned before the charges could be resolved. (Id.) According to Plaintiff, this evidence does nothing to disprove his claim of disparate treatment since "nothing was done to Mr. Aubry while Plaintiff was on the job." (Pl.'s Mem. 13.)

Although the Court agrees with Plaintiff that the record contains evidence of discipline of Aubry (who was employed by Defendant for far less time than Plaintiff) that largely post-dates Plaintiff's employment and, therefore, it does little to disprove Plaintiff's claim of disparate treatment, it is not Defendant's burden to disprove an unsupported claim of disparate treatment. Plaintiff has the ultimate burden under the *McDonnell Douglas* framework, *St. Mary's Honor Ctr., 509 U.S. at 507*, and he cannot satisfy his burden by making bare and conclusory assertions that he and Aubry were similarly situated but that they were treated differently. [9] A conclusory allegation without support in the record will not give rise to an inference of discriminatory intent nor will it defeat a motion for summary judgment.

Aubry, who was a Maintenance Laborer, was required to have a driver's license. Based on the Housekeeper job specifications, it appears that Plaintiff was not. [10] (Kahan Aff., Ex. I.) On December 30, 2002, however, Plaintiff was issued a warning notice by Bates for failure to produce a license. (Id., Ex. AA ("Mr. Perry could be asked to drive at any time and should have his license with him.").) The record shows that on June 17, 2002, Aubry was notified by Commissioner Stanley G. Motley that his probationary appointment would be terminated if he failed to produce a driver's license by July 22, 2002. (Pl.'s Exs. in Opp'n Pursuant to Local Rule 56.1(a) 21 ("Pl.'s Ex.").) In response to this notification, Aubry wrote a letter to Motley on July 8, 2002, indicating that he was in the process of getting his license back, but that he may not have it back from the Department of Motor Vehicles ("DMV") within the time limit specified. (Id.)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 435 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Motley replied to Aubry on July 10, 2002, stating that "[the County] will try to expedite the return of your driver's license through the Department of Motor Vehicles. I[n] the event we can not please be assured that you will still be an employee in good standing since you have met the legal requirements and are just awaiting the return of your paperwork from the State of New York." (*Id.*)

**\*13**  Again, Plaintiff has not pointed to any evidence in the record from which the Court could conclude that Plaintiff and Aubry were similarly situated with regard to the driver's license issue. The record demonstrates that Aubry was threatened with termination (by someone other than Bates) if he did not produce a driver's license by a certain date. The record also suggests that Defendant did not offer to "help" Aubry until it was satisfied that Aubry had done all that he could to obtain his driver's license and that he was waiting on paperwork from the DMV. Plaintiff offers no evidence suggesting that, at the time he was issued a warning notice, he, like Aubry, had done all that could to obtain his license but was waiting on documentation from the DMV. Further, Plaintiff and Aubry did not hold the same positions. Though it is not entirely clear from the record why Plaintiff was issued a warning notice for failure to produce a driver's license, there is nothing in the record suggesting that the reason was racial discrimination. And, Plaintiff's bare belief that Defendant was "messing" with him is not evidence of anything. *See Powell v. Consol. Edison Co.*, 97-CV-2439, 2001 WL 262583, at *12 (S.D.N.Y. Mar. 13, 2001) ("[P]laintiff's subjective belief that a supervisor had an improper motive is not evidence at all...."). From this feeble evidence, no reasonable jury could find that Plaintiff and Aubry were similarly situated but were treated disparately under circumstances giving rise to an inference of discriminatory intent.

Plaintiff argues that he was forced to work out-of-title, while his similarly-situated Caucasian co-workers were not. Some of his complained of out-of-title duties included digging ditches, performing firefighter duties, and moving concrete parking lot bumpers, none of which expressly appear on the illustrative list of possible Housekeeper duties. (Compl. 3-4; Kahan Aff., Ex. I.)[11] Even if the Court accepts Plaintiff's argument that he was given assignments outside of his Housekeeper title, Plaintiff has offered no evidence from which the Court could infer that such assignments were given on account of Plaintiff's race as opposed to any other reason (such as department need or even personal dislike of Plaintiff). It is noteworthy that in regard to this claim, Plaintiff has submitted no evidence of disparate treatment.

Defendant has submitted an affidavit from Bates, in which he stated that "[t]he decisions regarding jobs to be performed depended upon the needs of the department and who is available.... Perry's job assignments were no more difficult, demanding or dangerous than assignments given to other ... employees. That Perry did not like some of [ ]his job assignments is true, but Perry was not singled out for particular jobs." (Bates Aff. ¶¶ 3-4.) Plaintiff testified that during a meeting while Plaintiff was at Bronx River Parkway, Bates said that "any shit detail that was going to be done, [Plaintiff] would be doing it." (Pl.'s Dep. 45.) Plaintiff also testified that, while at Bronx River Parkway, he worked as part of a crew – albeit "not the popular crew." (*Id.* 44.)

Plaintiff cannot defeat Defendant's Summary Judgment Motion with these statements. By themselves, these alleged comments show only that Bates might have disliked Plaintiff (and others in the group), not that he discriminated against him. Thus, it is even more apparent that Plaintiff has failed to demonstrate that any of the work he was assigned – including the assignment that allegedly led to his back injury on May 2, 2003 – was assigned to him because of his race. In a conclusory fashion, Plaintiff claims that he was made to perform dangerous and demanding out-of-title work, while Caucasian co-workers were not. (Pl.'s Mem. 9.) Plaintiff has not made any specific allegations asserting, nor has he provided any admissible evidence suggesting, that Plaintiff was given assignments more dangerous or demanding than similarly-situated Caucasian co-workers.[12] *See Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Jones*, 2008 WL 495498, at *11 (finding plaintiff failed to establish prima facie case of discrimination because plaintiff offered no specific information or evidence to substantiate his conclusory allegation that "white [co-workers] with less seniority and experience were provided summer employment while he was not"); *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *10 (E.D.N.Y. Mar. 12, 2008) (holding vague and conclusory statements that similarly situated employees were treated differently failed to give rise to issue of material fact regarding disparate treatment); *Randolph v. CIBC World Markets*, No. 01-CV-11589, 2005 WL 704804, at *13 (S.D.N.Y. Mar. 29, 2005) ("Although [plaintiff] has made the general allegation that he was treated more harshly than white ... employees who committed similar violations ..., there is no other evidence in the record to support this

assertion. Conclusory allegations of this sort are insufficient to survive a motion for summary judgment.").

**\*14** As set forth above, Plaintiff has failed to establish a prima facie case of racial discrimination based on disparate treatment because he has not offered admissible evidence suggesting that he suffered adverse employment actions under circumstances giving rise to an inference of racial discrimination.

### 2. Hostile Work Environment Claim

Plaintiff also brings a hostile work environment claim. "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse*." *Schiano*, 445 F.3d at 600 (internal quotation marks and citations omitted).

> In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.

*Feingold*, 366 F.3d at 149-50 (internal citations and quotation marks omitted).

The first prong involves an objective and a subjective component: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (internal quotation marks omitted). In determining whether a work environment is "hostile" or "abusive," courts are to look at the totality of the circumstances, as guided by the following factors: "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *abrogated on other grounds by, Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742 (1998). Thus, to satisfy the first prong, a plaintiff " 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment.' " *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ). Though a single incident may be severe enough to materially alter employment conditions, *see Patterson*, 375 F.3d at 227, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Alfano*, 294 F.3d at 375 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) ); *see also Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding "incidents must be more than episodic"). "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227.

**\*15** The existence of a hostile environment alone is insufficient to make out a Title VII claim, however. Plaintiff must also show there is some reason to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to make an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with authority over a plaintiff. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." (internal citations and quotation marks omitted) ).

Finally, Plaintiff must prove that the hostile conduct occurred because of his membership in a protected class. To make such a showing, a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 437 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff argues that the accumulation of the following incidents – which occurred from 1995 through May 2003 – demonstrate that he was treated differently than his Caucasian co-workers and constitute a hostile work environment: [13] (1) After filing a grievance, Emery and Ponce were reclassified from the Housekeeper title to the Maintenance Mechanic title, and Plaintiff was not (Pl.'s Mem. 15); (2) Plaintiff was told he would be fired if he did not do what he was told, regardless of whether the assignment was in- or out-of-title (*id.*; Compl. 5; Pl.'s Dep. 112); (3) Plaintiff was the only person docked pay for going to jury duty (Pl.'s Mem. 15); (4) Plaintiff was written up for excessive absenteeism on May 8 and 9, 2003, even though his supervisor knew that he was out because of the May 2, 2003 injury (*id.*); (5) Plaintiff had to drive Aubry around, even though Aubry was required to have a license (*id.*; Pl.'s Dep. 113); (6) Plaintiff was not allowed to wear safety equipment like his Caucasian co-workers (Pl.'s Mem. 15); (7) Plaintiff was subjected to "Kunta Kinte" jokes (*id.* 15-16); [14] and (8) Plaintiff was disciplined for minor infractions while his Caucasian co-workers were not (Compl. 3). Plaintiff acknowledges that he was not generally subjected to racial epithets or insults, but insists that, because he was the only African-American person in his group, no outright insults were necessary. (Pl.'s Mem. 16.)

**\*16** Plaintiff does not suggest, and the Court does not find, that any one of these alleged incidents was severe enough by itself to alter the conditions of Plaintiff's employment and thereby constitute hostile work environment. [15] Therefore, the Court considers these incidents in the aggregate to determine whether, under the totality of the circumstances, Plaintiff was subjected to a hostile work environment during his employment with Defendant. For present purposes, with regard to timeliness, the Court will assume – without deciding – that these acts are all properly before the Court as part of Plaintiff's hostile work environment claim, unless otherwise noted.

The first issue for the Court is whether Plaintiff was subjected to an objectively hostile environment during his employment with Defendant. *Feingold*, 366 F.3d at 150. In making this determination, the *Harris* factors guide the Court's "totality of the circumstances" analysis. *See Harris*, 510 U.S. at 23. The conduct complained of spans a period of approximately eight years, which is a considerable amount of time considering the fact that most of the incidents complained of are isolated

occurrences. The fact that the incidents are spread out over a long period of time tends to weigh against a finding that Plaintiff's work environment was altered for the worse. *See Williams*, 2007 WL 2907426, at \*11 ("The incidents that plaintiff points to were isolated in nature and took place over a number of years.... Taken together, the incidents described are separated in time and space and do not demonstrate a change in work environment.").

Nonetheless, keeping in mind that it is not for the Court to act as a " 'hierophant of social graces,' " *see Schiano*, 445 F.3d at 605 (quoting *Holtz v. Rockefeller Co.*, 258 F.3d 62, 75 (2d Cir. 2001) ), the Court is unwilling to say that no reasonable jury could find that the incidents listed above were severe enough in the aggregate to alter the conditions of Plaintiff's employment, though the Court has serious doubts. Indeed, the Second Circuit has cautioned that "hostile work environment claims present 'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.' " *Id.* (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) ) (alteration in original). Only when "application of the law to th[e] undisputed facts will reasonably support only one ultimate conclusion" is summary judgment appropriate. *Richardson*, 180 F.3d at 438. Because reasonable minds may differ on the issue of whether the conduct complained of altered Plaintiff's employment for the worse, the Court will not grant summary judgment to Defendant on the objective element of Plaintiff's hostile work environment case.

With regard to whether Plaintiff subjectively believed that his work environment with Defendant was hostile, Plaintiff has pled that he was caused to "undergo an intimidat[ing], hostile and offensive work environment causing [him] monetary damages and emotional injuries and numerous other injuries." (Compl. 8.) At this stage, Defendant does not challenge Plaintiff's claim that he found the work environment subjectively hostile, so the Court will assume, for purposes of this Motion, that this element is satisfied.

Plaintiff must show a basis upon which to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Because most of the complained-of conduct was alleged to have been committed by Bates, Plaintiff's direct supervisor, Defendant can be held vicariously liable for any resulting hostile work environment. *See Mack*, 326 F.3d at 123.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 438 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

**\*17** Finally, Plaintiff must demonstrate that the hostile conduct occurred because of his membership in a protected class. *See Brennan*, 192 F.3d at 318. "Although the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred ... they must occur under circumstances in which ... the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Williams*, 2007 WL 2907426, at \*10 (internal quotation marks omitted) (ellipses in original). Plaintiff points to no admissible evidence in the record suggesting that his race played a role in the way he was treated during his employment with Defendant. Instead, Plaintiff relies on his own conclusory statements that: (1) race must have been a motivating factor because Plaintiff was the only African American employee in the group (Pl.'s Mem. 16); and (2) he was treated differently from his Caucasian co-workers (Compl. 1-2, 3-5, 7; Pl.'s Mem. 15). The problem, however, is that Plaintiff's membership in a protected class in and of itself does not establish discriminatory intent. *See Ghent v. Moore*, 519 F. Supp. 2d 328, 338 (W.D.N.Y. 2007) ("Without other evidence of discrimination, [the fact that plaintiff was the only African-American employee] alone is not probative of unlawful discrimination."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 252 (S.D.N.Y. 2006) ("It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have actually suffered discrimination."). Further, as discussed above, Plaintiff has offered no evidence demonstrating that these Caucasian co-workers were similarly-situated to and actually treated differently than Plaintiff. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) ("When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile work environment claim."); *see also Marro*, 2008 WL 699506, at \*10; *Randolph*, 2005 WL 704804, at \*13.

The Second Circuit has said that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [his] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent." *Schiano*, 445 F.3d at 605. However, the Second Circuit has stood firm on its position that district courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466; *accord Schiano*, 445, F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims

in cases lacking genuine issues of material fact." (internal quotation marks omitted) ). On the record before the Court, no reasonable jury could find that Plaintiff was subjected to a hostile work environment on account of his membership in a protected class. Therefore, Defendant's Motion for Summary Judgment dismissing Plaintiff's hostile work environment claim is granted.

### 3. Section 1981 Claim

The *McDonnell Douglas* burden-shifting framework also applies to 42 U.S.C. § 1981 claims. *See Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007). "To establish the requisite prima facie case for a violation of [Section 1981], a plaintiff must establish: (1) that [he] is a member of a racial minority; (2) that the Defendant intended to discriminate against Plaintiff on the basis of [his] race; and (3) that the Defendant discriminated in connection with one of the statute's enumerated activities." *Id.* (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999) ).

An individual may be held liable under Section 1981 where the plaintiff demonstrates "some affirmative link to causally connect the [defendant] with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal quotation marks omitted). Although the elements of a Section 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of a Section 1981 claim. *See Patterson*, 375 F.3d at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 ... must show that the discrimination was intentional."). Thus, a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under Section 1981. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) ("Although claims under 42 U.S.C. § 1981 ... involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination. Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 ... claims." (internal quotation marks and citations omitted) ); *Patterson*, 375 F.3d at 225 (holding that reasons supporting summary judgment for defendants on Title VII claims also merited dismissal of plaintiff's Section

1981 claims). As described in the previous section, Plaintiff has failed to show intentionally discriminatory conduct on the part of Defendant, and therefore, summary judgment on Plaintiff's Section 1981 claim is granted.

### III. Conclusion

**\*18** For the reasons stated herein, Plaintiff's application to supplement the record is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions (Dkt. Nos. 23, 45), to enter judgment for Defendant, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11438085

---

### Footnotes

1    Defendant's Employee Handbook provides the following:

   If you are required to serve as a juror or to appear in court pursuant to a subpoena or court order, you will be granted a leave with pay for such required attendance. Any fees received for such attendance, other than travel and meals, must be paid to the County. This leave with pay does not apply when your own personal interests are the subject of the court activity.

   (Kahan Aff., Ex. Z.)

2    The Court will cite to Plaintiff's Complaint by page number rather than paragraph number in an attempt to alleviate the confusion resulting from Plaintiff's reuse of paragraph numbers within the document.

3    "[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred...." 42 U.S.C. § 2000e-5(e)(1).

4    Plaintiff offered these tardy additions to the record, after he failed to provide the record evidence he claimed would prove that a supervisor had referred to Plaintiff as "Kunta Kinte." Obviously, the Court found Plaintiff's assertion of this claim in response to Defendant's Summary Judgment Motion, which was not backed up by any evidence in the record (despite representations to the contrary), to be potentially material, if not dispositive, in resolving the Motion. Accordingly, the Court asked counsel for Plaintiff to show where in the record there was support for this assertion. Plaintiff never did provide any evidence in the record as it existed when he responded (several months late) to Defendant's Motion. Instead, Plaintiff sought to augment the record with the March 13 submissions.

5    Defendant reads Plaintiff's submissions to assert that the various warning notices Plaintiff was issued for time abuse and failure to produce a driver's license were adverse employment actions in support of this claim. The Court disagrees with this reading. Instead, it is evident to the Court, based on its reading of Plaintiff's various submissions, that Plaintiff relies on these warning notices not as adverse employment actions, but as evidence of discriminatory intent and in support of his hostile work environment claim.

6    Plaintiff offers no specific allegations – let alone evidence – to support this claim. First of all, Plaintiff never identifies which title would be the appropriate recipient of such duties, nor does he identify the salary grade appropriate to these duties. Despite these significant infirmities in Plaintiff's claim and because the outcome

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 440 of 520

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

herein is the same either way, the Court will assume – for purposes of this Motion – that the complained-of assignments would normally be given to an employee with a higher salary-grade title.

7    Interestingly, Plaintiff does not here claim a failure to compensate for higher grade work he allegedly was assigned, but claims that the out-of-grade work he was assigned both was highly undesirable (which one would imagine would be lower-grade work) and led to his injuries in May 2003.

8    In his Complaint, Plaintiff also states "the other white employees were given time off without being docked when they had to perform citizenship duties." (Compl. 7.) Without any specific allegations or evidence to support this statement, it cannot be relied upon to establish the fourth prong of Plaintiff's prima facie case. *See Jones v. W. Suffolk Boces*, No. 03-CV-3252, 2008 WL 495498, at *11 (E.D.N.Y. Feb. 20, 2008) (finding as insufficient to satisfy fourth prong of prima facie case plaintiff's conclusory allegation that "white [employees] with less seniority and experience were provided summer employment while [plaintiff] was not").

9    On December 14, 2006, Magistrate Judge George A. Yanthis ordered that Defendant turn over to Plaintiff in discovery Aubry's leave history from 2001 through 2004. (Dkt. No. 15.) Exhibit 34 to Plaintiff's Local Civ. R. 56.1 Statement indicates that these records were in fact provided to Plaintiff. Interestingly, however, Plaintiff decided not to include Aubry's leave history in the present record. Based solely on the record before it, the Court has no way of knowing whether Aubry was excessively absent while Plaintiff was employed by Defendant or, more importantly, whether his pay was ever docked as a result. The Court cannot assume either of these things to be the case based solely on Plaintiff's bare assertions.

10    The Court notes, however, that there is evidence in the record to suggest that, in May 2002, Plaintiff was told that some work assignments would require him to drive. (Kahan Aff., Ex. V.) During his deposition, Plaintiff testified to his belief that his supervisors would make him drive because "they w[ere] just messing with [him]." (Pl.'s Dep. 60.)

11    Plaintiff elaborated more fully on this issue in his complaint before the NYSDHR:

> Since Mr. Bates became my supervisor, I have been assigned tasks that no one else wants to do. These tasks are the most physically demanding and dangerous assignments. For example, I have been assigned to dig holes without a back hoe or assistance, and I have been required to move concrete parking lot bumpers despite the fact that I have a documented back injury. I have been sent to do weed-whacking jobs without chaps, safety glasses and ear protection. The aforementioned examples are not an exhaustive list of undesirable duties I have been assigned since 1999. It should be noted that when co-workers are assigned to work with me, they view the assignments as a form of punishment. I am being punished everyday especially since almost all the work I perform is out of my job title.

(Kahan Aff., Ex. GG.) Again, it is entirely unclear from Plaintiff's allegations and submissions the title for which Plaintiff believes these duties are appropriate.

12    One of the alleged out-of-title assignments that Plaintiff complains of was when he was allegedly asked to perform "firefighter duties." (Compl. ¶ 1.) However, in an undated letter written by Donald Kranker, a Maintenance Laborer and Shop Steward, he complains of an August 23, 2002 firefighting assignment that was given to him, Plaintiff, Jason Aubry and one other employee. (*See* Pl.'s Ex. 29.) Thus, at least with respect to the firefighting assignment, the record not only fails to show that Plaintiff was singled out for the assignment, but actually demonstrates that Caucasian co-workers were given the same assignment; in fact, Jason Aubry – who happens to be the employee Plaintiff focuses on to demonstrate disparate treatment – was one of the employees sent to perform firefighting duties with Plaintiff. Therefore, there is no basis whatsoever for Plaintiff to claim that he was assigned firefighter duties based on his race.

Perry v. County of Westchester, Not Reported in Fed. Supp. (2008)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 441 of 520

13    In his Complaint, Plaintiff alleged that the hostile work environment spanned from 1999 to 2003. (Compl. 3.)

14    In his opposition brief, Plaintiff asserted – as evidence that he was subjected to a hostile work environment – that he endured comments about "Kunta Kinte." (Pl.'s Mem. 15-16.) In support of this allegation, Plaintiff offered the Court an unhelpful and erroneous citation – without page number – to Plaintiff's Exhibit 3, which is an approximately 50-page excerpt from Plaintiff's deposition testimony. Yet, there was no reference to this comment in Plaintiff's deposition. In fact, nothing Plaintiff provided in opposition to the Summary Judgment Motion contained any evidence that Plaintiff was subjected to such comments.

During oral argument, the Court asked Plaintiff's counsel what in the record supported the allegation that Plaintiff was subjected to "Kunta Kinte" comments. Plaintiff's counsel represented to the Court that Plaintiff testified during his deposition that he was referred to as "Kunta Kinte" by his supervisor. Defendant's counsel indicated that he had a recollection of such testimony. Plaintiff's counsel further represented that she would send the relevant pages from Plaintiff's deposition transcript to the Court the following day, which she failed to do.

Instead, on March 12, 2008, Defendant's counsel sent to the Court Plaintiff's entire deposition transcript and a letter, in which he represented: "I have found no reference to the 'Kunta Kinte' comment referenced by plaintiff's counsel. I was in error when I stated that such a comment was made by Mr. Perry at his deposition." (Letter from Stuart E. Kahan, Esq., to the Court, dated Mar. 11, 2008.)

On March 14, 2008, the Court received from Plaintiff's counsel via overnight mail: (1) a letter dated March 13, 2008, in which she admitted, "[t]here is no reference to the "Kunta Kinte" comment] in the *deposition* transcript," and (2) an application to supplement the record with a new affidavit from Plaintiff and what appears to be the minutes of a meeting held on November 9, 1999. (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 13, 2008.) In his putative supplemental affidavit, Plaintiff states that he was referred to as "Kunta Kinte" by a supervisor identified only as "Mike," without any details regarding when or where this allegedly occurred.

This affidavit is suspicious. First, Plaintiff never made this allegation in either claim he made to the EEOC, nor included it in his Complaint. Second, it is plainly lacking in details – including the full identity of the speaker and the date. In any event, the Court will not accept this affidavit, as it is way out of time from a party that has already demonstrated, through his counsel, a profound disregard for deadlines and process in this case. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (allowing plaintiff to oppose defendant's summary judgment with new evidence for limited purposes because plaintiff could not have submitted new evidence earlier and plaintiff demonstrated good faith).

15    Again, this excludes the alleged "Kunta Kinte" reference.

---

**End of Document**                                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 865296
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William PFLAUM, Individually and as a Citizen,
Resident and Taxpayer of Town of Stuyvesant, Plaintiff,
v.
TOWN OF STUYVESANT, COLUMBIA CTY.,
N.Y.; and Valerie Bertram, Individually and as
Supervisor of Town of Stuyvesant, Defendants.

1:11-CV-0335 (GTS/DJS)
|
Signed 03/02/2016

**Attorneys and Law Firms**

WILLIAM PFLAUM, Plaintiff, Pro Se [1], 3 Rybka Road, Box
40, Stuyvesant Falls, NY 12174.

BRYAN D. RICHMOND, ESQ., THOMAS J. MORTATI,
ESQ., BURKE, SCOLAMIERO, MORTATI & HURD, LLP,
Attorneys for Defendants, 9 Washington Square, Suite 201,
P.O. Box 15085, Albany, NY 12212-5085.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this civil rights action
filed by William Pflaum ("Plaintiff") against the Town of
Stuyvesant ("Town") and Valerie Bertram, Town Supervisor
("Bertram") (collectively, "Defendants"), is Defendants'
motion for summary judgment pursuant to Fed. R. Civ. P. 56.
(Dkt. No. 59.) For the reasons set forth below, Defendants'
motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
As a result of the Court's prior decisions (Dkt. Nos. 17,
26), Plaintiff's sole remaining claim in this action is his
First Amendment retaliation claim. More specifically, as
articulated in his Complaint (which was drafted by Plaintiff,
*pro se*, and therefore must be construed with special
solicitude), that claim alleges three separate ways he was
retaliated against for publicly criticizing Town officials. [2]

First, Plaintiff alleges that, in retaliation for filing charges
of ethical violations against Defendant Bertram, she (a)
"collaborated with and supported" the Town's Fire Chief
to deny and/or threaten to deny fire protection to Plaintiff,
(b) "supported and encouraged" various Town employees
to "illegal[ly] revo[ke] ... Plaintiff's permit to operate his
business," and (c) "supported and encouraged" the Town
Assessor's "campaign to intimidate Plaintiff by linking [his]
political speech [with his] real estate assessment." (Dkt. No.
1, ¶¶ 20-23, 116 [Pl.'s Compl.].)

Second, Plaintiff alleges that, in retaliation for writing
columns on his Internet blog regarding corruption among the
Town's public officials, the Town filed false criminal charges
against him. (*Id.*, ¶ 116.)

Third, and finally, Plaintiff alleges that, in retaliation for
criticizing Bertram, the Town Assessor, and the Town, the
Town Assessor used his authority to raise taxes in order to
intimidate Plaintiff into silence. (*Id.*, ¶¶ 23, 39, 47, 116.)

### B. Defendants' Motion for Summary Judgment
**\*2** In their motion for summary judgment, Defendants
request the dismissal of Plaintiff's Complaint in its entirety.
(Dkt. No. 59.) In support of their motion, Defendants make
the following four arguments. First, Defendants argue that
there was no adverse action against Plaintiff in that there
was no actual chilling of Plaintiff's First Amendment speech
or any other damages. (Dkt. No. 61, at 3-8 [Defs.' Mem. of
Law].)

Second, Defendants argue that, in any event, any such adverse
action was not motivated or substantially caused by Plaintiff's
First Amendment speech. (*Id.* at 5-6.)

Third, in the alternative, Defendants argue that Bertram was
not personally involved in any deprivation of fire protection
services to Plaintiff. (*Id.* at 5, 8-10.)

Fourth, and finally, Defendants argue that Bertram is entitled
to qualified immunity. (*Id.*)

### C. Plaintiff's Opposition Memorandum of Law
Generally construed, Plaintiff makes five arguments in
opposition to Defendants' motion. First, Plaintiff argues that
he engaged in protected speech by creating an Internet blog
on which he publicly criticized Town officials and exposed

their illegal activities. (Dkt. No. 65, at 3 [Pl.'s Opp'n Mem. of Law].)

Second, Plaintiff argues that Town officials took adverse action against him by issuing noise violations against him with respect to loud dog barking on his property, retaining special prosecutors to pursue civil suits and criminal charges against him, encouraging harassment and extra-judicial threats against him, and treating him differently from other residents. (*Id.* at 4-5.) As a result, Plaintiff argues that he suffered a chilling effect on his blogging as well as monetary damages due to the expense required to oppose the Town's retaliatory activities. (*Id.* at 6-8.)

Third, Plaintiff argues that the timing of these adverse actions, i.e., that they began after he created his blog, establishes the causal connection between his protected speech and the adverse actions. (*Id.* at 5.)

Fourth, Plaintiff argues that Bertram is not entitled to qualified immunity because it was not objectively reasonable to believe that her actions did not violate Plaintiff's First Amendment rights. (*Id.* at 5-6.) According to Plaintiff, these actions consisted of (1) threatening to fire the Town's Dog Control Officer if he did not serve Plaintiff with a criminal charge related to dog barking, and (2) retaining special prosecutors to pursue this charge against Plaintiff without first obtaining the Town's approval. (*Id.* at 9.)

Fifth, Plaintiff argues that municipal liability extends to the Town because of the actions of Bertram, the Town's supervisor, and her position as a policymaker. (*Id.* at 8-9.)

Finally, the Court notes that Plaintiff spends considerable time in his opposition papers arguing the merits of issues not raised by Defendants in their motion. For example, Plaintiff discusses the Town's denial of his FOIL requests, the Town's failure to respond appropriately to alleged vandalism of his property, and the sufficiency of the evidence that led to the issuance of noise violations related to dog barking. (*See generally id.*, at 3-4, 6-9; Dkt. No. 67, ¶¶ 4, 14, 25, 27, 36, 56-107 [Pl.'s Decl.].)

### D. Defendants' Reply Memorandum of Law
In reply to Plaintiff's opposition memorandum of law, Defendants make two arguments. First, Defendants argue that, because Plaintiff has not complied with Local Rule 7.1(a)(3) in his response to their statement of material facts, their

statement of material facts should be deemed admitted. (Dkt. No. 74, at 2-6 [Defs.' Reply Mem. of Law].)

**\*3** Second, Defendants argue that the record is devoid of any admissible evidence that Bertram was personally involved in an alleged deprivation of fire protection services with regard to Plaintiff's residence. (*Id.* at 6-7.) Furthermore, Defendants argue that Plaintiff cannot demonstrate that any adverse action was taken because he was never actually deprived of fire protection services and his subjective belief that the fire department may not respond to a fire at his residence is insufficient to create a genuine dispute of fact. (*Id.* at 7-8.)

### E. Statement of Material Facts

#### 1. Plaintiff's Failure to Comply with N.D.N.Y. Local Rule 7.1

Before reciting the material facts of this case, the Court must address Plaintiff's response to Defendant's Rule 7.1 Statement of Material Facts. Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court requires a party moving for summary judgment to submit a statement of material facts supported by specific citations to the record where those facts are established. N.D.N.Y. L.R. 7.1(a)(3). The non-moving party's subsequent response must mirror the moving party's statement of material facts by (1) admitting and/or denying each of the moving party's factual assertions in matching numbered paragraphs and (2) supporting any denials with specific citations to the record where the factual issues arise. *Id.* Importantly, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.*

This Court's "Local Rule requirements are not empty formalities." *Bombard v. Gen. Motors Corp.*, 238 F. Supp. 2d 464, 467 (N.D.N.Y. 2002) (Munson, J.) (stating that "[t]he courts of the Northern District have adhered to a strict application of Local Rule 7.1[a][3]'s requirement on summary judgment motions"); *accord*, *Cross v. Potter*, 09-CV-1293, 2013 WL 1149525, at *3 (N.D.N.Y. Mar. 19, 2013) (McAvoy, J.). Indeed, the underlying purpose of this rule "is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment." *Youngblood v. Glasser*, 10-CV-1430, 2012 WL 4051846, at *4 (N.D.N.Y. Aug. 22, 2012) (Peebles, M.J.); *see also N.Y. Teamsters Conference Pension*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 444 of 520

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

*& Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005) (noting that "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties'") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 [2d Cir. 2001]).

In the present case, Plaintiff has failed to respond appropriately to Defendants' Rule 7.1 Statement of Material Facts. Specifically, Plaintiff has failed to admit and/or deny each of Defendants' factual assertions in matching numbered paragraphs. Indeed, Defendants' Rule 7.1 Statement contains 71 paragraphs of factual assertions, while Plaintiff's 7.1 Response contains only 11 paragraphs. (*Compare* Dkt. No. 62 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Response].) Moreover, many of Plaintiff's responses are conclusory in nature and/or contain legal arguments. The Court notes that, when he responded to Defendants' motion, Plaintiff was represented by counsel. Accordingly, the Court will accept the factual assertions in Defendants' 7.1 Statement as true to the extent that the evidence in the record supports these facts. *See Davis v. Cumberland Farms, Inc.*, 10-CV-0480, 2013 WL 375477, at *4 (N.D.N.Y. Jan. 29, 2013) (Scullin, J.) (accepting the defendant's statement of material facts as true where plaintiff neither admitted nor denied defendants' factual assertions); *Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ).

## 2. Undisputed Material Facts

**\*4**  For purposes of this motion, the undisputed material facts are as follows. Gerald Ennis has served as the Zoning Enforcement Officer for the Town of Stuyvesant continuously since 2003. (Dkt. No. 62, ¶ 43 [Defs.' Rule 7.1 Statement].) In this capacity, Mr. Ennis issued Plaintiff a Class 2 Home Occupation Permit in August, 2009. (*Id.*, ¶ 44.) Under this permit, "[n]o unusual appearances, noise, vibration, smoke, dust, odors, heat, glare or electrical disturbances that exceed those normally produced by a resident shall be permitted." (*Id.*, ¶ 45.) Following the issuance of this permit, Mr. Ennis received numerous noise complaints from Plaintiff's neighbors in regard to increasingly loud barking from dogs on Plaintiff's property. (*Id.*, ¶¶ 46-47.) Following an investigation into these complaints, Mr. Ennis concluded that

Plaintiff's "home dog kennel which housed up to 50 dogs at a time was producing noise levels that exceeded those normally produced by a resident and, accordingly, [Plaintiff] was in violation of his Permit." (*Id.*, ¶ 48.)

On December 7, 2009, Mr. Ennis issued Plaintiff a notice of violation, which informed Plaintiff that the Town had received several complaints about the noise coming from his property and directed Plaintiff to remedy the violation by December 23, 2009. (*Id.*, ¶ 49.) Subsequently, Plaintiff contacted Mr. Ennis and requested that his phone number be given to those who had complained with instructions that they contact Plaintiff directly when there are noise issues so he can rectify any problems. (*Id.*, ¶ 50.) However, after a few months had passed, Plaintiff stopped answering his neighbors' phone calls; and, as a result, his neighbors made new complaints to Mr. Ennis. (*Id.*, ¶ 51.) After receiving these complaints and personally observing the loud noise emanating from Plaintiff's property, Mr. Ennis issued a second notice of violation to Plaintiff on April 26, 2010. (*Id.*, ¶¶ 52-53.) In response, Plaintiff advised Mr. Ennis that he would erect a sound barrier to remedy the issue. (*Id.*, ¶ 54.)

According to Mr. Ennis, he waited "some time" for Plaintiff to erect, or apply for a permit to construct, a sound barrier but neither action was taken. (*Id.*, ¶¶ 55-56.) After continuing to receive noise complaints, Mr. Ennis issued a third notice of violation to Plaintiff on August 9, 2010. (*Id.*, ¶ 56.) On the same day, Mr. Ennis met with Bertram and the Town Attorney to discuss the noise issue on Plaintiff's property. (*Id.*, ¶ 57.) The Town Attorney advised Bertram that Mr. Ennis had the authority to revoke Plaintiff's home occupation permit if he determined that Plaintiff was in violation of the permit's conditions. (*Id.*, ¶ 37.) As a result, Bertram advised Mr. Ennis that he may revoke Plaintiff's permit if he determined that the permit's conditions had been violated. (*Id.*, ¶ 38.) Later that same day (August 9, 2010), Mr. Ennis made the decision to revoke Plaintiff's permit and notified Plaintiff of that fact. (*Id.*, ¶¶ 39, 59.) Neither Plaintiff's statements concerning various issues in the Town nor his postings on various Internet sites had any bearing on the decision to revoke Plaintiff's permit. (*Id.*, ¶¶ 40, 61.)

Plaintiff testified at his deposition that the basis for his claim that he was deprived of fire protection services is that, "in 2011, or perhaps late 2010," a local fire department chief, Steve Montie, posted an online statement that Plaintiff should move out of town. (*Id.*, ¶ 14.) Plaintiff testified that the post was made in response to one of his earlier posts on a local

town Internet forum; in Plaintiff's post, he had complained of alleged ethical violations committed by Bertram. (*Id.*, ¶¶ 15-16.) The alleged post by Mr. Montie states in its entirety as follows:

> William,
>
> How much more of this are you going to do ? ? ? ? You are wasting more tax payer dollars than its worth. Man up correct your problems and move on, or better yet move out.
>
> S

(*Id.*, ¶ 19.) The author of this post is not identified by name but only by the email address stuyvesantchief@fairpoint.net; and, as indicated above, the post is signed only as "S." (*Id.*, ¶ 18.)

**\*5** Plaintiff testified that the statements in the alleged post amounted to a threatened denial of fire department services because "the fire chief told me I should move out of town, which makes me wonder if there was a fire at my house would he come." (*Id.*, ¶ 20.) However, Plaintiff testified that no one has ever told him that the fire department would not respond if there was a fire at his house. (*Id.*, ¶ 22.) In addition, Plaintiff testified that there are two distinct fire departments in the Town, Stuyvesant Company 1 and Stuyvesant Company 2, which divide their responses to emergency calls in the Town geographically. (*Id.*, ¶ 23.) Steve Montie is the Chief of Stuyvesant Company 1 and a different chief controls Company 2. (*Id.*, ¶ 25.) Plaintiff's property is located in the geographic area covered by Company 2. (*Id.*, ¶ 24.) According to Bertram, she did not "in any way direct any fire department to deprive or threaten to deprive [Plaintiff] of fire services." (*Id.*, ¶ 33.)

Finally, Plaintiff testified that there was "never" a time that he did not publicize or speak out against some issues based upon any actions by the Town and the alleged efforts to silence him did not work. (*Id.*, ¶ 26.) In fact, following the alleged actions by the Town, Plaintiff did more blogging and increased his "political activities against the Town." (*Id.*, ¶ 27.) With respect to his business, Plaintiff testified that, despite losing his business permit in August, 2010, he continued to operate his business uninterrupted without a permit as he had before it was issued in 2009. (*Id.*, ¶ 29.) Accordingly, there was no interruption to Plaintiff's business as a result of his home business permit being revoked. (*Id.*, ¶¶ 28, 30.)

## II. STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2). As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e). However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant fails to deny the factual assertions contained in the movant's Rule 7.1 Statement of Material Facts in matching numbered paragraphs supported by a citation to admissible record evidence (as required by Local Rule 7.1[a][3] of the Court's Local Rules of Practice), the court may not rely solely on the movant's Rule 7.1 Statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 446 of 520

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

## III. ANALYSIS

### A. Whether Plaintiff Suffered an Adverse Action

**\*6** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth in Defendants' memorandum of law and reply memorandum of law. (Dkt. No. 61, at 3-8 [Defs.' Mem. of Law]; Dkt. No. 74, at 6-8 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following two points.

As this Court noted in its prior decisions, in order to state a claim for retaliation under the First Amendment, "a plaintiff must prove (1) his conduct was protected by the First Amendment, (2) the defendants' actions were motivated or substantially caused by the exercise of that right, and (3) defendants' actions effectively 'chilled' the exercise of plaintiff's First Amendment right." *Pflaum*, 937 F. Supp. 2d at 303 (citing *Dillon v. Morano*, 497 F.3d 247, 251 [2d Cir. 2007]). "In cases 'involving criticism of public officials by private citizens,' the Second Circuit has generally 'impose[d] an actual chill requirement for First Amendment retaliation claims[,]' i.e., a requirement that the plaintiff allege and ultimately prove an 'actual chill' of his First Amendment rights." *Hafez v. City of Schenectady*, 894 F. Supp. 2d 207, 221 (N.D.N.Y. 2012) (D'Agostino, J.) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 [2d Cir. 2004]). "To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment." *Hafez*, 894 F. Supp. 2d at 221. "However, 'where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim.'" *Id.* (quoting *Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226, 239 [E.D.N.Y. 2009]); *see also Brink v. Muscente*, 11-CV-4306, 2013 WL 5366371, at *7 (S.D.N.Y. Sept. 25, 2013) (noting that, in private citizen cases, "various forms of concrete harm have been substituted for the 'actual chilling' requirement").

First, it is clear from Plaintiff's deposition testimony that there was no actual chilling of his protected speech as a result of Defendants' actions. As discussed above, Plaintiff admitted that he increased his political activities and continued to publicize his opinions against the Town in the face of his alleged efforts to silence him. "Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chilling effect where, after the filing of a lawsuit, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit).

Second, to the extent that Plaintiff argues that he perceived the online post regarding the loss of fire protection as a real threat, he is still required to show that his perception was objectively reasonable, i.e., "that the defendant[s'] actions had some actual, non-speculative chilling effect." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002); *see also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Plaintiff's subjective belief that the online post constituted a real threat, without more, is insufficient to demonstrate an actual chilling effect on his First Amendment rights. Indeed, as discussed above in Point I.E.2. of this Decision and Order, Plaintiff admitted that no one had told him that the fire department would not respond if there was a fire at his house. Moreover, a different fire chief than the one who allegedly authored the online post is responsible for responding to fire calls in the location of Plaintiff's residence.

### B. Whether There Was a Causal Connection Between Plaintiff's Speech and Any Adverse Action

**\*7** After carefully considering the matter, the Court answers this question in the negative for the reasons set forth below.

To establish the second element of his First Amendment retaliation claim, "plaintiff must provide specific proof of defendants' improper motivation with either circumstantial or direct evidence." *Media All., Inc. v. Mirch*, 09-CV-0659, 2011 WL 3328532, at *5 (N.D.N.Y. Aug. 2, 2011) (D'Agostino, J.) (citing *Curley*, 285 F.3d at 73). "Circumstantial evidence includes close temporal proximity between plaintiff's speech and the alleged retaliatory act." *Mirch*, 2011 WL 3328532, at *5.

"Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [1977]). "Plaintiff has the initial burden

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 447 of 520

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." *Scott*, 344 F.3d at 288.

### 1. Revocation of Plaintiff's Business Permit

In denying Defendants' underlying motion to dismiss Plaintiff's First Amendment claim, this Court held that Plaintiff had sufficiently alleged a concrete harm through the loss of his business permit, and consequently, the loss of business income, as a result of Defendants' alleged retaliatory actions. *Pflaum*, 937 F. Supp. 2d at 308. Having carefully reviewed the record, the Court finds that Plaintiff has failed to create a genuine dispute of material fact regarding Defendants' alleged improper motive. Specifically, with respect to the revocation of his business permit, the undisputed facts establish that the Town received complaints regarding the noise emanating from Plaintiff's property. Plaintiff was given two [3] noise violations over the course of approximately one year and ample opportunity to rectify the problem. (Dkt. No. 67, Attach. 5.) Because the noise problem and complaints continued, Mr. Ennis revoked Plaintiff's permit. [4] Even if Plaintiff were able to establish that an improper motive played a part in this decision, it is clear to the Court that, under these circumstances, the revocation would have still occurred. Indeed, Plaintiff challenged the decision to revoke his permit in appeals made to the Town's Zoning Board of Appeals and in two actions filed in New York State Supreme Court. (Dkt. No. 67, Attachs. 1 & 2.) Although Plaintiff was successful in his state court actions, those decisions were based, in part, upon the Town's failure to follow proper procedure, rather than the merits of the Town's decision. (*Id.*)

### 2. Criminal Charges

 **\*8**  Plaintiff has also failed to demonstrate an improper motive with respect to his claim that he received false criminal charges in retaliation for comments on his website about corruption among public officials. Plaintiff relies on the temporal proximity of these charges with a meeting he had with Bertram and his filing of an Article 78 petition in New York State Supreme Court. More specifically, Plaintiff argues that he began an Internet blog on or about January 1, 2011,

and in that blog reported on what he perceived to be the illegal activities of Town officials. (Dkt. No. 67, ¶ 15 [Pl.'s Decl.].)

For example, on January 1, 2011, Plaintiff wrote about the alleged inflation of billable time by the Town Attorney that was spent on work paid for by the Town. (*Id.* at 65:8-11.) Around the same time, Plaintiff met with Bertram to discuss his discovery of specific instances of corruption by public officials, including the alleged inflation of billable work by the Town Attorney. (Dkt. No. 59, Attach. 7, at 62:13-15; 64:9-15 [Pl.'s Dep. Tr.].) On January 15, 2011, a few days after this meeting occurred, Plaintiff was issued a criminal summons for the offense of "habitual loud barking," in violation of N.Y. Local Law § 1. (*Id.* at 61:19-22; Dkt. No. 68, Attach. 7 [Criminal Summons]; Dkt. No. 67, ¶ 15 [Pl.'s Decl.].) Plaintiff testified at his deposition that the Town Attorney went to great lengths to research the Local Law that he was charged under and assisted one of Plaintiff's neighbors in drafting an affidavit upon which the criminal summons was based. (Dkt. No. 59, Attach. 7, at 65:17-21 [Pl.'s Dep. Tr.]; Dkt. No. 67, ¶ 107 [Pl.'s Decl.].) Plaintiff argues that he is the first Town resident to be charged under this section of the Local Law. (Dkt. No. 67, ¶¶ 100, 106 [Pl.'s Decl.].) Finally, Plaintiff argues that Bertram retained outside counsel to pursue this charge against him, which was later dismissed. (Dkt. No. 67, ¶¶ 5, 19, 21 [Pl.'s Decl.]; Dkt. No. 59, Attach. 7, at 57:16-18 [Pl.'s Dep. Tr.].)

Thereafter, in October 2011, Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the Town's denial of Plaintiff's FOIL requests. (Dkt. No. 59, Attach. 7, at 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff sought disclosure of the information in the FOIL requests to substantiate his belief that Town officials were engaging in illegal activities. (Dkt. No. 67, ¶¶ 43-44 [Pl.'s Decl.].) One week after commencing that action, Plaintiff received a second criminal summons for the same offense related to loud dog barking. (Dkt. No. 68, Attach. 7 [Appearance Ticket]; Dkt. No. 59, Attach. 7, at 56:16-19; 67:7-12 [Pl.'s Dep. Tr.].) Plaintiff testified that he had "almost no dogs" on his property in October 2011. (Dkt. No. 59, Attach. 7, at 67:8-10 [Pl.'s Dep. Tr.].) According to Plaintiff, that charge was neither dismissed nor withdrawn, but "vanished." (*Id.*, at 57:19-58:9.)

While Plaintiff's allegations may plausibly suggest that an improper motive played a role in the charges brought against him, Defendants have submitted admissible record evidence that establishes otherwise. (Dkt. No. 59, Attach. 17.) Specifically, the criminal information in question is signed

by one of Plaintiff's neighbors, Frederick Platt, and states, in part, that "my complaint is that the dogs at Glencadia Dog Camp exhibit ongoing habitual barking/howling at any given time of day or night. This has been an issue since the Fall of 2009." (*Id.*) Furthermore, an affidavit filed by Wes Powell, the Town's Dog Control Officer, states that he received repeated complaints from Mr. Platt throughout 2010, culminating in the noise complaint that served as the basis for the criminal charge. (Dkt. No. 59, Attach. 16, ¶¶ 3-5 [Powell Aff.].) Mr. Powell states that the complaint was written by Mr. Platt in his presence and that no Town official directed Mr. Powell to serve Plaintiff with the criminal summons. (*Id.*, ¶¶ 7-10.)

**\*9**  Conversely, Plaintiff has not submitted any admissible record evidence supporting his claim that the Town Attorney (who is not a party) played any role in the charge being filed against him or that he is the only resident to have ever been charged under this section of the Local Law. Similarly, Plaintiff's contention that the Town pressured Mr. Platt to file a complaint against him (Dkt. No. 67, ¶ 7[Pl.'s Decl.] ) is unsubstantiated. While the timing of the charge may appear suspicious, the Town cannot control when its residents decide to file a complaint and, in light of the record evidence demonstrating that there was a preexisting noise problem on Plaintiff's property, the complaint is unsurprising. Moreover, the fact that Plaintiff *believes* the Town shored up its criminal charge against him is of little, if any, materiality. Finally, because the second charge seemingly "vanished," no documentation or evidence (other than the appearance ticket itself) has been submitted with respect to that charge. In any event, because the charge was never prosecuted, Plaintiff has failed to support his claim that he suffered any harm. Accordingly, the Court finds that Plaintiff has failed to meet his burden in demonstrating an improper motive with respect to this charge.

### 3. Town Assessor Gleason

Plaintiff claims that Town Assessor Howard Gleason (also not a party) threatened to raise his property taxes for engaging in political activities when Mr. Gleason hand delivered a letter to Plaintiff before a public meeting. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason]; Dkt. No. 67, ¶ 29 [Pl.'s Decl.].) The only evidence submitted with respect to this claim is not the original letter from Mr. Gleason to Plaintiff but letter correspondence from Plaintiff to Mr. Gleason. (Dkt. No. 69, Attach. 18, at 3 [Letter from Pl. to Gleason].) Plaintiff's letter to Mr. Gleason, dated October 5, 2010, states that Plaintiff

interpreted Mr. Gleason's attempt to speak with him about tax filings before a town hall meeting as threatening in nature due to the "timing and manner of the interaction." (*Id.*) This is because Plaintiff "had announced [his] intention to call for a referendum frequently and in many forums prior to appearing for the meeting." (*Id.*) Furthermore, Plaintiff requested that, in order to "avoid the impression that you coordinate your tax-related activities with other people in government in order to intimidate free speech, please do not present important information to me in such an information [sic] and unverifiable way." (*Id.*)

However, Mr. Gleason's response to Plaintiff's letter suggests that their interaction was not meant as a threat to raise Plaintiff's taxes or "was in any way politically motivated." (Dkt. No. 69, Attach. 18, at 4 [Letter from Pl. to Gleason].) More specifically, Mr. Gleason explains that he needed to re-assess Plaintiff's property in light of the fact that Plaintiff was now running a kennel (business) on his property and decided to hand deliver his letter knowing that Plaintiff would be present for the town hall meeting. (*Id.*) Moreover, Mr. Gleason reassured Plaintiff that politics do not dictate how he performs his job and promised that all future communication will be transmitted through mail rather than in-person. (*Id.*)

Plaintiff has failed to submit any additional evidence with respect to his tax assessment, that his taxes were improperly raised or that Mr. Gleason acted with a retaliatory animus. [5] Similarly, no evidence has been submitted to substantiate Plaintiff's claim that Bertram encouraged Mr. Gleason to use his authority as Town Assessor to intimidate Plaintiff. In sum, Plaintiff has wholly failed to satisfy his burden demonstrating that he suffered harm as a result of any action taken by Mr. Gleason and that Mr. Gleason acted with an improper motive.

**\*10**  For all of these reasons, the Court finds that Plaintiff has failed to create a genuine dispute of material fact with respect to his First Amendment claim. Because the Court has reached this conclusion, it need not, and does not, consider the merits of Defendant Bertram's alternative qualified immunity argument.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the Defendants and close this case.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 449 of 520

Pflaum v. Town of Stuyvesant, Columbia Cty., N.Y., Not Reported in Fed. Supp. (2016)

**All Citations**

Not Reported in Fed. Supp., 2016 WL 865296

## Footnotes

1    Although Plaintiff is currently proceeding *pro se*, the Court notes that he had counsel when preparing his response to Defendant's motion for summary judgment. Accordingly, no need exists to construe Plaintiff's response with the special solicitude ordinarily afforded to *pro se* litigants.

2    The Court notes that, while it did not previously (i.e., in its prior decisions) liberally construe Plaintiff's retaliation claim as arising under three separate theories, it does so now. The Court further notes that it has the power to address these two additional theories for each of two alternative reasons: (1) because Defendants moved for dismissal of Plaintiff's retaliation claim in its entirety, Plaintiff has had sufficient notice and an opportunity to be heard with respect to the two theories in question; and (2) in any event, even if Plaintiff cannot be said to have had such notice and an opportunity to be heard, he filed his Complaint *pro se* and the Court finds the two theories to be so lacking in arguable merit as to be frivolous, *see Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district court has power to *sua sponte* dismiss *pro se* complaint based on frivolousness notwithstanding fact that plaintiff has paid statutory filing fee).

3    As discussed above, Plaintiff was actually given three noise violations. However, because his permit was revoked on the same day that he received the third violation, the Court will disregard the third violation for purposes of this analysis.

4    The Court notes that Plaintiff spends considerable time in his opposition papers disputing the sufficiency of the evidence and procedures that were followed that led to the issuance of noise violations. (*See generally* Dkt. No. 67, ¶¶ 56-95 [Pl.'s Decl.].) However, this Court is not the proper forum for that dispute. Furthermore, to the extent that the New York Supreme Court observed that there appeared "to have been a disproportionate amount of time and money spent on [the noise violation] notice," and that the records did not "reveal a real issue with dog-barking," those observations are not binding upon this Court. (Dkt. No. 67, Attach. 2, at 6.) Setting aside the fact that the observations constitute dicta, Defendants have submitted admissible record evidence demonstrating that Mr. Ennis acted upon complaints made to him by residents of the Town, which Plaintiff has failed to properly dispute.

5    For example, with regard to this lack of additional evidence regarding retaliatory animus, Plaintiff has failed to adduce admissible record evidence establishing that, even assuming Mr. Gleason knew of Plaintiff's intent to engage in protected speech, the so-called "manner of the interaction" by Mr. Gleason (i.e., the hand delivery of the letter) was in fact unusual for Mr. Gleason given the date of the letter and the date of the public meeting. Moreover, Plaintiff has failed to adduce admissible record evidence that the so-called "timing ... of the interaction" is significant, given his rather constant exercise of his First Amendment rights during the time in question.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 450 of 520

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

2018 WL 1832929
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Russell RILEY, Plaintiff,

v.

Andrew CUOMO, in his official capacity
as governor of the State of New York,
New York State Police, Defendant(s).

2:17-cv-01631 (ADS)(AYS)
|
Signed 04/16/2018

**Attorneys and Law Firms**

Christopher Joseph Cassar, 13 East Carver Street,
Huntington, NY 11743, By: Christopher J. Cassar, Esq., Of
Counsel, Attorney for the Plaintiff.

New York State Office of the Attorney General, Nassau
Regional Office, 200 Old Country Road, Suite 240, Mineola,
NY 11501, By: Christina H. Bedell, Assistant Attorney
General, Counsel for the Defendants.

**MEMORANDUM OF DECISION & ORDER**

ARTHUR D. SPATT, United States District Judge

**\*1** The Plaintiff Russel Riley (the "Plaintiff") brought this
federal civil rights action pursuant to 42 U.S.C. § 1983
("Section 1983") against the Defendants Andrew Cuomo, in
his official capacity of the Governor of the State of New
York ("Governor Cuomo," the "Governor," or "Cuomo") and
the New York State Police (the "NYSP") (collectively, the
"Defendants").

Presently before the Court is a motion by the Defendants
to dismiss the complaint pursuant to Federal Rule of Civil
Procedure ("FED. R. CIV. P.") 12(b)(1) and 12(b)(6). For the
following reasons, the Defendants' motion is granted in its
entirety.

**I. BACKGROUND**

**A. The Relevant Facts**

The following facts are drawn from the Plaintiff's complaint,
and for the purposes of the instant motion, are presumed to
be true.

The Plaintiff owned and had a valid license for ten firearms.
On January 9, 2017, members of the NYSP entered the
Plaintiff's home without a warrant and seized ten firearms.

The firearms have not been returned to the Plaintiff, and there
has been no hearing regarding the seizure of the firearms.

The Plaintiff makes broad references to the New York Secure
Ammunition and Firearms Enforcement Act of 2013 (the
"NY SAFE Act"), but does not explicitly state that his
firearms were confiscated as a result of that statute.

**B. The Relevant Procedural History**

On March 23, 2017, the Plaintiff filed his complaint. The
complaint alleges that the NY SAFE Act is unconstitutional
under the Fourth and Fourteenth Amendments to the United
States Constitution in that it fails to provide gun owners who
have had their firearms seized with a hearing. However, the
Plaintiff does not seek a declaratory judgment declaring that
the NY SAFE Act is unconstitutional. Furthermore, as stated
above, he does not explicitly state that his guns were seized
because of that statute; or, if they were, how that statute
caused his firearms to be seized.

The complaint alleges that the Plaintiff's Fourth, Fifth,
and Fourteenth Amendment rights were violated when the
Defendants seized his firearms without a warrant; failed to
provide him with a hearing; and illegally obtained statements
from him. In those ways, the Defendants allegedly violated
Section 1983.

The Plaintiff seeks declaratory relief in the form of an
order stating that the Defendants violated his constitutional
rights. He asks that the Court order that the firearms be
returned to him. Further, he seeks "a judgment ... requiring the
Defendants to conduct a prompt hearing following the seizure
of the property in all cases at which time the Defendants must
demonstrate probable cause for the seizure of the property and
that it was necessary that the property remain in the custody
of the Defendants." (Compl. Wherefore Clause ¶ 3).

The Plaintiff seeks injunctive and declaratory relief; and
a judgment requiring the Defendants to provide notice
and a hearing to any future victims of seizures similar to
the one experienced by the Plaintiff. The complaint does

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 451 of 520

Riley v. Cuomo, Not Reported in Fed. Supp. (2018)

not explicitly seek damages, but only reasonable attorneys' fees and costs. While the Court notes that the Plaintiff's memorandum in opposition to the motion to dismiss states that "the underlying complaint is not exclusively seeking an award of damages under § 1983," (Pl.'s Mem. in Opp. to Mot. to Dismiss at 4), a plaintiff is not permitted to amend his complaint by virtue of what is said in a memorandum of law, *Uddoh v. United Healthcare,* 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) ("A plaintiff, however, is not permitted to interpose new factual allegations or a new legal theory in opposing a motion to dismiss...." (citing *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir. 1998) ) ). The complaint does not explicitly seek damages, and the Court cannot construe it otherwise.

**\*2** On September 25, 2017, the Defendants filed the instant motion to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b)(1), and for failure to state a claim pursuant to Rule 12(b)(6).

## II. DISCUSSION

### A. As to the Defendants' Motion to Dismiss Based on Sovereign Immunity

The Defendants have moved for dismissal based on sovereign immunity pursuant to Rule 12(b)(1).

As an initial matter, the Court first observes that within the Second Circuit, the question of whether a motion to dismiss made on sovereign immunity grounds should be reviewed under Rule 12(b)(1) or under Rule 12(b)(6) remains unresolved. *See Carver v. Nassau Cty. Interim Fin. Auth.,* 730 F.3d 150, 156 (2d Cir. 2013) ("[W]hether the claim of sovereign immunity constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense is an open question in the Supreme Court and the Second Circuit." (citing *Wisc. Dep't of Corr. v. Schacht,* 524 U.S. 381, 391, 118 S. Ct. 2047, 141 L.Ed. 2d 364 (1998) ) ); *see also Garcia v. Paylock,* 13-CV-2868 KAM, 2014 WL 298593, at \*2 n.3 (E.D.N.Y. Jan. 28, 2014) ("It is an open question in the Second Circuit whether the claims of sovereign immunity should be viewed as raising a question of subject matter jurisdiction, and thus be evaluated under \*339 Rule 12(b)(1), or as an affirmative defense analyzed under Rule 12(b)(6).").

This "distinction is significant," because "while [a district court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under FED. R. CIV. P. 12(b)(6), ... in adjudicating a motion to dismiss for lack of subject-matter jurisdiction [pursuant to FED. R. CIV. P. 12(b)(1) ], a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 (2d Cir. 2007) (internal citations omitted). As such, in accordance with the approach taken by other district courts within this Circuit, the Court will apply the stricter standard set under Rule 12(b)(6) while analyzing Defendants' sovereign immunity arguments. *See Tiraco v. New York State Bd. of Elections,* 963 F. Supp. 2d 184, 191 n.6 (E.D.N.Y. 2013) (noting that "[t]his distinction [ ] does not alter the outcome" of the case because "the court [ ] considered only the pleadings and the relevant state and federal law and [drew] all inferences in Plaintiff's favor") (citations omitted); *McMillan v. N.Y. State Bd. of Elections,* No. 10-CV-2502 (JG)(VVP), 2010 WL 4065434, at \*3 (E.D.N.Y. Oct. 15, 2010) (looking "only to the pleadings and to state and federal law" to resolve questions regarding sovereign immunity).

### 1. The Rule 12(b)(6) Standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006); *Bold Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.,* 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

**\*3** Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second,

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 452 of 520

Riley v. Cuomo, Not Reported in Fed. Supp. (2015)

only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L.Ed. 2d 868 (2009) ).

Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 556 U.S. at 679.

## B. The Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *Rowland,* 494 F.3d at 95 (quoting U.S. CONST. AMEND. XI). The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 90-100, 104 S. Ct. 900, 79 L.Ed. 2d 67 (1984); *see also Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir. 2004). Although the plaintiff generally bears the burden of proving subject matter jurisdiction, the entity claiming Eleventh Amendment immunity bears the burden to prove such. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d Cir. 2006).

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370-71, 96 S. Ct. 598, 46 L.Ed. 2d 561 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states are not "persons" under section 1983 and, therefore, Eleventh Amendment immunity is not abrogated by that statute. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L.Ed. 2d 45 (1989).

## 1. Claims Against State Administrative Agencies

Regardless of the type of relief sought, the Eleventh Amendment bars this Court from assuming jurisdiction over plaintiffs' claims asserted against the State of New York and its agencies. When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining lawsuits against them "regardless of the nature of the relief sought." *Pennhurst,* 465 U.S. at 100.

### a. Application to the Plaintiff's Claims Against the NYSP

**\*4** As the Eleventh Amendment bars all suits against administrative agencies of a state, the Plaintiff's claims against the NYSP cannot be sustained. Defendant New York State Police is a division in the executive department of New York—*see* section 210 of New York's Executive Law— and is therefore immune from all claims, both federal and state. Congress has not overridden states' sovereign immunity respecting constitutional claims brought under 42 U.S.C. § 1983. *Will,* 491 U.S. at 109. And it is well established that "New York State has not waived its sovereign immunity from Section 1983 claims." *Nolan v. Cuomo,* No. 11 CV 5827 (DRH)(AKT), 2013 WL 168674, at \*7 (E.D.N.Y. Jan. 16, 2013) (citing *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 39-40 (2d Cir. 1977) ); *see also Mamot v. Bd. of Regents,* 367 Fed.Appx. 191, 192 (2d Cir. 2010) (summary order); *Dube v. State Univ. of New York,* 900 F.2d 587, 594-95 (2d Cir. 1990) (holding that the Eleventh Amendment precludes an action under Section 1983 against SUNY, an integral part of the State of New York). Therefore, the NYSP is entitled to sovereign immunity on the Plaintiff's claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against the NYSP is granted.

### 2. Claims Against State Officials in Their Official Capacity

A suit for damages against a state official in his or her official capacity "is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993); *see also Will,* 491 U.S. at 71; *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir. 2003). However, "the applicability of the Eleventh Amendment bar [to suits against individuals in their official capacities] depends on the form of relief sought." *Lee v.*

*Dep't of Children & Families,* 939 F.Supp.2d 160, 165-66 (D. Conn. 2013). Money damages cannot be recovered from state officers sued in their official capacities. *See e.g., Will,* 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against an official but rather is a suit against the official's office."); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L.Ed. 2d 662 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); *Goonewardena v. New York,* 475 F. Supp. 2d 310, 329 (S.D.N.Y 2007) ("[S]overeign immunity also extends to bar claims for monetary damages brought against state officers sued under section 1983 in their official capacities.").

Similarly, "judgments against state officers declaring that they violated federal law in the past" are also not permitted. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 146, 113 S. Ct. 684, 121 L.Ed. 2d 605 (1993) (citing *Green v. Mansour,* 474 U.S. 64, 73, 106 S. Ct. 423, 88 L.Ed. 2d 371 (1985) ). However, prospective injunctive relief is available against individuals being sued in their official capacities in order to correct an ongoing violation of federal law. *See Edelman,* 415 U.S. at 663; *Ex Parte Young,* 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908). In this regard, through the doctrine of *Ex Parte Young,* a party may bring "a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law." *CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.,* 306 F.3d 87, 98 (2d Cir. 2002) (internal quotation marks and alteration omitted); *see also Arthur v. Nyquist,* 573 F.2d 134, 138 (2d Cir. 1978).

In order to determine whether the *Ex parte Young* exception allows the Plaintiff to bring suit against state officials, this Court must first determine whether the complaint alleges an ongoing violation of federal law and second, whether the Plaintiff seeks relief properly characterized as prospective. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S. Ct. 1753, 152 L.Ed. 2d 871 (2002). "[T]o successfully avoid the Eleventh Amendment bar, a plaintiff must prove that a defendant's violation of federal law is of an ongoing nature as opposed to a case 'in which federal law has been violated at one time or another over a period of time in the past.' " *Papasan v. Allain,* 478 U.S. 265, 277-78, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986) (quotation omitted). The inquiry for determining whether an "ongoing violation" exists is, "does the enforcement of the law amount to a continuous violation of plaintiffs constitutional rights or a single act that

continues to have negative consequences for plaintiffs." *New Jersey Educ. Ass'n v. New Jersey,* No. 11-5024, 2012 WL 715284, at *4 (D.N.J. Mar. 5, 2012).

*5 Furthermore, when a plaintiff seeks prospective relief against a state official in their official capacity where the plaintiff alleges that a particular statute is unconstitutional, "the state officer ... 'must have some connection with the enforcement of the act' " that includes "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Kelly v. New York State Civil Serv. Comm'n,* No. 14 CV 716 VB, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) (quoting *Ex Parte Young,* 209 U.S. at 157), *aff'd sub nom. Kelly v. New York Civil Serv. Comm'n,* 632 Fed.Appx. 17 (2d Cir. 2016); *see also CSX Transp.,* 306 F.3d at 99 (amenability to suit under Eleventh Amendment requires "both the power and the duty" to take challenged action).

### a. Application to the Plaintiff's Claims Against Governor Cuomo in His Official Capacity

As stated above, the complaint does not explicitly seek damages. However, even if it did, the Plaintiff would be unable to seek that relief against Governor Cuomo in his official capacity. *Ying Jing Gan,* 996 F.2d at 529 ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." (internal citations omitted) ).

As to his requests for declaratory and injunctive relief, the Court finds that the Plaintiff does not explicitly seek prospective relief. Instead, he seeks a declaration that the Defendants violated federal law in the past, and a return of his firearms. Courts have held that neither of these types of relief are prospective. *See Puerto Rico Aqueduct and Sewer,* 506 U.S. at 146 (stating that "judgments against state officers declaring that they violated federal law in the past" are not permitted under the *Ex Parte Young* doctrine); *Dotson v. Griesa,* 398 F.3d 156, 177 n.16 (2d Cir. 2005) (holding that Second Circuit precedent "preclude[s] a federal court from ordering affirmative action by either the state or federal government employees in their official capacities"); *Nat'l R.R. Passenger Corp. v. McDonald,* 978 F. Supp. 2d 215, 233 (S.D.N.Y. 2013) ("[C]ourts in this Circuit have [held] ... that the return of property taken by the state is barred by the

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 454 of 520

Riley v. Cuomo, Not Reported in Fed. Supp. (2015)

Eleventh Amendment because that constitutes 'retrospective' relief." (collecting cases) ), *aff'd*, 779 F.3d 97 (2d Cir. 2015); *Dean v. Abrams*, No. 94 CIV. 3704 (LAK), 1995 WL 791966, at *2 n.5 (S.D.N.Y. Dec. 26, 1995) ("The only exception to the Eleventh Amendment's protection is for 'prospective injunctive relief,' but Dean's demand for ... the return of her property does not qualify for this exception." (collecting cases) ).

While the Plaintiff does ask for an order declaring that the Defendants must afford any future victims of such seizures a prompt and fair hearing, the Plaintiff has not plead sufficient facts to demonstrate that he has standing to request such relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185, 120 S. Ct. 693, 706, 145 L.Ed. 2d 610 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought.")

"In seeking prospective relief like an injunction, a plaintiff must show that he can reasonably expect to encounter the same injury again in the future—otherwise there is no remedial benefit that he can derive from such judicial decree." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L.Ed. 2d 675 (1983) ). A plaintiff cannot seek injunctive relief merely for past injury. *O'Shea*, 414 U.S. at 495-96, 94 S. Ct. 669; *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Instead, "the injury alleged must be capable of being redressed through injunctive relief 'at that moment.' " *Robidoux v. Celani*, 987 F.2d 931, 938 (2d Cir. 1993) (quoting *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S. Ct. 1661, 114 L.Ed. 2d 49 (1991) ).

 **\*6** Here, the Plaintiff does not allege that his guns will again be seized in the future. Indeed, as stated above, the Plaintiff did not state why his guns were seized. He does not plead sufficient facts to demonstrate standing to seek an order forcing the state to afford any future victims of seizures a prompt and fair hearing because he has not alleged that he will be a victim of such a seizure in the future.

Therefore, the Plaintiff does not seek prospective relief for an ongoing violation of federal law, and cannot avail himself of the *Ex Parte Young* doctrine. Governor Cuomo therefore has sovereign immunity with regard to the Plaintiff's claims.

The Plaintiff contends that he should be permitted to proceed on his theory of supervisory liability until he is able, through discovery, to determine which subordinate officials should

be added to the complaint. This argument is completely unavailing.

First, "[a] defendant's supervisory authority is insufficient in itself to demonstrate liability under § 1983." *LaMagna v. Brown*, 474 Fed.Appx. 788, 789 (2d Cir. 2012) (citing *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ); *Richardson*, 347 F.3d at 435 ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (citations and internal quotation marks omitted) ). Instead, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases). As the Second Circuit has stated, a supervisory defendant's personal involvement can be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (emphasis omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ).

Accordingly, "supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (quoting *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) ). The Plaintiff does not

allege that any of the above factual circumstances are present here.

Second, the Plaintiff does not even allege that the Governor supervises the NYSP. Indeed, the complaint does not contain any allegations that are specific to Governor Cuomo.

Furthermore, as to the Plaintiff's argument that he should be permitted to maintain suit against Governor Cuomo until he has been afforded an opportunity to identify subordinate officials who have personal liability, the Plaintiff does not meet that "exception" to the supervisory liability rule here. The case cited by the Plaintiff for this very proposition held "[p]ermitting plaintiffs to use discovery as a fishing expedition undermines the principle that only portions of a complaint which satisfy a plausibility standard, *i.e.,* more than possible and less than probable, should unlock the doors of discovery." *Dudek v. Nassau Cty. Sheriff's Dep't,* 991 F. Supp. 2d 402, 414 (E.D.N.Y. 2013) (internal citations and quotation marks omitted).

*7 The *Dudek* court relied on the fact that the complaint failed to contain a single factual allegation that any of the supervisory defendant's subordinates were personally involved in the action. Here too, the Plaintiff does not allege that Governor Cuomo supervises members of the NYSP, nor does he allege any specific acts by any individual John Doe officers of the NYSP. Nor would the Plaintiff be permitted to avail himself of the exception allowing discovery to go forward where a litigant raises colorable claims against supervisors because that exception only applies to *pro se* litigants. *See Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir. 1998) ("We therefore hold that when a *pro se* plaintiff brings a colorable claim against supervisory personnel, and those supervisory personnel respond with a dispositive motion grounded in the plaintiff's failure to identify the individuals who were personally involved, under circumstances in which the plaintiff would not be expected to have that knowledge, dismissal should not occur without an opportunity for additional discovery."); *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 34 (2d Cir. 1996) (holding that where a pro se litigant mistakenly failed to name the individual corrections officers who might be liable, the pro se plaintiff would be afforded opportunity to amend his complaint after discovery); *Satchell v. Dilworth,* 745 F.2d 781, 785 (2d Cir. 1984) (same).

Finally, the Plaintiff is also unable to bring claims against Governor Cuomo based on his allegation that the NY SAFE Act is unconstitutional. The Court notes again that the Plaintiff does not seek an order stating that the NY SAFE Act is unconstitutional. He instead alleges that it is unconstitutional, and seeks an order requiring the Defendants to afford victims of gun seizures fair hearings.

In any event, the Plaintiff has not alleged that the Governor has any duty to enforce the NY SAFE Act. Nor does N.Y. PENAL LAW § 400, the only specific statute cited by the Plaintiff, afford any duty or power to the Governor. To the extent that the Plaintiff relies on the fact that the NY SAFE Act was signed by Governor Cuomo, which the Court notes that he did not allege, "[t]he well-settled doctrine of absolute legislative immunity ... bars actions against legislators or governors ... on the basis of their roles in enacting or signing legislation." *Warden v. Pataki,* 35 F.Supp.2d 354, 358 (S.D.N.Y. 1999), *aff'd sub nom. Chan v. Pataki,* 201 F.3d 430 (2d Cir. 1999). Furthermore, "the vast majority of courts ... have held ... that a state official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." *Warden,* 35 F. Supp. 2d at 359.

Therefore, the Plaintiff has failed to allege that Governor Cuomo has the power or duty to take action regarding the NY SAFE Act, and the Governor has sovereign immunity over those claims.

Accordingly, the Defendants' motion to dismiss the Plaintiff's claims against Governor Cuomo is granted.

### III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the complaint based on sovereign immunity is granted in its entirety. The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1832929

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 456 of 520
Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)
2018 A.D. Cases 233,217

2018 WL 3213290
United States District Court, D. Connecticut.

Jacabed RODRIQUEZ-COSS, Plaintiff

v.

Jeff B. SESSIONS, Attorney General, United
States Department of Justice, Defendant

CIVIL ACTION NO.: 3:16-cv-00633-VLB
|
Signed 06/29/2018

**Attorneys and Law Firms**

Bill L. Gouveia, Bridgeport, CT, Kevin Gerard Little, Law
Office of Kevin G. Little, Fresno, CA, for Plaintiff.

Jordan M. Anger, U.S. Attorney's Office, Newark, NJ, for
Defendant.

MEMORANDUM OF DECISION
GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [DKT. 35]

Hon. Vanessa L. Bryant, United States District Judge

**\*1** Plaintiff Jacabed Rodriguez-Coss ("Plaintiff" or
"Rodriguez-Coss") brings this action raising claims of
retaliation and sex discrimination under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and
discrimination due to perceived or actual disability under the
Rehabilitation Act of 1973, 29 U.S.C. § 791, et seq., arising
from her employment at the Department of Justice. Defendant
moves for summary judgment pursuant to Federal Rule of
Civil Procedure 56. [Dkt. 35]. For the reasons that follow, the
Court GRANTS Defendant's motion.

Background

The following facts are taken from the Local Rule 56
statements of material facts and evidence cited by the parties,
and they are read in the light most favorable to the non-
movant. In 2008, Rodriguez-Coss joined the Department of
Justice's Criminal Division, as an attorney in the Capital Case
Unit ("CCU") in Washington D.C. [Dkt. 35-2 (D. Conn Civ.
L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 47 (D. Conn. Civ. L. R. 56(a)
(2) Stmt.) ¶ 1]. [1] Initially, when Rodriguez-Coss first joined

the CCU, members of the CCU were not required to travel to
the regional United States Attorney Offices ("USAO"). [Dkt.
46-2, Ex. B (Rodriguez-Coss Dep.) at 40:8–11]. One of the
primary reasons that Rodriguez-Coss accepted the position at
the CCU was the promise from the previous chief of the CCU
that there was no travel requirement. *Id.* at 23:6–9.

In 2010, Kevin Carwile became Chief of both the CCU and
the Capital Case Section ("CCS"). [Dkt. 46-5, Ex. E (Carwile
Dep.) at 166:1–167:14]. Carwile expanded the unit's mission
to include the active litigation of cases with the local USAOs.
*Id.* This expansion meant attorneys in the unit were required to
travel to the venues where their assigned cases were pending.

In the months following this meeting, Rodriguez-Coss's
husband accepted a job in Connecticut, leading Rodriguez-
Coss to resign from her position at the CCS. [Dkt. 46-2
at 53:3–9]. A week before her employment ended with the
CCS, Gwynn "Charlie" Kinsey, the Deputy Chief of the
CCS, offered Rodriguez-Coss the opportunity to continue
working with the CCS remotely on a capital case pending in
Connecticut, *United States v. Aquart*, which was then pending
in Connecticut. *Id.* at 53:10–16. Rodriguez-Coss accepted
and signed her first Flexiplace Agreement on November 8,
2010, which enabled her to work remotely for the CCU
from the USAO in Bridgeport, Connecticut. [Dkt. 35-4, Ex.
D (Flexiplace Agreements) at 71 of PDF]. The term of
this agreement lasted until February 28, 2011. *Id.* As the
agreement detailed, "[d]uring the period of this arrangement,
the employee will be assigned to assist in the pretrial
preparation of U.S. v. Azibo Aquart, et al. ... as well as conduct
case review and policy work as assigned by CCU. At the end
of the agreement period, the Chief of the Capital Case Unit
will evaluate if extension is warranted, and a new agreement
will be required if extension is granted." *Id.* Rodriguez-Coss
initially believed that this assignment was only a temporary
measure until she was able to find other employment in
Connecticut. [Dkt. 46-2 at 29:21–25].

**\*2** After the *Aquart* trial concluded in July 2011, Carwile
contacted Rodriguez-Coss to inform her that she could
continue working for the CCS from Connecticut based on
continually updated Flexiplace Agreements. *Id.* at 29:16–
30:2; [Dkt. 35-2 ¶ 5; Dkt. 47 ¶ 5]. Thereafter, until February
2014, Rodriguez-Coss worked for the CCS in Connecticut
under Flexiplace Agreements of varying duration on cases
pending in New England primarily. [Dkt. 35-2 ¶ 5; Dkt. 47
¶ 5].

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 457 of 520

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

After the conclusion of the *Aquart* trial, during the summer of 2011, Rodriguez-Coss was assigned to litigate a § 2255 habeas case, *United States v. Fell*, in Vermont. [Dkt. 35-2 ¶ 8; Dkt. 47 ¶ 8; Dkt. 35-5, Ex. Q (Email 1/6/14) ].

Months later, near the end of 2011 or at the beginning of 2012, Rodriguez-Coss was assigned an additional case, *United States v. Stone*, pending before the Eastern District of California in Fresno. [Dkt. 46-2 at 58:21–59:3]. When Rodriguez-Coss received this assignment, she immediately called Carwile to inform him that it would be very difficult for her to litigate the case, since it would require her to be away from her family for three to four months at a time. *Id.* at 82:9–17. Rodriguez-Coss did not resign from her position and proceeded to litigate the case; however, she continually requested a reassignment, and even proposed alternative solutions, so that she could assist with the case without acting as the lead prosecutor. *Id.* at 83:14–23. Despite her misgivings, Rodriguez-Coss entered her appearance in the case on March 26, 2012. [Dkt. 35-5, Ex. F (Not. Appearance) ].

In addition to *Fell* and *Stone*, Rodriguez-Coss was also assigned a case pending in Rhode Island, *United States v. Pleau*, in 2012. [Dkt. 35-5, Ex. Q]. All three of these cases —*Fell, Stone*, and *Pleau*—remained active until the summer of 2013, when the defendant in *Pleau* pled guilty. [Dkt. 46-2 at 162:24–164:1].

Several AUSAs submitted affidavits opining that the number of cases assigned to Rodriguez-Coss was abnormal. [Dkt. 46-6, Ex. F (Mosley Decl.) ¶ 11; Dkt. 46-7, (Hegyi Decl.) ¶ 16]. According to Kinsey, at the time his deposition was taken the CCS currently had an estimated total of eight to 12 capital cases and 15 to 25 § 2255 cases, with a total of 13 attorneys. [Dkt. 46-5 at 118:21–120:2]. Based on Kinsey's estimate of a range of 23-38 cases and 13 AUSAs, there could not be an equal number of cases assigned to each AUSA in the unit. There is no evidence in the record showing the number of active criminal cases, criminal trials or habeas cases pending in the unit during the time Rodriguez-Coss was employed. Nor is there any evidence of the number of AUSAs in the unit, their background and experience, their reporting relationships or their caseloads.

During the summer of 2012, Rodriguez-Coss complained of discriminatory accommodations to her supervisors. [Dkt. 46-1, Ex. A (Rodriguez-Coss EEOC Stat.) at 17:12–13]. Rodriguez-Coss complained that a white male coworker,

Stanley Rothstein, was not required to travel or litigate cases outside of Washington, D.C. *Id.* at 17:13–19. Rothstein confirmed that, between 2008 and 2013, he was only assigned one case. [Dkt. 46-11, Ex. K (Rothstein Decl.) ¶ 4]. During that case, Rothstein was not an active litigator and only made two short trips to the regional USAO. *Id.*

In late 2012, Rodriguez-Coss's family was impacted by the tragic mass shooting at Sandy Hook Elementary School, located five minutes away from where Rodriguez-Coss lived. [Dkt. 46-2 at 117:10–12]. Rodriguez-Coss testified that, given the proximity of this shooting, there was an emotional impact on Rodriguez-Coss's family, particularly her school-age children. *Id.* at 117:12–13, 119:24–120:8. Because of this turmoil, Rodriguez-Coss expressed concerned to Carwile and Kinsey about leaving her family for months to conduct a lengthy trial. *Id.* at 117:17–20. As Rodriguez-Coss informed Kinsey, the combined stress of three active cases alongside her family's struggles made it increasingly difficult to adequately litigate each case. *Id.* at 117:24–118:2.

**\*3** On February 26, 2013, Carwile wrote in an email:

> As you know, we have Jackie Rodriguez-Coss on our payroll but working out of the USAO in Connecticut. Not a perfect arrangement but I prefer, at this point, to continue the arrangement until mid-summer and see where we stand at that point as a result of hiring additional attorneys, etc. Her prior Flexiplace Agreement has expired.... I would like to [renew] this asap because she recently received her mid-year review and started squawking when she was told she needed to be more proactive in traveling to cover her litigation matters. Before I raise this matter with her again, I want to get an updated agreement in place. I shortened the duration of the agreement in the event this turns into a larger problem.

[Dkt. 35-5, Ex. H (Email 2/26/13) ]. Rodriguez-Coss was subsequently issued a four-month Flexiplace Agreement on February 27, 2013 with an expiration date of June 29, 2013.

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

[Dkt. 35-4 at 75 of PDF]. Rodriguez-Coss was later offered a six-month Flexiplace Agreement that was signed on June 30, 2013, and ended December 31, 2013. *Id.*

As Rodriguez-Coss continued to litigate *Stone* in 2013, she encountered numerous hurdles. She testified that the previous prosecutors had apparently "neglect[ed]" the case before Rodriguez-Coss was assigned. [Dkt. 46-2 at 83:13–17]. Moreover, the local AUSA assisting Rodriguez-Coss was inexperienced and completely unfamiliar with the case. *Id.* at 93:20–94:1. The federal judge in *Stone* was also considered to have negative feelings about the death penalty. *Id.* at 169:12–17. The record is devoid of any evidence of tardy filings in the *Stone* case before it was assigned to Rodriguez-Coss. Nor is there any evidence on the record of judicial bias on the part of the presiding judge(s) or that Rodriguez-Coss filed a motion to recuse or to disqualify the judge.

On February 5, 2013, Judge John C. Coughenour noted that Rodriguez-Coss filed a tardy response to a discovery motion in *Stone*. [Dkt. 35-5, Ex. G (*Stone* Tr. 2/5/13) at 13]. In the months that followed, Rodriguez-Coss missed numerous other deadlines. *See* [Dkt. 35-5, Ex. K (*Stone* Order 10/21/13) (noting six untimely filings on January 7, January 9, August 22, September 30, October 4, and October 10) ].

On October 9, 2013, Rodriguez, Carwile, and Kinsey discussed Rodriguez-Coss's litigation assignments over a conference call. [Dkt. 46-4, Ex. D (Kinsey Dep.) at 48:4–9]. During this call, Rodriguez-Coss informed Carwile and Kinsey that she could not travel to California for several months in order to prosecute *Stone*. *Id.* at 53:6–7, 53:14–19. Either during this conversation or during one similar, Rodriguez-Coss characterized the local AUSA as busy and less active with the case. [Dkt. 46-2 at 169:9–170:23]. Nevertheless, Rodriguez-Coss asked Carwile to reduce her workload by reassigning the guilt phase of *Stone* to the inexperienced local AUSA, leaving her to try the penalty phase only. [Dkt. 46-2 at 83:14–23, 175:19–22]. Rodriguez-Coss believed that "the evidence [in *Stone*] was pretty overwhelming for the government" and thus "felt that was something that a regular prosecutor didn't need capital experience in order to handle the guilt phase of the trial." *Id.* at 176:1–15. This proposed reassignment was rejected. *Id.* at 84:20–22. Carwile admitted that he allowed similar arrangements for other CCS attorneys. [Dkt. 46-5 at 24:1–5].

**\*4** Nearly two years after the case was assigned to her, on October 21, 2013, Judge Coughenour again reprimanded the prosecution, headed by Rodriguez-Coss, for failing to meet deadlines. [Dkt. 35-5, Ex. K at 2–3]. In a written order, the court remarked that:

> [T]he government has demonstrated a cavalier attitude towards obeying deadlines and other procedural requirements, and thus its demand that the Court refuse to grant Defendant an extension of time after a timely motion is audacious at best. The inability of the attorneys representing the United States to obey court orders has significantly lowered their credibility with the Court. Counsel are forewarned that the Court is seriously considering an order to show cause why government counsel should not be held in contempt for their flagrant disregard of the Court's orders.

*Id.* The magistrate judge assigned to *Stone*, Magistrate Judge Gary S. Austin, also noted the "government's pattern of filing untimely motions and deficient responses" on November 8, 2013. [Dkt. 35-5, Ex. L (*Stone* Order 11/8/13) at 1 n.1]. A few weeks later on November 20, 2013, Magistrate Judge Austin cautioned the government "that future late filings in this case will not be tolerated and will likely result in the imposition of sanctions." [Dkt. 35-5, Ex. N (Order 11/20/13) at 2].

On November 26, 2013, there were two conference calls between Rodriguez, Carwile, and Kinsey. [Dkt. 46-4 at 88:17–22, 93:11–15]. The first call was a case review that included the Fresno USAO Branch Chief Kevin Rooney and the Fresno AUSA, Mike Fry, assigned to *Stone*. *Id.* at 88:17–22. During the call, Rodriguez-Coss claimed that her work in *Stone* was impairing her ability to work on *Fell*. *Id.* at 91:7–10. Immediately afterwards, Rodriguez, Carwile, and Kinsey held a conference call. *Id.* at 93:11–15. Kinsey's notes indicate Rodriguez-Coss complained about the "fundamentally unfair" travel requirements and said she would not try the *Stone* case as scheduled. *Id.* at 96:3–97:11.

A few weeks later, on December 19, 2013, Rodriguez-Coss was given a two-month, instead of a six-month, Flexiplace Agreement, which was effective from January 1, 2014 to February 28, 2014. [Dkt. 35-5, Ex. D]. In an email sent

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 459 of 520
Rodriquez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)
2018 A.D. Cases 233,217

alongside the new agreement, Kinsey informed Rodriquez-Coss that subsequent agreements were "dependent on your satisfactory completion of all pre-trial and trial litigation duties and other assigned work responsibilities." [Dkt. 35-5, Ex. J (Email 12/19/13) ]. In response, Rodriquez-Coss noted that, in her situation, ending her Flexiplace Agreement "would be tantamount to a constructive firing" and "our current disagreements are stressful enough without adding to them the uncertainty, every two months, of whether my Flexiplace agreement will be renewed." *Id.* Carwile later testified that the period for Rodriquez-Coss's Flexiplace was reduced in response to Rodriquez-Coss's objections to travel and to "buy additional time" to resolve this issue. [Dkt. 46-5 at 48:8–49:1].

Soon thereafter, on January 7, 2014, Carwile issued an official reprimand to Rodriquez. [Dkt. 35-5, Ex. R (Official Reprimand) ]. Carwile wrote:

> This is an official reprimand for your refusal to handle a case assignment given to you by your supervisors. You informed Capital Case Section (CCS) that you are unwilling to litigate the case of *United States v. Samuel Stone* (E.D. Cal.) due to the travel required to adequately prepare and prosecute this matter. You cannot unilaterally refuse to handle a case or change your work assignments to accommodate your personal preferences. This conduct is unacceptable and will not be tolerated. You are expected to accept all assignments from your supervisors.

 **\*5** *Id.* The reprimand was "intended to be constructive in nature" and was added to Rodriquez-Coss's personnel file. *Id.* Later that month, on January 22, 2014, Rodriquez-Coss contacted the Department of Justice's Equal Employment Opportunity Commission ("EEOC"), [Dkt. 35-5, Ex. T (EEOC Compl.) ], and she filed an internal grievance regarding her official reprimand, [Dkt. 35-5, Ex. Z (Grievance Response 3/28/14) ]. CCS was later notified of the EEOC contact on February 4, 2017. [Dkt. 35-5, Ex. U (EEO Letter Excerpt 6/4/14) ]. The reprimand was later upheld by the Department of Justice's Grievance Official, who called the reprimand "fair and reasonable." [Dkt. 35-5, Ex. Z].

Around February 10, 2014, Carwile and Kinsey learned of the deficient filings in *Stone*. [Dkt. 46-4 at 159:22–160:22]. At this time, the U.S. Attorney for the Eastern District of California alerted Carwile and Kinsey to the reprimands issued by the *Stone* judges. *Id.* at 160:18–22; [Dkt. 46-5 at 82:19–83:4]. Two weeks later, on February 24, 2014, Carwile notified Rodriquez-Coss that he would not renew her Flexiplace Agreement after it expired on February 28, 2014. [Dkt. 35-5, Ex. Y (Email 2/24/14) ]. Carwile explained his decision was based on "revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings." *Id.* Moreover, Carwile also "determined that more direct supervision of [Rodriquez-Coss's] work is needed" and instructed Rodriquez-Coss to resume working from the CCS office in D.C. beginning March 31, 2014. *Id.* On March 24, 2014, Rodriquez-Coss emailed Carwile seeking authorization to continue working from Connecticut until April 30 in preparation for an evidentiary hearing in *Fell. Id.* This was denied. *Id.*

Rodriquez-Coss did not return to the CCS office on March 31, 2014. [Dkt. 35-2 ¶ 31; Dkt. 47 ¶ 31]. Instead, on March 31 at 10:35 pm, she emailed Carwile and Kinsey, explaining:

> Unfortunately, the stress from my current disputes pertaining to the status of my flexi-place agreement has had a marked and detrimental effect on my health, to the point where I am now under the continuing care of physicians and taking medication. While I am suffering medically from this situation and under the care of physicians, I simply cannot act contrary to their advice and report for duty in Washington. I will be providing you with medical documentation that the requested transfer is detrimental to my health and that I can only continue working with the limitation that I remain in their care.

[Dkt. 35-5, Ex. AA (Email 3/31/14) ]. Rodriquez-Coss also indicated that she would continue working out of the Connecticut USAO. *Id.* The following afternoon, Kinsey

2018 A.D. Cases 233,217

replied and informed Rodriguez-Coss that she would be placed on "AWOL status" starting April 2, 2014 unless she provided medical documentation, since she did not report to the D.C. office. *Id.* On April 2, 2014 Rodriguez-Coss was declared AWOL and, because of her AWOL status, Kinsey cancelled Rodriguez-Coss's enrollment in a training that was necessary for her to stay in good standing with her state bar. *Id.*; [Dkt. 35-2 ¶ 33; Dkt. 47 ¶ 33].

Rodriguez-Coss provided medical documentation from her general practitioner on April 3, 2014. [Dkt. 35-5, Ex. AA]. After receiving the documentation, Kinsey informed Rodriguez-Coss that she was still on AWOL status and could not work from the Connecticut USAO. *Id.* In the days that followed, Rodriguez-Coss supplied further medical documentation indicating that she had suffered chest pains and an anxiety attack induced by the "stress of her present situation." [Dkt. 35-5, Ex. GG (Medical Records) ]. Rodriguez-Coss was eventually granted sick leave from April 4, 2014 to May 12, 2014 and annual leave under the Family and Medical Leave Act from May 13, 2014 to May 30, 2014. [Dkt. 35-2 ¶ 36; Dkt. 47 ¶ 36; Dkt. 35-5, Ex. BB (Leave 3/23/14 to 4/5/14); Dkt. 35-5, Ex. CC (Sick Leave Grant) ].

*6 On May 6, 2014, Rodriguez-Coss filed a formal complaint of discrimination with the Department of Justice's EEO staff. [Dkt. 35-2 ¶ 37; Dkt. 47 ¶ 37].

Then, on May 20, 2014, Rodriguez-Coss informed CCS management that she had accepted a position with the USAO in Connecticut and was resigning from the CCS. [Dkt. 35-2 ¶ 39; Dkt. 47 ¶ 39]. Rodriguez-Coss also indicated that she intended to remain on leave for the remainder of her time with CCS. [Dkt. 35-2 ¶ 39; Dkt. 47 ¶ 39]. Rodriguez-Coss's position was converted from a Trial Attorney to an AUSA in the District of Connecticut on June 1, 2014. [Dkt. 35-2 ¶ 40; Dkt. 47 ¶ 40]. This was effectively a transfer and Rodriguez-Coss remained continuously employed by the Department of Justice. [Dkt. 35-2 ¶ 40; Dkt. 47 ¶ 40].

On March 23, 2016, the DOJ EEOC granted Rodriguez-Coss the right to a file a complaint within 30 days. [Dkt. 1 (Compl. and Exs.) at 105 of PDF]. This case was timely filed on April 21, 2016. *Id.* at 1.

Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether the burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) ). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "[t]hese determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. "Summary judgment cannot be defeated by the presentation ... of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 252). Rather, a party opposing summary judgment "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). The evidence such as affidavits offered in opposition to a motion for summary judgment must be both admissible and must be sufficient to raise a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991); *Beyah*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 461 of 520
Rodriquez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)
2018 A.D. Cases 233,217

*v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011); *Hollander v. Am. Cyanamid Co.*, 999 F. Supp. 252, 256 (D. Conn. 1998) (citing *John Hancock Prop. and Cas. Ins. Co. v. Universal Ins. Co., Ltd.*, 147 F.R.D. 40, 45 (S.D.N.Y. 1993) ); *Welch–Rubin*, 2004 WL 2472280, at *1.

**\*7** "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement ... must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. Conn. L. Rule 56(a)3; *see also* Fed. R. Civ. P. 56(e). The Local Rules also points out,

> Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law.

*Id.;* Fed. R. Civ. P. 56(e). Where there is no admissible evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment.

## Analysis

Defendant moves for summary judgment on all three grounds: (1) retaliation for conduct protected by Title VII; (2) sex discrimination in violation of Title VII; and (3) discrimination due to disability protected by the Rehabilitation Act. Defendant addresses the retaliation and disparate treatment claims under a single analysis, presumably because they both utilize the *McDonnell Douglas* framework and have overlapping facts. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). The Court will address disparate treatment first.

### I. Title VII Sex Discrimination Based on Disparate Treatment

The Complaint asserts a combined claim for discrimination on the basis of sex and parental status. [Dkt. 1 ¶¶ 31–32]. Defendant moves for summary judgment on two grounds. First, Defendant argues that the Court lacks jurisdiction over the claim of parental status discrimination because parental status is not actionable under Title VII and, instead, is only covered by Executive Order 13152. Exec. Order No. 13,152, 65 Fed. Reg. 26,115 (May 2, 2000). Importantly, the executive order explicitly states, "This Executive Order does not confer any right or benefit enforceable in law or equity against the United States or its representatives." *Id.* As a representative of the United States, Defendant thus argues that the Court lacks subject matter jurisdiction over this issue. [Dkt. 35-1 (Mot. Summ. J.) at 18]. In response, Plaintiff argues that "discrimination on the basis of parental status *per se* is not actionable under Title VII," but nonetheless argues that forms of gender discrimination can target female parents. [Dkt. 45 (Corrected Opp'n) at 2 n.1]. Therefore, Plaintiff has not contested the lack of jurisdiction over her claim of parental status. The Court construes this as a waiver of that claim and any evidence presented of disparate treatment on the basis of Plaintiff's parental status will be considered in the analysis of Plaintiff's sex discrimination claim.

**\*8** Second, Defendant moves for summary judgment against Plaintiff's gender discrimination claim by contesting her prima facie case and articulating a number of legitimate nondiscriminatory reasons for its actions. Disparate treatment claims under Title VII are analyzed under the *McDonnell Douglas* framework: (1) Plaintiff must demonstrate a *prima facie* case of sex discrimination; (2) Defendant must then offer legitimate nondiscriminatory reason(s) for its adverse employment actions; and (3) Plaintiff then bears the burden to prove that Defendant's stated reasons were pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 803–05. The parties' arguments under the sex discrimination claim will be analyzed below under this framework. [2]

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 462 of 520
**Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)**

2018 A.D. Cases 233,217

Notably, Plaintiff barely addresses the sex discrimination claim at all, relying on the arguments and evidence from the retaliation claim in only one, short paragraph. Plaintiff has failed to comply with Rule 56 by filing a rule-compliant Local Rule 56(a)(2) Statement and has submitted inadmissible material in support of her opposition to summary judgment. The Court has assessed the evidence Plaintiff cites and applies it to the appropriate discrimination standard.

A. Prima Facie *Case of Discrimination*

In order to establish a prima facie case of sex discrimination, Plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) ). Defendant only contests the third and fourth elements.

1. *Adverse Employment Action*

For an action to be adverse in a claim of discrimination it must amount to a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) ). Moreover, "[a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). For example, actions that are materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Terry*, 336 F.3d at 141). In the end of the day, "[a]n adverse employment action may or may not entail economic loss, but there must be a link between the discrimination and some tangible job benefits such as compensation, terms, conditions or privilege of employment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Defendant contends that neither Plaintiff's work and travel assignments, AWOL status, reduction and non-renewal of her Flexiplace Agreement, nor her letter of reprimand constitute adverse employment actions. [3] Plaintiff challenges each position and argues that "[a] denial of a requested accommodation can constitute an adverse employment action." [Dkt. 45 at 7]. The Court views Plaintiff's argument to be essentially the same as Defendant's workload and travel argument and will assess these positions together. The Court will then address Defendant's other arguments.

i. Workload and Travel Assignments

**\*9**  First, Plaintiff argues that Defendant did not accommodate her travel and workload. Plaintiff submitted several declarations from Plaintiff's coworkers, who opine without reference to any facts that Plaintiff was assigned more cases than other attorneys and was required to travel more than certain male attorneys. [Dkt. 46-6, Ex. F ¶ 11; Dkt. 46-7, Ex. G ¶ 16; Dkt. 46-11, Ex. K ¶ 4; Dkt. 46-1, Ex. A at 17:12–13].

Defendant presented a summary of various CCS attorneys' travel. [Dkt. 35-5, Ex. MM (Travel Summary Data) ]. [4] These records reveal that Rodriguez-Coss traveled approximately as often as, and even less often than a few, other CCS attorneys. *See id.* However, Defendant has not presented evidence that challenges the claim that her workload was burdensome.

The Second Circuit has clearly held that "the assignment of a disproportionately heavy workload can constitute an adverse employment action." *Vega*, 801 F.3d at 85 (internal quotation marks omitted). The key, however is *disproportionate*. Courts within this circuit have held that unfavorable schedules, work assignments, or excessive work are not *per se* adverse employment actions, and a plaintiff must show more than just these actions. *See Linell v. New York City Dep't of Educ.*, No. 15-cv-5085 (CBA) (ST), slip op. at 6–7 (E.D.N.Y. Mar. 30, 2018) (granting summary judgment in age- and disability-discrimination case for failure to show more); *Johnson v. Long Island Univ.*, 58 F. Supp. 3d 211, 224 (E.D.N.Y. 2014) (finding a disproportionate workload in a race and gender discrimination case when the plaintiff was assigned seven weeks of duty while other employees were only assigned two weeks). Plaintiff must therefore demonstrate a triable issue of fact that her workload was disproportionate in order to survive summary judgment.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 463 of 520

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

From 2012 through the summer of 2013, Rodriguez handled three capital cases: *Stone*, a criminal trial in the Eastern District of California; *Fell*, a habeas case in the District of Vermont; and *Pleau*, a criminal trial in the District of Rhode Island. *See* [Dkt. 46-2 at 162:21–164:16]. Rodriguez-Coss relies on affidavits submitted by her colleagues Bruce Hegyi and Julie Mosley as evidence of her disproportionate workload. *See* [Dkt. 45 at 7–8]. Attorney Mosley stated,

> During my six-year tenure in the Capital Case Section, I do not recall handling three active litigation matters simultaneously. Based on my experience, the demands of a capital litigation matter are intensified when it is pending in a district that is not particularly supportive of the death penalty and when the local United States Attorney's Office does not allocate sufficient personnel or resources to the case.

**\*10** [Dkt. 46-6 ¶ 11]. Bruce Hegyi also attested to similar matters:

> During my tenure in the CCS, I was never required to handle simultaneously three active capital matters with impending trial dates; and I am not aware of anyone other than Ms. Rodriguez-Coss who handled simultaneously that many active capital trial matters. Over my tenure at CCS, there were times when a CCS Trial Attorney had no active capital trial matters, and it seemed to me that the norm was for CCS Trial Attorneys to have one, or at most two, active capital trial matters with impending trial dates.

> \* \* \*

> In every Federal Death Penalty Act (FDPA) case that involved CCS during my tenure, the federal capital defense counsel employed a "scorched Earth" litigation approach. In my experience, most of the CCS cases that have gone to trial have in the neighborhood of 1,000 docket entries and/or pleadings.

[Dkt. 46-7 ¶¶ 16–17]. He then went on to describe the increasing demands when a capital case is before a district judge "who is hostile to the FDPA" or the USAO does not adequately assist the CCS attorney. *Id.* ¶ 17.

The Court finds that this evidence is insufficient for a jury to conclude Rodriguez-Coss's workload was disproportionate. First, Attorneys Mosley and Hegyi submitted declarations that are speculative and not quantitative. They are devoid of any facts which would allow their hypotheses to be tested. The only facts offered to establish the disproportionality of Plaintiff's workload was that there were 23-38 cases and only 13 attorneys, meaning that the caseload was necessarily disproportionate. There is also no evidence of the relative experience of the attorneys in the unit or the complexities of their caseloads. The proffered declarations represent the opinions of a small percentage of the 12 or more attorneys who worked for the CCS during 2012 and 2013.[5] Rodriguez-Coss had the opportunity to discover both from public records and the discovery process the information to make a factual showing of the relative workload of the attorneys in the unit during the relevant time frame. After all, Defendant provided the Court with a data sheet of all the attorneys' travel broken down by fiscal year, and it is likely they would have kept documentation of the caseloads in order to approve travel. The Court therefore cannot conclude, based on attorneys' affidavits, that Rodriguez-Coss's workload was disproportionate when compared to the entire office.

Second, Rodriguez-Coss's workload does not even appear disproportionate in comparison to the workload referenced in the affidavits. Attorney Hegyi stated he "was never required to handle simultaneously three active capital matters with impending trial dates," *see* [Dkt. 46-7 ¶ 16], but neither was Rodriguez-Coss. Rather, she was assigned two active criminal trial matters and one active § 2255 habeas petition. The Court cannot conclude Rodriguez-Coss's workload to be disproportionate based on Attorney Hegyi's testimony as he appears to have misunderstood her caseload as three active *criminal trials*. That Attorney Mosley never worked on three active litigation matters is of no moment because there is no basis to conclude all other CCS attorneys would testify to the same fact (i.e. that they did not have three active cases). Plaintiff cites no evidence in the record leading a reasonable jury to conclude two active criminal trials and one active habeas petition is disproportionate.

**\*11** Third, the evidence indicates Rodriguez-Coss complained to her managers only of her travel requirements, not the alleged excessive workload itself. For example, on January 6, 2014, Rodriguez-Coss sent an email to Renee Caputo regarding the shortening of her Flexiplace Agreement. *See* [Dkt. 35-5, Ex. Q]. She indicated she could not work

2018 A.D. Cases 233,217

on *Stone* because she could not be away from home for three to four months. *See id.* Of note, she expressly stated her "concerns relate primarily to [her] inability to travel, particularly to California, on a regular basis." *Id.* When explaining her case assignments with the CCS, she stated the following: "In November 2011 I received a call from Chief Carwile during which he asked whether I was willing to litigate another case. I told him that as long as the case was 'not in Alaska,' meaning not far away from my home, I would be willing to do so." *Id.* In this same email, she indicated she "agreed" to take on *Pleau* in 2012 and see *Fell* to its conclusion. *See id.*

The Court concludes that Plaintiff has not presented a triable issue of fact that her workload was excessive notwithstanding the fact that Defendant did not present any evidence speaking to her workload which is a function of more than just the number of cases. At this stage of the litigation, Plaintiff has had the opportunity to conduct discovery and present facts establishing the disproportionality of her workload. She has failed to raise a triable issue of fact. Therefore, in light of the authenticated summary chart showing Rodriguez-Coss traveled the same or less than most CCS trial attorneys, the Court finds that her assigned workload and travel did not constitute an adverse action.

Plaintiff's main argument is that Defendant's failure to accommodate her travel needs constituted an adverse action. *See* [Dkt. 45 at 7]. She cites *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 337 (S.D.N.Y. 2002), a Title VII discrimination action on the bases of race and sex. In defining "adverse action," the district court stated,

> While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify: discharge or demotion, denial of a provisional or permanent promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, <u>denial of a requested employment accommodation</u>, denial of training that may lead to promotional opportunities,

and a shift assignment that makes a normal life difficult for the employee.

*Id.* (internal citations omitted, emphasis added). The district court cited *Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230 (MBM), 1999 WL 9843, at *9 (S.D.N.Y. Jan. 11, 1999), in stating that a denial for a requested employment accommodation is an adverse action. *Pomilio* is inapposite here as it addresses a plaintiff's discrimination claim in violation of the Americans with Disabilities Act ("ADA") and corresponding New York state provision. An individual's need for a reasonable accommodation is decidedly different in the context of the ADA where "reasonable accommodation" is a statutory requirement. *See* 42 U.S.C. § 12112(a)(5)(A). Rodriguez-Coss does not assert any entitlement to relief for an ADA violation or for another basis in which a reasonable accommodation is statutorily required to be given. Furthermore, Rodriguez-Coss has provided no legal basis for the Court to extend an ADA case to this Title VII case based on these facts in evidence. She is essentially asking the Court to rule that a supervisor must give case assignments based on the requests of the employees without any legal support. The Court should not and will not usurp the role of the employer to manage its workload and employees. The Court finds that the decision not to accommodate Rodriguez-Coss's travel request and case assignments is not an adverse action.

### ii. AWOL status

Second, it is disputed whether Plaintiff's AWOL status from April 2, 2014 to April 3, 2014 constitutes an adverse action. Generally, AWOL designation is not an adverse action when employees are absent without any documented reason. *See, e.g., Pierre v. Napolitano*, 958 F. Supp. 2d 461, 479 (S.D.N.Y. 2013) (finding that plaintiff's AWOL status was not an adverse employment action because it "was the direct result of his failure to provide [medical] documentation" in support of his request for medical leave); *Lucas v. Potter*, No. 3:08CV480, 2010 WL 148451, at *8 (D. Conn. Jan. 11, 2010) (finding that AWOL status was not an adverse employment action because plaintiff neglected to provide the required medical documentation until one month after his request for sick leave). Although there are few decisions on this issue, other courts in this circuit have found that AWOL status coupled with ignorance of a request for sick leave with medical documentation qualifies as an adverse action. *See Krishnapillai v. Donahoe*, No. 09–CV–1022,

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 465 of 520

**Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)**

2018 A.D. Cases 233,217

2013 WL 5423724, at *12–13 (E.D.N.Y. Sept. 25, 2013) (finding that AWOL status and wrongful denial of sick leave constitutes an adverse employment action); *Jordan v. Potter,* No. 05-CV-3005, 2007 WL 952070, at *6, *21–22 (E.D.N.Y. Mar. 29, 2007) (on a motion to dismiss, finding an adverse employment action in a Rehabilitation Act claim—analyzed under the *McDonnell Douglas* framework—where plaintiff was wrongly declared AWOL and denied sick leave).

 **\*12**  In this case, Plaintiff did not provide medical documentation until the day after she was declared AWOL. [Dkt. 35-5, Ex. AA]. After providing the information, she was ultimately granted sick leave from April 4 through May 12 after which she took annual FMLA leave until May 30. *See* [Dkt. 35-2 ¶ 36; Dkt. 47 ¶ 36; 35-5, Ex. AA, Ex. BB, Ex. DD (Leave 4/6/14 to 5/31/14) ]. The physicians' letters indicate that Rodriguez-Coss had medical appointments for March 31, April 4, and April 7. *See* [Dkt. 35-5, Ex. GG]. Her cardiologist signed a letter dated April 8, 2014, indicating that she should not return to work until cardiac testing is completed and reviewed. *See* [Dkt. 35-5, Ex. EE (Physician Letter 4/8/14) ]. The record therefore supports Defendant's conclusion in giving Rodriguez-Coss retroactive sick leave for all days except April 2 and 3 of 2014.

Alternatively, Plaintiff argues she was denied the opportunity to attend a continuing legal education class because of her AWOL status, which "she needed urgently to maintain her law license." [Dkt. 45 at 9]. She does not allege, however, that she lost her license. Given the nearly constant stream of continuing legal education courses offered to attorneys, the Court surmises that she could have taken (and possibly did take) another course in lieu of the one she missed. *See* [Dkt. 46-1 at 51:8–52:3]. The Court finds this set back was a mere inconvenience that did nothing to materially alter the conditions of her employment or cause some other loss of tangible job benefits, given that she was not suspended and did not lose her license. *See Terry,* 336 F.3d at 138.

Moreover, Defendant withdrew Rodriguez-Coss from the training after she represented that her physician advised her to remain in Connecticut under care and not travel to Washington D.C. The Court is in a quandary how, under those facts, she could allege she was harmed by her inability to attend a training in North Carolina when she was advised to remain under her doctor's care. *See* [Dkt. 35-5, Ex. EE]. For these reasons, Rodriguez-Coss's AWOL status does not qualify as an adverse employment action.

### iii. Letter of Reprimand

Third, it is Defendant's position that Rodriguez-Coss's letter of official reprimand did not constitute an adverse action. "Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, and whether they do is typically a question of fact for the jury." *Lawrence v. Melhman,* 389 F. App'x 54, 56 (2d Cir. 2010) (Title VII discrimination case citing Second Circuit cases); *see McKinney v. Dep't of Transp.,* 168 F. Supp. 3d 416, 423 (D. Conn. 2016) (recognizing in a Title VII race discrimination case that an adverse employment action includes reprimand) (citing *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999) (First Amendment retaliation), *abrogation recognized on other grounds by Montero v. City of Yonkers,* 196 F.3d 102, 110 (2d Cir. 1999) ); *Abraham v. Potter,* 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (acknowledging a reprimand may constitute an adverse action in a Title VII discrimination suit); *see generally Sanders,* 361 F.3d at 756 (recognizing in a Title VII discrimination case that a negative job evaluation may cause an adverse action).

Typically, district courts in this circuit have held that reprimands, without more, are not adverse actions in employment discrimination suits. *See Abraham v. Potter,* 494 F. Supp. 2d 141, 147 (D. Conn. 2007) (applying the "reprimand plus other negative results standard"); *Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) (holding that no adverse employment action occurred where plaintiff was unfairly scrutinized and informally reprimanded for tardiness, when monitoring and reprimands did not result in decrease in pay, probation, or other negative consequence); *c.f. Stembridge v. City of New York,* 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (finding a reprimand was not an adverse action because it did not indicate "any planned discipline or further action," but acknowledging "[a]n adverse employment decision is actionable under Title VII when it relates to an employee's '[c]ompensation, terms, conditions, or privileges of employment,' or involves a classification which '[w]ould deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.' ") (quoting 42 U.S.C. § 2000e-2(a) ).

 **\*13**  Defendant issued the official reprimand on January 6, 2014 in which it cited Plaintiff's refusal to litigate and travel for the *Stone* trial as the basis for the reprimand.[6] [Dkt. 35-5, Ex. R]. Rodriguez-Coss previously discussed this issue with her supervisors on multiple occasions. *See, e.g.,* [Dkt.

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

46-4, Ex. D at 48:4–9, 53:6–19, 91:7–10]. The Court observes that Plaintiff did not experience any changes in her terms of conditions directly after receiving the letter of reprimand. The letter was deemed to be "constructive in nature" and cautioned that "future misconduct may lead to more formal disciplinary action being proposed against you, up to and including removal from the federal office." [Dkt. 35-5, Ex. R]. The Court questions the letter of official reprimand was an adverse action. However, in light of the previous discussions (leading the Court to conclude this was not the first time Plaintiff was made aware of the issue), the subsequent non-renewal of her Flexiplace Agreement, and in consideration of the prevailing case law, the Court assumes without deciding the letter of reprimand was an adverse action.

### iv. Flexiplace Agreement Denial

The remaining actions addressed by Defendant is the reduction and subsequent non-renewal of Plaintiff's Flexiplace Agreements. The Second Circuit has not addressed whether the denial or non-renewal of work-from-home status or telecommuting privileges constitutes an adverse action. *See Martinez-Santiago v. Zurich N. Am. Ins.*, No. 07 Civ. 8676, 2010 WL 184450, at \*7 (S.D.N.Y. Jan. 20, 2010). In *Martinez-Santiago*, the plaintiff was pregnant and received telecommuting status for the few weeks leading up to her due date. She took leave after giving birth and then sought permission to telecommute a few days per week "in order to observe the level of care being given to her son by the new caretaker." *See id.* at \*3. The plaintiff maintained that the accommodation would be temporary to resolve the unanticipated day care problem. *Id.* Her employer denied the request, which gave rise to the litigation. In ruling that the telecommuting denial did not constitute an adverse employment action, the district court stated the denial "was a short term inconvenience that did not rise to the level of an adverse employment action." *Id.* at \*7. The district court cited numerous cases finding such denied requests did not constitute an adverse action, but it nonetheless acknowledged that "there may be some situation where the denial of a request to work from home qualifies as an adverse action...." *Id.*

The Court has assessed these cases and finds they differ in one key respect: unlike the plaintiffs in those cases, the plaintiff in this case had been working remotely for over three years prior to the non-renewal of her Flexiplace Agreement. After electing not to renew the Flexiplace Agreement, Defendant gave her only one month to return to D.C. *See* [Dkt. 35-5, Ex.

Y]. This would have forced her to quickly relocate herself, her small children and husband; leave them behind; or quit her job. Indeed, over the span of three years, Plaintiff lived in Connecticut and established deep roots to her home. Her young children spent three years growing accustomed to their school and her husband's career was based in Connecticut. CCS management was patently aware of Plaintiff's familial situation; after all, Plaintiff began working in Connecticut as a direct result of her husband's work transfer and her requests for accommodation frequently referenced her children. On the other hand, she knew from the onset it was a temporary arrangement.

It is worth noting that Carwile initially offered her the Flexiplace Agreement in 2010 to keep her with the CCS. *See* [Dkt. 46-5 at 109:14–110:6]. He explained, "I believed that she was leaving to move to Connecticut and that the only way that I would be able to, perhaps, have a discussion with her about having a long distance work arrangement for some period of time would be pursuant to some sort of arrangement like this." *Id.* at 110:20–111:3. His knowledge that a Flexiplace Agreement was necessary to keep her with the CCS suggests Defendant foresaw her resignation should the non-renewal be issued.

**\*14** Clearly, this non-renewal is more than just an "inconvenience or an alteration of job responsibilities." *Terry*, 336 F.3d at 138. Given Carwile's motivation in issuing the Flexiplace Agreement and the length of time she worked remotely, a reasonable jury could determine it is a material change in the terms and conditions of her employment if not a calculated effort to squeeze Rodriguez-Coss out of employment. *See Galabya*, 202 F.3d at 640.

### 2. *Inference of Discriminatory Intent*

The Court now addresses whether Defendant's actions surrounding the letter of reprimand or the non-renewal of the Flexiplace Agreement gives rise to discriminatory intent.

With respect to the fourth element of the *prima facie* case, all that is needed is "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation...." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (internal quotation marks omitted); *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (stating the *prima facie* burden is minimal). "Because an employer who discriminates is unlikely to leave

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 467 of 520

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). [7]

Examples of circumstantial evidence giving rise to a discriminatory inference include, "but [are] not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted); *Chambers*, 43 F.3d at 37; *c.f. Vill. of Freeport v. Barrella*, 814 F.3d 594, 601 n.9 (2d Cir. 2016) ("But we have nonetheless suggested that a plaintiff may be able to plead a prima facie case under Title VII even without showing that the defendant favored someone outside of the plaintiff's protected class."). Plaintiff lists general principles about Defendant's discriminatory motive without alerting the Court to specific evidence.

First, she alleges Carwile and Kinsey are sexist and "biased in favor of male and against female CCS attorneys." This appears to be an argument that similarly situated male employees were treated more favorably. *See Littlejohn*, 795 F.3d at 312. "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010).

A plaintiff makes a *prima facie* case for an inference of discrimination "by showing that a similarly situated individual not in [plaintiff's] protected group ... was treated differently." *Tramble v. Columbia Univ.*, No. 97 Civ. 1271 (RWS), 1999 WL 61826, at *5 (S.D.N.Y. Feb. 10, 1999) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) ). In order to be similarly situated, plaintiff must be similarly situated in all material respects to her comparator. *Shumway*, 118 F.3d at 64. One measure of whether two employees are similarly situated is whether they have comparable experience. *See Bandhan v. Lab. Corp. of Am.*, 234 F. Supp. 2d 313, 317-18 (S.D.N.Y. 2002); *Shumway*, 118 F.3d at 64; *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 999 (S.D.N.Y. 1999). Plaintiff does not identify any individuals, compare herself to any particular individual

or individuals, or provide any legal argument allowing the Court to assess those who were similarly situated.

**\*15** Without any evidence speaking to the CCS attorneys' performance evaluations, discipline standards, experience, or their caseloads, the Court will not make assumptions on behalf of Plaintiff. *See Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); D. Conn. Civ. L. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and when the opponent fails to comply, an order granting the motion if the motion and supporting materials show that the movant is entitled to judgment as a matter of law."). The Court will not consider the attesting attorneys' qualified opinions that male attorneys were often given more desirable and high profile cases, whereas female attorneys were more likely to be assigned to cases in remote districts before courts that were hostile to the death penalty. *See* [Dkt. 46-6 ¶ 5; Dkt. 46-7 ¶ 7; Dkt. 46-8 ¶ 12]. The affidavits do not elucidate who these male attorneys were, whether they should properly be considered similarly situated, and the basis on which the profile or desirability of a case can be evaluated. For the same reason, the Court will not conclude discriminatory intent based solely on Plaintiff's statement that in the summer of 2012 she complained that her male coworker was given a travel accommodation while she was not, because she does not assert he was similarly situated. *See* [Dkt. 45 at 6; Dkt. 46-1 at 17:8-19; *see* Dkt. 35-5, Ex. Q (email from 01/06/2014 documenting his travel accommodation) ].

Second, she alleges "comments by the decision maker" were made against her protected group. *See* [Dkt. 45 at 10]. The central question in evaluating remarks is whether they have a "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Vogel v. CA, Inc.*, 662 Fed. App'x. 72, 75 (2d Cir. 2016) (emphasis added) (age discrimination); *see Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (citing *Tomassi* in a Title VII discrimination case). In other words, "the more remote and oblique the remarks are in relation to the employer's adverse

2018 A.D. Cases 233,217

action, the less they prove that the action was motivated by discrimination." *Tomassi, 478 F.3d at 115*. A helpful framework to consider is "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry, 616 F.3d at 149* (establishing these factors in the context of determining the probative value under *Fed. R. Evid. 403*).

The Court finds instructive *Norris v. New York City Housing Auth.*, No. 02 Civ. 6933 (RJH), 2004 WL 1087600, at *10 (S.D.N.Y. May 14, 2004). In this Title VII disparate treatment and retaliation case, the plaintiff, an African American woman, submitted an affidavit from a former supervisor who averred that the director of the office "disparaged [the plaintiff's] Afrocentricity, manner of dress, hairstyles, and reading materials...." *Id.* The district court held that the allegations failed to "identify the content, place, or time of the remarks, and is devoid of details from which such animus could be inferred." *Id.* In support, the court cited several cases in this circuit that find a "stray remark" remote from any connection to the adverse action is insufficient to show an inference of discrimination. *See id.* (citing *Eastman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 264–65 (S.D.N.Y. 2002); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000); *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000); *Sanders v. Mount Sinai Med. Ctr.*, No. 98 Civ. 828, 1999 WL 1029734 (S.D.N.Y. Nov. 10, 1999) ). Affidavits submitted on behalf of Rodriguez-Coss must likewise provide some specificity linking the comments to the adverse action in a way where discriminatory intent may be inferred—otherwise, they are mere stray remarks.

Rodriguez-Coss generally cites the affidavits she submitted without pointing the Court to the particular comments made or, at times, who made them. A number of Plaintiff's coworkers testified that CCS management gave male attorneys preferential treatment and, at least once, expressed a derogatory opinion of women. AUSA Haines recalled that Carwile once said that "women only go to law school to find rich husbands." [Dkt. 46-8 ¶ 12]. Carwile once attempted to conceal an incident where Kinsey groped a female employee. [Dkt. 46-12 ¶¶ 6–8]. The Court has evaluated these affidavits and finds they fail to (a) specify the time period when any alleged invidious comment was made and/or (b) come from

a decision-maker. *See, e.g.,* [Dkt. 46-6 ¶ 6; Dkt. 46-7 ¶ 9; Dkt. 46-8 ¶ 12; Dkt. 46-10 ¶ 4]. Nor do these comments rise to the legal of invective held to be sufficient to constitute discriminatory intent in this circuit. *See Norris*, 2004 WL 1087600, at *10; *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 316–17 (E.D.N.Y. 2012); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (finding in an age discrimination case that stray remarks of a decision-maker, without more, is insufficient to show an inference of discrimination); *Tomassi, 478 F.3d at 114–15* (distinguishing stray remarks from comments evincing a discriminatory state of mind). The Court cannot conclude, based on the evidence submitted, that the comments show the letter of reprimand or the non-renewal of the Flexiplace Agreement were motivated by discrimination. *See Tomassi, 478 F.3d at 116*.

**\*16** Accordingly, Plaintiff has failed to show that Defendant acted with a discriminatory intent when it issued the letter of reprimand and did not renew the Flexiplace Agreement.

### B. *Legitimate Nondiscriminatory Reason*

Assuming *arguendo* Plaintiff had met her burden, the Court will now address Defendant's proffered legitimate nondiscriminatory reason for the adverse actions detailed above.

The Court first addresses the letter of official reprimand. The letter is based on Rodriguez-Coss's refusal to litigate *Stone* and it states, "You cannot unilaterally refuse to handle a case or change your work assignments to accommodate your personal preferences." [Dkt. 35-5, Ex. R]. Essentially, Defendant explained that its actions were a response to Plaintiff's unwillingness to perform the same work as every other CCS attorney. Defendant contends that Plaintiff's work assignments and travel were no more burdensome than any other CCS attorney. *See* [Dkt. 35-1 at 24]. Refusal to do work assignments constitutes a legitimate, non-discriminatory reason for an adverse action. *See Becker v. Ulster Cty., NY*, 167 F. Supp. 2d 549, 554 (N.D.N.Y. 2001) ("Defendants assert that Becker was terminated for excessive absenteeism and refusal to work on January 2 and 12, 2000. This suffices for defendants to meet their burden at the second step."); *see generally Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 469 of 520
Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)
2018 A.D. Cases 233,217

The Court next addresses the non-renewal of the Flexiplace Agreement. On February 24, 2014, Carwile emailed Rodriguez-Coss informing her that he would not be renewing her Flexiplace Agreement set to expire in four days. He stated,

> As you know, use of the flexiplace agreement is within management's discretion and is not an entitlement. Due to revelations over the last 2 weeks that were brought to my attention which relate to missed deadlines and other deficiencies in court filings, I have determined that more direct supervision of your work is needed. As a result, I do not intend to renew your flexiplace agreement upon its expiration.

[Dkt. 35-5, Ex. Y]. Indeed, approximately two weeks prior Kinsey was notified for the first time of Rodriguez-Coss's late filings in the *Stone* case. [Dkt. 35-5, Ex. I (Kinsey Dep. Excerpt) at 159:22–162:8; Dkt. 35-5 Ex. W (Email 2/10/14) ].

The late filings were numerous and resulted in several strongly-worded reprimands from federal judges. On February 5, 2013, Magistrate Judge Austin addressed one of the defendant's discovery motions during an in-person hearing and the government's late response. Magistrate Judge Austin stated, "There was a delay, a tardy delay of about five or so days. And I would just like an explanation at the end of these proceedings as to why that happened. Because I don't want to let either side think that deadlines that the court set will simply be not considered seriously by the Court." [Dkt. 35-5, Ex. G, at 14:3–8]. When Rodriguez-Coss stated the late filing was a mistake, Magistrate Judge Austin responded, "Which tells me that you missed reading the orders that emanated from the Court. Because it distinctly gave you a date set for the response." *Id.* at 14:9–17.

*\*17* On October 21, 2013, Judge Coughenour issued a ruling that granted the defendant's motion for extension of time. *See* [Dkt. 35-5, Ex. K]. The government filed its response late, and Judge Coughenour stated the following:

> [T]he Court cannot take the government's arguments demanding that Defendant comply with the "established deadline" seriously when the government made those arguments in a document filed more than three weeks late. Indeed, the government has demonstrated a cavalier attitude towards obeying deadlines and other procedural requirements, and thus its demand that the Court refuse to grant Defendant an extension of time after a timely motion is audacious at best. The inability of the attorneys representing the United States to obey court orders and deadlines has significantly lowered their credibility with the Court. Counsel are forewarned that the Court is seriously considering an order to show cause why government counsel should not be held in contempt for their flagrant disregard of the Court's orders.

*Id.* Judge Coughenour cited nine instances in 2013 in which Plaintiff's performance fell below an acceptable standard. He cited six late filings in 2013 for which the government did not show good cause and three deficient filings in 2013. *See id.*

The next month, Magistrate Judge Austin also issued an order acknowledging the government's pattern of untimely filings, *see* [Dkt. 35-5, Ex. L], issued a discovery order noting a deficient submission to the court, *see* [Dkt. 35-5, Ex. M (Supp. Disc. Order 11/8/13) ], and granted a late filing, *see* [Dkt. 35-5, Ex. N]. With respect to the order granting the late filing, Magistrate Judge Austin stated, "[T]he United States is *again* cautioned that future late filings in this case will not be tolerated and will likely result in the imposition of sanctions." *See* [Dkt. 35-5, Ex. N, at 2 (emphasis in original) ]. Magistrate Judge Austin also acknowledged that both he and Judge Coughenour have noted the government's pattern of late filings. *See id.* at 2 n.2.

Notwithstanding these admonitions, Rodriguez-Coss missed another deadline set by the court and on February 4, 2014, she filed a motion *nunc pro tunc* requesting court's permission

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 470 of 520

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

to file a document after the deadline. *See* [Dkt. 35-5, Ex. V (Mot. 2/4/14) ].

It is well-settled that poor performance is a legitimate, nondiscriminatory reason for an employer's adverse action. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (reversing on the grounds of sufficient pretext, but acknowledging district court held defendant had "seemingly legitimate, non-discriminatory reasons for firing [plaintiff] —primarily, poor performance reviews and affidavits from three regional managers whom [plaintiff] supervised"); *Jain v. McGraw-Hill Cos., Inc.*, 506 F. App'x. 47, 48 (2d Cir. 2012) (stating plaintiff's poor work performance was a legitimate, non-discriminatory reason for terminating plaintiff's employment in an FMLA case); *see also Forrester v. Prison Health Servs.*, No. 12 CV 363(NGG)(LB), 2015 WL 1469521, at *15 (E.D.N.Y. Jan. 5, 2015) ("Misconduct, excessive lateness, and poor performance are legitimate, non-discriminatory reasons for defendants' adverse actions."). In this case, Rodriguez-Coss's clear and repeated failures to timely and properly submit court filings was egregious and caught the attention of not just one, but two federal judges. It is a rare case in which this Court observes an attorney's failure to comply with deadlines as consistent as that of the government in *Stone*. Such a performance would clearly warrant closer monitoring from a supervised attorney.

### C. Pretext for Discrimination

**\*18**  Because Rodriguez-Coss could not show an inference of discriminatory intent, she also cannot show Defendant's legitimate, nondiscriminatory reasons are pretext.

The Court also notes that the supervisors' apparent absentee-style of working does not mean that the non-renewal of the Flexiplace Agreement was pretext for discrimination. *See* [Dkt. 45 at 8]. There is no basis to conclude the supervisors, in light of Rodriguez-Coss's persistent delinquency in the *Stone* case, would not have supervised her more closely if she was working in Washington, D.C. than they did when she was working in Connecticut. At the very least, changing her duty station to Washington, D.C. would have enabled them to discern the amount of hours she was devoting to the performance of her duties.

### II. Retaliation for Conduct Protected by Title VII

In support of her retaliation claim, Plaintiff has put forward two theories of retaliatory conduct: (i) retaliation by creating a hostile work environment and (ii) retaliation directly in response to plaintiff's grievances.

### A. Retaliatory Hostile Work Environment

With respect to the hostile work environment theory, Defendant argues that Plaintiff has not provided evidence of any conduct that rises above the level of "ordinary workplace conflicts." [Dkt. 35-1 at 35]. In support, Defendant draws the Court's attention to numerous cases that support the general proposition that a claim of retaliatory hostile work environment requires repeated instances of severe harassment that create an abusive workplace environment. *Id.* at 11, 34; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct."); *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005) (requiring that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" to establish a hostile work environment), *abrogation recognized on other grounds by Chung v. City Univ. of New York*, 605 F. App'x 20 (2d Cir. 2015); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) ("The incidents [of harassment] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). Although the Plaintiff makes passing references to the legal standard of a hostile work environment, she does not provide any legal or factual analysis as to this type of retaliation claim. [*See* Dkt. 45 at 3–4, 5–11]. The Court has reviewed the evidence and finds Plaintiff has not provided any evidence of repeated workplace harassment targeting her because of her grievances. Therefore, Plaintiff has not met her burden to bring forward evidence supporting her hostile work environment claim and has not established a genuine dispute of fact on this claim.

### B. Discrete Retaliatory Actions

Under Title VII, it is unlawful for an employer to retaliate against employees who oppose discriminatory practices or file complaints of discriminatory treatment. 42 U.S.C. § 2000e-3(a) (2012). When analyzing retaliation claims, courts apply the *McDonnell Douglas* burden-shifting framework. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 471 of 520
Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)
2018 A.D. Cases 233,217

*also McDonnell Douglas*, 411 U.S. at 802–05. Initially, the plaintiff must establish a prima facie case by demonstrating "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) ). Thereafter, there is a presumption of retaliation that the defendant must rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Finally, if the defendant proffers such a reason, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action. A plaintiff can sustain this burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]. *Hicks*, 593 F.3d at 164–65 (alterations in original) (internal quotations omitted).

### 1. Prima Facie Case *of Retaliation*

**\*19** Defendant contends that Plaintiff has failed to establish a prima facie case primarily because her protected activity occurred well after the actions she argues constitute retaliation. [Dkt. 35-1 at 22].

Defendant argues that Rodriguez-Coss does not have a valid retaliation claim because she filed her EEOC complaint in January of 2014, her employer became aware of the filing in February 2014, and there is no adverse action that is causally connected to the filing. [Dkt. 35-1 at 22]. Plaintiff does not dispute this but rather asserts that the protected activity is different: that in the summer of 2012 she complained Defendant gave a travel accommodation to a white male, Stanley Rothstein, but not to her. *See* [Dkt. 45 at 6]. Defendant's response to this position is that she did not actually complain of discriminatory treatment, but rather was only attempting to get a travel accommodation for herself. [Dkt. 48 at 10–14].

Assuming Rodriguez-Coss's alleged complaint in the summer of 2012 was a protected activity, she cannot show any causal connection to an adverse action. The adverse action standard for Title VII retaliation is slightly different from that of discrimination. The Supreme Court in *Burlington N.*

*& Santa Fe R.R. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.Ed. 2d 345 (2006), expanded the definition of an adverse action for Title VII retaliation claims to include changes in employment outside the terms and conditions of employment. *See id.* at 64. The Supreme Court held that an adverse action in the retaliation context means "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. The Court must thus consider alleged adverse actions that would not necessarily be cognizable under a discrimination claim.

Most of the alleged adverse employment actions—namely, the letter of reprimand, the Flexiplace Agreement non-renewal, and the AWOL status—were issued more than 1.5 years after the summer of 2012. When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation. *Clark Cty. School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *McCormick v. Donovan*, 365 F. App'x 247, 249 (2d Cir. 2010) (affirming district court's dismissal of *pro se* Title VII retaliation claim where the 1.5 years delay between the alleged protected activity and adverse action was "insufficient to suggest a causal relationship"); *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 3:04cv1707 (PCD), 2006 WL 2642415, at \*25 (D. Conn. Sept. 13, 20106) (finding 13 months to be insufficient to show causal connection between the complaint and the termination); *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010) (nine month period between protected conduct and retaliation did not support causation); *see generally Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51, 75 (D. Conn. 2014) (finding a 15 month delay to be insufficient to support a causal connection in an FMLA case); *but see Summa v. Hofstra Univ.*, 708 F.3d 115, 128–29 (2d Cir. 2013) ("The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote."). Therefore, these actions are too temporally remote to warrant a causal connection.

**\*20** The only alleged adverse action that is close in time to the summer of 2012 is the alleged excessive workload and failure to accommodate travel and workload needs. The evidence shows that Rodriguez-Coss took on the *Fell* case in the District of Vermont and the *Stone* case in California in 2011, which is before she complained to the CCS about the travel accommodations. [8] [Dkt. 35-5, Ex. Q]. She admits that

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 472 of 520

Rodriguez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

she agreed to take on *Pleau* in June of 2012. *Id.* The Court notes that she could have taken all three assignments before she complained about Rothstein's travel accommodations, but it will put this possibility aside for now. The fact of the matter is there is simply no evidence supporting a conclusion that her workload assigned in the summer of 2012 could be causally connected to her alleged protected activity given that she was asked and agreed to take on the case. The Court will not consider the failure to accommodate her as she has not shown a legal basis for concluding a requested accommodation is a cognizable adverse action in the context of her particular Title VII discrimination and retaliation claim. Rodriguez-Coss therefore fails to establish a *prima facie* case.

The Court need not address the second and third prongs because Rodriguez-Coss willingly took on the third assignment.

### C. Rehabilitation Act of 1973

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination ... under any program or activity conducted by any Executive agency...." 29 U.S.C. § 794(a) (2012). Furthermore, the Act instructs that claims of discrimination are interpreted in accordance with the standards applied under the Americans with Disabilities Act. 29 U.S.C. § 794(d). Accordingly, the standard for a prima facie case of discrimination under the Rehabilitation Act requires Rodriguez-Coss to show:

> (1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.

*Dean v. Univ. at Buffalo Sch. of Med. & Biochemical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) ). However, in Plaintiff's memorandum in opposition to summary judgment, Plaintiff neglected to designate which facts in the voluminous record support her claim under the Rehabilitation Act. Instead, Plaintiff baldly claims "[t]he record also shows that Rodriguez-Coss was perceived to have a temporary disability" without a single citation to the record, nor even reference to facts that might support her claim. [Dkt. 45 at 12]. Vague references to the record are not enough; Federal Rule of Civil Procedure 56 makes quite clear that a party must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Moreover, Rule 56 also warns counsel that a court need only consider the materials cited to decide the motion. Fed. R. Civ. P. 56(c)(3).

Plaintiff's Rehabilitation Act claims falls at the first hurdle, since none of the facts cited in her memorandum support a finding of disability. Plaintiff did not produce a scintilla of evidence demonstrating the medical conditions alleged in her complaint. *See* [Dkt. 1 ¶¶ 21–22]. Therefore, Plaintiff has failed to establish a *prima facie* case and there is no genuine dispute of fact in regards to her Rehabilitation Act Claim.

Even if she was disabled, the only adverse action taken after she claimed to have been ill was the cancellation of her attendance at a training program in North Carolina. However, Plaintiff informed Defendant that she could not travel to Washington, D.C. because she needed to remain in Connecticut under the care of her doctors. Because Plaintiff was required to remain in Connecticut she has failed to show that the cancellation of her trip to North Carolina was an adverse employment action.

### Conclusion

**\*21** For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3213290, 2018 A.D. Cases 233,217

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 473 of 520

Rodriquez-Coss v. Sessions, Not Reported in Fed. Supp. (2018)

2018 A.D. Cases 233,217

---

## Footnotes

1    Prior to joining the CCU, Rodriquez-Coss previously served as an Assistant U.S. Attorney in the District of Maryland and the District of Puerto Rico. [Dkt. 35-2 ¶ 1; Dkt. 47 ¶ 1].

2    Plaintiff neglected to include any citations to the record in the section of her memorandum supporting her sex discrimination claim. Therefore, the Court will only consider the evidence cited in support of her retaliation claim.

3    Of note, Plaintiff does not expressly assert a constructive discharge claim in the Complaint. *See* [Dkt. 1]. She did, however, claim Defendant's conduct resulted in her constructive discharge in the Joint Rule 26(f) Report, which was signed by both parties. *See* [Dkt. 26 at 2]. Constructive discharge is one example of a materially adverse action. *See Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 359 (2d Cir. 1993). "An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Terry*, 336 F.3d at 151–52. Intolerable working conditions are those that "when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* at 152 (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) ). The discrepancy between the two filings elucidates how murky these claims are. The Court surmises the constructive discharge has been subsumed into the argument that the non-renewal of the Flexiplace Agreement is an adverse action and that Plaintiff intended not to raise a separate constructive discharge claim. This conclusion is also necessitated by the fact that a pleading can only be amended by re-pleading and not in a memorandum of law or other document filed in a case. *See Doe v. Torrington Bd. of Educ.*, 179 F. Supp. 3d 179, 189 n.3 (D. Conn. 2016); *Auguste v. Dep't of Corrs.*, 424 F. Supp. 2d 363, 369 (D. Conn. 2006).

4    Plaintiff objects to the admission of this summary chart on the basis that it is not a CCS document and does not qualify as a business or Government record, and it was not produced during discovery. *See* [Dkt. 47 ¶ 41]. The Court agrees with Defendant that this chart is admissible as a summary chart under Rule 1006 of the Federal Rules of Civil Procedure, as it is authenticated by Chief Financing Officer Stacey Bass and the original can presumably be inspected if the Court were to order the production. *See* [Dkt. 35-5, Ex. LL (Bass Decl.) ]. The Court need not do so, however, because Plaintiff never requested to inspect the originals and does not object on Rule 1006 grounds.

5    The record shows that 12 attorneys traveled for the CCS in fiscal year 2012 and 14 attorneys traveled for the CCS in fiscal year 2013. *See* [Dkt. 35-5, Ex. MM]. The Court recognizes this may not be reflective of the entire CCS attorney list. Kinsey testified that there were approximately 13 attorneys working for CCS at the time of his deposition on August 2, 2017. *See* [Dkt. 46-4 at 118:21-120:2].

6    The reprimand does not reference her delinquent filings in the *Stone* case, as her supervisors did not find out about that issue until February 10, 2014. *See* [Dkt. 46 at 159:22–160:13-22].

7    Plaintiff argues "the declarations of the present and former CCS attorney declarants in many instances constitute direct evidence of discrimination." [Dkt. 45 at 10]. Plaintiff does not, however, point the Court to any such direct evidence.

8    Indeed, her assignment to the *Stone* case is what gave rise to her need for a lighter travel requirement.

---

2018 A.D. Cases 233,217

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4122616
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

VESTED BUSINESS BROKERS, LTD., Plaintiff,
v.
COUNTY OF SUFFOLK, Suffolk County Police
Department, Detective Thomas Gabriele (Shield #
1203), Richard Dormer, Alexander J. Caro, Kieran
Rodgers, Bridge Business & Property Brokers,
Inc., Joseph Holstein, Zygmund Marszalek, Arrow
Security, Inc., John and Jane Does 1-10, Defendants.

16-CV-4945 (JMA)(SIL)
|
Signed 09/15/2017

**Attorneys and Law Firms**

Alexei M. Schacht, New York, NY, for Plaintiff.

L. Adriana Lopez, Suffolk County Attorney's Office,
Hauppauge, NY, William C. Goggins, Mattituck, NY, Gayle
Sharon Gerson, Silvermanacampora LLP, Robert J. Ansell,
Silverman, Perlstein & Acampora, LLP, Jericho, NY, for
Defendants.

Joseph Holstein, Farmington, CT, pro se.

**MEMORANDUM AND ORDER**

STEVEN I. LOCKE, United States Magistrate Judge

**\*1** Presently before the Court are three motions to
dismiss Plaintiff Vested Business Brokers, LTD's ("VBB" or
"Plaintiff") Complaint ("Compl.") filed by: (1) Defendants
Alexander J. Caro ("Caro"), Bridge Business & Property
Brokers, Inc. ("Bridge"), and Arrow Security, Inc. ("Arrow");
(2) Zygmund Marszalek ("Marszalek") (collectively "Private
Defendants"); and (3) the County of Suffolk ("Suffolk
County"), the Suffolk County Police Department ("SCPD"),
Detective Thomas Gabriele ("Det. Gabriele"), and Richard
Dormer ("Dormer") (collectively "County Defendants"). [1]
*See* motion to dismiss ("Caro Motion"), Docket Entry ("DE")
[31]; motion to dismiss ("Marszalek Motion"), DE [34],
motion to dismiss ("County Motion"), DE [38]; *see also*
Compl., DE [1]. On April 14, 2017, Judge Azrack referred
these motions to this Court for a Report and Recommendation

as to whether they should be granted. *See* DE [41]. On April
26, 2017, pursuant to 28 U.S.C. § 636(c), the parties filed an
executed Notice, Consent, and Reference of a Civil Action
to a Magistrate Judge, indicating their intention to have this
Court "conduct all proceedings and order the entry of a final
judgment" on the motions, which Judge Azrack So Ordered
on the same date. *See* DE [41, 42]. For the reasons set forth
herein, the motions to dismiss are granted in their entirety with
prejudice.

**I. STATEMENT OF RELEVANT FACTS**
The following facts, set forth in the Complaint and
the attached exhibits, are presumed true for purposes of
Defendants' motions.

The gravamen of Plaintiff's claims are that, due to a
conspiracy amongst the Private and County Defendants,
the County Defendants failed to properly investigate and
prosecute the Private Defendants for crimes committed
against VBB. *See* Compl. ¶ 43. VBB is a web-based
business designed to allow independent contractor-brokers
to arrange the purchase and sale of other businesses. *See
id.* ¶¶ 8, 21. Plaintiff allegedly created a proprietary system
called "Broker Net" which contains more than 225,000 pre-
qualified, registered business buyers as well as the financial
details of approximately 12,000 businesses for sale. *Id.* ¶
21. In order to safeguard financial details, VBB requires
all of its employees and independent brokers to execute
non-disclosure and restrictive covenant agreements prior to
receiving a password to enter the Broker Net system. *Id.* ¶ 24.

On or about January 16, 2004, VBB and Defendant Kieran
Rodgers ("Rodgers") entered into an employment agreement
and executed a non-disclosure and restrictive covenant
agreement. *Id.* ¶ 25. Around the same time, Defendant Caro
founded Bridge Business and Property Brokers, Inc. and
"decided to build Bridge's business by stealing confidential
information, including business listings, training information
and other processes and procedures, and listing pitches and
sales techniques from VBB." *Id.* ¶ 27. To that end, in
2006, Caro approached Rodgers and asked him to steal leads
and other proprietary information from Plaintiff, and for a
confidential VBB log-in username and password. *Id.* ¶¶ 29,
31. According to the Complaint, Defendants Joseph Holstein
("Holstein") and Marszalek, also worked with Caro and
Rodgers to steal listings and other confidential information
from VBB. *See id.* Sometime thereafter, Plaintiff allegedly
confronted Rodgers about his conduct and he confessed. *See
id.* ¶ 37. Subsequently, VBB filed complaints with, and turned

over evidence to, the SCPD about the Private Defendants' alleged crimes. *Id.* ¶ 39. The SCPD, however, failed to make any arrests, and Plaintiff's complaint was closed in November 2015. *Id.* ¶ 42.

## II. PROCEDURAL HISTORY

**\*2** As set forth above, VBB filed its Complaint on September 5, 2016. *See* DE [1]. The Complaint seeks money damages and equitable relief for: 1) violations of the Fourteenth Amendment of the U.S. Constitution made pursuant to 42 U.S.C. § 1983; 2) conspiracy claims made pursuant to 42 U.S.C. §§ 1985(3) and 1986; 3) breach of contract; 4) tortious interference with contract; 5) misappropriation; and 6) an injunction against Rodgers, Caro, and Bridge. *See generally* Compl. In response, on February 13th, 16th, and 17th, 2017, Caro, Bridge, and Arrow, as well as Marszalek and the County Defendants, respectively, moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) to dismiss. *See* DE [31, 34, 38]. On March 16, 2017, Judge Azrack referred the motions to this Court for Report and Recommendation. *See* DE [41]. On April 26, 2017, the motions to dismiss were referred to this Court to conduct all proceedings and enter a final order on the motions in accordance with 28 U.S.C. § 636(c). *See* DE [47].

## III. LEGAL STANDARD

### A. Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). Notwithstanding, "threadbare recitals

of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal. *See Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted).

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court may consider:

> (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated ... by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint relies heavily, *i.e.,* documents that are "integral" to the complaint.

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (internal citation omitted); *see also Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 425 (S.D.N.Y. 2008) ("[I]n assessing the legal sufficiency of a claim, the court may consider only the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference.").

## IV. DISCUSSION

Applying the standards outlined above, and for the reasons set forth herein, the Court grants Defendants' respective motions to dismiss in their entirety with prejudice. Plaintiff asserts several federal causes of action made pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986 based upon alleged violations of its rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Initially, the Court considers the Private and County Defendants' argument that these claims are barred by the applicable statutes of limitations and, alternatively, fail to state a claim upon which relief can be granted. The Court then considers the remaining state law claims.

### A. Conversion to a Motion for Summary Judgment

**\*3** As a preliminary matter, the Court considers whether the affidavits annexed to the County Defendants' motion

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 477 of 520

Vested Business Brokers, Ltd. v. County of Suffolk, Not Reported in Fed. Supp. (2017)

and Plaintiff's opposition papers converts that motion to one for summary judgment. On a 12(b)(6) motion, "[i]f matters outside the pleadings are presented to the court, a court may convert the motion to dismiss into a summary judgment motion." *Vailette v. Lindsay*, No. 11-CV-3610, 2014 WL 4101513, at *3 (E.D.N.Y. Aug. 18, 2014); *see also Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) ("When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.") (internal quotation marks and alterations omitted). Although the court "must ordinarily give notice to the parties" before conversion, "a party 'is deemed to have notice that a motion may be converted ... if that party should reasonably have recognized the possibility that such a conversion would occur.' " *Almonte v. Pub. Storage Inc.*, No. 11 CIV. 1404, 2011 WL 3902997, at *1 (S.D.N.Y. Sept. 2, 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004)); *see also In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985) ("The essential inquiry is whether [the party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.").

Whether to convert the motion is in the District Court's discretion. *See Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co.*, No. 05 CIV. 217, 2008 WL 190310, at *3 (S.D.N.Y. Jan. 16, 2008) ("It is within the discretion of this Court to convert a motion filed under Rule 12(b)(6) into a motion seeking summary judgment when matters outside the pleadings have been presented and accepted by the Court, and where all parties have been given a reasonable opportunity to present materials pertinent to the motion's disposition.") (internal quotation marks omitted); *Scope, Inc. v. Pataki*, 386 F. Supp. 2d 184, 190 (W.D.N.Y. 2005) ("The Court determines in its discretion, however, not to convert these motions on the pleadings into ones for summary judgment at this time."); *Staveley v. St. Charles Hosp.*, 173 F.R.D. 49, 51 (E.D.N.Y. 1997) ("In its discretion and upon notice to the parties, a court may consider materials outside the pleadings. If it does so, and notice is given to the parties, the motion for judgment on the pleadings is treated as one for summary judgment."). In exercising this discretion, Courts "look[ ] to the substance of the motion," *Ansonia Tenants' Coal., Inc. v. Ansonia Assocs.*, 163 F.R.D. 468, 470 (S.D.N.Y. 1995), as "[t]he element that triggers the conversion ... is a

challenge to the sufficiency of the pleader's claim supported by extra-pleading material." *Nat'l Cement Co. v. Mead Corp.*, 80 F.R.D. 703, 704–05 (S.D.N.Y. 1978) (citing 9 Wright & Miller, Federal Practice and Procedure, § 1366, at 676).

Here, the Court declines to exercise its discretion to convert this motion into one for summary judgment. The County Defendants' and Plaintiff's extra-pleading material consists of two affidavits by Robert Creighton ("Creighton"), a non-party former Chief Investigator of the Suffolk County District Attorney's Office who initially contacted the District Attorney's Office on behalf of VBB, and an affidavit by Frank Shea ("Shea"), a non-party private investigator contacted by Creighton about VBB's claims. *See* Creighton Affidavit in Support, DE [39-2]; Creighton Affidavit in Opposition; DE [35], [2] Ex. B; Frank Shea Affidavit in Opposition, DE [35], Ex. A. Creighton's and Shea's affidavits have no impact on the Court's analysis however. *See, e.g., FragranceNet.com, Inc. v. Les Parfums, Inc.*, 672 F. Supp. 2d 328, 334 (E.D.N.Y. 2009) (declining conversion where "there is nothing for the Court to consider, in terms of evidence from the defendants, if it were to convert the motion to dismiss into a summary judgment motion."). Moreover, the County Defendants neither include a Rule 56.1 statement nor advocate for summary judgment in their brief. *See* County Defendants' Memorandum of Law ("County Def.'s Mem. Law"), DE [38]. For these reasons, the Court declines to convert the County Defendants' motion to dismiss to a motion for summary judgment. Accordingly, the ignores the Creighton and Shea Affidavits, as well as facts in the County Defendants' motion papers and Plaintiff's Opposition Papers not set forth in the Complaint, in determining this motion. *See Patell Indus. Mach. Co. v. Toyoda Mach. U.S.A., Inc.*, No. 93-CV-1572, 1997 WL 10972, at *2 (N.D.N.Y. Jan. 9, 1997) ("The Court, however, declines to convert Defendant's motion to a motion for summary judgment, and therefore will not consider Plaintiff's affidavit in ruling upon the merits of Defendant's Rule 12(c) motion.").

### B. Timeliness of VBB's Federal Law Claims

**\*4**  Initially, the Private and County Defendants move to dismiss Plaintiff's various federal law claims on timeliness grounds. In response, VBB argues that its claims are timely as the applicable statutes of limitations are tolled by the doctrines of continuing harm and equitable estoppel.

*i. VBB's 42 U.S.C. §§ 1983, 1985(3), and 1986 claims*

Plaintiff's Section 1983, 1985(3), and 1986 claims are untimely. While Section 1983 does not contain a statute of limitations provision, the Supreme Court has held that courts entertaining claims brought under 42 U.S.C § 1983 should borrow the state statute of limitations governing general personal injury actions. *See Owens v. Okure,* 488 U.S. 235, 249, 109 S. Ct. 573, 582 (1989). New York State has a three-year statute of limitations governing such claims. *See CPLR § 214(5).* Accordingly, the Supreme Court has held that the statute of limitations for claims brought under 42 U.S.C. § 1983 in New York State is three years. *See Owens,* 488 U.S. at 249, 109 S. Ct. at 582; *Curto v. Edmundson,* 392 F.3d 502, 504 (2d Cir. 2004) (finding N.Y. C.P.L.R. 214(5), which sets the statute of limitations for personal injury claims, supplies the limitations period for a civil rights claim brought under 42 U.S.C. § 1983 in New York). "[A] section 1983 cause of action accrues ... when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir. 2002). The statute of limitations governing actions brought under 42 U.S.C. § 1985 is also three years. *See Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir. 1994). A cause of action also accrues under Section 1985 "once the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (internal quotation marks omitted). In contrast to Sections 1983 and 1985, a claim under Section 1986 must be commenced within one year after the cause of action has accrued. *See 42 U.S.C. § 1986.*

Although VBB fails to allege when it initially filed a complaint with the SCPD, the events that form the basis for its Sections 1983, 1985(3), and 1986 claims occurred between 2007 and 2008. *See* Compl. ¶¶ 35-41. Plaintiff does not dispute that it gained knowledge of the allegedly unlawful activity at this time. Accordingly, the three-year limitations period began no later than 2008, and ended in 2011. As a result, the Complaint's federal law claims, which were filed on September 5, 2016, over eight years later, are time-barred.

*ii. The Continuing Violation Doctrine*

Instead, Plaintiff argues that its federal law claims are saved by the continuing violation doctrine. The Court disagrees. Pursuant to the continuing violation doctrine, "[w]here a plaintiff can demonstrate an ongoing or continuing violation

of his federally protected rights, the plaintiff is entitled to bring suit challenging all conduct that was part of the violation, even conduct that occurred outside the limitations period." *Cornwell,* 23 F.3d at 704. Generally, under the continuing-violation doctrine, where there is an "ongoing discriminatory policy or practice," the accrual time for the statute of limitations may be delayed until the last act in furtherance of the policy." *Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir. 1999). "[C]ourts of this circuit consistently have looked unfavorably on continuing violation arguments ... and have applied the theory only under compelling circumstances." *Blankman v. Cnty. of Nassau,* 819 F. Supp. 198, 207 (E.D.N.Y. 1993). Compelling circumstances have been found "where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy [that is] alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness." *Ruane v. Cty. of Suffolk,* 923 F. Supp. 2d 454, 460 (E.D.N.Y. 2013) (internal quotations and citations omitted). The Second Circuit has held that "a continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris,* 186 F.3d at 250. Instead, to trigger the continuing violation doctrine, a plaintiff must also allege some non-time-barred acts taken in furtherance of a discriminatory policy. *See id.* Moreover, the Second Circuit has made clear that "[c]haracterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as a series of interlocking events does not postpone accrual of claims based on individual wrongful acts." *Singleton,* 632 F.2d at 192 (internal quotations omitted). "To permit [a plaintiff] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable [plaintiff] to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims." *Id.*

**\*5** Here, VBB's allegations are insufficient to establish a continuing violation. Plaintiff argues that the "SCPD committed a continuing wrong up until November 2015 and that therefore, the statute of limitations runs from that date." VBB's Combined Memorandum of Law in Opposition to the Defendants' Motion to Dismiss ("Pl.'s Opp.") at 10. Plaintiff also argues that it refrained from commencing a civil action against the Private Defendants on the "belief that [the Private Defendants] would be arrested and prosecuted." *Id.* VBB, however, does not dispute that it had knowledge of

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 479 of 520

Vested Business Brokers, Ltd. v. County of Suffolk, Not Reported in Fed. Supp. (2017)

the requisite facts underlying its claims when it made its initial complaint to the SCPD sometime in 2007 or 2008. Further, Plaintiff fails to allege what constitutional wrongs were committed by the Private and County Defendants in the period between 2008 and September 2016, or identify any compelling circumstances that would warrant the application of the continuing violation doctrine. Finally, VBB's mistaken belief that the Private Defendants would be arrested does not constitute a continued wrongdoing; it is, instead, a continued effect of the time-barred allegedly unlawful acts. Accordingly, VBB has failed to demonstrate that tolling the statute of limitations under the continuing violation doctrine is warranted. Moreover, the Court recognizes that the weight of authority in the Second Circuit appears to hold that the continuing-violation doctrine may not be applied to Section 1983 civil rights claims that do not involve allegations of discrimination. See, e.g., Koehl v. Greene, No. 06-CV-0478, 2007 WL 2846905, at *8 (N.D.N.Y. Sept. 26, 2007) (collecting cases). Accordingly, even if the continuing violation doctrine might otherwise be applicable, it would not save Plaintiff's Section 1983 claims, which do not involve allegations of unlawful discrimination.

### iii. The Equitable Estoppel Doctrine

VBB also fails to demonstrate a basis for tolling the statute of limitations under the doctrine of equitable estoppel. "The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense ... [such as] where a plaintiff is induced by fraud, misrepresentations or deception to refrain from filing a timely action." Good Luck Prod. Co. v. Crystal Cove Seafood Corp., 60 F. Supp. 3d 365, 373 (E.D.N.Y. 2014) (quoting Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) (internal quotation marks and citations omitted)). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." Tardif v. Brookhaven Nat'l Lab., 407 F. Supp. 2d 404, 416 (E.D.N.Y. 2006) (internal quotation marks and citation omitted). "Typically, the doctrine is invoked in cases in which [a defendant] has made misrepresentations concerning the statute of limitations or lulled the plaintiff into believing that it was not necessary for him to commence litigation." Id. (internal quotation marks and citation omitted).

VBB's equitable estoppel argument fails as the Complaint is devoid of any allegations of fraud, misrepresentation, or deception that prevented the timely commencement of the instant action. Plaintiff argues that it was "led by the SCPD to believe that its investigation was active and ongoing and that the wrongdoers would eventually be brought to justice, thereby inducing [P]laintiff to defer from commencing a civil action." See Pl.'s Opp. at 9. However, VBB fails to describe any statements or acts committed by the Private or County Defendants that affirmatively concealed any facts or prevented the timely commencement of a civil action. Instead, as set forth above, it is undisputed that, since 2008, VBB had knowledge of the requisite facts underlying its claims. Plaintiff, therefore, has failed to demonstrate that it was prevented in "some extraordinary way" from exercising its rights in a civil action. See Pearl v. City of Long Beach, 296 F.3d 76, 85 (2d Cir. 2002). As a result, Plaintiff is unable to invoke the doctrine of equitable estoppel as a means of tolling the applicable statutes of limitations, and its Sections 1983, 1985, and 1986 claims are untimely. Accordingly, Defendants' motions to dismiss VBB's federal claims as time-barred are granted.

### C. VBB's 42 U.S.C. § 1983 Claims

Alternatively, VBB's Complaint also fails to plausibly state a cause of action pursuant to Section 1983. In the Complaint, Plaintiff asserts multiple causes of action under 42 U.S.C. § 1983 against the County Defendants for: (1) violations of the Equal Protection Clause of the Fourteenth Amendment regarding its "class of one" claim; (2) violations of the Due Process Clause of the Fourteenth Amendment; and (3) municipal liability based on the SCPD's policy and practice of improperly investigating alleged crimes. See Compl. The Court considers each argument in turn.

### i. 42 U.S.C. § 1983 Generally

*6 42 U.S.C. § 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 480 of 520

Vested Business Brokers, Ltd. v. County of Suffolk, Not Reported in Fed. Supp. (2017)

secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. Although Section 1983 itself does not create substantive rights, it does provide "a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). To prevail on a claim arising under 42 U.S.C. § 1983, a plaintiff must demonstrate: "(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law." Hawkins v. Nassau Cty. Corr. Facility, 781 F. Supp. 2d 107, 111 (E.D.N.Y. 2011) (citing 42 U.S.C. § 1983). Further, "it is well-settled that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Jones v. Nassau County Sheriff Dep't, 285 F. Supp. 2d 322, 325 (E.D.N.Y. 2003) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)).

### ii. Failure to Allege "Class of One" Equal Protection Violations

Plaintiff has failed to adequately allege a "class of one" claim. The Equal Protection Clause of the Fourteenth Amendment guarantees " '[the] right to be free from invidious discrimination in statutory classifications and other governmental activity.' " Bernheim v. Litt, 79 F.3d 318, 323 (2d Cir. 1996) (quoting Harris v. McRae, 448 U.S. 297, 322, 100 S. Ct. 2671, 2691 (1980)). "The [Clause] requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001); accord City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 105 S. Ct. 3249 (1985); Disabled American Veterans v. United States Dep't of Veterans Affairs, 962 F.2d 136, 141 (2d Cir. 1992). Following the Supreme Court's decision in Engquist v. Oregon Dep't of Agric, 553 U.S. 591, 603, 128 S. Ct. 2146, 2154 (2008), to succeed on a "class of one" claim, a plaintiff must allege: (1) that it was treated differently from others similarly situated in all relevant respects; (2) that defendants had no rational basis for the differential treatment; and (3) that the differential treatment resulted from a non-discretionary state action. Seymour's Boatyard, Inc. v. Town of Huntington, No. 08-CV-3248, 2009 WL 1514610, at *7 (E.D.N.Y. June 1, 2009).

Initially, the plaintiff "must demonstrate that [he was] treated differently than someone who is prima facie identical in all

relevant respects." Mangino v. Inc. Vil. of Patchogue, 739 F. Supp.2d 205, 255 (E.D.N.Y. 2010) (quoting Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005)). This requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is "extremely high"-so high (1) that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." Id.

**\*7** Plaintiff's "class of one claim" fails for two reasons. Initially, the Complaint fails to adequately allege the existence and differential treatment of any similarly situated individuals. See Fortress Bible Church v. Feiner, 694 F.3d 208, 222 (2d Cir. 2012) ("[A] class-of-one claim requires a plaintiff to show an extremely high degree of similarity between [himself] and [his] comparators.") (internal citations omitted). Here, VBB alleges that Dormer's relationship to Caro "is the reason it was treated differently than other victims of similar crimes in Suffolk County." Compl. ¶ 68. Even assuming a relationship between Dormer and Caro existed, the Complaint, does not reference a person that was a "victim[ ] of similar crimes" or how he was "treated differently" by the SCPD. Accordingly, Plaintiff's claim fails as it is unable to demonstrate the existence of and differential treatment of similarly situated individuals.

Moreover, the SCPD's decision not to arrest the Private Defendants constitutes a discretionary state action. See DePietro v. City of N.Y., No. 09–CV–932, 2010 WL 449096, at *10 (E.D.N.Y. Feb. 2, 2010) ("When officials act within their discretion, basing their decision on a variety of factors that could yield different results on a case by case basis, the rationale of Engquist precludes a class of one challenge."). The duty to investigate possible criminal acts involves a significant level of law enforcement discretion. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 760, 125 S. Ct. 2796, 2805 (2005) (observing that "[i]n each and every state there are longstanding statutes that, by their terms, seem to preclude nonenforcement by the police" but that, "for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility," such statutes "clearly do not mean that a police officer may not lawfully decline to make an arrest") (alteration and internal quotation marks omitted); Harrington v. County of Suffolk, 607 F.3d 31, 34 (2d Cir. 2010). Here, the decision to initiate

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 481 of 520

Vested Business Brokers, Ltd. v. County of Suffolk, Not Reported in Fed. Supp. (2017)

and continue an investigation, such as the one involving VBB and the Private Defendants, inherently rests upon a variety of factors to be determined on a case-by-case basis. *See Heckler v. Chaney,* 470 U.S. 821, 831–32, 105 S. Ct. 1649, 1656, (1985) (finding that the courts are ill-equipped to deal with the many variables involved in the proper ordering of law enforcement priorities in light of finite resources). Therefore, to the extent that VBB is challenging the SCPD's investigation and subsequent decision not to make an arrest, the actions and decisions taken are discretionary, and not subject to a "class of one claim." Accordingly, Plaintiff has failed to state a cause of action for a violation of the Equal Protection Clause of the Fourteenth Amendment, and the motion to dismiss this claim is granted.

### iii. Failure to Allege Due Process Violations

Plaintiff has also failed to state a claim for a violation of the Due Process Clause under the Fourteenth Amendment. While the Complaint does not assert a separate cause of action for alleged Due Process violations, it does allege unspecified violations of the Due Process Clause. *see* Compl. ¶¶ 45, 65, 80, 102. The Supreme Court has explained that, with respect to a Due Process claim, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion," *id.* at 756, 125 S. Ct. at 2804, and that a "well established tradition" of police discretion has long existed. *See id.* at 760, 125 S. Ct. at 2806. Accordingly, the Court has declared that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its substantive manifestations." *Id.* at 768, 125 S. Ct. at 2810. Simply, there is "no constitutional right to an investigation by government officials." *Stone v. Dep't of Investigation of City of New York,* No. 91 CIV. 2471, 1992 WL 25202, at *2 (S.D.N.Y. Feb. 4, 1992) (citing *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir. 1985)).

**\*8** Applying these principles, VBB does not have a protected interest in the County Defendants' investigation or the arrest of the Private Defendants. As stated above, the duty to investigate possible criminal acts involves a significant level of law enforcement discretion. *See Castle Rock,* 545 U.S. at 760, 125 S. Ct. at 2805. That discretion precludes any "legitimate claim of entitlement" to a police investigation. *See id.* at 756, 125 S. Ct. at 2804 (explaining that a discretionary benefit is not a protected entitlement); *see also Roth,* 408 U.S. at 577, 92 S. Ct. at 2709. Accordingly, as VBB does not have a "legitimate claim of entitlement" to a police investigation, and as no procedural irregularities have been alleged, it has failed to adequately allege a violation of the Due Process Clause of the Fourteenth Amendment, and the County Defendants' motion to dismiss this cause of action is granted.

### iv. Municipal Liability Arising Under 42 U.S.C. § 1983

Plaintiff's claim of municipal liability under 42 U.S.C. § 1983 is also untenable. A municipality may not be held liable under Section 1983 on a *respondeat superior* theory of liability. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2036 (1978); *see also Genovese v. Town of Southampton,* 921 F. Supp. 2d 8, 24 (E.D.N.Y. 2013) ("[A] municipal entity may only be held liable where the entity itself commits a wrong; a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (internal quotation omitted). To state a claim for municipal liability, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Authority of New York & New Jersey,* 615 F.3d 129, 140 (2d Cir. 2010) (citing *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007)); *see Norton v. Town of Islip,* 97 F. Supp. 3d 241, 264 (E.D.N.Y. 2015), *reconsideration denied,* 12 CV 4463, 2016 WL 264930 (E.D.N.Y. Jan. 21, 2016), *aff'd,* 16-490-CV, 2017 WL 440131 (2d Cir. Feb. 1, 2017) (citing *Monell,* 436 U.S. at 690-91, 98 S. Ct. at 2036; *Lamont v. City of New York,* 12-CV-2478, 2014 WL 4829328, at *7 (E.D.N.Y. Sept. 29, 2014)).

Moreover, though Section 1983 does not require application of a heightened pleading standard to allege municipal liability, a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678, 129 S. Ct. at 1937 (alteration in original) (internal citations and quotation marks omitted); *see Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S. Ct. 1160, 1163 (1993). Thus, Plaintiff cannot simply allege the existence of a policy and/or custom without putting forth "facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos,* 847 F. Supp. 2d at 576 (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds by Leatherman,* 507 U.S. at 164, 113 S. Ct. at 1163-64). Simply asserting that the alleged violations could not have occurred unless supervisors and policy makers

tolerated them is insufficient to demonstrate the existence of such a custom unless the assertion is clearly supported by an articulated factual context. *See Missel v. Cnty. of Monroe,* 351 Fed.Appx. 543, 545 (2d Cir. 2009); *Duncan v. City of New York,* 11-CV-3826, 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (holding that "boilerplate statements" claiming that the city has a custom of making and tolerating false arrests and of using excessive force "are insufficient to state a claim of municipal liability under *Monell*"); *Bradley v. City of New York,* 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The Complaint's conclusory, boilerplate language—that the City 'fail[ed] to adequately discipline and supervise' employees and 'fail[ed] to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused Plaintiff to be arrested without probable cause.") (internal citations omitted).

**\*9** A policy or custom for purposes of municipal liability under Section 1983 need not be explicit however. *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir. 1992). Rather, a policy or custom may be inferred from constitutional violations that are so "persistent and widespread" that they "practically have force of law." *Davis v. City of New York,* 959 F. Supp. 2d 324, 338 (S.D.N.Y. 2013). Accordingly, "a single incident involving an employee below the policymaking level will not suffice to support an inference of municipal custom or policy." *Brewster v. Nassau County,* 349 F. Supp. 2d 540, 549 (E.D.N.Y. 2004) (quoting *Vann v. City of New York,* 72 F.3d 1040, 1050 (2d Cir. 1995)).

A municipality may also be held liable where it demonstrates a "manifest failure to train, supervise or discipline [its] employees." *Mahan v. City of New York,* No. 00-CV-6645, 2005 WL 1677524, at *3 (E.D.N.Y. July 19, 2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S. Ct. 2427, 2436 (1985)). In such cases, an inference of a municipal custom or policy may

> be drawn from circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction, or evidence that the municipality had notice of but repeatedly failed to make any

meaningful investigation into charges that its agents were violating citizens' constitutional rights.

*DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998); *see also Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983) ("We have held that municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy or ratification of unconstitutional conduct within the meaning of *Monell*."). However, "[o]nly where a failure ... reflects a deliberate or conscious choice by a municipality ... can a city be liable for such a failure under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S. Ct. 1197, 1205 (1989); *see also Triano v. Town of Harrison,* 895 F. Supp. 2d 526, 538 (S.D.N.Y. 2012) ("A municipality may be liable for the failure to supervise or discipline its employees only where the need to act is so obvious, and the inadequacy of the current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.") (internal quotation omitted).

Applying these standards, VBB has failed to state a claim for municipal liability under Section 1983. As to municipal liability, Plaintiff alleges that the SCPD has adopted: (1) careless and reckless policies, customs, or practices, that include, among other violations, a policy for stalling and impeding criminal investigations; (2) a policy of refusing to remove conflicted police officers when required; (3) a policy of permitting its officers to protect individuals who commit crimes with whom they are connected in an effort to shield such individuals from prosecution; (4) a policy of permitting its officers to intentionally manipulate evidence and withhold documentation in an effort to protect individuals who commit crimes and with whom they are connected in an effort to shield such individuals from prosecution; and (6) a policy of failing to properly discipline its police officers for their wrongdoing, improper investigation techniques and other violations. Plaintiff, however, fails to state any facts that support the allegations that the SCPD has adopted and implemented any of the above-mentioned policies. *See Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir. 1995) ("[A]ssertion[s] ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."). Instead, it appears that VBB attempts to impermissibly infer a policy from the alleged violation of its own civil rights. *See Anderson v. City of New York,*

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 483 of 520

Vested Business Brokers, Ltd. v. County of Suffolk, Not Reported in Fed. Supp. (2017)

657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights."). Therefore, at most, Plaintiff has identified a single alleged incident which is insufficient to state a claim for municipal liability. *See Tuttle*, 471 U.S. at 814, 105 S. Ct. at 2431 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*."). Accordingly, the County Defendants' motion to dismiss Plaintiff's municipal liability claim is also granted.

### D. VBB's 42 U.S.C. § 1985(3) Claims

**\*10** All Defendants also move to dismiss VBB's conspiracy claims pursuant to 42 U.S.C. § 1985(3) for failure to state a cause of action. To state a valid claim pursuant to Section 1985(3) a plaintiff must allege:

> (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen.

*Turkmen v. Hasty*, 789 F.3d 218, 262 (2d Cir. 2015). To prevail on a claim under 42 U.S.C. § 1985(3), "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)). VBB alleges that the Private and County Defendants' actions contained the "necessary 'invidiously discriminatory animus' necessary to support" a Section 1985(3) claim. The Complaint, however, fails to allege that Defendants acted with any racial or class-based invidious discriminatory motivation. Accordingly, Plaintiff has failed to adequately state a Section 1985(3) claim and this claim is dismissed.

### E. Plaintiff's 42 U.S.C. § 1986 Claims

As VBB has failed to adequately plead a violation of Section 1985, its Section 1986 claim is similarly invalid. 42 U.S.C. § 1986 imposes liability on an individual who has knowledge

of discrimination prohibited under 42 U.S.C. § 1985. *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996). Accordingly, Section 1986 claim is contingent upon a tenable Section 1985 claim. *See Mian*, 7 F.3d at 1088 (finding that Section 1986 claims are contingent upon a valid section 1985 claim). As a result, having found that VBB fails to state a claim under Section 1985, its Section 1986 claim must also be dismissed.

### F. Qualified Immunity and the Individual County Defendants

Defendants further argue that Plaintiff's claims against Dormer and Gabrielle arising under Section 1983 should be dismissed pursuant to the doctrine of qualified immunity. *See* County Defs.' Mem. at 20-21. The doctrine of qualified immunity "protects government officials from suit if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation omitted). A police officer is entitled to qualified immunity if he establishes "either that his conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' to believe that his acts did not violate these clearly established rights." *Landy v. Irizarry*, 884 F. Supp. 788, 800 (S.D.N.Y. 1995) (quoting *Finnegan v. Fountain*, 915 F.2d 817, 818 (2d Cir. 1990)). In determining whether the doctrine of qualified immunity applies, courts consider: "(1) whether a plaintiff has shown facts making out a violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Deanda v. Hicks*, 137 F. Supp. 3d 543, 561 (S.D.N.Y. 2015) (quoting *Gonzalez*, 728 F.3d at 154). An officer's actions are objectively reasonable "if officers of reasonable competence could disagree on the legality of the defendant's actions." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (internal quotation omitted). On a motion to dismiss, "[t]he initial question with respect to qualified immunity is whether, viewing the facts alleged in the light most favorable to the plaintiff, there was a constitutional violation." *Fierro v. City of New York*, 341 Fed.Appx. 696, 698 (2d Cir. 2009) (citing *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006)). Here, as VBB has failed to allege an underlying constitutional violation, an inquiry on the issue of qualified immunity is unnecessary. *See Pearson v. Callahan*, 555 U.S. 223, 243, 129 S. Ct. 808, 822 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 194, 121 S. Ct. 2151, 2152 (2001)).

### G. Supplemental Jurisdiction Over State-Law Claims

**\*11**  Having concluded that each of Plaintiff's federal claims against the moving Defendants must be dismissed, the Court declines to exercise supplemental jurisdiction over any remaining state law causes of action. Supplemental jurisdiction over Plaintiff's state-law claims is governed by 28 U.S.C. § 1367, which provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction where, as here, all claims over which it had original jurisdiction have been dismissed. 28 U.S.C. § 1367(c). When such circumstances arise prior to the commencement of trial, Second Circuit precedent consistently recognizes that, "the balance of factors to be considered," which includes "judicial economy, convenience, fairness and comity," "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003).

The County and Private Defendants' filed their Rule 12 motions to dismiss the Complaint in lieu of an Answer. *See* DE [31], [34], [38]. Thus, this litigation is still in its initial stages and no discovery has taken place. Accordingly, the Court grants the Private and County Defendants' motions to dismiss as to Plaintiff's federal claims and declines to exercise supplemental jurisdiction over VBB's state-law causes of action.

### H. Leave to File an Amended Complaint

While leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007). Consistent with this principle, "a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim 'is substantive ... [and] better pleading will not cure it.' " *Reynolds v. City of Mount Vernon*, 14-CV-1481, 2015 WL 1514894, at \*5 (S.D.N.Y. Apr. 1, 2015) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000)).

The Court finds that the deficiencies in VBB's pleadings are substantive and, due to the untimely and untenable nature of its claims, any subsequent amendments would be futile. Additionally, in its opposition VBB has not requested permission to file an amended complaint, nor has it "given any indication that it is in possession of facts that would cure the problems identified in this opinion." *Clark v. Kitt*, 12-CV-8061, 2014 WL 4054284, at \*15 (S.D.N.Y. Aug. 15, 2014). Accordingly, as the facts present in the pleadings "give[ ] no indication that a valid claim may be stated," the Court denies Plaintiff leave to amend. *See Flaherty v. All Hampton Limousine, Inc.*, 02-CV-4801, 2008 WL 2788171, at \*8 (E.D.N.Y. July 16, 2008).

### V. CONCLUSION

Based on the foregoing, the Court hereby grants the motions to dismiss the Complaint for failure to state a claim in their entirety with prejudice.

### All Citations

Not Reported in Fed. Supp., 2017 WL 4122616

---

## Footnotes

1    *Pro se* Defendant Joseph Holstein interposed an Answer, *see* DE [23], but did not file a motion to dismiss. Defendant Kieran Rodgers has failed to respond or otherwise appear in this matter. Nevertheless, because the federal law claims that establish subject matter jurisdiction are dismissed for the reasons set forth below, and the Court declines to exercise supplemental jurisdiction over the state law claims against Holstein and Rodgers, their failure to file a motion to dismiss does not save any of Plaintiff's claims in this Court.

2    In response to the Creighton Affidavit in Support, submitted by the County Defendants, VBB submitted the Creighton Affidavit in Opposition, of which the latter clarifies and expands on information propounded in the former.

---

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 486 of 520

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment 2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

#### I. In Forma Pauperis

**\*1** Plaintiff pro se Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. See Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keshia Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

The Court has reviewed plaintiff's IFP application and determines that she financially qualifies to proceed IFP for purposes of filing only. [1]

#### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting her to proceed with her action. As plaintiff is representing himself, the court must afford plaintiff special solicitude; thus, it is to consider her claims "liberally" and "interpret them 'to raise the strongest arguments that they suggest.' " Cold Stone Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir. 2010) (summary order) (quoting Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

**\*2** Further, Rule 10 of the Federal Rules provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 487 of 520

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter."

Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice [2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

**\*3** The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 488 of 520

Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCaribbean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda FCM children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14.

As for plaintiff's causes of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

> employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at

CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt. Id. In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

**B. Analysis**

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII.[3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/CFH), 2020 WL 5203673, at *3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020,[4] appears to have been last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

**\*5** However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction.[5] Plaintiff makes several disjointed,

confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's

jurisdiction. See generally Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Next, plaintiff files an "emergency motion" for the Death Penalty, [6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

**6** Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of

the complaint.' " Aguilar v. United States, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.") Thus, although the Court must show special solicitude to pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See Bennett v. Mnuchin, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describ[e] fantastic or delusional scenarios."); Brown v. New York State Educ. Dept., 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with

prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

## IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3518439

---

### Footnotes

1    Plaintiff is still financially responsible for any other fees or costs she may incur.

2    It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving

rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4    As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

5    Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

6    This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

7    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    7

Walker v. CIBC Limited, Not Reported in Fed. Supp. (2021)

Case 1:25-cv-00968-ECC-ML    Document 54    Filed 11/26/25    Page 493 of 520

2021 WL 3204860
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)

|

Signed 07/29/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, Albany, NY, Pro Se.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

**\*1** This case was before the Hon. Christian F. Hummel, United States Magistrate Judge, for an initial review of plaintiff's complaint and other filings pursuant to 28 U.S.C. § 1915(e)(2)(B). Judge Hummel recommends that plaintiff's complaint (dkt. no. 1) be dismissed with prejudice; that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed; and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *See* April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Plaintiff did not file objections directed to Judge Hummel's recommendations, and the time to do so has expired. Plaintiff did, however, file an amended complaint. For the reasons that follow, the Court adopts Judge Hummel's recommendations, and independently reviews plaintiff's amended complaint and finds it fails to assert viable causes of action.

## II. DISCUSSION

### a. Complaint

As Judge Hummel explains, plaintiff *pro se* Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. *See* Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint. Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty

Against Adethea Keisha Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted an additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, *et seq.* On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." *Id.* Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. The exhibits include an 80-page letter relating to apparent visa fraud that plaintiff sent to the US Department of Justice, the United States Department of Homeland Security, Immigration and Customs Enforcement, and the Federal Bureau of Investigation, as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff.

The supplement plaintiff filed on March 15, 2021 is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before the Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. *Id.* The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State

incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021 appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." *See* dkt. no. 7.

**\*2** Plaintiff's complaint discusses Allison Carolyn Rattray, allegedly the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. *Id.* Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." *Id.* at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," forced plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. *Id.* at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom staples [sic] has visual and audio devices inside of them." *Id.* at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. *See generally* Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was

born on the day the crucifixion was celebrated, that is Easter and Good Friday.

*Id.* at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC First Carribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

*Id.* at 14.

As for plaintiff's first cause of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

Dkt. No. 1 at 69. As for a second cause of action is

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had me fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

*Id.* at 70. The third cause of action is listed as

employment discrimination - compensation: denied increases in my salary verbally communicated to me by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to me by Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt.

*Id.* In the prayer for relief, plaintiff requests:

(1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2) An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

*Id.* at 71.

Judge Hummel found (a) that plaintiff's complaint fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 10, *see* Dkt. 10 at 8-9; (b) plaintiff's claims under Title VII (1) are barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII, *see id.* at 9-10; and (c) apart from the Title VII claims, "plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails [to] establish this Court's jurisdiction under federal question or diversity jurisdiction." *Id.* at 10. Judge Hummel indicated that he was

**\*3** at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in a murder scheme that is somehow related to her Easter birthday. *See* Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

*Id.* at 11.

Judge Hummel also concluded that to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. *Id.* at 11-12.

As to plaintiff's "emergency motion" for the Death Penalty, Judge Hummel found that it appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus

ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. *See* Dkt. No. 5. Judge Hummel concluded that "this Court does not have the authority or jurisdiction to *sua sponte* impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff can decide the ultimate punishment if convicted after a criminal trial." Dkt. 10 at 12.

Judge Hummel concluded that although the Court must show special solicitude to *pro se* litigants, and is to exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *id.* at 14 (quoting *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted)), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis. Id.* Judge Hummel concluded:

> Even if, *arguendo,* the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." *See Bennett v. Mnuchin,* 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describe[e] fantastic or delusional scenarios."); *Brown v. New York State Educ. Dept.,* 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing *pro se* plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

**\*4** *Id.* at 14. As indicated above, Judge Hummel also recommends that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed, and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *Id.* at 15.

After examining the record, this Court has determined that the recommendations in the Report-Recommendation and Order are not subject to attack for plain error or manifest injustice. Further, even if plaintiff's amended complaint is treated as an objection, the Court has completed a *de novo* review and has determined to adopt Magistrate Judge Hummel's recommendations for the reasons stated in his report.

### b. Amended Complaint

As indicated, plaintiff filed an amended complaint after Judge Hummel recommended that the complaint be dismissed with prejudice. After a review of the amended complaint, the Court finds that it too must be dismissed with prejudice.

Plaintiff's amended complaint is a form Title VII complaint. *See* dkt. no. 11. She indicates that the defendant is "CIBC Limited/Michael Capatide CEO CIBC." *Id.* at ¶ 3(b). [1] Plaintiff checks the boxes indicating that the defendant discriminated against her on account of her "race or color," "religion," "sex (or sexual harassment)," "national origin," and "other" indicating on the line that follows: "my right to marry; my right to life; my right to work and provide for my daily living expenses." *Id.* at ¶ 6. Where plaintiff is asked to indicate what the complained-of conduct involves, she checked the boxes for "failure to employ," "termination of employment," "failure to promote," "unequal terms and conditions of employment," "retaliation," and "other acts as specified below" after which she writes: "I am being sex trafficked by CIBC First Caribbean staff in lieu of my salary." *Id.* at ¶ 7. In the section of the amended complaint asking for the facts underlying her claims, plaintiff asserts she is being sex trafficked because she was born on Easter and that the sex trafficking is in lieu of her salary paid to her by CIBC First Caribbean Jamaica." *Id.* ¶ 8. She also asserts that "the force" of the Jamaican Police, the Jamaican Judiciary, the Jamaican Hospital, and the University of the West Indies are conspiring with her "Walker relatives used to commit crimes with my identity using identity theft of Myrna Suzette Walker employed by Jamaican government Judge Barrington Andrew Rattray & Allison Carolyn Rattray." *Id.* In addition, she asserts that "Adethia Keisha Fitten is physically cutting me to create presumed consent for the crimes organized by Judge Barrington Andrew Rattray." *Id.*

The First Cause of Action alleges "forced organized criminality using the salary that was paid to the plaintiff by CIBC First Caribbean Jamaica January 1, 1995 to March 28, 2009." It also asserts that Myrna Suzette Walker "is a

thief," and that "Allison Carolyn Rattray ... hired Myrna Suzette Walker and her five (5) children and Adethia Keisha Fitten to steal and to say that the stealing was done by the plaintiff." Plaintiff also appears to indicate that "to do the stealing," Myrna Suzette Walker "and others" repeatedly physically injure plaintiff. As discussed by Judge Hummel, these allegations do not provide plaintiff with a timely Title VII cause of action, *see, e.g.,* Am. Compl. attach. 4, dkt. no. 11-4 at 1, [2] nor do they provide a basis for the relief plaintiff seeks. *See* Dkt. 11, at 5. [3]

**\*5** The Second Cause of Action asserts violations of the "Human Rights Act of 1998." The Human Rights Act of 1998 appears to be a law or act of Parliament in the United Kingdom. *See Brady v. Wks. Med. Ctr.,* No. 19-CV-00655-SM, 2019 WL 6529870, at *2 (D.N.H. Nov. 12, 2019)("A law in effect in the United Kingdom bears that title.")(citing Human Rights Act 1998, ch. 42, http://www.legislation.gov.uk/ukpga/1998/42/contents), *report and recommendation approved,* No. 19-CV-655-SM, 2019 WL 6529459 (D.N.H. Dec. 4, 2019); *Simpson v. Dauphin Cty. Hous. Auth.,* No. 1:16-CV-01747, 2017 WL 2375702, at *2, n. 4 (M.D. Pa. Apr. 26, 2017) ("Simpson also references a 'Human Rights Act of 1998,' which as best we can tell refers to an Act of Parliament of the United Kingdom, not applicable in this jurisdiction."), *report and recommendation adopted,* No. 1:16-CV-1747, 2017 WL 2362510 (M.D. Pa. May 31, 2017). The Human Rights Act of 1998 does not provide plaintiff with a viable cause of actions against the defendant for any events occurring in the Northern District of New York over which this Court would have jurisdiction. *See Brady,* 2019 WL 6529870, at *2.

The Third Cause of Action is confusing but appears to be a claim seeking unpaid wages. *See* dkt. no. 11 at 4 (stating at the start of Third Cause of Action: "The right to my paycheck."). Plaintiff asserts that her aunt Myrna Suzette Walker "assisted by CIBC First Caribbean staff Allison Carolyn Rattray has been falsely selling me as a whore in lieu of my current income(s) from JC Penney, Aerotek, Walmart, Fidelis Care and more." However, Myrna Suzette Walker, Allison Carolyn Rattray, JC Penney, Aerotek, Walmart, or Fidelis Care are not defendants in this action. Further, plaintiff does not assert when it was that she worked at JC Penney, Aerotek, Walmart, or Fidelis Care, or when or where it was that Myrna Suzette Walker and Allison Carolyn Rattray purportedly took actions preventing plaintiff from receiving her wages from these employers. The claim in this regard fails to assert a

viable cause of action under Title VII. In addition, in nearly incomprehensible fashion plaintiff ends the Third Cause of Action by asserting: "The rapes of me by co-workers is [sic] recorded and published. Walmart staff a [sic] man named Donnell she [sic] gave permission to live in my apartment as well as Fidelis Care Health Insurance staff- Rashid Rardon." These allegations fail to provide a sufficient basis for the Court to discern any viable cause of action under Title VII or any other law or statute over which the Court would have jurisdiction.

Accordingly, for the reasons set forth above plaintiff's amended complaint will be dismissed. Because the allegations in the amended complaint are factually frivolous, and because plaintiff filed an amended complaint that did not cure the pleading defects pointed out by Judge Hummel, dismissal will be with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be futile.

### III. CONCLUSION

For the reasons discussed above, the Court **ACCEPTS AND ADOPTS** Judge Hummel's recommendations in the April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Thus, it is hereby

**ORDERED** that plaintiff's complaint (dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) is **DENIED and DISMISSED**; and it is further

**ORDERED** that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) is **DENIED and DISMISSED as moot**.

Based on the Court's review of the amended complaint, it is hereby

**ORDERED** that plaintiff's amended complaint (dkt. No. 11) is **DISMISSED with prejudice**.

The Clerk of the Court may mark this file as closed.

### IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 3204860

### Footnotes

1    At paragraph 3(a) asking to identify the defendant, plaintiff writes: "Not Applicable"

2    Dkt. no. 11-4 is a letter from Maureen Kielt, Director of the EEOC Buffalo Local Office to plaintiff in the matter
     of *Walker v. CIBC* confirming that plaintiff indicated that her "last date of harmed occurred on March 24,
     2009, when [she] was terminated," thus making her EEOC administrative claim against CIBC untimely. Dkt.
     No. 11-4 at 1.

3    In the Prayer for Relief, plaintiff requests the Court to grant the following relief:

     1. The plaintiff <u>do</u> <u>not</u> [sic] want to be a party to the religious killing business of Myrna Suzette Walker;
     her five children; and CIBC First Caribbean Jamaica staff, Allison Carolyn Rattray and her husband Judge
     Barrington Andrew Rattray, Supreme Court of Jamaica;

     2. The plaintiff do not [sic] want cocaine nor any thing to ingest from anyone, by force or otherwise.

     3. The plaintiff wants full restitution socially, physically, professionally.

     Dkt. 11, at 5 (emphasis in original).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Report and Recommendation Adopted as Modified by   Whitbeck v. Otsego
County,   N.D.N.Y.,   October 20, 2025

2025 WL 2717564
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Janel WHITBECK, Plaintiff,

v.

OTSEGO COUNTY; Otsego County Sheriff's
Office; Deputy E. Lincoln, in her individual and
official capacities; and Deputy J. Smith, in his
individual and official capacities, Defendants.

3:25-CV-0673 (AMN/ML)
|
Signed September 24, 2025

**Attorneys and Law Firms**

JANEL WHITBECK, Plaintiff, Pro Se, 225 Main Street,
Franklin, New York 13775.

### ORDER and REPORT-RECOMMENDATION

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** Plaintiff Janel Whitbeck ("Plaintiff") commenced this
*pro se* action against Defendants Otsego County, Otsego
County Sheriff's Office, Deputy E. Lincoln, and Deputy J.
Smith (collectively "Defendants") alleging violations of her
civil rights. (Dkt. No. 1.) Plaintiff did not pay the filing fee
and seeks leave to proceed *in forma pauperis* ("IFP"). For the
reasons set forth below, I (1) grant Plaintiff's IFP application,
and (2) recommend that the Complaint be accepted in part for
filing and dismissed in part.

### I. BACKGROUND

Construed as liberally [1] as possible, the Complaint alleges
violations of Plaintiff's civil rights by Defendants. (*See
generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on March
1, 2025, Plaintiff experienced a medical emergency while
attempting to complete a transaction at Walmart. (Dkt. No.
1 at 2.) Plaintiff alleges that her trained service dog alerted

her to the onset of a transient ischemic attack ("TIA"). (*Id.*)
Plaintiff alleges that she attempted to return to her vehicle to
access medication, but that Walmart staff stopped her, took
her to the security office, and summoned law enforcement.
(*Id.*)

The Complaint alleges that Defendants Lincoln and Smith
arrested Plaintiff for petit larceny. (Dkt. No. 1 at 2.) Plaintiff
alleges that her speech was garbled, her gait was unsteady, and
she was wearing a medical alert bracelet. (*Id.*) Plaintiff alleges
that she was not handcuffed but was physically steadied by
Defendant Smith, which indicated his awareness of Plaintiff's
impairment. (*Id.*)

The Complaint alleges that Defendant Lincoln conducted
a search during which she saw Plaintiff's medical alert
bracelet. Plaintiff alleges that she explained that she was
experiencing a TIA but was taken to booking, fingerprinted,
and photographed with facial droop. (*Id.*)

Plaintiff alleges that the criminal charges against her were
"never dropped" and she was "forced to pay $200 to clear her
record." (Dkt. No. 1 at 3.)

Based on these factual allegations, Plaintiff asserts the
following five causes of action: (1) a claim of false arrest
in violation of the Fourth and Fourteenth Amendments and
42 U.S.C. § 1983; (2) a claim of deliberate indifference to
medical needs in violation of Fourteenth Amendment and
42 U.S.C. § 1983; (3) a claim that Defendants violated the
New York State Andrew Kearse Act (N.Y. Exec. Law § 837-
u); (4) a claim that Defendants violated the Americans with
Disabilities Act ("ADA"); and (5) a claim that Defendant
Otsego County failed to properly train and supervise its
deputies. (Dkt. No. 1 at 2-3.) As relief, Plaintiff seeks
monetary damages in the amount of $5,000,000.00 and
injunctive relief requiring Defendant Otsego County to
implement training for deputies related to recognizing and
responding to medical emergencies. (*Id.* at 3-4.)

**\*2** Plaintiff has not paid the filing fee and seeks leave to
proceed IFP.

### II. PLAINTIFF'S APPLICATION TO PROCEED *IN
FORMA PAUPERIS*

When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $405, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed IFP status if a party "is unable

to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing Plaintiff's IFP application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed IFP is granted. [3]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**\*3** Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the

adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

### A. Claims Against Defendant Otsego County Sheriff's Office

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal ... department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at \*3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at \*2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

"[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* 20-CV-2287, 2021 WL 4392422, at \*3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau*, 15-CV-6487, 2019 WL 4754326, at \*14 (E.D.N.Y. Sept. 30, 2019) (holding that the Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.").

As a result, I recommend that Plaintiff's claims against Defendant Otsego County Sheriff's Office be dismissed because it is not an entity that is amenable to suit. *See Dudley v. Hochul*, 24-CV-0048, 2024 WL 1906594, at \*9 (N.D.N.Y. May 1, 2024) (Lovric, M.J.) (recommending dismissal of claims against the Onondaga County Sheriff because it was "not an entity amenable to suit."), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024)

(Hurd, J.); *Taranto v. Putnam Cnty.*, 21-CV-2455, 2023 WL 6318280, at *15 (S.D.N.Y. Sept. 28, 2023) (dismissing claims against the defendant Putnam County Sheriff's Office because it was "not a suable entity.").

### B. Claims Pursuant to 42 U.S.C. § 1983

#### 1. Unlawful Seizure/False Arrest Claim

"In analyzing claims alleging the constitutional tort of false arrest, '[the Court has] generally looked to the law of the state in which the arrest occurred.' " *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). "To establish [a claim of false arrest under New York law] the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975). Confinement is "otherwise privileged" when probable cause exists, in other words, "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). However, "[p]laintiffs are not required to set forth a lack of probable cause in their complaint." *Case v. City of New York*, 233 F. Supp. 3d 372, 384 (S.D.N.Y. 2017). "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton*, 37 N.Y.2d at 458 (internal citations omitted).

**\*4** Plaintiff has sufficiently plead her false arrest claim against Defendants Lincoln and Smith because she appears to allege that they did not have a warrant to arrest her. Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest claim against Defendants Lincoln and Smith.

#### 2. Deliberate Indifference to Medical Need

The "Second Circuit has recently observed ... that ... pre-arraignment conditions of confinement claims should be treated as arising under the Fourteenth Amendment." *Stinson v. Saint Vincent's Hosp.*, 20-CV-0704, 2022 WL 2047221, at *7 (D. Conn. June 6, 2022) (citing *Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) (summary order)). Under the "applicable Fourteenth Amendment standard, '[a] pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions.' " *Shakir*, 805 F. App'x at 40 (quoting *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). More specifically, "a plaintiff must demonstrate: (1) that an official 'denied [him] treatment needed to remedy a serious medical condition,' and (2) that the official did so 'because of his deliberate indifference to that need.' " *Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourteenth Amendment deliberate indifference to medical needs claim against Defendants Lincoln and Smith.

#### 3. Claims Against Defendant Otsego County

A municipality may not be held liable solely because it employs a tortfeasor. *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Monell*, 436 U.S. at 694; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.

Finally, municipal liability can, under limited circumstances, be based upon a failure to properly train the municipality's

employees. *Connick,* 563 U.S. at 61. However, municipal liability is most tenuous when a claim turns on the failure to train. *Id.* (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*")). To satisfy the statute, a municipality's failure to train its employees must amount to " 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989)).

**\*5**  Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff,* 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's claims against Defendant Otsego County and Defendants Lincoln and Smith in their official capacities alleging that Defendant Otsego County failed to train or supervise Defendants Lincoln and Smith which resulted in Plaintiff's false arrest and deliberate indifference to her medical needs.

### C. ADA Claim

Title II of the ADA prohibits any public entity from discriminating against "qualified" individuals with disabilities "in the provision or operation of public services, programs, or activities." *Tennessee v. Lane,* 541 U.S. 509, 517 (2004). [4]

To establish a violation of the ADA, the plaintiff must demonstrate (1) that she is a "qualified individual" with a disability; (2) that the defendants are subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of her disability. *Disabled in Action v. Bd. of Elections in City of New York,* 752 F.3d 189, 196-97 (2d Cir. 2014) (citing *McElwee v. Cnty. of Orange,* 700 F.3d 635, 640 (2d Cir. 2012)).

It appears that Plaintiff is a qualified individual with a disability [5] and Defendant Otsego County is a public entity that is subject to the ADA. Moreover, "law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities'

within the scope of Title II." *Williams v. City of New York,* 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015).

Courts in this Circuit have found two fact patterns during the course of an arrest that can commonly raise a legitimate possibility of discrimination in violation of Title II or the Rehabilitation Act. *See Durr v. Slator,* 558 F. Supp. 3d 1, 27 (N.D.N.Y. 2021) (D'Agostino, J.). The first is when police wrongfully arrest a plaintiff because they misinterpret his disability to be criminal activity. *Durr,* 558 F. Supp. 3d at 27-28. The second is when police fail to reasonably accommodate a disability during an investigation or arrest. *Id.* at 28.

As set forth above in Part IV.B.1., Plaintiff plausibly alleges that she was falsely arrested because her response to her disability was misinterpreted as criminal activity. Plaintiff alleges that she informed Defendants Lincoln and Smith that she suffers from TIA and that they observed her medical alert bracelet and in a disoriented state.

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff,* 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's claims against Defendant Otsego County and Defendants Lincoln and Smith in their official capacities alleging a claim pursuant to Title II of the ADA. [6]

### D. New York State Claim

**\*6**  To the extent that Plaintiff attempts to assert a claim pursuant to N.Y. Exec. Law § 837-u, I recommend that it be dismissed for failure to state a claim upon which relief may be granted. N.Y. Exec. Law § 837-u imposes data collection and reporting requirements on the division of criminal justice services with the chief administrator of the New York State courts. N.Y. Exec. Law § 837-u. There is no private cause of action pursuant to N.Y. Exec. Law § 837-u.

Plaintiff also references the "New York State Andrew Kearse Act," which refers to an Assembly bill from the 2021-2022 New York State Legislative session that imposes criminal liability for the failure to obtain medical care for a person in custody displaying medical distress. *See* New York State Senate Assembly Bill A1745, https://www.nysenate.gov/legislation/bills/2021/A1745 (last visited

September 23, 2025). The Bill appears to still be in committee with the New York State Assembly.

Furthermore, even if this Bill was valid law, there is no private cause of action to enforce criminal violations. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518419, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

As a result, I recommend that Plaintiff's claim pursuant to N.Y. Exec. Law § 837-u be dismissed for failure to state a claim upon which relief may be granted.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [7]

 **\*7** The issue with Plaintiff's claims (1) against Defendant Otsego County Sheriff's Office, and (2) pursuant to New York Executive Law § 837-u or the "New York Andrew Kearse

Act" are substantive such that a better pleading will not cure them. As a result, I recommend that Plaintiff's claims against Defendant Otsego County Sheriff's Office and pursuant to the New York Executive Law § 837-u be dismissed without leave to replead.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be (1) **ACCEPTED FOR FILING** to the extent that it asserts (a) a claim of false arrest in violation of the Fourth Amendment and 42 U.S.C. § 1983 against Defendant Otsego County and Defendants Lincoln and Smith in their individual and official capacities; (b) a claim of deliberate indifference to medical needs in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 against Defendant Otsego County and Defendants Lincoln and Smith in their individual and official capacities; and (c) a claim that Defendant Otsego County and Defendants Lincoln and Smith in their official capacities violated Title II of the ADA; and (2) **DISMISSED WITHOUT LEAVE TO REPLEAD** to the extent that it asserts claims (a) against the Otsego County Sheriff's Office, and (b) pursuant to New York Executive Law § 837-u or the "New York Andrew Kearse Act"; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [8]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b) (1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

### All Citations

Slip Copy, 2025 WL 2717564

---

## Footnotes

1    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)).

2    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States,* 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.,* 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3    Plaintiff is reminded that, although her IFP application has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

4    Title II provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

5    A "qualified individual with a disability" is an individual with a disability "who, with or without reasonable modifications to rules, policies or practices, the removal of ... communication ... barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

6    "It is well-settled that ... Title II of the ADA ... [does not] provide[ ] for individual capacity suits against state officials." *Hill v. LaClair,* 20-CV-0441, 2020 WL 2404771, *7 (N.D.N.Y. May 11, 2020) (Hurd, J.) (internal quotation marks and citation omitted).

7    *See also Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)), *rev'd on other grounds,* 682 F. App'x 30.

8    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

9    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 2959467
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Janel WHITBECK, Plaintiff,

v.

OTSEGO COUNTY; Otsego County Sheriff's
Office; Deputy E. Lincoln, in her individual and
official capacities; and Deputy J. Smith, in his
individual and official capacities, Defendants.

3:25-CV-00673 (AMN/ML)
|
Signed October 20, 2025

**Attorneys and Law Firms**

JANEL WHITBECK, 225 Main Street, Franklin, New York
13775, Plaintiff pro se.

**ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**
**\*1** On May 27, 2025, Plaintiff *pro se* Janel Whitbeck
commenced this action and asserted claims of false arrest and
deliberate indifference to medical needs pursuant to 42 U.S.C.
§ 1983, as well as claims pursuant to the Americans with
Disabilities Act ("ADA") and the New York State Andrew
Kearse Act, N.Y. Exec. Law § 837-u, against Otsego County,
the Otsego County Sheriff's Office, and Otsego County
Sheriff's Deputies Lincoln and Smith in their individual and
official capacities. Dkt. No. 1. Plaintiff did not pay the
filing fee and sought leave to proceed *in forma pauperis*
("IFP"). Dkt. No. 2. This matter was referred to Magistrate
Judge Miroslav Lovric, who, on September 24, 2025, granted
Plaintiff's motion for leave to proceed IFP. Dkt. No. 5.

Also on September 24, 2025, after conducting an initial
review of the Complaint pursuant to 28 U.S.C. § 1915(e),
Magistrate Judge Lovric issued an Order and Report-
Recommendation recommending that (i) Plaintiff's false
arrest and deliberate indifference claims be permitted to
proceed against Otsego County and Defendants Lincoln
and Smith in their individual and official capacities; (ii)
Plaintiff's ADA claim be permitted to proceed against Otsego
County and Defendants Lincoln and Smith in their official

capacities; and (iii) Plaintiff's claims under the New York
State Andrew Kearse Act and Plaintiff's claims against the
Otsego County Sheriff's Office be dismissed with prejudice.
Dkt. No. 5 ("Report-Recommendation"). Magistrate Judge
Lovric advised that under 28 U.S.C. § 636(b)(1), the parties
had fourteen days within which to file written objections and
that failure to object to the Report-Recommendation within
fourteen days would preclude appellate review. Dkt. No. 5 at
14. [1]

For the reasons set forth below, the Court adopts the Report-
Recommendation in its entirety, except that it dismisses
Plaintiff's false arrest and deliberate indifference claims
against Defendants Lincoln and Smith in their official
capacities with prejudice and without leave to amend and
permits Plaintiff's ADA claim to proceed against Defendants
Lincoln and Smith in their official capacities only to the extent
Plaintiff seeks prospective injunctive relief.

**II. BACKGROUND**
On March 1, 2025, Defendants Lincoln and Smith arrested
Plaintiff for petit larceny. Dkt. No. 5 at 2 (citing Dkt.
No. 1 at 2). Plaintiff alleges that, shortly before her arrest,
she experienced a medical emergency while attempting to
complete a transaction at Walmart. *Id.* (citing Dkt. No. 1 at
2). Specifically, Plaintiff alleges that her trained service dog
alerted her to the onset of a transient ischemic attack (referred
to as "TIA"), and when she attempted to return to her vehicle
to access medication, Walmart staff stopped her, took her
to the security office, and summoned law enforcement. *Id.*
(citing Dkt. No. 1 at 2).

Plaintiff alleges that she was visibly impaired; she was
wearing a medical alert bracelet, her speech was garbled, and
her gait was unsteady. *Id.* (citing Dkt. No. 1 at 2). Plaintiff
alleges that during Defendant Lincoln's search of Plaintiff she
observed her medical alert bracelet. *Id.* (citing Dkt. No. 1 at
2). Plaintiff further alleges that Defendant Smith physically
steadied her, which indicated his awareness of Plaintiff's
impairment. *Id.* (citing Dkt. No. 1 at 2). Defendants Lincoln
and Smith then allegedly proceeded to book, fingerprint, and
photograph Plaintiff while she was exhibiting a facial droop
consistent with a TIA. *Id.* (citing Dkt. No. 1 at 2).

**III. STANDARD OF REVIEW**
**\*2** This Court reviews *de novo* those portions of a
magistrate judge's report-recommendation that have been
properly preserved with a specific objection. *Petersen v.*

*Astrue*, 2 F. Supp. 3d 223, 228 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). If no specific objections have been filed, this Court reviews a magistrate judge's report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 228 (citing Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition). Similarly, if an objection simply rehashes arguments originally presented to the magistrate judge, this Court reviews the relevant portions of the report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 228-29 & n.6 (collecting cases). "When performing such a 'clear error' review, 'the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " *Dezarea W. v. Comm'r of Soc. Sec.*, No. 21-cv-01138, 2023 WL 2552452, at *1 (N.D.N.Y. Mar. 17, 2023) (quoting *Canady v. Comm'r of Soc. Sec.*, No. 17-cv-0367, 2017 WL 5484663, at *1 n.1 (N.D.N.Y. Nov. 14, 2017)).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 22-cv-567, 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

Because neither party has filed any objections to the Report-Recommendation, the Court reviews the Report-Recommendation for clear error.

First, Magistrate Judge Lovric recommended that Plaintiff's claims against the Otsego County Sheriff's Office be dismissed with prejudice. Dkt. No. 5 at 6. Specifically, Magistrate Judge Lovric noted that a municipal department "does not have the capacity to be sued as an entity separate from the municipality in which it is located." *Id.* at 5 (quoting

*White v. Syracuse Police Dep't*, No. 18-cv-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019)). Under New York law, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999); *see also Dudley v. Hochul*, No. 24-cv-0048, 2024 WL 1906594, at *9 (N.D.N.Y. May 1, 2024) (dismissing claims against the Onondaga County Sheriff's Office because it was not amenable to suit), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024).

Second, Magistrate Judge Lovric addressed Plaintiff's claim of false arrest under the Fourth Amendment against Defendants Lincoln and Smith in their individual and official capacities. Dkt. No. 5 at 6-7. Magistrate Judge Lovric noted that, when analyzing constitutional claims of false arrest, courts generally look to the law of the state where the arrest occurred. *Id.* at 6 (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)). "To establish a claim of false arrest under New York law, the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* (internal brackets omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975)). Confinement is otherwise privileged when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 6-7 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Here, Plaintiff alleges that she experienced a TIA while attempting to complete a transaction at Walmart, and in the course of her attempt to access medication in her car, Walmart staff summoned law enforcement. Dkt. No. 5 at 2 (citing Dkt. No. 1 at 2). Plaintiff further alleges that despite their awareness of her impairment, Defendants Lincoln and Smith proceeded to arrest her. *Id.* Magistrate Judge Lovric recommended that Plaintiff's claim for false arrest against Defendants Lincoln and Smith proceed. *Id.* at 7.

**\*3** Third, Magistrate Judge Lovric addressed Plaintiff's claim of deliberate indifference to medical needs under the Fourteenth Amendment against Defendants Lincoln and Smith in their individual and official capacities. *Id.* at 7-8. Courts evaluate claims of deliberate indifference that arise during the course of a pretrial arrest and detainment under the Due Process Clause of the Fourteenth Amendment. *Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (citing *Weyant*, 101

F.3d at 856). Magistrate Judge Lovric noted that a plaintiff must demonstrate that (i) an official denied plaintiff the treatment needed to remedy a serious medical condition, and (ii) the official denied such treatment because of his deliberate indifference to that need. Dkt. No. 5 at 7-8 (citing *Mills*, 216 F. App'x at 10). Here, among other things, Plaintiff alleges that in connection with her arrest for petit larceny, Defendants proceeded to book Plaintiff after she explained that she was experiencing a TIA and while she was exhibiting symptoms of a TIA. *See id.* at 2 (citing Dkt. No. 1 at 2). Magistrate Judge Lovric recommended that Plaintiff's medical indifference claim proceed against Defendants Lincoln and Smith. *See id.* at 8. [2]

Fourth, Magistrate Judge Lovric addressed Plaintiff's claims of false arrest and deliberate indifference against Otsego County. Dkt. No. 5 at 8-9. "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Adams v. City of Syracuse*, No. 21-cv-650 (AMN/MJK), 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)). A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted). Here, Magistrate Judge Lovric recommended that Plaintiff's claims against Otsego County, in which she alleges that Otsego County failed to train or supervise Defendants Lincoln and Smith, be permitted to proceed. Dkt. No. 5 at 9.

Fifth, Magistrate Judge Lovric addressed Plaintiff's claim alleging a violation of Title II of the ADA. *Id.* at 9-11. [3] "To establish a violation of the ADA, the plaintiff must demonstrate (1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to the ADA; and (3) that she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of her disability." *Id.* at 10 (quoting *Disabled in Action*

*v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014)). Magistrate Judge Lovric found that Otsego County is a public entity that is subject to the ADA, and Plaintiff appeared to be a qualified individual with a disability who plausibly alleged that Defendants Lincoln and Smith wrongfully arrested her because Plaintiff's actions in response to her disability were misinterpreted as criminal activity. *Id.* Magistrate Judge Lovric noted that Plaintiff alleged that Defendants Lincoln and Smith observed her in a disoriented state, wearing her medical alert bracelet, and she informed Defendants that she suffers from the risk of a TIA. *Id.* at 10-11. Accordingly, Magistrate Judge Lovric recommended that Plaintiff's ADA claim be permitted to proceed against Otsego County and Defendants Lincoln and Smith in their official capacities. *Id.* at 11. [4]

**\*4** Sixth, Magistrate Judge Lovric addressed Plaintiff's claims pursuant to the New York State Andrew Kearse Act. *Id.* at 11-12. Magistrate Judge Lovric noted that the New York State Andrew Kearse Act is an unenacted New York State Assembly Bill that imposes criminal liability for failure to obtain medical care for a person in custody displaying medical distress. *Id.* at 11. [5] Magistrate Judge Lovric further noted that there is no private right of action to enforce federal or state criminal statutes. *See id.* at 12 (citing, *inter alia*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Thus, Magistrate Judge Lovric recommended that this claim be dismissed for failure to state a claim without leave to amend.

Having reviewed the Report-Recommendation for clear error and considered Magistrate Judge Lovric's findings as to each claim, the Court adopts the Report-Recommendation in its entirety, except that it dismisses Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities with prejudice and without leave to amend and permits Plaintiff's ADA claim to proceed against Defendants Lincoln and Smith in their official capacities only to the extent that Plaintiff seeks prospective injunctive relief.

**V. CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation, Dkt. No. 5, is **ADOPTED** in its entirety except as noted above; and the Court further

**ORDERS** that the Otsego County Sheriff's Office is **DISMISSED from this case with prejudice;** and the Court further

**ORDERS** that Plaintiff's claims pursuant to the New York State Andrew Kearse Act be **DISMISSED with prejudice and without leave to amend**; and the Court further

**ORDERS** that Plaintiff's claims of false arrest and deliberate indifference against Otsego County and Defendants Lincoln and Smith in their individual capacities **SURVIVE initial review and require a response**; and the Court further

**ORDERS** that Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities be **DISMISSED with prejudice and without leave to amend**; and the Court further

**ORDERS** that Plaintiff's ADA claim against Otsego County **SURVIVES initial review and requires a response**; and the Court further

**ORDERS** that Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities **SURVIVES initial review and requires a response** to the extent that Plaintiff seeks prospective injunctive relief under the ADA; and the Court further

**ORDERS** that the Clerk shall issue summonses and General Order # 25 and forward them, along with copies of the Complaint, to the United States Marshal for service upon the Defendants; and the Court further

**ORDERS** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Norther District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by the Court. Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any changes in his address; his failure to do so may result in the dismissal of this action.

**\*5  ORDERS** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2959467

---

### Footnotes

1    Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2    To the extent that Plaintiff brings her false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities, "this District has held that [Section 1983] claims against municipal officers in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant." *Sears v. Carmichael*, No. 18-cv-909, 2018 WL 7291417, at *2 (N.D.N.Y. Aug. 6, 2018) (internal citations and quotations omitted), *report and recommendation adopted*, 2019 WL 587587 (N.D.N.Y. Feb. 13, 2019). Since Plaintiff also names Otsego County as a defendant in this action, Plaintiff's Section 1983 claims against Defendants Lincoln and Smith in their official capacities are redundant of her claims against Otsego County. *See, e.g., id.* (recommending dismissal of plaintiff's *Monell* claims against the individual defendants in their official capacities as "redundant," given that plaintiff also named the town of Saranac Lake as a defendant). Accordingly, Plaintiff's false arrest and deliberate indifference claims against Defendants Lincoln and Smith in their official capacities are dismissed with prejudice and without leave to amend.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

3    Magistrate Judge Lovric recommended that Plaintiff's ADA claim proceed against Defendants Lincoln and Smith only in their official capacities because Title II of the ADA does not permit individual capacity suits against state officials. Dkt. No. 5 at 11 n.6 (quoting *Hill v. LaClair*, No. 20-cv-441, 2020 WL 2404771, at *7 (N.D.N.Y. May 11, 2020)).

4    To the extent that Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities seeks prospective injunctive relief, such claim may proceed. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (holding that Title II ADA suits for prospective injunctive relief may proceed against individual officers in their official capacities). However, Plaintiff's ADA claim against Defendants Lincoln and Smith in their official capacities seeking monetary relief is redundant of Plaintiff's ADA claim against Otsego County. *See Johnson v. New York State Police*, 659 F. Supp. 3d 237, 254 (N.D.N.Y. 2023). Accordingly, Plaintiff's ADA claim is permitted to proceed against Defendants Lincoln and Smith in their official capacities only to the extent it seeks prospective injunctive relief.

5    As of October 16, 2025, the New York State Andrew Kearse Act is in committee with the New York State Assembly. *See* New York State Senate, Assembly Bill A1745, https://www.nysenate.gov/legislation/bills/2021/A1745.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1994848
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David ZAIRE, Plaintiff,

v.

John/Jane DOE, Deputy Commissioner/
Designee for NYS Department of Corrections;
and Thomas Welch, Corrections Counselor
at Clinton Correctional Facility, Defendants.

No. 9:03-CV-629(FJS/RFT).
|
July 13, 2006.

**Attorneys and Law Firms**

David Zaire, Dannemora, NY, pro se.

Office of New York State, Attorney General, Maria Moran, AAG, Hon. Eliot Spitzer, Attorney General for the State of New York, of counsel, Syracuse, NY, for Defendant Welch.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

**I. INTRODUCTION**

**\*1** Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging violations of his First Amendment rights. Specifically, Plaintiff alleges that Defendant Welch violated his First Amendment rights when he changed and/or falsified [1] Plaintiff's Department of Correctional Services' ("DOCS") records with respect to a therapeutic program for Plaintiff's pursuit of a previous federal civil rights action. [2] *See* Complaint at ¶ 19; Report-Recommendation and Order at 2.

Currently before the Court are Defendant Welch's objections to Magistrate Judge Treece's Report-Recommendation and Order. Defendant Welch objects to Magistrate Judge Treece's recommendation that this Court deny his motion for summary judgment on Plaintiff's First Amendment retaliation claim because Magistrate Judge Treece neglected to address the second element of Plaintiff's claim, i.e., whether Defendant's

actions were adverse. *See* Defendant Welch's Objections at 1-2.

**II. BACKGROUND**

Plaintiff previously filed *Zaire v. Muller,* 9:98-CV-1838, in this District. That case proceeded to trial, and the jury returned a verdict in Plaintiff's favor on June 21, 2002. Plaintiff then moved, in part, for and was granted declaratory and injunctive relief. [3] He then filed a motion to hold the defendants in that case in contempt for not complying with the district court's order; the court denied that motion. From May 10, 2001, until October 4, 2002, Plaintiff was incarcerated at Clinton Correctional Facility ("Clinton"). During his incarceration at Clinton, Plaintiff's Correction Counselor was Defendant Thomas Welch.

On July 8, 2002, Defendant met with Plaintiff regarding a Sexual Offenders Program consent form, a document signifying agreement to participate in that program. Defendant's signature is on the document, but Plaintiff's is not. Defendant also noted in Plaintiff's Quarterly Review for the period from May 4, 2002, through August 26, 2002, that Plaintiff refused to accept the Sexual Offenders Program on July 8, 2002, and August 27, 2002. Plaintiff's signature is not on the quarterly review.

**III. DISCUSSION**

**A. Standard of Review**

*1. Review of Report-Recommendation and Order*

"When a district court evaluates the report and recommendation of a magistrate judge, the court may 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.' " *Wilds v. United Parcel Serv., Inc.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003) (quoting 28 U.S.C. § 636(b)(1)). A party " 'may object to the findings or recommendations of the magistrate judge' " within ten days of being served with the report and recommendation. *Id.* (citations omitted). When neither party files objections, " 'a district court need only satisfy itself that there is no clear error on the face of the record' " to accept the report and recommendation. *Id.* (quoting *Nelson v. Smith,* (S.D.N.Y. 1985) 618 F.Supp. 1186, 1189). However, " '[w]hen an objection is raised, the court is required to conduct a *de*

*novo* review of the contested sections.' " *Id.* at 170 (quoting *Pizarro v. Bartlett* (S.D.N.Y.1991) 776 F.Supp. 815, 817).

### 2. Summary Judgment

**\*2** A court may grant summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure when " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Dibble v. Fenimore,* slip copy, No. 1:97-CV-1256, 2006 WL 1373061, \*3 (N.D.N.Y. May 15, 2006) (quotation and other citation omitted). The court must resolve all ambiguities and draw all rational inferences of fact in favor of the nonmoving party. *See id.* (citation omitted). "A dispute regarding a material fact is genuine 'if evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Young v. Corbin,* 889 F.Supp. 582, 584 (N.D.N.Y.1995) (quotation omitted). "Once the movant ... has established a prima facie case demonstrating the absence of a genuine issue of material fact, the non-moving party must come forward with enough evidence to lead a rational trier of fact to find for the non-moving party." *Id.* (citation omitted). Finally, "sworn statements are more than mere conclusory allegations subject to disregard ...; they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." *Scott v. Coughlin,* 344 F.3d 282, 289 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

### B. Exhaustion of Administrative Remedies

Magistrate Judge Treece recommended that the Court deny Defendant's motion for summary judgment to the extent that it was based upon the assertion that Plaintiff has failed to exhaust his administrative remedies. After stating the law pertaining to the Prisoner Litigation Reform Act, 42 U.S.C. § 1997(e)(a), and describing the New York State Department of Correctional Services' three-step process for exhausting all administrative remedies available to inmates, Magistrate Judge Treece examined the facts and evidence that both parties had presented. *See* Report-Recommendation and Order at 7-9. Magistrate Judge Treece noted that Plaintiff stated that he had grieved and appealed his claims of retaliation and false entries against Defendant in grievance BRL-5893-02 entitled "Wants Transfer to Downstate HUB," which is contrary to Defendant's assertion that Plaintiff failed to file a grievance regarding these incidents. *See id.* at 7-8 (citing Plaintiff's 7.1 Statement at ¶ 13; Affidavit of Thomas

Egan, dated July 12, 2005 ("Egan Aff."), at ¶ 4 & Exhibit "A" at p. 4; Defendant's 7.1 Statement at ¶ 13). Furthermore, Magistrate Judge Treece found that the Court could not ascertain the contents of that grievance because neither party provided the Court with a copy of the grievance and its title did not indicate whether the grievance was against Defendant. *See id.* at 8. Therefore,, Magistrate Judge Treece found that the Court could "not deem Plaintiff's claim as unexhausted as the grievance complaint may very well have brought up the issues of retaliation and forgery." *See id.* at 8-9. Neither party objects to Magistrate Judge Treece's recommendation that the Court deny Defendant's motion for summary judgment on the issue of failure to exhaust administrative remedies.

**\*3** As Magistrate Judge Treece recognized, under the Prisoner Litigation Reform Act "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Furthermore,

[s]o long as the prisoner's grievance "present[s] the relevant factual circumstances giving rise to a potential claim ... sufficient under the circumstances to put the prison on notice of potential claims and to fulfill the basic purposes of the exhaustion requirement, ... [t]here does not appear to be any reason to require a prisoner to present fully developed legal and factual claims at the administrative level."

*Sulton v. Wright,* 265 F.Supp.2d 292, 298 (S.D.N.Y.2003) (quotation and other citation omitted). Additionally, New York only requires the grievance to include "the grievant's name, department identification number, housing unit, program assignment ... [and] a concise, specific description of the problem and the action requested...." N.Y. Comp.Codes R. & Reg. tit. 7, § 701.7(a)(i).

Based upon its review of the record, the Court finds that the conclusion and recommendation that Magistrate Judge Treece reached is not clearly erroneous. Without being able to ascertain the contents of grievance number BRL-5893-02, the Court cannot determine whether Plaintiff's claim is exhausted because, despite the title stating that the grievance is about a request for transfer, the Court cannot determine whether the grievance contained Plaintiff's claims of retaliation and forgery against Defendant, as he states it does. Accordingly, the Court adopts Magistrate Judge Treece's recommendation and denies Defendant's motion for summary judgement to the

extent that the motion rests upon Plaintiff's failure to exhaust administrative remedies.

## C. First Amendment Retaliation Claim [4]

To maintain a claim for First Amendment retaliation, a plaintiff must demonstrate " '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Holmes v. Grant,* slip copy, No. 03 Civ. 3426, 2006 WL 851753, *15 (S.D.N.Y. Mar. 31, 2006) (quotation omitted). Once the plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the defendants 'to show that the plaintiff would have received the same punishment even absent the retaliatory motivation....' " *Bartley v. Collins,* No. 95 Civ. 10161, 2006 WL 1289256, *4 (S.D.N.Y. May 10, 2006) (quotation and other citation omitted). If the defendant demonstrates that the plaintiff would have received the same punishment absent retaliatory motive, the plaintiff's claim fails.

### 1. Protected-Speech Prong

With respect to the protected-speech prong of a retaliation claim, it is well established that "[p]risoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Id.* (citations omitted). Plaintiff's filing of the civil case *Zaire v. Muller* is protected conduct. *See Gill v. Pact Org.,* No. 95 Civ. 4510, 1997 WL 539948, *12 (S.D.N.Y. Aug. 28, 1997) (citation omitted). Accordingly, the Court adopts Magistrate Judge Treece's finding that Plaintiff satisfied the first prong of his retaliation claim.

### 2. Adverse-Action Prong

**\*4** To satisfy the adverse-action prong of a retaliation claim in the prison setting, an inmate must show that prison officials took adverse action against him. In this setting, the Second Circuit has "defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchack,* 389 F.3d 379, 381 (2d Cir.2004) (quotation omitted). However, to prove an adverse-action, a prisoner need not demonstrate an actual subjective chill, i.e., that the defendant's action dissuaded him from further exercising his own rights. *See id.* at 384.

Plaintiff asserts that Defendant retaliated against him for filing a civil action in federal court by changing or falsifying DOCS' records to reflect that Plaintiff refused to participate in the Sexual Offender Program ("SOP"). *See* Complaint at ¶ 19. Plaintiff asserts that Defendant's entries on July 8, 2002, and August 27, 2002, were false and harmed him because DOCS' officials used these entries as a pretext to assert that he was not eligible for the Close-to-Home transfer program, that they subjected him to confiscation of ten-years good behavior allowances, [5] and that they continued his imprisonment past his previous conditional release date of January 12, 2003. [6] *See* Complaint at ¶¶ 17-19.

Defendant argues that the entries he made were not an erroneous change of Plaintiff's position towards the SOP program because "the Sexual Offender Program was *not available,* which is quite different from a claim that records were changed to indicate a refusal of SOP if Plaintiff had previously indicated that he would take the program." *See* Defendant's Objections at 2. He further claims that Plaintiff provides no evidence to indicate that he was on a waiting list for the SOP as of July 8, 2002, [7] and that he refused to participate in SOP both before and after his meetings with Defendant. *See id.* Moreover, Defendant argues that his actions were not adverse because they did not deter Plaintiff from filing grievances after the incidents, that his actions were in no way threatening and would not have deterred any other inmate from filing subsequent grievances or lawsuits, and that his actions were simply *de minimus. See id.* at 2.

With respect to the circumstances surrounding the documentation of Plaintiff's refusal to participate in SOP, Defendant states that, pursuant to DOCS' policy, [8] he approached Plaintiff on July 8, 2002, and August 27, 2002, provided him with the opportunity to sign the SOP consent form, and informed him that refusing to sign the form was tantamount to refusing the program. *See* Affidavit of Thomas Welch, dated July 12, 2005 ("Welch Aff."), at ¶ 3. Defendant states that Plaintiff refused to sign the consent form and that he documented Plaintiff's actions on the form just like any other prison official would. *See id.* at ¶ 3, Exhibit "A." Contrary to Defendant's account, Plaintiff states that, on July 8, 2002, and August 27, 2002, Defendant did not approach him with an opportunity to sign the SOP consent form. *See* Plaintiff's 7.1 Statement at ¶ 6. Rather, Plaintiff states that Defendant insisted that he sign a declaration of refusal of the SOP; and, when he refused to comply, Defendant filled it out himself. *See id.* at ¶¶ 6-7. Although Defendant asserts that

he did not "change" the DOCS' records to reflect a refusal, Plaintiff's complaint and motion papers indicate that it was not necessarily a change, but a falsification of his refusal. *See* Complaint at ¶¶ 16-18; Plaintiff's Affirmation at p. 1; Plaintiff's 7.1 Statement at ¶ 6. Thus, an issue of fact exists as to whether Defendant's alleged action actually occurred.

**\*5** Assuming such action did occur, the question is whether a reasonable jury could find such action to be adverse. Contrary to Defendant's assertion, it is of no consequence whether Plaintiff was deterred from exercising his constitutional rights; rather, the question is whether a similarly-situated inmate would be deterred from exercising his constitutional rights. Defendant states that his action is not adverse because he was making an accurate and appropriate documentation of the facts. *See* Defendant's Memorandum of Law at 7. Defendant also claims his action was *de minimus* and that a similarly situated inmate would not have been deterred from exercising his constitutional rights because of Defendant's actions; however, Defendant offers no evidence to support his claims, except to say that his conduct was in no way threatening and that a similarly-situated inmate would not be deterred from exercising his constitutional rights; he simply concludes that such is the case. *See* Defendant's Objections at 2. However, if a reasonable jury concluded that Defendant's false entries resulted in officials denying Plaintiff participation in the Close-to-Home Transfer Program,[9] resulted in a loss of ten-years good behavior allowances, and continued imprisonment past his previous conditional release date, it could also conclude that such consequences would deter a similarly-situated inmate from filing a federal action.

Based upon the above-stated reasons, the Court finds that a reasonable jury could conclude that Defendant took some action against Plaintiff and that his action was adverse because it would deter a similarly-situated inmate of ordinary firmness from exercising his constitutional rights. Accordingly, the Court holds that issues of material fact exist with respect to the adverse-action prong of Plaintiff's retaliation claim.

### 3. Causal-Connection Prong

To satisfy the causal-connection prong of a retaliation claim, an inmate must show "that the protected conduct was a 'substantial or motivating factor' in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord,* No. 9:02 CV 00915, 2005 WL 3531464, \*6 (N.D.N.Y. Dec. 22, 2005) (citations omitted). The court may consider

a number of factors when determining whether a causal connection exists, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Holmes,* 2006 WL 851753, at \*15 (citation omitted).

Based upon the record, the Court concludes that a reasonable jury could find a causal connection between Plaintiff's federal civil action and Defendant's actions with respect to the SOP consent form. The temporal proximity between the favorable verdict in Plaintiff's lawsuit and Defendant's alleged retaliation is circumstantial evidence of such retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002) (citation omitted). Plaintiff received a favorable verdict on June 21, 2002, and the first of Defendant's allegedly false notations that Plaintiff had refused to participate in the SOP occurred on July 8, 2002, a mere two weeks later. *See* Affirmation of Maria Moran, dated July 22, 2005 ("Moran Aff."), at Exhibit "1" at 1; Plaintiff's 7.1 Statement at ¶ 6. Furthermore, July 8, 2002, was the first time Defendant approached Plaintiff about SOP; previous entries on the quarterly review indicate that in February 2002 and May 2002 the program was not available. *See* Welch Aff. at Exhibit "B." In addition, although Defendant states that he was not aware of the outcome or substance of any legal actions that Plaintiff was pursuing while he was at Clinton, Plaintiff contradicts this statement, indicating that he and his attorney had three different telephone conversations about his federal civil action, *Zaire v. Muller,* and that Defendant was present on each occasion and remained inside the cubicle office where the conversations were held and sat three feet away from Plaintiff. *See* Plaintiff's Affirmation at p. 2. Additionally, Plaintiff states that his attorney had at least three conversations with Defendant regarding DOCS' policies relating to issues raised in *Zaire v. Muller. See id.* Moreover, Plaintiff claims that his attorney had a conversation with Defendant on July 8, 2002, regarding her need to speak to Plaintiff about post-trial motions. *See id.* Finally, Plaintiff contends that, when he questioned Defendant about the sudden need to have him sign an SOP consent form, Defendant replied " '[b]ecause you pushed the issue. Now you have to put up or shut up.' " *See id.* Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff had established a causal connection between Defendant's alleged falsification of Plaintiff's DOCS' records and Plaintiff's successful federal action. Accordingly, the Court concludes that Plaintiff has raised material issues

of fact as to the existence of a causal connection between his federal civil rights action and Defendant's alleged retaliatory act of falsely noting on the SOP consent form that Plaintiff has refused the program.

#### 4. Defendant's Burden

**\*6** Defendant states that "DOCS policy requires that convicted and incarcerated sex offenders, who are roughly two to three years away from their earliest release date, sign a Sexual Offender Program ... participation consent form to remain eligible for early release ... [and] because SOP is not offered at Clinton, inmates are requested to sign a consent form for SOP before transfer to a facility with the program will be submitted," and that refusal to sign is interpreted as a refusal to participate in the program. *See* Welch Aff. at ¶¶ 2-3. On the other hand, Plaintiff asserts that he was not aware of any such DOCS' policy and disputes that the form must be signed in order to receive a transfer because on two occasions, November 9, 2000, and September 17, 2002, he submitted transfer requests without signing the SOP consent form. *See* Plaintiff's 7.1 Statement at ¶¶ 4-5. Furthermore, Plaintiff states that he has been eligible for early release since November 1997, after his initial parole board hearing, and that he has appeared before the parole board for early release on three subsequent occasions. *See* Plaintiff's 7.1 Statement at ¶ 4.

Finally, Defendant asserts that part of the criteria for the SOP is that an inmate admit his sexual offense and that the demonstration of acceptance of responsibility is integral to the successful completion of SOP; and, therefore, an inmate's unwillingness to admit his sexual crimes is construed as a refusal of the SOP. *See* Welch Aff. at ¶ 5. However, Defendant does not cite to any DOCS' policy or provide the Court with copies of the policies to which he refers. Furthermore, Plaintiff states that, until his favorable verdict in *Zaire v. Muller,* Defendant acknowledged that the SOP was a moot issue by placing "program not available" entries on his quarterly evaluations in February 2002 and May 2002. Although Defendant has submitted documents indicating that Plaintiff had refused SOP when others had offered it to him [10] and that Defendant was not a party to Plaintiff's federal litigation, this does not demonstrate, as a matter of law, that Defendant would have taken the same action against Plaintiff regardless of the outcome of Plaintiff's litigation. Moreover, although Defendant argues that any prison official would document an inmate's refusal to participate in a program, there is an issue of fact with respect to whether Defendant

offered Plaintiff the opportunity to participate in the program, Plaintiff refused the program and then refused to sign the refusal form, or whether Defendant demanded that Plaintiff sign a refusal to participate and, when Plaintiff would not comply, filled it out himself. Therefore, the Court finds that Defendant has not demonstrated, as a matter of law, that he would have taken the same action against Plaintiff despite the favorable verdict awarded to Plaintiff in his federal action.

Accordingly, as Plaintiff has created issues of fact regarding the second and third prongs of his First Amendment retaliation claim, the Court adopts Magistrate Judge Treece's recommendation and denies Defendant's motion for summary judgment.

### IV. CONCLUSION

**\*7** After carefully considering Magistrate Judge Treece's February 22, 2006 Report-Recommendation and Order, Defendant's objections thereto, the relevant parts of the record, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Treece's February 22, 2006 Report-Recommendation and Order is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's claims against him in his individual capacity; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED** with respect to Plaintiff's claims against him in his official capacity; and the Court further

**ORDERS** that the parties contact Magistrate Judge Treece's chambers within **ten (10) days of the date of this Order** to schedule a final pre-trial conference.

**IT IS SO ORDERED**

RANDOLPH F. TREECE, Magistrate Judge.

#### REPORT RECOMMENDATION and ORDER

*Pro se* Plaintiff David Zaire brings a civil action pursuant to 42 U.S.C. § 1983, alleging that John/Jane Doe ("Doe")

violated his First Amendment rights when Doe "knowingly and vindictively retaliated" against Plaintiff and violated his Fifth Amendment rights when Doe "willfully, knowingly, and vindictively maintained the plaintiff at a hardship traveling distance" from his family in two prison transfers; Plaintiff also alleges that Thomas Welch violated his First Amendment rights when Plaintiff's records were changed in regards to a therapeutic program in retaliation for a previous federal civil rights claim brought by Plaintiff. Dkt. No. 1, Compl. at ¶ 19. Defendant Welch brings this Motion for Summary Judgment. Dkt. No. 22. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **denied.**

## I. FACTS

Plaintiff previously filed a federal lawsuit, *David Zaire v. Muller,* 9:98-CV-1838, in the Northern District of New York. Def.'s 7.1 Statement at ¶ 14; *see also* 9:98-CV-1838, Dkt. Nos. 1, Compl. & 52, Am. Compl. After a jury trial, a verdict was returned in Plaintiff's favor on June 21, 2002. [1] Def.'s 7.1 Statement at ¶ 14, Maria Moran Affirm., Ex. 1, Mem. and Order, dated Nov. 18, 2002; *see also* 9:98-CV-1838, Dkt. Nos. 63, Jury Verdict & 64, Judgment. Upon the verdict, Plaintiff moved, in part, for declaratory and injunctive relief, which was granted. [2] Def.'s 7.1 Statement at ¶ 14, Moran Affirm., Ex. 1, Mem. and Order at pp. 1-2; *see also* 9:98-CV-1838, Dkt. No. 72, Mem. and Order, dated Nov. 18, 2002.

Prior and subsequent to Plaintiff's previous lawsuit, Plaintiff was incarcerated at Clinton Correctional Facility ("Clinton") from May 10, 2001 until October 4, 2002. Def.'s 7.1 Statement at ¶ 2. During that period of time, Thomas Welch was Plaintiff's Correction Counselor. *Id.* Plaintiff's incarceration was a result of convictions which included rape in the first degree and sodomy in the first degree. *Id.* at ¶ 3.

**\*8** Sexual offenders are to participate in Sexual Offender Program ("SOP"). *Id.* at ¶ 4. SOP is not offered at Clinton. *Id.* at ¶ 5. On July 8, 2002, Welch met with Plaintiff regarding a SOP consent form, which is a document for the agreement to participate in the sex offender counseling program; the form was signed by Welch but Plaintiff's signature was not on the document. *Id.* at ¶ 6; Dkt. No. 22, Thomas Welch Aff., Ex. A, Clinton SOP Form. In Plaintiff's Quarterly Review for the period of May 4, 2002 to August 26, 2002, Welch noted on the document that Plaintiff refused to accept SOP on July 8, 2002 and August 27, 2002; Plaintiff did not sign the Quarterly

Review. Def.'s 7.1 Statement at ¶ 7; Welch Aff, Ex. B, Inmate Review Worksheet, dated Aug. 27, 2002.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED.R.CIV.P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED.R.CIV.P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Furthermore, "[a] dispute regarding a material fact is genuine 'if evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Young v. Corbin,* 889 F.Supp. 582, 584 (N.D.N.Y.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

**\*9** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. John/Jane Doe

This Court previously stated to Plaintiff that "[i]n order to pursue his claim against 'John Doe' Defendants, Plaintiff must take reasonable and expeditious steps to ascertain their identities and then file a motion to amend seeking leave of the Court to bring such named individuals into this action." Dkt. No. 4, Order, dated May 29, 2003. The U.S. Marshals also noted they could not serve John/Jane Doe as they were not named. Dkt. No. 5. On January 16, 2004, the Honorable Frederick J. Scullin, Chief United States District Court Judge, issued an Order whereby it was noted that Plaintiff had provided an affidavit stating he had submitted a letter to Mr. Anthony Annucci, Deputy Commissioner and Counsel for the Department of Correctional Services, seeking the identities of the "John/Jane Doe" Defendant[s]. Dkt. No. 8, Order, dated Jan. 16, 2004; Dkt. No. 7, David Zaire Aff., dated Dec. 1, 2003, at ¶ 3. Plaintiff further stated that since he received no response to his inquiry, he sent a follow up letter, for which he also did not receive a response. Order, dated Jan. 16, 2004; Zaire Aff. ¶ 4. Judge Scullin ordered that "Plaintiff's request for assistance in ascertaining the identity or identities of the 'John/Jane Doe' Defendant(s) is **DENIED WITHOUT PREJUDICE TO RENEW** at a later time." Plaintiff made no further application to the Court.

However, Plaintiff, in his Response to the Motion for Summary Judgment, asks the Court not to dismiss the action as to the "John/Jane Doe" Defendants but Plaintiff also does not make a formal motion for court intervention. Dkt. No. 23, David Zaire Affirm. at p. 4. Plaintiff does submit three letters, dated August 28, 2002, July 14, 2003, and August 4, 2003, whereby he attempted to ascertain the identities of the "John/Jane Doe" Defendants. *Id.,* Ex. A. Nevertheless, the Court is unaware of any steps taken by Plaintiff subsequent to Judge

Scullin's January 16, 2004 Order to identify the "John/Jane Doe" Defendants. To that extent, Plaintiff may file a motion for court intervention to aid in his identification of the "John/Jane Doe" Defendants. If Plaintiff chooses to file the motion, Plaintiff is to provide the Court with information as to his attempts to ascertain the identities after the issuance of the January 16, 2004 Order.

### C. Eleventh Amendment

**\*10** Plaintiff brings suit against Defendant Welch in his official capacity and, although Plaintiff does not specifically state that he is suing Defendant in his individual capacity, it will be assumed as prisoners suing pursuant to § 1983 normally sue in both capacities. Compl. at ¶ 3. Plaintiff seeks punitive damages against Defendant Welch in his individual and official capacities. *Id.* at ¶ 21.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the " 'real, substantial party in interest.' " *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, Defendant Welch cannot be sued in his official capacity in a claim for money damages. However, Zaire may seek damages from him in his individual capacity.

### D. Exhaustion of Remedies

Plaintiff states that he exhausted his remedies in regards to his retaliatory and false entries claims against Welch. Pl.'s 7.1 Statement at ¶ 13. Defendants allege, however, that Plaintiff

did not file a grievance or appeal as to this claim for either the July or August 2002 incidents. Def.'s 7.1 Statement at ¶ 13.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (3d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, if the inmate appeals the IGRC decision, then the inmate may appeal to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701 .7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001); *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)).

**\*11** If a prisoner's grievance " 'presents the relevant factual circumstances giving rise to a potential claim ... sufficient under the circumstances to put the prison on notice of potential claims and to fulfill the basic purposes of the exhaustion requirement ... [then] there does not appear to be any reason to require a prisoner to present fully developed legal and factual claims at the administrative level. *Sulton v. Wright,* 265 F.Supp.2d 292, 298 (S.D.N.Y.2003) (quoting *Irvin v. Zamora,* 161 F.Supp.2d 1125, 1134-35 (S.D.Cal.2001) and further citing *Lewis v. Washington,* 197 F.R.D. 611, 614 (N.D.Ill.2000)); *see also Strong v. David,* 297 F.3d 646, 649-50 (7th Cir.2002) (citing *Booth v. Churner,* 532 U.S. 731 (2001) for the proposition that the PLRA requires prisoners to exhaust a *process* and not a *remedy).* Indeed, New York State's

regulations prescribing the content to be included in a prisoner grievance states that in addition to administrative information, such as a grievant's name and housing unit, the grievance "must contain a concise, specific description of the problem and the action requested...." N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1)(I).

Here, Plaintiff states he did grieve and appeal his claim of retaliation and false entries against Welch in complaint BRL-5893-02, which is entitled "Wants Transfer to Downstate HUB." Pl.'s 7.1 Statement at ¶ 13; Dkt. No. 22, Thomas Eagen Aff., Ex. A at p. 4. This complaint was appealed to the CORC. Eagen Aff. at ¶ 4. However, this Court cannot ascertain the contents of the complaint as neither Plaintiff nor Defendant provided documentation of that complaint and the title does not provide any insight as to whether the complaint was against Welch. Furthermore, the Court cannot deem Plaintiff's claim as unexhausted as the grievance complaint may very well have brought up the issues of retaliation and forgery.

Therefore, it is recommended that the Motion for Summary Judgment on the issue of exhaustion be **denied.**

### D. First Amendment Claim

Plaintiff alleges that Welch violated his First Amendment rights when Welch "knowingly, vindictively and maliciously" changed his Department of Correctional Services ("DOCS") records to express a refusal to participate in SOP "in direct retaliation for ... exercising his right to pursue a federal civil rights claim." Compl. at ¶ 19.

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Id.* at 139 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they

can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir .1998); *see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

**\*12** Here, since Defendant Welch "does not dispute that an inmate may file a civil right lawsuit," the first element is not at issue. Dkt. No. 22, Def. Mem. of Law at p. 6. However, Welch does repugn the existence of a causal connection between the protected activity, the filing of a lawsuit, and the actions taken by Welch. *Id.; see also Bennett,* 343 F.3d at 137. Welch also disputes that he subjected Plaintiff to any adverse actions. Def. Mem. of Law at p. 6.

Defendant Welch states that DOCS policy requires inmates who are convicted as sex offenders to sign a SOP participation consent form to stay eligible for early release and that the form must be signed before there the prisoner can be transferred to a facility with the program.[3] Def.'s 7.1 Statement at ¶¶ 4 & 5; Welch Aff. at ¶ 2. Plaintiff states he not aware of any such DOCS policy and he disputes that the form must be signed in order to receive a transfer. Pl.'s 7.1 Statement at ¶¶ 4 & 5. Plaintiff notes that on two occasions, November 9, 2000 and September 17, 2002, transfer requests were made without signing the SOP consent form. *Id.* at ¶ 5.

On July 8, 2002, Welch submits that he approached Plaintiff with an opportunity to sign the SOP consent form but that Plaintiff had refused. Def.'s 7.1 Statement at ¶ 6; Welch Aff. at ¶ 3. Plaintiff, on the other hand, contends that Welch insisted that he "sign a declaration of refusal of the SOP" and then proceeded to "fill[ ] out the refusal on his own when Plaintiff would not comply with his demand." Pl.'s 7.1 Statement at ¶ 6. Plaintiff states that when he questioned Welch as to the need to sign an SOP refusal, Welch's response was "because you pushed the issue. Now you have to put up or shut up." Dkt. No. 23, David Zaire Affirm. at p. 2. Plaintiff claims that the timing of this statement "was obviously connected to Plaintiff's just-completed litigation." Zaire Affirm. at p. 2. The verdict had been returned on June 21, 2002. Moran Affirm., Ex. 1, Mem. and Order at p. 1. On August 27, 2002, Plaintiff met with Welch in regards to Plaintiff's Quarterly Review. Pl.'s 7.1 Statement at ¶ 7; Def.'s 7.1 Statement at ¶ 7; Welch Aff. at ¶ 4. At that time, the SOP consent form was discussed; however, Welch contends that while he provided Plaintiff with another opportunity to sign the form, Plaintiff refused to sign it. Def.'s 7.1 Statement at ¶ 7; Welch Aff.

at ¶ 4. Notwithstanding, Plaintiff alleges that Welch was "attempting to obtain a signed refusal ... in order to nullify entries previously made in Plaintiff's records[.]" Pl.'s 7.1 Statement at ¶ 7.

Plaintiff claims that Welch's entries on July 8 and August 27, 2002, were false and in retaliation for Plaintiff's previously filed lawsuit, *David Zaire v. Muller.* Welch Aff. at ¶ 9; Zaire Affirm. at p. 2. Welch avers that he "was not aware of the outcome or substance of any legal actions [Plaintiff] was pursuing while he was at Clinton." Welch Aff. at ¶ 9. Plaintiff, on the other hand, purports that prior to trial on the *Muller* case, he participated in three telephone conversations with his attorney regarding the issues of the trial while at Clinton. Zaire Affirm. at p. 2. Furthermore, Welch "was present on each occasion and remained inside the small cubicle office where the conversations were held, sitting just three feet away[.]" *Id.*

**\*13** Plaintiff has met his initial burden of producing sufficient evidence to raise a question of material fact about whether retaliation was a substantial factor in the entries refusing to participate in SOP. The temporal proximity between the favorable verdict of his lawsuit and the alleged retaliation provides circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002). The verdict was rendered on June 21, 2002. The first attempt to obtain a signature on the SOP consent form occurred on July 8, 2002, only about two weeks after the verdict. Welch also attempted to obtain Plaintiff's signature on August 27, 2002 during the Quarterly Review. And despite the fact that the jury trial had ended, Plaintiff had an outstanding motion for attorney's fees, reimbursement costs, and declaratory and injunctive relief, which may have possibly influenced Welch. Moran Affirm., Ex. 1, Mem. and Order; Zaire Affirm. at p. 3.

As Plaintiff has met his burden, Defendant Welch may still be entitled to summary judgment if he can prove, by a preponderance of the evidence, that he would have taken the same action in the absence of Plaintiff's prior lawsuit. Welch provides an affidavit whereby he presents reasons for the need for an SOP consent form. Welch submits that it is standard DOCS policy to require convicted sexual offenders, "who are roughly two to three years away from their earliest release date, sign a Sexual Offender Program ... participation consent form to remain eligible for early release." Welch Aff. at ¶ 2. Welch further states that prisoners are requested to sign the consent form before a prisoner can be transferred to another facility to enroll in SOP. *Id.* Refusal to sign the consent form

is interpreted as a refusal to participate in the program. *Id.* at ¶ 3. Defendant Welch also states that one of the criteria to enter SOP is that the participant must accept his or her sexual offenses and that because Plaintiff maintains his innocence, "DOCS policy construes the plaintiff's unwillingness to admit his sexual crimes as a refusal of the program." *Id.* at ¶ 5. However, Welch points to no specific DOCS policies regarding SOP. Furthermore, Welch did not provide any copies of the DOCS policies to which he makes reference. Plaintiff states that up until his favorable verdict in *David Zaire v. Muller*, Welch "had been routinely acknowledging that the SOP was a moot issue" by placing Program Not Available ("PNA") entries on the quarterly evaluations for February 2002 and May 2002. Zaire Affirm. at p. 2; Welch Aff., Ex. B, Inmate Review Worksheet, dated Aug. 27, 2002. Defendant Welch has not met his burden of establishing as a matter of law that he would have taken the same action in the absence of Zaire's First Amendment activity.

Therefore, it is recommended that the Motion for Summary Judgment be **denied.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**\*14 RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 22) be **DENIED;** and it is further

**ORDERED,** that Plaintiff may, if he chooses, file a motion for court intervention to aid in his identification of the John/Jane Doe Defendants; such motion shall be filed no later than April 7, 2006. Should Plaintiff fail to file such motion, the Clerk is directed to forward this matter to the undersigned for the issuance of a report-recommendation wherein the Court will recommend dismissal of the claim against the John/Jane Doe Defendants which will be deemed abandoned; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1994848

---

### Footnotes

1    In his motion papers Plaintiff uses the term "changed;" however, in his complaint, he indicates that Defendant made false entries in his record. *See* Complaint at ¶¶ 16-18.

2    Plaintiff's complaint also names John/Jane Doe as Defendants. Two of Plaintiffs three causes of action pertain to John/Jane Doe. In his Report-Recommendation and Order, Magistrate Judge Treece ordered that "Plaintiff may, if he chooses, file a motion for court intervention to aid in his identification of John/Jane Doe Defendants...." *See* Report-Recommendation and Order at 13. Plaintiff did file a motion for court intervention and that motion is currently pending before Magistrate Judge Treece. *See* Dkt. No. 26.

3    Magistrate Judge Treece noted that, "[i]n Plaintiff's claim for declaratory and injunctive relief, he sought to participate in the Family Reunion Program ("FRP"); however, the Defendants' position in that case was that Plaintiff first needed to complete the Sexual Offender Program ("SOP") in order to qualify for FRP." *See* Report-Recommendation and Order at 2 n. 2.

4    Magistrate Judge Treece found that, under the Eleventh Amendment, Plaintiff could not sue Defendant Welch in his official capacity. *See* Report-Recommendation and Order at 6. Defendant Welch states that he does not object to this finding and asks the Court to dismiss the claims against him in his official capacity. Plaintiff filed no objections. Accordingly, the Court adopts Magistrate Judge Treece's finding that Plaintiff cannot sue Defendant Welch in his official capacity.

5    Plaintiff states that the DOCS' Commissioner noted that Plaintiff "has refused to address assessed needs of the therapeutic program." *See* Complaint at ¶ 18.

6    Plaintiff's 7.1 Statement and his Complaint list the main harm that Defendant's retaliatory action caused as the denial of his participation in the Close-to-Home Transfer program. However, his complaint includes all of the above-listed injuries.

7    Plaintiff notes in his affirmation that he does not allege that he was on an "active waiting list" for SOP as of July 8, 2002. *See* Plaintiff's Affirmation at 2 n. 1.

8    Plaintiff and Defendant provide conflicting views of DOCS' policy regarding SOP consent forms and transfer submissions and the circumstances surrounding the documentation of Plaintiff's refusal to participate in the SOP. Defendant indicates that DOCS' policy states that, in order for Plaintiff to remain eligible for early release, within two or three years of the earliest date for release, Plaintiff must sign an SOP consent. Furthermore, Defendant states that in order to submit a transfer request to a facility with a SOP, the SOP consent form must be signed. *See* Welch Aff. at ¶¶ 2-3. Plaintiff, however, states that he is not aware of any such policies and that he previously has been transferred to facilities offering SOP without signing the form. *See* Plaintiff's 7.1 Statement at ¶¶ 4-5.

9    Plaintiff states that his wife has medical conditions and transfers out of "Shawangunk's lower Hudson Valley would impose hardship traveling distance upon his wife and possibly exacerbate her medical conditions." *See* Complaint at ¶ 7.

10    As part of his submissions, Defendant included affidavits from *Zaire v. Muller.* It appears that Defendant submitted these forms to show Plaintiff's continued refusal of SOP and to show that Plaintiff, therefore, refused SOP on the occasions at issue in this case. However, the Court cannot determine, as a matter of law, based upon Plaintiff's alleged prior and subsequent refusals that he necessarily refused an opportunity for SOP when Defendant offered it to him because there is an issue of fact concerning whether Defendant offered SOP to Plaintiff or just demanded that he sign a refusal. Furthermore, according to Plaintiff, one of these affidavits contains a forged signature, and another one has a note from Plaintiff stating that he had never refused SOP. *See* Plaintiff's Affirmation at p. 3 n. 1; Moran Aff., at Exhibit "3" at Exhibits "B" & "C."

1    Plaintiff was awarded "$1.00 in damages as to three of the four defendants." Def.'s 7.1 Statement, Maria Moran Affirm., Ex. 1, Mem. and Order, dated Nov. 18, 2002, at p. 1; *see also* 9:98-CV-1838, Dkt. No. 72, Mem. and Order, dated Nov. 18, 2002.

2    In Plaintiff's claim for declaratory and injunctive relief, he sought to participate in the Family Reunion Program ("FRP"); however, the Defendants' position in that case was that Plaintiff first needed to complete the Sexual Offender Program ("SOP") in order to qualify for FRP. Def.'s 7.1 Statement, Moran Affirm., Ex. 1, Mem. and Order at pp. 1-2; *see also* 9:98-CV-1838, Mem. and Order, dated Nov. 18, 2002.

3    A copy of the policy was not provided to the Court.

---